UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

    *vs.*　　　　　　　　　　　　　　　　　　　　　Case No. 16-CR-21 (WED)

SAMY M. HAMZEH,

    *Defendant*.

## CONSOLIDATED REPLY BRIEF IN SUPPORT OF PRETRIAL MOTIONS

Samy Hamzeh, by counsel, previously filed four pretrial motions; the government has responded, and this brief addresses the salient points raised in its omnibus brief.

Before addressing the meat of the government's argument, it's important to clarify a few points concerning pretrial motions two, three, and four—namely, the multiplicity challenge, the disclosure of the *Brady* and *Giglio* material, and the demand for translations. Concerning early disclosure, the defense agrees that so long as the *Giglio* and *Brady* materials are turned over 90 days before trial, we can adequately prepare. But the government's representation that it will comply with our request is not grounds to deny to the motion as moot. Rather, it serves as a

*Federal Defender Services*
*of Wisconsin, Inc.*

basis to grant the motion as unopposed. Having a court order in place will ensure that the materials are timely produced.

As to the multiplicity argument, there is a factual issue that is relevant to the resolution of the motion. In filing the motion, the defense relied on an FBI report produced in discovery which states that:

> Item #2 is a Heckler & Koch 9mm MP5 SD fully automatic rifle with a factory manufactured sound suppressor. The suppressor is not a separate item for the weapon. As described by a FBI Firearms Instructor familiar with the weapon, the suppressor is manufactured as a part of that serial number weapon, not a separate item.

If that report is accurate, Hamzeh is entitled to relief for the reasons set forth in his supporting memorandum. But in its response the government offers the following brief footnote: "To the extent that the January 25, 2016, FBI report suggests that the silencer had no independent serial number and could not be physically removed from the machinegun, the report is not correct." R.32:12. Following the government's written response, the government further communicated to defense counsel that a revised report is being prepared that demonstrates that the silencer is a separate item.

Hamzeh filed his multiplicity motion based on the representations in the original FBI report. At this point, Hamzeh needs to receive the revised report before he can determine whether to proceed with this motion.[1]

The parties have not resolved their differences regarding Hamzeh's motion for translations. True, the defense has no reason to doubt that the government has given us all the disks it has, but there's a problem: they're all in Arabic and the defense can't understand them. The government pushes that point aside and argues that it has no duty to "create *Brady* material" nor does *Brady* "require the government to seek out material not within its possession" and "it will follow its open file policy." R.32:14. That line of reasoning both misses the mark and fails to accurately reflect the state of the law.

For one, ordering the government to produce the transcripts is not ordering the government to create *Brady* or Rule 16 material. Rather, the *Brady* and Rule 16 material lies within the conversations—they show the pressure exerted on Hamzeh by the confidential informants and how they persuaded and induced him to commit the offense. Those conversations are relevant to establishing Hamzeh's innocence, and they must be parsed to see how the confidential informants'

---

[1] Of course errors within FBI reports are *Brady* material. Hamzeh requests identification of all other errors in the FBI reports as well.

behavior matched up with the factors set out in the pattern jury instructions and *United States v. Mayfield,* 771 F.3d 417, 434–35 (7th Cir. 2014) (en banc). Clearly, if these conversations were in English, the defense would have the right to listen to them and the government's failure to turn them over would violate both *Brady* and Rule 16. *See* Fed. R. Crim. P. 16 (a)(1)(B) (defendant's recorded statement); *id* (a)(1)(E)(i) (material to preparing the defense); *see United States v. Hernandez-Meza,* 720 F.3d 760, 768 (9th Cir. 2013) ("Materiality is a low threshold; it is satisfied so long as the information would have helped . . . prepare a defense."(brackets and quotation omitted)).

Yet the government argues that because we have the recordings, that's the end of it even though we can't understand them. Not so. The discovery has to be accessible or the commands of Rule 16 and *Brady* are illusory. The defense has to be able to parse those conversations and to prepare for trial, by matching them up with the factors that support an entrapment defense. And the only way to do that is through transcripts. The defense is not asking for the government to "create" *Brady* or Rule 16 material; the defense is simply demanding that it be able to access the material. In sum, the flaw in the government's logic is the false distinction it has created between giving the defense access to *Brady* material and a demand no one has made—for the government to create *Brady* material.

The government's final argument against turning over the transcripts is an implicit one: these will be created in time for trial and consistent with its open-file policy they will be turned over to the defense. R.32:14. To the extent that this argument finds some traction with the Court, the defense asks that as with the *Gigilo* and *Brady* material, all transcripts be turned over to the defense 90 days before trial. The transcripts will be necessary for trial—no question. And 90 days provides sufficient time for the defense to sift through them all, prepare challenges to points we believe are inaccurate (and file the appropriate motions to test and remedy those discrepancies), and otherwise use them to defend Mr. Hamzeh. A 90-day order also should be sufficient to avoid trial delay that otherwise might arise if the government delays preparing transcripts, given how long it took to prepare summaries of the recordings.

