UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

  *vs.*                                                     Case No. 16-CR-21 (DEJ)

SAMY M. HAMZEH,

    *Defendant*.

## POST-HEARING MEMORANDUM IN SUPPORT OF RELEASE

Samy Hamzeh, by counsel, files this memorandum providing the Court with the name of a suitable third-party custodian (his parents have agreed to do so), a few brief points that came to counsel after the argument was over, and citations to portions of Hamzeh's post-arrest statement that would help inform the Court's analysis on release.

At the hearing and on the briefing, the parties offered competing narratives on the context of Hamzeh's statements. The government focused on the tour of the Masonic Temple and Hamzeh's statements afterwards; the defense focused on Hamzeh backing out and adamantly telling his friends not to do it. The government also pointed out Hamzeh's talk of machine guns and silencers; the defense pointed

*Federal Defender Services*
*of Wisconsin, Inc.*

out Mike's insistence on a machine gun and Hamzeh's repeated desire for a handgun. And the Court has to weigh all of these competing factors. But here's the take-away: If there is an equally valid claim in response to each of the government's points, the government can't prevail under the clear-and-convincing standard that applies here. On top of that, doubts regarding the propriety of release must be resolved in the defendant's favor. *E.g.*, *United States v. Hammond*, 204 F. Supp. 2d 1157, 1161 (E.D. Wis. 2002).

That points bleeds into a second argument that should have been more clearly made by Hamzeh. The issue for release is Hamzeh's threat of danger now, today, 17 months after his vile statements.[1] Those words nearly a year and a half ago—before his intervening about-face on committing the attack, his arrest, his separation from the two informants who distorted his thinking, and before a lengthy jail term away from his family—say little about what risk he poses today. So while no one disputes the despicable nature of Hamzeh's words that day, they aren't indicative of the person who will be set for release. That person, as the video shows and Dr. Robbins confirms, is not violent, is empathetic, and is not a danger

---

[1] *See, United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) ("this finding cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct").

2

*Federal Defender Services
of Wisconsin, Inc.*

Case 2:16-cr-00021-PP   Filed 07/13/17   Page 2 of 6   Document 55

to society. Any concerns are reasonably addressed by his lack of access to weapons, GPS, and his parents acting as third-party custodians.

These points are reinforced in the video clips that the Court is set to watch. While Hamzeh believes the entire three-hour video interrogation favorably reflects on the sincerity of his refusal to go along with the plan, Hamzeh asks the Court to pay special attention to five parts, recognizing the Court's limited time. It's important to note that all of these statements are made without counsel, twelve hours after backing out of the "plan," and just a couple hours after Hamzeh encountered the shock-and-awe of the SWAT team arresting him; and unlike most armed-robbery suspects and even alleged murderers, in the interview room he's wearing a full harness and handcuffs the whole time. While Hamzeh seemingly communicates well in English, counsel's experience is that at times his understanding and use of language are imprecise and leave something to be desired.

- Disk 1-23, 10:02-11:00. In this clip, without attributing blame, Hamzeh tells the agents that Mike was the one who put the idea of guns in his mind and that he never handled guns before that. An agent then remarks that everybody makes mistakes, it's what we do about them that determines the kind of person we are—indeed.

- Disk 1-23, 31:30-37:30. In this clip, Hamzeh lays out (with great sincerity) how he came to see the Imam, what the Imam told him to do, and how he told his friends the plan was wrong. Although Hamzeh did not know he had been recorded, his statements track the recorded conversations, revealing his

credibility. He also discusses the plan he had with the informants to go target shooting with the machine guns.

- Disk 1-23, 41:30-43:00. In this clip, Hamzeh says the idea was the three of theirs as a group. He also talks about how concerns about the plan being wrong plagued his every waking thought, left him unable to sleep, and prompted him to consult the Imam. The Imam confirmed Hamzeh's instincts that the plan was wrong and led him to denounce it and refuse to follow through.

- Disk 1-23, 54:15-56:30. Hamzeh expands on how he was tormented by his continual thoughts that the plan was immoral and inconsistent with his religion. Hamzeh also explains how his concern about the Masons developed when "we" started watching YouTube videos. These videos depicted the Masons eating people's hearts and as the devil, and Hamzeh tells the agents that's what "we" thought. But then after his tour he saw the Masons were "normal people." As discussed in Hamzeh's initial memorandum, in the recorded conversations Hamzeh told Steve that it was Mike who had started talking about the Masons a couple weeks earlier, that he came up with the idea of attacking the Masonic Center, and that "the guy brainwashes you." *See* R. 47 at 30-32.

- Disk 2-24, 4:15-15:40. This clip includes the statements relied upon by the government in which Hamzeh indicates he believed he was controlling his companions because he knew more about religion. And he adds, "I stopped it." Hamzeh did stop it, but he wasn't in control even if he thought he might be. The informants applauded each outrageous statement Hamzeh made while deriding positive ones. Longing for approval, Hamzeh made inflammatory statements that were met with praise and gave him the impression he was controlling the dialogue. Yet he did stop the plan despite the encouragement of the informants to move forward, their attempts to isolate him, and their rejection of his decision that it was wrong.

    At the 6:35 mark of this clip, Hamzeh mentions that the first time he told the informants about wanting to see an Imam, they told him not to tell anyone. So he did it on the sly anyway. And he got the response he was looking for–it was wrong.

Later in the clip, Hamzeh explains that they didn't have any overseas conversations or connections, that Hamas is a terrorist organization that hurts Muslims, and that he associated the Masons with ISIS, which he is against "100%." Hamzeh explains that they began watching videos a month ago in which Masons were committing horrific acts. Hamzeh says he never watched such videos before then.

The clip concludes with Hamzeh once again expressing his reasons why he would never conduct such an attack. He then assures the agents, in response to their question, that if released by the judge, he would not retaliate or misbehave.

These clips should dispel whatever reservations remain in the Court's mind about Hamzeh and the danger he poses to the community. Indeed, they reinforce the point that Hamzeh's words on the 19th are despicable, but they can't be divorced from the role the others played in this and they are not an accurate reflection of Hamzeh's character or risk and how he'll behave while on bond. That picture is captured in refusing to participate in the plan, talking his friends out of it, and the sincerity of his words hours after his arrest.

Dated at Milwaukee, Wisconsin this 13th day of July, 2017.

>Respectfully submitted,
>
>*/s/       Craig W. Albee*
>Craig W. Albee, WI Bar #1015752
>Joseph A. Bugni, WI Bar #1062514
>FEDERAL DEFENDER SERVICES
>  OF WISCONSIN, INC.
>517 E. Wisconsin Ave - Rm 182
>Milwaukee,  WI   53202
>Tel.: (414) 221-9900
>E-mail: craig_albee@fd.org
>
>*Counsel for Defendant,* Samy M. Hamzeh