UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

```
UNITED STATES OF AMERICA,       )
                                )
                 Plaintiff,     )  Case No. CR 16-21
                                )  Milwaukee, Wisconsin
        vs.                     )
                                )  July 12, 2017
SAMY MOHAMMED HAMZEH,           )  10:02 a.m.
                                )
                 Defendant.     )
```

----------------------------------------------------------------

**TRANSCRIPT OF BOND HEARING**
BEFORE THE HONORABLE DAVID E. JONES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

```
For the Government:        Office of the US Attorney
                           By: GREGORY J. HAANSTAD
                               PAUL L. KANTER
                           517 E Wisconsin Ave - Rm 530
                           Milwaukee, WI 53202
                           Ph: 414-297-4581
                           Fax: 414-297-1738
                           gregory.haanstad@usdoj.gov
                           paul.kanter@usdoj.gov
For the Defendant
SAMY MOHAMMED HAMZEH:      Federal Defender Services of
(Present)                  Easterin Wisconsin, Inc.
                           By: CRAIG W. ALBEE
                               GABRIELA LEIJA
                               JOSEPH A. BUGNI
                           517 E Wisconsin Ave - Rm 182
                           Milwaukee, Wisconsin 53202
                           Ph: 414-221-9900
                           Fax: 414-221-9901
                           craig_albee@fd.org
                           gabriela_leija@fd.org
                           joseph_bugni@fd.org


U.S. Probation Office:     MARIA J. MAHMOUDI 414-297-1432

U.S. Official Transcriber: JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:         WWW.JOHNSCHINDHELM.COM
```

Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1          TRANSCRIPT OF PROCEEDINGS

2          Transcribed From Audio Recording

3                    *     *     *

4          THE CLERK:  Court calls Case No. 16-CR-21, United

5    States of America vs. Samy Mohammed Hamzeh, here for a bond

6    hearing.  May I have the appearances, please, first for the

7    government?

8          MR. HAANSTAD:  Good morning, Your Honor.  Gregory

9    Haanstad on behalf of the United States.  Also with me at

10   counsel table is Assistant United States Attorney Paul Kanter.

11         THE COURT:  Good morning to you both.

12         PROBATION OFFICER:  Good morning, Your Honor.  Maria

13   Mahmoudi on behalf of Pretrial Services.

14         THE COURT:  Ms. Mahmoudi, good to see you.

15         MR. ALBEE:  Good morning, Your Honor.  Mr. Hamzeh

16   appears in person with Craig Albee, Joe Bugni, and Gabby Leija.

17         THE COURT:  All right, Mr. Albee, Ms. Leija, Mr. Bugni

18   and Mr. Hamzeh, good morning to you all.

19         We are here for a bond hearing or a hearing for me to

20   reconsider filed by Mr. Hamzeh, reconsider my earlier

21   determination that there were no conditions that could

22   reasonably assure the safety of the public and appearance at

23   future proceedings in this case.

24         The standard, as the briefing has pointed out -- and

25   let me say at the outset that I compliment both parties for the

1    quality and thoroughness of your written submissions on this

2    matter.  It's been very helpful to get the written submissions.

3    And I know you've had very little time to do it.

4           I wanted to say at the outset also that I will not

5    make a decision from the bench on this matter.  I'm going to

6    take it under advisement.  I'm not going to sit on it for a long

7    time, but it would -- I would anticipate having -- issuing

8    something in writing within a week and then you'll have your

9    opportunities.

10          My sense is, and I'm not tipping my hand one way or

11   the other, but just as a logistics matter, should I decide to

12   release I take it the United States would likely seek a

13   reconsideration by the district judge; is that correct?

14          MR. HAANSTAD:  That's correct, Your Honor.

15          THE COURT:  All right.  So what I would do in entering

16   my decision, if it were -- and please, again, don't -- this is a

17   logistics question, I'm not tipping my hand one way or the

18   other -- but if I were to order release I would also stay entry

19   of that order so that you folks, the United States, would have

20   an opportunity to seek reconsideration by the district judge.

21   The likelihood that any decision I make would be then appealed I

22   guess is one way to put it, asked for to be reviewed by the

23   district judge is another reason why I want to put something in

24   writing so that the district judge would have the benefit of my

25   thinking and not just have to base it on a transcript which may

1    not be as precise as the parties deserve in this case.

2         So, having said all that, let me set out how I would

3    like to go forward this morning.  And if you folks want to do

4    something different that's fine.

5         Let me hear -- it is the motion of Mr. Hamzeh.  So

6    following the usual tradition, let me hear first from

7    Mr. Hamzeh.  But recognizing that I did receive and review your

8    reply brief that you filed last night and if you want to just

9    simply focus on what you think are the main points that you want

10   me to consider.  Then I'll hear from the United States.  I'll

11   also then hear from you, Ms. Mahmoudi.  And then I'll let you

12   folks, as the moving party, finish up.

13        It's a little bit of an oddity because the United

14   States, as defense points out, as Mr. Hamzeh points out, the

15   United States has the burden here to show by clear and

16   convincing evidence that there are no conditions that would

17   reasonably assure the safety of the public.  And that is by far

18   my primary concern.  The flight risk aspects don't compare to

19   the issues that I think are important that pertain to risk to

20   the community.  I'm not saying that there is no flight risk

21   here, but I do think I've got tools at my disposal to deal with

22   flight risk issues.  My concerns are focused primarily on the

23   safety to the community issues.

24        So the United States does have that burden, but since

25   you're the moving party I'll let you guys go first and finish

1      up.  Take your time, you don't need to rush it.  I do have a

2      hearing after this but if I need to I can have them wait and

3      we'll give you an opportunity to make your full record.

4             Let me also, just because folks who aren't necessarily

5      here all the time are here, I am in receipt of a Pretrial

6      Services report that does recommend release on conditions.  Just

7      so folks know, that -- when Pretrial Services does a report like

8      this, they are focusing on the background, primarily the

9      background of the individual and are not making an assessment or

10     a recommendation based on the charged offense or the conduct

11     charged in the offense.

12            Is that right, Ms. Mahmoudi?

13            PROBATION OFFICER:  Yes, Your Honor.

14            THE COURT:  All right.  So, while I do -- and I have a

15     great deal of respect for the recommendations and the assistance

16     provided by Pretrial Services, it should not be -- their

17     recommendation should not be misinterpreted as having made some

18     sort of assessment of the weight of the arguments made by the

19     parties in their briefing.

20            All right.  I've talked enough.  Let me hear first

21     from Mr. Hamzeh's counsel, then the United States, Ms. Mahmoudi,

22     and then from Mr. Hamzeh.

23            MR. ALBEE:  Judge, as the court knows, on I guess

24     Monday, Monday night, the government filed its response.  In

25     putting together our reply yesterday -- and that response

5

1  referred at times to the post-arrest statement that Mr. Hamzeh

2  made --

3          THE COURT:  Right.

4          MR. ALBEE:  -- and relied to some extent on that, that

5  caused us to review the post-arrest statement closely.  And

6  there are portions of that that we wanted to bring to the

7  court's attention.

8          Because of the short timeframe yesterday and the

9  tediousness of going back and looking at video, we didn't feel

10  that we wanted to file it -- you know, as early as possible and

11  we weren't able to identify specifically what minimal portions

12  we'd like the court to review.  And I recognize this isn't

13  ideal, but we have I think five or six snippets from that video

14  that we'd like the court to review.  They total about 15 to 17

15  minutes, I think.  Somewhere in that area.  Unfortunately there

16  are mentioned within those videos of the informants' names.  And

17  so while we certainly wouldn't have any problems playing the

18  videos in open court, there remains a protective order and I

19  understand the government would object to playing those videos

20  in open court.

21          So I guess it would be my suggestion at the outset,

22  and I understand this isn't ideal, that we play those in

23  chambers and have the court -- and again I think it's about 15

24  to 17 minutes.  It's about three hours total, the post-arrest

25  statement.  But obviously we don't need to have the court watch

1  the whole thing.

2  THE COURT:  Well, let me ask if you can go forward

3  without me having first seen it because, as I say, I'm not going

4  to make a judgment from the bench today.  I'll let you guys talk

5  for a second.

6  (Brief pause.)

