# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

      Plaintiff,

    **v.**                                            **Case No. 16-CR-21 (DEJ)**

**SAMY MOHAMMED HAMZEH,**

      Defendant.

---

## DECISION AND ORDER DENYING MOTION FOR RELEASE ON BOND

On January 26, 2016, Samy Hamzeh made his initial appearance before me on a criminal complaint alleging that he had unlawfully possessed two fully automatic weapons and a silencer on the prior day. Criminal Complaint ¶ 8, ECF No. 1. At the conclusion of the initial appearance, I ordered that Mr. Hamzeh be detained rather than released on conditions, concluding that the United States had shown by clear and convincing evidence that there were no conditions that could reasonably assure the public's safety. Detention Order Pending Trial, ECF No. 5 (citing 18 U.S.C. § 3142(f)).

This conclusion was based primarily on statements Mr. Hamzeh had made to confidential informants, describing in graphic detail his plan to attack a Masonic center and "annihilate everyone" there. Compl. ¶ 3. The Complaint indicated that acquisition of the weapons Mr. Hamzeh was charged with possessing was a near-final step to execution of this plan. *Id.* ¶¶ 3.a., 3.b. & 3.i.

On February 9, 2016, a grand jury returned an indictment against Mr. Hamzeh. Like the Complaint, the Indictment charges him with possessing illegal weapons (two MP-5 submachine guns and a silencer) and does not charge him with any terrorist or other violent activities. Indictment, ECF No. 6.

Mr. Hamzeh still sits in jail awaiting trial, which is currently scheduled to commence on February 12, 2018. Court Minutes and Order, ECF No. 45. In the meantime, Mr. Hamzeh's counsel have been able to review the ample discovery materials produced by the United States, including numerous recorded or reported conversations involving Mr. Hamzeh and two confidential informants, known as Mike and Steve, as well as the recorded post-arrest statement that Mr. Hamzeh provided to law enforcement.

As discussed below, the discovery materials show that Mr. Hamzeh did plan to attack a Masonic facility along with Mike and Steve. The target was chosen because Mr. Hamzeh believed, based apparently on YouTube videos and other sources, that the Masons sought to discredit Islam and had created ISIS to kill Muslims. He believed that by striking at the Masons, he would be striking at ISIS as well. After visiting a Masonic center in Milwaukee on January 19, 2016, Mr. Hamzeh discussed with Mike and Steve a horrifically detailed plan to use machine guns to kill Masons.

In the days following the visit, Mr. Hamzeh decided that he could not carry out the plan without first determining whether it would be permitted under Islamic law. Accordingly, Mr. Hamzeh consulted two imams (religious leaders of the Muslim

faith), one in person in Milwaukee and the other telephonically in Jordan, to get their guidance. Each imam told him that to engage in such conduct would be "haram"; that is, an act forbidden by the Quran and Islamic law. If he were to engage in an offensive operation without provocation, the imams instructed him, he would go to hell. Mr. Hamzeh had also become concerned that his plan may have been leaked to authorities.

Consequently, Mr. Hamzeh, in recorded conversations, told Mike and Steve on January 24, 2016, about his discussions with the imams and that the attack had to be abandoned. He stated that, based on what the imams had advised him, he could not attack another person without provocation and that no one had done anything to him. Mike and Steve repeatedly pressed Mr. Hamzeh not to abandon the attack, but Mr. Hamzeh remained resolute, exclaiming, "I can't have you do this, then we all go to hell." Exhibit C to Defendant's Memorandum in Support of Bond 49, ECF No. 49-3 (defense translation of recorded conversation).

Mr. Hamzeh nevertheless went forward with acquiring through Mike the weapons he is charged with illegally possessing. The recorded conversations between Mike, Steve, and Mr. Hamzeh indicate that there were a number of motivations to proceed with the purchase of the weapons, but none of them involved current plans to conduct offensive or terrorist activities. The fact remains, however, that it appears at this stage that Mr. Hamzeh did acquire at least one automatic weapon and wanted to maintain a relationship with the arms dealer in the event he

3

wanted to acquire more in the future. Mr. Hamzeh was arrested on January 25, 2016, by FBI agents after completing the purchase of the weapons.

On June 22, 2017, Mr. Hamzeh moved to be released on conditions. Defendant's Motion for Release on Bond and Request for a Bond Hearing, ECF No. 46; Defendant's Memorandum in Support of Bond, ECF No. 49. The United States has filed a brief in opposition to release. Government's Response to Defendant's Motion for Release on Bond, ECF No. 51. The matter has been fully briefed, and the Court conducted a hearing on the motion on July 12, 2017. *See* Court Minutes for Bond Hearing, ECF No. 56. For the reasons that follow, the Court will deny Mr. Hamzeh's Motion for Release on Bond and will maintain the Detention Order.

## I.     Statement of Facts

### A.  Mr. Hamzeh's personal background

Samy Hamzeh is a citizen of the United States, born on July 31, 1992, in New Jersey. *See* Pretrial Services Report 1–2, ECF No. 53; *see also* Def.'s Mem. 7, ECF No. 49. He has a high school education and attended one year of college. His family moved to Jordan when he was three. The Hamzeh family was originally from Palestine but was displaced to Jordan before coming for a time to the United States. Mr. Hamzeh still has an uncle and other family in Jordan. Def.'s Mem. 38.

When Mr. Hamzeh was nineteen, he left Jordan and returned to the United States. PTS Report 1–3. Mr. Hamzeh lived first in Chicago and then moved to Milwaukee in 2011. His parents and a younger sister have joined him in Milwaukee, and they all make the city their home. Mr. Hamzeh has been

4

consistently, if erratically, employed at various odd jobs since relocating to Milwaukee, and he helps support his parents and sister with his earnings.

Prior to his arrest in January 2016, Mr. Hamzeh had no criminal record aside for some traffic violations. PTS Report 3. There is no indication that Mr. Hamzeh has ever associated himself with ISIS or any other terrorist group, and the United States affirmed at the bond hearing that Mr. Hamzeh acted as a "lone wolf," Ct. Mins. for Bond Hr'g 2.

## B. Mr. Hamzeh's interactions with Mike and Steve in Fall 2015

In September 2015, a confidential informant called Steve informed the FBI that Mr. Hamzeh had said he was going to Egypt for terrorist training and would then conduct an unspecified terror attack. R. 1.[1] A week later, however, Steve reported that Mr. Hamzeh had "changed his mind about doing stupid things" and was now characterizing his earlier statement as "a bunch of bullshit." R. 5.

Shortly thereafter, the FBI had a second confidential informant, named Mike, get involved with Mr. Hamzeh and Steve. Throughout October 2015, Mr. Hamzeh met frequently with Mike and Steve; at one point Mike showed his gun to Steve and Mr. Hamzeh, suggesting they go to a shooting range together. R. 12–13. The three eventually went to a shooting range in December 2015.

Mr. Hamzeh also began making claims about plans to go to the Middle East and engage in attacks against Israelis. R. 14 & 106. He talked about shooting Israeli soldiers and taking their automatic weapons so that he could kill more

---

[1] Citations to "R." refer to the pagination of discovery materials produced by the United States and provided to the Court for review. *See* ECF No. 61.

soldiers. He specifically claimed that he was leaving for Jordan on October 21, 2015, and that he had purchased a ticket to do so. R. 106. October 21 came and went without Mr. Hamzeh acting on his plan, and the record has no indication that he ever purchased an airplane ticket.

During November 2015, Mr. Hamzeh again discussed with Mike and Steve plans to go to the Middle East to fight against Israel. R.24–26; 32. Mr. Hamzeh could be quite detailed in his plans, explaining modes of attack or stating that he had a specific, substantial sum saved for the trip. *Id.* Yet the United States has not suggested that he took any affirmative steps, or possessed any sums of money, consistent with his statements.

The subject of weapons also arose in November 2015. Mr. Hamzeh said he wanted a pistol to protect himself in his job as a delivery driver, as a co-worker had been robbed. R. 14. During the November 2016 period, there is no record of Mr. Hamzeh obtaining an automatic weapon in the United States, though he spoke of taking an automatic weapon in the course of attacking Israeli soldiers.

### C. Mr. Hamzeh's interactions with Mike and Steve in December 2015

In December, Mike began discussing with Mr. Hamzeh the possibility of acquiring a machine gun. Recorded conversations reflect that Mike twice asked Mr. Hamzeh whether he wanted a machine gun or a pistol, and Mr. Hamzeh replied, "Just a handgun, don't need a machine gun" and "I want a handgun; a machine gun is too much for me. . . . Just a handgun, that's it." Exhibit A to Def.'s Mem. 28, 32, ECF No. 49-1 (defense translation of recorded conversation).

6

Besides protection for his delivery job, Mr. Hamzeh indicated in this time period that he wanted a handgun to protect himself in the event that he was attacked for being a Muslim. Specifically, Mr. Hamzeh stated: "All I want is a handgun in case they attack us or attack our mosque. What if someone starts to shoot at us just because we are Muslims? I want to be able to fire back, like a real man." *Id.* at 34–35. Mr. Hamzeh also expressed concern about the political tenor of the time: "I want to buy a handgun before they introduce any legislation banning Muslims from buying weapons. . . . Of course, to protect yourself Mike, if someone approaches us and starts to bother us you can defend yourself." *Id.*

Later in December, Mr. Hamzeh and Mike went to a shooting range on two occasions, presumably firing Mike's handgun as Mike did not bring the Kalashnikov assault rifle that he said he owned. R. 122. Again, the two talked about Mr. Hamzeh getting a weapon, and again, Mr. Hamzeh stated that he wanted "[a] pistol for me, for home. . . . Just for me, for home." Exhibit B to Def.'s Mem. 80–82, ECF No. 49-2 (defense translation of recorded conversation).

### D. Mr. Hamzeh's interactions with Mike and Steve in January 2016

Through mid-January 2016, conversations between Mike, Steve, and Mr. Hamzeh continued along a similar vein, with occasional discussions of obtaining a handgun to defend against possible attacks against Muslims. R. 78. During this time, Mr. Hamzeh apparently talked about going to Jordan, where he has family, to relax, but he no longer talked about engaging in violent acts there or anywhere else. R. 44. Then, on January 17 and 18, 2016, Mr. Hamzeh talked about an attack on

7

the Masonic Center in Milwaukee after watching videos that portrayed Masons in a highly negative manner. R. 46. These conversations were apparently not recorded. Rather, they were reported by Mike and Steve to the FBI.

Recording by Mike and Steve resumed on January 19, 2016. From January 19 to 21, Mr. Hamzeh had numerous discussions with Mike and Steve in which they talked about the Masons and how they were in league with ISIS to kill Muslims and to bring discredit to Islam. R. 54; 94 at 11; 95 at 8; 97 at 12. It appears that Mike may have been the one who introduced the idea of attacking the Masonic Center. R. 95 at 8.

On January 19, 2016, Mr. Hamzeh, Mike, and Steve visited the Masonic Center in Milwaukee. Compl. ¶ 3. After receiving a tour of the Center, Mr. Hamzeh was recorded late on January 19 and early on January 20 detailing a gruesome plan to attack the Center and to "annihilate everyone" there. *Id.* ¶ 3.a.–k. Mr. Hamzeh explained that, for the operation, "[w]e want two machineguns, you [Mike] now have one, so we want two more, and we need three silencers, that's it. Find out how much all together these will cost, then we will march." *Id.* ¶ 3.a. He directed how the receptionist should be killed: "two or three shots in her stomach and let her sit on the chair and push her to the front, as if she is sleeping." *Id.* ¶ 3.g. He described "killing everyone"; "[i]f I got out, after killing thirty people, I will be happy 100% . . . 100% happy, because these 30 will terrify the world. [They] will know that nobody can play with Muslims." *Id.* ¶ 3.k.

8

According to Mr. Hamzeh, this plan was conceived solely by Mike, Steve, and Mr. Hamzeh—no person was more responsible for the plan than the others. DVD Disc No. 99 Part 1 (2 of 2) 41:35–41:46. Moreover, it appears that no one else was recruited to assist in executing any aspect of the plan. Nor did the plan involve any association with any outside terror group, as the United States has acknowledged that Mr. Hamzeh acted as a "lone wolf."

Based on Mr. Hamzeh's post-arrest statement and on pre-arrest recordings, it appears that Mr. Hamzeh decided that he could not carry out the attack without first consulting with a religious authority. DVD Disc No. 99 Part 2 41:45–42:45; Def.'s Mem. Ex. C at 7. Mr. Hamzeh stated that he was "not 100% sure about this," DVD Disc No. 99 Part 1 (2 of 2) 40:25–41:30, so between January 23 and 24, 2016, he spoke to two imams. The first was in a mosque in Milwaukee. Mr. Hamzeh asked if it was permissible to kill people who were against Islam, and the imam told him that "if you guys do this, you guys are going to hell." *Id.* 41:46–42:46; *see also id.* 48:30–49:50.

In a recorded conversation, Mr. Hamzeh then told Mike and Steve what the imam had said and that he no longer wanted to conduct the attack: "I told you this operation will be considered haram [forbidden by Islam]. He the Sheikh told me this plan will be forbidden because people will not trust and they will kill and slaughter Muslims and all this will be because of what you did and will be your fault." Def.'s Mem. Ex. C at 7. When pressed, Mr. Hamzeh further explained that "[t]his country [USA] let you in, and have taken a pledge from you that nothing happens here

9

unless they become hostile to you, and no one has become hostile or enemy [to] you, in this country." *Id.* at 8.

Even though Mr. Hamzeh had backed out of attacking the Masonic Center, Steve suggested that they should still get the weapons through Mike's contact, and Mr. Hamzeh agreed, stating that they could go practice shooting, "but to attack, to get this out of your thinking. Take it off your head." *Id.* at 32–37. Mr. Hamzeh believed it was important to complete the transaction "[b]ecause we want to make sure about [the seller], to ensure that he's on board to trust us, so in the future if we need more, he will be accommodating to us." *Id.* at 21. Mr. Hamzeh worried that "if we don't go, he will think, they are dragging their feet. But for the weapons, I am ready to go get it tomorrow." *Id.* Mr. Hamzeh also said they would no longer need the silencer for the machinegun they were purchasing. *Id.* at 56.

Before completing the transaction, Mike and Steve persisted in wanting to conduct the attack and questioned the authority of the imam, so Mr. Hamzeh contacted a second imam, his uncle in Jordan. DVD Disc No. 99 Part 1 (2 of 2) 45:00–45:35. Mr. Hamzeh stated that if his uncle said the attack was wrong, he would not do it, but if it was permitted, he would do it. *Id.* 45:24–45:35.[2] Mr. Hamzeh's uncle gave the same direction as the Milwaukee imam: an attack would

---

[2] In his post-arrest statement, Mr. Hamzeh is inconsistent about whether he would have conducted the attack if an imam had said it was permissible. *Compare* DVD Disc No. 99 Part 1 (2 of 2) 54:29—54:34 ("Even if he [the imam] told me 'go do it,' I'm not going to do it") *with* No. 99 Part 2 7:00—7:18 (explaining to law enforcement that if two imams had told Mr. Hamzeh the attack was permissible, "I would do it").

be haram. DVD Disc No. 99 Part 2 8:10–8:40. Mr. Hamzeh conveyed this information to Mike and Steve, saying, "it's over." Def.'s Mem. Ex. C at 102.

In addition to the religious objections raised by the two imams, Mr. Hamzeh cancelled the attack because "information about us has been leaked." *Id.* at 42. Mr. Hamzeh told Mike and Steve that "I swear if we do this anywhere in the United States, they will know, that it is us." *Id.* at 46. Concern about discovery appears to have been at least as important a factor in cancelling the attack as the religious guidance Mr. Hamzeh received, as he explained to Mike and Steve that "I felt like our information is becoming well known. That's point number 1, point 2, I went and spoke with the sheikh." *Id.* at 6.

As they had previously agreed, Mr. Hamzeh met with Mike and Steve on January 25, 2016, to complete the purchase of the weapons that they had arranged to buy from Mike's contact. R. 62–63; 103. The sellers (undercover agents) initially showed them a longer rifle, but Mr. Hamzeh indicated he wanted a small-size weapon. The sellers then pulled out two MP-5 submachine guns, including one with an attached silencer. They offered to sell the two MP-5s for $1000. This sale price was more than Mr. Hamzeh could afford, so the agents lowered the price: $300 for the MP-5 purchased by Steve, and $270 for the MP-5 purchased by Mr. Hamzeh. Because Mr. Hamzeh had only $200, he had to borrow $70 from Steve to complete the purchase. Mr. Hamzeh was arrested after taking possession of the weapons.

11

## II.   Analysis

In the federal criminal justice system, the "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (internal citation omitted). The Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, so respects and reflects this preference for freedom that "[d]etention until trial is relatively difficult to impose." *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999). Consequently, under federal bail law, "it is only a limited group of offenders who should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (internal quotations and citations omitted).

Specifically, the federal bail law requires this Court to assess four factors in determining whether to release or detain a defendant: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4).

In considering these factors, a court may not order detention unless it is convinced either (a) by clear and convincing evidence that no set of conditions would reasonably assure the safety of the public or (b) by a preponderance of the evidence that no set of conditions would reasonably assure the defendant's appearance. 18

12

U.S.C. §§ 3142(e)(1) & 3142(f); *United States v. Portes*, 786 F.2d 758, 765 (7th Cir. 1985).[3] That analysis follows.

### A. § 3142(g)(2): Weight of the evidence

In one view, the weight of the evidence against Mr. Hamzeh is powerful. He was caught red-handed by law enforcement possessing two submachine guns and a silencer. There is no question of mistake or inadvertence. Mr. Hamzeh knew exactly what he possessed and had used a substantial sum of money for him ($200) to obtain the weapons.

At the same time, weight of the evidence has been described as the "least important of the various factors" because the bail statute "neither requires nor permits a pretrial determination that a person is guilty." *United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (internal quotations and citation omitted). It is also true that in nearly every federal criminal case, the weight of the evidence developed by the United States against a defendant is nigh on overwhelming, as substantiated by a federal felony conviction rate of over 90%. If weight of the evidence played a significant role in the release decision, very few federal defendants would be released. But in fact, defendants are released on conditions in this district at about a 65% rate.

In another view, the view of Mr. Hamzeh, the weight of the evidence favors release because it establishes that federal agents entrapped Mr. Hamzeh. As the United States points out, the entrapment defense is for the jury, and it rests on

---

[3] The crimes charged here do not give rise to the rebuttable presumption in favor detention as they are not included within 18 U.S.C. § 3142(e)(2)–(3).

"demeanor and credibility evidence," *United States v. Rutgerson*, 822 F.3d 1223, 1235 (11th Cir. 2016), precisely the type of evidence that I have not had an opportunity to review. Even more significantly, the entrapment argument goes to Mr. Hamzeh's culpability for the charged conduct—there has been no showing that Mr. Hamzeh was entrapped into planning, in detail, to engage in a mass shooting at the Masonic Center.

Accordingly, I find that the weight of the evidence against Mr. Hamzeh supports detention.

## B. § 3142(g)(3): Mr. Hamzeh's history and characteristics

As to Mr. Hamzeh's criminal history, he has none. This absence of a prior criminal history is critical. An analysis of numerous studies focused on predicting future criminal behavior concluded that "a key predictor of future crime is past crime. The data show that the number of previous convictions is directly correlated with future likelihood to commit crime." Shima Baradaran & Frank L. McIntyre, *Predicting Violence*, 90 Tex. L. Rev. 497, 529 (2012). Outside of some traffic tickets, Mr. Hamzeh has no criminal convictions, nor even any arrests. He has been a law-abiding citizen, which suggests he would be able to follow conditions of release and not re-offend.

As discussed at the hearing, it was this absence of any criminal history, a relative rarity for a federal criminal defendant outside the white-collar context, that drove the recommendation of Pretrial Services to release Mr. Hamzeh with conditions. *See* PTS Report 4. Also at the hearing, the United States made reference

14

to a bizarre incident in which Mr. Hamzeh allegedly kicked and struck a pedestrian for kicking his car. The allegation is worrisome, but no police or hospital report of the incident has been presented to the Court, and no charges were brought against Mr. Hamzeh.

Yet Mr. Hamzeh's personal characteristics are a cause for deep concern. He talked on a number of occasions about engaging in murderous acts, here in Milwaukee and in Israel. This may have been just boastful talking, but it is shocking to the conscience. Well-centered individuals do not harbor fantasies of killing other people. He was also apparently erratic in his personal conduct, was susceptible to suggestion, and harbored a great deal of pent-up anger.

To be sure, Mr. Hamzeh has submitted a mental health evaluation that reports on a day-long, in-person examination and record review. *See* Exhibit D to Def.'s Mem., ECF No. 49-4. The evaluation concluded that Mr. Hamzeh was not violent and was not suffering from any mental health conditions that would cause a safety risk to others. Of far greater importance to me, however, is the actual record of events, which shows that Mr. Hamzeh helped conceive, plan, and prepare to execute an act of terror. His affirmative actions included arranging for the purchase of automatic weapons, reconnoitering the target site, and providing specific guidance as to how the attack should be carried out, who should be shot first, and the number of people to be killed. Only the suasion of two imams and the fear of discovery and capture convinced him to abandon the plan.

15

So while Mr. Hamzeh's spotless criminal record indicates that release would be appropriate, his abnormal personal behavior causes me to doubt whether he would abide by conditions of release and to fear that he might give vent to that anger.

## C. § 3142(g)(1): Nature and circumstances of the offense charged

### 1. The violent nature of the charged conduct

Mr. Hamzeh is charged with possessing three illegal weapons, which consist of two MP-5 submachine guns and a silencer for one of the MP-5s, in violation of 26 U.S.C. § 5861(d). Indictment. The United States is correct when it says that possession of weapons of the type charged here, two submachine guns and a silencer, is indicative of Mr. Hamzeh's dangerousness. To be sure, illegal possession of weapons like these may be highly probative of dangerousness. *See United States v. Brazeau*, 237 F.3d 842, 844 (7th Cir. 2001) (holding that "possession of a sawed-off shotgun—by the very nature of the weapon—always creates a serious potential risk of physical injury to another under the Sentencing Guidelines"). As the Fifth Circuit observed, possession of these types of weapons "constitutes conduct that presents a serious risk of physical injury to another" due to the "inherently dangerous nature of machine guns." *United States v. Golding*, 332 F.3d 838, 840 (5th Cir. 2003).

At the same time, possession offenses are not of a piece with acts of violence. "The active use of a gun is a crime of violence in a way that mere possession of it, even if criminal, is not." *United States v. Lane*, 252 F.3d 905, 907–08 (7th Cir. 2001).

16

This distinction has been recognized in declining to hold that possession of a sawed-off shotgun was a "violent" felony for purposes of the recently interred residual clause of the Armed Career Criminal Act. *United States v. Miller*, 721 F.3d 435, 440 (7th Cir. 2013) ("The range of conduct which could constitute knowing possession of a short-barreled shotgun can vary on a scale of risk of danger to others, but the mere possession of a weapon doesn't have to involve any risk.").

Similarly, the First Circuit refused to characterize as a crime of violence for Sentencing Guidelines purposes a conviction for possessing a machinegun, reasoning that "[p]assive possession of a firearm (even one as potentially dangerous as a machinegun) is not a crime that includes—as an element that must be proved by the government—the use, attempted use, or threatened use of physical force." *United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016).

The point of this discussion is not whether the conduct charged here fits the definition of a "crime of violence," as found in 18 U.S.C. § 3156(a)(4). Rather, the point is that that labels alone are not particularly helpful in this case given the nature of the crime charged, which has both passive (possession) and active (destructive capacity of the weapon and potential for future use) aspects. And ultimately, the question is whether the active aspects of the offense can be addressed through conditions that would provide safety to the community.

## 2. The nature and circumstances of this case

Based on my review of the record, I conclude that the nature and circumstances of the offenses charged show by clear and convincing evidence that

17

Mr. Hamzeh's release with conditions would pose an unreasonable risk to safety.

In Mr. Hamzeh's favor, I am convinced that he had firmly resolved not to engage in an offensive attack at the time he purchased the weapons. Whether motivated by a fear of going to hell or by a fear of detection and capture (likely substantial measures of both), the record establishes that Mr. Hamzeh had no current intent or plan to use the purchased MP-5 in an offensive manner.

Moreover, Mr. Hamzeh is not charged with engaging in, supporting, or conspiring to conduct terrorist or otherwise violent activity. Such a charge would lead almost inevitably to detention. *See Hir*, 517 F.3d at 1090 (affirming detention of a person with no criminal history charged with supporting terrorist activities). So the absence of such a charge under the circumstances of this case has significance. It is also true that Mr. Hamzeh was not shown to have recruited others, nor was he shown to be a member of some terrorist group, such as ISIS.

In the end, however, I am convinced by the circumstances of this case that I cannot release Mr. Hamzeh on conditions that would reasonably assure that he would refrain in the future from taking some rash and violent action. Were it not for the timely guidance of two imams, urging Mr. Hamzeh to abandon his attack, it is quite possible, even likely, that Mr. Hamzeh would have gone forward with his attack.

My concern about Mr. Hamzeh's potential for future violence has nothing to do with his religious beliefs. Rather, it is his violent fantasies and recorded statements that cause concern. As he told Mike and Steve in the secret recordings,

"nothing happens here unless they become hostile to you, and no one had become hostile or enemy [to] you, in this country." Def.'s Mem. Ex. C at 8. The latter part of this statement is encouraging. But the first part is deeply troubling. If released, I worry that Mr. Hamzeh might perceive some act as "hostile," warranting in his mind that something "happen." And given his capacity for planning acts of violence, the risk of his harming someone if released is simply too high and cannot be mitigated by any condition that I might impose.

True, Mr. Hamzeh lacks the financial resources to acquire sophisticated weaponry like the expensive MP-5s involved in this case. Also true, violence against an individual whom Mr. Hamzeh might perceive as being hostile can be accomplished with unsophisticated weapons such as a club or a knife. And a sixteen-foot moving truck can be rented for under $50.

It comes down to this: it should not take the spiritual guidance of two religious leaders to dissuade a person from committing mass murder. A person whose moral compass depends so heavily on the advice of others on such a fundamental question of human decency presents an unacceptable risk of violence.

### D. § 3142(g)(4): Nature and seriousness of the danger posed by release with conditions

This factor also weighs against release. In the common gun possession case, the risk is that the person might acquire another firearm, the possession of which might be dangerous under certain circumstances.

The risk here, however, is far more profound. At best, Mr. Hamzeh's history and the circumstances of this offense indicate that he might attack someone

perceived by him to have acted hostilely, as in the uncharged attack on the pedestrian. At worst, the nature of the danger here involves the possibility of mass murder. Under these circumstances, the Court must order detention.

### E. Flight risk

Finally, the United States has shown by a preponderance of the evidence that Mr. Hamzeh presents an unacceptable risk of flight. He has strong ties to Jordan, as discussed above, and he faces a substantial federal sentence in this case (though just how substantial is the subject of debate). Defendant is correct when arguing that flight would be foolish. The Court's view, though, is that Mr. Hamzeh's past conduct shows that he is given to foolish behavior. As such, the Court finds that it could not impose conditions that would reasonable assure Mr. Hamzeh's presence in this district.

\* \* \*

The law in the United States favors pre-trial release, as there is nothing worse you can do to an American than to take away his or her liberty. *See* Patrick Henry, *Speech to Second Virginia Convention* (March 23, 1775). Mr. Hamzeh does not stand convicted of any crime, and nothing in this Decision should be construed as suggesting that he is guilty. Defense counsel has put forward an intriguing entrapment argument that may in the end prove persuasive, and the factual recitation in this Decision has not been tested by cross-examination. Nor is it within the power of this Court to punish Mr. Hamzeh for his past activities, as charged in the Indictment.

20

Instead, this Court's task is to predict what Mr. Hamzeh's future conduct might be if released, guided by the Court's experience and the record developed by the parties. Based on that experience and the record, the Court finds that the risk of harm and of flight is simply too high and cannot be mitigated by conditions. Detention must follow.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendant's Motion for Release on Bond, ECF No. 46, is **DENIED**.

Dated at Milwaukee, Wisconsin, this <u>26th</u> day of October, 2017.

**BY THE COURT:**

<u>*s/ David E. Jones*      </u>
DAVID E. JONES
United States Magistrate Judge

21