UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    *Plaintiff*,

*vs*.                                                           Case No. 16-CR-21 (PP)

SAMY M. HAMZEH

    *Defendant*.

## MOTION TO REVIEW DETENTION ORDER

Samy Hamzeh, by counsel, respectfully moves under 18 U.S.C. § 3145(b) for this Court to review the magistrate judge's detention order and release Hamzeh on the conditions previously proposed. These include electronic monitoring, a third-party custodian, surrender of his passport, and other attendant conditions. The defense previously filed over seventy pages of briefing in support of its previous motion for bond. The defense principally relies on those pleadings as supplying the foundational basis for release.[1] Those filings also provide an accurate history of the case. The reasoning that follows addresses the magistrate judge's detention order, the fact that the judge applied the wrong legal standard, and why the cited reasons fail to establish that the government has met its burden and established that Hamzeh cannot be released on conditions. In addition, the defense asks that this Court hold a hearing on this motion, so the defense

---

[1] Motion for Release on Bond (D.E. 46), Memorandum in Support of that motion (D.E. 47), the reply in support of his motion for bond (D.E. 54), his post-hearing memorandum (D.E. 55), and the attachments to those pleadings.

*Federal Defender Services*
*of Wisconsin, Inc.*

can present visual evidence and further argument in support of this motion—that includes addressing any of the myriad questions this Court would have after working through the filings centered on Hamzeh's release.

**I.   A brief introduction to this case and Hamzeh's history with Mike and Steve.**

Almost two years ago, the FBI arrested Samy Hamzeh after undercover agents delivered two machine guns and a silencer to him and two confidential informants. Hamzeh was to purchase one of the guns, and Steve, an informant, who doubled as Hamzeh's longtime friend, was to purchase the other. This machine gun purchase was the culmination of a four-month investigation where the two informants had virtually daily contact with Hamzeh. This included the FBI planting one of the informants, "Mike," in Hamzeh's workplace so he could get close to Hamzeh. That step was taken within days of the investigation beginning and at a point when the FBI had virtually no information backing such a measure—the information the FBI had was vague and uncorroborated.

During the months that followed Hamzeh being introduced to and working with Mike, the two met frequently and often discussed the conflict between the Israelis and the Palestinians. This led to a great deal of boasting about what they would do to Israeli soldiers if they had a chance. Upping the rhetoric, at various points Hamzeh claimed that he was going to travel to the Middle East and perform extraordinary acts of valor as vindication for mistreatment of the Palestinians. He even claimed he actually had a plane ticket to go, but had to back out when his mom had a heart attack and was hospitalized. Despite an incredibly thorough investigation (including interviewing the doctor who

2

*Federal Defender Services*
*of Wisconsin, Inc.*

delivered Hamzeh as a baby), to date the government has presented no evidence that this actually happened, and the defense is sure Hamzeh's mom never had a heart attack. Instead, Hamzeh's excuses matched his M.O.: every time he and the informants discussed travel to the Middle East, he always had a reason why now wasn't the time. As the bond motion points out, Hamzeh always had an excuse—making him a Palestinian Walter Mitty.

Travel to the Middle East and actions against Israeli soldiers was one large and troubling part of Hamzeh's talk. The other part concerned firearms. Days after the FBI's investigation began and they placed Mike at Hamzeh's workplace, Mike introduced the topic of firearms. Soon after Mike introduced himself to Hamzeh, he brought a gun to work so that Hamzeh could see it. Hamzeh didn't own one and there is no evidence that he had any involvement with guns before meeting Mike—although as a citizen with no criminal record, there was no reason Hamzeh couldn't have one. As Mike grew closer to Hamzeh, he invited Hamzeh to go to the shooting range with him, which Hamzeh did on a few occasions. During these conversations, Mike began asking Hamzeh if he'd like to get a gun and taking Hamzeh to gun stores. Given that he was a delivery driver, who frequented dangerous neighborhoods, Hamzeh thought that getting a pistol might be a good idea. But as the transcripts attached to the bond motion make clear, Mike wasn't satisfied with Hamzeh getting a pistol—possession of a pistol was, of course, legal. So he repeatedly encouraged Hamzeh to get a machine gun, which Hamzeh repeatedly declined, saying all he needed was a pistol.

3

*Federal Defender Services*
*of Wisconsin, Inc.*

After an investment of over three months of FBI and informant time, by early January there appeared to be nothing left to pursue. All the FBI had was a bunch of inflammatory statements by Hamzeh, and the informants were reporting that Hamzeh seemed disinterested in taking any action. One thing that is so troubling about this case is that at that point, the recorded conversations virtually come to a stop. That is, where November and early December were marked with long, recorded conversations about the best shawarma places in Milwaukee, the virtues of Burlington Coat Factory's prices, and the mistreatment of Muslims in the Middle East, after Hamzeh declines any interest in jihad or an illegal firearm, the recordings cease. And then, suddenly, they are resurrected in the midst of a supposed plot to attack the Masonic Center. There are no contemporaneous recorded discussions about the genesis of the plan or how it developed. After Hamzeh's arrest, and in conversations with the informants shortly before that, Hamzeh attributed the plan to Mike, who promoted it by showing inflammatory videos falsely accusing the Masons of being ISIS. To be clear: the group's supposed motivation for a terrorist act was that Mike had convinced Hamzeh that they would be attacking a terrorist organization—for his part, Steve seemed to just echo and affirm Mike's agenda.

While the defense (and for that matter the world) can only speculate about what happened when Mike and Steve met daily with Hamzeh and recorded nothing, the recordings that were made after Mike introduced and fostered the idea of an attack on the Masonic Center are extremely alarming. The three discuss obtaining machine guns

4

*Federal Defender Services*
*of Wisconsin, Inc.*

and killing innocent people at the Masonic center. These conversations were captured in the criminal complaint filed after Hamzeh's arrest; they made for sensational headlines; and they are also the primary reason cited by the Magistrate Judge for detaining Hamzeh. But as alarming as the conversations are, none of them provided a reason to arrest Hamzeh.

What's more, the conversations captured in the criminal complaint failed to acknowledge that by the time of his arrest Hamzeh had completely backed out of the alleged plan to attack the Masonic Center, and that he had angrily denounced the plan to his informant friends. To bolster his credibility in trying to convince them the plan was wrong, Hamzeh went to two Imams and urged the informants to meet with the local Imam themselves so they could hear him explain why the plan was so wrong. Despite Hamzeh's protest that the plan was morally forbidden, the informants continued to lobby to move forward with the attack, they taunted Hamzeh about whether he was scared, and they said they were prepared for martyrdom. Despite Steve and Mike's hectoring, Hamzeh remained resolute: he would have no part in the plan. The defense's memorandum in support of bond describes in detail how adamant Hamzeh was that the plan was wrong, appealing to the informant's supposed moral and religious ideals. He also was clear that the United States was not their enemy:

> **Samy:** This country let you in, and have taken a pledge from you that nothing happens here unless they become hostile to you, and no one has become hostile or enemy [to] you, in this country.[2]

---

[2] Ex. C at 8.

*Federal Defender Services*
*of Wisconsin, Inc.*

So a day before his arrest, Hamzeh was opposed to any violence, and he was resolute that he would not be part of any plan to harm innocent people.

Unfortunately, Hamzeh still agreed to get the guns as previously arranged. Mike alone had made all arrangements for the guns, machine guns which might sell for $10,000 or more, but which he was obtaining for a few hundred dollars each. Hamzeh had never purchased a gun, didn't own one, and had no sources for weapons. Whether to save face with friends, because it was a good deal, because target shooting sounded like fun, or for protection if sometime down the line Muslims became subject to violence, Hamzeh drove with the informants to meet the undercover FBI agents. Within moments after being handed a bag with the two guns and a silencer, Hamzeh was arrested.

Hamzeh has been in custody now for almost two years awaiting trial—including fourteen weeks awaiting the bail decision. Of course, a trial of this sort is complicated and the delay has been chiefly the product of waiting for a full rendering of the transcripts to be prepared. Without them, the defense cannot make an effective case for entrapment— the defense at trial. As he awaits trial in February, Hamzeh's guidelines appear to be 24– 30 months, so he may already have served out a guideline sentence once good time is credited. Those are the basic facts of this case but again, the prior pleadings give a fuller treatment of the case's history and the facts supporting release.

## II. The facts of this case, including those found by the Magistrate Judge, mean that Hamzeh should be released pending trial.

With those broad strokes of background in mind, the question is whether there are reasonable conditions under which he can be released pending trial, including so he can

6

*Federal Defender Services of Wisconsin, Inc.*

assist his attorneys with his defense, which is of paramount importance. As the magistrate judge recognized, Hamzeh has no record, he has a stable family to live with, he is a citizen, a high school graduate, he has no criminal record, and has a decent work history. Hamzeh has a job waiting for him and family members who are willing to serve as third-party custodians. He has no history of engaging in radical activity and he has never associated with extremist groups. Nor is there any evidence that he has ever owned a gun, of any sort. Based on those usually dispositive points, the probation department recommended release.

Although the magistrate judge ruled in favor of detention, he made the following findings, which are germane to this Court's consideration and should help inform this Court's decision:

- Hamzeh is not charged with any terrorist or other violent activities.[3]

- "[T]here were a number of motivations to proceed with the purchase of the weapons, but none of them involved current plans to conduct offensive or terrorist activities."[4]

- Mr. Hamzeh has a "spotless criminal record."[5]

- There is no indication that Mr. Hamzeh has ever associated himself with ISIS or any other terrorist group.[6]

- With regard to the discussions about Egypt and Israel, the government has not shown that Hamzeh took any affirmative steps, or possess any sums of money consistent with his statements.[7]

---

[3] R.67 at 2.
[4] *Id*. at 3.
[5] *Id*. at 16.
[6] *Id*. at 5; 9.
[7] *Id*. at 5-6.

- On more than one occasion, Hamzeh insisted that he did not want a machine gun.[8]

- The FBI informant "Mike" owned a "Kalashnikov assault rifle," that he displayed to Hamzeh.[9]

- "It appears that Mike may have been the one who introduced the idea of attacking the masonic center."[10]

- Hamzeh backed out of the supposed plan to attack the masonic center, and attempted to dissuade Mike and Steve from following through.[11]

- The magistrate judge was "convinced" that Hamzeh had firmly resolved not to engage in an offensive attack at the time he purchased the weapons.[12]

Those are all pretty strong points that suggest (if not demand) that release is proper—especially the last point that when he got the weapons, Hamzeh had firmly resolved not to engage in an attack. Despite those points, the magistrate judge ordered that Hamzeh stay detained, primarily relying on Hamzeh's disturbing remarks about attacking the masonic center that were made in late January 2016.

This Court must review that determination *de novo* as the magistrate judge placed excessive emphasis on words that not only Hamzeh didn't act upon but that he affirmatively disavowed; the magistrate judge also failed to resolve doubts in favor of release as required by the Bail Reform Act; and the magistrate judge legally erred by relying on past indications of dangerousness (solely Hamzeh's words), rather than

---

[8] *Id.* at 6-7.
[9] *Id.* at 7.
[10] *Id.* at 8.
[11] *Id.* at 9-10.
[12] *Id.* at 18.

8

*Federal Defender Services*
*of Wisconsin, Inc.*

assessing whether, if released on conditions, Hamzeh currently poses a danger to the public. Yet under the totality of the circumstances, and when the law is correctly applied, release on reasonable conditions is appropriate because the government cannot establish that no combination of conditions will assure the community's safety.

At the outset, it is important to emphasize several principles that must be applied under the Bail Reform Act that the magistrate judge failed to properly apply. First, doubts regarding the propriety of release must be resolved in the defendant's favor. *United States v. Hammond*, 204 F. Supp. 2d 1157, 1161 (E.D. Wis. 2002). Second, the government bears the burden, not the defense, and the government must show by clear and convincing evidence that Hamzeh *currently* poses a danger to the community if released. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). Importantly, the government's burden and the Court's finding of dangerousness "cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." *Id*. The third principle that guides this analysis is that "courts cannot demand more than an 'objectively reasonable assurance of community safety.'" *United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990). These principles of binding law, when considered alone and in combination, make clear that facts, not fear, must control the detention decision and that some uneasiness about what could happen won't support detention. The Magistrate Judge erred when he relegated these principles to an afterthought and went with his gut: "[Hamzeh's] abnormal personal behavior causes me

to doubt whether he would abide by conditions of release and to fear that he might give vent to that anger."[13]

### A. The magistrate judge failed to resolve doubts in Hamzeh's favor when considering the Bail Reform Act factors.

The magistrate judge's decision canvased the factors relevant to the detention decision under the Bail Reform Act and decided that they weigh against Hamzeh. But the Bail Reform Act, demands more than checking off the boxes. It requires that the government prove by clear and convincing *evidence* that the defendant presently poses a risk if released. 18 U.S.C. § 3142(f)(2)(B); *see also United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). Even if some factors might be deemed to weigh against Hamzeh, the Court still must determine whether the government overall (under the totality of the circumstances) has met its heavy burden. *Id.* All the while, doubts about release must be resolved in favor of the defendant, and (critically) Hamzeh maintains his presumption of innocence. 18 U.S.C. § 3142 (j).

---

[13] *Id*. at 16.

*Federal Defender Services
of Wisconsin, Inc.*

### i. The magistrate judge erred in his analysis of the weight of the evidence and whether that favors release.

The magistrate judge's order begins by evaluating the weight of the evidence. Here, the assessment of the weight of the evidence has an additional layer beyond whether Hamzeh was caught on video with a prohibited gun. While the evidence of momentary possession is strong, the magistrate judge recognized that Hamzeh has proffered a viable entrapment defense—a defense that the government must disprove (beyond a reasonable doubt) at trial. The magistrate judge also recognized that the entrapment defense requires a court to make credibility determinations and that it is not presently in a position to weigh demeanor and credibility. The viability of the entrapment defense and the inability to determine credibility at this point shows that the weight-of-the-evidence factor favors release. While the magistrate noted that federal cases have a conviction rate of over 90%, in contrast to most federal cases, Hamzeh has a triable issue. *See* R.67:13. That means Hamzeh may be serving time for a charge the government cannot prove. Despite recognizing that Hamzeh has a viable entrapment defense, the magistrate judge somewhat mysteriously and improperly presumes the credibility of the government's witnesses, forgets about the presumption of innocence, and fails to resolve doubts in the defendant's favor. *See id.* at 13–15. Given the viability of the entrapment defense and the uncertainty over how credibility might later be resolved, this factor should have been resolved in Hamzeh's favor, and it militates towards release.

The confusion on this factor isn't limited to the magistrate judge making credibility determinations for the government, it stretched into the judge's reasoning in other places

11

*Federal Defender Services*
*of Wisconsin, Inc.*

as well—namely that the defense has not demonstrated entrapment as to the Masonic Center claim. *Id.* at 13–14. There are two points in response. First, Hamzeh has not elaborated on that "defense" because he's not charged with that "offense." What's more, there was not an "offense" that Hamzeh could be charged with. Remember: in the face of two informants working on him for months and before taking any action, Hamzeh disavowed the plan, and he tried to convince his "friends" not to engage in any behavior of that kind. It was inappropriate for the magistrate judge to engage in speculation about uncharged conduct that Hamzeh need not defend against in his bail pleadings. But lest this Court have some concerns, the defense could establish entrapment on that as well. The same pressures exerted by the informants as to the gun case, would speak even louder and more convincingly to a jury (or court) on the Masonic Center claim that the magistrate judge focused upon. Thus, this Court needs to look anew at the weight of the evidence and when judged correctly, that factor favors Hamzeh's release.

    **ii.**    **The magistrate judge erred by placing undue emphasis on Hamzeh's words while discounting his actions.**

The magistrate judge's analysis regarding the other bail factors reveals that the basis for his decision to detain really comes down to Hamzeh's inflammatory statements about Israel and the Masonic Center. While acknowledging that despite the enormous pressure placed on him by two confidential informants, Hamzeh adamantly refused to go through with that plot, the magistrate judge suggests that anyone who would express such thoughts must be dangerous. The court's exact quote is: "So while Mr. Hamzeh's spotless criminal record indicates that release would be appropriate, his abnormal

12

*Federal Defender Services*
*of Wisconsin, Inc.*

personal behavior causes me to doubt whether he would abide by conditions of release and to fear that he might give vent to that anger." *Id.*at 15. But the magistrate judge's position that Hamzeh's choice comments portend how he'll behave under supervision, ignores the psychological reality of the situation that Hamzeh faced. It also gives short shrift to his steadfast refusal to continue with the plan in the face of that psychological pressure. And the reasoning elevates the magistrate judge's opinion of Hamzeh's mental health (based on nothing but the pleadings) above those of the psychiatrist who evaluated Hamzeh and found that he was *not* a danger. *See* R.47:54.

To be clear, Hamzeh's recorded words are deeply disturbing, but words themselves aren't dangerous. They are generally constitutionally protected, and Hamzeh is not charged with any of the words spoken because they were not criminal. The words were also the product of two informants who encouraged, promoted, and rewarded such dialogue. And finding that his words alone control the issue of Hamzeh's dangerousness is to ignore the Seventh Circuit's command in *Dominguez*, that dangerousness "cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct." 783 F.2d at 707. Allowing Hamzeh's words to seemingly control the question of release or detention was to do precisely what the Seventh Circuit commanded a district court cannot: base a determination of danger on the thin reed of a conduct (or words) that are not likely to be repeated.

13

*Federal Defender Services*
*of Wisconsin, Inc.*

That's not the only place the magistrate judge's analysis went beyond the commands of the Bail Reform Act. When it comes to the point of past dangerousness, the magistrate judge added that "it should not take the spiritual guidance of two religious leaders to dissuade a person from committing mass murder." D.E. 67 at 19. That's simply unfair. Hamzeh has not had an opportunity to present his case and won't until trial. Under one interpretation of the evidence, Hamzeh did what we want people to do when they are in crisis—consult a spiritual leader or other wise person for guidance. That course of action should be praised, not scoffed. But there also is another reasonable and more favorable interpretation of the evidence: Hamzeh didn't want to follow through with the plan but wanted to persuade the informants to abandon their horrific plan while knowing that the Imam's words would be more persuasive than his own. Remember: backing out of "plans" was Hamzeh's M.O.—he was all bark and no bite.

As noted, at one point Hamzeh claimed to be on the verge of traveling to the Middle East. This claim was accompanied by a litany of empty boasts about attacking Israeli soldiers. But Hamzeh didn't go. And it appears he was lying to Steve about the plan all along—the government hasn't made any representations that Hamzeh had the means or opportunity to do otherwise. And when push to came to shove, Hamzeh had plenty of excuses for why he couldn't do it—a constant pattern in his dealings with Mike. And while his comments about Israel are hard to stomach, we must remember that Palestine and Israel are in permanent conflict and many Palestinians are angry, bitter, and vocal about Israel's mistreatment of Palestinians. Hyperbole is common in such

14

*Federal Defender Services*
*of Wisconsin, Inc.*

situations. Little weight can be given to these hollow claims as Hamzeh wouldn't expect them to be met with condemnation from his friends, given their shared hostility toward Israel, and there's no indication he had any intention of following through. Hamzeh made them because they were well received by his compatriots who reacted with affirmation and admiration. These reactions and safety of their feigned friendship encouraged Hamzeh to make more outrageous statements.

Although the magistrate judge felt these conversations were all but dispositive for purposes of release, there is nothing to show that any of these conversations, were anything more than empty and distasteful boasts. So while polite society would condemn or shun Hamzeh for his words, the Bail Reform Act does not concern a judge with anything other than whether the defendant is a danger to the community. When it comes to that question, Hamzeh's vitriol against Israel and the Masons pales in comparison to his words, the night before his arrest, pleading with his "friends" to turn away from violence and embrace peace.

### iii. The magistrate judge's concern over Hamzeh's desire for weapons in the face of Muslim persecution is unfounded and does not favor detention.

While read in its totality, the former points seemed to have been dispositive for the magistrate judge, the order also expressed concern about Hamzeh saying he wanted weapons in the event that Muslims were stripped of the right to bear arms or if he, his family, and other Muslims otherwise became victims of Islamophobia. That too is not a reason to detain Hamzeh. In fact, such concerns are part of the recognized historical purpose underlying the Second Amendment—it was and remains to protect against both

15

*Federal Defender Services*
*of Wisconsin, Inc.*

public and private violence. *See, e.g., District of Columbia v. Heller*, 554 U.S. 570, 592-95 (2008) (recognizing that the individual right to bear arms arose in the wake of efforts by the Crown at various times to disarm political opponents). Justice Thomas has written eloquently on that point. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3087-88 (2010) (Thomas, J. concurring in the judgment) (explaining the historical importance of the individual right to bear arms for black citizens in defending themselves from racially-motivated violence by whites). There was no reason to conclude that this desire for self-protection in case of Muslim persecutions would make Hamzeh a danger if released under appropriate conditions that included no possession of firearms, house arrest, and GPS location monitoring.

On top of that, there is no reason to believe that at the time of the alleged possession of the guns that Hamzeh had any plans to use any weapons obtained for anything other than target shooting. The magistrate judge specifically found that Hamzeh "had firmly resolved not to engage in an offensive attack at the time he purchased the weapons." R.67:18. Thus, the foundation for believing that Hamzeh would pose a danger if released is weak (and certainly doesn't predominate over the other evidence favoring release) given that Hamzeh had abandoned any attack plans and would have no access to guns if released. There also is no evidence that at this point, two years later, that Hamzeh has any plans to commit any criminal offenses or engage in anti-social behavior. He has no criminal record and the psychiatrist who examined him

16

*Federal Defender Services
of Wisconsin, Inc.*

Case 2:16-cr-00021-PP   Filed 11/22/17   Page 16 of 19   Document 68

concluded that he poses a low risk of recidivism. Thus, given the totality of the circumstances release is appropriate.

### iv. The magistrate judge failed to consider the length of delay and how it favors release.

A final point of contention with the magistrate judge's order is that it gives no consideration to the length of Hamzeh's detention, which raises due process concerns. In *United States v. Salerno,* the Supreme Court recognized that a defendant's prolonged pretrial detention may violate the defendant's due process rights when the detention becomes punitive rather than regulatory. 481 U.S. 739, 746–47 (1987). There is no specific amount of time that triggers a due process violation, but the delay here, which primarily has been necessitated by the time it takes to prepare Arabic translations, is, at the very least, near the outer edge. *See United States v. Infelise,* 934 F.2d 103, 104 (7th Cir. 1991) (finding that two years between indictment and trial was not a violation, but remanding the case with instructions to determine whether release on electronic monitoring would satisfy the Bail Reform Act). In addition, as trial nears, defense counsel desperately needs Hamzeh present to assist in going through conversations at their office; the jail offers limited visitation time, the travel is time-consuming, and it's difficult to have all necessary materials available. This factor too, even if the analysis were close, should favor release.

### III. Conclusion

The magistrate judge got it wrong. He clearly took a lot of time thinking of the case and the order reads as though he went back and forth on the issue. The fourteen weeks it took to issue the recommendation supports that idea. But at the end of the day, the magistrate judge misjudged the facts and misapplied the law. The decision elevated the judge's concerns over Hamzeh's speech above the surrounding facts that showed Hamzeh is not a danger to the community—namely, his lack of criminal record, his refusal to engage in violence, and the psychiatrist's report. And when the law is properly applied, the totality of the circumstances are considered, and doubts about release are resolved in favor of he defense, then it's clear that the government cannot meet its burden and that Hamzeh should be released pending trial. Again, the defense has presented broad brush strokes in this appeal for review of the detention order and asks for the opportunity to make additional arguments at a hearing before this Court, where additional evidence for release will be presented.

*Federal Defender Services*
*of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin this 22nd day of November, 2017.

        Respectfully submitted,

        /s/     *Craig W. Albee*
        Craig W. Albee, WI State Bar #1015752
        Joseph A. Bugni, WI State Bar #1062514
        FEDERAL DEFENDER SERVICES
          OF WISCONSIN, INC.
        517 E. Wisconsin Ave - Rm 182
        Milwaukee, WI  53202
        Tel. (414) 221-9900
        E-mail:  craig_albee@fd.org
                  joseph_bugni@fd.org

        *Counsel for the Defendant*, Samy M. Hamzeh