# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED OF AMERICA,

       *Plaintiff,*

    *vs.*                                    Case No. 16-CR-21 (PP)

SAMY M. HAMZEH,

       *Defendant.*

---

## MOTION FOR PRODUCTION OF *BRADY* MATERIAL

Samy Hamzeh, by counsel, moves this Court for the entry of an order requiring the government to produce the discovery described below. Hamzeh submits that the following materials must be produced under Rule 16 of Fed. R. Crim. P. or under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The requested information is material and helpful to Hamzeh's defense or to his sentence. Since motions for discovery are rare in this district, it's important to note that the "helpful" information that Rule 16 and *Brady* requires to be disclosed to the defense is not limited to exculpatory evidence; it also includes inculpatory evidence because it is "just as likely to assist 'in the preparation of the defendant's defense as exculpatory evidence," since the preparation of the defense requires knowledge of its pitfalls as well as its strengths. *See United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998); *see also United States v. Cruz-Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) (finding that government should have disclosed potentially inculpatory passenger

*Federal Defender Services of Wisconsin, Inc.*

list to defense under Rule 16, but that district court's remedy of prohibiting the government from using list to rebut defendant's trial testimony was not abuse of discretion).

So while the government may object that some of the information sought is not "helpful to the defense," the information sought and detailed below is, indeed, helpful to the defense. It may not be exculpatory; it may just be in the government's view neutral, but these categories of information are essential to Hamzeh presenting his defense at trial. In addition, given the time that remains before trial and the potentially voluminous reports and documents at issue, the defense requests that the Court order expedited briefing on this motion and hold a hearing.

## I.    The background facts that frame this demand, establish its legal basis, and show the defense's compliance with the local rules.

The Court is familiar with the facts of this case from the extensive pleadings filed in support of Hamzeh's bond motion—so this brief will use broad strokes. For four months, two confidential informants talked or met with Samy Hamzeh on nearly a daily basis in an effort to obtain evidence against him. Although Hamzeh had made inflammatory remarks and empty boasts about traveling to Israel and conducting an attack, he never took any actions in furtherance of those statements. To the contrary, he routinely came up with excuses as to why he couldn't travel or take part in any plan. Many of his boasts about his supposed plans were plainly falsehoods—as were some of his excuses.

*Federal Defender Services*
*of Wisconsin, Inc.*

Despite the mounting evidence in November and December of 2015, that Hamzeh was nothing more than an attention seeker, the informants continued to have near-daily contact with him and to sporadically report to the FBI. By early January 2016, however, the informants reported that Hamzeh seemed disinterested in conducting an attack; and after more than three months' investment of time and money the investigation seemed at a standstill. One of the informants, CI Mike, stopped recording his conversations with Hamzeh. This happened on December 14. And Mike did not start recording the conversation again until January 19 — a 35-day period of silence. Although the FBI wasn't (for some unknown reason) recording conversations between CI Mike and Hamzeh during this period, FBI agents continued to conduct surveillance of Hamzeh. In total, surveillance was conducted on 64 occasions during the course of the investigation according to what the defense has been told by the prosecutors.

Then after 35 days of no recordings between CI Mike and Hamzeh, on January 19, Mike reported to the FBI that Hamzeh and the informants had a plan to attack a Masonic center in Milwaukee. There are no recordings of the discussions leading to this supposed plot, but in the recordings during the days that followed Hamzeh disclosed to others that CI Mike came up with the plan and showed him videos of Masons engaged in atrocities and that the Masons were (of all things) actually ISIS.

Ultimately, Hamzeh adamantly refused to go along with the plan to attack the Masonic Center, yelling at his comrades that it was wrong, resisting their overtures to become a martyr, and insisting that they could not go through with the plan because it

3

*Federal Defender Services*
*of Wisconsin, Inc.*

was wrong. He implored them to see the Imam themselves so they would understand how wrong the plan was. Yet, Hamzeh, perhaps to save face, agreed to go with the informants to obtain two machine guns and a silencer that one of the informants had arranged to be purchased for a few hundred dollars. When FBI agents handed Hamzeh a bag with the guns and the silencer, he was arrested.

Hamzeh's defense to the charge of possessing unregistered NFA firearms is that he was entrapped. The discovery includes no evidence that Hamzeh had ever before been involved with or pursued illegal firearms (or for that matter legal firearms) and he had no criminal record. The subject of guns was first broached by Mike shortly after the FBI had him get a job at Hamzeh's work place. Within two weeks of starting the job, CI Mike brought his gun to the workplace's parking lot to show Hamzeh. After that, he suggested that they go to a shooting range to spark Hamzeh's interest in a new hobby. When Hamzeh first met CI Mike, he apparently had little or no experience with firearms and certainly had not owned one. The government (and presumably the informant) knew that possession of a pistol (or even a semiautomatic weapon) by Hamzeh would not be illegal.[1] Accordingly, CI Mike began lobbying heavily for Hamzeh to get a machine gun.

---

[1] For purposes of evaluating predisposition in the context of entrapment, it is important not to conflate Hamzeh's expression of interested to obtaining a pistol with a desire to illegally obtain a machine gun. In *Jacobson v. United States*, 503 U.S. 540 (1992), the Court held that the defendant was entrapped as a matter of law when he capitulated to a 2 ½ year government effort to coax him into ordering child pornography. The defendant had ordered such material before it became illegal. The Court emphasized that the fact that Jacobson was predisposed to view such material when it was legal to do so did not show a predisposition to break the law—"evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Id.* at 550.

4

*Federal Defender Services of Wisconsin, Inc.*

But Hamzeh resisted—telling Mike that he only was interested in a pistol for self-defense and did not need a machine gun.

One thing that is especially troubling about this case and will be a large part of the defense's argument at trial is that numerous contacts between the informants and Hamzeh were apparently not recorded. What makes that absence of recordings particularly concerning is that during this time period the FBI was continuing to have the informants contact Hamzeh, the agents were meeting with the informants themselves, and the FBI was conducting surveillance on Hamzeh. And it's during this period that the supposed plot to attack the Masons develops and Hamzeh relents to the informants' pressure to obtain a machine gun. Thus, it is critical for the defense to know what the government and the informants were up to during this time period.[2]

A. **The requested discovery is important to establishing entrapment**

To help demonstrate the significance of the requested material, a brief overview of entrapment law is helpful. Entrapment involves "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Jacobson v. United States*, 503 U.S. 540, 553-54 (1992). Or, put another way, "the government is supposed to catch criminals, not create them." *United States v. Barta*, 776

---

[2] The possibility that exculpatory evidence is being withheld or ignored is not merely fanciful. *See, e.g.,* Denny Walsh & Sam Stanton, *Convicted 'eco-terrorist' freed amid claims FBI hid evidence,* Sacramento Bee, Jan. 8, 2015 (describing how thousands of pages of evidence had been withheld from defense counsel, including information relevant to the relationship between the defendant and the informant); Carrie Johnson, *Report: Prosecutors Hid Evidence in Ted Stevens Case*, NPR.org, March 15, 2012, available at www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case; *United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013) (Kozinski, J., dissenting from order denying petition for rehearing en banc) ("There is an epidemic of *Brady* violations abroad in the land.").

5

*Federal Defender Services of Wisconsin, Inc.*

F.3d 931, 939 (7th Cir. 2015). Thus, entrapment is a defense to criminal liability "when the defendant was not predisposed to commit the charged crime before the intervention of the government's agents and the government's conduct induced him to commit it." *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014). The entrapment defense guards against government overreach, recognizing that "the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character." *Id.* at 436 (citation omitted).

A defendant is entitled to a jury instruction on entrapment "whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Id.* at 440 (citation omitted). The defendant must proffer evidence on both elements of entrapment: lack of predisposition to engage in the criminal conduct and the government's inducement of the crime. But this initial burden of production "*is not great.*" *Id.* (emphasis added). An entrapment instruction is warranted if the defendant proffers "some evidence" that the government induced him to commit the crime and that he was not predisposed to commit it. *Id.* In making this determination, the judge is not to weigh the evidence or decide whether the defense is believable; so long as there is some evidence of entrapment, it is for the jury to weigh conflicting testimony, to draw reasonable inferences from the evidence, and to make credibility determinations. *Id.* at 440. Once the defendant has met this initial burden, the prosecution must prove beyond a reasonable doubt the defendant was predisposed to commit the criminal act before first being approached by government agents. *Barta,* 776 F.3d at 933.

*Federal Defender Services of Wisconsin, Inc.*

Several points about inducement and predisposition warrant brief mention. First, inducement requires something more than government solicitation of the crime. According to the Seventh Circuit in *Mayfield,* "inducement" means government solicitation of the crime "plus some other government conduct" that creates a risk that a person who would not commit the crime if left to his own devices. 771 F.3d at 434–35. Courts have articulated several so-called "plus factors," which may include "repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, pleas based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." *Id.* at 435; *Barta,* 776 F.3d at 933 (calling them "plus factors"). "[S]ubtle, persistent, or persuasive conduct by government agents or informants may qualify as an illegitimate inducement." *Mayfield,* 771 F.3d at 435 (citation omitted). Such subtle pressure can take on many forms, ranging from repeated requests and an atmosphere of comradery, to establishing a friendly relationship and then playing on the defendant's sympathies, or it might just be simply providing justifications for the illicit activities. *See United States v. Poehlman*, 217 F.3d 692, 698, 701–02 (9th Cir. 2000). Thus, a court's and jury's proper analysis of inducement requires a thorough understanding and contextualization of the entire scope of the government agents' relationship with the defendant.

*Federal Defender Services*
*of Wisconsin, Inc.*

The other element to entrapment is predisposition. *Jacobson,* 503 U.S. at 549 (noting "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents"). That simply "refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." *Mayfield,* 771 F.3d at 436. With respect to predisposition, it's important to recognize that it "requires more than a mere desire, urge, or inclination to engage in the charged criminal misconduct." *Id.* at 439. And (critically) "predisposition is measured *prior to* the government's attempts to persuade the defendant to commit the crime." *Id.* at 436. A final important principle when it comes to this case is that when weighing the entrapment defense, the defendant's predisposition must be to commit the charged crime, not just any crime. *Id.* at 438 (noting "[s]ince then, the Court has said that "the principal element in the defense of entrapment [i]s the defendant's predisposition to commit the crime—not just any crime." (quotation omitted)).

In determining whether a defendant was predisposed to commit the crime at issue, the court and finally the jury must consider the following factors, although the list is not exhaustive and no one factor controls:

- the defendant's character or reputation, including background and criminal history;

- whether the government initially suggested the criminal activity;

- whether the defendant engaged in the criminal activity for profit;

*Federal Defender Services
of Wisconsin, Inc.*

- whether the defendant evidenced a reluctance to commit the crime that was overcome by government persuasion;

- the nature and the extent of the inducement, pressure, or persuasion by the government;

- whether the government merrily invited or solicited the defendant to commit the offense;

- whether the government offered the defendant an ordinary opportunity to commit a crime or instead offered the defendant exceptional profits or persuasions; and

- the defendant's ability to commit the crime without the assistance of the government's agents.

*See Seventh Circuit Pattern Criminal Jury Instruction* 6.05. (2012); *see also Mayfield*, 771 F.3d at 435. The most significant factor is whether the declarant was reluctant to the commit the offense. *Mayfield,* 771 F.3d at 435. That list gives this Court and ultimately the jury a broad field of factors to contemplate when deciding whether Hamzeh was predisposed to buy an illegal machine gun. And those factors also provide the defense with a host of potentially relevant information to present to the jury—much of that information, however, is controlled by the government and isn't being turned over. Hence this motion.

B. **Efforts to resolve these issues with the government.**

Knowing the local rules and having a good working relationship with the United States Attorney's office (including great familiarity with its open-file policy) defense counsel sent three formal discovery requests (Ex. A, B, and C) to the government seeking

*Federal Defender Services
of Wisconsin, Inc.*

production of discovery.[3] The first of these letters was sent over a year ago. In addition, there have been informal discussions and meetings regarding discovery. Some issues have been resolved but not those that precipitate this motion and request for a hearing. The most recent effort to hash out discovery disputes took place on December 21, 2017. Despite those requests and meetings, there remain a number of discovery/*Brady* issues that remain in dispute and require the Court's intervention to resolve.

The defense has always feared that in the weeks leading up to trial this would be an issue. Hence, in February of last year, the defense filed its third pretrial motion, asking that the *Brady* and *Giglio* material be turned over 90-days before trial. *See* R.28. The defense also filed its fourth pretrial motion laying out its defense: this would be an entrapment case and the defense would need the government's transcripts. *See* R.31. In response, the government stated that it will disclose *Brady* and *Giglio* material 90 days before trial. R.32:13. And given the government's assurance, the motion was denied as moot. R. 41:14. Finally, the government represented that it "is following its open-file policy" and "[b]ecause in following its open-file policy the government has met—and will continue to meet—its disclosure obligations under *Brady* and Rule 16." R.32:14. Yet given the government's disclosure that surveillance was conducted on Hamzeh for 64 days, and only four days of reports have been produced that statement is not entirely accurate. The prosecutors have material, such as texts and surveillance reports for

---

[3] The letters were provided on or about December 28, 2016, November 6, 2017, and November 30, 2017.

*Federal Defender Services*
*of Wisconsin, Inc.*

starters, that have not been produced and those materials are essential to Hamzeh presenting his defense at trial.

## II. The defense's discovery requests are covered under *Brady* and Rule 16 and they can be broken down into these eleven categories.

With that backdrop, Hamzeh requests an order requiring the government to produce the following information. At the end of this brief, a full outline of the requests is set out that mirrors those points addressed at the end of each subsection.

### A. Reports, Notes, and Communications Made During the Course of the Investigation.

From conversations with the prosecutors, the defense is aware that there are reports, notes, and communications that were made during the course of the investigation that have not been turned over. These include surveillance reports, agents' rough notes, and texts between the informants and the FBI. In addition, Hamzeh has reason to believe that other similar material likely exists that also should be turned over.

#### 1. Surveillance reports

The government has informed defense counsel that agents conducted surveillance on. Hamzeh on 64 occasions. It has produced four reports concerning that surveillance out of the 64. A report from surveillance on October 15, 2015, (attached under seal as Exhibit E) shows that a number of agents conducted surveillance for 8 hours and that the agents tried to identify people Hamzeh came into contact with, detailed where he went, took photos, and documented what he did. The surveillance on January 16, 19, and 21 also were for approximately eight hours, each day. These types of reports, showing the

*Federal Defender Services of Wisconsin, Inc.*

absence of illegal activity and identifying Hamzeh's associates and whereabouts, are exculpatory and also may lead to the discovery of additional exculpatory evidence.

They are also statements of the agents and fall within the open file policy the government is supposedly following. And they also demonstrate the enormous investment of time and money into this investigation, which was strong motive for the agents not to come up empty-handed. Nonetheless, the government has declined to produce any of the documentation regarding the other 60 instances of surveillance. This documentation must be produced because contemporaneous documentation of Hamzeh's activities, whereabouts, and associations will aid in showing how ordinary his life was and will corroborate that he was not associating with criminals, radicals, or extremists. Remember: the pattern jury instruction commands the jury to consider, among other things, "the defendant's character or reputation, including background and criminal history." *Seventh Circuit Pattern Criminal Jury Instruction* 6.05. (2012). Not only will that assist the defense in presenting an entrapment defense, it may also be mitigating at sentencing.

This contemporaneous documentation will also aid defense counsel in cross-examining the informants as the agents' surveillance observations may contradict or (At the very least) refresh the informants' accounts. *See United States v. Pelullo*, 105 F.3d 117, 122–23 (3d Cir. 1997) (finding a *Brady* violation where rough notes and surveillance tapes would have undermined informants' claim that he met with the defendant at a particular location). The surveillance reports will also provide additional information about the

*Federal Defender Services of Wisconsin, Inc.*

extent of the contacts between the informants and Hamzeh. In essence, these reports are critical to the defense and must be turned over, so that the defense can use them at trial.

The government asserts that the remaining 60 surveillance reports are insignificant. Yet their insignificance is the very reason they are likely to be exculpatory to Hamzeh as they presumably show him engaged in law-abiding activities. And if they are insignificant it is hard to understand why the government would resist their production. The extent of the surveillance activities also demonstrates the huge investment the government put in this case—and its motive to make sure that investment resulted in a prosecution. A theme that the defense will stress at trial and one that is supported by these reports.

Thus, Hamzeh specifically requests that the Court order the government to produce the following:

    a.    All information pertaining to surveillance of Hamzeh, including:

        i.    All surveillance logs of Hamzeh;
      ii.    Any written reports about surveillance of Hamzeh; and
    iii.    Any video or audio recordings of surveillance of Hamzeh.

### 2. Text messages and other communications

The informants communicated with the FBI agents by text at times. Presumably these texts may contain information about their contacts with Hamzeh, their instructions from the FBI, their understanding of those instructions, their motivations, and their other activities. FBI agents likely texted each other about the investigation and also may have texted prosecutors about the investigation. Texts are witness statements that must be

13

*Federal Defender Services*
*of Wisconsin, Inc.*

produced under Rule 16 and also are likely to contain *Brady* material. *See United States v. Suarez*, 2010 WL 4226524, *5 (D. N.J. 2010) (holding that text messages between agents and informant were statements producible under Rule 16 and emphasizing that "what the cooperating witness may have said to the agents during the crucial meetings [with the defendant] and whether he abided by the agents' instructions are fertile grounds for cross-examination"; government's failure to preserve texts warranted an adverse inference instruction). The government has indicated that it will produce at least the texts from the informants to the agents, but Hamzeh requests the Court to order the production of all texts in the FBI's possession, including those between agents and agents and prosecutors. There also is reason to believe that any texts to or from the agents' phones are still available.[4]

Thus, despite the government's assurance that the defense will get the text messages eleven months after first being requested and sometime before trial, the defense specifically requests the following:

> b.  All communications between each CHS and the FBI agents, including:
>
>> i.   All emails sent between them;
>> ii.  All text messages;

---

[4] Recently, FBI text messaging became newsworthy when the Justice Department released numerous texts of agents involved in the Mueller investigation into Russian interference with the 2016 election. News reports indicated that the agents should have been aware that "messages from one FBI phone to another would be saved in government computers and retrievable," and that the FBI's legal office "has warned FBI agents for years to exercised good judgment when texting because those messages can be found later by internal investigators or defense lawyers." *See* Devlin Barrett, *FBI officials' text message about Hillary Clinton said to be a cover story for romantic affair*, Washington Post 12/15/17, available at https://www.washingtonpost.com/world/national-security/fbi-officials-text-message-about-hillary-clinton-said-to-be-a-cover-story-for-romantic-affair/2017/12/15/23205bee-e1b6-11e7-bbd0-9dfb2e37492a_story.html?utm_term=.6b0bb1cedd96

*Federal Defender Services of Wisconsin, Inc.*

      iii.     Any voicemails that were left and recorded;

      iv.     Any other communication, in any form, between them; and

      v.     All FBI notes and recordings of meetings with the informants.

    c.     All communications to or from Hamzeh that were captured, including:

      i.     All emails;

      ii.     All text messages;

      iii.     All Facebook messaging;

      iv.     All recorded phone calls, captured either by the informants or the FBI or any other governmental agency; and

      v.     Logs or other documentation regarding this information.

### 3. Rough Notes

The prosecutors have indicated that they assume that there are rough notes the agents took relating to their investigation in this case. But the government is declining to produce these notes. To the extent these notes include witness statements (either the agents' own or the informants) they must be produced under Rule 16 and *Jencks*. Also, to the extent they include any information regarding instructions given to informants or reflect the informants' understanding of their mission, they should be disclosed as relevant to the bias and motive of the informants under *Brady*. Further, any deviation between the notes and the ultimate reports are exculpatory as bearing on the accuracy of the reports and the bias and motive of the agents. Hamzeh seeks the production of all rough notes or an order requiring their preservation with the expectation that they will be turned over under Rule 16, *Jencks*, or *Brady*. *See e.g., United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994).

    d.     Thus Hamzeh specifically requests that the Court order the government to turn over all rough notes.

15

### B. All Information Concerning Protocol for Instructing Informants and Instructions and Benefits Given to the Informants.

As noted above, whether an informant abided by an agent's instructions is a fertile area for cross-examination. *See Suarez,* 2010 WL 4227624 at *5. Likewise, whether an agent violated protocol when instructing and documenting his or her instructions to an informant also provides a fertile area for cross-examination. Despite requests for this information, including any written instructions or agreements with the informants and identification of the manuals the agents relied upon in instructing the informants, the only response the government has provided thus far is that the agents told the informants four things:

(1) the informant's assistance was voluntary;

(2) the informant must be truthful to the FBI;

(3) the informant must abide by the FBI's instructions and not take any independent actions on behalf of the U.S. government; and

(4) the government will strive to protect the informant's identity.

Given almost thirty years of experience dealing with law enforcement and informants, the defense would fully expect that the informants (in a case of this significance) were given much more detailed instructions than these four simple platitudes. The defense's concern, however, extends beyond how law enforcement advises its informants and rests with the very real concern that in this case the agents memorialized additional advice

*Federal Defender Services of Wisconsin, Inc.*

that is relevant to trial, and that the defense should have notice of those communications well before trial.

Hamzeh also understands that at least one informant was paid, but the government only has supplied a summary of payments. This is inadequate. Hamzeh requests all documents, receipts, expense requests, tax forms, etc. documenting the payments. The underlying documents are necessary to allow defense counsel to confront the witnesses, confirm or dispel the assertions of the informants, agents, and government, and to demonstrate to the jury fully the informants' motive to curry favor with the government. If the informant has not reported this income to the IRS, that also is exculpatory.

Hamzeh also requests identification of all payments or benefits to the informants in any other case, and the underlying documentation. The informant's ability to profit, and knowledge of that ability, also establishes motive and bias to assist the government because it benefits him.

The defense's belief that this information exists goes well beyond years of experience and common sense and instead finds root in the FBI's own manuals. Under "The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources" ("Guidelines," attached as Exhibit D), before using a person as an informant, FBI agents must vet informants to assess their suitability, including by doing the following:

1. determining their true identity; determining their criminal history and whether they are the subject of any investigation or charges; determining their

*Federal Defender Services*
*of Wisconsin, Inc.*

motivation for providing information, including whether they are seeking consideration; promises made to them; and any other information that is required to be documented in the Confidential Human Source's file pursuant to these Guidelines and FBI policies, *including but not limited to, the instructions provided to the Confidential Human Source.*

2. With respect to payments to informants, the Guidelines provide that after receiving a payment, the informant shall be required to sign or initial, and date, a receipt and that the agent must advise the informant that the payment is taxable.

3. Advising them that they cannot engage in any unauthorized illegal activity.

*See Guidelines* at 13–16. Accordingly, the defense is requesting production of information about the informants that extends from whether the informants disliked Hamzeh to the protocols that were in place to control the informants. *See, e.g., United States v. Sipe*, 388 F.3d 471, 492 (5th Cir. 2004) (holding that government's failure to reveal that a government witness told the government that he "disliked" the defendant, as well as the benefits granted to numerous other witnesses, violated Brady and was reversible error).

These types of documents are exculpatory because they are admissible in whole or part, could "lead to admissible evidence" or would "*be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise.*" *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002) (emphasis added). And negative information about the FBI's perception of an informant's character or false statements by an informant during the vetting process must be produced under *Brady. See United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463-64 (9th Cir. 1992) (reversible error not to disclose government memo written to government agent "highly critical" of key government informant); *see also United States v. Phillips*, 854 F.2d 273, 1278 (7th Cir. 1988) (court examined entire contents

*Federal Defender Services of Wisconsin, Inc.*

of FBI informant file in camera to determine if government summary was accurate and complete).

Thus, the Court should order that the following information be produced to the defense:

> e.    Any policy manuals, guidance, memoranda, training manuals, or other documents concerning terrorist investigations and/or the use of confidential sources, including:
>
>> i.    Those in effect at the time of this investigation;
>> ii.   Those that were used by the agents in this case;
>> iii.  Instructions that were given to the informants or that the informants were told they had to follow;
>> iv.   Signed statements of understanding by the informants in this case or any other case;
>> v.    All instructions given to the informants in this case or any other case regarding how to conduct themselves.
>
> f.    All documentation required to be maintained under The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources, including, but not limited to:
>
>> i.    The initial suitability report for each informant, to include biographical information, personal information, motivation for becoming an informant, and criminal history;
>> ii.   All written instructions reviewed with the informant upon registration and thereafter;
>> iii.  All annual or other reviews of each informant;
>> iv.   All authorities for any informant to engage in illegal activity and supporting documentation;
>> v.    Identification of any violations or deviations by any informant;
>> vi.   Identification of any violation or deviation from any guidelines or policies by any government agent.
>
> g.    Identification of any polygraphs given to the informants. For any polygraph, we are requesting the date, location, and duration for each polygraph examination, the polygraph administrator's identity and qualifications, results of any and all polygraph examinations and any reports summarizing those examinations administered to the informants

19

*Federal Defender Services*
*of Wisconsin, Inc.*

during the investigation and after his arrest, and the individuals receiving the results of each examination.

h.      Identification of any payments or benefits, whether or not memorialized in writing, given to the informants in this case or in any other case for working as an informant, including:

i.      An itemized description of each "service" for which the informants were paid for each service and the date paid, along with copies of any receipts or other supporting documents;

ii.     An itemized description of each "expense" paid to the informants, including the amount and the date paid, along with supporting documents;

iii.    An itemized description of any payments or expenses not made directly to the informants, but made on their behalf, along with supporting documents;

iv.     An itemized description of any immigration benefits received, or hoped to be received, by the informants or others due to the cooperation.

v.      An itemized description of any other benefits provided for the informant's cooperation.

vi.     Specification of all other cases in which the informant has assisted the government, along with identification of all benefits.

vii.    All information concerning any personal animosity expressed against Hamzeh by any witness,

viii.   All other exculpatory information regarding the informants, such as that summarized in Hamzeh's previous discovery requests. *E.g.*, Ex. A.

**C. All information concerning investigations that failed to result in the discovery of incriminating information.**

The government expended enormous resources in this case—far beyond what the defense ever could hope to have. This includes the use of two full-time confidential informants and the use of multiple FBI agents—agents who conducted surveillance, supervised the informants, and conducted investigations. And these resources included numerous translators. The investigation was so in-depth that agents obtained Hamzeh's

*Federal Defender Services
of Wisconsin, Inc.*

birth records and even spoke to the doctor who delivered him. Undoubtedly, an investigation that covered so much ground also aimed to uncover Hamzeh's history of extremism, communications with extremists, and overseas communications to prepare for attacks in Israel that the government guessed were in the planning stage in October 2015.

Naturally given such a thorough investigation into parts as inconsequential as the doctor who delivered Hamzeh would extend to the areas that matter. These would include the FBI seeking to identify the supposed group in Chicago that Hamzeh at one point claimed he was aligned with and the bank accounts in which he had saved thousands and thousands of dollars as he had claimed to the informants. The defense believes that the FBI agents conducting these types of investigations and others would have come up empty-handed. Certainly, if the FBI discovered anything incriminating about Hamzeh's background, it would have been turned over as part of its case. But if the FBI conducted these types of investigations and uncovered nothing, then that's exculpatory and must be produced. Indeed, it would go to the jury's assessment of Hamzeh's predisposition.

Accordingly, Hamzeh requests production of the following:

> i.      Identification of all efforts to link Hamzeh with extremists, including through examination of historical data such as phone records, emails, texts, instant messaging, chat groups, other social media, data mining, interviews in the United States and overseas, financial records, and the interception of communications, and the results of those efforts.[5]

---

[5] *See* Charlie Savage, *N.S.A. Said to Search Content of Messages to and from U.S.*, N.Y. Times, Aug. 8, 2013 (available at  www.nytimes.com/2013/08108/us/broader-shifting-of-data-abroad-is-seen-by-nsa.html. In

*Federal Defender Services*
*of Wisconsin, Inc.*

     i. Identification of all efforts to link Hamzeh with any groups in the United States, including any supposed group in Chicago, and the results of those efforts.

    ii. Identification of all efforts to identify communications between Hamzeh and persons overseas in preparation for any violent act or to further any extremist agenda.

   iii. Identification of all efforts to identify any assets or bank accounts of Hamzeh and the results of those efforts, including any records obtained.

   iv. Identification of all efforts to confirm any of Hamzeh's excuses for not following up on any action he claimed to be contemplating and the results of those efforts.

    v. Identification of any investigation the FBI or other law enforcement agency took in an effort to gather incriminating information about Hamzeh that failed to result in the acquisition of incriminating information.

   vi. Identification of all efforts to identify past instances in which Hamzeh researched guns, shot a gun, went to a shooting range, applied for a gun permit, or researched buying or attempted to buy a gun, and the results of those efforts.

**D. Identification of all violations of FBI instructions by the informants**

As noted above, the defense assumes that the FBI would have advised its informants and its agents that it is the role of agents is to catch criminals, not create them, and therefore it was critical that the informants be careful not to entrap Hamzeh. The *Attorney General Guidelines for Conducting Undercover Activities* (2002) ("Undercover Guidelines") emphasized the importance of protecting innocent parties against entrapment, warning that entrapment "must be scrupulously avoided." *Id.* at 16.[6] Those

_____

this article, Savage details the operation of NSA surveillance programs through which the NSA "is searching the contents of vast amounts of Americans' e-mail and text communications into and out of the country, hunting for people who mention information about foreigners under surveillance."

[6] These guidelines can be found as an attachment to the Defendant's motin for additional discovery in *United States v. Daoud,* 12CR723 (N.D. Ill) (D.E. 54–1). The citations are to the page numbers of the Undercover Guidelines.

*Federal Defender Services of Wisconsin, Inc.*

Guidelines further provide that undercover employees must not "initiate or instigate any plan to commit criminal acts," that they shall be instructed in the law of entrapment, and if an undercover employee learns that a target intends to commit a violent crime, "he or she shall try to discourage the violence." *Id.* at 17.

While the FBI undercover employee Guidelines typically don't apply to confidential informants, *id.* at 2, there is even more reason to make sure untrained and unaccountable informants understand these limitations. And there is at least some evidence in the discovery that the FBI warned the informants about being too zealous. For example, the following phone conversation took place on November 2, when Hamzeh temporarily left CI Mike's presence:

> CI Mike: Oh my God. He just confessed to me he wants to go overseas and aaa and do some shit.
> FBI:     Okay. Just maintain like we said. Just . . . just talk to him and just, just just listen to him. You don't have to add any comments. Do not add any commentary.
> CI Mike: No, man. I just talked about the news and stuff and what is going on too, overseas.
> FBI:     Okay, appreciate.
> CI Mike: Ah?
> FBI:     Alright, man. Alright will see you, will see you afterward.
> Mike:    Alright bud.

Despite this warning (and presumably others), there are a number of occasions where Mike adds commentary and more to induce Hamzeh. Thus, the defense seeks notice and reports of the following:

> j.     All occasions on which the FBI cautioned or sanctioned the CI's for violating protocol.

> i.     This would include inducements to Hamzeh to engage in criminal conduct.

*Federal Defender Services
of Wisconsin, Inc.*

ii.   This would also include admonitions for engaging in criminal conduct such as possessing, smoking, or delivering marijuana,

iii.   This would also include any information that any informant was involved in a sham marriage in an effort to obtain citizenship.

k.     To the extent that the recordings produced to the defense have been modified to excise conversations between agents and informants before or after meetings with Hamzeh, Hamzeh requests the remaining portions of the recordings because of their potential exculpatory value.

### E. Information regarding the genesis of the Mason plot and the effort to obtain machine guns.

This case began when Hamzeh's long-time friend, CI Steve, reported about some statements Hamzeh was making that caused him some concerns. CI Steve did not believe, however, that Hamzeh posed an immediate threat. That initial report also claimed that Hamzeh would like to get a gun, although he never did. Within ten days, CI Steve reported that Hamzeh had "changed his mind about doing stupid things" and was saying it was "a bunch of bullshit." Based on CI Steve's initial report, the FBI planted CI Mike at Hamzeh's workplace in late September 2015. By early October, Mike was bringing a gun to work and showing it to Hamzeh and CI Steve in the parking lot. CI Mike used his gun as a springboard to suggest they go to the shooting range together. Hamzeh went with him to the range on a few occasions. Hamzeh was a citizen who could lawfully purchase and possess a gun.

In December, CI Mike began putting pressure on Hamzeh to get a gun, but when Hamzeh indicated he just wanted a pistol for work, Mike wasn't satisfied. Instead he showed Hamzeh semi-automatic guns at the range's pro shop (also legal for Hamzeh to own) and suggested that Hamzeh should get a machine gun. Hamzeh rebuffed Mike's

*Federal Defender Services of Wisconsin, Inc.*

repeated overtures, assuring him that a pistol would be sufficient for his purposes. Although he never obtained a gun, Hamzeh mentioned wanting a pistol for protection on at least five occasions in November and December. On December 14, 2015 (during their last recorded conversation until January 19, 2016) Hamzeh again told Mike that he did not want a machine gun, but only a pistol. The bond memo recounts these conversations in detail—ranging from Hamzeh complaining that Mike keeps asking him the same question every day to Hamzeh telling Steve and Mike that he's thinking of going to Jerusalem in February "just for a visit." R.47:17–25. And they are worth re-reading to understand where Hamzeh and the investigation stood in December 2015.

Fast forward to January 4, CI Mike reported to the FBI that he didn't believe that Hamzeh had acquired a weapon and he had not made further mention of any plans to conduct an attack overseas or in the United States. Hamzeh had, however, requested that Mike get him a pistol because a coworker had been carjacked. Four days later, Steve reported that Hamzeh was no longer speaking of Jihad, only going on vacation back to Jordan, where Hamzeh was raised. And on January 11, the reports were similarly benign. CI Mike reported to the FBI that Hamzeh wanted to go to the Shooter's Shop to look at guns—Mike surmised this was because he had been talking to Hamzeh about Mike's AK-47. In this report, Mike reiterated that Hamzeh had not spoken of traveling for Jihad. So at no point from September (when the investigation began) through January 11 had either informant reported anything about the Masons. *See* R.47:25–27 (providing further detail to these points).

*Federal Defender Services*
*of Wisconsin, Inc.*

The summary above raises several obvious questions not answered by the discovery. First, how did CI Mike's push for machine guns originate? As noted, Hamzeh could legally buy other guns and he showed no interest in purchasing a machine gun, which would be illegal. There plainly was a plan hatched to encourage Hamzeh to buy a machine gun so that there would be a prosecutable offense. It seems unlikely that CI Mike came up with the plan on his own and even if he did the agents would have to approve it (and also CI Mike's decision to go armed with a firearm and display it to Hamzeh and others). Any information concerning discussions, decisions, or approvals to promote a sale of machine guns to Hamzeh are exculpatory because they help establish two important entrapment factors:

> (1) that the government first suggested the criminal activity; and

> (2) that the government did not merely invite or solicit Hamzeh to commit the offense.

It also goes to the motive and bias of the agents and informants because this information supports Hamzeh's view that they had a strong desire to have Hamzeh engage in illegal conduct.

One other point of significance regarding who came up with the machine gun plan, when, and what instructions were given relates to the confusion among the informants and obscure differences, if any, in their speech between semi-automatic and automatic guns. In Arabic, the three often used the term "Kalashnikov" for semi-automatic and automatic firearms. For example, in conversation on January 19, CI Steve

*Federal Defender Services*
*of Wisconsin, Inc.*

asks if Hamzeh has used a machine gun on the range and at another point Hamzeh notes that CI Mike already has a machine gun. CI Mike did not have a machine gun but a semi-automatic rifle. This lack of clarity may become significant at trial so it will be important to determine whose plan this was (informant's? FBI agent's? Prosecutor's?).

The same also is true for the alleged plot against the Masons. Who developed this plan and when? As of January 11, the Masons had never been discussed, and the conversations in which the supposed plan was hatched were mysteriously not recorded. But contemporaneous recordings before Hamzeh's arrest had Hamzeh reporting to others that the plan was CI Mike's. Hamzeh stated that Mike "brainwashes" you, and that he had shown him a lot of disturbing videos to convince him the Masons were ISIS. So any mentions or discussions by agents, between informants, or between informants and agents about the Masons before January 19 are (like discussions about the machine guns) exculpatory to Hamzeh as they support his claim that he did not come up with the plan or lead it.

Finally, Hamzeh requests information concerning any instructions or discussions with the informants about playing on Hamzeh's religious beliefs, his feelings about Israel, or his ignorance of world events to encourage his participation in any plan. That would include any discussions about the Masons or how to falsely portray the Masons to convince Hamzeh that they were ISIS and anti-Islam.[7]

---

[7] In *Mayfield,* the court recognized that under prior Supreme Court decisions, the accused may examine the conduct of the government agent. 771 F.3d at 428. In explaining how "subtle, persistent, or persuasive" government conduct may constitute an illegitimate inducement, the Court notes that in *Sorrells,* the inducement was the informants persistent appeal to military comradery; in *Sherman* it was repeated

27

*Federal Defender Services*
*of Wisconsin, Inc.*

Thus, the defense seeks a court order directing that the government turn over the following:

> 1. All reports, memorandum, rough notes, text messages, or any other form of communication between the FBI agents and the informants be turned over concerning the following topics:
>
>    i. All information about machine guns and direction given to the informants about machine guns.
>    ii. All information about the Masons and direction given to the informants about the plan to attack the Masons or any other domestic target.
>    iii. All information provided to the informants that falsely portrays the masons as in league with ISIS and enemies of Islam.

## F. Information about the informant's activities that only the government can obtain.

The defense's position is that discussions about the Masons and machine guns originated with Mike and/or the FBI. Hamzeh's statements before and after his arrest, as well as Mike's own statements, refer to videos that influenced Hamzeh. These disturbing videos were intentionally shown by CI Mike to Hamzeh to mislead him about the Masons, and they are important to show government inducement. Indeed, the something more (the plus factors) can be "repeated attempts at persuasion" it can include "fraudulent representations" it can include "coercive tactics" and "subtle, persistent, or persuasive conduct by government agents or informants [all of it] may qualify as an illegitimate inducement." *Mayfiedl*, 771 F.3d at 435 (citation omitted). Here, the jury will

---

requests from an informant posing as a fellow addict, who fell off the wagon; and in *Jacobson*, the inducement was a two-year campaign conditioning the defendant to believe that child pornography was acceptable and encouraging him to purchase it. *Id*. at 434 (citations omitted).

*Federal Defender Services of Wisconsin, Inc.*

better understand the repeated attempts at persuasion that CI Mike used if it sees the YouTube videos that Hamzeh was shown.

To locate the videos Mike showed to Hamzeh, Hamzeh seeks all YouTube videos that the informants watched with, or sent to, Hamzeh, and all emails and text messages that were sent to Hamzeh. Because the Stored Communications Act, 18 U.S.C. §§ 2701–12, precludes the defense from subpoenaing this information from the informants or from social media sites, this information can only be obtained through the government. For these reasons we seek an order requiring the government to produce:

m.   Google account information for both informants, including:

  i.   Google account usernames;
  ii.  YouTube videos (including link information) that were viewed through the accounts of the informants;
  iii. Archive records of the YouTube searches for each account between October 1, 2015, and January 25, 2016;
  iv.  Any and all emails that were sent by the informants to Hamzeh, to each other, and to the FBI agents; and
  v.   Archive records of Google searches for Masons, machine guns, Jihad, or others subjects potentially relevant to entrapment.

n.   All Facebook information for both informants, including:

  i.   Account usernames;
  ii.  Messages sent by the informants to Hamzeh, and to each other (where related to Hamzeh or the investigation); and
  iii. Facebook account downloads of both informants, between September 2015 and February 1, 2016.

o.   All SMS and text messaging for both informants, including:

  i.   Messages sent by the informants to Hamzeh, each other, and to the agents.

*Federal Defender Services*
*of Wisconsin, Inc.*

### G. Mental health records.

Defense counsel has learned from multiple sources that one of the informants was hospitalized for mental-health issues. This apparently happened within days of Hamzeh's arrest. The government has not turned over police reports and hospital records relating to the informant's mental health. That information obviously is exculpatory as it is close in time to the events and likely affects the informants' perceptions, memory, and ability to recall the events that occurred. There is also the potential that the informant's guilt over betraying Hamzeh and entrapping him into criminal conduct caused the breakdown and that he expressed regret over his actions as well as evidence that he did more than what he was comfortable with and what the law provided he could do in inducing Hamzeh to possess the machine gun.

The government is in contact with the informant and has assured the defense he will be at trial, but his whereabouts have not been disclosed to the defense and he is believed to be out of the country. Hamzeh requests all information, including all police reports and hospital records, relating to mental health or substance abuse concerns regarding the informants. *E.g., Wilson v. Beard*, 589 F. 3d 651, 660-62, 666 (3d Cir. 2009) (vacating defendant's conviction because prosecutor failed to disclose that one witness experienced head pain, "blackouts," occasional "memory loss," and confusion and a second witness had mental health issues that required medication, which caused drowsiness, confusion, and impulse control; "[t]his evidence could have been used to demonstrate the witness's impaired ability to perceive, remember, and narrate

*Federal Defender Services*
*of Wisconsin, Inc.*

perceptions accurately"). Likewise a witness's substance use and abuse history, should be disclosed. *E.g.*, *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) (drug use is basis for disclosure to permit defense to ask about whether drug use altered ability to recall and relate); *United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("Mental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' testimony").

Thus, the defense seeks a court order directing that the government turn over the following:

> p.     The mental-health records of the informants relating to any post-arrest commitment.

> q.     Any records concerning the informants drug use.

### H.  Copies of un-redacted reports

In many cases, the defense is provided with redacted reports. This is meant to protect the informants and the integrity of the government's investigation. And normally, that isn't an issue. But as a case gets closer to trial it's customary to turn over a clean copy of the reports. Sometimes helpful information lied under the blacked-out sections; other times, it just facilitates trial preparation and allows for proper impeachment of witnesses. In this case, the redacted reports prevent the defense from knowing with certainty who is being referred to in the reports, and they prevent the defense from conducting follow-up interviews of witnesses who where present. The blacked-out sections also increase the chance of the defense making erroneous assumptions that could jeopardize the defense

*Federal Defender Services*
*of Wisconsin, Inc.*

at trial. Exhibit E, which is submitted under seal, will give the Court some flavor of what the defense is dealing with in these reports.

To date, the government has declined to provide the defense with a clean copy of the discovery. In order to prepare for trial, the defense is requesting that the Court order the government to provide a clean copy of the all discovery. There is already a protective order in place, so there is no reason to withhold the unredacted reports. In addition, to make trial go smoother and let the parties be on the same pages, the discovery should be batestamped, to make impeachment easier and keep the parties from talking past each other.

Thus the defense asks that the Court direct the following

      r.    That an unredacted copy of all reports be turned over to the defense.

          i.    That the discovery be batestamped to allow for ease of use and citation at trial.

## I.  Reports by the informants about each other

According to the government, each informant didn't know the other was also working as an informant until several days before Hamzeh's arrest. Because each informant had been acting for months as though he was interested in engaging in some sort of violence, and the two informants interacted frequently and worked together, it would have been natural for each of them to report to the FBI their suspicions about the other—these would include oral reports and text messages. But no such reports have been turned over. Yet what the informants said about each other, and any contradictions in their reports, are exculpatory and subject to Rule 16. Also, each informant's perception

32

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:16-cr-00021-PP-WED    Filed 01/03/18    Page 32 of 41    Document 82

of the other informant may supply important information that explains both Hamzeh's reactions and captures the inducement that was being used upon Hamzeh and (in the informant's view) the other conspirator, who was actually an informant. Accordingly, any such reports, or notes of such conversations with the informants, should be turned over.

In addition, at some point the agents told the informants that they were not the only informant working the case. Presumably there was a meeting of some sort where instructions were given, questions asked, and a plan devised. In particular, there were directions on who would take the lead and what support would be given to the various ideas that were thrown about. It seems a little odd that unless otherwise directed and in on the plan, the other "informant" wouldn't balk at or act surprised about the sudden mention of the Masons now being aligned with ISIS and the enemies of Islam.

All of that information should be turned over as it is relevant and exculpatory as to the bias and motives of the agents and informants, that information is also relevant to the informants' state of mind. What's more, that information will speak to the perception that each informant had of the other and how influence was being used within the group to persuade Hamzeh (and the other informant) to engage in criminal conduct. These reports also are likely to reveal statements made by the informants that can be used to establish inducement.

Thus, the defense seeks an order directing the government to turn over the following:

*Federal Defender Services*
*of Wisconsin, Inc.*

s.    All reports by the CI or the agents about one CI's perception or recording of the other CI.

    i.   So, the defense wants, all reports by or about Steve that concern his perceptions and meetings with Mike—both when Hamzeh was present and when he wasn't.

    ii.  The defense wants all reports by or about Mike that concern his perceptions and meetings with Steve—both when Hamzeh was present and when he wasn't.

t.    All reports concerning the meeting when the CI's were told of each other and the instructions given to them about how they are to approach Hamzeh.

    i.   This includes any mention of directing Hamzeh to attack the masons

    ii.  This includes any mention of directing or ensuring that Hamzeh get an illegal machine gun.

## J.  Translations of the remaining recordings

Under Rule 16(a)(1)(A) and *United States v. Bailleaux*, 685 F.2d 1105, 1112–16 (9th Cir. 1982), the defense is entitled to receive all the defendant's statements in the possession of the government. The defense requests identification of any portion of those recordings that is exculpatory since they have not all been transcribed and the defense counsel doesn't (unfortunately) speak Arabic. To the extent that the government has draft translations that haven't been turned over because it doesn't intend to use them at trial, those are statements of the defendant that must be turned over under Rule 16. The defense simply doesn't have the resources to translate all conversations.

## K.  Reports regarding silencer

In response to the pretrial motions and the defense's multiplicity challenges, the government offered that the initial reports (embedded into the defense's brief) were

34

*Federal Defender Services of Wisconsin, Inc.*

inaccurate. The silencer and the gun were not made as one piece but constructed separately. To date, the defense has not received any reports corroborating that claim.

Thus, the defense seeks:

> u.    All reports concerning the machine gun, the silencer, and its manufacturing.

### III.    Conclusion and a checklist of the discovery sought.

In sum, the defense is getting ready to try this case but the more it prepares the more it discovers what's missing. The defense anticipated a drought of information until the Court imposed deadline of 90-days before trial, but with that deadline there didn't come the flood we'd hope for but a trickle of information about the informants—some summaries on payments without the underlying documents or full disclosure about *all* the informants' activities. At the same time, the defense received 29 final transcripts that are too voluminous to properly scrutinize and parse before trial.

But the real find was the government's disclosure that there was more surveillance, 64 days of it, and that has not and will not be turned over to the defense, despite the government's assurance that it is following it's open-file policy. While the government's policy don't make for binding obligations, *Brady* and Rule 16 do. Thus, the defense seeks recourse to both and seeks the following information. Given how close this comes to trial, the defense also seeks expedited briefing on the issue and a hearing, so that the Court and the parties can be on the same page both about what information exists, when it will be turned over, and in what format.

35

*Federal Defender Services*
*of Wisconsin, Inc.*

a.     All information pertaining to surveillance of Hamzeh, including:

    i.     All surveillance logs of Hamzeh;
    ii.    Any written reports about surveillance of Hamzeh; and
    iii.   Any video or audio recordings of surveillance of Hamzeh.

b.     All communications between each CHS and the FBI agents, including:

    i.     All emails sent between them;
    ii.    All text messages;
    iii.   Any voicemails that were left and recorded;
    iv.    Any other communication, in any form, between them; and
    v.     All FBI notes and recordings of meetings with the informants.

c.     All communications to or from Hamzeh that were captured, including:

    i.     All emails;
    ii.    All text messages;
    iii.   All Facebook messaging;
    iv.    All recorded phone calls, captured either by the informants or the FBI or any other governmental agency; and Logs or other documentation regarding this information.

d.     Thus Hamzeh specifically requests that the Court order the government to turn over all rough notes.

e.     Any policy manuals, guidance, memoranda, training manuals, or other documents concerning terrorist investigations and/or the use of confidential sources, including:

    i.     Those in effect at the time of this investigation;
    ii.    Those that were used by the agents in this case;
    iii.   Instructions that were given to the informants or that the informants were told they had to follow;
    iv.    Signed statements of understanding by the informants in this case or any other case;
    v.     All instructions given to the informants in this case or any other case regarding how to conduct themselves.

36

*Federal Defender Services*
*of Wisconsin, Inc.*

f.      All documentation required to be maintained under The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources, including, but not limited to:

  i.    The initial suitability report for each informant, to include biographical information, personal information, motivation for becoming an informant, and criminal history;

  ii.   All written instructions reviewed with the informant upon registration and thereafter;

  iii.  All annual or other reviews of each informant;

  iv.   All authorities for any informant to engage in illegal activity and supporting documentation;

  v.    Identification of any violations or deviations by any informant;

  vi.   Identification of any violation or deviation from any guidelines or policies by any government agent.

g.      Identification of any polygraphs given to the informants. For any polygraph, we are requesting the date, location, and duration for each polygraph examination, the polygraph administrator's identity and qualifications, results of any and all polygraph examinations and any reports summarizing those examinations administered to the informants during the investigation and after his arrest, and the individuals receiving the results of each examination.

h.      Identification of any payments or benefits, whether or not memorialized in writing, given to the informants in this case or in any other case for working as an informant, including:

  i.    An itemized description of each "service" for which the informants were paid for each service and the date paid, along with copies of any receipts or other supporting documents;

  ii.   An itemized description of each "expense" paid to the informants, including the amount and the date paid, along with supporting documents;

  iii.  An itemized description of any payments or expenses not made directly to the informants, but made on their behalf, along with supporting documents;

  iv.   An itemized description of any immigration benefits received, or hoped to be received, by the informants or others due to the cooperation.

  v.    An itemized description of any other benefits provided for the informant's cooperation.

37

*Federal Defender Services*
*of Wisconsin, Inc.*

<ol type="i" start="6">
<li>Specification of all other cases in which the informant has assisted the government, along with identification of all benefits.</li>
<li>All information concerning any personal animosity expressed against Hamzeh by any witness,</li>
<li>All other exculpatory information regarding the informants, such as that summarized in Hamzeh's previous discovery requests. *E.g.*, Ex. A.</li>
</ol>

i.      Identification of all efforts to link Hamzeh with extremists, including through examination of historical data such as phone records, emails, texts, instant messaging, chat groups, other social media, data mining, interviews in the United States and overseas, financial records, and the interception of communications, and the results of those efforts.

<ol type="i">
<li>Identification of all efforts to link Hamzeh with any groups in the United States, including any supposed group in Chicago, and the results of those efforts.</li>
<li>Identification of all efforts to identify communications between Hamzeh and persons overseas in preparation for any violent act or to further any extremist agenda.</li>
<li>Identification of all efforts to identify any assets or bank accounts of Hamzeh and the results of those efforts, including any records obtained.</li>
<li>Identification of all efforts to confirm any of Hamzeh's excuses for not following up on any action he claimed to be contemplating and the results of those efforts.</li>
<li>Identification of any investigation the FBI or other law enforcement agency took in an effort to gather incriminating information about Hamzeh that failed to result in the acquisition of incriminating information.</li>
<li>Identification of all efforts to identify past instances in which Hamzeh researched guns, shot a gun, went to a shooting range, applied for a gun permit, or researched buying or attempted to buy a gun, and the results of those efforts.</li>
</ol>

j.      All occasions on which the FBI cautioned or sanctioned the CI's for violating protocol.

<ol type="i">
<li>This would include inducements to Hamzeh to engage in criminal conduct.</li>
<li>This would also include admonitions for engaging in criminal conduct such as possessing, smoking, or delivering marijuana,</li>
</ol>

38

*Federal Defender Services of Wisconsin, Inc.*

iii.   This would also include any information that any informant was involved in a sham marriage in an effort to obtain citizenship.

k.     To the extent that the recordings produced to the defense have been modified to excise conversations between agents and informants before or after meetings with Hamzeh, Hamzeh requests the remaining portions of the recordings because of their potential exculpatory value.

l.     All reports, memorandum, rough notes, text messages, or any other form of communication between the FBI agents and the informants be turned over concerning the following topics:

i.     All information about machine guns and direction given to the informants about machine guns.
ii.    All information about the Masons and direction given to the informants about the plan to attack the Masons or any other domestic target.
iii.   All information provided to the informants that falsely portrays the masons as in league with ISIS and enemies of Islam.

m.     Google account information for both informants, including:

i.     Google account usernames;
ii.    YouTube videos (including link information) that were viewed through the accounts of the informants;
iii.   Archive records of the YouTube searches for each account between October 1, 2015, and January 25, 2016;
iv.    Any and all emails that were sent by the informants to Hamzeh, to each other, and to the FBI agents; and
v.     Archive records of Google searches for Masons, machine guns, Jihad, or others subjects potentially relevant to entrapment.

n.     All Facebook information for both informants, including:

i.     Account usernames;
ii.    Messages sent by the informants to Hamzeh, and to each other (where related to Hamzeh or the investigation); and
iii.   Facebook account downloads of both informants, between September 2015 and February 1, 2016.

o.     All SMS and text messaging for both informants, including:

39

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:16-cr-00021-PP-WED   Filed 01/03/18   Page 39 of 41   Document 82

i. Messages sent by the informants to Hamzeh, each other, and to the agents.

p. The mental-health records of the informants relating to any post-arrest commitment.

q. Any records concerning the informants drug use.

r. That an unredacted copy of all reports be turned over to the defense.

i. That the discovery be batestamped to allow for ease of use and citation at trial

s. All reports by the CI or the agents about one CI's perception or recording of the other CI.

i. So, the defense wants, all reports by or about Steve that concern his perceptions and meetings with Mike—both when Hamzeh was present and when he wasn't.
ii. The defense wants all reports by or about Mike that concern his perceptions and meetings with Steve—both when Hamzeh was present and when he wasn't.

t. All reports concerning the meeting when the CI's were told of each other and the instructions given to them about how they are to approach Hamzeh.

i. This includes any mention of directing Hamzeh to attack the masons
ii. This includes any mention of directing or ensuring that Hamzeh get an illegal machine gun.

u. All reports concerning the machine gun, the silencer, and its manufacturing.

*Federal Defender Services*
*of Wisconsin, Inc.*

Dated at Milwaukee, Wisconsin this 3rd day of January, 2018.

Respectfully submitted,

/s/     *Craig W. Albee*
Craig W. Albee,
Joseph A Bugni
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave. - Rm 182
Milwaukee, WI  53202
Tel. (414) 221-9900
e-mail:  craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

41

*Federal Defender Services
of Wisconsin, Inc.*