UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

v.                                        Case No. 16-CR-21-PP

SAMY M. HAMZEH,

           Defendant.

## ORDER

On February 9, 2016, a grand jury in this district returned a three-count indictment against Samy M. Hamzeh, charging him with three counts of knowingly receiving an unregistered firearm in violation of 26 U.S.C. § 5861(d). (ECF No. 6.) On January 3, 2018, Hamzeh filed a motion for release of *Brady* materials. (ECF No. 82.) The court held a hearing on January 31, 2018, and ordered a supplemental response by the government and a supplemental reply by Hamzeh. (ECF No. 101.) The motion is now ready for resolution.

The Due Process Clause requires that the government disclose to the defendant all exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963). Federal Rule of Criminal Procedure 16(a) requires the government to provide the defendant upon request: (1)

written and oral statements made by the defendant; (2) the defendant's prior record; (3) documents or other tangible objects that are material to the preparation of the defense; (4) results and reports of scientific tests and other physical or mental examinations; and (5) written summaries of any expert opinions. In this district the government typically follows an "open file" policy, disclosing without demand (1) all information and materials listed in Fed. R. Crim. P. 16(a)(1)(A), (B), (C), (D), (F) and, upon request, (E); (2) material disclosable under 18 U.S.C. § 3500 (except grand jury transcripts); (3) reports of interviews with witnesses the government intends to call in its case-in-chief relating to the subject matter of the testimony of the witnesses; (4) relevant substantive investigative reports; and (5) all exculpatory material. Crim. L.R. 16(a)(2). The government is following its open file policy here. (ECF No. 7.)

The government's investigation of Hamzeh included the use of two confidential informants. Hamzeh apparently made statements to these individuals about traveling to Israel and conducting an attack. (ECF No. 82 at 2.) During the course of the investigation, FBI agents conducted surveillance of Hamzeh on 64 occasions. (*Id*. at 3.) Ultimately, one of the confidential informants reported to the FBI that Hamzeh and the informants had a plan to attack a Masonic center in Milwaukee. (*Id*.)

According to Hamzeh, he refused to go along with the plan. (ECF No. 82 at 3.) Nevertheless, he agreed to go with the informants to obtain two machine guns and a silencer that one of the informants had arranged to be purchased from an undercover

FBI agent. (*Id*. at 4.) When FBI agents handed Hamzeh a bag with the guns and the silencer, he was arrested. (*Id*.)

Hamzeh's defense to the charge of possessing unregistered firearms is that he was entrapped. (ECF No. 82 at 4.) Hamzeh contends that the requested discovery is important to establishing that defense. Many of the requests are aimed at the confidential informants, including communications between the informants and FBI agents, whether the informants were paid for their efforts, and their other activities.

Many of the issues raised in Hamzeh's motion have been resolved. The remaining dispute consists of the following requests: (1) FBI policy manuals, guidance, memoranda, training manuals, or other documents concerning terrorist investigations and/or the use of confidential sources; (2) agents' rough notes; (3) receipts and other paperwork documenting payments to confidential sources; (4) specification of cases in which confidential sources provided assistance to the government; and (5) unredacted reports.

In his supplemental reply Hamzeh raises a few additional requests. Specifically, he asks that the court order the government to indicate whether there were unpreserved text messages; he asks the court to order the government to identify efforts to link Hamzeh with terrorists; and he asks the court to order the government to provide all reports, memoranda, etc., concerning information about machine guns, the Masons, any

3
Case 2:16-cr-00021-PP-WED   Filed 03/08/18   Page 3 of 15   Document 107

plan to attack the Masons, or that falsely portray the Masons in league with ISIS and enemies of Islam. (ECF No. 105 at 10-11.)

### I. FBI policy manuals, etc.

Hamzeh requests FBI policy manuals, guidance, memoranda, training manuals or other documents concerning terrorist investigations and/or the use of confidential sources to determine "whether an agent violated protocol when instructing and documenting his or her instructions to an informant[.]" (ECF No. 82 at 16.) According to Hamzeh, "if the agents violated their guidance as set forth in these materials, that's exculpatory, or, at the very least, producible under Rule 16(a)(1)(E) because the documents are in the government's possession and material to the defense." (ECF No. 105 at 2.) Hamzeh's position is that it is important that agents follow the required protocols regarding the use of informants so as to "protect[] innocent persons from entrapment." (ECF No. 105 at 6.)

The government contends that Hamzeh fails to show that the requested manuals are exculpatory or material under Rule 16. (ECF No. 93 at 3.) The government argues that "[v]ague and unsupported assertions that internal FBI guidance…may contain 'fertile' information are not a sufficient basis upon which to compel disclosure of sensitive internal operating methods and procedures." (ECF No. 104 at 4.) Moreover, it argues, internal policies, etc., do not create enforceable rights. (ECF No. 104 at 5.) Finally, it argues that the information sought is not material to Hamzeh's entrapment

defense, the merits of which "will be assessed according to the legal elements of the defense, and not according to what an internal manual or policy may or may not require." (*Id*.)

Hamzeh does not seek the internal manuals in order to enforce a substantive right; he seeks the information to determine whether the investigators involved in investigating him followed the recommended protocol for dealing with informants and for "sting operations." (ECF No. 105 at 2.) Although Hamzeh has access to some of the Attorney General's guidelines, he doesn't know whether he has the guidelines that were in effect at the time of this investigation. (ECF No. 105 at 3.) Hamzeh is concerned that, should the information he has be outdated, witnesses will "seek refuge by denying knowledge of the particular manual or use of that particular manual." (*Id.*)

Although Hamzeh may not know which particular policies or training materials, if any, were in place at the time of this investigation, he has access to materials describing best practices in conducting investigations with confidential informants and in conducting undercover activities. More importantly, Hamzeh has not established that internal manuals setting forth "best practices" for investigating terrorist organizations or for dealing with confidential informants is material to his entrapment defense.

As recognized by Hamzeh, entrapment has two elements: a lack of predisposition to engage in criminal activity and the government's inducement of the crime. *United States v. Mayfield*, 771 F.3d 417, 442 (7th Cir. 2014). Both elements can be

5

proven regardless of whether case agents complied, or failed to comply, with some internal manual on how to investigate terrorist organizations or how to handle confidential informants. If Hamzeh could prove both a lack of predisposition and inducement, the fact that agents complied with internal policies and/or manuals would not render the entrapment defense a nullity. In the same vein, evidence that agents failed to comply with internal policies and/or manuals would not establish that Hamzeh was not predisposed to engage in criminal activity or that he was induced. Furthermore, unnecessary weight on compliance with internal policies and/or manuals risks confusion of the issues, with undue focus on whether the agents complied with a manual when the issue is whether Hamzeh was entrapped. *See* Fed. R. Evid. 403.

Therefore, the court shall **deny** defendant's request for these materials.

## II. Agents' rough notes

According to the government, case agents have preserved rough notes that they used to prepare reports during their investigation of Hamzeh. (ECF No. 104 at 6.) Hamzeh wants to see the notes so he can determine whether there are any inconsistencies between the agents' notes and what is stated in the reports. (ECF No. 105 at 7.) If there are inconsistencies, the notes are exculpatory and *Brady* material. (*Id.*) Hamzeh asks that either the court or the government review all notes and, if discrepancies exist between the notes and reports which have been turned over, any notes that differ from what is stated in reports should be produced. (*Id.*)

6

Case 2:16-cr-00021-PP-WED   Filed 03/08/18   Page 6 of 15   Document 107

In response, the government argues that in this district "open file materials" do not ordinarily include agents' rough notes used to prepare reports, citing Criminal Local Rule 16(a)(3). (ECF No. 104 at 6.) Beyond that, the government states that the agents will continue to preserve their notes, and it is "aware of its present and ongoing discovery obligations and will comply with them." (*Id.*)

Hamzeh does not have a constitutional right to his own search of the government's files. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). Nor does it appear necessary for the court to review the rough notes to confirm that the government has complied with *Brady* or its discovery obligations. *See United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir. 1989). *Brady* is a disclosure obligation of the government that exists regardless of a court's order. *United States v. Higgins*, 75 F.3d 332, 335 (7th Cir. 1996). Absent any reason to believe that exculpatory evidence exists within the agents' rough notes that has been withheld, the prosecutor's decision on disclosure is final. *See Ritchie*, 480 U.S. at 59. Thus, the court shall **deny** Hamzeh's request for the agents' rough notes.

### III. Documentation of instructions and payments to confidential sources

Hamzeh requested that the government identify "any payments or benefits … given to the informants in this case or in any other case for working as an informant[.]" (ECF No. 82 at 20.) In response, the government identified for each of two confidential human sources the dates and amount of payments, along with a stated purpose for each payment. (ECF No. 93 at 5.) The government identifies, among other things, payments

to CHS-2 on five different occasions in the amounts of $750, $550, $2,000, $2,000 and $2,000 "[b]ecause the FBI was tasking CHS-2 to his own financial detriment" (including quitting his job to take a job at a restaurant where Hamzeh worked and using his personal vehicle). (*Id*.)

Hamzeh requests the underlying documentation for the payments so that he "can confirm their accuracy, identify and investigate other witnesses to the transactions, and use these materials as exhibits and in cross-examination." (ECF No. 105 at 8.) The government argues that the information already provided (dates, amounts, and purposes of payments) is the "material impeachment information from underlying internal paperwork related to the payments." (ECF No. 104 at 6.) It does not otherwise explain why it should not have to produce to Hamzeh the documentation supporting the payments, although it does acknowledge that it "is in possession of paperwork documenting the payments to" the two confidential informants. (ECF No. 93 at 6.)

It is not clear from the information provided by the government whether the payments were merely reimbursement or whether they were more generally compensatory. Under the facts of this case and in light of Hamzeh's proffered defense, the court finds a relevant and material distinction as to whether the informants were merely "made whole" for their out-of-pocket expenses incurred as part of their cooperation or if the informants were essentially earning income from their cooperation. There are reasons to believe that the payments were for both purposes. For example, the

government says that it paid CHS-2 because he "was using his personal vehicle and paying for gas and a telephone." (ECF No. 93 at 5.) But the payments to CHS-2 were all in round numbers, suggesting they were not strictly reimbursement for objective expenses. In total, the government states that it paid CHS-2 $7,300, plus another $896.54 for a telephone, between September 30, 2015 and January 20, 2016. (*Id.*)

With regard to CHS-1, the government indicates that CHS-1 was offered a payment of $599 in January 2015 which he "refused." (ECF No. 93 at 5.) The government does not explain what this tendered payment was for, but the fact that CHS-1 turned it down suggests it might not have been simply reimbursement for out-of-pocket expenses.

Hamzeh has made a showing that the requested documents are material to the preparation of the defense: they are needed to determine what the payments to the informants were for so as to determine whether the informants were biased or improperly motivated. It is insufficient for the government to provide only the bottom-line dollar amounts; that information does not enable Hamzeh to determine what portion was strictly reimbursement and what was essentially income. The material is in the control of the government. Thus, the court shall **grant** Hamzeh's request that the government turn over all underlying documentation regarding the payments given to informants as part of their work in this case.

## IV. Specification of previous cases in which confidential sources worked

Hamzeh also asks the government to identify all other cases in which each informant "has assisted the government, along with identification of all benefits." (ECF No. 82 at 20.) The government states that it "has already informed the defendant that CHS-2 was previously a source for the FBI from March 28, 2011, to October 6, 2011." (ECF No. 104 at 7.) The government has also disclosed to the defendant why CHS-2 was closed as a source, and that he was 'reopened' as a source on April 15, 2015. (*Id.*) The government states that it is aware of its continuing discovery obligations and will comply with them in the event it comes into possession of additional responsive information. (*Id.*)

In reply, Hamzeh articulates more specifically what it is that he is looking for: information about "how many cases the informants have worked on with the government, what their motivations were for working for the government, what benefits they have received for working for the government, what benefits they requested from the government, what benefits they expected to receive from the government, whether they expect to receive benefits in the future from the government, whether they feel insulated from civil or criminal liability as a result of their work for the government, and how much money they have received in total from the government." (ECF No. 105 at 9.) This information will "expos[e] the reasons the

informants want to curry favor with the government as revealed by the number and degree of contacts between the informants and government agents." (*Id.*)

Hamzeh has not established the need for all of the detail he seeks regarding the informants' work in other cases. The government has already told him that CHS-2 has worked with it previously, telling him exactly when and for how long. (The absence of any discussion about CHS-1 implies that he has not previously "assisted" the government.) Hamzeh has not demonstrated how it is material whether that work was on one matter or several matters. As for payments received by CHS-2 working on other matters, given the nature of this case and the defense's intention to rely on an entrapment defense, Hamzeh has demonstrated that the amount of compensation that CHS-2 received working as a source of information for the FBI on other matters is material to establish bias or motive. Therefore, the court will **grant** that portion of Hamzeh's request and order that the government provide information in its possession regarding the amount of compensation which CHS-2 has received for his role as a source of information for the government during the time period identified above by the government.

## V.     Unredacted reports

Hamzeh states that the government has provided a number of reports that have been redacted. (ECF No. 82 at 31.) He requests unredacted copies of the reports because,

among other things, it "facilitates trial preparation and allows for proper impeachment of witnesses." (*Id*.)

In response, the government argues that the redacted information is "neither exculpatory nor relevant." (ECF No. 104 at 7.) It states that "[a]lmost all of the redactions are of administrative markings, classification markings, names of innocent third parties, and personal identifying information (such as social security numbers and driver's license numbers)." (*Id*.) In any event, the government again states that it will comply with its discovery obligations, and if Hamzeh identifies redactions that he believes withhold discoverable information the government will "reassess" its decision to redact that information. (*Id*. at 7-8.)

In reply, Hamzeh takes issue with the government's redaction of information about "third parties." According to Hamzeh, the third parties "are witnesses to interactions between Hamzeh and the informants or are persons Hamzeh and the informants were discussing." (ECF No. 105 at 9-10.) Beyond that, Hamzeh expresses skepticism that the only other information redacted is the markings and identification information referenced by the government. He says that he shouldn't have to go through "the cumbersome process of sorting through hundreds of pages of reports identifying every possible problematic redaction and then vetting it." (ECF No. 105 at 10.)

"The government retains the authority to redact from open file material anything (i) that is not exculpatory and (ii) that the government reasonably believes is not relevant to the prosecution, or would jeopardize the safety of a person other than the defendant, or would jeopardize an ongoing criminal investigation." Crim. L.R. 16(a)(2) The government states that the redacted information is neither exculpatory nor relevant. (ECF No. 104 at 7.) The court has reviewed the one redacted report submitted by Hamzeh as Exhibit E to his motion and concludes that its redactions are not excessive. Although Hamzeh argues otherwise, the redactions appear to be consistent with what the government says they are—redactions of administrative markings, classification markings, names of innocent third parties, and personal identifying information (such as social security numbers and driver's license numbers).

If Hamzeh objects to certain specific redactions on specific reports, he should present his individualized objections to the government, which has said it will consider any such objections (*see* ECF No. 104 at 8). If the parties are unable to come to an agreement on unredacting particular portions of specific documents, Hamzeh can renew his motion and the court will schedule a hearing at which the parties can discuss each disputed report, with the court then determining whether unredaction is necessary.

Thus, the court shall **deny without prejudice** Hamzeh's request for a blanket unredaction of reports, subject to the parties attempting to work through this issue

together. If they cannot do so, Hamzeh can file a renewed motion regarding the redactions in the reports and the court will schedule a hearing to, if necessary, discuss each report and each redaction one-by-tedious-one.

## VI. Remaining issues

At the motion hearing the government indicated it would look into whether there were any text messages that were not preserved. The court shall **grant** Hamzeh's request that the government be ordered to identify what texts were not preserved, if any**.** The government shall inform Hamzeh as to whether an inquiry has been conducted into non-preserved text messages and provide him with as much information as the government has, such as the dates text messages were sent and topics that were discussed through text message.

Hamzeh also asks the government to identify efforts to link him with extremists. The government responds that that all material in its possession responsive to that request has been turned over. Expressing "grave doubts" that that is the case, Hamzeh seeks an order specifically requiring the production of this information. The court shall **deny** Hamzeh's request for such an order. More than the defense's "grave doubts" would be required for such an order. The government is aware of its discovery and disclosure obligations and no basis exists for concluding that it will not comply with them.

Finally, Hamzeh requests an order directing the government to provide any documentation of any communication about machine guns, the Masons and any plan to attack the Masons, or that falsely portrays the Masons in league with ISIS and enemies of Islam. But the government has already responded to that request, stating that it is not in possession of anything responsive. (ECF No. 93 at 7-8.) The court sees no basis for any further order. Therefore, the court shall **deny** Hamzeh's request.

**IT IS THEREFORE ORDERED** that Hamzeh's Motion for Release of Brady Materials (ECF No. 82) be **granted** in part**.** The government is ordered to release all underlying documentation regarding the payments given to informants as part of their work in this case and the amount of compensation which CHS-2 has received assisting the government as a source of information during the time period from March 28, 2011 to October 6, 2011. The government is further ordered to provide a response as to whether an inquiry has been made into non-preserved text messages. Hamzeh's remaining discovery requests are **denied** without prejudice**.**

Dated at Milwaukee, Wisconsin this 8th day of March, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge