UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


UNITED STATES OF AMERICA,    )   CASE NO:  2:16-CR-00021-PP
                      )
          Plaintiff,    )      CRIMINAL
                      )
    vs.              )    Milwaukee, Wisconsin
                      )
SAMY MOHAMMED HAMZEH,     )  Wednesday, January 31, 2018
                      )
_____Defendant.   )  (10:14 a.m. to 11:14 a.m.)


STATUS CONFERENCE

BEFORE THE HONORABLE WILLIAM E. DUFFIN,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:           SEE PAGE 2


Courtroom Deputy:     Mary Murawski

Court Reporter:       Recorded; FTR Gold

Transcribed by:       Exceptional Reporting Services, Inc.
                      P.O. Box 18668
                      Corpus Christi, TX 78480-8668
                      361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff:                PAUL KANTER, ESQ.
                             GREGORY HAANSTAD, ESQ.
                             Office of the U.S. Attorney
                             517 E. Wisconsin Avenue, Room 530
                             Milwaukee, WI 53202

For Defendant,               CRAIG W. ALBEE, ESQ.
(not present):               JOSEPH A. BUGNI, ESQ.
                             Federal Defender Services of Wisconsin
                             517 E. Wisconsin Ave., Rm. 182
                             Milwaukee, WI 53202

1    **Milwaukee, Wisconsin; Wednesday, January 31, 2018; 10:14 a.m.**

2                    **(Call to Order)**

3            **THE CLERK:**  Judge Duffin is present for *The United*

4    *States of America versus Sammy Mohammed Hamzeh*, Case Number

5    16-CR-21, here for a status conference.

6            May I have the appearances, please, first by the

7    Government?

8            **MR. HAANSTAD:**  Good morning, your Honor, Gregory

9    Haanstad and Paul Kanter for the United States.

10           **MR. KANTER:**  Good morning, Judge.

11           **THE COURT:**  Good morning to you both.

12           **MR. ALBEE:**  Good morning, your Honor, Craig Albee and

13   Joe Bugni appearing for Mr. Hamzeh.

14           **THE COURT:**  Good morning to you both.

15           Well, as you can see, despite our best efforts,

16   Mr. Hamzeh is not here and we can't seem to track him down.  So

17   we're going to go forward and I really just wanted to have this

18   talk about the motion for production of Brady material.  I've

19   read what -- I've read the motion and the Government's response

20   and kind of distilled the request down to what I think

21   continues to be in dispute.

22           The Government's response to a large extent is some

23   version of, "We'll give it to you" or "We don't have anything"

24   or "We don't have anything beyond what we've already given you"

25   and that really is the response to a lot of their requests, at

1    least as I understand.  The requests that I have kind of

2    identified that are still in dispute where the Government

3    admits that it has responsive material but doesn't want to turn

4    it over are the -- you know, the thought -- or what I want to

5    talk about today.

6            So starting with the first thing that I think is in

7    dispute, the Defense asks for -- let's go back.  I think I

8    skipped one here.  "All communications" -- it's under B of the

9    request.  "All communications between each CHS and the FBI

10   agents" including Subsection 5, "all FBI notes and recordings

11   of meetings with the informants."

12           And as to that request, the Government's response is

13   that the agents have preserved rough notes that they used to

14   prepare reports but they ask that I either deny the Defendant's

15   request that the notes be disclosed or examine the notes in

16   camera and determine whether and to what extent they should be

17   disclosed, the theory being that according to the Government,

18   the Defendant is generally not entitled to an agent's notes if

19   the report contains all that was in the notes.

20           So let me start by asking.  Mr. Albee, are we talking

21   -- is there any limit in the scope of notes you're looking for

22   either as to time period or subject matter or it's just all

23   notes of all agents that were involved in any aspect of this

24   investigation?

25           **MR. ALBEE:**  If I could take a step back, Judge, about

1  some --

2          THE COURT:  Sure.

3          MR. ALBEE:  -- overarching concerns that I think

4  inform the discussion on a number of these points.  One concern

5  I think we have overall is whether the U.S. Attorney's office

6  knows of everything that the FBI has.  It seems that in many

7  cases, the response is, "The Government doesn't have that."  I

8  don't know whether that refers to U.S. Attorney's office, to

9  the FBI, to all the agencies involved in this investigation but

10  it should.

11          And so we want to, I guess, at the conclusion of this

12  be clear on what the U.S. Attorney's office has talked to the

13  FBI about and knows whether they have or don't have.

14          THE COURT:  Well, let's stop right there and ask the

15  -- Mr. Haanstad or Mr. Kanter.  When these responses say, you

16  know, we don't have anything, are you referring to "we," the

17  U.S. Attorney's office or is it broader than that?

18          MR. HAANSTAD:  It's broader than that.  We're

19  referring to the prosecution team which includes our office and

20  the FBI.

21          THE COURT:  Okay.

22          MR. ALBEE:  And another -- and I appreciate that.

23  That's helpful.  Another question is whether there are other

24  reports that are out there that we don't know about.  One

25  frustration here is take an example of the surveillance reports

1    which we sort of belatedly reading between the lines thought,

2    it's clear that there's more surveillance going on here than

3    the reports we've received and we asked about them and then we

4    were told that there were a number of surveillance reports.

5              But it is a concern because we thought that they

6    should have been identified earlier and produced earlier and

7    even in the Government's response, there's talk about another

8    particular report being declassified about when the informants

9    were told that each other were on the Government's -- were

10   working for the Government.

11             So I do have concerns about what reports haven't been

12   identified here.  I mean, I don't think this should be -- and

13   this goes to some of our specific requests, too.  I hope that

14   answers are responsive to the spirit of what we're asking and

15   not gamesmanship as to whether we use the particular word or

16   phrase as to, you know, what exists out there.

17             So I guess we are interested in whether there are

18   other reports that, you know, the Government has not turned

19   over because it is an open-file policy, as I understand it, but

20   if they have other reports relative to this investigation, if

21   they don't want to turn them over, great, but I think we should

22   know about the reports.  You know, then we can address those.

23   My concern is because there is this declassification process

24   that takes a couple months that if we learn about them on the

25   eve of trial, we're back to putting this off again.

1       **THE COURT:**  So what specific request are you

2   referencing when you talk about that?

3       **MR. ALBEE:**  I guess consistent with the open-file

4   policy for starters, whether there are other reports relating

5   to this investigation that have not been turned over.

6       **THE COURT:**  Okay.  So you want an answer to that.  Is

7   that --

8       **MR. ALBEE:**  That would be correct.

9       **THE COURT:**  Okay.  Can either of you answer that,

10  Mr. Haanstad or Mr. Kanter?

11      **MR. HAANSTAD:**  Yeah, there's no gamesmanship going

12  on.  We've disclosed the reports that we have.  And I just want

13  to say with respect to the surveillance reports, we're not

14  disclosing them now because we've suddenly been convinced that

15  information in those reports is exculpatory or otherwise

16  disclosable.  We're erring on the side of providing as much

17  information as we possibly can.  So there were surveillance

18  reports with regard to 64 days' worth of surveillance and in

19  our view, there was nothing about those that required they be

20  disclosed under Brady, under Rule 16 or any other authority.

21      But because we've been given some additional time

22  before trial, our approach was, let's just have those reports

23  declassified and turn them over for whatever they're worth to

24  the Defense.

25      **THE COURT:**  And when do you think that's going to

1  happen?  How long -- when are we talking about?

2        **MR. HAANSTAD:**  I think that we should have those

3  available -- I mean, I don't want -- this is a hard deadline

4  necessarily but I think by February 23rd.

5        **THE COURT:**  Okay.  All right, Mr. Albee?

6        **MR. ALBEE:**  Okay.  All right.  I think we can delve

7  into the more -- the specific area the Court was addressing

8  although there was one item I did want to ask about that's in

9  -- and I'm going through the Government's response.  I guess

10  it's -- it would be B2, all the text messages and there I

11  understand the Government will be disclosing the text messages

12  that they have but our request would also be for identification

13  of what was not preserved.

14        We had cited case law to the effect that the failure

15  to preserve texts between the Government and -- Government

16  agents and informants is problematic.  In the case we cited, I

17  think it gave rise to an adverse inference jury instruction but

18  we did want to know whether there were additional text messages

19  that have not been preserved.

20        **THE COURT:**  Okay.  Was that -- and anybody want to

21  respond to that?

22        **MR. HAANSTAD:**  So that's Request B2.  That

23  information is available now.  We can provide that by the end

24  of the week and those would be all text messages between the

25  confidential sources and the FBI.  I have to say, when I

1    prepared our response, I went through just the Defendant's

2    checklist.  So this question about what was not preserved, I'll

3    have to look into that.

4              **THE COURT:**  Okay.

5              **MR. HAANSTAD:**  But as to that B2, again, those text

6    messages that are requested there are available now.

7              **THE COURT:**  You'll have to look into that to see if

8    there were text messages that were not preserved?

9              **MR. HAANSTAD:**  Correct.

10             **THE COURT:**  And if there were, do you have a position

11   about whether that information will be produced to the

12   Defendant and if so, by when?

13             **MR. HAANSTAD:**  I don't have a position on it yet just

14   because I don't know what that looks like but I can look into

15   it quickly and report back.

16             **THE COURT:**  Okay.  Why don't you do that?  That'd be

17   great.

18             **MR. HAANSTAD:**  Okay.

19             **MR. ALBEE:**  And then as to the rough notes question

20   that the Court had asked, I think the Government's right as a

21   general matter.  Rough notes aren't automatically admissible as

22   statements is the case law but if there are -- if there's

23   information included in the rough notes that's not in the

24   actual report or there are any contradictions, then those are

25   statements of the witness and they're potentially Brady

1    material that does need to be turned over.  The Government has

2    suggested the possibility of the Court reviewing these in

3    camera.  Frankly, that seems a difficult burden for the Court

4    because there are --

5             THE COURT:  Well, beyond that, my question for the

6    Government was going to be, how will I know -- if the basis for

7    not producing an agent's notes is that they're all -- all the

8    information in the notes is contained in reports, how will I

9    know if reports contain all that's in notes?

10            MR. HAANSTAD:  We can provide both the notes and the

11   reports.

12            THE COURT:  Okay.  And what kind of -- what volume

13   are we talking about?

14       (Counsel confer)

15            MR. HAANSTAD:  Yeah, I think the reports themselves

16   are that -- it's a small stack and, you know, I would guess --

17            THE COURT:  Okay.

18            MR. HAANSTAD:  -- around 200 pages and a lot of those

19   pages -- you know, from seeing reports before, there's a lot of

20   fluff in there, you know, headings and things like that.  So

21   the actual text is significantly less than that 200 pages but

22   I'd say 200 pages worth of reports and then whatever the

23   corresponding number of pages of notes.

24            THE COURT:  Okay.  Mr. Albee?

25            MR. ALBEE:  Well, I meant that's certainly, I guess,

1   an option.  I don't know -- you know, I'm always a little

2   surprised on the rough notes, if they're all incorporated in

3   the reports.  I don't see what the Government's -- you know,

4   where it burdens the Government or somehow undermines their

5   position to turn them over to the Defense and we can determine

6   whether it's all included.  And the Court doesn't have to do

7   the work and we do.  So that seems reasonable.  It's also not

8   clear to me whether the prosecution has compared these and

9   determined whether there are any inconsistencies.  So --

10          **THE COURT:**  Well, let me ask -- let me -- again, I

11  apologize for keep jumping in but let me ask Mr. Haanstad.

12  What is the objection to the notes?

13          **MR. HAANSTAD:**  Well, there --

14          **THE COURT:**  Is there stuff in the notes that are --

15  well, I mean, if in theory everything that's in the notes is in

16  the reports --

17          **MR. HAANSTAD:**  Right.

18          **THE COURT:**  -- why not give the notes?

19          **MR. HAANSTAD:**  A couple things.  First of all, the

20  local rules specifically exempt rough notes from our discovery

21  obligations under Rule 16(a)(3).  So we don't do it as a matter

22  of practice because we're acting consistent with the local

23  rule.  But also in this particular case -- and I know we've

24  talked about declassification procedures before but I believe

25  that we'd have to go through declassification with respect to

1    not only the reports, which we've already done, which enable us

2    to disclose them to Defense.  We'd have to do that with respect

3    to all of the rough notes as well.

4           MR. ALBEE:  You know, that raises a separate concern,

5    Judge, in that it's certainly not unusual in my experience that

6    while rough notes weren't produced before trial, that something

7    happens at trial that necessitates the rough notes being

8    produced.  I've had that happen and if we have this

9    declassification problem at trial, I don't know what we'd do

10   about it, is one issue.  But I think it's essential that the --

11   one way or another the notes be compared to the reports and if

12   there's additional material and/or contradictions that all that

13   be turned over.

14          THE COURT:  Okay.  I'm not going to rule on this

15   stuff today.  I'm just getting information that will help me

16   rule, by the way.

17          So let me ask you, Mr. Haanstad.  What is the form of

18   the rough notes?  Are these literally like I'm taking notes up

19   here?  I mean --

20          MR. HAANSTAD:  I'm not sure.  I believe, yes.

21          THE COURT:  Okay.

22          MR. HAANSTAD:  I mean, they're handwritten.  Just

23   handwritten notes, Judge.

24          THE COURT:  Okay, all right.  Anything else anybody

25   wants to add on that particular point?

1      **MR. ALBEE:**  I -- and I don't -- if the Court did

2  review these in camera, I guess the other concern would be

3  there -- as we've indicated elsewhere, these are -- the reports

4  we have, at least, are heavily redacted.  So I don't know

5  whether the Court would get unredacted reports so that it could

6  make those determinations.

7           **MR. HAANSTAD:**  That will be the idea, is that the

8  Court would get unredacted reports.

9           **THE COURT:**  Unredacted?

10          **MR. HAANSTAD:**  Right.  Which would --

11          **THE COURT:**  Then how will I know --

12          **MR. HAANSTAD:**  I'm sorry?

13          **THE COURT:**  Well, let me ask.  If I would get the --

14  you'd have to give me the unredacted and the redacted versions

15  I'm guessing because, I mean, I may look at the unredacted

16  reports and say, oh, yeah, everything from the notes is in here

17  but unbeknownst to me, some of that information has been

18  redacted in the version that went to Defense counsel.  So --

19          **MR. HAANSTAD:**  Right, that's correct and that plays

20  in a little bit to -- I'm sure you're getting to it but there

21  was also a request for unredacted reports.

22          **THE COURT:**  Yes.

23          **MR. HAANSTAD:**  Our response to that would be largely

24  the same, that is, we can provide the Court with both the

25  redacted and unredacted and the Court can make the

1  determination whether the reports need to be further redacted.

2  And there are some procedure questions that would go along with

3  that.  It's not as though if you ordered with respect to either

4  of these categories the rough notes or the unredacted reports,

5  if you were to rule that there is information in there that's

6  disclosable or discoverable, there's some procedures in place,

7  declassification and things of that nature that we'd have to go

8  through before we provided those to Defense counsel.

9          THE COURT:  Well, let me -- as long as we're on

10  unredacted reports, that was -- it's obviously one area that is

11  in dispute.  Let me ask.  What kind of reports are we talking

12  about, just to give me some idea?

13          MR. HAANSTAD:  In terms of volume?

14          THE COURT:  No, no, just -- I mean, what are the

15  reports that we're dealing with?

16          MR. ALBEE:  In terms of what reports are redacted,

17  Judge?

18          THE COURT:  Yeah.

19          MR. ALBEE:  Yeah.  And I'll let Mr. Bugni address the

20  redacted reports.  Did the Court get our submission yesterday?

21          THE COURT:  Yes.

22          MR. ALBEE:  Yeah, okay.

23          MR. BUGNI:  These are the confidential human -- or

24  the CHS reports and for us to be able to track exactly what

25  happened and what was said.  You know, as we pointed out

1   yesterday and I hope you have the attachments, some of those

2   are heavily redacted.  So you can't understand anything that

3   happened on that day.  Yet those are pivotal days in the, you

4   know, genesis of what was happening in this case.  And we only

5   chose five but there are numerous other ones where we have

6   large questions of, you know, what is in this report, what

7   happened, what was said.  So for us to be able to make hay out

8   of these reports and be able to mount a defense or impeach a

9   witness, we need to have the unredacted reports.

10          **THE COURT:**  How many reports are we talking about?

11          **MR. BUGNI:**  Sixty-eight -- it may be, you know, may

12   be more.

13          **MR. ALBEE:**  Sixty-five.

14          **MR. BUGNI:**  Sixty-five.  Sorry, your Honor.  That

15   would also include the surveillance as well.  Exhibit 1 to our

16   motion was actually some of the surveillance and that's heavily

17   redacted as well.  So that would actually increase the number.

18   I imagine that would bring it to 129.

19          And, your Honor, there is also the witness reports

20   that are separate and those are also redacted and there's

21   identification numbers -- identification information in there

22   that's been redacted.  Some of that we know -- we were able to

23   figure out but other ones -- you know, we shouldn't have to

24   guess.

25          **THE COURT:**  I mean, is the Government's position that

1   the Defendant isn't going to get unredacted reports at any time

2   or just not yet?

3          **MR. HAANSTAD:**  At any time if it's not further

4   redacted -- or further unredacted.  There -- our position is

5   that nothing in those reports that's been redacted is

6   substantive.  The redactions fall under a few main categories,

7   classification markings; administrative markings, things like

8   FBI case file number that's associated with this case; names of

9   some innocent third parties and personal identifying

10  information.  That would be things like phone numbers, social

11  security numbers, driver's license numbers and addresses.

12         **THE COURT:**  Okay, what else?  Anything else?

13         **MR. HAANSTAD:**  No.

14         **THE COURT:**  Okay.

15         **MR. ALBEE:**  Your Honor?

16         **THE COURT:**  Yeah.

17         **MR. ALBEE:**  If I could just -- if you look at CHS

18  Report 42 that we had filed yesterday, I mean, that entire

19  report is black. So it's beyond just an identification number

20  and a few administrative markings for us to be able to make out

21  exactly what was there.  So that's the problem, is we agree

22  that, you know, there are going to be -- that the Government

23  has that view but when it comes to substance, there is a lot of

24  substance that has not been turned over and that we can't

25  discover.

1           **THE COURT:**  Okay.  Well, that one, it may be that I

2    would have to take a look at it and review it first.

3           Okay.  Let me ask.  One of the responses, I don't

4    understand it's in dispute because the Government's position is

5    that it doesn't have anything but I'm just looking at the

6    response to C, "All communications to or from Hamzeh that were

7    captured including emails, text messages, Facebook messaging"

8    and as to all those, the Government's response is it doesn't

9    have anything.  And I guess the question there is, so the --

10   there's no emails to or from Hamzeh that were captured, no

11   Facebook messages, no text messages; is that right?

12        **(Counsel confer)**

13          **MR. HAANSTAD:**  There were some things that would have

14   been responsive but we've already provided them.  So there were

15   things -- one that comes to mind -- so there was a search that

16   was executed and we got some -- I think a laptop, a

17   PlayStation, things like that and a telephone.  Those had this

18   type of information on it but it's already been provided to the

19   Defense.

20          **THE COURT:**  Okay.  The next one that I identified

21   that is in dispute is E, any policy manuals, guidance

22   memoranda, training manuals or other documents concerning

23   terrorist investigations and/or the use of confidential

24   sources, including Sub 1, those in effect at the time of this

25   investigation.  And, again, the Government says, "We ask the

1    Court to either deny the request or examine the material in

2    camera to determine the -- whether and to what extent they

3    should be disclosed."

4            And, again, my question for you, Mr. Haanstad, is, as

5    I read that, how will I know whether what was done here -- my

6    understanding is that what the Defense -- and Mr. Albee or

7    Mr. Bugni, you can correct me.  My understanding of what the

8    Defense is -- one thing they're trying to find out is, focus on

9    the confidential source component of that.  You know, what are

10   agents trained as to what they're supposed to do as it relates

11   to the use of confidential sources and here, was that policy

12   followed?  Did they act consistently with that policy?

13           And if you give me copies of the policies that I can

14   review it, how am I going to know if what they did here was

15   consistent with the policy?  I don't know that I have that

16   level of detail about the investigation.

17           **MR. HAANSTAD:**  I don't know that you would you be --

18   that you would have to make that level of finding or undertake

19   that level of analysis to determine whether or not it's at

20   least potentially --

21           **THE COURT:**  Discoverable?

22           **MR. HAANSTAD:**  Right.  You know, and --

23           **THE COURT:**  So you ask that I review it for what

24   purpose?  What do you want me to do when I take a look at it?

25           **MR. HAANSTAD:**  To determine whether anything in that

1    document, again, is potentially exculpable.  And I should say

2    Document A.  It's two -- principally two very thick manuals

3    which, you know, if there was maybe a -- maybe everybody would

4    benefit from an attempt to narrow this a little bit but I don't

5    know if the Defense has something specific in mind that they're

6    looking for but the case agents believe that it may be these

7    two manuals that he's talking about.  I know there have been

8    requests before for documents that, for example, need to be

9    maintained under the Attorney General's guidelines for

10   confidential human sources.  That's something that apparently

11   the Defense has already seen or been made aware of.  I don't

12   know if there's something that they've seen or been made aware

13   of that they're trying to get at with this particular request

14   because the --

15           **THE COURT:**  What are the two manuals you're

16   referencing?

17           **MR. HAANSTAD:**  You know, I'm not sure what the titles

18   of them are.

19           **THE COURT:**  Okay.

20           **MR. HAANSTAD:**  But it would be -- I've heard

21   described by one of the case agents as basically something like

22   our Federal Criminal Code and Criminal Rules.  I mean, turn

23   that over just to see, is there anything potentially helpful in

24   here which is something of a fishing expedition.

25           **MR. ALBEE:**  Judge, one of them, my understanding, is

1    entitled, "The Attorney General's Guidelines regarding the use

2    of FBI confidential human sources."  My recollection is we had

3    attached that to our discovery motion.

4            The version we have, I think, is about 50 -- roughly

5    50 pages or something like that and the -- we have this from

6    the Internet.  I think I've seen versions that have been filed

7    in other cases.  I understand this to be, I think, 2002 but,

8    again, part of our concern is we don't want to end up -- we

9    think there are contradictions between what the FBI did and

10   what the manual calls for.  You know, one issue is we don't

11   want to be -- end up in trial and the -- and what they'll say

12   is, "Well, that's the old manual, I don't know what the new

13   manual says" or "You don't have the new manual," something like

14   that.

15           But we had also identified a number of portions of

16   that manual that we think are relevant and also relevant to

17   other discovery requests that we're making in our motion,

18   including -- this is at Page 12, "All FBI confidential human

19   sources must be subjected to the validation process as provided

20   in these guidelines and other FBI policies."

21           And it talks about a particular validation process

22   that takes place where they have to establish the person's true

23   identity; a photograph; their criminal history; whether they

24   might be subject of pending investigations; what their

25   motivation is for providing information or assistance, which we

1  think is very important, including any consideration they might

2  get for the assistance; promises or benefits; other information

3  required to be documented in the file.  There are supposed to

4  be annual reviews.  They're supposed to document -- the

5  informant is supposed to sign understandings of the rules and

6  so there's a signed receipt.  So those are just some of the

7  things that are there.

8          There's another manual about the use of undercover

9  employees.  There were some used in this case but that manual

10 also more specifically speaks to what must be done to avoid

11 entrapment and we think that there are some contradictions

12 between what was done here and what should be done to avoid

13 entrapment as laid out in that manual.

14         **THE COURT:**  And where did you get these?  You said

15 you got the first one off the Internet.  Where's the second

16 manual?  How do you have it?

17         **MR. ALBEE:**  The second manual, I didn't bring that.

18 I think that was -- my recollection off the top of my head is

19 that it was filed in a Northern District of Illinois case

20 called *Daoud*, D-a-o-u-d, I think is where we found that one.

21 And then I don't know whether there are others including, you

22 know, these deal -- the two have identified deal generally with

23 confidential informants and undercover confidential employees

24 but I believe that there may be others that deal specifically

25 with terrorism investigations and things that might be done in

1    those cases.

2         But, again, I -- you know, I believe these to be used

3    in training of the FBI agents to establish the guidelines that

4    they're supposed to follow and, you know, we think that are

5    some -- both contradictions and also it exposes some other

6    information that we should have received in discovery.

7         THE COURT:  Okay.  Well, I -- I mean, it sounds like

8    you're aware of a couple specific manuals.  Your request is

9    broader than that, of course, because you're -- you don't want

10   to be limited to those not knowing what other manuals are out

11   there.  As to the two that he's aware of that he's just

12   referenced here in open court, the one specific issue he's

13   raised is, are these the latest versions or are there more

14   updated versions.  Is there any way to answer that without

15   violating some confidentiality concern that the Government has?

16        MR. HAANSTAD:  Yeah, I don't know.  I mean, I can

17   look into it and see whether there are --

18        THE COURT:  More updated versions?

19        MR. HAANSTAD:  -- more updated versions and if so,

20   whether there's anything of concern in there when it comes to

21   disclosure.

22        THE COURT:  Okay.  Is your position that these

23   shouldn't be disclosed because they contain confidential

24   information or is it that, you know, you're just not certain

25   what he's looking for or what?

1           **MR. ALBEE:** It's a combination of both and this helps

2   to have some idea of what he's looking for in this type of

3   updated versions of these two manuals but what -- so I guess

4   I'm doing this sort as a balance. I don't know that it is

5   established that there's likely anything in those materials

6   that's exculpatory or otherwise disclosable and the same

7   question might be asked, well, why not just go ahead and

8   provide it but I don't know what's on the other side of that

9   balance when it comes to protecting FBI methods and things like

10  that.

11          **MR. SPEAKER:** Good. And -- you know, I --

12          **THE COURT:** If it had already been disclosed and at

13  least if some versions of prior iterations of these have

14  already been disclosed in other cases and they're public

15  records, it makes me wonder --

16          **MR. SPEAKER:** And I --

17          **MR. SPEAKER:** It also makes me wonder why -- I mean,

18  they're not exclusively within the control of the Government at

19  that point either if they're publicly available on the

20  Internet.

21          **MR. ALBEE:** Well, again, we want to know which ones

22  were governing these FBI agents at the time they were acting in

23  Mr. Hamzeh's case and from reviewing the ones we have, I mean,

24  these are hardly State secrets that are included here. I mean,

25  they're kind of common-sense law enforcement procedures that

1    you'd expect them to follow but, again, we think that they

2    haven't followed them and it's important to be able to identify

3    exactly what should be done in the case.

4            If there weren't prohibitions against subpoenaing the

5    Government -- I mean, this is the kind of thing if it was some

6    other organization.  We'd use Rule 17(c) and just -- and get

7    these manuals.  I can't imagine there's a confidentiality that

8    attaches to them but we can't do that.  I do think they're

9    Brady material because there are some contradictions and I also

10   can't think of any reason why it's just in fairness not

11   provided to the Defense.  I mean, we want our agents to follow

12   the rules.

13           **THE COURT:**  I mean, I looked at this request and I

14   thought that you're seeking two very different things.  When

15   you're seeking policy manuals, et cetera that concern terrorist

16   investigations, that's very different from confidential

17   sources, obviously, which are used in all kinds of

18   investigations other than terrorist investigations.  And are

19   you looking for specifically confidential -- you know, policies

20   relating to the use of confidential sources in terrorist

21   investigations rather than all policy manuals regarding

22   terrorist investigations just generally?

23           **MR. ALBEE:**  You know, and here's where I struggle

24   because of a lack of knowledge of what might be out there.  You

25   know, I'm not looking for the manual that shows, you know, how

1  they're trying to find ISIS in Syria kind of -- you know, I

2  mean, that wouldn't seem to be relevant here but I would think

3  that there may be manuals in terms of doing stings domestically

4  that have guidelines.  And so I think those would be important

5  and those are the kinds of things that we would be asked to be

6  produced.

7          **THE COURT:**  So I guess my last question to you,

8  Mr. Albee, is there any narrower scope -- any way to narrow

9  down what you're looking for to get you specifically what you

10 want?

11         **MR. ALBEE:**  It's -- I think I've identified the two

12 specific things that we're looking for and then really any

13 other manuals that were -- manuals, memoranda, what have you

14 that would have governed their conduct in this case.  So I

15 think that's --

16         **THE COURT:**  Would have or should have?

17         **MR. ALBEE:**  That were applicable.  I'm not sure I

18 know where the would have and should have -- it's kind of --

19         **THE COURT:**  Well, the would have, I guess, is the,

20 you know, actually bolded out and used it in their discussions

21 with their confidential sources versus --

22         **MR. ALBEE:**  Yeah, I think it should have, that -- you

23 know, that it was applicable to this setting.  So I'm not

24 asking for, again, terrorism that has -- it's so far afield

25 from what the investigation that was going on here is but I

1  think that the agents would be able to identify that there are

2  manuals -- if there is one, for example, relating to terrorism

3  stings, that's clearly relevant to what they should have been

4  doing in this case and we're asking for that.

5         **THE COURT:** Okay. Well, the last request that I

6  interpreted as truly in dispute was the request for H. H

7  requested identification of any payments or benefits whether or

8  not memorialized in writing given to the informants in this

9  case or in any other case for working as an informant,

10 including -- and then it's Subsection 6, specification of all

11 the cases in which the informant has assisted the Government

12 along with identification of benefits.

13        In response, the Government identifies that one of

14 the CHS's, CHS2, was previously a source. They say when and

15 then ultimately they say, and he continues to cooperate. But

16 they don't want to provide the specific cases in which CHS2 has

17 provided assistance.

18        So I'll start with you, Mr. Albee. Why do you need

19 to know the specific cases, some of which may be ongoing

20 investigations?

21        **MR. ALBEE:** What we'd be looking for is what are the

22 possible biases of these informants and if they're working in

23 other cases and getting paid in other cases and presumably want

24 to keep being paid in other cases, they need to curry favor

25 with the Government. So --

1          **THE COURT:**  Why do you need to know the names of the

2    cases or the specific cases?

3          **MR. ALBEE:**  And I -- what I'm pondering is I could

4    see it's possible that a redacted version might be adequate or

5    it might not.  I guess if I received at least initially some

6    description of what they were doing and being paid.  Part of it

7    is determine whether the payment is commensurate with what they

8    were doing or that they were getting extra monies.  Again, it's

9    kind of the level of potential need to curry favor with the

10   Government.  Also, it'd be important to know whether there were

11   any violations in any of those other cases.

12          If we had the names of the cases, certainly it would

13   allow us to determine whether there was -- potentially

14   investigate whether there was other dishonesty in that case,

15   whether they reported things that didn't pan out.

16          **THE COURT:**  I mean, but that was one reaction I had.

17   It was, geez, all of a sudden, you're going to open up -- this

18   up to -- you're going to have another trial about another case

19   and there's going to be a dispute about -- I mean, it opens --

20          **MR. ALBEE:**  Well, and, again --

21          **THE COURT:**  -- up discovery in a completely different

22   case.

23          **MR. ALBEE:**  Well -- and the Brady material, Judge,

24   doesn't -- is broader than what's admissible in court.  So the

25   Court may have identified something valid in terms of if the

1   Court was deciding what we could use during cross examination.

2   I don't know without knowing about it but it is something that

3   certainly could lead to favorable evidence from investigation

4   and it exposes bias on behalf of the informants.  So that's why

5   we'd be looking for the other cases and certainly what's been

6   paid in the other cases.

7           Going back to what I was quoting from the CHS manual,

8   their initial -- when they first sign up -- and it looks like

9   this CHS2 worked as an informant in 2011 and then he joined up

10  again in April 2015.  Those should be two occasions, at least,

11  where they identified what their motivation was for getting

12  involved as an informant and I think that would be important as

13  to bias but we don't have those kinds of things.  So it would

14  be in their file according to the guidelines.

15          **THE COURT:**  And, Mr. Haanstad, what's the

16  Government's objection to producing that information?

17          **MR. HAANSTAD:**  Well, as he noted, it has the

18  potential of -- the reason he was requesting information about

19  ongoing investigations and if it were narrowed, there might be

20  some ways that we could respond.  For example -- and I'll

21  double-check this but my understanding is there were no

22  violations or any indication of dishonesty with regard to this

23  informant's prior and subsequent cooperation, that is, the

24  cooperation he provided prior to becoming involved in the

25  Hamzeh investigation or after his involvement in that

1    investigation.

2         Payments, I could check on them.  One falls outside

3    the scope.  There's a payment, for example, that's identified

4    in H1 of the Government's response.  That payment was made on

5    February 25th of 2016.  We identified that because even though

6    it took place after Mr. Hamzeh's arrest, it was basically --

7    money was provided so that Mr. -- or so that the informant

8    could get a new telephone.

9         I could check to see whether there's a record of

10   other payments but, again, we provided everything that the

11   Defendants -- oh, I'm sorry -- that the informants were paid

12   with respect to this -- not just during the timeframe of this

13   investigation but also with respect to this investigation which

14   I think is the material that would arguably potentially be

15   usable in cross examination of those witnesses.

16        **THE COURT:**  So, Mr. Albee, when you ask for a

17   specification of other cases in which the informant has

18   assisted the Government along with identification of benefits,

19   "benefits" meaning?

20        **MR. ALBEE:**  Benefits, anything.  I mean, it could be

21   expenses, payments, immigration consequences, not charging in a

22   crime, all those kind of things.  They're all reasons for them

23   to be biased in favor of the Government or to fear the

24   Government and so I think they'd all be relevant here, any

25   benefits that they receive from the Government, including in

1    other cases.  If these -- it seems to indicate that the

2    informant continues to work for the Government.  Again, if

3    there's -- if he's being paid in that case, he has reason to

4    continue to do what they want and say what they want because

5    that's his usefulness to them and he knows that.  And so we can

6    expose that bias if we're aware that he's being paid.

7            **THE COURT:**  And from the Government's perspective,

8    other than the concern about the fact that informants may be,

9    you know, currently, you know, working on cases that are

10   ongoing, does it have the -- is it -- would it be willing to

11   provide the information that Mr. Albee is looking for for

12   investigations in cases that are closed?

13           **MR. HAANSTAD:**  I think that we provided all of that.

14   I -- we can talk with the FBI again to make sure that that's

15   the case but that's my understanding, is we provided all that

16   information.

17           **THE COURT:**  Okay.  Well, these -- those were the four

18   categories of documents that I read as continuing to be in

19   dispute.  Everything else is either under one of the other

20   categories of it's already been produced or the Government

21   doesn't have anything.

22           Mr. Albee, is there anything else that you think is

23   still in dispute?

24           **MR. ALBEE:**  Judge, if we could continue for a moment

25   related to the subject we were just talking about, about

1    payments.  The information disclosed about other cases doesn't

2    say anything about whether there were any benefits received or

3    requested and so we -- as I've explained, we think that stuff

4    is all relevant to bias.  I note in the CHS guidelines that

5    we'd also ask for the specific documents showing, I received

6    this money on this date from, you know, whatever kind of

7    document shows the receipt, a breakdown of expenses, those

8    kinds of things.  So we have a list that says he was paid

9    $2,000 on X date but we don't have any document.

10         The -- we have cited in our motion a Second Circuit

11   case, *Gill*, where it talks about those kind of documents as

12   being exculpatory because they're admissible in whole or part

13   that they could "lead to admissible evidence" or would "be an

14   effective tool in disciplining witnesses during cross

15   examination by refreshment of recollection or otherwise."  And

16   that's why we need them because this is not an admissible or

17   usable document, what the Government gave us, but if we have

18   the receipt for $2,000 or what have you, it may be used in

19   cross examination of the informant and/or the agents.

20         The Government characterizes some of what was

21   received.  Let me see if I can find this spot.  They

22   characterize some of the payments as being expenses.  It

23   says --

24         **THE COURT:**  The total expense.

25         **MR. ALBEE:**  Well, no -- and, yes, that's one but as

1    to the CHS2, it says he was using his personal vehicle and

2    paying for gas and telephone because it was to his financial

3    detriment, they made the following payments.  So their

4    suggestion is, you know, they came up with some ballpark figure

5    and came up with the following payments.  But what the

6    guidelines require is that the FBI's reimbursement of expenses

7    -- this is at Page 28.  The FBI's reimbursement of expenses

8    incurred by a confidential human source shall be based upon

9    actual expenses incurred.  So, you know, that, again, is a

10   potential discrepancy between what the policy requires --

11           **THE COURT:**  Does it -- it doesn't sound -- what you

12   just read doesn't say they need receipts.

13           **MR. ALBEE:**  No, but actual expenses were incurred and

14   I see that the payments are 750, 550, 2,000, 2,000.  They

15   don't --

16           **THE COURT:**  They're round numbers.

17           **MR. ALBEE:**  -- those don't sound like, you know,

18   here's my gas bill.  It happens to be $750 or something like

19   that.  It also sounds far -- because these people never left

20   Milwaukee as far as I know, it also sounds like a lot of gas

21   money.  So that doesn't seem to jive.  And --

22           **THE COURT:**  What --

23           **MR. ALBEE:**  -- so that's why we'd be looking for the

24   specifics.

25           **THE COURT:**  So what documentation exists to back up

1    the payments that are referenced on Page 5 of your response?

2         **MR. HAANSTAD:**  You know, the information that we

3    provided -- first of all, I thought that -- our view was that

4    was substantively what was required, that is, the date of

5    payments, amount of payments and purpose of payments.  We

6    pulled the numbers obviously from some underlying documents.

7    Again, that's a category that I indicated we could make those

8    receipts and other paperwork available to the Court and see if

9    it's anything additional that would be disclosable beyond,

10   again, payment amount, payment date and payment purpose.  So I

11   would put that in the category of also these other documents

12   that we'd be willing to provide to the Court for its in-camera

13   review.

14        **THE COURT:**  I appreciate all this documentation that

15   you're going to be giving.

16        **MR. ALBEE:**  And, Judge, one thing, again, is the

17   Second Circuit characterized it, disciplining the witness but,

18   you know, what guidelines provide for is that there's this

19   issue of paying taxes on this money, that there should be

20   documents notifying the informant that he has to pay taxes on

21   the money.  We don't have any indication whether he did pay

22   taxes on the money.  I know that that witness also -- while I

23   don't think there's a formal order, he should be paying child

24   support and at the very least, there's a question of whether

25   things are concealed from his ex-wife in terms of not paying

1   for that child's expenses.

2           So, you know, there are a number of reasons why the

3   underlying documents would be important in this case and would

4   be Brady material.

5           THE COURT:  Okay.  Is there anything else you want to

6   raise?

7       (Counsel confer)

8           MR. ALBEE:  If we could have just one moment, Judge,

9   so we just --

10          THE COURT:  Sure.

11          MR. ALBEE:  Judge, the -- one major concern I have in

12  this case is -- well, I guess this relates to two different

13  parts of our request.  According to the response of the

14  Government the agents gave the informants for discrete pieces

15  of advice about what they could or could not do in this case as

16  informants, those strike me as woefully deficient if that's all

17  they told them.  And if that's what it is, that's fine but the

18  concern is that something extra will show up at the time of

19  trial and agents will be saying, oh, yeah, well, we told them

20  that, too.  We told them not to do this because that would

21  create a danger of entrapment or we told them not to do X, Y or

22  Z.

23          So I have grave concerns that that's not complete and

24  there should be a -- there should be some sort of order that

25  the instructions that were given to the informants be produced

1  so that we have the order and can ask for its enforcement when

2  we get to trial.

3         Similarly, it's -- I just can't imagine -- we've

4  asked for information about conversations between agents and

5  informants about when machine guns came up or when the Masons

6  came up because there's nothing in the reports as to any

7  directions that were given, like, you know, why don't you see

8  if he'll get a machine gun or whether this was just a rogue

9  informant who decided on his own what course this would take

10 and whether he'd push machine guns or push the Masons or what

11 have you.

12        There had to have been discussions at different times

13 reporting or alerting them to the fact that this was what the

14 informant was going to try to get Mr. Hamzeh interested in.

15 And I just -- it's just incomprehensible to me that there's not

16 some documentation of what discussions took place at those

17 times and what's exculpatory -- you know, so all that's fine

18 and it can be incomprehensible to me but what becomes

19 exculpatory is that if I'm -- just to pick something.

20        On January 5th, they talked about the Masons -- the

21 Government and the informant -- or the informant mentioned

22 something about it or sometime earlier he mentioned guns and

23 then it later came up in discussions with the Mr. Hamzeh.  That

24 shows the Government introducing the subject which is

25 exculpatory because it's a consideration under entrapment law

1    as to who introduced it and so the fact that it was discussed

2    before a certain time supports our claims.

3             And so I just -- at some stage of this, there must

4    have been conversations between informants and agents about

5    Masons or machine guns and there's no indication that there is.

6    So we are --

7             THE COURT:  So what are you asking?

8             MR. ALBEE:  So we're asking that that be, I guess,

9    specifically ordered.  I can't do anything if the Government

10   claims that it --

11            THE COURT:  That what be ordered?

12            MR. ALBEE:  That the Government produce all

13   information about discussions between the informants and agents

14   about the Masons and/or about machine guns, whether documented

15   in written form or not.

16            THE COURT:  Has that been requested?  Does that fall

17   within the scope of one of these specific requests?

18            MR. ALBEE:  Um --

19            THE COURT:  Or are you asking it anew right now?

20            MR. ALBEE:  -- well, I have in front of me, Judge, at

21   Page 7 of the Government's response, it's L.  And so I presume

22   there's parity in what we had asked for but rather than look

23   for mine -- it says, "All reports, memoranda, rough notes, text

24   messages or any other form of communication."  So it's any

25   other form of communication.

1           And, again, Judge, if I don't specifically ask for

2    it, it doesn't mean it's not very -- I'm alerting the Court and

3    the Government that any of these -- any conversations between

4    agents and informants about the Masons or guns that we don't

5    have is Brady material because it shows that the Government

6    initiated it rather than Hamzeh.  That's my position and my

7    theory on that and so if that happened, regardless of whether

8    an agent put it on a piece of paper, they need to tell the

9    Government about it and they need to tell us.

10          **THE COURT:**  Okay.  Mr. Haanstad, any response?

11          **MR. HAANSTAD:**  Just that we've already disclosed

12   everything that's -- that would be responsive to that.  There's

13   -- we've disclosed the reports.  We've dealt today with the

14   issue of rough notes, text messages.  So, again, we have

15   nothing further responsive to that.

16          **THE COURT:**  Okay.  And Mr. -- what I heard Mr. Albee

17   saying is that in addition to physical documents that may exist

18   and kind of independent of this request for the production of

19   the documents, if agents did talk to confidential sources or to

20   these informants about introducing the concept of machine guns

21   or Masons that even if there are no documents that exist to

22   evidence that conversation, he needs -- he wants to be informed

23   about it because he thinks it's Brady material.  So, I mean, I

24   guess that is what it is but there's nothing that is being

25   requested of me.

1          **MR. HAANSTAD:**  Right.

2          **MR. ALBEE:**  Well, I would ask for -- when the Court

3    reviews this, ask for an order along the lines of what I

4    specifically requested and I won't repeat the arguments.  It's

5    at Page 24 and 25 where I discuss why our -- why we think

6    that's exculpatory and what we think should be there.

7          **THE COURT:**  I mean, I can order it but their position

8    is they've already produced it.  So I don't know what I'm

9    ordering.

10         **MR. ALBEE:**  Going back to, I think, my initial

11   comments, I worry about communication between all the FBI

12   agents and the Government.  Sometimes things don't get to the

13   prosecutors.

14         **THE COURT:**  So you're saying you're just not sure

15   when they say they've already given it that they really have

16   already given it?

17         **MR. ALBEE:**  Well, again, they would get the -- they

18   would get whatever is in written form but if -- they might not

19   know that an agent had such a discussion with an informant.  I

20   mean, I -- it's just it's a concern because it's exculpatory

21   and we should be given it and maybe it doesn't exist but if it

22   happened, it doesn't mean that it was documented and it's just,

23   I think, so important that --

24         **THE COURT:**  So when you're saying, "I should be given

25   it," you mean given the information, not the document?

1                  **MR. ALBEE:**  That's right.

2                  **THE COURT:**  Given the information --

3                  **MR. ALBEE:**  If there's a document, great, but

4       otherwise, I'm entitled to the information even if it's not

5       documented, yeah.

6                  **THE COURT:**  Okay.  Anything else?

7                  **MR. ALBEE:**  Yeah, there's one other thing.  We also

8       ask for the mental health records.  The Government says it's

9       not in possession and, again, acknowledges that some should

10      exists and it also sounds like -- I can't remember what the

11      word is but that an agent was perhaps the person who checked in

12      the informant into the hospital and maybe had been some sort of

13      point of contact.  So it seems to me that there may be have

14      been a consent filled out at that time and that these mental

15      health records are available to the Government.  Otherwise I

16      suppose we subpoena those for in-camera review because those

17      would seem to be exculpatory, that there was a hospitalization

18      soon after the arrest in this case.

19                 **THE COURT:**  Which request is that?

20                 **MR. ALBEE:**  I'm looking at the Government's response,

21      Page 9P.  Ours --

22                 **THE COURT:**  Okay.  And, again, they say they don't

23      have anything.  So your position is what?

24                 **MR. ALBEE:**  Well, so I think that they -- one

25      question is, did they receive a consent to obtain those

1    records, in which case I think they should -- then they have

2    access to them and they can turn them over.  Beyond that, I

3    guess the next step would be to try to subpoena them for

4    in-camera review because I believe them to be exculpatory but

5    because it appeared that somebody -- that an agent may have

6    been with the informant when he checked into the mental health

7    facility, there may have been some sort of consent given at

8    that time giving them access to the exculpatory information.

9         THE COURT:  Okay.  Any response you want to make,

10   Mr. Haanstad?

11        MR. HAANSTAD:  Again, we don't have any mental health

12   records.  I'm not sure that we could obtain them if we tried

13   to.  I'm not aware of any -- and I'm not aware of any consent

14   that was signed that would give us the authority to obtain a

15   confidential source's mental health records.

16        THE COURT:  Okay.  Well, I guess before -- I mean,

17   there's a couple of things that the Government indicated it

18   wanted to follow up on, I guess.  Do you want to have some

19   opportunity to supplement your response and if so, how much

20   time do you need?

21        MR. HAANSTAD:  I don't think it would take long.

22   There aren't many responses.  They're pretty easy to look into.

23   Maybe just the end of next week, next Friday.

24        THE COURT:  Okay, that's fine with me.  And, you

25   know, address anything that was discussed here today that you

1  think you can --

2          **MR. HAANSTAD:**  Sure.

3          **THE COURT:**  -- help narrow or further refine before I

4  say, give me everything to take a look at so that I don't have

5  to do that.  That would be even better.

6          And I guess, Mr. Albee, is there any reason for you

7  to respond to anything that they supplement with?

8          **MR. ALBEE:**  It's obviously hard to predict what would

9  be in that response.  I guess we'd like an opportunity to

10  submit a reply.  We won't try to belabor any points.

11          **THE COURT:**  Okay.  Try hard.

12          **MR. ALBEE:**  Okay.

13          **THE COURT:**  So the Government's response -- or

14  supplemental response will be due on February 9th.

15          **MR. HAANSTAD:**  Okay.

16          **THE COURT:**  And then, Mr. Albee, time to reply, do

17  you need a week?  Do you need less?

18          **MR. ALBEE:**  A week would be great.

19          **THE COURT:**  I guess under the circumstances, that's

20  fine.  February 16th.  And then once we get that, we'll tackle

21  what remains in dispute and issue an order.  Okay?

22          **MR. ALBEE:**  All right, thank you.

23          **THE COURT:**  Thanks, everybody.

24          **MR. HAANSTAD:**  Thank you, Judge.

25          **THE CLERK:**  All rise.

(This proceeding adjourned at 11:14 a.m.)


                         CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          ____April 16, 2018_



            TONI HUDSON, TRANSCRIBER