UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

  *Plaintiff*,

  *vs*.            Case No. 16-CR-21 (PP)

SAMY M. HAMZEH,

  *Defendant*.

## SECOND MOTION FOR PRODUCTION OF *BRADY* MATERIAL AND TO COMPEL DISCOVERY

Samy Hamzeh, by counsel, moves this Court for the entry of an order requiring the government to produce the discovery described below. Hamzeh submits that the following materials must be produced under Rule 16 of Fed. R. Crim. P. or under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The requested information is material and helpful to Hamzeh's defense or to his sentence.[1]

The Court is familiar with the facts of this case from the extensive pleadings filed in support of Hamzeh's bond motion and various motions to dismiss and the first motion to compel, so this motion will be brief and to the point. This discovery motion breaks

---

[1] The "helpful" information that Rule 16 and *Brady* requires to be disclosed to the defense is not limited to exculpatory evidence; it also includes inculpatory evidence because it is "just as likely to assist 'in the preparation of the defendant's defense' as exculpatory evidence." Since the preparation of the defense requires knowledge of its pitfalls as well as its strengths. *See United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998); *see also United States v. Cruz-Velasco*, 224 F.3d 654, 665 (7th Cir. 2000) (finding that government should have disclosed potentially inculpatory passenger list to defense under Rule 16, but that district court's remedy of prohibiting the government from using the list to rebut defendant's trial testimony was not abuse of discretion).

*Federal Defender Services*
*of Wisconsin, Inc.*

down along three lines, with a fourth category added to forewarn the Court of an enormous looming problem. First, text messages between the agents and informants and the underlying data that surrounds them. Second, *Giglio* and *Brady* materials surrounding the informants and agents. Third, information concerning the agents, their training, their personnel files, including the internal information related to the investigation, and its integrity. The fourth category discussed in this brief concerns the transcripts that were supposed to have been disclosed 40 days ago.

1. **The text messages from the agents to the informants and all the information surrounding them.**

The government has disclosed twenty-six pages of text messages between the agents and the informants. They are from four different agents to the informants. Some of these are redacted, and we are requesting that they be entirely disclosed—we need to know what was said and it cannot be discerned through context. Here is an example of one such text:

```
14:41:57, Wed    Agent 4          CHS 2        ███████████
2016-01-27
```

The text is meaningless when it's completely blank.

Second, we need to know from what numbers the text messages were sent. And here's why: we only have a small amount of the text messages that were actually sent. For instance, the government has disclosed that Agent Adkins (the lead agent) texted with Mike and we have some of those texts—44. The problem is a review of Mike's cell records (gathered from a defense subpoena) reveal an additional 132 text messages were sent between the two, for a total of 176 contacts through text or SMS. So there are many,

2

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:16-cr-00021-PP-WED   Filed 07/11/18   Page 2 of 13   Document 135

many missing texts. To be clear: there could be more, some of the text messages we have are duplicates, so it could be that more are missing. But the defense is giving a conservative estimate. And if the agents were texting from multiple numbers, there could be even more. What's more, the defense just recently learned that Mike had multiple phone numbers, so there could be even more text messages at issue.

The government has indicated that Special Agent Adkins' Bureau phone had a software issue that caused a gap in text message capture and storage and that the FBI was unable to recover them. But no information has been provided as to how this happened, when it happened, when it was discovered, whether the FBI sought the texts through other means, or whether there are additional methods available to try to recover the texts.

When it comes to the informant Steve, the phone records reflecting contact between him and the agents don't match up. Meaning: the government's disclosure of when a text was sent does not match up with Steve's cell phone records. And because we don't know what the agents' phone numbers are or what numbers they texted from, we cannot determine how many other communications there were between Steve and the agents. Understanding the breadth of contact between the agents and the informants against the paucity of the disclosed and preserved texts stands as essential information for the defense. It's necessary to have a complete picture of how the agents were driving and directing the investigation.

Not only are the absence of preserved texts important, the text messages that have been turned over have been very helpful to the defense; they provide a clearer insight into the investigation and document that the government's prior representations about

*Federal Defender Services*
*of Wisconsin, Inc.*

instructions given to the informants were not entirely correct. In December, the government was adamant that only four instructions were given to the informants. These were:

1. The CHS's assistance and the information provided to the FBI are entirely voluntary;

2. The CHS must provide truthful information to the FBI;

3. The CHS must abide by the instructions of the FBI and must not take or seek to take any independent actions on behalf of the US government;

4. The United States government will strive to protect the CHS's identity but cannot guarantee it will not be divulged.

That is, what the defense and the Court had been told, were the sum of all the instructions that FBI gave the informants.

Yet the text messages have given a different picture of what had been communicated. This included an unknown agent scolding Steve in October for not recording conversations.

> We need to talk before you talk to Samy anymore in the future. We need to get stuff like last night recorded every time. If you need to push him off for a day or two before you can meet we have to do it. The bosses got a bit upset that last night wasn't recorded and said they want everything recorded from now on. Thank you for understanding.

Remember: a significant defense point is the 35-day window when there are no recordings of the daily in-person meetings between the informants and Samy between mid-December and January 19th—the pivotal week when Hamzeh became concerned that the Masons were actually ISIS and his attention turned to getting a gun.

And then after Samy had refused to engage in any violence, but agreed to buy a weapon with his "friend" Steve, the agent texted Steve this message, with the last sentence being the most important and its being emphasized:

> Nice work Call Eric or myself tomorrow You'll have to book another night before checkout. Do you have enough money to cover another night? We'll get you the money tomorrow. Thank you! *Delete my messages*.

If the messages that we have are just a small part of the overall messages, much could be inferred about what else must be out there. And what's out there (as far as contacts go and from what phone numbers) is both discoverable and essential to Hamzeh's entrapment defense.

To that end, the defense is specifically requesting the following:

a. Identification of any unpreserved text messages to or from the agents regarding this investigation, including with the informants in this case (we understand that all texts that are available have been produced).

b. Please identify any phone numbers that Steve or Mike were using when texting with the agents. Those numbers are redacted from the reports and it is necessary to confirm the accuracy of the information we have and to conduct additional investigation.

c. Identify the agents who texted with the informants and the phone numbers from which they contacted the informants.

d. All texts/SMS, IM plus e-mail on both the FBI internal (FBI net) and FBI official external (Internet Café-IC) to/from all agents, TFOs, CHSs or professional support staff relating in any way to the investigation. If personal or private devices were used, produce those relevant communications also.

e. Detail funds expended, and any documents related to purchase software/apps to configure text communication to save incoming communications and delete outgoing communications.

5

*Federal Defender Services*
*of Wisconsin, Inc.*

f. Toll records for UCE and CHS phones for all contact made with Hamzeh's phones.

   g. The precise problem that affected agent Adkin's phone and the preservation of text messages.

What's more, all of this information is derivative of the Court's prior order that the text messages be produced, and it is also encompassed within *Brady,* Rule 16 and *Jencks*.

   **2. The *Brady* and *Giglio* material that should be turned over to the defense.**

On June 6, 2017, the Court entered an order requiring the government to turn over all *Brady* and *Giglio* material by November 13, 2017, which was three months before the scheduled trial date. R. 45. Previously, the government had agreed to provide that material at least 90 days before trial. R. 32 at 13. So far, rather than receiving a massive amount of data and information, the defense has received little—a mere fifty pages in December and nothing else. The government was previously ordered to provide the underlying documentation regarding payments made to the informants and that has not happened. *See.* R. 107. Nor has the defense received any information concerning Mike's prior cooperation and payment. That too was ordered and has not been turned over. *See id.* While government's counsel has orally said the payment information doesn't exist, we'd expect a report or something to that effect. What's more, given the text messages that we now have there is evidence of additional payments made to the informants. Reference is made to Steve getting payment for a hotel room. One of the agents texted Steve that "We'll get you the money tomorrow. Thank you!!" And in another instance, Mike complains in November about how much this is costing him, and whether he'll be

6

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:16-cr-00021-PP-WED   Filed 07/11/18   Page 6 of 13   Document 135

able to sustain the costs associated with this operation. In response to Mike's grievances, he receives this text message:

| 2015-11-05 23:07:14, Thu | Agent 3 | CHS 2 | Completely understood. You have valid points but hang in there just a bit longer. John will be back in town Monday and he will be fully advised of your situation. We want to make it right for you. |
|---|---|---|---|

To that end, we are requesting any information about expected future payments for the informants. While it is possible that Mike did all this work as an informant for a cumulative $8,000. It seems unlikely that he would quit his job, get a job at a restaurant with Hamzeh and Steve, hangout with Hamzeh on a daily basis, and go to the trouble of doing all this, including spending a week with Hamzeh from January 19-25 with no greater compensation or expectation of it. Indeed, Mike's last payment for $2000 came on January 20, *before* the operation was complete. After that, he only received a new phone valued at $896.54. What's more, the defense is entitled to know whether Mike will receive greater compensation if Hamzeh is later convicted.

In addition, the government advised the defense that Steve returned to Milwaukee from overseas this Spring before again returning home. The government previously represented that he had refused all benefit for his cooperation, and the immigration benefits he received ended in March 2016. So the defense requests updated information, including the following.

a. All updated *Giglio* material (we are well past the 90-day time frame).

b. Any requests by any informant for immigration assistance of any type or any immigration benefits offered or received or contemplated.

c. Whether any informant has received post-conviction benefits in any case for their cooperation.

7

*Federal Defender Services*
*of Wisconsin, Inc.*

d. Based on the USAO's office's verbal inquiry of all FBI employees and TFOs working the case for any pending *Giglio* issues, and that each government employee's name has been queried with negative results in the U.S. Attorney's Office *Giglio/Brady* database for past entries.

e. Disclose all money paid in total for any purpose to the CHS including both expenses and services.

f. Disclose the amount of money paid related strictly to the Hamzeh case (Services + Expense broken out separately).

g. Disclose the most recent Criminal History for the informants.

h. Disclose the result of FBI required Public Records check for CHS from commercial databases (e.g. Lexis/Nexis-Investigator).

i. Disclose the result of periodic indices/sentinel inquiries related to the CHS (specifically if the CHS was indexed as a reference or subject in other FBI investigations).

j. Disclose all FBI approvals for the CHS to engage in other illegal activity and include dates of authority and termination of authority

k. Provide copies of any admonishments documented to the CHS file evidencing the CHS having violated rules, violated policies etc.

l. Disclose any third-party benefit agreements documenting the CHS is working off prosecution issues of another person.

m. Disclose any prosecution deferral or declination or benefit promised to the CHS in exchange for the CHS's cooperation.

n. Disclose the results of the required CHS "testing" by the case agents if the CHS failed the testing. In any case, confirm the CHS was tested via policy (believed to be the sub "V" file).

o. Disclose if the CHS had recording equipment routinely assigned to him for extended periods of time, which is routine with CHS's in the FBI. Disclose if that recording equipment was in the possession while the CHS was having unrecorded conversations with Hamzeh.

*Federal Defender Services*
*of Wisconsin, Inc.*

Case 2:16-cr-00021-PP-WED   Filed 07/11/18   Page 8 of 13   Document 135

p. Detail funds expended, and any documents related to purchase software/apps to configure text communication to save incoming communications and delete outgoing communication.

The above information is discoverable and should be turned over; indeed, the government has represented that all *Brady* and *Giglio* would be turned over by now. So a new court order is necessary directing the information be turned over to the defense immediately.

**3. Information concerning the agents and their training and the investigation's integrity.**

Most of what is relevant concerning the agents is covered under *Giglio* and *Brady*, but the defense is also requesting that the government provide information about the agents' training and the chain of custody for the recordings. At trial, the defense will contest the voluntariness of Hamzeh's statement. This is a question for the jury and one that the defense has the right to challenge. *See Kentucky v. Crane,* 476 U.S. 683 (1986). The defense will also challenge the recording methods used (what days were selected) and why large swaths of recordings are missing. To that end, the defense requests:

a. a list of any trainings concerning interrogation and interrogation techniques that Agents Adkins and Frazier have attended.

b. Produce the approved undercover proposals and comments of the CUROC and the FBIHQ review committee.

c. Copies of the front portion of every ELSUR envelope (commonly referred to as the 1D Envelope or FD-504 envelope) for all digital recordings. Include copies of any ECs documenting justification for late submission.

d. The Sentinel index/listing of all electronic recordings from the "ELSUR" (1D) Section of the file.

9

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:16-cr-00021-PP-WED   Filed 07/11/18   Page 9 of 13   Document 135

e. FD-302's regarding obtaining custody of the recording devices from the CHS or undercover agents, the downloading and chain of custody for the digital recording devices and the production of the original CDs from those recording devices for every recorded conversation.

This information is all relevant and discoverable both under Rule 16, and *Brady*.

**4. An additional order concerning the transcripts**

Hamzeh has forecasted for well over a year-and-a-half that this would be a trial and that the defense would be entrapment. The defense has also noted the importance of the transcripts in this case—including filing a motion that all of the recordings have verbatim transcripts. R. 31. In response to that motion, the government agreed it would provide verbatim transcripts of the conversations it intended to use no later than 90 days before trial. R. 43. The transcripts that the government intended to use at trial were supposed to be produced in November based on the February trial date. The hope was that a joint set of transcripts would be used at trial, saving time and resources that could drag the trial into three weeks. A set of transcripts was sent over to the defense in November but it was incomplete (it didn't entail disk 104), and the transcripts, in excess of 1300 pages, were rife with errors. The defense reviewed them and sent corrections and memos to the government pointing out specific problems with the transcripts, including some were just terrible, others were mislabeled, out of order, or were riddled with just summaries. In addition, with the absence of an index, there was a misidentification of speakers and confusion about the labeling of the speakers in the transcripts; and inconsistent translation of important terms. The defense letter emphasized the need to act promptly to fix the transcripts, turn them over to the defense for review by its translator

10

and Hamzeh, sort out disagreements, and try to stipulate to the transcripts. Because of this, the trial was moved from January to June. At a hearing on January 24, 2018, the defense explained its concerns about the transcripts.

As the defense sent further corrections, the understanding was that a single person at the FBI would create a single set. The previous set was the product of a half-dozen interpreters with varying results. That single set would be turned over on a rolling basis, as the transcripts were done. And the defense would have time to review them before the final transcript being turned over on May 31. To accommodate this timeline, the trial was moved to August as it would not have been possible for the defense to receive the transcripts on May 31 and use the transcripts for a June trial. At a status conference on March 21, 2018, the government repeated the desire of the parties to come up with an agreed translation of the transcripts to use at trial. R. 111. The months moved on and finally May 31st day came and went, with no transcripts having been turned over. So far (5 weeks from trial) two transcripts from early in the investigation have been turned over. These were disclosed on June 27 and July 3, 2018. That leaves at least 27 transcripts to go with trial less than six weeks off.

The defense has had repeated calls and conversations with AUSA Greg Haanstad about this. And to be clear, the defense has no reason to believe he is acting in anything other than good faith; rather, the defense believes that he is the victim of the FBI's incompetence and dilatory tactics. While the defense has tried to be creative with this situation and piece together what it can while still keeping the trial date on, the defense's ability to prepare for trial is hindered greatly by this delay. When transcripts are received,

11

*Federal Defender Services*
*of Wisconsin, Inc.*

they must be reviewed by the defense translator, given to the client, checked for accuracy, and checked to make sure the speakers are (at the very least) accurately identified. After this is all done, there needs to be discussion with the government and its translator over differences in an effort to agree on stipulated transcripts. Only after this is done can the defense then incorporate the transcripts into its opening, cross-examinations, and exhibits. It has taken the government since November, even with the defense assistance in identifying problems with the transcripts, to produce two transcripts out of 29 or more. Apparently it believes that although the government has spent well over six months on the project, the defense (and its translator who has other cases to tend to) should be able to do all this in a matter of weeks with resources that pale next to the government's. And all the while Hamzeh sits in custody while the FBI delays.

## Conclusion

In sum, the defense has spoken to AUSA Greg Haanstad about these discovery issues and he has advised that the government understands and will comply with its discovery obligations. Because the parties have inconsistent views of what stands as compliance the defense asks for expedited briefing on this issue and a prompt hearing to resolve the dispute and hopefully keep the trial date.

*Federal Defender Services*
*of Wisconsin, Inc.*
Case 2:16-cr-00021-PP-WED   Filed 07/11/18   Page 12 of 13   Document 135

Dated at Milwaukee, Wisconsin this 11th day of July, 2018.

                Respectfully submitted,

                /s/    *Craig W. Albee*
                Craig W. Albee, WI Bar #1015752
                Joseph A. Bugni, WI Bar #1062514
                FEDERAL DEFENDER SERVICES
                  OF WISCONSIN, INC.
                517 E. Wisconsin Ave. - Rm 182
                Milwaukee, WI 53202
                Tel. (414) 221-9900
                e-mail: craig_albee@fd.org
                       joseph_bugni@fd.org

                *Counsel for Defendant*, Samy M. Hamzeh