

**FORENSIC REPORT**

**Type of Report**: Examination : Video / Audio Interviews

**Criminal case Consultants Case File #**: 1320-c

**Primary Examiner**: Brian Leslie

**Date of Report**:  June 25, 2018

**Re:** Possession Of Firearms / Guns

**Charged Person (s)**: Samy HAMZEH
**Client Name**: Federal Defenders Services Of Wisconsin, Inc.
**City**: Milwaukee
**State**: Wisconsin

## Summary of Case:

The FBI conducted a two-year investigation relating to a potential terrorist threat against the Masonic Temple located in Indiana. Because of this investigation, Samy HAMZEH was ultimately charged with a federal firearms offense.

## List Of Documents Examined:

1. Video Interview - Samy HAMZEH – January 26, 2016
2. In Car audio Interview - Samy HAMZEH - January 26, 2016

1

3. Memorandum In Support Of Bond
4. FBI Post Custodial Notes Of Samy HAMZEH
5. IQ report prepared by William A. Merrick, Ph.D

## The Purpose Of This Report:

The purpose of this report is to conduct a forensic examination on a video interviews, written statements, CID report provided by the client and provide expert opinion.

## Client's Specific Area of Concern:

Techniques used during the interviews and interrogation

## Name of Defense Attorney(s):

Joseph Bugni

## The Offense Occurred in the State Of:

Wisconsin

## Police Agencies Involved:

FBI

## Other Agencies Involved:

None

## List of Attached Exhibits:

None

## General Background Information on Interview and Interrogation Techniques Used by Law Enforcement Agencies:

The primary difference between an interview and an interrogation is as follows:

**Interview:**

- Non-accusatory
- Purpose is to gather information
- Interviews are conducted earlier during an investigation
- Interviews are free flowing
- Notes are usually taken during the interview
- Interview room is generally set up for building relationship

**Interrogations:**

- Interrogations are accusatory
- Involves persuasive techniques
- Conducted in a controlled environment
- Interrogations are conducted only when the investigator is reasonably certain of the suspect's guilt.
- Investigators are trained not to take notes until after suspect has told the truth.
- Interview room set up with the interrogator facing the suspect in the personal space

## Coercive Techniques During Interviews & Interrogations:

False confessions can be directly attributed to coercive techniques that may have been used by law enforcement during an interview or interrogation. In some cases, untrained interviewers may not recognize their line of questioning or style as coercive. Coercive techniques used during questioning should not be confused with "misconduct" by the interviewer, however can still be responsible for false confession. Below are some examples of coercive techniques that could be attributed to a false confession that are not necessarily misconduct issues:

- Trauma, Lack of Sleep, highly aggressive manipulative interrogation techniques used by the interviewer
- Convincing vulnerable persons (alcoholics, drug users) that they committed the offense during a "black out"
- Confusing the accused with his/her own words
- That there is trace evidence, witnesses or physical evidence that ties them to a crime.
- In sexual assault cases the crime maybe minimized and suggest that if the accused confesses it will save the victim from testifying and they will be forgiven.
- In sexual offenses where consent was an issue the accused may be convinced he did not see the signs the partner was attempting to convey

- Convincing an accused, he had culpability of a crime by simple proximity to where the crime took place
- Investigators improperly vetting eye witnesses

Below are examples of improper techniques that could be considered misconduct issues. These techniques would be if used outside of their training.

- Suggesting that if the suspects confesses to the crime they will receive a much less sentence (something the investigator has no control or authority to authorize)
- Witnesses who wrongfully identify an accused by manipulated photo line-ups by investigators and/or purposely failing to disclose exculpatory information during witness interviews.
- Tipping suspected persons off or implanting specific evidence prior to an interrogation that was found at the scene but not released to the public. Then during the interrogation, in some cases days later, construct specific questions where the suspect reveals the information.

## Definitions & Terms

- **Vulnerable Persons –**
  - Person's who are alcoholics or drug users
  - Person's with mental disabilities
  - A person who maybe involved in a relationship and has an emotional connection to both the alleged victim or friends in common to the alleged victim. These friends may place pressure on a suspect to confess so that the alleged victim gets closure. This is in some cases used in connection with "minimization" of the offense first such as IE: tricking a suspect into writing a confession masked as an apology letter, when the suspect believes that's all that is required with no further action.
  - A person who may have deep seeded religious or political belief(s) may also be vulnerable to manipulative tactics or coercive questioning by the interviewer.
  - A low (IQ) Intelligence Quotient may also affect a person's ability to articulate answers or not fully understand the questions asked. This may also be the case for persons that speak English as a second language.

- **Minimization –** An interviewer may minimize a suspect's culpability or involvement in a crime to make it more likely for a suspect to confess.

- **Deductive Method of Investigation -** Deductive Method Of Investigation refers to a model used when investigators only accept information that fits the initial theory they have formed of how the crime occurred and who the prime suspects are. In this investigative method, adverse or exculpatory evidence is ignored thus creating the frame work for a specific narrative the investigator is attempting to achieve.

4

Case 2:16-cr-00021-PP   Filed 07/20/18   Page 4 of 19   Document 145-10

EX. J

- **Inductive Method of Investigation -** Inductive Method Of Investigation refers to a model used when investigators accept all information during an investigation vetting and the source of the information for credibility as well as the information the source provides. If the information provided is credible but the source may not be due to conflict or may have an interest in the result of the investigation, a second source should be sought to corroborate the provided information.

- **"Feeding Narrative"** is when an interviewer attempts to feed specific words, phrases, or idea's masked through structured suggestive questioning to the subject.

# Examiners Notes & Opinions:

## ITEM # 1 – Video Interview Samy Hamzeh -Technical Review

Upon review of the video interview it does not appear to contain "time code burns". The purpose of a "time code burn" is the verification of date and time the interview was conducted and to maintain continuity of the interview. Failing to maintain proper "time code burns" on a video during any interview or interrogation leaves the possibility open to tampering or re-editing of content. It is unknown whether this video interview had been altered or tampered with or if the camera had been turned off during parts of the interview. Only on approximately 4 occasions during the interview is a "time record" verbally stated by the primary interviewer (ATKINS) and only on approximately 2 occasions during interview is the date read into the record by the primary interviewer (ATKINS). Complete time of interview approximately 2 hours 25 minutes on record.

**COMMENTS AND OPINION:** In order to confirm my statements above I re-edited 2 parts of the video using basic desktop editing software in specific areas of the interview to hide potentially questionable interview techniques used by the primary interviewer and his partner with success. It is my expert opinion that the video interview of HAMZEH as reviewed cannot be relied upon as a true copy. "Chain Of Custody" of the video interview should also be reviewed prior to trial. As there are also unknown persons in the room from time to time off camera it also leaves the possibility that the camera could be turned off for periods. ALL persons in an interview should be identified for the record.

## ITEM # 2 – Video Interview Samy Hamzeh – Room Setting / Style Of Interview

The video interview of Samy HAMZEH was conducted at an FBI office located in Milwaukie. The interview was conducted by FBI agent Jonathan ATKINS (primary interviewer) and agent

Eric FRAZIER. It is clear that the video interview was conducted in a room setting similar to **example # 2** (as seen below) This room setting would be generally used for an informal interview such as an employment interview or specifically in this case a booking room setting. as there was evidence of a metal bar mounted on the back wall used normally to secure a prisoner using handcuffs.

## Room Setting Examples



The video interview conducted by the Agents was done so as an informal interview not an interrogation style as would be used **example #3 above**.

## ITEM # 3 – Video Interview Samy Hamzeh – Techniques

Examination of the video interview would indicate that the two FBI agents were not utilizing specific methods as taught in standard formal training methods to law enforcement. They appear to be not using a standard interrogation technique as taught in the "Reid Technique" but instead a very casual interview style, even though it is clear they had a pre-belief of guilt, since HAMZEH was arrested and in custody at the time.

6

Case 2:16-cr-00021-PP   Filed 07/20/18   Page 6 of 19   Document 145-10

It is unclear whether the FBI agents had undergone formal interview training. Listed below are some areas of concern.

1. HAMZEH's phone is taken by Agent ATKINS from HAMZEH's property bag. He is warned verbally not to text or call anyone which would have been a concern for the Agents. Due to the casual set up of the room and having HAMZEH sitting across the table they still allow him to look through his phone for phone numbers not having a good view of what he is doing. In fact, on several occasions there is no monitoring of his activities by either Agent at all.

    **Transcript Page # 32 Line 13 --**

    **ATKINS: " here is your phone" (hands HAMZEH his phone from property bag) "Don't call or text anyone."**

    (37:33) HAMZEH enters room HANDCUFFED after taking a bathroom break escorted by unknown person(s) -- immediately goes to his phone. ATKINS does not prevent him or is even looking at HAMZEH as ATKINS is speaking to a third party in the room not on the record. HAMZEH is standing up appears to doing something on his phone. The phone to ATKINS is upside down unable to see what he is doing.

    (37:48) HAMZEH appears to be entering something or scrolling on his phone with ATKINS looking away talking to person(s) off camera until (37:55)

    (39:07) Again ATKINS is not monitoring HAMZEH go through his phone while ATKINS is looking for a form (total 1 min)  Atkins not watching HAMZEH while he is looking for a form. Looks up at (40:06) Then continues to look at paper work asking questions of Sammy about numbers in his contacts but is writing not watching what HAMZEH is doing until (40:33) looks up asking what kind of phone he has. At (40:44) HAMZEH places the phone on the table.

    (41:06) Agent FRAZIER arrives back in room

    From **1:03:39 to 1:03:53** HAMZEH is on his phone again ATKINS doing paperwork not paying attention

**COMMENTS:**  The fact that the Agents were concerned about HAMZEH texting or destroying potential evidence from his phone, ATKINS allowed HAMZEH unmonitored access to the same phone on several occasions during the interview.

2. During the course of the interview there are several occasions where ATKINS or FRAZIER are speaking or looking at third parties (off camera) who either enter the room or are in the room. It is unclear who these persons are and are never placed on the record. Some of these conversations are too quiet to know what the third party is saying. Examples of this are page 54 between line 5 & 6, page 55 between line 3 & 4

7

3. There are conversations whispered between FRAZIER and ATKINS not picked up by audio such as page 28 between line 9 & 10 – FRAZIER leans over and shows ATKINS a paper and whispers approximately 10-12 seconds. On page 33 or audio time 35:34 FRAZIER asks ATKINS <u>if the camera is still running</u> ATKINS states yes then FRAZIER suggest they step out of the room to have a conversation.

4. Page 36 between line 24 & 25 audio code **42:48** to **43:04** FRAZIER whispers again to ATKINS not picked up on video.

    Page 53 between line 11 & 12 audio code **1:05:00** FRAZIER quietly to ATKINS not picked up on video.

**COMMENTS:** This may be an indication that the CAMERA could possibly have been turned off at any point, as previously noted, due to being third parties in the room not known or identified for the record.

## ITEM # 4 – Video Interview Samy Hamzeh – Minimization

For the purposes of this report, as there was no time code burns on the video, reference will be made to audio stamps and written transcript pages.

During the review of the HAMZEH video interview there were several area's where interviewer Agent ATKINS was using minimization techniques:

**Transcript Page # 57 Line 12-15 --**

**ATKINS:** *Sure. Okay. And I appreciate that.* ***<u>Everybody makes mistakes</u>****. It's what we do about them that **<u>determines the kind of person we are</u>**. So I appreciate that. You know what? Why don't we -- why don't we get*

**Transcript Page # 61 Line 20-25 --   Page # 62 Line 1-2 --**

**ATKINS**: *like we talked about before, it's -- it's – **we all make mistakes**.  Nothing happened; right?  **Nobody got hurt**. It's what we do about them that kind of **determines what kind of person we are**.  And **nobody did get hurt**. Right?*

**HAMZEH**: *No.*

**ATKINS**: *No weapons were fired*


**Transcript Page # 62 Line 21-25 --   Page # 63 Line 1-11 --**

**ATKINS**: *Okay.  I think the important thing is that you realize that you didn't hurt anybody.*

A *No.*

**ATKINS**: ***No kid got kidnapped.  No bank got robbed.  No one got hurt**.  So really what we're talking about is something that never even occurred; correct?  And that's why I don't think that -- I would rather us be open and honest and upfront about this than -- because it would be a lot different if somebody was dead.  I could see how that could be a big problem. That would be a big problem.*

**HAMZEH**: *Of course.*

**ATKINS**: *But talking about something and doing something is a whole lot different than actually doing it, would you not agree?*

**HAMZEH**: *I agree.*


**Transcript Page # 70 Line 21-25 --   Page # 71 Line 1-10 --**

**ATKINS**: *Okay.  And the important thing to know here is that **no attack occurred; right**?  We've been over this.  But **no attack happened**.  So even if -- even if some bad things were said, **bad things weren't done**; correct?  **So that's way better** than if you talked about attacking something and then actually attacked it.  That would be a huge problem.*

**HAMZEH**: *Yeah.*

**ATKINS**: *A huge problem. But talking about it,* **even though it's a small problem, it's not nearly the problem** *it would be if you actually did it. Would you agree with that?* **Somebody talking about robbing a bank is not nearly as bad as somebody actually robs a bank.**

**HAMZEH**: *Exactly.*

**ATKINS**: *That's the difference.*

**Transcript Page # 90 Line 13-15 --**

**ATKINS**: *I guess what I'm asking though is did you guys ever talk about --* **and again, this didn't happen**, **so keep that in mind.** **This attack did not happen.**

**Transcript Page # 68 Line 24-25 -- Page # 69 Line 1-4 --**

**ATKINS:** *And* <u>I would rather hear it from you what's going on</u> *than to hear from someone else.* **Because then it seems as though you're lying** *and then I have to wonder what else you told me that isn't true, you know what I mean? So* <u>that's why I would rather have you tell me</u> *what happened* <u>so that I'm hearing it from you.</u>

## ITEM # 5 – Video Interview Samy Hamzeh – Feeding Narrative

"Feeding A Narrative" is when an interviewer attempts to feed specific words, phrases, or idea's masked through structured suggestive questioning to the subject.

**Transcript Page # 2 Line 11-25 – Word Usage "Guns" to "Weapons"**

*HAMZEH: I do like **guns**. Like other guys, we all like **guns**. We like to practice and go have fun with the **guns**, like in range or something like that, but we didn't have enough money to buy the whole **gun** legally.*

***ATKINS**: Legally?*

*HAMZEH: That's why we done it like this. And we know this is a bad way to do it.*

***ATKINS**: Sure.*

HAMZEH: So -

ATKINS: Why -- why did you need to buy an **automatic weapon**? Like, why did you need to buy one that you press the trigger and bullets come out until you stop pressing the trigger?

HAMZEH: I told you I like **weapons.**

ATKINS: **You like weapons?** Okay. All right.


**COMMENTS:** In the very early stages of the interview HAMZEH starts by using the word "guns" when describing his "love of guns". ATKINS very quickly begins feeding the word "weapon (s)" which is used extensively from that point on by ATKINS. This would fit ATKINS narrative that weapons would be used to kill vs the word gun used to shoot at a range or for fun. HAMZEH begins using the term unaware of the significant difference in the term usage due to his weak language skills. On a couple of occasions during the interview HAMZEH catches the error. (an example on **page 69 lines 6-9** of the transcript.)

ATKINS: Okay. So in the car you talked about just obtaining **weapons.**

HAMZEH: **Guns.**

ATKINS: Guns. Whose idea was it to obtain the **guns?**

HAMZEH: Like what I told you, since I met ▇▇▇▇ we've been, like, talking about this.


# ITEM # 5(a) – Video Interview Samy Hamzeh – Feeding Narrative 2nd Example


**Transcript Page # 23**

ATKINS: *Jordan? Jordanian passport?*

HAMZEH: Yes.

ATKINS: *Do you travel on both of them? I mean have you?*

HAMZEH: I only go here and *I went to Palestine twice.*
That's it.

ATKINS: *Okay.*

HAMZEH: So I only used the American passport.

ATKINS: American passport? *When did you go to Palestine?*

**HAMZEH:** *It was a <u>long time ago.</u> 2009 and 2008. I went twice over there.*

**ATKINS:** *….. Okay. <u>So you've been to Palestine</u> in 2008 and 2009. How did you get there?*

**HAMZEH:** *By cab. Like my -*

**ATKINS:** *But you fly to <u>Jordan first; right</u>?*

**HAMZEH:** *<u>To Palestine? Like, I</u> **used** <u>to go to Palestine</u> before I come here.*

**ATKINS:** *Oh, okay. I see.*

**Transcript Page # 24**

**HAMZEH:** *Before I come to America.*

**ATKINS:** *<u>Did you still have to have a passport to get in Palestine though?</u>*

**Transcript Page # 26**

**ATKINS:** *Okay. <u>So what do the Palestinians think of the Americans?</u>*

**HAMZEH:** *We never think nothing bad about the Americans, but we do think bad about Israel because they took our country.*

**ATKINS:** *When you say we, would you <u>consider yourself to be, like, supportive of Palestine</u>?*

**HAMZEH:** *<u>Yeah, I support Palestine.</u>*

**ATKINS:** *Okay. <u>Are you very religious?</u>*

**HAMZEH:** *I pray.*

**ATKINS:** *You pray?*

**HAMZEH:** *Like, I pray five times.*

**Transcript Page # 27**

**ATKINS:** *So you don't -- you're not -- **obviously if you support Palestine,** <u>you're not a supporter of **Israel**</u>*

**Transcript Page # 56**

**ATKINS:** *That's it. Okay. **What's your profile picture look like?***

**HAMZEH:** *I have like a scarf on my head.*

**ATKINS:** *Scarf on your head?*

**HAMZEH:** *Yes.*

**ATKINS:** *Okay. What type of scarf?*

**HAMZEH:** *Like, black and white.*

**ATKINS:** *Is that like a -- is that like a Palestinian type?*

**Transcript Page # 57**

**ATKINS:** *So you believe that you are -- like, you feel close to Palestine.*

**HAMZEH:** *Yeah.*

**ATKINS:** *Okay*

**Transcript Page # 94**

**ATKINS:** *But before you talked to the Imam, **did you believe that that would please Palestine?***

--------------------------------

**HAMZEH:** *It's not about Palestine. Like what I told you, in the Koran,*

**Transcript Page # 108**

**ATKINS:** *Do you believe in their cause -- Hamas's cause to free Palestine*

**COMMENTS:** During this exchange ATKINS is determined to create a narrative associating HAMZEH with Palestine first then drawing assumptions such as: "**obviously if you support Palestine, you're not a supporter of Israel**". ATKINS also type casts HAMZEH in his

narrative by suggesting that by wearing a black and white scarf he fits a stereo type by asking: "*is that like a Palestinian type?*" , then goes further to suggest that before he approached the Imam he wanted to "PLEASE" Palestine. It is at this point when HAMZEH catches on to what is being asked of him by his rebuttal "***It's not about Palestine.*** *Like what I told you, in the Koran*".

## ITEM # 5 – Video Interview Samy Hamzeh – Vulnerability

For the purposes of this report, as there was no time code burns on the video, reference will be made to audio stamps and written transcript pages.

During the review of the HAMZEH video interview there were several area's where interviewer Agent ATKINS exploited HAMZEH's vulnerability (religious and political beliefs) to extract responses that would feed a specific narrative

**Transcript Page # 26 Line 12-20 --**

*ATKINS*: When you say we, would you consider yourself to be, like, **supportive of Palestine**?

*HAMZEH*: Yeah, **I support Palestine.**

*ATKINS*: Okay. *Are you very religious?*

*HAMZEH*: I pray.

*ATKINS*: You pray?

*HAMZEH*: Like, I pray five times. That's it. Not like I told you I go to clubs, I go hang out with the friends, this is not, like -- this is bad in my religion.

**Transcript Page # 56 Line 11-25 –**

*ATKINS*: So you believe that you are -- like, **you feel close to Palestine.**

*HAMZEH*: Yeah.

*ATKINS*: Okay.

*HAMZEH*: Because *my nationality from there*, like, what my family told me about, like, they told me this is our country. We live there ever since 1948 and we left to Jordan. *So it's our country. But Jordan is not our country, but we living there.*

ATKINS: I see.

HAMZEH: That's what happened, so, yeah.

ATKINS: **_There's not any pictures of you and guns_**?

HAMZEH: No.

ATKINS: **_You said you like guns, but there's no pictures like that of you_** and –

**Transcript Page # 100 Line 20-25 -- & -- Page # 101 Line 1-6 –**

ATKINS: you didn't do anything -

HAMZEH We _didn't do anything and we didn't want to do anything_.

ATKINS: But we want to be sure.

HAMZEH Because I have proof for this. I can show you messages.

ATKINS: I have to ask you, Samy, **_I believe you speak very fondly of Palestine_** because that's your home.

HAMZEH Yes.

ATKINS: **_That's your homeland_**.

HAMZEH Um-hmm.

ATKINS: _Did you ever have any thoughts about_ **_traveling to Palestine to try to help out_**?

HAMZEH No.

ATKINS: Never. Okay. All right. **_You had those -_** _(inaudible)_

**Transcript Page # 64 Line 19-25 – & -- Page # 65 Line 1-2 –**

HAMZEH: Okay, let me ask you a question: What are you guys saying? _Like, we're going to attack something. Because we're Arabs_ that's why? Is that what you guys think about us?

ATKINS: No, no, I don't think that at all. I don't think that at all.

HAMZEH: Okay. Like I told you I haven't harmed, like, anybody have harmed. _Like our religion says we don't even hurt anybody._ Doesn't matter what religion he is.

15

Case 2:16-cr-00021-PP   Filed 07/20/18   Page 15 of 19   Document 145-10

Ex. J

**Transcript Page # 106 Line 9-25 –**

**ATKINS:** *Do you believe that they were being directed by anybody overseas or are involved in any kind of terrorist group **or are you involved in any kind of terrorist group**?*

**HAMZEH:** *(Shakes head No)*

**ATKINS:** *Do you know what **Hamas** is?*

**HAMZEH:** *I know Hamas is some people who, like -- like in Gaza, some people who fight in Gaza. That's all I know about it.*

**ATKINS:** *Okay. You don't know anything -*

**HAMZEH:** *I don't know anything about them. I know nothing about them.*

**ATKINS:** *Do you believe in their cause -- **Hamas's cause to free Palestine**?*

**HAMZEH:** *No. I'll tell you why. Because some, like, the top people in Hamas, like, the people who control everything in Hamas, what **I believe and where my family believe they are terrorists**.*

**Transcript Page # 108 Line 9-14 –**

**ATKINS:** *So you would be against **ISIS**.*

**HAMZEH:** *I'm against **ISIS**.*

**ATKINS:** *Okay.*

**HAMZEH:** ***100 percent against ISIS**. And that is what make me think about this, because ISIS are masonic and they all devil -*

**COMMENTS:** HAMZEH becomes aware of ATKINS attempt to use his religion and background with his love for guns to associate him to radicalism and terrorist organizations with negative results. This would be consistent in ATKINS attempt to feed his narrative. This would also be consistent that both ATKINS and FRAZIER potentially were using a deductive method of investigation prior to conducting this interview. *(see definition section above)*

**Transcript Page # 103 Line 24 – 25 Page # 104 Line 1 – 20**

**HAMZEH:** *Then when we start reading the Koran and explaining the Koran and stuff like that, like what I told you, <u>we don't understand everything about the Koran.</u> We don't understand anything.*

**ATKINS:** *Sure.*

**HAMZEH:** *So the other two guys, <u>they were listening to me.</u> Like, I was telling them everything.*

**ATKINS:** *When you say other two guys, who -*

**HAMZEH:** *Like,* ███████████ *<u>Like, I have more religious than them.</u> Like I know more than them. So they believe me. They do anything I want to do.*

**ATKINS:** *I see. Okay.*

**HAMZEH:** *Like, I control -- <u>I'm always controlling them.</u>*

**ATKINS:** <u>**You tell them yes or no.**</u>

**HAMZEH:** <u>*Yes, exactly.*</u> *Exactly. So what happened is they told me, like, after we talked about this with Mo, the barber guy, he left us. So then we sit together and they're, like, if you guys want to tell anybody else, we all have to be there. So what happened is when I went to the Iman, I didn't tell them about it because I was, like, <u>if I tell them I'm going to go talk to the Iman, they're going to tell me no, don't go, don't go.</u> You know, what I say?*

**ATKINS:** *They may not trust you.*

**HAMZEH:** *Exactly. So I went to the mosque and I was talking to the Iman and they called me while I'm talking to the mosque -- to the Iman. **So he told me no, don't do it.** And I was, like, "Guys, go back to the -- to the house. I'm coming over there. I got to talk to you about something."*

**COMMENTS:** HAMZEH prides himself as being knowledgeable in his religion and by <u>bragging</u> to ATKINS on his ability to control his friends in my opinion would be consistent with his vulnerability of having a low IQ. This is also supported when he is unable to understand the significance of ATKINS comments above when he interjects **"You tell them yes or no"** ATKINS suggesting that they would do anything on his command where HAMZEH is actually explaining is his ability to prevent them from doing anything harmful.

## IQ EXPERT REPORT REFERENCE

- *"Bragging and boasting are often signs of self-perceived weakness and poor self-esteem, as Edgerton's examples illustrate. "*
- *"People with BIF are rather uniquely susceptible to being influenced and manipulated by their friends, fearing that if they do not do as they are told, they risk losing one of these few social resources that they had been able to develop."*

## OPINIONS & RECOMMENDATIONS:

Upon review of the HAMZEH interview the following expert opinions are provided:

- The video having no "timecode burns" allows the video to be altered, edited, stopped or changed and thus cannot be relied upon for its accuracy. What draws attention to this possibility is a conversation on record between FRAZIER and ATKINS where referenced on page 33 or audio time 35:34 FRAZIER asks ATKINS **"is the camera is still running?"** ATKINS states yes then FRAZIER suggest they step out of the room to have a conversation.
- This is also an issue as the interviewer made no attempt to mention even the date except when having HAMZEH sign documents on camera the date was mentioned. The time was mentioned by the interviewer a total of approximately 4 times during the interview.
- Although Agents ATKINS and FRAZIER conducted a casual interview of HAMZEH (see diagram example #2), instead of a standard interrogation style interview (see diagram example #3), this would indicate in my opinion that they had a belief there was already sufficient evidence at that point to form a presumption of guilt. This would be corroborated by the fact HAMZEH was in custody at the time. This may also indicate that the agents may have used a deductive vs inductive method of investigation where they formed a theory based on unknown information. If this was the case then it would be important to know what information was used, who provided the sources for this information and how the sources were vetted.

  It is my expert opinion that there were significant uses of minimization by ATKINS during the interview, as detailed in my report, to suggest that because HAMZEH had not carried out any actions that his culpability was minimized. It is clear during the interview conducted by both agents, that HAMZEH had minimal command of the English language, regardless agents at one point offered him an interpreter. It is also my opinion, based upon review of an IQ report prepared by William A. Merrick, Ph.D., that the combination of both minimal language skills and low IQ, along with passionate religious and political views, would have made

18

Case 2:16-cr-00021-PP   Filed 07/20/18   Page 18 of 19   Document 145-10

EX. J

HAMZEH vulnerable. It is clear that ATKINS exploited HAMZEH's vulnerabilities using minimization techniques to extract specific responses favorable to his investigation.
- It is my expert opinion that based on minimizations used by ATKINS during the interview combined with HAMZEH's vulnerabilities (as stated in this report) the statements made by HAMZEH during the interview should not be relied upon without verification and corroboration.

This forensic opinion report is created as a result of examining specific documents provided by the client (stated above). The expert's analysis and comments provided in this report are only based on the documents that were provided to the examiner and are in no way representative of the complete case. This report in no way offers or represents a legal opinion and thus should not be relied upon for that purpose. Criminal Case Consultants Inc. provides analysis on the contents of interrogations, witness statements, interviews, court testimony, police notes that are related to criminal cases. The comments, expert opinions and findings in this report are solely based on supporting documentation provided by the client and are that of the expert.

The following examiner has reviewed the materials provided for this report and provided an expert opinion:

Brian Leslie
Forensic Expert
Coercive Interrogation and Interview Techniques
Criminal Case Consultants Inc.

June 25, 2018