UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,    )     Case No. CR 16-21
                                 )     Milwaukee, Wisconsin
    vs.                       )
                                 )     July 24, 2018
SAMY MOHAMMED HAMZEH,         )     9:30 a.m.
                                 )
                Defendant.    )

------------------------------------------------------------

### TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE WILLIAM E. DUFFIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    Office of the US Attorney
                             By: GREGORY J. HAANSTAD
                                BENJAMIN P. TAIBLESON
                           517 E Wisconsin Ave  - Rm 530
                           Milwaukee, WI 53202
                           Ph: 414-297-4581
                           Fax: 414-297-1738
                           gregory.haanstad@usdoj.gov
                           benjamin.taibleson@usdoj.gov
For the Defendant
SAMY MOHAMMED HAMZEH:      Federal Defender Services of
(Not Present)                 Eastern Wisconsin, Inc.
                           By: CRAIG W. ALBEE
                                JOSEPH A. BUGNI
                           517 E Wisconsin Ave - Rm 182
                           Milwaukee, Wisconsin 53202
                           Ph: 414-221-9900
                           Fax: 414-221-9901
                           craig_albee@fd.org
                           joseph_bugni@fd.org

U.S. Official Reporter:    JOHN T. SCHINDHELM, RMR, CRR,
Transcript Orders:        WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1            P R O C E E D I N G S (9:31 a.m.)

2            THE CLERK:  All rise.

3            THE COURT:  Please be seated.

4            THE CLERK:  Judge Duffin is present for the United

09:32  5  States of America vs. Samy Mohammed Hamzeh, Case No. 16-CR-21,

6  for a hearing on the motions.

7            May I have the appearances, please, first by

8  government?

9            MR. HAANSTAD:  Good morning, Your Honor.  Gregory

09:32  10  Haanstad for the United States.  Also with me at counsel table

11  is assistant U.S. attorney Benjamin Taibleson.

12            THE COURT:  Good morning to you both.

13            MR. ALBEE:  Good morning, Your Honor.  Craig Albee and

14  Joe Bugni appearing on behalf of Samy Hamzeh.

09:32  15            THE COURT:  Good morning to you both.

16            Well, we're here to address some *Brady*/Rule 16 motions

17  filed by the defendant.  And I've kinda broken them out by the

18  transcription/translations that we've been talking about and

19  everything else.

09:32  20            So I thought we would address the translations/

21  transcriptions issues first since we've had multiple

22  conversations about those in the past.  And if at this point you

23  say we've worked it out, feel free to jump up and say "we've

24  resolved that, Judge."

25            (No response.)

 1          THE COURT:  Not hearing anything, I'll move forward.

 2          So with the translations/transcriptions, I --

 3          You know, we've been talking about this for a couple

 4   of years, and I know that early on the government was having

09:33  5   some difficulties transcribing these conversations and at

 6   various times we've had meetings where summaries of the

 7   translations were produced to the defense.  Ultimately it got in

 8   front of Judge Pepper by middle of last year, June 6, 2017, and

 9   she ordered that the transcripts that the government proposes to

09:34 10   use at trial be produced by November 13th, 2017.  Looks like

11   something was produced by that date, the defense still takes

12   issue with it.

13          So tell me, is the issue that the parties don't agree

14   on the translations of these conversations?  I know there's

09:34 15   reference to errors in the transcriptions, although it's not

16   clear what those errors are.  I'll start with you, Mr. Albee.

17          MR. ALBEE:  Judge, whether we agree or don't agree is

18   unknown to us because we don't have them this close to the

19   trial.  There were a number -- the transcripts were produced in

09:34 20   November of last year, which was approximately 90 days before

21   trial, with the idea then that we could examine those for their

22   accuracy.  We went through those and there were just a number of

23   obvious problems with the transcripts.

24          THE COURT:  Tell me about the transcripts.  Describe

09:35 25   them generally.  They cover roughly 10, two-week period?

3

1       MR. ALBEE:  Well, there are 29 -- I believe there are

2   29 transcripts in that group that the government thought that

3   they might use at trial.

4       THE COURT:  And how long are each of the transcripts?

5       MR. ALBEE:  The total is about 1400 pages.  13, 14.

6   13 or 1400 pages.  So, in total, out of those.

7       We reviewed them.  There are some instances in which

8   the translator reverted back to summary form.  There are

9   situations where the speaker has clearly misidentified as if I

10  was speaking to you right now and I said Mr. Albee, this is the

11  problem.  I mean just the context wouldn't make any sense there.

12  There were other issues where it was I think unintelligible

13  where things could be heard.

14      THE COURT:  What do you mean?  What does that mean?

15      MR. ALBEE:  So the transcript might say

16  unintelligible, "UI," and we thought that there was things that

17  could be heard.

18      Again, sometimes it would say -- it would just

19  summarize some portion and we would say, no, that needs to be

20  translated, you can't just move into summary.  And other

21  portions where -- other transcripts were you read them and they

22  just -- without being specific, were just of poor quality.

23      We put this in a letter in January and identified to

24  the government what all of our problems were with the

25  transcripts and what we thought needed to be fixed.  And I think

4

1    there was an acknowledgement that they needed to be fixed; that

2    they needed to go back to their translators and new transcripts

3    would be prepared.

4         And that's been the understanding ever since in the

09:36    5    two status conferences with Judge Pepper, that there would be

6    new transcripts prepared that would correct those errors.  And

7    the idea being that we would get those, we'd be able to go

8    through them with our client and with our translator, and the

9    idea being we hope to agree on these things.

09:37    10        I mean, we have no advance thought that we want to go

11    into court and have a big fight about the transcripts.  We want

12    to get them and agree on whatever we can.  And we sort of had

13    the sense all along that we would be able to agree on virtually

14    everything.

09:37    15        We then had the understanding that these would be

16    turned over on a rolling basis.  That had been talked about

17    much -- or, you know, two years ago, as the court mentioned,

18    that when transcripts were available we'd get them on a rolling

19    basis so we could always, you know, get them to our translator

09:37    20    who isn't sitting around -- he's got other work to do, he's not

21    sitting around waiting for these things.

22        So, you know, to make it more efficient and easier,

23    that we'd get these on a rolling basis.  But, in any event, we

24    thought -- we were led to believe no later than the end of May,

09:38    25    which again would be about three months before the trial in this

1    case.

2              We had conversations with Mr. Haanstad who believed he

3    would be -- and he can correct me if I'm wrong, this is how I

4    recall it -- that he believed he would be getting the

09:38    5    transcripts from his translators by the end of May.

6              Even like in the week before when we're saying where

7    are the transcripts, he said, well, they should be here by May

8    31st.  They hadn't been produced in any kind of rolling manner

9    at all.  So, you know, again we thought if five were available

09:38    10    in April we'd get those five in April so we could start this

11    process.

12              The end of May -- the end of May came and he said,

13    well, now it looks like maybe next week.  Then I understood them

14    to come in next week, or some of them came in, the government

09:39    15    didn't produce them.  My guess, I don't know if this was

16    specifically stated, was that there were problems with those

17    translations that they still weren't happy with them because

18    none were turned over at that time.

19              And since then, if they went back to the translator --

09:39    20    I also understand that the government intends to have one

21    translator, who's gone through all of these, approve them or

22    verify that they're accurate.  But since then I believe we've

23    gotten three out of the 29 transcripts is where we're sitting

24    right now.

09:39    25              And so, it's been since November --

1    THE COURT:  You've had the 29 at some point, all be it

2  with errors.

3    MR. ALBEE:  Right.  But we don't know what the final

4  transcript is going to be.  I can't prepare exhibits.  I can't

5  prepare crosses.  I can't cross-reference where these things are

6  going to be.  I can't -- when I get these things I don't know if

7  they're gonna -- they have screwed up the speakers again, so I

8  have to have somebody listen to those to make sure those are

9  accurate.  I'm now left with like three weeks on a project that

10  their person in January said here are the problems.

11    The government, with all of its resources, all the

12  translators it has available, six months later I've got three

13  transcripts.  And now we're supposed to like try to put all this

14  into exhibits and have our translator look at it.  Our client's

15  interested in what's in there.  I've got nothing to show -- I've

16  got nothing to show them as final transcripts.

17    You know, we don't know which words are going to be

18  changed.  We have to go through all those things.  And we've got

19  nothing.  And we've got three transcripts.  And then --

20    THE COURT:  So you're saying you've got three that are

21  from your perspective, quote-unquote, trial-ready transcripts.

22    MR. ALBEE:  Three that we've been told by them are

23  trial-ready transcripts.  That's --

24    In the meantime, we've produced on our end either some

25  transcripts that -- of conversations that they appeared not to

7

1    intend to use.

2            (To Mr. Bugni)  What did we produce?  Five?  Six?

3    Seven?

4            We've produced seven transcripts that we are

09:41  5    suggesting are trial ready.  Again with the idea that, here

6    government, this is what we'd like to use, we're giving them to

7    you in advance so you can tell us whether you have problems with

8    them because we would like to stipulate to these things and not

9    have a six-week trial where people just take the stand and

09:41  10   replay the conversations and then they translate them.

11           So, but I mean the bottom line is, we have at this

12   point I think three translations that we've been told are trial

13   ready.  We've been told that for all 29 we are going to be

14   getting different transcripts.  And I don't know when those -- I

09:41  15   don't know when those are.  But that's where we're sitting right

16   now.

17           One moment, Your Honor.

18           (Defense counsel confer.)

19           MR. ALBEE:  And then as to some of the translations

09:42  20   that we've sent, we've gotten no responses to, you know, whether

21   these are acceptable, not acceptable.  But, you know, going back

22   to -- I think our first one was produced in March for disk 104.

23   But that's our understanding of what the status is right now.

24   We're waiting for the other 26 translations that the government

09:42  25   had previously indicated it intended to use.

8

1    THE COURT:  So tell me about the 26 that are not trial

2    ready.  Of what value are those to the defense right now?

3    MR. ALBEE:  Well --

4    THE COURT:  What are they?  Tell me about those 26.

09:43    5    What do you have on those 26?

6    MR. ALBEE:  As the court knows, I mean, this is four

7    months of conversations that are recorded at different times.  I

8    mean, the defense is entrapment, we want to -- we'll put in the

9    specific conversations here including Mr. Hamzeh withdrawing

09:43    10    entirely from the alleged plot here the conversations in which

11    he was asked if he wanted a machine gun and he said no.

12    All these things.  All the conversations.  And again,

13    our understanding is we've been told that this is what the

14    government intends to use.  We've been relying on, you know,

09:43    15    representations that these transcripts are being prepared and

16    would be available.

17    THE COURT:  I'm just trying to understand the nature

18    of the shortcoming of these 26.  So, for example, is it

19    Mr. Hamzeh saying the transcript says that's me talking, that's

09:44    20    not me talking, that's, you know, John Smith talking?  Or, you

21    know, it says yes, but I said no.  Or is it that, you know,

22    they're interpreting a word he said incorrectly?  What is the

23    issue with those 26?

24    MR. ALBEE:  I'll -- Mr. Bugni is a little more

09:44    25    familiar with the transcripts than I am.

9

1    MR. BUGNI:  Your Honor, you will have a variety of

2  problems.  One, the misidentified speaker.  There are some where

3  you could go on for 20 pages with a misidentified speaker.

4    In one that we just recently caught, we had relied

09:44    5  upon it, we were like, wow, this is a really good nugget, it

6  turns out that's not who the translator said is speaking.

7    So those are very large problems.  I think they're

8  prevalent in about four transcripts.  So that's not a large

9  percentage of them, but it is a very big problem especially when

09:44    10  it comes to impeachment.

11    The other problem is specific words.  Some translators

12  would translate Kalashnikov as machine gun when that's not what

13  they had said or the word "sllaak" as a gun.  It's -- you know,

14  there has to be precision here, and we've brought that though

09:45    15  their attention.

16    There are also large swaths where you'll have an hour

17  that has been summarized and the translator will add in their

18  own opinion about whether or not it's valuable or not.  Well,

19  that becomes problematic.

09:45    20    And then you go down to some of the bigger nuances

21  about, you know, what is unintelligible, what could be heard,

22  and what precisely is being said at those moments.  Because

23  sometimes -- the translators were of varying value.  There are

24  some that were quite good.  But there were other ones, I think

09:45    25  Mr. Haanstad would back me up on this, where you would still

10

1    find the red line and the translators notes within that saying,

2    "hey, we need to re-listen to this, I don't hear it," or "that's

3    not what they said."  And then they'll also have just crossed

4    out where you can tell this is a rough draft.  Then there are a

09:45    5    couple of translations that just aren't worth anything.  And

6    some of those are the most pivotal ones.

7    So, you've asked where we are?  The early transcripts

8    that we have are the early dates when there's just a little bit

9    of talk.  So we're talking about October and then November 2nd

09:46    10    and I believe we have November 23rd.

11    And then you have the real big dates which are

12    December 7th, December 14th, and then all of January.  And

13    that's really where the rubber hits the road.  And that's where

14    it's the most important.

09:46    15    Now, the translations that we have, I think they

16    probably total 200 pages.  What the full breadth of these --

17    THE COURT:  When you say the translations, where you

18    have the trial-ready translations?

19    MR. BUGNI:  Of the government's, yes.  And ours are

09:46    20    about 201 pages.  And they're of different days earlier on and

21    then as well as different segments.  So one confidential human

22    source is recording and the government has chosen to use that

23    recording, but there were parts where the other person went to

24    the bathroom.  You know, and so that part is -- it's kind of

09:46    25    bled into it.

11

1    Then there are other aspects, Your Honor, where we're

2  not sure the transcript is at all reliable, where a person who

3  couldn't be there is suddenly calling in and their voice is

4  mentioned.  And they're supposed to be in a busy pool hall and

09:47  5  yet you can hear the conversation perfectly.  So it's not to say

6  that -- we don't know exactly what was said on some of those,

7  and that's very problematic.  So they're not trial ready in that

8  they wouldn't be worth anything for impeachment, nor would they

9  be reliable for the jury, to go to that.

09:47  10    I think that outlines most of the specific problems,

11  but definitely word usage is a huge one that we've identified,

12  as well as ones where we think -- or we know this is not the

13  speaker that you're referring to.

14    Oh, yeah, there's also -- other ones we'll take out

09:47  15  the whole CHS, you know, that needs to be in there for

16  confidential human source, who is the true speaker, is it Mike

17  or Steve, and then is it a third person or a fourth person.

18  They're not ready.

19    THE COURT:  Mr. Haanstad?

09:47  20    MR. HAANSTAD:  Your Honor, if I could just back up a

21  little bit.

22    THE COURT:  Sure.

23    MR. HAANSTAD:  And the court is probably aware of this

24  or remembers this, but I just wanted to point out a couple of

09:48  25  things.

12

1      The government provided the audio of every one of

2  these recordings at the time of the defendant's arraignment.  So

3  he's had in his possession literally the audio recordings of all

4  these conversations for over two years.

09:48  5      And, in addition to that, the government provided

6  written summaries of all these recorded conversations by August

7  26th of 2016, so a little under two years ago.

8      And I'll get to the verbatims in a minute.  But I

9  think our position all along is that we've complied with our

09:48  10  disclosure requirements under Rule 16 and *Brady* by providing

11  those audio recordings and then supplementing those with the

12  written summaries, again, two years ago.

13      THE COURT:  Although you committed to producing

14  verbatim transcripts and Judge Pepper ordered that.

09:48  15      MR. HAANSTAD:  Correct.  And that's what we, as you

16  noted, were required to do by November 30th.  My

17  understanding --

18      THE COURT:  November 13th.

19      MR. HAANSTAD:  I'm sorry, November 13th.  My

09:49  20  understanding was that each party was to identify for opposing

21  counsel those transcripts of conversations they intended to rely

22  upon or introduce at trial.  We provided written rough draft

23  verbatim transcripts on November 13th.  We --

24      THE COURT:  Is it your position that complied with the

09:49  25  order?

09:49

09:50

09:50

09:50

09:51

1    MR. HAANSTAD:  It probably -- I think it might have

2  complied with the language of the order, but our intent all

3  along was to clean those transcripts up.  There's no question.

4  We've been trying to do that since November of 2017.

5    THE COURT:  I mean you could not -- the state they

6  were in in November of 2017, would those have been in a state

7  that you could have used those at trial?

8    MR. HAANSTAD:  You know, we could have used them, but

9  there were clearly mistakes.  There's no question.  So we

10  couldn't use the entirety of those transcripts.  But it's not as

11  though there was only 5 percent translations that were useful.

12  It was -- they were substantially better than that.

13    But all that being said, again, we recognize that

14  there were errors in those November 13th transcripts, and our

15  effort all along has been to work with the defense and correct

16  some of those errors.

17    THE COURT:  Let me ask you this, Mr. Haanstad.  Why

18  has it taken so long?  I mean clearly what Judge Pepper ordered

19  was that the trial-ready versions of those transcripts be in the

20  defendant's hands 90 days before trial so that they could use

21  them, be familiar with them, you know, and get ready for trial.

22  And by November 13th, 2017, the government -- I mean, yes, the

23  defendants had the audio since, you know, earlier in 2016, but

24  the government's had even longer than that.

25    What's taken -- by November 13th, 2017 -- we're not

14

1    talking about, you know, hundreds of thousands of pages.  Why

2    has it taken the government so long to come up with accurate

3    transcriptions?  By November 13th you were more than a year and

4    a half from the time this case was commenced.  Why so long to

09:51  5    get those transcripts?  Why has it been such an effort?

6            MR. HAANSTAD:  I'm not entirely sure, Your Honor.  I

7    don't mean to be flip about this.

8            THE COURT:  No, I understand.

9            MR. HAANSTAD:  I'm not doing the translations.  And

09:51  10   we've been working with the FBI, we've been--

11           THE COURT:  Early on -- let me just interject.  Early

12   on -- I was told in one of these early conversations with -- I

13   think Mr. Kanter was in there at the time -- that the FBI's

14   position was essentially, you know, we do this shortly before

09:52  15   trial.  I mean that's when we -- we got a lot of stuff going on,

16   and we'll get this to the defense shortly before trial.  That's

17   our general policy.  And I don't remember whether they said 90

18   days or even less time than that.

19           And, you know, there was some pushback by the defense

09:52  20   about waiting that long.  And so there was a commitment, no,

21   we'll get on it.  This is the FBI.  And it wasn't the local FBI,

22   it was, you know, folks in other locations that I think were

23   being, you know, told that this was -- this is roughly the

24   general procedure about when we get this stuff done.

09:53  25           And, you know, you could critically look at what has

15

09:53    1    transpired and conclude that notwithstanding orders from me and
         2    from Judge Pepper, that other folks have to say, you know, we'll
         3    do this as we always do it, which is we'll get it when we get
         4    it, and it just doesn't work that way. You know, they don't
09:53    5    call the shots, Judge Pepper called the shots. I made some
         6    orders too.

         7         But I just don't know what has taken -- I mean we're
         8    over two years since this case was indicted. And we're not just
         9    talking about months and years of translations. It sounds like
09:53   10    it's a pretty finite period of time. And I know you're talking
        11    about translations that may not be easy to do. But I don't
        12    understand why by November 13th trial transcripts weren't ready.

        13         MR. HAANSTAD: And, Your Honor, all I can tell you is
        14    that we've repeatedly emphasized that. Mr. Kanter's assessment
09:54   15    from a couple of years ago that you mentioned still remains
        16    true. We have had no problem at all with the local FBI office.
        17    And they've emphasized to their counterparts in these other
        18    jurisdictions who are responsible for doing the translations how
        19    important it is to get them done. We identified the court's
09:54   20    orders and the scheduling that was contained within those
        21    orders.

        22         But, you know, our effort right now is just to try to
        23    determine how best to get transcripts/translations ready and in
        24    place as early as possible so that they can be -- so we don't
09:54   25    have to move the trial date.

16

09:55 1    THE COURT:  But of what value are those guesses or

2    representations at this point?  I mean we've had lots of

3    representations about when things would be done, orders about

4    when things were supposed to be done.  And, you know, November

09:55 5    13th was a long time ago.  You know, we're now almost to the end

6    of July.  And, you know, what good is any projection of when

7    this stuff will be done?

8    MR. HAANSTAD:  All I can tell you, Your Honor, I don't

9    have a projection in terms of time.  And maybe it wouldn't be

09:55 10   worth much anyways given what's gone on so far in the case.  But

11   I can tell you that we've asked our translation service to do

12   something different now; that is, we've asked them to focus only

13   on those portions of the transcripts that we intend to introduce

14   at trial, not the entire conversation.  And I don't have an

09:55 15   exact number on it, but my sense is that that's going to end up

16   taking what was somewhere a little over a thousand pages and

17   could reduce it down to as much as 250 to 350 pages.  So it's

18   much more manageable.

19   And, again, I can't translate that into a projection

09:55 20   as far as how long it will take, but just given those numbers I

21   think that it should be significantly faster.

22   THE COURT:  But, I mean, you've got a trial.  At the

23   moment I think the trial is still scheduled to begin next month,

24   isn't it?

09:56 25   MR. HAANSTAD:  Yes, August 20th.

17

1     THE COURT:  And these were supposed to be in the

2  defendant's hands 90 days before trial.  So now we're at some --

3  back to some vague "we'll get it as soon as we can" and "we're

4  going to try and do it as best we can" and meanwhile Mr. Hamzeh

09:56     5  is sitting in custody 2 1/2 years and counting.  What's

6  Judge Pepper supposed to do with that?

7     I mean obviously at this point one solution would be

8  to dismiss -- I mean move the trial again if we're still -- if

9  these transcripts are still coming in.  I don't know how she has

09:56    10  a trial in the middle of August.  I mean there are other avenues

11  she could take.  I suppose she could hold the government to

12  whatever versions were in place in November 13th, 2017.  I just

13  don't know what I'm supposed to do with the information you're

14  telling me about how we schedule things on a forward-going

09:57    15  basis.

16     MR. HAANSTAD:  Well, I would say too, Your Honor -- I

17  mean just the fact to your calculation -- both parties were

18  ordered to provide transcripts of the conversations they

19  intended to introduce at trial and were ordered to do so by

09:57    20  November 13th.  And we're making an effort to do that.  I think

21  the defense is also making an effort to do that.  They had

22  mentioned seven trial-ready transcripts that they provided to

23  the government.  I believe we received the last of those last

24  night.  I think we received four or five over the last five or

09:58    25  six days.

18

1          So our intention, again, would be to have our

2    translator focus on those portions we intend to introduce at

3    trial, but our translator would also have to go over these

4    newly-received transcripts that we've gotten from the defense

09:58    5    over the last couple of days.

6          But I think maybe in the interest of streamlining this

7    a little bit we could discuss this with the defense and see if

8    they too would be willing to just highlight those portions of

9    their transcripts that they intend to introduce at trial out of

09:58   10    these newly-received transcripts.  And I think that would reduce

11    the work of both translators, both the defense translator and

12    the government translator, significantly.

13          Again, I can't translate that into a number of days or

14    weeks as far as how long it will take, but I can -- if we

09:58   15    discuss this with the defense and they're willing to do that we

16    can go back to our translator and see if we can get a better

17    estimate of how long that will take.  As we mentioned he is from

18    another jurisdiction, but is present here in Milwaukee right now

19    working on this.

09:59   20          THE COURT:  So, but as of right now you don't have an

21    estimate as to when the transcripts that the government intends

22    to use at trial will be trial ready.

23          MR. HAANSTAD:  I don't have an estimate.  But I offer

24    that maybe the court could order that we do this -- we provide

09:59   25    these transcripts no later than 14 days before trial.

19

1      THE COURT:  Judge Pepper ordered it 90 days before

2  trial, why is it now 14 days?  Just because the government's

3  taken a lot longer to do it?

4      MR. HAANSTAD:  Well, it's -- all I can say is that's

09:59  5  my -- I hate to say my estimate, but if the court orders that

6  they be produced by again no later than 14 days before trial --

7      THE COURT:  Well, 14 days before trial is basically

8  the end of the month, isn't it?  So are you going to --

9      MR. HAANSTAD:  August 6th.

10:00  10     THE COURT:  The trial is scheduled to begin August

11  6th?

12     MR. HAANSTAD:  No, the trial is scheduled to begin

13  August 20th.

14     THE COURT:  Okay.  So are you saying that if we order

10:00  15  it by August 6th you're going to have it done by August 6th?

16     MR. HAANSTAD:  Well, that'll be our effort, yes, that

17  we'd have it done by August 6th.

18     THE COURT:  Mr. Albee?  Looks like you're busting at

19  the seams back there.

10:00  20     MR. ALBEE:  The court asked the question why weren't

21  these done by November 13th.  And part of the real question is

22  when supposedly the versions that were turned over were somewhat

23  close -- I don't know how they are all characterized by

24  Mr. Haanstad -- but really the question is, why in the eight

10:01  25  months since then are they not finished?  I mean if they had

20

1   done it by November 13th, they provided something that was --

2   you know, that Mr. Haanstad thought in some respects some of

3   them were trial ready but yet we only have three out of 29,

4   eight months later?  I mean that just doesn't make sense at all.

10:01  5   We moved the trial twice already.

6         THE COURT:  I think the answer is self-evident, isn't

7   it?

8         MR. ALBEE:  It is.  Maybe I'm just asking rhetorical

9   questions at this point.  But now there's --

10:01  10         Another frustrating thing, Judge, is we're hearing now

11   about this idea of doing just partial transcripts for the first

12   time as we're sitting here in court.  Frankly, we're sandbagged,

13   because we have been trying to work with the government.  We've

14   provided -- we provided them a long letter saying we think these

10:01  15   are the problems with your transcripts.  Another option for us

16   was go to trial and start slamming it to the translator about

17   how many times they had screwed up.  I mean that could have been

18   the way we went, but we wanted to work with the government.  In

19   part --

10:02  20         THE COURT:  Why isn't that the solution at this point?

21   Just go to trial with what you have.  They're stuck using what

22   they produced on November 13th --

23         MR. ALBEE:  Because we're sandbagged.  The idea was,

24   Judge, it's enormously expensive to do these translations.  The

10:02  25   government was doing them.  They agreed to do them 90 days in

21

1    advance, in which case we thought we would have -- you know,

2    we'd reach an agreement and stipulate.  And so we've been -- I

3    mean that's been the plan is not to create our own 30

4    transcripts on top of theirs and have that fight.  I mean I'll

10:02    5    tell ya, I mean, because I think that's a six-week trial.  I

6    mean, the -- I mean, we've been -- you know, in terms of this

7    trial, I mean, we're turning over experts, we're doing all sorts

8    of things to prepare for this trial.

9    You know, as I said, it's the first time we hear about

10:03    10    maybe doing a smaller version.  But, I mean, we've been

11    communicating what our expectations are the whole time in trying

12    to help out and provide -- we've provided what our translator

13    says as problems with their translations to see if we can get

14    these fixed, with the expectation again that maybe we'll have

10:03    15    these at the end.

16    So, and, frankly, we haven't been preparing in the

17    way, you know, that we're going to have a translation fight at

18    this trial.  And even then, even when they turn them over, I

19    mean, I can't imagine the government isn't going to say, well,

10:03    20    here's Exhibits 1 through 29, and we're turning these over, then

21    we want to produce these to the jury.  And we'll be like, I

22    don't even know if we have the right speakers; my client hasn't

23    had a chance to see if certain words that he thinks are

24    important are done right; we won't have had our translator be

10:04    25    able to go through all those.

22

1    Because we have our own the trial preparation to be

2    doing at this stage too and our own transcripts for him to be

3    finalizing.  And, you know, we didn't block out his next three

4    weeks to work exclusively on the transcripts that should have

10:04    5    been prepared forever.

6    We have exhibits that are due Monday, Judge.  Those

7    exhibits -- our plan is, I mean, we've been waiting, our plan is

8    to have, not surprisingly, excerpts from transcripts that we

9    expected the government would use in their case in chief, that

10:04    10    they would tell us that they were using, and we would have

11    excerpts of those as exhibits in this case.  Lots of them.  We

12    obviously haven't been able to -- you know, to do those

13    exhibits.

14    Nor do I have cross-examination notes because if I'm

10:05    15    cross-examining one of the informants or one of the FBI agents I

16    want to know what page it's on.  I mean, that's how I have to

17    cross-reference the notes.  I want to use exact quotes, not just

18    say, well, no, that's not this transcript says.

19    I mean, there was a reason why it was 90 days.  Which

10:05    20    I think was very tight to begin with.  I really was worried 90

21    days wasn't enough.  And, but -- you know, if they were so close

22    to being trial ready, the 29 transcripts in November, why do we

23    have three of them eight months later?  Just, it -- it's --

24    THE COURT:  What do you propose?

10:05    25    MR. ALBEE:  I propose that he be released is really

1    what I propose.  I don't see any other -- that's the thing.  Mr.

2    Hamzeh is there for 2 1/2 years.  I mean, I don't see any other

3    reasonable option other than releasing him, setting this trial

4    at a reasonable date when the transcripts can be provided, 90

10:05    5    days in advance, as planned, and that everybody can be properly

6    prepared for trial and that it's not a fire drill.  But he

7    should be released.  You know, after 2 1/2 years this is the

8    government's fault and that's what should happen.

9        THE COURT:  Well, I don't have the authority to make

10:06    10    that decision.  That's Judge Jones and Judge Pepper.

11        All right, is there anything else?  I'll have to

12    make -- go ahead.

13        MR. HAANSTAD:  I'm sorry, Your Honor.  I was just

14    going to ask --

10:06    15        THE COURT:  Go ahead.

16        MR. HAANSTAD:  -- about whether an appropriate remedy

17    would just be that the government is stuck with the transcripts

18    that it had on November 13th.  Would the idea be that the

19    defense would also be limited to the transcripts that they

10:06    20    finalized and provided to the government by November 13th?

21        THE COURT:  I'm just looking at Judge Pepper's order

22    from that date and I don't know that it was bilateral.

23        Yes, it was actually.

24        MR. ALBEE:  And, Judge, I frankly -- I have the

10:06    25    greatest respect for Mr. Haanstad.  I haven't placed any of

24

1  this.  But that suggestion is I think disingenuous.  Again, I

2  think the idea is we were waiting to see what the government is

3  using.  We necessarily are leapfrogging off of that.  It just --

4  it doesn't make sense for everybody to do all the transcripts in

10:07  5  the world.

6  And certainly since November, we've looked at this

7  case, we have other ideas or different things that we have found

8  that we think are important or our client thinks is important.

9  We have seven transcripts we provided.  I wouldn't be here

10:07  10  crying like I am if they gave me 22 transcripts 90 days in

11  advance and I was only fooling around with seven.

12  MR. BUGNI:  Your Honor, can I add one small point?

13  THE COURT:  Sure.

14  MR. BUGNI:  For informational purposes.  The only

10:07  15  trial-ready difference between what we had previously given the

16  government is that we actually put in the names of the

17  informants.  So before they had been done pursuant to our

18  agreement, which was never identify who the CHS's were.  And

19  they were ready to be filed.  Well, the reason that we would

10:08  20  want them filed is so that with the bond motion and everything

21  else that we were litigating, the court would be able to have

22  that.

23  So we stuck with the CHS's, even where it was within

24  the conversation.  Now, as we get ready for trial that's what's

10:08  25  been provided to them.  Just indented with the names spelled out

25

1  perfectly.  There's no difference between what the defense has

2  already provided and these rolling bases.

3        Now, there are a few that we've been -- like, I just

4  want to give a small point of clarification.  November 13th,

5  when we got those transcripts, not only were many of them not

6  worth anything, there was also one that was missing.  Probably

7  the most critical transcript.  We didn't receive that until

8  March.  And as soon as we got it we like -- we sent it off to

9  our translator and we went over and sent back the notes.  Here

10  you go.  Here's what's missing.  Here's what you don't hear.

11  Because when you listen to disk 104, there's also disk 105, disk

12  106.  And we sent it over to the government immediately.  Just

13  like we had did on about five or six other transcripts.  I can't

14  remember the exact number at this point.

15        But any time we had our translators go over it we

16  said, hey, you know, we don't care about who ordered shawarma,

17  but we care about these points.  Tell us the important points.

18  What's going on here.  Redline it and we'll send it back to the

19  government.  We did that.  That was in response to what they had

20  done.  They had our corrections for that.

21        But the idea that we would be held back to our

22  November 13th submissions is that we didn't even know about

23  disk 104.  We had no idea about that, about the second part of

24  disk 104, and which was a very critical conversation in this

25  whole case.  And as soon as we did we turned that over, we

26

1    edited it, and we sent it back to the government.

2            So it's not as if, you know, this November 13th

3    deadline that we've been calling foul the whole time.  In fact,

4    we were the ones that moved it in January.

10:09  5            THE COURT:  So tell me about that specific

6    conversation.  Just so I get a flavor for the shortcomings of

7    that particular portion of the transcript and your ability to

8    use it and how it hampers your ability to use it.  I mean

9    what -- give me some understanding of if shortcomings of that

10:10  10   transcript.

11            MR. BUGNI:  Can I have one second with Mr. Albee?

12            THE COURT:  Yes.

13            (Defense counsel confer.)

14            MR. BUGNI:  So there are three major problems with it.

10:10  15           One, the translation of the word "machine gun" when

16   that's not what was said.  That would be a big deal.  One is the

17   basis of this charge, the other one is just an innocuous weapon

18   or a gun that Mr. Hamzeh is legally allowed to possess.

19            THE COURT:  So let me stop you there then.  Why is

10:10  20   that not something that you attack at trial with your own

21   translator saying that's not what he said, he said this?

22            MR. BUGNI:  Partly because we had always gone with the

23   expectation that there was going to be a stipulation as to all

24   of these exhibits.  So that's the first part.

10:10  25           We want a clean trial.  Two weeks is a long time to be

1    in trial.  The trial that we're now talking about for the last

2    30 minutes is a six-week trial.  And it's also us having to have

3    our translator in the back waiting to go through the whole time.

4    And then going through their translator and every word that they

5    translate differently.

6         I believe I sent over to the government the 591 times

7    the word "weapon," "revolver," "pistol," "firearm," you know,

8    "machine gun," "Kalashnikov" is used.  That's a lot of

9    impeachment, Your Honor.  That would be a lot of days on the

10   stand for that translator going through each time and where that

11   definition comes from.  And how it's being used within that

12   conversation.

13        So they're at Cabela's and they say, hey, look at that

14   machine gun.  You know, I want that machine gun.  Well, that's

15   clearly not a machine gun that they're seeing at Cabela's.

16   That's not one that will, you know, fire multiple rounds with a

17   single pull of the trigger.

18        So that's a big problem.  The other problem is, it's

19   unintelligible.  They're saying large swaths are unintelligible

20   that you clearly could hear if you were to take the other disks.

21        So you'd have one conversation being recorded in the

22   car on the mic and then on another mic.  And so we said, look,

23   you can hear this part, you're just not listening to it.

24        And, again, we're not accusing the government.  We've

25   worked well together the whole time, always towards the idea of

28

1    a large stipulation that would be very easy to move in and keep

2    this trial on course.  This isn't like an accusatory -- we

3    haven't been acting as if we have been true adversaries when it

4    comes to the general facts of this.

10:12   5        And the third part about it was, there was also not

6    just attributions to different speakers, but words that weren't

7    being said, and those words were very important to the entire

8    case.  So that's why like this disk coming in in March.

9        Now, what it was was also that the video had come in

10:12   10   two parts.  So we weren't aware of the second part of the video

11   until we got the translation.  Because, believe me, we're

12   dealing with proprietary software that sometimes is very

13   finicky.  So we had no idea.  There was no summary of this.

14   There was nothing that allowed for us to see this.  And then we

10:13   15   got the translations that this is very important to us.

16       And so we did everything we could after March.  And we

17   haven't been crying foul with the government with all of these.

18   It's only now that we're coming this close to trial and we're

19   hearing for the first time that we're not going to have

10:13   20   trial-ready full transcripts, instead we're going to have the

21   excerpted portions that they care to use.

22       MR. ALBEE:  Judge, I would just add, we moved this

23   trial twice already with the idea of getting these things all as

24   agreed upon as possible and he's been sitting as a result.  The

10:13   25   court's right, we could just fight this out and I guess that's

1    everybody's prerogative.  But that doesn't hold water when, you

2    know, when nobody tells us that; when we were told, yeah, we're

3    all trying to get these things trial ready and work on it.

4            And it's just an intolerable position right now after

5    Mr. Hamzeh is sitting 2 1/2 years and we since November got

6    three out of 29 fixed.

7            THE COURT:  So, Mr. Haanstad, last word, for you.  And

8    that is, summarize from the government's perspective why it has

9    taken 2 1/2 years to get where we're at with the transcripts.

10           MR. HAANSTAD:  Again, Your Honor, I don't have any

11   information on the specifics of, you know, day in day out, week

12   in week out, or month in month out why this was a cumbersome

13   process.  Obviously it's a difficult language to translate.

14   It's not a typical Title III wiretap case, for example, where

15   you might have a couple of sentences here and there and that's

16   all that's significant.  I mean these are lengthy, they're also

17   in Arabic, so the supply of translators isn't maybe the same as

18   it is for some other languages.

19           But all we're trying to do at this point is do what we

20   can to not have to move the trial date.  And the only solution

21   that I see would be, again, to just focus on these smaller

22   segments of the transcripts, get those nailed down by the

23   translator, and then have our translator go through the defense

24   translations which I think are probably 250 to 300 pages.

25           THE COURT:  The smaller segments that you reference

30

1    are just which segments?

2        MR. HAANSTAD:  These would be the segments that we

3    intend specifically to introduce at trial.  When we talked

4    about, you know, the 29 transcripts, that's basically the 29

10:15 5  conversations.  And there are sometimes very, very lengthy

6    segments where not much is going on.

7        THE COURT:  How many of the 29 does the government

8    intend to introduce at trial?  29?

9        MR. HAANSTAD:  Parts of 29.

10:16 10     THE COURT:  Okay.

11       MR. ALBEE:  Judge, I think the court recognizes this,

12   but we've been told they're introducing basically what they gave

13   us in November.

14       THE COURT:  I thought -- that's what I thought.  I

10:16 15 thought Judge Pepper ordered that people produce -- that the

16   parties produce those transcripts that they were going to rely

17   on.  So I thought that was what everybody was producing to

18   everybody else.

19       MR. ALBEE:  And what I'm saying is like we got those,

10:16 20 we have those what I'll call rough drafts, and we've been --

21   it's been represented to us and we've had every reason to

22   understand that those transcripts and the entirety of what they

23   produced then would be what the government's introducing.

24       So without me going back, I don't know which parts I

10:16 25 would have our translator now do that he wasn't doing because

1    we've been -- we were like, oh, the government's fixing that and

2    so, you know, we'll all rely on the same transcript.

3         In addition, if this is about a fight at trial, we

4    likely need another translator to verify what our one translator

10:17    5    is doing or to be a potential rebuttal witness.

6         There are all sorts of problems.  There was -- there

7    were agreements, orders and understanding that have all been

8    thrown out the window that put us in an intolerable position and

9    --

10:17   10         THE COURT:  Let me ask you, Mr. Haanstad, what's the

11   government's position on moving the trial date if it means that

12   Mr. Hamzeh's going to be released on bond?

13         MR. HAANSTAD:  Well, we would oppose it.

14         THE COURT:  All right.  Anything else on the

10:18   15   transcriptions?

16         MR. HAANSTAD:  Not from the government.

17         MR. ALBEE:  I guess I will just say I know Mr. Hamzeh

18   very vehemently opposes moving the trial.

19         THE COURT:  Understood.

10:18   20         All right.  Then everything else.  The *Brady*/motion to

21   compel under Rule 16.  Let me start by asking this.  It's been a

22   couple of weeks since the defendant filed the motion.  Have the

23   parties been able to resolve any of the issues raised by the

24   motion?

10:18   25         MR. ALBEE:  I don't believe we've heard anything back

1      from the government.

2              MR. HAANSTAD:  No.

3              THE COURT:  Okay.

4              MR. ALBEE:  I do have one clarification to make with

10:18  5      regard to I think it's entitled, "Second Motion For Production

6      of *Brady*" and it also relates to the spoliation motion.  We

7      realized following the filing of these motions that phone

8      records we had subpoenaed from the phone company, that one phone

9      company may have not produced all texts with those records and

10:19  10     we since are making an effort to get complete records.  So just

11     in terms of whether there's a matching -- a matching phone

12     record, we're not as certain as we were at that time as to

13     whether that's the case or whether it's a problem with the

14     records that we received.  So -- but we're hopeful that by the

10:19  15     end of the week or so that we'll have that part pinned down.

16     But the fact remains, particularly with respect to the texts,

17     that there are numerous texts that have not been produced in

18     this case.  As well as I think there hasn't been compliance yet

19     with a couple of the court's orders.

10:20  20             THE COURT:  Let's talk about that.  I mean, I issued

21     an order on March 8th, 2015, in response to the defendant's

22     first, at that time, motion to compel that addressed a number of

23     matters that are still relevant here for our purposes today.  So

24     one portion of the motion to compel at that time had to do with

10:20  25     the government's turning over documentation regarding the

33

1    payments given to the informants as part of their work in this

2    case.

3         I granted that portion of the defendant's motion to

4    compel and ordered that the government turn over all underlying

10:20  5    documentation regarding the payments given to informants as part

6    of the work in this case.

7         So let's start with that.  Has the government done

8    that?

9         MR. HAANSTAD:  We have not yet, Your Honor.  We're --

10:21  10   we filed not necessarily an objection to your recommendation,

11   but sought to comply via CIPA, the Classified Information

12   Procedures Act.  We're waiting on one segment from Washington.

13   And there's a declaration that the FBI makes that this

14   information is national security information.  And once we

10:21  15   receive that, again we'll proceed under CIPA write would entail

16   us eventually presenting these materials for your in-camera

17   inspection.

18         THE COURT:  And when do you expect to do that?

19         MR. HAANSTAD:  We should be able to do that by early

10:21  20   next week.

21         THE COURT:  Okay.  Then I ordered --

22         MR. ALBEE:  And Judge, I'd just note again,

23   *Brady/Giglio*, there's a 90-day before trial.  And I understand

24   they're taking a different route, but as to why it's now and

10:22  25   without asking for leave of the court that it's going to be late

34

1    because they have to do this, I don't get that.

2         THE COURT:  And to respond to that, Mr. Haanstad, you

3    would say what?  Why it's taken -- that was March 8th, why are

4    we at July 24th and they don't have that or I haven't seen that

10:22    5    yet?

6         MR. HAANSTAD:  Again, I think it just takes a while

7    for the parties in Washington who have to put these documents

8    together to do that.  But I would suggest that --

9         THE COURT:  I gotta believe this is a pretty small

10:22    10    volume of documents, isn't it?

11         MR. HAANSTAD:  Very.

12         THE COURT:  So why does it take so long?  I mean, it's

13    clear it hasn't been a priority in Washington it sounds like.

14         MR. HAANSTAD:  You know, I -- it's a very small volume

10:22    15    of documents.  For whatever it's worth, my assessment is that

16    there's nothing there.  I would just suggest maybe we wait and

17    see after your in-camera inspection whether this is significant

18    or not.

19         THE COURT:  I don't know what other choice we have at

10:23    20    this point.

21         MR. ALBEE:  There's nothing I can ask for other than I

22    think that compliance with the court's discovery order is

23    significant.

24         THE COURT:  Yes.  The next portion of what I ordered

10:23    25    back then was I ordered that the government provide information

1    in its possession regarding the amount of compensation which

2    CHS2 has received for his role as a source of information for

3    the government during the time period identified above by the

4    government.

10:23    5    So, has that been done yet?

6    MR. HAANSTAD:  Yes.  I think the defense acknowledges

7    that we've told them that there were no payments for that prior

8    period of cooperation.  I know they say they would expect a

9    report or something to that effect, but there's no report

10:23    10    documenting something that didn't happen.  We -- the fact is

11    that there were no payments for CHS2's prior cooperation.

12    THE COURT:  Okay.  And the last thing that I ordered

13    back then was that -- go ahead, Mr. Albee.

14    MR. ALBEE:  Yeah.  I guess I just want to be clear

10:24    15    that it's no benefits -- no benefits of any kind including

16    reimbursements.  I --

17    THE COURT:  Payments.  Yeah.  I ordered payments I

18    think.  So we're not just talking compensation.  We're talking

19    any payment --

10:24    20    MR. ALBEE:  Actually, I think the court -- at page 11

21    of the court's order it does say compensation.

22    THE COURT:  Compensation.  So even if that's

23    interpreted to be more generally payments, Mr. Haanstad, the

24    answer would be the same?

10:24    25    MR. HAANSTAD:  Correct.

36

1    THE COURT:  Okay.  And then back in that order, I

2    granted Hamzeh's request that the government be ordered to

3    identify what texts were not preserved, if any.

4        I said:  The government shall inform Hamzeh as to

5    whether an inquiry has been conducted into non-preserved text

6    messages and provide him with as much information as the

7    government has such as the dates the text messages were sent and

8    topics that were discussed through text message.

9        Where are we at on that?

10    MR. HAANSTAD:  So, we have gotten the information that

11    the FBI has on that and relayed it to the defense.  That

12    information was that Special Agent Jonathan Adkins' Bureau phone

13    was impacted by a software issue that caused a gap in text

14    message capture and storage.  The FBI has made efforts to

15    retrieve text messages from the phone and was unable to recover

16    them.

17        I can also add that the date that that system-wide

18    failure took place was from October of 2015 to April of 2016.

19    So, but we don't have information about what texts, what the

20    content was of the texts or what texts were sent on any specific

21    dates, nothing like that.  So we provided all the information

22    that we have as to that part of the order.

23    MR. ALBEE:  I don't know what the we -- there's a lot

24    of questions that are obviously here that aren't addressed by --

25    in Mr. Haanstad's statement.

37

1    Identify what texts were not preserved.  Government

2    has phone records.  They can identify when texts were made with

3    Special Agent Adkins that weren't preserved.  We've done it.

4    We've identified how many?  132 or something like that.  That's

10:26  5    what we think.  But we don't have as good of records or

6    investigatory capacity as the FBI does.  But we think it's 132.

7    As to the court's order, what topics were discussed

8    through those text messages.  Well, we can get the records of

9    when the texts were made, but we can't get the topics.  But

10:27  10   Mr. Adkins, he's somebody who would know what those topics were

11   during that time.  But we've gotten no information about that.

12   We don't know what kind of efforts were made to

13   recover this information.  We just are told there's some

14   software failure.  But we don't know whether there was an effort

10:27  15   to do say Cellebrite on Mr. Adkins' phone so that those could

16   have been -- what texts were on there could be captured in that

17   fashion.

18   We don't have -- when they learned about this in April

19   of 2016, we don't have any information about what was done,

10:27  20   could have been done and what might have been able to be found

21   at that time.  We don't have any information concerning efforts

22   to recover text messages from the CI's themselves.

23   There's all sorts of things that could have been done

24   and all sorts of information that already is known because again

10:28  25   Mr. Adkins may have information about the topics of the texts,

38

1   may have handwritten notes, may have reports, may have memories

2   about what happened during those text messages.  And the court's

3   order encompasses those things and we don't have a satisfactory

4   response.

10:28   5       THE COURT:  Mr. Haanstad, I think it's fair to say

6   that my order wasn't limited to gathering this information from

7   Special Agent Adkins' phone.  If there's a software issue that

8   made that problematic did the FBI make efforts to obtain the

9   texts from other sources or gather information responsive to my

10:28   10  order from other sources?

11      MR. HAANSTAD:  Well, when you talk about things like

12  phone records, I mean, I think the defense's statement that

13  they've already done this -- the defense has already done it,

14  that is, they've matched it up and come up with 132 texts.  I

10:28   15  mean, it's not information that's exclusively within the control

16  of the government.

17      THE COURT:  Although the topics would be more known to

18  Mr. Adkins than to the defense presumably.

19      MR. HAANSTAD:  Sure.  And I think they can ask him

10:29   20  about that at trial.  But there's no material, no documents in

21  which Special Agent Adkins, for example, sets forth what it is

22  that he spoke with about informants during this time period.

23      THE COURT:  They could ask him that at trial, but I

24  ordered that it be done before that.  And it's largely because

10:29   25  the texts don't exist anymore that they are put in the position

39

1    of not knowing what the texts were about.

2           So, yes, they could find it out for the first time at

3    trial, but I ordered that it be done before that.

4           MR. HAANSTAD:  Well, but there's nothing -- nothing

10:29  5    exists that's responsive to that.  There's nothing in the

6    government's possession that's responsive to that particular

7    part of the order.

8           THE COURT:  Well, there's no documents that exists.

9    But I said:  The government shall inform Hamzeh as to whether an

10:30  10    inquiry has been conducted into non-preserved text messages and

11    provide him with as much information as the government has such

12    as the dates text messages were sent and topics that were

13    discussed through text message.

14          So we're trying to fill in the gap because of the

10:30  15    texts that were not preserved.  And other than determining that

16    he -- this agent had a software issue on his phone, has the

17    government done anything else to comply with that order?

18          MR. HAANSTAD:  Well, that is all the information that

19    the FBI had responsive to that part of the order.

10:30  20          THE COURT:  So let me ask Mr. Albee.

21          Obviously, everything else -- I mean, your motion has

22    got a host of other specific information that you're requesting.

23    And to go through it all, which we could, the -- I want to at

24    least take a pass at -- obviously the government's obligated to

10:31  25    produce certain things under *Brady* and *Giglio* and then, of

40

1    course, under Rule 16 if it falls within Rule 16.

2           Is there anything other than what we've just discussed

3    that you've requested -- or rather that you contend the

4    government has been ordered to produce that it hasn't produced?

10:31  5           MR. ALBEE:  Judge, if I could just address one last

6    thing on the text messages.

7           THE COURT:  Sure.

8           MR. ALBEE:  So again, I think the court ordered

9    information as the government has.  That certainly includes

10:32  10   what's in Agent Adkins' head.  Mr. Bugni has some concerns about

11   additional text messages that may be there.

12          And then I just note the recent news articles and

13   Special Agent's Strzok's testimony in front of Congress last

14   week that reveals that the FBI has a significant ability to go

10:32  15   back and obtain texts.  So, one software problem, I don't know

16   that that conclusively establishes their inability to obtain

17   these.

18          As I said, Mr. Bugni has some other text concerns and

19   he can address whatever he thinks needs to be dealt with on the

10:32  20   *Brady* and discovery claims beyond what we've talked about.

21          MR. BUGNI:  So, Your Honor, just to address your

22   earlier point and to Mr. Haanstad's point.  We've learned I

23   think three weeks ago that Mike, the CHS, had three phones.  We

24   only new of one.  So we were only able to subpoena one phone

10:33  25   record.  The other phone records, because it's been so long --

1    one subpoena has said there are no records exist.  We still have

2    one other one outstanding.

3         So though we can count how many times we believe Agent

4    Adkins text to Mike, there are two other phones out there that

10:33  5    have text messages on them to Mike and that Mike would be

6    texting with.  We want all that underlying documentation.  What

7    days did you text, who did you -- when you texted with him, what

8    times.

9         THE COURT:  You want it under Rule 16 or you contend

10:33  10   it's *Brady* or *Giglio* material?

11        MR. BUGNI:  Both.  And it's also in compliance with

12   your order.  All text messages that Adkins sent, not just ones

13   with the phone number that we knew about previously.  So the

14   idea that we can reconstruct this is faulty.  We don't have the

10:33  15   phone records to be able to match to what Agent Adkins did.

16        THE COURT:  I didn't order -- my order was focused on

17   non-preserved text messages.

18        MR. BUGNI:  Correct.  And there are three phones and

19   we only have text messages for one small segment of time.  So

10:34  20   there's non-preserved out there that we don't know about.  We

21   want, you know, how many times did you text him.  We think that

22   the number is 176.  And we have 32 of them.  But it could be

23   much larger.  So we want to know, you know, what is the orbit

24   that we're operating in.

10:34  25        THE COURT:  So let me ask you, how come it's been two

42

1   weeks since this motion's been filed and there's been no

2   conversation between the parties to try and work some of this

3   stuff out?

4           MR. BUGNI:  To me, Your Honor?

10:34   5       THE COURT:  No.  I mean, I'm throwing it out there

6   generally.

7           MR. BUGNI:  We sent a letter over seven weeks ago to

8   Mr. Haanstad.  We laid out our concerns.  And we also sent over

9   our phone records, said we can't make sense of this, there's

10:34   10  things that are missing, help us understand.  Both with Steve

11  and with Mike.

12          So we had an open hand and we showed them exactly what

13  we thought.  And we also asked for really just the phone

14  numbers.  It was just being professional.

10:35   15      Then when there wasn't a response to that, then we

16  sent a letter.  And then we waited for a month for that letter

17  -- to have a phone call about that letter.  We had follow-ups

18  begging for a conversation.  But we got on the phone and said,

19  you know, here's what I'm going to tell you, and everything else

10:35   20  go pound sand.  And so --

21          THE COURT:  So let me ask you, Mr. Haanstad.  Let me

22  ask Mr. Haanstad.  How much of what they're requesting in this

23  motion is the government saying we don't have anything, we don't

24  have it, versus we have it, but you're not entitled to it for

10:35   25  one reason or another?

1          MR. HAANSTAD:  I would say almost all of it we just

2     don't have.

3          THE COURT:  So can you identify for me what they've

4     requested in this most recent motion to compel that you have --

10:36  5     that the government has that it is taking the position it

6     doesn't have to disclose?

7          MR. HAANSTAD:  Can we have just a minute, Your Honor?

8          THE COURT:  Sure.

9          (Government counsel confer.)

10:36  10          MR. HAANSTAD:  Your Honor?

11          THE COURT:  Yes.

12          MR. HAANSTAD:  Just on a quick review.  We've

13     obviously looked at this and discussed it earlier.  But on page

14     5 there's a paragraph D that asks for all texts, plus email to

10:37  15     and from all agents relating in any way to the investigation.

16          I don't believe that we have anything responsive to

17     that, but we have asked the FBI to dig more deeply to make sure

18     that that's the case and they're in the process of that review

19     right now.

10:37  20          I spoke with an FBI agent just before the hearing and

21     so far this more extensive review has not uncovered anything

22     responsive to D either.  But I bring it up only because that

23     still is ongoing.  But it doesn't look like we're going to have

24     anything responsive to that either.

10:37  25          THE COURT:  But if you do you're agreeing that that

44

1    will be something disclosed to the defense?

2              MR. HAANSTAD:  Yes.

3              THE COURT:  Okay.  How about A, B, and C, they're

4    asking to identify various types of information.

10:37    5              MR. HAANSTAD:  Your Honor, I'm sorry.  Can I just go

6    back to D for just a second?

7              THE COURT:  Sure.

8              MR. HAANSTAD:  It does say messages relating, quote,

9    in any way to the investigation.

10:38   10              I can imagine a situation in which we see some text

11   message or email that relates broadly speaking in any way to the

12   investigation, but it's on something that's not substantive —

13   scheduling a meeting, something like that.  But if there's

14   anything --

10:38   15              THE COURT:  And I don't think they're probably looking

16   for stuff like that.

17              MR. HAANSTAD:  Right.  I don't think our obligation

18   extends that far either.  So, but, again, as it stands right now

19   we don't have anything responsive on D.

10:38   20              THE COURT:  Okay.  Well on A, B, and C they're asking

21   to identify various pieces of information.

22              MR. HAANSTAD:  I think we've already discussed A.

23              THE COURT:  Yes.

24              MR. HAANSTAD:  B.  We've provided the three phone

10:38   25   numbers that Mike was using and the one that Steve was using

45

1    when texting with the agents.

2         THE COURT:  You have already done this?

3         MR. HAANSTAD:  Yes.

4         THE COURT:  Okay.

10:39  5         C.  Have you identified the agents who texted with the

6    informants and the phone numbers from which they contacted the

7    informants?

8         MR. HAANSTAD:  Yes.

9         THE COURT:  Mr. Bugni, you're shaking your head,

10:39  10   you're saying they haven't?

11        MR. BUGNI:  They haven't, Your Honor.  Both with -- to

12   B, I can pass up if the court wants what we've received so the

13   court can see.  It just identifies Agent 1, CHS2, and doesn't

14   tell us what phone number any of the texts came from.

10:39  15        That's critical.  You know, what we've said before

16   about Mike having three different phone numbers and what we're

17   able to construct on one.  But they have not provided us with

18   what name attaches to what phone number.

19        THE COURT:  All right.  Let's keep it at the general.

10:39  20   For now what I want to do is I just want the government to

21   identify for me what in this request it's taking the position it

22   has documents and information but is not obligated to produce it

23   for one reason or another.

24        MR. HAANSTAD:  Okay.

10:40  25        E.  We have nothing responsive to that request.

46

1    THE COURT:  And again, I don't know that you need to

2    go through every one.  You're just identifying -- maybe we can't

3    avoid it, so go ahead.

4    MR. HAANSTAD:  If I could just skip F for just a

10:40    5    minute and go to G.  Again, we've provided the information that

6    we have with regard to the problem that had impacted Special

7    Agent Adkins' phone.

8    THE COURT:  So just let's -- what I would like you to

9    do for now, Mr. Haanstad, is just identify for me what has been

10:40   10    requested in here that the government contends the defendant's

11    not entitled to, even though the government has -- well, leave

12    it at that.  What in here does the government take the position

13    the defendant's not entitled to?

14    MR. HAANSTAD:  Your Honor, we're not taking that

10:41   15    position with regard to any of these requests.

16    THE COURT:  Okay.  So everything in this motion to

17    compel, aside of the transcripts that we've already spent a lot

18    of time, everything in here the government concedes is

19    information that to the extent the government has it, it is

10:42   20    obligated under either Rule 16 or *Brady* or *Giglio* to produce to

21    the defendant.

22    MR. HAANSTAD:  I might phrase it just a little bit

23    differently.  Whether it's disclosable or not, we don't have it.

24    I'm not necessarily taking the position that one particular

10:42   25    thing in here would be disclosable if we had it.  I'm just

47

1    saying that regardless of its disclosability we don't have

2    anything responsive to these requests.

3              THE COURT:  So that was going to be my next question.

4    Is there anything that is in this second motion for production

10:42  5    and to compel discovery that the government contends it has

6    anything responsive to that has not yet been produced?

7              MR. HAANSTAD:  No.

8              THE COURT:  You mentioned the one on page 5, the D.

9    So maybe that.  But other than that?

10:42  10             MR. HAANSTAD:  Maybe that it appears right now.  But

11   other than that, that's correct.

12             THE COURT:  The government has nothing responsive to

13   these requests.

14             MR. HAANSTAD:  Right.

10:43  15             THE COURT:  That has not already been produced.

16             MR. HAANSTAD:  Right.

17             THE COURT:  Okay.  Mr. Albee or Mr. Bugni?

18             MR. BUGNI:  Then we're missing a couple letters from

19   the government where these facts are turned over.  We have no

10:43  20   idea -- we don't have all the unredacted texts.  That's part of

21   the request.

22             We also don't have the numbers that they were texting

23   from.  We don't know what Agent 1's phone number is, we don't

24   know what Agent 5's phone number is.  We don't know any of them.

10:43  25   So we don't have that.  That is --

48

                1       THE COURT:  So that is, on page 5 that's B --

                2       MR. BUGNI:  B and C.

                3       THE COURT:  B and C.

                4       MR. BUGNI:  Yeah.

    10:43       5       THE COURT:  And the government I'm assuming has that

                6  information and can provide that information to the defense?

                7       MR. HAANSTAD:  B, we provided the four phone numbers

                8  that they were using.  Three that Mike was using one that Steve

                9  was using.  So C, I guess the question is whether we can attach

    10:44      10  the names to the phone numbers.  I'll have to look at that one,

               11  Your Honor.

               12       THE COURT:  Okay.  And when are you going to do that?

               13       MR. HAANSTAD:  I can do that this afternoon.

               14       THE COURT:  Okay.  And then get back to the defense

    10:44      15  and somebody let me know whether that continues to be an issue

               16  or not.

               17       MR. HAANSTAD:  Okay.

               18       MR. BUGNI:  Your Honor, we also continue with -- the

               19  order was and the agreement in court previously was that all

    10:44      20  text messages will be turned over to the defense.  You know, the

               21  unredacted.  We need them unredacted.  So that should be part of

               22  the order.

               23       But the order should be not just the unpreserved, that

               24  we have the notes and everything else about that, but that all

    10:44      25  the text messages in this case sent by the agents to the

                                                                          49

1    confidential human sources and vice versa must be turned over to

2    the defense.

3           THE COURT:  Well, if it's been -- if it's in your

4    motion Mr. Haanstad is acknowledging that you're entitled to it.

5    He's just saying that they don't have anything else.  So what I

6    guess I would say is talk about that with him as well.  If

7    there's still a dispute about unredacted let me know by tomorrow

8    and -- so, I mean, he's saying he's got redacted text messages,

9    Mr. Haanstad, and he needs unredacted.

10          MR. HAANSTAD:  The only thing that's been redacted in

11   those text messages is personal identifying information, email

12   addresses, things like that.  We went through this with regard

13   to emails in a prior round of discovery litigation, and I think

14   the court examined a couple of --

15          THE COURT:  Certainly in the first motion to compel I

16   addressed -- I don't know if it was text messages, but it was --

17   let's see what it was.

18          Unredacted reports.  These were government reports of

19   some sort that had been redacted, and I did review those and

20   felt like there was nothing that had been redacted that was --

21   other than, as the government represented, kind of ministerial

22   type things.

23          MR. ALBEE:  I think one thing Mr. Bugni was just

24   trying to clarify is that much earlier on the government had

25   indicated that it had turned over all text messages, and then we

50

1   said we also need to know which ones haven't been preserved.

2   But based on that representation that all text messages had been

3   turned over, I don't know that the court had made a specific

4   order requiring all text messages to be turned over.  And we're

10:47   5   just asking for that order to be clear that if they have text

6   messages those need to be turned over.

7           THE COURT:  Have all text messages been turned over?

8           MR. HAANSTAD:  Yes.

9           THE COURT:  All right.  Well -- I don't know whether

10:47   10   there's anything else to order if they've already been turned

11   over.

12           MR. ALBEE:  We just believe otherwise and we're still

13   trying to get to the bottom of that.  But we just think that

14   there are.

10:47   15           THE COURT:  Okay.

16           MR. BUGNI:  If they haven't we just want -- you know,

17   identifying which ones are unpreserved.

18           THE COURT:  Okay.  Well, I'm going to end up issuing

19   an order so I'll take that into consideration.

10:47   20           MR. BUGNI:  Thank you.

21           THE COURT:  Is there anything else on this aspect of

22   the motion to compel?

23           MR. BUGNI:  No, Your Honor.

24           MR. HAANSTAD:  No, Your Honor.

10:48   25           THE COURT:  All right.  Anything else?

51

1        MR. HAANSTAD:  Not from the government.

2        MR. BUGNI:  We would still ask for our spoliation

3   hearing, Your Honor.

4        THE COURT:  I understand.  I'm not going to address

10:48   5   that right now.  It's not clear whether that's going to be in

6   front of me or Judge Pepper.  I'll have to talk to her about

7   that.  That may be because at some level that's going to have

8   credibility issues that may be best heard by her, but if she

9   wants a recommendation from me I'll certainly do whatever she

10:48   10  requests.

11       MR. BUGNI:  Just to be clear for purposes of tomorrow,

12  we'll file a pleading as to points A and B on page 5 and C and

13  the government's compliance with those.  But also as far as the

14  rest of them go the government's taking the position they're not

10:48   15  privileged, just we don't have them.

16       THE COURT:  That's what I understood Mr. Haanstad to

17  say.  Correct, Mr. Haanstad?

18       MR. HAANSTAD:  Correct.

19       MR. BUGNI:  Is the court going to order that they go

10:49   20  get those?  Because those things exist.

21       We know that these -- this information exists out

22  there.  It's just whether or not the government is willing to go

23  have the FBI get it for us.

24       THE COURT:  I'll see.  Okay?

10:49   25       MR. BUGNI:  Okay.  Thank you, Your Honor.

52

1          THE COURT:  All right.  Then we're concluded.  Thanks,

2   everybody.

3          THE CLERK:  All rise.

4          (Proceedings concluded at 10:49 a.m.)

5                         *    *    *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

53

C E R T I F I C A T E

I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified July 24, 2018.

/s/John T. Schindhelm

John T. Schindhelm

John T. Schindhelm, RPR, RMR, CRR
United States Official Reporter
517 E Wisconsin Ave., Rm 236,
Milwaukee, WI 53202
Website: WWW.JOHNSCHINDHELM.COM



54