UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION


------------------------------------------------------------

UNITED STATES OF AMERICA,       )
                                      )
                Government,     )  Case No. 16-CR-21
                                      )
   vs.                         )
                                      )
SAMY MOHAMMED HAMZEH,      )  July 27, 2018
                                      )
                Defendant.     )

------------------------------------------------------------




**TRANSCRIPT OF BOND REVIEW HEARING**

BEFORE THE HONORABLE PAMELA PEPPER

UNITED STATES DISTRICT JUDGE




Official Transcriber:
Richard Derrick Ehrlich, RMR, CRR
richard_ehrlich@wied.uscourts.gov
(414) 290-2642


Proceedings recorded by electronic recording.
Transcript produced by computer-aided transcription.

```
 1                    A P P E A R A N C E S

 2


 3      For the Government:   Gregory J. Haanstad
                              Paul L. Kanter
 4                            Benjamin P. Taibleson
                              United States Department of Justice
 5                            Office of the U.S. Attorney
                              517 E. Wisconsin Street
 6                            Milwaukee, WI 53202
                              414.297.1700
 7


 8      For the Defendant:    Craig W. Albee
 9                            Federal Defender Services of
                              Wisconsin, Inc.
10                            517 E. Wisconsin Street
                              Room 182
11                            Milwaukee, WI 53202
                              414.221.9900
12
                              Joseph A. Bugni
13                            Appearing Telephonically
                              Federal Defender Services of
14                            Wisconsin, Inc.
                              22 E. Mifflin Street
15                            Suite 1000
                              Madison, WI 53703
16                            608.260.9900

17


18      Samy Mohammed Hamzeh, defendant, present in person.
19

20

21

22

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

Transcribed From Audio Recording

\*           \*           \*

THE COURT:  Have a seat everyone, please.

THE CLERK:  Case No. 2016-CR-21.  *United States of America vs. Samy Hamzeh*.

This matter is before the Court for a bond review hearing.

May we have the appearances, please?

MR. KANTER:  Yes.  Good afternoon, Your Honor. Paul Kanter, Greg Haanstad, and Ben Taibleson on behalf of the United States.

THE CLERK:  Thank you.

PRETRIAL SERVICES:  Good afternoon, Your Honor. Hannah Graham with Pretrial Services.

THE COURT:  Good afternoon.

MR. ALBEE:  Good morning, Your Honor.  Mr. Hamzeh appears in person by Craig Albee and Joe Bugni.

THE COURT:  Good afternoon.

Good afternoon, Mr. Hamzeh.

As you are all are aware, I noticed this hearing and scheduled it because, under 3164, a provision of the Speedy Trial statutes, the law requires that if the trial for the case doesn't start within 90 days of the time that the defendant begins his time in custody -- so it's a little

1    bit different than the Speedy Trial calculation -- that that

2    person can no longer be detained if the reason that the

3    person was being detained was solely for the purpose of

4    trial, or solely for -- ahead of trial.

5            And I went through, and with the help of my staff,

6    went through and did some calculations, and by my

7    calculations we passed that 90-day period.  And the statute

8    requires that once the 90-day period has expired, there is

9    an automatic, quote, unquote, "requirement for review of

10   bond conditions."  I say "automatic," quote, unquote,

11   because I'm always a little uncomfortable with the statute

12   that presumes that something is going to automatically

13   happen as if it falls out of the sky or something.  But at

14   any rate, I take "automatic" in this case to mean that the

15   Court ought to conduct a review of bond conditions.  So

16   that's why I scheduled this hearing.

17           I know the parties will recall that there have

18   been a couple, three bond review hearings in front of

19   Judge Jones, and there was one prior hearing in front of me,

20   I think, back in December.  So that is why I scheduled the

21   hearing.  So I think I'll start by giving each of the

22   parties an opportunity to address statute and discuss that,

23   and then we will go from there.

24           I will note, by the way, that the Defense filed

25   something just, I think, a short while ago, and I don't know

1    whether the Government had an opportunity to see it, but it

2    was -- it's a brief motion, a couple of pages, and then

3    attached to it is a January 22nd, 2018 letter from Defense

4    counsel to Mr. Kanter and Mr. Haanstad.

5            Have you all had an opportunity to see that?

6            MR. KANTER:  No, Judge.

7            THE COURT:  Okay.  Just share that with you,

8    Mr. Kanter.

9            Oh, okay.  Thank you, Mr. Albee.

10           We'll take just a second and let you all take a

11   look at that.

12           MR. KANTER:  I think, Judge, it would probably

13   take a little bit more time than just these few moments to

14   completely digest this and answer it, but I can try my best.

15           THE COURT:  Well, I guess I'll just note that the

16   letter -- the short motion and the letter are an indication,

17   I think from Defense counsel, that at the hearing that Judge

18   Duffin held a few days ago, that counsel was concerned that

19   maybe there hadn't been as fulsome an explanation about

20   what's been going on with transcripts as counsel would

21   otherwise have provided, and that's a little bit more detail

22   about that.  It's related to what we're here to discuss

23   today, albeit not perhaps the direct focus of what we're

24   here to discuss today.  So if you need more time to digest

25   it, I'll certainly be happy to give you that, Mr. Kanter,

1  but in the meantime, I guess I'm interested in starting with

2  the 3164 question.

3          MR. KANTER:  Well, perhaps if I could, let me

4  begin just by making some general comments about where we

5  are today.  I think that's probably what you would like to

6  hear from the Government.  And one of the reasons why I'm

7  here today, Judge, is to simply to tell you that the

8  Government failed to deliver.  We did.  We flat out failed

9  to deliver.  We failed to deliver as promised, and we failed

10  to deliver perhaps most -- perhaps of most importance to

11  you, we failed to deliver according to the Court order that

12  was entered.  We just failed, and we accept responsibility

13  for that, and I will tell you that I most humbly apologize

14  to you and the Defense for the failure of the Government.

15          With that being said, however, I trust that you

16  know, both from your personal experience with us, not only

17  me but with the United States Attorney's Office and as well

18  by reputation, that this is atypical of the United States

19  Attorney's Office for the Eastern District of Wisconsin.

20  We're embarrassed by that, and we apologize again.

21          You may want just a brief explanation.  I'm not

22  going to go into great detail on this, but -- unless you

23  want more explanation, but you might want to know basically

24  what happened here.  Why are we in the position that we find

25  ourself in today.  And in large part, if not completely,

we're in the situation we are today because of the nature of

the case.  This was new to the U.S. Attorney's Office here.

National security cases are very tightly

controlled, particularly by the FBI headquarters in

Washington, D.C., and the freedom that we normally

experience in processing discovery and in dealing with the

disclosure of evidence does not exist in cases of this

nature.  It's quite a different animal, and I learned that,

quite frankly, for the first time going through this case.

Hopefully the experiences that we've had through this

process will guide us in future national security cases, and

we won't confront this again, but it was a learning

experience.  And of particular difficulty, I guess, for lack

of a better term in this case, is the fact that we were

dealing with recorded conversations which are all in Arabic.

There isn't -- I don't want to say that there is absolutely

no English on any of those transcripts -- or excuse me -- on

any of the recordings, but it is, for all practical

purposes, all in Arabic, and that, obviously, presents a

multitude of problems, particularly for the FBI.

It would be wonderful to be able to tell you that

this is the only national security case that the FBI is

working on across the country.  It would be wonderful to be

able to tell you that it's the only national security case

involving Arabic that the FBI is working on across the

country, but, of course, that is simply not true.  The FBI

is overtaxed both on the cases and on their ability to

handle Arabic translations.  That is perhaps in and of

itself worthy of criticism.  Perhaps the Government should

have thought about correcting that situation, but the

reality is that they are overtaxed.

As a result, quite frankly, I think it's best to

simply say that on November -- back in November of last

year, when the transcripts were originally delivered, they

simply were not in final trial ready form.  They were not.

And, quite honestly, since then, we have been struggling

with the language services division of the FBI in order to

address these problems.  Both the Milwaukee field office of

the FBI and, in turn -- because our information comes

through the Milwaukee field office, in turn, the United

States Attorney's Office, I can tell you was assured

repeatedly more times than I can probably count that the

work was being done, that an expert translator had been

assigned to the case, and that the transcripts -- translated

transcripts would be completed on time.

I can only tell you as honestly as I can that the

language services division of the FBI failed completely to

hit those deadlines.  There's no other way to put it.  They

failed to hit the deadlines.

I can tell you based on information that I've been

told that last week, the FBI finally admitted and addressed

and realized the failure of their language services division

and moved immediately to address the problem. This is what

they've done. They have reassigned the translation

responsibilities to a different team of people.

Currently there are three translators that have

been detailed to the Milwaukee field office and are

currently at the Milwaukee field office working full time

and solely on completing these transcripts. They are

working on them, actually, as we speak.

Just before coming into court, I was informed, we

were informed, that there are two additional translators on

their way to Milwaukee, one translator and a supervisor

translator to continue to work on these transcripts. It is,

I think, safe to say now one of the perhaps national

priorities of the FBI to accomplish the completion, the

trial ready final completion of these transcripts.

With that said, again, in all honesty,

realistically, whether or not the complete 29 transcripts

that are at issue at this time can be completed before trial

is still an unknown. I can't tell you that as I sit here

right now as to whether or not that's possible. I certainly

hesitate, in fact, I won't even speculate as to whether or

not it's possible because I feel embarrassed by the fact

that the estimates that I personally have provided to this

1    Court in the past have not come true.  And I'm embarrassed

2    by that, so I'm not even going to estimate.  But I can tell

3    you, and, again, readily admit that, quite frankly, even if

4    we were able to provide those full trial ready 29

5    transcripts, we certainly have failed to do it as previously

6    ordered by the Court.  We missed that deadline, and there's

7    no excuse for that.

8              So that brings us, I guess, to today's hearing and

9    the reason why we're here today.  And as I see it at least,

10   you're facing a conflict between two relatively simple

11   truths.  On the one hand, you have a detained defendant who

12   has not yet received final transcripts, and we're just

13   shy -- or just over three weeks from trial.  It's just a

14   reality.

15             And on the other hand, the other truth, I think,

16   is that -- on the other hand is that there has been no

17   change, no factual change in the reasons that this Court and

18   the magistrate court originally ordered detention.  The

19   facts and circumstances and the reasons for that pretrial

20   detention still exist.  Nothing with regard to that has

21   changed.  And, quite frankly, the Government still feels

22   strongly that those reasons compel continued detention in

23   this case.

24             The Government's proposal in order to at least

25   attempt, make as good attempt as we can to keep this trial

on schedule, or at least as close to the current schedule as
we possibly can, is that the Government would propose to
focus on the final preparation of those excerpts of the 29
transcripts that the Government intends to introduce at
trial.

Let me just say that I think -- I hope it's clear
to -- for everybody's understanding that the Government
identified 29 transcripts, or 29 conversations, if you will,
meetings that the Government believes is important to our
case and from which our evidence would come.

Like in any case, any drug case, for example, we
never had any intention of laying forth as an example let us
say the entirety of a four-hour conversation. That was
never our intention as it never is in any of our cases. But
the entirety of those conversations we had taken the burden
to prepare because the evidence would come from those
transcripts, but it's only excerpts that we would intend and
had ever intended to present. So we would propose to focus
on that. I can tell you, actually, that that is the
instructions that have been given to the translators that
are currently working at the FBI field office right now.
They are focusing on those excerpts. And we offer, if the
Defense is interested, to do the same for them; to take
whatever excerpts of the 29 conversations that we previously
identified, and we would have our translators focus on

preparing their excerpts as well.  Again, realistically whether or not we can conclude and complete the entirety of those 29 transcripts, I don't know, and I can't tell you today.

Again, just so that there's no confusion, there are many more conversations, I think maybe 100, roughly 100 conversations in total that were recorded, and, of course, any of the conversations beyond the 29 that we did at least timely identify, though not in final form, that we did identify according to the Court's order by last November, those are, remain, and always have been the sole responsibility of the Defense.  We never took any responsibility for transcriptions beyond the 29 that we identified.

So, Judge, I don't know whether or not that answers your question, your concerns.  I hope it does, but I'll be happy to answer any questions you might have.

THE COURT:  Thank you, Mr. Kanter.  And I'll obviously turn to Mr. Albee in a moment.

I do want to make one remark, though, with regard to what you have said today.  In preparation for today's hearing, and, quite frankly, before I even scheduled today's hearing, I went through the minutes, which, as you all know, are on our docket for all the hearings that we've had in this case, and by "we" I mean not just me but the magistrate

judges as well since February of 2016, which is when this
all started.  And I do want to note that there have been a
number of hearings at which the Government has made clear,
either you or Mr. Haanstad, to the magistrate judges -- and
the Defense has not disagreed -- that the issues you just
described are not attributable to anything dilatory on
behalf of members of the U.S. Attorney's Office here in
Milwaukee or even necessarily members of the FBI field
office here in Milwaukee.  I think the prosecution has
stated that several times to the magistrate judges, either
Judge Duffin or Judge Jones, and I have not noted anywhere
in any of these hearings where either Mr. Albee or Mr. Bugni
has intimated otherwise.

        I appreciate your comments in that regard, but I
want to make clear that I didn't schedule this hearing today
because I think the U.S. Attorney's Office here has been
deliberately dragging its feet.  That wasn't the purpose of
scheduling the hearing.

        I appreciate your comments, and I reckon if I were
sitting in your chair, I probably would've said some of the
same, but that was not why I scheduled today's hearing.

        Thank you for those comments.

        I do want to ask one question before I turn to
Mr. Albee.

        You commented, Mr. Kanter, about the factual

1    reasons that Judge Jones and I had stated in previous bond

2    hearings for ordering continued detention and noted that

3    none of that had changed.

4            The reason I scheduled this hearing today,

5    however, was because of the specific provisions in 3164, and

6    3164, I will note, doesn't have as a component a discussion

7    of the reason for the person being detained other than to

8    note that if the detained person is being held in detention

9    solely because he is awaiting trial and has been designated

10   high risk, then 3164 applies.  And I think both of those

11   factors apply to Mr. Hamzeh.  I think it's pretty clear he's

12   being detained solely because he's awaiting trial.  And I

13   know that the Government considers him to be high risk.  So

14   all that says to me is that 3164 comes into effect because

15   of those two provisions.

16           It's the second part, 3164(b), that caused me to

17   schedule the hearing today, and that part of the statute

18   doesn't say, you know, Judge, look at why the person is

19   being detained.  It says look at how long the person has

20   been detained.  So I would appreciate any comments you have

21   as to that part.

22           MR. KANTER:  Sure.  No, I understand.  And I think

23   our understanding of the statute -- the first time I've

24   confronted it.  Our understanding of the statute is that it

25   triggers an automatic review.  I don't think that

necessarily means that release is compelled, at least that's our position.

I understand that there might be -- one could read a preference for release, but I don't know that it's compel. And that's why I'm saying that I think that those reasons for detention that were previously identified before the Court still need to be considered because I think that there needs to be a -- I'm suggesting that there needs to be a balance between those very compelling reasons for detention that the Court has already addressed and the delay that the defendant has experienced.

THE COURT:  Thank you, Mr. Kanter.

Mr. Albee.

MR. ALBEE:  I don't think Mr. Hamzeh's sitting in jail after 30-plus months worrying about which part of the Government is screwing him over, he just know he's being screwed over.

It's inexcusable that these transcripts weren't done.  We provided the Court with a letter that we sent back in January.  We haven't moved forward at all since that letter.  Not at all.

You know, sometimes you reach these points in proceedings, and the Defense -- there's a suspicion that the Defense is sandbagging, or it's a last-minute effort to postpone the trial, that there's some manipulation or

1    something going on. And, you know, just this letter --

2    could we have been more straightforward about trying to

3    resolve this issue than we are in this letter? It would be

4    impossible.

5          Mr. Bugni spent countless hours going through

6    these transcripts with a fine tooth comb and identifying for

7    the Government what the problems were. And instead of us

8    concealing it, or waiting to attack a translator on the

9    stand and point out all the ways they screwed up, we gave

10   them the information and said, Could you fix this? We want

11   a clean trial that doesn't take six weeks. We want to make

12   this as efficient and streamlined as possible because we're

13   confident in the evidence that we have and what we can

14   present if we can just get that evidence out there through

15   the transcripts that they've indicated that they were going

16   to prepare. And so they gave us the 29 of November.

17         We identified the problems with them. And,

18   you know, our letter concludes in the last paragraph that

19   there has to be some deliberate speed in this endeavor. And

20   then we explained all the things that we have to do once we

21   get the translations because that's kind of the starting

22   point for our preparation rather than an endpoint. And then

23   we talked about how we're only a month out for trial.

24   You know, we got to fix these very problematic ones. We

25   would like to set a definite and short deadline to resolve

the transcript problems and move on to other issues, and our
hope was, you know, that by February or March we can get
these things done and we have more than 90 days because it
is very difficult to work through these transcripts, but we
have to have our translator go through them. We have to
give Mr. Hamzeh an opportunity to at least give a pass on
some of these things and tell us whether the speakers are
correct, or whether there's something misinterpreted, or
whether there's something that he can hear that they don't
that's important.

It's wonderful that there are now five translators
coming into Milwaukee to try to resolve this problem. I
don't have five translators on staff. I don't have five
people sitting in my office waiting to do this. It's just
outrageous.

Mr. Kanter talks about things that -- that there
haven't been changes. I think our case continues to get
better.

At the last time we were in front of this Court,
we didn't have the actual surveillance documents. On 64
occasions, the Government, this overtaxed FBI, had six to
eight agents watching Mr. Hamzeh for eight hours at a time.
So all that manpower and money that was spent, they observed
one incident of road rage and nothing else that was germane
to their investigation. Not one thing that they could use

that would suggest he had some predisposition to be involved in terrorism or the possession of machine guns.

We finally, this winter, got some, not all, texts from the FBI.  We believe there are others that should exist.  There are some that haven't been preserved that we're still trying to find out about.  But one of the texts clearly told one of the informants, "We have to record everything.  If you can't get ahold of us to record it, wait a day or two.  I mean, the bosses are coming down on us.  We have to record everything."

Yet for 35 days with near daily meetings with their professional informant and Mr. Hamzeh, there are no recordings, and then all of a sudden this plot exists.  So those texts are something we really want, and it's just hard to comprehend why things weren't recorded during that time.  And it's -- at the very least, it would appear that there's a rogue confidential informant.  That paid professional rogue confidential informant we found out yesterday was charged last month with a felony involving a gun in Milwaukee County.  Have they told us?  No.  Two options:  They're not giving us the Brady information timely like they're supposed to, or their informant is concealing stuff on them.  Either way it's just another indication that our case is better, and things haven't changed since they were -- we were last here for bail reports.

We have filed now expert reports that is ordered by the Court, on the timeline ordered by the Court relevant to Mr. Hamzeh's IQ and how he would be particularly susceptible to inducement.

We filed expert reports explaining that the likelihood of any random individual in Milwaukee ever being able to obtain a machine gun, regardless of their financial resources, is being slim to none. And also that the price -- you know, these were supposedly purchased for $570 when these things would cost -- the pair of them would be well over $10,000, and Mr. Hamzeh had to borrow money, according to the discovery, to buy a $300 gun. And even then he came up short, but he borrowed some of the 270 that he negotiated, according to the discovery.

As I said -- I mean, we weren't lying in the weeds. It's not as though, you know, there was this issue, and we were just waiting to jump on the Government and go, "Gotch you. You didn't do 90 days. You screwed up."

This letter shows what kind of degree of effort that we put in to try to resolve these issues because we know it's going to be -- even after we get these things from their five translators, we have one who is, you know, used by other lawyers, too. He's not sitting around waiting. And we know that, you know, once we finally get those, then our process begins of checking the translations, deciding

what we want to use. And, again, all along our desire has been to stipulate to something. And we've had many conversations with Mr. Haanstad, and that's his understanding, too. We appreciate that part of it. I mean, it's been a cordial back and forth with the Government and the prosecutors that we want to work this out, and that's been our understanding all along is, yeah, we're adults here, we're not uncivil, and we're going to get this worked out so we can have an efficient trial. And it is the translators, the FBI translators, for whatever reason that haven't produced these things.

But we have a United States citizen who has been in custody for a really long time. I don't see any way we can prepare for the trial date that's coming up, yet he, Mr. Hamzeh, absolutely doesn't want an adjournment. You know, it puts us in a position. I have no idea what to do unless he is released.

In terms of the 3164, I agree with the Court that we're -- it appears we're well over 90 days in excludable time. One thing I couldn't quite decipher or determine with certainty was whether the pendency of a bail motion is a pretrial motion. It's not so defined, it would appear, under Rule 12. I don't think that bail motions toll with the time. But even if they did, we're well past the 90 days under any circumstance.

And Mr. Kanter had some question as to whether
release is mandatory, but I think the language of the
statute is no detainee, as defined in Subsection A, shall be
held in custody pending trial after the expiration of such
90-day period required for the commencement of his trial.

I mean, to me, that sounds like the release is
required under 3164. So we would ask for Mr. Hamzeh's
release under Section 3164. We also think it's warranted,
as a matter of due process, his presumption of innocence,
and that the Court, under the Bail Reform Act, can also
consider delay as one of the factors, which, of course, is
probably the biggest factor that's changed since the last
time we were here is that he'll have been sitting a much
longer period of time. And for the due process analysis,
the Court considers the length of the delay, which now is
pretty extraordinary.

Whose fault it is, I think we've pretty much
exhausted that issue, and also the weight of the evidence.
And, you know, it remains our position that there's a very
strong entrapment defense here as well.

So those would all support due process, and we
think the release under the Fifth, Sixth, Eighth Amendments
and to know -- I mean, the Court knows this, I won't go on
at length -- but pretrial services has indicated there's a
good release plan, in the beginning, the recommended

1  release.  He has a place to live.  He has a job.

2      The other thing is -- our position is -- my

3  recollection is I think we believe the guidelines are 30 to

4  37 months.  Even the Government, I understand, think the

5  guidelines are 70 to 87 months.  And with good time at this

6  point, I think he would be about 35 months that he's already

7  served without any determination whether he should serve a

8  single day, which can only be determined at trial.

9      I guess the other thing, just for a host of

10  reasons that I think I've already explained, it would be

11  obvious to the Court trying to prepare for trial, getting

12  these transcripts -- I guess the Government is being

13  straight.  They don't even know if we would have them by

14  trial.  But we have exhibits and a whole bunch of other

15  things that are due Monday.  Exhibits would certainly

16  include these transcripts would be the major, you know, a

17  major thing, and then a lot of exhibits that are taken off

18  the transcripts.  So we have that.

19      Oh, the other thing, Judge, is we've provided, I

20  think, seven transcripts apart -- I'm not sure the number,

21  but it's something like seven transcripts of additional

22  conversations that we would like to use at trial that we've

23  given to the Government in advance so that their translators

24  would have a chance to take a pass at those and let us know

25  what they thought the mistakes might be so we could get an

agreed transcript for those, too, and that hasn't been done.
So it's not just the Government finishing its own
transcripts but getting back to us on that. But we've
operated with the understanding throughout this period that
we would have set transcripts, and that we could work off of
those. And Mr. Kanter may be right, they may have prepared
a 70-page transcript and choose to focus on 30 pages of it,
but we've been always told and had a fair understanding we
would get all 70 pages, and we could work from that.

      Mr. Kanter said the last time we were here for a
bail hearing, that he said -- you know, that the context for
statements that are made -- he was talking about the
post-arrest interview -- are important as opposed to just
pulling out words or brief phrases. So we thought the
entirety would be important.

      Again, I'm not trying to put in every word that
was ever said between these people but, you know, until we
see what excerpts they want, we won't know whether,
in fairness, and the Rule of Completeness, we'll say, Hey,
you got to add these extra five pages, or whatever it might
be in order for the jury to be able to understand that
conversation.

      So, Judge, at this point, we're asking the Court
to release Mr. Hamzeh under the conditions proposed by
pretrial services and their original report.

He does have a job and a place to live.  And
assuming if the Court did that, then we would be asking to
move the trial.

THE COURT:  Anything further from the Government,
Mr. Kanter?

MR. KANTER:  No, Your Honor.  Thank you.

THE COURT:  Thank you.

I've made a response to one comment that
Mr. Kanter had made.  I'll make a response to one comment
that Mr. Albee had made.  I think the same record of
hearings that I went through (indiscernible) Mr. Albee has
indicated, which is the Defense has been clear from day one
that it was asking to work through, hopefully, a joint
series of transcripts that everyone could utilize, and that
that has been made clear at hearings in the past as well.

And so I think the way Mr. Albee put it was the
Defense has not been lying in the weeds.  I think that's
absolutely true, and I don't believe the Government has
indicated as much either.

I will note as a practical matter, quite frankly,
that if the parties -- I'm not sure who could question why
we wouldn't need a joint set of transcripts.  I have no
earthly idea how 12 citizens sitting in a jury box, whom I
think we can safely anticipate wouldn't speak Arabic, would
be expected to make heads or tails out of a trial in which

1    the Government said, "We think that this conversation is

2    saying this," and the Defense said, "We think this

3    conversation is saying that."

4         Even Spanish language transcripts, usually there

5    are a couple folks on the jury who can kind suss out a word

6    here or there.

7         I'm not sure how the trial would even go.  And I'm

8    guessing counsel would agree if there weren't a set of

9    transcripts that everyone at least felt comfortable were

10   correct, even if one might disagree about the interpretation

11   of a particular word or a particular phrase or the intent

12   behind a particular word or a particular phrase, I believe

13   that the attorneys sitting in front of me today have always

14   been working very hard -- I know you have.  It's not a

15   matter of whether I believe it or not.  I know that you have

16   all been working extremely hard on this case from your

17   respective positions.

18        I find it shocking, however -- and perhaps this is

19   what Mr. Kanter was getting at -- that we find ourselves in

20   a position where, after 30 months and change, Mr. Kanter is

21   forced to say that only recently did the Federal Bureau of

22   Investigation wake up and conclude that it was important to

23   provide an accused defendant with constitutional rights of

24   evidence that is required to be provided under the law and

25   rules; that prosecutors should have to beg, wheedle, and

cajole to turn over evidence, that the Defense should have to beg, wheedle, and cajole seems to me to fly in the face of everything that the constitution guarantees both charged defendants and our citizens.

I understand -- and I know Mr. Kanter is right -- that the FBI has many national security cases that they must focus on, and that they have many cases that involve Arabic to English or other languages to English translations that they must focus on.

I'll note as an aside that I was not aware, and I don't think I'm incorrect after all these months, I was not aware that Mr. Hamzeh has been charged with national security violations. I believe he's charged with possession of two machine guns and a silencer. I understand that there are allegations, very serious ones, that I addressed at the last bond hearing regarding what intent Mr. Hamzeh may have had in obtaining those weapons, and that's, of course, a question to be settled at trial. But this hasn't been charged, for whatever reason, as a national security case. But even assuming that it has, and even -- that that discredited way the Bureau was treated with regard to its interactions with the Government, but even assuming that it had, people who are charged with national security violations have no fewer constitutional and civil rights than others. And looking at the minutes of the hearings, it

is quite clear that the Government has been working to obtain these translations for what, quite frankly now, is years with only recent success -- and I appreciate Mr. Kanter's frankness -- that it remains to be seen how successful this recent effort will be.

I should note as an aside that the transcripts, as I understand it, are not the only issue. Judge Duffin has been dealing, for the most part, with the discovery issues, but there are other issues as well, Mr. Albee touched on a few, but the Defense continues to seek other evidence in addition to the transcripts, and those are things that also have taken time.

I know that the Government has been working hard to deal with the issues of a security classification on some of these materials, and that that's added a layer of time, and the Government has been frank with that and has tried to move as quickly as possible in filing any motions it needed to under Section 4.

But, again, all of that being said, it is staggering to me that the law enforcement agency responsible for investigating this case and asking the U.S. Attorney's Office to return charges, or the grand jury to return charges has only realized 28, 29, 30 months in that maybe it should start to do what the law required it to do from day one. That isn't the system as I understand it. That's not

1   the system that I was proud to represent when I sat in the

2   prosecutor's chair, it's not the system that I was proud to

3   be a part of as a defense attorney, and it's certainly not

4   the system that, as a member of the federal judiciary, I

5   would like to think we operate in.

6          With regard to the reason that I scheduled this

7   hearing today, 18 U.S.C. 3164 says -- and I've recounted a

8   little bit of it already -- that if a person is being

9   detained solely because they're awaiting trial, and the

10  Government designated that person as being a high risk, that

11  trial has to be accorded priority -- a relatively loose

12  phrase, I suppose, but in keeping with the comments that I

13  just made, that the Government has made and that the Defense

14  has made, it's fairly clear that it appears the Bureau has

15  not treated this case as a priority.  And by "the Bureau,"

16  I'm not necessarily referring to local agents.

17         The statute says that failure to convince the

18  trial, such a detainee, through no fault of his counsel --

19  and I don't think there's any question these delays are not

20  the fault of defense counsel -- shall result in automatic

21  review of the conditions of release.

22         But Mr. Albee is correct.  The next sentence says,

23  "No detainee, as defined in Section A, Subsection A, shall

24  be held in custody pending trial after the expiration of

25  such 90-day period described -- required for the

commencement of trial."

　　　　　With regard to the calculation of that 90-day period, I have gone through it three times.  I did not find any case law that indicated that a bail motion was not a pretrial motion.  There may be some; if there is, I missed it.  I did find case law talking about whether one counts the day that the motion is filed and the day that the motion is decided.  I think that may be academic given the calendar as it's played out here.

　　　　　I did also find Seventh Circuit case law that says that one does not exclude the time between the day that the magistrate judge issues a report and recommendation and the day that a party may object to that, but that may be academic as well given my calculations.

　　　　　As far as I can tell, the time between the date that Mr. Hamzeh was arrested and indicted and the first excludable time period was 14 days.  Mr. Hamzeh was arrested on January 26th, indicted on February 9th, had his first appearance in front of Judge Jones on February 9th, and that's when the excludable time started running.  That's 2016.  And the excludable time ran until -- time continued to be excluded until February 24th at which point in time there were motions filed.  So significant chunks of time were excluded, but the clock began running again on June 6th of 2017.  It ran until June 22nd of 2017 when

the motion for bond was filed, and I believe that that time,

between that time and the time that was decided, is

excluded. It resumed on October 26th of 2017 once the

bond motion was decided. It stopped again on

November 22nd of 2017 when another bail motion was filed.

It resumed running again December 4th, 2017. It stopped

again when a motion for Brady materials was filed

January 3rd of 2018. It remained tolled until June 8th

of 2018 when I ruled on a motion -- I think it was the last

motion at that time that was outstanding -- and ran until a

motion for bond June 20th. It began running again

June 25th, stopped June 28th. Was stopped until

July 6th and ran again until July 11th, and I believe

it's been tolled since then because there have been motions

pending since July 11th.

          Under that math -- and I can certainly recount it

in more detail if any party wishes me to -- but taking that

into account, even in the most conservative estimate, not

counting the day the motion was filed or the day a decision

was made and maybe even assuming that the Seventh Circuit

case, which is a very old one called Thomas wasn't worried

about the excludable time between the R & R and the

objection, we still have 100 days that have expired since

the time that Mr. Hamzeh went into custody that were not

excluded.

                    Under those circumstances, 3164 mandates that

Mr. Hamzeh can't be detained any further pending his trial.

                    I understand Mr. Kanter's comments.  Both

Judge Jones and I have expressed grave concerns in

particular about the information provided to us by the

Government about conversations recorded between Mr. Hamzeh

and the informants with regard to the intent to commit what

I described at the last bond hearing as a chilling crime at

the Masonic Temple down the street.

                    I don't think that those facts have become any

less concerning, and I think that was Mr. Kanter's point,

that that particular circumstance hasn't changed.  The

Government's concerns, obviously, have not changed.  The

Defense argues that the one thing that has changed is the

strength of its case.  That may be.  I don't know.  But what

has changed is that enough time has now passed that under

the statute, as best I can calculate it in good faith,

Mr. Hamzeh cannot be detained any longer.

                    In addition, Mr. Albee made reference to those

cases, and there are a number of them out there relating to

the due process concerns, withholding someone in custody for

an extended period of time when that person has not been

found guilty of a crime.  There are some cases that have

found that a shorter period is a year or 14 months in

custody can violate due process.  I don't think I have to

make that determination necessarily given 3164, but I certainly note that 30 months is a period of time that must raise questions in anyone's mind as to whether or not we've crossed a due process line.

So for all of those reasons, I am going to order that Mr. Hamzeh be released on conditions. I think it appropriate for the magistrate judge to set those conditions.

I do note Ms. Graham's office, Ms. Graham herself, filed an update to the bond study that had been filed awhile back, and I trust that all the parties have had an opportunity to see that. And so I'm going to ask my staff to contact the magistrate judge and see who is available and who's on duty to consider the parties, both sides, positions with regard to the conditions of release, and I expect that someone will be available to take care of that this afternoon.

Given that, Mr. Albee indicated that depending on what my decision was with regard to release, that the Defense might be seeking adjournment of the trial.

Mr. Albee, I don't know if you want to try to take that up this afternoon or if you would prefer to confer with the Government and/or have some time to consider that before addressing that issue?

MR. ALBEE: Judge, I would make that request.

It's clear from what the Government said that, at best,
there's a hope that these can even be completed by the date
of the trial let alone incorporated into the parties'
presentations.

As I mentioned, there's a lot of stuff due on
Monday, and it's a lot of work over the weekend.  And a lot
of the exhibits, a lot of the preparation, a lot of the
decisions in this case turns on the transcripts.  That's
really the beginning part of the preparation, not the end.

There's just no -- I mean, the Government has
taken since, you know, eight months, however you want to
calculate six, seven, eight months with multiple translators
to get to this point.  They have five, and they're not sure
they can do it in a few weeks.  It's obviously going to take
our person, who I don't even know what his availability is
whenever these come in, more time than that.  So I just
don't see any option other than to move this trial.  We ask
to do that.  And, frankly, I would ask for a status after
the Government knows when this group of translations would
be done.

THE COURT:  Mr. Kanter, first of all, is there an
objection to adjourning the trial date?

MR. KANTER:  No.

THE COURT:  I will say, if I may, I understand the
Defense request, and I will grant it, and I will take the

1   August 20th trial date off given the efforts that the


1   August 20th trial date off given the efforts that the

2   Government counsel here in the room have made to get the

3   transcripts on track.  I don't want to lose that momentum.

4   And so given that, I am interested in scheduling a status

5   perhaps sooner rather than later not only to talk about a

6   trial date but also perhaps to talk about a plan, a

7   scheduling plan for trying to keep the efforts of the folks

8   who are now in Milwaukee working on these on track with

9   progress reports to the Court and to the Defense.

10          And so I guess I think issue number one is to set

11  a status date, and I'll inquire to both of you as to when

12  you want to set that.  And then giving you a heads-up, issue

13  number two, that I would hope to talk about not only a trial

14  date but also how we can stay on top of this between now and

15  then.

16          MR. ALBEE:  Judge, a couple things.  I think

17  Judge Duffin has scheduled a hearing August 9th?

18          UNIDENTIFIED SPEAKER:  For August 9th on the

19  issue of the translations.

20          THE COURT:  Okay.

21          UNIDENTIFIED SPEAKER:  2nd.

22          THE COURT:  2nd?

23          UNIDENTIFIED SPEAKER:  August 2nd.

24          THE COURT:  Sometime early August.

25          MR. KANTER:  If I could, I would ask you not to

1    suspend that date.  I would like Judge Duffin's status of

2    the 2nd to remain in place.

3              MR. ALBEE:  Can ask for that.

4              MR. KANTER:  I think that will be a good incentive

5    to make significant progress on the transcripts.  I would

6    like that to stay in place.

7              THE COURT:  That's perfectly fine with me.  I

8    mean, that's kind of what I was trying to get at.  And I'm

9    sorry, I must've missed that.  I know he filed an order

10   recently, and I don't think I caught that.

11             MR. ALBEE:  That was going to be my request as

12   well.  We would ask the Court to order that -- you know, all

13   along we've expected the full transcripts for the 29

14   transcripts, that the full transcripts be prepared, and then

15   we can work off those.  So that's the Defense request, those

16   full 29 transcripts be prepared that were given to us in

17   November, and then we'll have a jumping off point for our

18   translator and to decide which portions of the transcript

19   should be admitted.  Again, we want to work with the

20   Government to come up with stipulations and to, you know,

21   both on the content, and to the extent we can, on which

22   portions of those translations should come in, but I think

23   we should have the benefit of having the entire translation

24   so for Rule of Completeness purposes in deciding what should

25   come in.  That's been our understanding the whole time as to

1    what would happen.

2              THE COURT:  Mr. Kanter.

3              MR. KANTER:  Now that we have the time, Judge, we

4    have no objection to that.

5              THE COURT:  Then I will order that, that the full

6    transcripts be prepared.

7              Let me ask this, though.  As I understand it,

8    whatever hearing Judge Duffin has set, it was relating to

9    where we are on those transcripts.

10             MR. KANTER:  It's a status.  It's not a drop-dead

11   date.  It's a status.

12             THE COURT:  Okay.  Because what I would like to do

13   is to ask from you all when you think we might be in the

14   position -- eventually we will be setting a new trial date,

15   and that's where I think I need to reconnoiter with you all.

16   And so would you like to have that August hearing with Judge

17   Duffin and then perhaps get back in touch with me about when

18   you think would make sense to talk about a trial date?

19             MR. KANTER:  Yes.

20             MR. ALBEE:  That makes sense.

21             THE COURT:  All right.  All right.  Then I'll keep

22   an eye on the docket once that hearing has taken place.

23   Then we'll circle back with each other and talk about when

24   it would make sense to have a discussion about a new trial

25   date once you all have a better sense of where things are.

1          Mr. Kanter, anything else from the Government?

2          MR. KANTER:  There is one last thing, Judge.

3  Mr. Haanstad (indiscernible) my attention the other day when

4  we were working the case.  I would like to just ask you to

5  clarify the record, if you would.

6          THE COURT:  You're making a huge assumption.

7          MR. KANTER:  From -- we had a status conference on

8  March 21st of this year.

9          THE COURT:  Yeah.

10          MR. KANTER:  And I have a copy of the transcript

11  right here.  It's been prepared.  It's part of the record.

12          At that time, on March 21st, it's clear from

13  your comments and from the parties' comments in setting the

14  trial date, and, actually, continuing a June trial -- not

15  continuing -- rescheduling a tentative June trial date to

16  August 20th.

17          THE COURT:  Right.

18          MR. KANTER:  It's clear from reading the

19  transcript that it was your intention to suspend the Speedy

20  Trial Act and make a Speedy Trial Act finding as you did

21  back in January when we had a status conference in January.

22  It was not done in March, and I will just ask you to clarify

23  that that was your intention so that at some future point in

24  time there's no confusion about that.

25          MR. ALBEE:  Well, I guess I oppose that at this

point. They offer to go back in time. I don't think it was
done then, and I think it's much too late, much too late
now.

MR. KANTER: No, it's not. This is something that
you can clarify. Your comments were clear from the record
that that was your intent. It was just not stated.

THE COURT: Mr. Kanter, is the transcript on the
docket?

MR. KANTER: It is.

THE COURT: Do you know what docket entry?

MR. KANTER: Actually, I don't. It's not typed on
here, but I think -- it was prepared just recently,
actually, in July.

THE COURT: Okay. So it would be --

MR. KANTER: I can give you my copies of them, if
you'd like.

THE COURT: You don't have to because I can go
look at -- that's why I asked if it was on the docket, let
me look at it because I have my minutes, and that's what I
reviewed.

MR. KANTER: Yes.

THE COURT: But the minutes don't reflect that, so
I would like to look at the transcript.

MR. KANTER: Okay.

THE COURT: And then I will -- let me look at the

transcript, and then I'll get back to you all.  And if
there's any further argument, I'll be happy to hear it at
that point, but thank you for calling that to my attention.
I just want to look at what I said because at this point --

MR. KANTER:  I understand.

THE COURT:  If I don't look at it, I don't
remember it exactly.

MR. KANTER:  So just for my clarification, a
hearing will be yet this afternoon?

THE COURT:  I believe.

MR. KANTER:  In front of one of the magistrates?

THE COURT:  Yes.  Yes.  I'm thinking it will
probably be Judge Duffin because I thought I heard
Judge Jones say that he was out today, but I'm not positive,
so let me get back to you all and let you know that.

MR. KANTER:  All right.

THE COURT:  Mr. Albee?

MR. ALBEE:  Yes, Judge.  And I'll just put one
thing on the record.  As the Court went through the
calculations of unexcluded time, there was one chunk the
Court didn't mention that came to mind, and the Court went
kind of fast.

THE COURT:  I'm sorry.

MR. ALBEE:  No, that's fine.  And, again, our
position is that the time for -- while bail motion is

1    pending is not excludable, but Judge Jones had taken that

2    bail motion under advisement, and briefing was certainly

3    done no later than July 26th.  And so the statute also

4    provides that matters taken under advisement, there's 30

5    days of excludable time under H1H, delay reasonably

6    attributable to any period not to exceed 30 days during

7    which any proceeding concerning the defendant is actually

8    under advisement by the Court.

9         And so that 30 days would've run approximately

10   August 25th or 26th and gone, and I think that would be

11   excludable time all the way until the motion for bail review

12   in November.

13        THE COURT:  I apologize, Mr. Albee, but which

14   bail -- because I think there were two.

15        MR. ALBEE:  At least, yeah.  So our initial bail

16   motion was June 22nd of 2017.

17        THE COURT:  Yes.

18        MR. ALBEE:  Okay.  And I think the Court stopped

19   the clock when going through that.  We would contend

20   otherwise.  But even assuming that a motion for bond stops

21   the clock, it looks like there was some post-hearing

22   briefing that concluded around July 26th.

23        THE COURT:  Okay.

24        MR. ALBEE:  And then the 30 days for Judge Jones

25   to take that under advisement would've expired in August,

1  and then we would've had that big chunk of time that came by

2  after that.

3         THE COURT:  Okay.  Okay.  Yeah, I didn't mention

4  that.  You're correct.

5         All right.  I'll go back, and I'll look over it

6  again, but I'll look over the notes.

7         MR. ALBEE:  It just supported the record that the

8  Court made in addition.

9         THE COURT:  Okay.

10        MR. ALBEE:  Thank you.

11        THE COURT:  All right.  Thank you all.  Thank you

12 everyone.

13     (Hearing concluded.)

1                    C E R T I F I C A T E

2

3          I, Richard D. Ehrlich, a Registered Merit Reporter

4    and Certified Realtime Reporter, certify that the foregoing

5    pages are a true and accurate transcription of the audio

6    file provided in the aforementioned matter to the best of my

7    skill and ability.

8

9    s/Richard D. Ehrlich  September 6, 2018
                          _____
10   Richard D. Ehrlich, Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25