Those points should clarify the issues in pretrial motions two through four. And that leaves the government's arguments in response to the first pretrial motion—that § 5861 is not a valid exercise of Congress's taxing power. In the first six pages of its brief, the government attacks the arguments that the defense adopted to preserve but didn't pursue with any force. *See* R.32:2–5. Over the next three pages there is little effort devoted to addressing the argument that under *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012), and *Dep't of Revenue*

*of Montana v. Kurth Ranch*, 511 U.S. 767, 767 (1994), this is not a valid exercise of Congress's taxing power. In fact, the government never discusses or even cites *Kurth Ranch.* Instead, its argument comes down to this: the defense has it all wrong, § 5811 is the real mover in this and not § 5861 — § 5811 is the tax and it's valid; thus, § 5861 is valid under the necessary and proper clause. R.32:6.

The logic has some superficial appeal, but the argument fails for three reasons. One, no court parses the statutes as finely as the government wants to. After all, on the same page where it's making this point about § 5811 being a valid tax, the government (consistent with the case law) identifies § 5861 as a use of the taxing power: "In any event, *Sonzinsky* and *Lim* remain binding precedent, and this Court should adhere to that precedent and uphold § 5861(d) as a valid exercise of Congress's taxing power." R.32:9. Two, all of the courts to address these challenges (albeit in different forms) have looked at § 5861 as falling under the taxing power and asked whether it was a valid use of the taxing power. *See United States v. Dalton*, 960 F.2d 121, 126 (10th Cir. 1992); *United States v. Carmel*, 548 F.3d 571, 577-79 (7th Cir. 2008). In fact, § 5811 is never mentioned in *Carmel,* let alone parsed out the way the government argues for. Rather, the two statutes are considered part of a whole operation. *See United States v. Lim,* 444 F.3d 910, 913 (7th Cir. 2006) ("However, when taken in context with the rest of the statute, section 5861(d) reasonably may

be construed as part of the web of regulation aiding enforcement of the transfer tax provision in section 5811.") (quotation omitted).

Three, looking at the Act as a whole is the way courts examine taxing challenges—practically, how is this operating? Is it an impermissible regulation or a valid tax? The government's take on the taxing power and the necessary-and-proper clause doesn't take for its authority *Bailey v. Drexel Furniture Co.*, 259 U. S. 20, 38 (1922) (*The Child Tax Case*), or *Nigro v. United States*, 276 U.S. 332, 353-54 (1928), or for that matter looking at *Sebelius.* Rather, those cases deal with multiple statutes working in concert. *See Nigro,* 276 U.S. at 353–54 (dealing with sections 1 and 2); *see also The Child Labor Tax Case*, 259 U.S. at 35 ("The heading of the title is 'Tax on Employment of Child Labor.' It begins with section 1200 and includes eight sections."). And that concert of activity either functionally operates as a tax or prohibited regulation. *Id.* at 43 (noting "the provisions of the so-called taxing act must be naturally and reasonably adapted to the collection of the tax and not solely to the achievement of some other purpose plainly within state power"). Indeed, the government's brief would have the three-factor test in *Sebelius* rise or fall on the issue of whether revenue could be raised under § 5811—end of the story. But that's not the issue. It's a factor but it's not dispositive. After all, in *The Child Labor Tax Case,* the title of the Act was "'[a]n act to provide revenue and for other purposes."

259 U.S. at 34. And in *Kurth Ranch,* "the Act's preamble evinces a clear motivation to raise revenue, it also indicates that the tax will provide for anticrime initiatives by 'burdening' violators of the law instead of 'law abiding taxpayers.'" *Kurth Ranch*, 511 U.S. at 781 n.18. The potential to raise revenue standing by itself has never been the mark of what's constitutional and what's not. What's more, the government has produced nothing to support the argument that § 5811 raises any revenue and provides any purpose other than a fulcrum for the regulation (the enforcement of the ban on machine guns) to operate. As such, it cannot stand under the analysis given in *Sebelius* and *Kurth Ranch* and therefore it must be struck down as unconstitutional.

Dated at Milwaukee, Wisconsin this 20th day of April, 2017.

Respectfully submitted,

/s/      Joseph A. Bugni
Joseph A. Bugni, WI Bar #1062514
Craig W. Albee, WI Bar #1015752
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee,  WI   53202
Tel.: (414) 221-9900
E-mail: craig_albee@fd.org
            joseph_bugnie@fd.or

*Counsel for Defendant,* Samy M. Hamzeh