7  MR. ALBEE:  That'll be fine.

8  THE COURT:  Yeah.  So, here's what I ask you to do is,

9  identify for me sort of the time hacks that you want me to focus

10  on.  And I think in fairness if the United States wants me to

11  focus on other time hacks -- because as I think you've done a

12  good job of pointing out, Mr. Albee, context matters in this

13  case -- but in fairness context matters as much to the United

14  States as it does to Mr. Hamzeh.

15  MR. ALBEE:  And we certainly don't object to that.

16  THE COURT:  Okay.

17  MR. HAANSTAD:  Your Honor, I'm wondering if it might

18  make sense to proceed this way.  Maybe we could enter the

19  entire --

20  THE COURT:  Right.

21  MR. HAANSTAD:  -- interview into evidence, each side

22  can refer to that interview, can direct your attention to

23  particular portions that it would like to emphasize and you can

24  then review it on your own.

25  THE COURT:  That makes sense.  And what I will allow

1  you guys to do is simply at the conclusion of the hearing, by

2  tomorrow sometime, just send me an e-mail with the time hacks,

3  make sure you cc the other side, send me an e-mail with the time

4  hacks that you would like me to focus on.  More likely than not

5  I'll probably watch the majority of the statement, but I would

6  appreciate the assistance of counsel in focusing on particular

7  time hacks that you think I should be focusing on.  All right?

8           All right, go ahead, then, Mr. Albee, please.

9           MR. ALBEE:  I recognize the court is fully aware of

10  this, but it does bear repeating that this is a gun case.

11  Technically it's probably a tax case under 5845.  It's a failure

12  to pay the taxes on a machine gun which aren't necessarily

13  unlawful to possess.  Under certain conditions people can.

14  Mr. Hamzeh was not a prohibited person.  That is, he's not a

15  felon.  He has no record at all in fact.  This isn't a

16  presumption case so, as the court already mentioned, it is the

17  government's burden to prove by clear and convincing evidence

18  that he presently poses a danger.

19           Pretrial Services has recognized that I guess by

20  virtue of character, personality, background Mr. Hamzeh is a

21  person who could be released into the community and doesn't pose

22  a flight risk.  There's a psyche eval that I think would support

23  what Pretrial Services is saying in terms of there's not

24  something about Mr. Hamzeh's mental health that would pose any

25  risk here.  He has a place to live, he has ties to Milwaukee, he

1   has family support.  He has a job waiting for him and, as we

2   have argued, minimal guidelines.  He also has a strong

3   employment history.  He's not someone who's been idle in his

4   life.

5       In terms of flight risk.  The court has said that's

6   not its main concern, but I, you know, as the court suggested,

7   GPS, the notoriety of this case, taking his passport, those

8   clearly address any flight risk here.

9       The supposed risk I think proffered by the government

10  here is that machine guns are dangerous.  That's what the charge

11  is: machine guns are dangerous.  Well, again, we're

12  forward-looking here.  And there's no risk of Mr. Hamzeh having

13  a machine gun.

14      As we've argued strongly in our entrapment defense

15  that we've proffered to the court, he didn't have the ability,

16  the money, the opportunity to ever get machine guns.  And I mean

17  we can flat-out say he has no desire to.  But in terms of again

18  forward-looking, there's no access to these things.  He doesn't

19  have one, he won't get one.  He's never owned a weapon.

20      After his arrest there was a thorough search of the

21  Hamzeh home.  There were no weapons in the home or anything else

22  that created a danger.  They searched his phone and computer and

23  those didn't turn up anything that would suggest any other

24  dangerousness; no memberships in extremist organizations, no

25  communications with extremist organizations.  So --

9

1          THE COURT:  Talk to me about that because I -- I do

2     take the thrust of your argument being that to the extent

3     Mr. Hamzeh was -- had identified before what you say is the sort

4     of decision not to go forward with the attack, but to the extent

5     he had identified the particular target it was because he viewed

6     the target as in some way being in cahoots with ISIS to bring

7     discredit to the prophet, is that basically your reading of it?

8          MR. ALBEE:  Again, I think the court understands this,

9     relying on the evidence that we've received rather than making

10    our representations for Mr. Hamzeh is, we have 3 1/2 months of

11    contacts and Mr. Hamzeh at that point it appears -- the

12    informants are reporting back saying there's no discussion of

13    any attacks, I mean it seemed completely at a dead end.

14         And then the recordings basically come to a halt.

15    There aren't reports to the FBI.  And then suddenly there's this

16    idea about the Masons.  And we know from the post-arrest

17    statement and some snippets from the recorded conversations that

18    a number of videos have been watched in which the Masons have

19    been associated in Mr. Hamzeh's mind with ISIS, with the devil,

20    doing things like eating people's hearts.  And I think the only

21    reasonable conclusion there is that this has been some

22    brainwashing that's gone on with the informants that have, you

23    know, put this idea -- because there's been no talk of the

24    Masons prior to that time.

25         But there is -- there is nothing in the computers in

1    the house or anything else that would show that any -- anything

2    there was because Mr. Hamzeh was part of some group or anything

3    else.  It was the two informants who were with him on a daily

4    basis in his head providing this echo chamber.

5         And as we've alluded to in our brief, you know, there

6    are plenty of psychological studies talking about how difficult

7    it is for somebody to break out of this kind of echo chamber

8    when two people who are surrounding you at all times are filling

9    your head with certain ideas.

10        Nonetheless, in assessing this risk the court has to

11   look at -- and we provided the transcripts to show that

12   Mr. Hamzeh saw the light.  And the court will see that more in

13   the post-arrest statement that we'll provide to the court or the

14   snippets that I will direct the court to.  So this wasn't an

15   after-the-fact claim by Mr. Hamzeh saying, you know, well, I was

16   going to get out of it, I wasn't interested.

17        I mean he is adamant.  It is heartfelt, it is angry.

18   He is saying this is against religion, you people cannot do

19   this.  He goes so far, he gets so wrapped up and upset that he

20   says "goddamn your religion" because he's -- he's angry that

21   these people won't listen to reason.

22        In the post-arrest statement --

23        THE COURT:  Just a second.  That's a pre-arrest

24   statement; is that correct?

25        MR. ALBEE:  Yeah.  There are contemporaneous

1   recordings that show that Mr. Hamzeh adamantly refused to go

2   through with this.  His friends -- and he began at the

3   beginning:  "I don't want to hear you telling me I'm scared."

4   And, of course, that's what they do.  They try to say you're

5   scared.  They try to intimate that the Imam that he talked to

6   isn't reliable because he only recently converted from -- they

7   do everything to undermine his best instincts.

8         And you'll hear in the post-arrest statement as well

9   that Mr. Hamzeh said:  "They told me not to talk to anybody;"

10   that it was "just between us and we shouldn't talk to anybody."

11         And he told them he wanted to talk to an Imam and they

12   didn't want that.  And he said, "I got up that day and I'm like

13   I can't tell them I have to go to the Imam.  I didn't want to do

14   it.  I went to the Imam."  And he got exactly what he expected

15   to get from that person, that don't do this.  And then he talked

16   to a second Imam who said don't do this.

17         And that's what -- that's what Mr. Hamzeh wanted to

18   hear.  And that comes through very clearly in the post-arrest

19   statement.  And it's what we want people to do, to follow our

20   spiritual leaders.  He went to the spiritual leaders looking for

21   moral guidance and he got it.

22         At the same time, this was so difficult for Mr. Hamzeh

23   to do and showed his character so strongly, because they were

24   trying to isolate him and he broke through that by going to see

25   his Imam and then following that advice and even in the face of

1    continued blow-back from these informants he continued to fight

2    and do what's right and say I am not doing this.

3            The government wants to focus on the words that were

4    prior to that.  Fear is not a consideration under the Bail

5    Reform Act.  It was over by the time this happened.  They go

6    back to earlier conversations.  And we talked about those in our

7    brief and I think addressed those appropriately about going to

8    Israel.  And, you know, it's clear because there's no evidence

9    of Mr. Hamzeh ever getting a plane ticket or anything else even

10   though he was telling his informant friends that he was all set

11   to fly to Jordan and that he had all sorts of money saved up.

12   He was -- he was just BS-ing them.

13           He is, as we suggest in our reply belief yesterday, a

14   Palestinian Walter Mitty who is talking about some grandiose

15   ideas about how he'd fight Israeli soldiers.  He wasn't going to

16   do that.  He was -- he made no plans.  He did nothing to take

17   any steps to that and there's not a shred of evidence to support

18   any such suggestion.

19           So for this four months there is just about daily

20   contact.  One of these informants -- I mean we don't have

21   anything about what the motivation for these informants working

22   for the government is, but it has to be either substantial or

23   the person just has to have a real -- what's the word I'm

24   looking for -- can't think of the word, but this person went to

25   work at the place where Mr. Hamzeh worked and worked there --

1           THE COURT:  Right.

2           MR. ALBEE:  -- for months.  I mean who does that

3     without incentive.  I mean it's one thing to go set up a single

4     drug deal like we frequently see in this court for somebody to

5     get out of something, but to go to work a job you don't --

6     aren't otherwise working to be close to somebody and to be in

7     their head on a daily basis --

8           THE COURT:  I understand those points.  I do have to

9     say that the motivations of -- and we'll call them Mike and

10    Steve, is that -- that's what we sort of agreed to call the

11    confidential informants?  That's of I guess less moment to me

12    because I don't -- those go to maybe entrapment and things of

13    that nature and that's not my -- that's well outside my

14    authority.

15          I'm focusing on -- here's the crux of my issue, is

16    that I have these very strong statements on January 19.  And

17    tell me if I get the dates right.  I think it's January 19 where

18    there's the tour of the Masonic Center and statements of the

19    kind that the United States, you know, identified in the

20    complaint in this matter that are frankly horrific.  And then

21    I've got about five days later, on January 24, a complete sort

22    of turnaround, "no, I don't want to do this."

23          So I mean you both tell me, well, look at his

24    statements.  And I've got statements from Mr. Hamzeh that would

25    support release and statements from Mr. Hamzeh that would

1  support not release.  So why should I credit -- what basis in

2  reason or law would I credit the statements that would auger in

3  favor of release?  And how would I respond to the statements

4  that say, boy, this is someone that you just can't reasonably

5  assure the safety of the public about?

6          MR. ALBEE:  The statements on January 19th aren't

7  followed up with actions.  The words on January 24th, he

8  disavows where he was earlier and takes the action to say we're

9  not doing this, of stopping it with his -- with his friends.

10         You know, here in the post-arrest statement as well.

11 The post-arrest statement, as well as the statements on January

12 24th, show how internalized Mr. Hamzeh's feelings are that this

13 is wrong and he's not going to do it.  His post-arrest statement

14 talks about how he thought about -- you know, he had been -- his

15 head had been filled with all these ideas of the Masons being

16 devils and eating hearts and doing these horrific things and

17 being ISIS and all the horrible things that go along with that.

18 And he says in his post-arrest statement about "I went there and

19 I saw they're humans like the rest of us.  They're not these

20 people."

21         I mean he -- it all -- it all was developing to where

22 he got on January 24th of doing the right thing.  It was the

23 information he was learning and the information he was acquiring

24 so that he would do the right thing and adamantly said -- you

25 know, set forth that he wasn't going to do this.

1     And again I think other parts of the context the court
2     can consider in that is that he doesn't -- he isn't part of a
3     group.  He wasn't -- he isn't, you know, hadn't joined some
4     extremist group or anything.  It was these two informants.  And
5     moving forward he's not going to be with these informants.
6     His awareness and time in jail, you know, has been --
7     you know, it sounds like -- I mean to tell you the truth he had
8     the smack in the face and stopped it because he had been smacked
9     in the face and went to the Imam.  But since then it's jail,
10    arrest, newspapers, family, shame, humiliation, all those kinds
11    of things.  And those all fit into the mix as to why you take
12    his words at face value from January 24th.
13         THE COURT:  And I take it the same sort of argument
14    would go to the statements from approximately November 6th and
15    November 12th of 2015, because in those time periods he again is
16    making statements about -- oh, no, those are -- those are
17    statements about killing soldiers.  And then, yeah, the November
18    statements are about killing -- going and -- to Israel or to
19    Palestine and killing Israeli soldiers, Jewish people.
20         MR. ALBEE:  Yeah.  And, Judge, no step is ever taken.
21    Again, the leap from pontificating in Milwaukee's coffee shops
22    to going over there.  And, you know, I mean I think we've
23    probably all heard, whether it be the Persian Gulf War or
24    something, that whenever the United States is in conflict with
25    somebody we hear people who, you know, are not criminals or

1    anything say awful things about whatever other ethnicity that

2    the United States is fighting and it hardly -- you know --

3              THE COURT:  Right.

4              MR. ALBEE:  -- it hardly means they're going to take a

5    trip to do such things.

6              As I say, I mean I think the court -- the court is

7    obligated to consider the weight of the evidence, although it's

8    the weakest factor.  We've expressed why we think that an

9    entrapment defense is strong, including the lies about the

10   Masons, this two on one, and the fact that there is no ability

11   to buy a machine gun by Mr. Hamzeh absent the government

12   intervention.

13             We have a good release plan for the court.  I haven't

14   heard the court express any concerns about that or the fact that

15   he could work and live with family.

16             But I think, you know, clear and convincing is a high

17   burden.  And it again is that he actually poses a danger right

18   now, not at some prior time.  The things you talked about for

19   flight risk, the family support and GPS, those also reduce any

20   potential current danger.  The fact that he has no ability to

21   get guns now; the fact that he saw the light.

22             So I think those are all important.  And at this point

23   the just thing to do is, the government doesn't meet its burden,

24   is to release him.  He needs to work with his lawyers, he

25   shouldn't be at risk of over-serving his time, and I don't think

17

1  the government meets its burden on clear and convincing and the

2  court hasn't expressed any concerns about the flight risk.

3          One moment, Your Honor.

4          (Brief pause.)

5          MR. ALBEE:  Okay.  Thank you.

6          THE COURT:  Yeah.  Just one question I was going to

7  ask about the release plan.  I don't recall if you folks

8  identified a potential person under 3142(c)(B)(i) that is a

9  custodian who would assume supervision and report any violations

10  of release conditions?  Have you folks put forward a (c)(B)(i)?

11          MR. ALBEE:  We had not.  I'm sure his parents --

12  either of his parents would do so.

13          THE COURT:  Well, that would be something -- again, I

14  am not tipping my hand one way or the other, but if I were to

15  do -- if I were to release in this instance I would need to have

16  identified a (c)(B)(i), or (i), however you want to refer to it,

17  a custodian in this case.

18          MR. ALBEE:  We'd be glad to do that.  And my

19  suggestion is when we submit the information to the court

20  regarding which parts of the video we'd like the court to watch

21  that we'll also identify a third-party custodian.  Unless the

22  court would prefer to do that through Pretrial Services.

23          THE COURT:  No.  You can certainly suggest it.  And

24  then Pretrial Services, if I do order release then they can take

25  whatever appropriate investigation steps they need to to confirm

18

1    that that would be an appropriate custodian.

2         All right.  And just before I let you go and have the

3    United States, my understanding is that there were two weapons

4    here, there are three weapons charges but one of those is a

5    silencer on one of the purchased weapons, correct?

6         MR. ALBEE:  It's a silencer that actually is I think

7    sold attached to the machine gun.  Yes.

8         THE COURT:  And we keep referring to, but were there

9    two HP -- what are the two weapons that were sold here?

10        MR. ALBEE:  They're two machine guns.  I don't know.

11        THE COURT:  Well, yeah, but -- are they, in fact --

12   because I know that there was -- Mr. Hamzeh had talked about

13   getting a pistol, but there's no question they were two

14   automatic weapons?

15        MR. ALBEE:  That's correct.

16        THE COURT:  Okay.

17        MR. ALBEE:  And there's no indication that at any time

18   he ever purchased any other gun.

19        THE COURT:  Got it.  All right.

20        All right.  So let me just before I turn to the United

21   States sum up my understanding.  This is not a case -- and I

22   invite the United States to correct me, but this is my sort of

23   preliminary understanding of the facts.  This is not a case

24   where we had a young person seeking to join a terrorist group, a

25   specific group like Hamas or ISIS.  This was a young man who was

1    interested in, at least based on certain statements made in the

2    January time period, interested in frankly killing a number of

3    persons because he thought that they were associated with ISIS

4    and that ISIS was, in fact, through its actions bringing

5    discredit to the Islamic community.  Is that your understanding

6    of the situation or do you folks have a different view?

7            MR. HAANSTAD:  I would say that Mr. Hamzeh was a

8    classic lone wolf.  There was some indication that dating back

9    to October of 2015, Mr. Hamzeh was engaged in conversations with

10   one of the confidential sources, Steve, and was expressing an

11   interest in not only going to the Middle East but joining Hamas

12   once he's there.

13           THE COURT:  Okay.

14           MR. HAANSTAD:  But then as we went into November,

15   December and certainly by January, again I'd classify him as a

16   lone wolf.

17           THE COURT:  Okay.  All right.  Well, let me hear a

18   response.  And I do also want to hear -- it is also part of my

19   concern that Mr. Hamzeh has been detained on my order for about

20   16 months now and he's an innocent person under the law.  That

21   causes me a great deal of concern.  So if you would -- I did see

22   that you folks have a different sort of sense of sort of

23   calculations as far as guideline range, but this matter it is my

24   understanding isn't going to go to trial until January; is that

25   correct?

1          MR. HAANSTAD:  I believe February.

2          THE COURT:  February.  All right.  So I mean I know

3    that no one here, most of all the United States Attorney's

4    Office, is not interested in running a Kafka judicial system

5    where people stay in pretrial detention longer than their

6    ultimate sentence.  So if you could address that aspect and

7    whether I should be or should not be concerned about that.  But

8    include addressing that.

9          Also if you would address as part of your presentation

10   the thoughts or the recommendations or the conclusions of

11   Dr. Robbins.  And then I'll hear, of course, anything else that

12   you think I need to think about in making my decision.

13         MR. HAANSTAD:  First of all, with respect to the

14   length of detention, this case was designated complex at the

15   request and agreement of both parties at the outset.  Both

16   parties recognized due to the volume of discovery in the case,

17   particularly the volume of recorded conversations that are going

18   to have to be translated and transcribed, that this was clearly

19   a case that qualified for complex designation.  I'd also note

20   that the parties' request for that February trial date was a

21   joint request.

22         THE COURT:  Right.

23         MR. HAANSTAD:  You're right, everyone has an interest

24   in ensuring the case moves along as quickly as possible,

25   particularly when a defendant is in custody.  But I view that as

1   a separate question, an important one but separate from the bond

2   question which focuses simply on danger to the community and, to

3   a lesser extent in this case as you've noted, flight risk.

4           THE COURT:  Fair enough.  Okay.  And I do ultimately

5   agree.  I mean it is something that I would need to address.

6   But if I were to conclude that there were no conditions that

7   reasonably assured the safety of the community, I could not let

8   a concern about length of incarceration and the big-picture

9   fairness of that trump safety to the community.  So I do agree

10  with that as an ultimate sort of how I have to make a decision.

11          MR. HAANSTAD:  Your Honor, I thought I would start

12  with Mr. Albee's characterization of this case as a gun case.

13  That's true, but it's also a factor that weighs in favor of

14  detention.  It's not a presumption case, but in 3142(g)(1) which

15  directs the court to look at the nature and the circumstances of

16  the offense, firearms offenses are among a very small number of

17  particularly dangerous offenses, they're identified as

18  weighing -- a factor weighing against pretrial release.

19          And in this case, of course, it's not just possession

20  of a firearm, but it's possession of a particularly dangerous

21  type of firearm; in fact, two different types of firearms.

22          As the court's probably aware maybe in the lay sense

23  it looks like we have two firearms here, two machine guns and a

24  silencer, but a silencer is actually defined under Section

25  5845(a) of Title 26 as a firearm, thus the separate charge for

1    that.

2              THE COURT:  Right.

3              MR. HAANSTAD:  So the nature of the firearms that are

4    possessed heightens the danger that is posed and again is a

5    factor that weighs heavily against pretrial release.

6              But the seriousness of the offenses here and the

7    danger that they suggest is especially heightened by the uses to

8    which Mr. Hamzeh intended to put those weapons.

9              Mr. Hamzeh, it's clear from the recorded conversations

10   that he had with the confidential sources, particularly the

11   recorded conversation that we've been talking about the most,

12   the one from January 19th of 2016, that Mr. Hamzeh devised and

13   planned this attack on the Masonic temple and he -- according to

14   that plan he and two confidential sources would go to the temple

15   and shoot and kill everybody that was there.

16             This was a deliberate and calculating plan that

17   Mr. Hamzeh attacked -- or, I'm sorry, plan of attack that

18   Mr. Hamzeh devised.  He assigned roles for both of the

19   confidential sources telling one of them that that source would

20   stay on the main level.  His first order of business was to

21   shoot and kill the receptionist -- in his words, to shoot her

22   two times -- two or three times in the stomach so there'll be no

23   blood, slouch her forward as if she's sleeping in her chair.

24             Mr. Hamzeh also identified for confidential source

25   number 2, the person we've referred to as "Mike," what his role

1    was going to be.  He and Hamzeh would go to the third floor

2    where there was a meeting room, would enter the room, spray it

3    with bullets, keep shooting until everyone in that room was

4    dead, and then would run down, join source number 1 and flee.

5            And Mr. Hamzeh made no secret about the fact that he

6    expected to inflict mass casualties here.  He said that if he

7    killed 30 people, which is what he expected, he would be

8    100 percent happy.

9            Mr. Hamzeh also went so far as to detail how it was

10   that they would flee.  Particularly important in that regard was

11   the use of silencers.  There was some suggestion I believe in

12   the reply brief that Mr. Hamzeh never asked for a silencer.

13   When he was planning that attack and when he was talking about

14   it on January 19th, in three or four different places he

15   specifically talked about using a silencer and the fact that

16   using a silencer would allow them to escape and evade detection

17   by the Milwaukee Police Department.

18           Mr. Hamzeh in that same January 19th conversation

19   referred to this attack as a "hit."  Once executed, it would be

20   known all over the world.  He also told sources that the hit

21   would, quote: inspire additional attacks in the United States.

22           According to Mr. Hamzeh, "This way we will be igniting

23   it, we will be marching at the front of the war."

24           And despite all of this and despite all of the similar

25   statements that Mr. Hamzeh made to the confidential sources that

24

1    are laid out in the government's response, Mr. Hamzeh now

2    continues to maintain that he's not a flight risk.  And he

3    maintains that basically for two reasons, the first of which is

4    that he stepped back from this plan ultimately.

5           The second reason is that, you know, he claims to have

6    been manipulated and led by these confidential sources.  And I

7    know that you've indicated that that's an entrapment argument.

8    And it basically is.  And I think that that, as I think we

9    mentioned in our brief, is quintessentially a jury question.

10   It's very fact dependent and maybe not strictly speaking for

11   your decision.

12          But as to the stepping back, when he talked to the

13   confidential sources Hamzeh indicated there were two reasons

14   that he was stepping back from this plan, the first of which,

15   what he called reason number one, the primary reason, was that

16   he was afraid that the information about the attack had been

17   leaked and that they would be caught.

18          Now, he also said that he sought the advice of

19   religious counsel, Imams, two of them, who told him that it was

20   wrong.  But that Hamzeh needed two Imams to tell him that mass

21   murder was wrong is, first of all, just not very believable.

22   And to the extent that Hamzeh actually did need these two Imams

23   to tell him that mass murder was wrong, that too shows that

24   he's -- he's dangerous and presents a danger to the community.

25          THE COURT:  You know, I wonder about -- and again I'll

1    put to you the same question I put to Mr. Albee.  I'm trying to

2    decide which of the statements I should be more concerned about.

3    Certainly if it had been the case that Mr. Hamzeh had on January

4    19th told his two confidants, hey, I just talked to my Imam and

5    he says not to go forward with this, then on January 24 he's

6    saying let's go to the Masonic temple and shoot people, you

7    would be arguing with a later-in-time statement really is the

8    better view into his mind.

9         Here we've got the opposite situation where he makes

10   an earlier statement about an intent, but then a later statement

11   that suggests that he's no longer wanting to go -- and reading

12   the transcript fairly, rather forcefully saying that he does not

13   want to go forward with this; that this will be haram; that this

14   will bring discredit on his religion.  I mean why -- what are

15   some -- why should I discredit that I guess?  Or why should that

16   not outweigh Mr. Hamzeh's earlier statements that are without

17   question horrific and would deserve detention?

18        MR. HAANSTAD:  Well, I would say -- I would say two

19   things.  Mr. Hamzeh, first of all, made clear that had he not

20   been told by the Imams that this was wrong he fully intended to

21   carry out this attack.  He made no secret of that when he talked

22   to agents in his post-arrest statement.

23        He also said in that statement that he didn't care

24   about laws, government, police, jails, none of those things were

25   going to stop him.  All he cared about was what these Imams told

26

1    him.

2          But I think, also significantly, there's no dispute

3    that after making those statements and supposedly backing away

4    from this plan Mr. Hamzeh days later -- a day later I think it

5    was -- goes forward and actually obtains these two machine guns

6    and silencer.

7          THE COURT:  Do you dispute the account that Mr. Hamzeh

8    claims that acquisition of at least his weapon was for purposes

9    of self-defense?  Or maybe not in the strict sense of

10   self-defense, but to the extent that there was going to be some

11   rising anti-Muslim animus, he wanted a weapon to protect

12   himself?  Do you dispute that characterization of his intent for

13   the purchase -- not that it would necessarily excuse it, but it

14   puts -- obtaining a weapon for a defensive purpose I think the

15   United States would agree is different from obtaining it with

16   the purpose of going out and killing 30 people ostensibly.

17         MR. HAANSTAD:  It is, but the nature of the firearms

18   here --

19         THE COURT:  Fair point.

20         MR. HAANSTAD:  -- these are offensive weapons, not

21   defensive weapons.  And, in fact, I know that the defense

22   mentions the Second Amendment, protecting individuals' rights to

23   possess firearms for purposes of self-defense.  Well, machine

24   guns are specifically excluded from that protection specifically

25   because they're not defensive, they're offensive weapons.

27

1        THE COURT:  Uh-huh.

2        MR. HAANSTAD:  And, you know, there's also something

3   to be said I think for the fact that Mr. Hamzeh doesn't appear

4   to have a good-faith belief that there's some sort of imminent

5   threat by a couple of people.  He's talking about arming himself

6   with this offensive weapon and basically looking for

7   provocation.

8        THE COURT:  Okay.  Address if you would Dr. Robbins'

9   opinion.  And in the interest of disclosure I do think it's

10  always better to get these things in the open.  I may have in my

11  prior life have retained Dr. Robbins as an expert when

12  representing inmates on conditions of confinement cases.  These

13  were cases that involved prolonged periods of solitary

14  confinement and Dr. Robbins provided opinion on the effects of

15  prolonged periods of solitary confinement on individuals and

16  things like that.

17        So I don't -- I will tell you, I just wanted you folks

18  to know that I may have retained Dr. Robbins in the past.  I

19  know certainly my office did.  But I will also tell you that it

20  was on a completely different subject matter and it would not

21  lead me to be swayed one way or the other about -- or give undue

22  weight to Dr. Robbins' opinion.

23        But at this point in the record I do have an opinion

24  from -- from a mental health professional and I don't have

25  anything from the United States on that yet.  What I'm curious

1    about knowing is does the United States feel like -- feels like

2    it needs an opportunity for a counter-opinion or are there

3    problems that you see in Dr. Robbins' opinion that should sort

4    of drain it of any sort of weight in this case?

5            MR. HAANSTAD:  If I could, maybe we'll discuss that

6    among --

7            THE COURT:  Please.

8            MR. HAANSTAD:  -- on the government's side a little

9    bit later whether we feel the need to do that.  But there are

10   some problems that I've identified just from Dr. Robbins' report

11   itself.

12           First of all, this report was prepared following an

13   interview of Mr. Hamzeh as I recall somewhere around 15 months

14   after he was arrested, after the post-arrest statement.  And I

15   think in large part for that reason more weight should be given

16   to the contemporaneous statements of Mr. Hamzeh that he made

17   during his post-arrest statement than what he told this

18   defense-retained expert more than a year later.

19           Also, most of -- and it's in part the nature of these

20   things I suppose, but most of Dr. Robbins' -- most of the memo

21   talks about things that Mr. Hamzeh himself self reported.  And

22   from those things Dr. Robbins concludes, for example, that

23   Mr. Hamzeh appears to have a strong sense of empathy; that he's

24   sympathetic to other people; has a strong conscience.

25           Those things are difficult to reconcile with some of

1  the things that Mr. Hamzeh said and intended to do in January of

2  2016.  And as a person with a strong conscience, a strong sense

3  of empathy wouldn't talk about going in, shooting a receptionist

4  in the stomach, wouldn't talk about going in and hoping to kill

5  everybody in the Masonic temple, hopefully 30 people.

6       And it seems -- there's also part of the report that

7  discusses the fact -- again, self reported by Mr. Hamzeh -- that

8  he's not a leader, he's a follower; always trying to satisfy his

9  peers.  But when you listen to some of the recorded

10 conversations that Mr. Hamzeh had with these confidential

11 sources including the January 19th conversation, it's clear that

12 he was leading that effort, he wasn't being manipulated, he

13 wasn't being led around by either of these confidential sources.

14 So that too is inconsistent I think with Dr. Robbins' report.

15      And I discussed a little bit at the end of the

16 government's response this notion that Dr. Robbins had that

17 really this was all -- this was all talk and that when

18 Mr. Hamzeh and others talked about killing people in the Middle

19 East, really that's the equivalent of a young Green Bay Packers

20 fan talking about killing the Vikings.  And there are all sorts

21 of reasons why this is obviously much more serious than that.

22      THE COURT:  Right.

23      MR. HAANSTAD:  If you had a statement from a

24 12-year-old Packers fan that he not only wanted to kill the

25 Vikings but he recruited accomplices to go and kill Vikings, he

1   went to Minnesota, toured the team's facility, got a sense of

2   its schedule, got a sense of the layout of the facility,

3   identified particular people that had to be killed first,

4   explained how they were going to be killed, and then, again, not

5   insignificantly, followed all that up by going and purchasing

6   the very weapons that he said he was going to use in that sort

7   of attack --

8           THE COURT:  Right.

9           MR. HAANSTAD:  -- it would be a different story.

10          If I can just have a minute, Your Honor.

11          THE COURT:  Of course.  Of course.  Take your time,

12  guys.  Please.  Thank you very much, Mr. Byal.

13          (Brief pause.)

14          THE COURT:  While you're thinking of what you want to

15  say, I'd also like you folks to consider -- because I am -- I

16  think you make some very good points about what Dr. -- about

17  Dr. Robbins' conclusions.

18          But they also point out I have to take Mr. Hamzeh for

19  his propensity to cause haram to the community as he sits today,

20  not as he sat in January.  And maybe he's still the same person

21  with the same sort of capacity for harm to the community that he

22  was then, but maybe he's not.  And so I would like your

23  thoughts, and you can perhaps provide them to me when you

24  provide the time hacks, on whether it makes sense to send

25  Mr. Hamzeh to Butner to have an evaluation of him done there so

1   we can get the benefit at least of one -- I'm not saying that

2   would be dispositive, ultimately it's my decision -- but, again,

3   someone who is not necessarily associated with the defense and

4   get their view as to Mr. Hamzeh's capacity for creating harm and

5   danger to the community.

6            I don't ask you to react.  I don't think it's fair to

7   ask you to react immediately to that.  I want you folks to have

8   a considered thought/opinion on that.  But that was one of the

9   things that I was considering was trying to get another

10  viewpoint at least on where he sits today as opposed to where he

11  was some number -- almost a year ago.

12           MR. HAANSTAD:  I appreciate that, Your Honor.  My

13  only -- I think that may well be a good idea, we'll consider

14  that and submit something.

15           THE COURT:  You don't have to tell me it's a good idea

16  or a bad idea, that's fine.

17           MR. HAANSTAD:  But it does seem -- maybe this is

18  obvious, but you talk about these two different time periods,

19  say January of 2016 and February or so of the following year

20  when the report was completed.

21           I understand that the relevant inquiry is the danger

22  that Mr. Hamzeh poses today rather than in January, but it's

23  certainly the danger that he posed in January, the things that

24  he did, the things that he said.  The things that he planned and

25  the actions that he took back then are still relevant to the

1  danger that he presents today.

2  THE COURT:  Absolutely.  No, you know, all the time I

3  have to make decisions based on basically a person's resume,

4  what they have said and done in their past.  That can include

5  criminal history, but it just as aptly applies to statements of

6  intent that an individual made.  So I -- I absolutely agree.

7  And that's why I want to stress that if I were to take

8  the step of having a referral -- a further psychological

9  referral, that would not be outcome determinative.  It would be

10  simply a data point for me to consider, but ultimately it would

11  be my responsibility to make the decision on release.

12  So even if they were to say, oh, no, he's completely

13  changed, I may not credit that because I have to take account

14  the very serious nature of the statements and the actions -- it

15  wasn't just statements but actions that constituted not just the

16  tour but, as you have pointed out, Mr. Haanstad, the ultimate

17  acquisition of two very dangerous firearms.

18  MR. HAANSTAD:  Coupled with an implausible

19  explanation, at least from the government's perspective.

20  THE COURT:  Fair enough.  As to why he obtained those

21  weapons.  All right.  Was there anything further that you wanted

22  me to think about?

23  MR. HAANSTAD:  You know, the only other thing that I

24  would note -- and this relates a little bit to the entrapment

25  issue but also to the nature of the offense.

1          THE COURT:  Sure.

2          MR. HAANSTAD:  I know that the government's clips that

3    it's going to submit focus principally on this issue of

4    leadership by Mr. Hamzeh compared to the two confidential

5    sources.  The fact that he did play this leadership role, that

6    it was him devising the plan, directing both of these sources,

7    that's evident not just from that January 19th transcript and

8    from earlier transcripts -- earlier recorded calls, but it's

9    also clear from the statement that Mr. Hamzeh provides after

10   being arrested.

11         You'll see -- and I think there's some discussion of

12   this in the parties' respective submissions.  But the defense,

13   for example, says that in that post-arrest statement Mr. Hamzeh

14   indicated that this was all Mike's idea.  Well, that's true.

15   But that's also about 15 minutes into this lengthy interview.

16   And what happens and what you'll see is that for the first 30

17   minutes or so Mr. Hamzeh is denying that he was up to anything.

18         THE COURT:  Uh-huh.

19         MR. HAANSTAD:  He acknowledged -- as he had to because

20   he was arrested in possession of these firearms -- acknowledged

21   that he had gone and gotten the firearms.  But what he wasn't

22   truthful about was whose idea it was.  He said it was Mike's.

23         He also wasn't truthful about whether he had discussed

24   a planned attack at the Masonic temple.  He denied that for

25   about the first 31 minutes.  And as you'll see at that point

1    Mr. Hamzeh literally hangs his head and says, "Okay, I'm going

2    to be honest, honest now," and then discusses the fact that --

3    first of all, he says, as Mr. Albee noted in his submission:

4    "We were all in this together.  Nobody led anybody, we were all

5    three responsible."

6           That too is just one step along the way of him coming

7    to -- and it's not uncommon for this to happen in a post-arrest

8    statement --

9           THE COURT:  Right.

10          MR. HAANSTAD:  A interviewee begins by denying

11   everything and slowly comes around as he's confronted with, for

12   example, evidence against him.  So one stop along the way for

13   Mr. Hamzeh was, "All three of us were planning this, no one was

14   leading anybody."

15          But then a little bit further on in the interview he

16   again says, "Okay, now I'm going to be honest, it was me, I

17   planned this.  I told them about it.  I presented the idea to

18   them."

19          So there are multiple instances like that.  And we can

20   highlight those --

21          THE COURT:  Sure.

22          MR. HAANSTAD:  -- in connection with your view of

23   this --

24          THE COURT:  And you did -- I think you folks did in

25   your brief identify exactly that statement, that "this was my

1  idea" --

2          MR. HAANSTAD:  Right.

3          THE COURT:  -- on using this.  But I would appreciate

4  you providing the time hacks because it will make sure that I

5  get a chance to see it.  And it also just provides a little more

6  precision that I can cite for the record for the -- ultimately

7  the district judge will probably be making the decision on this,

8  but I'll take the first crack.

9          MR. HAANSTAD:  Right.

10          THE COURT:  All right.  Anything further?

11          MR. HAANSTAD:  No, Your Honor.  Thank you.

12          THE COURT:  Very well.  Ms. Mahmoudi, was there

13  anything further that you wanted me to hear about?

14          PROBATION OFFICER:  No, Your Honor.

15          THE COURT:  All right.  Tell me this.  Give me your

16  thoughts just as to whether it can be done.  And again I'm not

17  saying I'm going to do this, but in your view would I have the

18  capacity to order -- I know that if I had concerns about

19  Mr. Hamzeh's competence to stand trial I could send him to

20  Butner or a Bureau of Prisons facility where we have appropriate

21  psychological services and have Mr. Hamzeh evaluated for

22  competence.  Are you aware of a similar authority to have him

23  evaluated -- Mr. Hamzeh evaluated for a dangerousness or

24  anything of that nature?

25          PROBATION OFFICER:  I am not aware.

36

1          THE COURT:  Okay.  All right.  Maybe I'll make it up.

2     Okay.  It would not be the first time.

3          Let me hear from you, Mr. Albee.

4          MR. ALBEE:  One moment.

5          THE COURT:  Sure, take your time.

6          (Brief pause.)

7          THE COURT:  Thank you.  Okay.  Got it.

8          (Brief pause.)

9          MR. ALBEE:  Judge, first I wanted to follow up on a

10    question the court asked at the end of my remarks about the two

11    guns.  Just to be clear, one of those guns was targeted for

12    Steve.

13          THE COURT:  Right.

14          MR. ALBEE:  He was the purchaser.  Mr. Hamzeh could

15    only come up with $270 ultimately for a gun.  And it was on the

16    morning I believe of the arrest on the way there where he was

17    saying -- questioning why a silencer was needed and asking that

18    if they had a smaller -- a smaller gun.  Throughout it had

19    been -- and we provided that in the December 7th and 14th

20    conversations.

21          He wanted a handgun.  And it's Mike who repeatedly

22    comes back to it and pushes -- and pushes the machine gun.

23    There just isn't anything here about him -- about Mr. Hamzeh

24    devising some plan to get machine guns; it's the government who

25    dictates it.  And in that post-arrest statement they ask him:

1     "Well, why would you get an automatic?"

2     He says: "Well, the automatic was cheaper."

3     I mean, that's what's going on here is that they're --

4 you know, that's what he's being told.

5     In terms -- I guess also we're considering when

6 there's this characterization of him as a lone wolf, what's he

7 doing by himself, he's not joining -- he's not communicating

8 with some group, he's not -- he doesn't have weapons at home, he

9 doesn't have ammunition at home, he's not stockpiling anything.

10     You know, he's not a felon, he can walk in anyplace

11 and buy a handgun. And he has a legitimate need for one. He's

12 a delivery driver to some rough neighborhoods and he has people

13 getting car-jacked who he works with. He's got a legitimate

14 reason for wanting to have a gun and yet he still doesn't even

15 do that.

16     When it's trying to be characterized as he devised and

17 planned this. Well, even you look at that last -- the night

18 before his arrest and they're pushing back, "you're scared."

19 "Oh, why would you believe that Imam?" I mean that's the kind

20 of stuff that's been going on all the time. I mean he's not

21 devising and planning, he's being manipulated and pushed.

22 Whenever he has a proper instinct they're like, well, I don't

23 understand your proper instinct. You know, they try to push him

24 back into the other direction.

25     The questions about worries about being caught. And I

1  guess Mr. Haanstad said, well, if he doesn't know enough to know

2  that it's wrong, well, he had been brainwashed into believing

3  that this is ISIS.  And we all think ISIS is a pretty horrible

4  thing and might want to take action if we thought somebody was

5  really -- really ISIS.  But at the same time he met these people

6  and he sees that they're human.

7        And he also in talking about that post-arrest

8  statement, he fully believed that he was going to get the Imams

9  to say what he wanted.  And he says if they had said I could do

10  it I would have gone to another Imam.  He's looking for the

11  answer so he can go back to them with something that isn't just

12  his opinion, but something stronger.  And, of course, any --

13  they act like it was 50/50 what the Imam was gonna say.  Every

14  Imam, like every priest and every rabbi, was gonna say you're

15  out of your mind, that's wrong.  And Mr. Hamzeh knew that.  And

16  that's what was gonna -- that was what was gonna happen.  And

17  that's what he did.  It's exactly what we want from people when

18  they're struggling is to go to their spiritual leader and follow

19  up.

20        THE COURT:  Mr. Albee, let me ask you though because,

21  again, timing is important from my perspective anyway.  I take

22  your point that Mr. Hamzeh goes to the Masonic Center and sees

23  that these are real people and has this epiphany of some kind.

24  But is it -- tell me what's your understanding of how the record

25  sits.  Is it the fact that the tour occurs and then the

39

1   statements are made about needing to shoot the receptionist in

2   the stomach so that it would show that she slumps forward?  I

3   mean is it the visit and then the --

4          MR. ALBEE:  I don't know.  Those are all wrapped up

5   together.  I'm not gonna say that there weren't some

6   statements -- statements after that.  But it's Mr. Hamzeh

7   pondering this.  He talks in the post-arrest statement about

8   sleepless nights and like this is wrong.

9          And again, the -- the degree to which it's a

10  heartfelt -- and the anger that he has that they won't -- that

11  they won't listen to him on this.

12         He also says in that post-arrest statement is, "I

13  thought we were joking at first."  And, you know, the -- you

14  know, there's just a lot of this loose talk.  And if they try to

15  characterize him as a leader, well, who is he leading?  Two guys

16  who are not gonna -- are not gonna act normal or, you know,

17  they're trying to push this.

18         And there's an effort to equate leadership with being

19  a loud mouth.  And we all know that they're not one in the same.

20  The loudest person isn't the leader.  These people know it's

21  being recorded and want Mr. Hamzeh to talk.  They want to take

22  advantage of the fact that, you know, he's -- you know,

23  unfortunately I think some of the Journal articles referenced it

24  that Mr. Hamzeh is a bit of an attention seeker.  He's -- you

25  know, that's the kind of guy he is.  And, you know, for better

1  or for worse, I mean, he's a talker.

2          And I think then the other point is when he's -- the

3  quotations from the government about like -- I can't remember

4  how they go, you know, suggesting that he was in charge of it

5  and they followed him?  Well, that's because they want to

6  follow -- you know, again, they're not real people, they're

7  fakes.  But he -- Mr. Hamzeh really wants to take responsibility

8  for "I stopped it."  "I was in charge, I stopped it."

9          He's not throwing his friends under the bus, he's like

10  "I stopped it, it was over."  And that's -- that is the one

11  point where Mr. Hamzeh truly was a leader against two people who

12  are working against him, trying to undermine all of his better

13  instincts, and not stepping -- you know, nobody stepped in four

14  months earlier and, you know, tried to guide him, have somebody

15  at the mosque intervene or anything else.

16          And, but Mr. Hamzeh's better instincts prevailed, he

17  said, "I won't do this" and got angry about it and did the right

18  thing.

19          Obviously getting the guns, bad idea.  We think he was

20  entrapped on all that after months of pushing him to get a

21  machine gun instead of the handgun that he talked about.

22          He also in terms of why he's getting the gun, he had

23  been -- Mr. -- Mike had been taking them to go target shooting.

24  That was something he introduced that Mr. Hamzeh didn't do

25  before and he said let's go up north and shoot -- and, you know,

41

1    have fun with these -- have fun with these guns.  And while

2    Mr. Haanstad characterizes them as offensive weapons, certainly

3    they can be used for target shooting.  I think many firearms

4    enthusiasts would love to be able to go shoot a machine gun out

5    in the woods if they had the opportunity.  And I think there's

6    an opinion by Justice Thomas in a dissent where he talked about

7    5 million people owning semiautomatics.  And certainly that's a

8    long-standing debate within this country as to whether those are

9    offensive or defensive or whether they should be allowed or not

10   allowed.  I mean it's not as clearcut as the government would

11   have it.

12          One moment, Your Honor.

13          (Brief pause.)

14          MR. ALBEE:  That's all I have, Judge, other than I

15   would note Mr. Bugni had more direct communication with

16   Mr. Robbins in this case and if the court had any other

17   questions about Dr. Robbins Mr. Bugni could address those.

18          THE COURT:  Thank you very much, Mr. Albee.

19          And Mr. Bugni, I appreciate you making yourself

20   available.  I won't -- I won't have a lot of questions.  But

21   approximately, to your knowledge, how long did Dr. Robbins have

22   an opportunity to spoke with Mr. Hamzeh?

23          MR. BUGNI:  I believe he had about five hours.

24          THE COURT:  Okay.  One visit though?

25          MR. BUGNI:  It was one visit.  He also reviewed the

1  transcripts.  We gave him access to I would say most if not all

2  of the discovery.

3          And if I can just address --

4          THE COURT:  Please.

5          MR. BUGNI:  -- one of the court's prior questions.

6          THE COURT:  Of course.

7          MR. BUGNI:  What you're looking here for is a lack of

8  empathy.  That's what's characteristic with a lone wolf.  That's

9  what's characteristic with the psychoses.

10          And Mr. Hamzeh is adamant that we say, you know, he

11  displays empathy.  He displays empathy both before his arrest

12  when he says, "Look, we can't do it."  He says it in his

13  post-arrest statement.  "I saw them as people.  We can't do

14  this.  This is wrong.  We're gonna go to hell.  This is

15  completely wrong."  He says it to Dr. Robbins.

16          Your Honor, I know you're blocked, maybe we should

17  have put Mr. Hamzeh in the middle but --

18          THE COURT:  No.  I can see.

19          MR. BUGNI:  This is not a man who's just, you know,

20  coldhearted.  And when you think about what does this man stand

21  to you before -- or stand before you today, this man has got

22  true empathy.  This is a man who if he's released I don't think

23  he's ever uttering those words again.  But he's definitely not

24  doing anything upon those words.

25          And when you think about those combination of

1   conditions and what Mr. Robbins is trying to get across -- or

2   Dr. Robbins is trying to get across, it's that here is a person

3   who's learned from his mistakes.  Here's a person who spoke vile

4   talk, but that vile talk can't be taken out of context.

5          And, Your Honor, I know we dropped a lot of footnotes

6   in our very large brief.

7          THE COURT:  Uh-huh.

8          MR. BUGNI:  This was one in particular.  And, you

9   know, there's lots of decisions in a 60-page brief about what

10  you're going to really stress.  But footnote 132.  And it's a

11  phenomenon actually in different cultures that's foreign to us

12  usually in Wisconsin.  We don't really have much hatred.  We

13  don't really think in those terms.

14         But we cited to the treatment or the discussion down

15  in Miami of the Cuban exiles and how here were the businessmen,

16  judges, lawyers, and they would gather at this Versai Cafe and

17  they would talk in-depth about how they would kill the

18  communists, how they would take down Castro.  None of them would

19  ever act on that.  They're politicians, they're lawyers, they're

20  good people, people we would all hang out with.  But it's of a

21  different culture.

22         And that's what Robbins -- Robbins is not meant to be

23  dismissed.  This is a doctor who took a lot of time and has a

24  good feel for this and a lot of experience.  It's to say here is

25  part of his culture.  Somebody from Palestine has endured what

1    Israel has subjected them to for a very long time and he has

2    hardened views of that. And that even comes across in the

3    post-arrest statement.

4           But to take his statements of those that we might

5    speak and try to attribute that same kind of background is

6    mistaken. And that's what Dr. Robbins' last point is about. We

7    don't really have anything that we can compare that to. The

8    best we can have is our hatred for an opposing football team.

9    But that falls far short. And that's why we went with that

10   footnote there.

11          In other cultures there is a discussion about violence

12   in a way that is divorced from reality but is just so ingrained

13   in the way they speak. And here's a man who spent pretty much

14   his entire life in Palestine. And that's what those comments

15   are directed towards, not towards America. And throughout our

16   brief we tried to show this is a guy who has had no attack

17   against America, no violence here. It was only when the Masons

18   were equated with ISIS and being the enemies of Islam that he

19   did.

20          THE COURT: Understood. All right.

21          MR. HAANSTAD: Your Honor, if I could have just --

22          THE COURT: Please.

23          MR. HAANSTAD: -- a couple of minutes?

24          THE COURT: Of course you can.

25          MR. HAANSTAD: First you had asked about the timing of

45

1    the quotes compared to the tour of the Masonic temple.

2              THE COURT:  Yeah.

3              MR. HAANSTAD:  Every quote that the government

4    included in its brief from January 19th was after the tour of

5    the temple.

6              THE COURT:  Right.

7              MR. HAANSTAD:  There's been some discussion about

8    Mr. Hamzeh's requests for handguns versus machine guns.  That's

9    not an either-or.  He was requesting both for different reasons

10   at different times.  And it's because he wanted a handgun for

11   protection.  I think a fellow delivery driver had been held up.

12             THE COURT:  That's right.

13             MR. HAANSTAD:  And that caused him some concern,

14   understandably, so he was looking for a handgun for that reason.

15   But at the same time he was also seeking out machine guns.  And

16   it's for that reason that when the defense talks about

17   Mr. Hamzeh's proper instinct being -- you know, going toward,

18   for example, handguns rather than machine guns, when that

19   happens these confidential sources were pushing him back towards

20   machine guns, that's not really what they were doing.

21             I mean you had a guy here in Hamzeh who, going back to

22   September of 2015, had been talking about a variety of different

23   types of armed attacks that he was going to commit.  And that's

24   what kicked off this investigation in the first place.

25             So when he's talking about that and when his plan

46

1    seems to keep on changing but he's still consistently talking

2    about going to the Middle East at times, you know, using a

3    handgun to shoot and kill Israeli soldiers, grab their machine

4    guns and kill more people, given all that, with the confidential

5    source, it's actually very reasonable for law enforcement -- and

6    it's good law enforcement to have confidential sources try to

7    flush that out a little bit to see what the criminal's true

8    intent is.

9         Also, this reference to confidential sources as fakes,

10   that is, you know, Hamzeh wasn't really leading anybody because

11   these people were working with the government.  I mean that's

12   true in a technical legal sense.  For example, you can't

13   conspire with government agents.

14        THE COURT:  Right.

15        MR. HAANSTAD:  But I think the significance here is

16   that Hamzeh doesn't know that they're sources at the time.  So

17   when Hamzeh is directing them, here's what we're going to do at

18   the temple, here's when we're going to do it, here's how we're

19   going to do it, why we're going to do it, here is your role,

20   Steve, here is your role, Mike, I mean, he's showing true

21   dangerousness by doing those things not knowing that he's

22   talking to confidential -- confidential sources.

23        And just a very minor point but, again, Hamzeh's

24   discussions about engaging in some sort of acts of violence date

25   back to September and October of 2015.

47

1          THE COURT:  Right.

2          MR. HAANSTAD:  And Mr. Albee both said and wrote that

3    there's no indication in the discovery that he did anything

4    other than just talk about that.  Like I said, it's a maybe a

5    relatively minor point, but he did settle on October 21st as a

6    travel date and he told the confidential sources that he was

7    traveling on October 21st.

8          He also, in the discovery there's an e-mail where he

9    reserved a flight for October 21st.  His explanation to the

10   sources had been that he was going to travel there with his

11   brother-in-law.  His brother-in-law actually -- and maybe his

12   sister as well.  He or they actually ended up traveling on the

13   21st.  They all had reservations, that is, for the 21st.  Hamzeh

14   just didn't show up and actually get a ticket.

15         But that was just a step along the way.  So he's

16   becoming increasingly specific and serious about doing

17   something.  It starts out as just talk, develops to the point

18   where he settles on a date, he's going to travel with relatives,

19   gets a reservation.  And it keeps progressing from there up

20   through January of 2016.

21         We talked a lot about the tour and the statements

22   after it.  But also three days before the tour -- this level of

23   violence pales in comparison maybe to some of the things we've

24   been talking about -- but there was an incident where Mr. Hamzeh

25   was driving on Wisconsin Avenue, an unknown pedestrian walked in

48

1    front of him and kicked Hamzeh's car.  Hamzeh jumped out of the

2    car leaving the driver's side door open, roundhouse kicked this

3    individual in the head, knocked him to the ground, jumped on

4    him, punched him and kicked him and didn't stop until he was

5    pulled off by another pedestrian.  And then, of course, three

6    days later is when he's talking about this additional -- these

7    additional violent acts.

8         And that's all I had, Your Honor.  Thank you.

9         THE COURT:  Appreciate that.  Well, it's not all

10   because you're going to also give me the time hacks and your

11   views on.  So you'll have an opportunity to say some additional

12   things.

13        I know that there was -- there are very few arguments

14   that I left thinking where I didn't have the thought, oh, I wish

15   I had said this.  So to the extent you have "I wish I had said

16   this" sort of inspirations after the hearing today, go ahead and

17   include it in whatever you're gonna send me by the end of the

18   day tomorrow.

19        MR. HAANSTAD:  Thank you.

20        THE COURT:  You bet.

21        Mr. Albee, any response?

22        MR. ALBEE:  [Indiscernible].

23        THE COURT:  Sure.

24        MR. ALBEE:  Mr. Haanstad talks about good law

25   enforcement because there's the statement about using a handgun,

49

1    shooting Israeli soldiers and taking their machine guns.  That's
2    a lot of bravado.  That's something that just wasn't gonna
3    happen.

4         But even let's accept that as, well, that provides a
5    foundation to follow up if he's interested in machine guns, even
6    though we're talking Middle East versus do you want a machine
7    gun here.  And Mike says, "Do you want a machine gun?"  "No,
8    just a handgun."  And that happened several times.  "No, just a
9    handgun."

10        So good law enforcement would be like let's leave it
11   alone, instead of pushing, pushing, pushing.  And what he pushes
12   Mr. Hamzeh to do -- and this is in our brief:  "You keep asking
13   me the same stupid questions over and over.  You are stupid and
14   a mother."  So I mean he's -- that illustrates what's not been
15   recorded because Mr. Hamzeh has just had it with the things
16   being brought up over and over.

17        As to October 24th, one quick -- or 21st one.  He was
18   saying he bought a plane ticket, there is no plane ticket.  I
19   mean he's -- and he's just -- he says things, they don't happen.
20   They were never intended to happen.  He's an attention seeker.
21   He's learned his lesson about that I'm sure.

22        THE COURT:  All right.  All right.  And also I --
23   again I appreciate your points about good or bad law
24   enforcement, but that's not a judgment I'm going to make.
25   Everybody understands that in cases of this kind, you know,

50

1    it's -- if you don't have appropriate follow-up and something

2    bad happens then everybody's pointing a finger.

3         So I'm not going to be in a position -- I'm not

4    certainly qualified to make a judgment as to whether it's good

5    law enforcement or bad law enforcement.  What I will have to do

6    and what I will do is make an assessment as to whether I can

7    release on conditions and reasonably assure the safety of the

8    public.  And in that decision I will have to determine whether

9    the United States has shown by clear and convincing evidence

10   that detention is the only status that is appropriate.

11        All right.  Ms. Mahmoudi, you've had to sit quiet for

12   most of the hearing, was there anything else that you wanted me

13   to know at this point?

14        PROBATION OFFICER:  No, Your Honor.

15        THE COURT:  You're done?  Good.  All right.

16        Then I will ask you folks to provide me with -- and

17   again, make it as informal as an e-mail.  If you want to put it

18   on your paper that's fine and send me a PDF.  But just provide

19   it by the end of the day.  If you need a little more extra time

20   I'm not gonna make a decision until I see what you have for me

21   and I'll make sure that I look at stuff.

22        MR. ALBEE:  End of day tomorrow is what the court --

23        THE COURT:  Correct, yes.  Not today.  No, I wouldn't

24   do that to you.  But again, if you need more time just talk to

25   each other because I don't want one side seeing the other's.

1  Make them relatively simultaneous.  And be on the same

2  timeframe.  You folks have worked professionally.

3       All right.  I thank you very much for the

4  professionalism of both your written submissions and of your

5  oral argument.  This is a sensitive case and we live in

6  sensitive times.  But you both have conducted yourselves, the

7  United States and defense, with the highest degree of

8  professionalism and I appreciate that.  I think it does credit

9  to your offices and it certainly shows respect for the office of

10 the court that I very much appreciate.

11       And I also thank you, the folks in the gallery.  I'm

12 not used to having this many people.  I know that this case is

13 very important to you and you've had to listen to some hard

14 things on both sides.  But you also maintained the respect of

15 the court and I appreciate that very much.

16       All right.  Thank you very much.  We're done.

17       (Hearing concluded at 11:14 a.m.)

18              *    *    *

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.

Signed and Certified July 28, 2017.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM
