1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF WISCONSIN

3    ----------------------------------------------------------------

4  UNITED STATES OF AMERICA,            )
                                        )
5                    Plaintiff,         )    Case No. CR 16-21
                                        )    Milwaukee, Wisconsin
6        vs.                            )
                                        )    December 12, 2018
7  SAMY M. HAMZEH,                      )    1:00 p.m.
                                        )
8                    Defendant.         )

9    ----------------------------------------------------------------

10

11

                    **TRANSCRIPT OF SPOLIATION HEARING**
12             BEFORE THE HONORABLE WILLIAM E. DUFFIN
                  UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17

18

19

20

21

22

23  U.S. Official Reporter:     JOHN T. SCHINDHELM, RMR, CRR,
   Transcript Orders:          WWW.JOHNSCHINDHELM.COM
24

   Proceedings recorded by computerized stenography,
25  transcript produced by computer aided transcription.

                                                                    1

```
 1   APPEARANCES CONT'D:

 2   For the Government:          US Department of Justice (ED-WI)
                                  Office of the US Attorney
 3                                By: ADAM H. PTASHKIN
                                      BENJAMIN P. TAIBLESON
 4                                517 E Wisconsin Ave - Rm 530
                                  Milwaukee, WI 53202
 5                                Ph: 414-297-1700
                                  Fax: 414-297-1738
 6                                adam.ptashkin@usdoj.gov
                                  benjamin.taibleson@usdoj.gov
 7
     Also Present:                Jessica Krueger, FBI
 8
     For the Defendant
 9   SAMY M. HAMZEH:              Federal Defender Services of
     (In Person)                  Eastern Wisconsin, Inc.
10                                By: CRAIG W. ALBEE
                                  517 E Wisconsin Ave - Rm 182
11                                Milwaukee, Wisconsin 53202
                                  Ph: 414-221-9900
12                                Fax: 414-221-9901
                                  craig_albee@fd.org
13
                                  Federal Defender Services of
14                                Eastern Wisconsin, Inc.
                                  By: JOSEPH A. BUGNI
15                                22 E. Mifflin Street - Ste 1000
                                  Madison, WI 53703
16                                Ph: 608-260-9900
                                  Fax: 608-260-9901
17                                joseph_bugni@fd.org

18

19

20

21

22

23

24

25
```

1        P R O C E E D I N G S (1:01 p.m.)

2            THE COURT:  Please be seated.

3            THE CLERK:  Judge Duffin is present for the United

4    States of America vs. Samy Mohammed Hamzeh, Case No. 16-CR-21,

01:01   5    here for a spoliation hearing.  May I have the appearances,

6    please, first by the government?

7            MR. PTASHKIN:  Good afternoon, Your Honor.  Adam

8    Ptashkin with AUSA Ben Taibleson from the United States, along

9    with Special Agent Jessica Krueger.

01:01  10            THE COURT:  Good afternoon to you all.

11            MR. ALBEE:  Good afternoon, Your Honor.  Samy Hamzeh

12    appears in person with Joe Bugni and Craig Albee as his

13    attorneys.  Also present at counsel table is Shavon Caygill, our

14    paralegal.

01:02  15            THE COURT:  Good afternoon to you.

16            Well, we're here for a spoliation hearing.  Let me

17    kind of recap where things are.

18            Back on March 8th, I issued an order that certain

19    information be produced from the government to the defendant

01:02  20    that was followed up with a motion for a spoliation hearing from

21    the defense on July 11th, 2018, which motion I granted on July

22    25th, 2018 as part of an order that also -- you know, just

23    identified issues that were going to be addressed.

24            And both the government and the defense have since

01:03  25    produced -- or recently produced or filed memorandum kind of in

1   anticipation of this afternoon's hearing.  So I guess the -- so

2   the purpose initially, and principally, is to discuss the

3   spoliation issue.

4           It looks like, at least from the document filed by the

5   defense yesterday, there is also -- they also want to have a

6   dialog about documents or information that they had requested

7   and that I've ordered produced that they say hasn't been

8   produced.

9           So let me start with you, Mr. Albee, how would you

10  like to proceed here?

11          MR. ALBEE:  Well, Judge, I think the Court's

12  accurately summarized some of the issues here.

13          We do view this as a spoliation hearing.  But I think

14  relevant to that issue is the fact that text messages and

15  information relating to text messages still hasn't been

16  produced.  And so, I mean, we think that's tied into the

17  spoliation hearing.  And the reason -- I think there's a need to

18  find out the reasons why things haven't been produced and then

19  to determine whether that's excusable in some way and what

20  sanctions, if any, should be imposed.

21          The government, I understand, has a witness that was

22  identified in its submission last week to the Court who is

23  available to testify regarding what took place and why Agent

24  Adkins' text messages were not preserved.

25          So my understanding is the government's prepared to

1    proceed by calling him as a witness, and may have another

2    witness or two regarding why text messages haven't been

3    recovered.

4         Also, we've asked that certain agents be available to

01:05    5    ask them questions about why certain things weren't preserved.

6         I guess, in addition to texts, there also are

7    questions about the failure to preserve or turn over emails.

8    We've had 11 pages turned over.  I don't know that that's the

9    whole universe of emails in this case either.

01:05    10        But if we could -- so my proposal, Judge, is to

11   proceed with the government calling its witnesses, and then

12   we're likely to call an agent or two if the government doesn't

13   call them to help establish their own case here.

14        There were a couple of -- yesterday we received a

01:06    15   letter from the government regarding Department of Justice

16   policy regarding the preservation of e-communications which

17   we've marked as Exhibit H.  I'd like to submit that I guess at

18   this time, as well as what we've prepared as Exhibit N which is

19   a complete list of the text messages that have been produced --

01:06    20   is that correct?  -- a complete list of the text messages that

21   have been produced by the government.

22        So I can provide the government with copies of those.

23   We've obviously received both of these -- both of these

24   documents from the government.

01:06    25        THE COURT:  All right.  Any objection?

1        MR. PTASHKIN:  No objection, Your Honor.

2        THE COURT:  All right.  Mr. Ptashkin, does that make

3   sense, to proceed with the government going first?  It seems

4   like that makes sense to me.

01:06    5        MR. PTASHKIN:  Absolutely, Your Honor.  And so, just

6   to give a quick preview, the United States has three witnesses.

7   The defendant requested that we make three additional special

8   agents available.  We've made them available, they're here and

9   ready to be questioned.  So I would anticipate I guess the

01:07   10  hearing's going to be six witnesses.

11        The other thing I just wanted to briefly address,

12  which was discussed in our briefing is, from the United States'

13  perspective, based on the sixth pretrial motion for spoliation

14  hearing the defendant filed, this hearing is about text messages

01:07   15  in the fall of 2015 to spring of 2016, and the preservation and

16  deletion of those text messages.

17        And so the United States, as it did in its briefing,

18  just wants to front to this issue.  The United States is going

19  to be objecting to any questions to the agents that go outside

01:07   20  the scope of this hearing in terms of its limited text message

21  preservation/deletion from the fall 2015, to spring of 2016.

22        And obviously this is a sensitive issue because this

23  is a opportunity for the defendant to potentially examine our

24  witnesses about the substance of the case that have absolutely

01:08   25  nothing to do with spoliation.  The United States is going to

6

1    object to that as outside the scope of the hearing.

2           THE COURT:  I agree that -- Mr. Albee, you can be

3    heard, if you would speak into the microphone but -- that the

4    purpose of today's hearing is to discuss spoliation issues.

01:08    5           MR. ALBEE:  I agree.

6           THE COURT:  All right.  And you're I'm assuming

7    standing because you're going to give those to --

8           MR. ALBEE:  I was going to provide --

9           THE COURT:  Pass those up?  Sure.  Go ahead.

01:08   10           MR. ALBEE:  Exhibits H and Exhibit N.

11           THE COURT:  All right.  Thank you.  All right.

12           Mr. Ptashkin, why don't you call your first witness.

13           MR. PTASHKIN:  Thank you, Your Honor.  At this time

14    the United States calls Joshua Baer.

01:09   15           THE CLERK:  Remain standing.  Please raise your right

16    hand.

17              JOSHUA BAER, GOVERNMENT WITNESS, DULY SWORN

18           THE CLERK:  Please state your full name and spell your

19    last name for the record.

01:09   20           THE WITNESS:  Joshua Robert Baer.  Last name spelled

21    B-a-e-r.

22           THE CLERK:  You can be seated.

23                        DIRECT EXAMINATION

24    BY MR. PTASHKIN:

01:10   25    Q.  Thank you so much for being here today, Mr. Baer.  Where do

1    you currently work?

2    A.  I work for the Counterintelligence Division of the FBI, at

3    the J. Edgar Hoover Building.

4    Q.  Is that the FBI headquarters on Pennsylvania Avenue in DC?

01:10    5    A.  Yes, sir.

6    Q.  And what is your precise position with the FBI currently

7    within the Counterintelligence Division?

8    A.  I'm a management and program analyst.

9            MR. ALBEE:  I'm sorry, could you speak up?

01:10    10           THE WITNESS:  Oh, I do apologize.  Is that better?

11           MR. ALBEE:  It is.

12           THE WITNESS:  Thank you.

13           I'm a management and program analyst.

14   BY MR. PTASHKIN:

01:10    15   Q.  Okay.  And what is the Counterintelligence Division?

16   A.  They're the component that oversees investigations for

17   counterintelligence/counterespionage across the U.S.

18   Q.  And broadly at a 10,000-foot level, what's your job

19   description?

01:10    20   A.  So currently I oversee a small program and support

21   counterintelligence investigations.

22   Q.  What's the total length of time you worked for the FBI?

23   A.  About eight years now.

24   Q.  What was your job in -- from about the fall of 2015 until

01:11    25   spring 2016?

1    A.   I was an analyst for the FBI's intelligence and risk

2    analysis unit.

3    Q.   And have you also previously been a contractor for the

4    Department of Energy?

01:11   5    A.   Yes, sir.

6    Q.   And where were you stationed for that job?

7    A.   Los Alamos National Lab.

8    Q.   In New Mexico?

9    A.   Yes.

01:11   10   Q.   What was your job there, broadly speaking?

11   A.   I was a laboratory assistant.

12   Q.   Okay.  Are you familiar with the IT infrastructure of the

13   FBI?

14   A.   Yes, very much so.  For the past year I was an information

01:11   15   technology specialist with the Enterprise Security Operation

16   Center in the FBI.

17   Q.   You mentioned this Enterprise Security Operation Center, is

18   the acronym for that ESOC?

19   A.   Yes, sir.

01:12   20   Q.   What is ESOC?

21   A.   It is the network defense component for the FBI.  So

22   defending FBI IT infrastructure against external actors

23   attempting to compromise the networks, as well as potentially

24   malicious actors inside misusing that same infrastructure.

01:12   25   Q.   Okay.  drawing your attention to roughly October 2015 until

1  April of 2016, during that time period was it standard for FBI

2  special agents to be provided with a government-issued cellular

3  telephone?

4  A.  Yes.

01:12  5  Q.  Do these cell phones have the ability to send text messages?

6  A.  Yes.

7  Q.  What, if any, software was placed on these FBI-issued cell

8  phones before they're issued to the agents in order to retain

9  text message content?

01:12  10  A.  So the FBI uses a commercial off-the-shelf product called

11  Steel Talon to log a variety of datasets on the cell phones to

12  include text messages.

13  Q.  And when -- again, when is that text retention software

14  installed on the FBI cell phone?  Before the SA receives them?

01:13  15  A.  Yes.  So at the time that the phone is first being handed

16  out to anyone, a variety of different security software pieces

17  would be installed.

18  Q.  Okay.

19  A.  Including this one.

01:13  20  Q.  And so the software that's on the cell phone before the SA

21  receives it, who installs that software?

22  A.  Generally that's the field office information technology

23  specialist or specialists.

24  Q.  Okay.  What does the installation process require?  And when

01:13  25  I say that, I guess I'm asking:  Are there a series of precise

1    steps that need to be followed by the installer?

2    A.   Yes.   It's a fairly lengthy manual process.   Because as I

3    mentioned, there are several pieces of software that are

4    installed at any -- at that time.   So the process needs to be

01:13    5    followed very closely otherwise that can cause problems with the

6    log-in software.

7    Q.   So, a little more specifically, what effect could it have on

8    text retention if the installer doesn't follow this series of

9    steps precisely?

01:14    10    A.   It could immediately or over a period of time negatively

11    impact that logging software's capability to collect those text

12    messages.

13    Q.   And let's talk about when the software's functioning

14    100 percent.   What does the text message retention software do

01:14    15    with text message content?

16    A.   So, in general, what it does is it attempts to take a

17    snapshot of the text message at the time that it is either being

18    sent or received.   So it will add additional data, metadata

19    associated with the transit of that message, as well as attempt

01:14    20    to capture the body of the text message.

21    Q.   Okay.   And what, if anything, can negatively affect the

22    ability of the software to function properly?   We've already

23    discussed this precise installation process --

24    A.   Uh-huh.

01:15    25    Q.   What other -- what, if anything, else can negatively impact

1   that software?

2   A.  Well, it's important to understand that this piece of

3   software is an application on the phone.  So that means that the

4   hardware of the phone itself, sort of the most basic piece, if

01:15   5   there's a problem with its ability to send or receive data, that

6   can negatively impact the quality of the logging.

7           There is the phone operating system.  So, Android or,

8   you know, IOS -- in the FBI's case that's all Android, and that

9   sort of regulates how the phones are able to operate.  Then the

01:15   10   software itself and the way the pieces of software interact with

11   each other.  And then the logging software itself.

12          So there are multiple layers where if any of those

13   cause -- any of those layers cause a conflict, that can

14   negatively impact the logging software.

01:16   15   Q.  Has the software provider that provides this software that's

16   installed on the FBI phone, have they ever acknowledged bugs in

17   the software?

18   A.  Yes.  There were bugs -- there have been bugs, for example,

19   in the 2015-2016 timeframe as well.

01:16   20   Q.  What does the FBI's manual provisioning process and update

21   schedule, what does that mean?

22   A.  So essentially what that means is that every time there's a

23   new phone -- so be it a technology refresh, you know, moving to

24   a new generation of cell phone, reissuing a phone if someone

01:16   25   loses it, it's destroyed -- all of that requires that field

12

1    information technology specialist to go through that precise

2    series of steps in order to install that logging software and

3    make that phone able to access FBI information technology

4    resources.

01:17    5    Q.  What, if any, negative effect can software updates have on

6    the ability of the software to collect or transfer text messages

7    from an agent's phone?

8    A.  Quite a few.  The two main areas would be both the operating

9    system of the cell phone -- because that regulates how all other

01:17    10    pieces of software interact with that cell phone.

11    So the ability to make copies of text message content

12    is entirely inherent on the operating system allowing that.  If

13    there's an update and the way that the operating system

14    functions with that capability, that can cause a -- that can

01:17    15    negatively impact the logging software's ability to actually

16    collect that information until a new patch is developed and

17    deployed.  Same thing, for example, with the text message

18    generation software.

19    Q.  Okay.  Directing your attention again to this October 2015

01:18    20    until April 2016 time period, did Special Agent Jonathan Adkins

21    from the Milwaukee division, did his phone during that time

22    period have this text retention software installed on it?

23    A.  Yes, it did.

24    Q.  And was it installed on his phone prior to the fall of 2015?

01:18    25    A.  Yes, it appears to have been.

1    Q.  Okay.  Was there a retention gap on Special Agent Adkins'

2    FBI-issued phone during this October 2015 to April 2016 time

3    period?

4    A.  Yes, it appears that there was a gap in the logging.

01:18    5    Q.  What caused this gap?

6    A.  Unfortunately I don't have any specific knowledge of what

7    did.  Just as we had kind of gone over previously, there are

8    multiple possibilities of what could have caused that gap, be it

9    a fault in the provisioning process, network connectivity

01:18    10    errors, software updates, or even a bug in the software, the

11    logging software itself.

12    Q.  Okay.  What, if any, possibility is there that a special

13    agent could have prevented the retention of Special Agent

14    Adkins' text message via the software?

01:19    15    A.  Via the logging software there is no way that I know of that

16    an agent could influence that capability.

17    Q.  Is it physically even possible for Special Agent Adkins or

18    another agent to interact with the text retention software

19    that's on their cellular phone?

01:19    20    A.  No.  So it has multiple layers of protection, including the

21    inability to modify or uninstall that software.

22    Q.  And during this October 2015 to April 2016 time period, is

23    it -- was it physically possible for Special Agent Adkins or any

24    other special agent to disable the text retention software?

01:19    25    A.  No.  As I mentioned, the software itself is protected

1    through multiple layers.

2    Q.   One last question along that line.  Is it physically

3    possible for the special agent to not completely disable but

4    partially inhibit the software on their cellular phone?

01:20    5    A.   Not in any way that I'm aware of.

6    Q.   What, if any, outages did the FBI text retention system

7    experience?  And again, going back to this fall 2015 to spring

8    2016 time period.

9    A.   There were a decent percentage of the FBI cell phones

01:20    10    experienced --

11            MR. ALBEE:  I'm sorry, a what percentage?

12            THE WITNESS:  A decent percentage.  So a precise

13    number is still being determined, but the -- these phones

14    were -- had a complete or partial loss of that logging

01:20    15    capability during that time period.

16            MR. PTASHKIN:  Your Honor, I apologize, I would just

17    request that if Mr. Albee has a question for the witness he wait

18    till he's cross-examining the witness as opposed to asking him

19    directly during my examination.

01:21    20            THE COURT:  Well, he's not really asking him

21    questions.  He's just not hearing him clearly, just like

22    Mr. Schindhelm asked him to clear up something that he said.

23    And I don't think that's unfair for him to do that.

24            MR. PTASHKIN:  I apologize, Your Honor.

01:21    25    BY MR. PTASHKIN:

1    Q.  So were these outages 100 percent of this October-to-April

2    time period, or was it intermittent?

3    A.  It was intermittent.  Depending on, again, the factors that

4    influenced why that phone created the logging gaps in the first

01:21    5    place.

6    Q.  And does the FBI know what caused these outages or does it

7    relate to your earlier answer where it could have been any one

8    of those?

9    A.  Right, there was sort of a confluence of events during that

01:21    10    time period, and at that point there were any number of things

11    that could have impacted them.  So the outcome appears the same,

12    but the root causes can be very diverse.

13    Q.  Is there any -- does the FBI have any information that

14    Special Agent Adkins caused the nationwide outages?

01:22    15    A.  None whatsoever.

16    Q.  And could these retention outages, can they randomly stop

17    and start or is it always down for a specific amount of time?

18    A.  They can stop and restart again.  As the operating system

19    and softwares are being updated and changed, again, something

01:22    20    may stop for a period of time, restart, or just be stopped until

21    further notice.

22    Q.  And in 2015 and 2016, what, if any, warning did special

23    agents receive that these retention outages were occurring on

24    their cell phones?

01:22    25    A.  There was no warning that I'm aware of.

1    Q.  When the service providers for FBI cell phones -- whether

2    that's Sprint, Verizon, AT&T, or some other service provider,

3    when they update their operating system what if any effect could

4    that have on the text retention software the FBI installs on the

01:23    5    phones?

6    A.  Well, as I mentioned earlier, that is sort of the most basic

7    layer of software.  So that regulates how every other piece of

8    software on the phone operates.

9        So if -- you know, the -- if that operating system

01:23    10   update restricts the ability to access a piece of information,

11   it changes that format and that can cause other pieces of

12   software down the line to stop functioning in part or in whole.

13   Q.  With regard -- what is time-stamping for a text message?

14   A.  So that would -- essentially that would just mean that

01:23    15   whenever -- whichever piece of information is being generated

16   there is a stamp -- a time associated with that.  So some

17   providers will timestamp the send and receive times.  It could

18   also be failure times.  Time-stamping is sort of just

19   associating time with an event or a piece of information.

01:24    20   Q.  And so, not to get into the specifics of the differences

21   between the different providers, but just by way of example,

22   AT&T and Verizon and others providers, they have different

23   methods of how they time and date stamp their text messages and

24   phone calls; is that accurate?

01:24    25   A.  Uh-huh, yes.

17

1    Q.   In regards to phone calls, is the time-stamping, is the

2    length of the call, the way they measure the length of the call

3    and report it on their logs, is that different between service

4    providers too?

01:24    5    A.   That may be.  Again, the service providers are generally

6    logging that for billing purposes.  So the precise reasons why

7    they are creating timestamps would dictate sort of the accuracy

8    and when those begin and end.

9    Q.   Again, not specific to any one specific provider, but

01:24   10    Sprint, Verizon, AT&T, other cell phone providers, do some of

11    them time and date stamp their texts in a manner that differs

12    from the FBI's own internal time-stamping?

13    A.   Absolutely.  I mean, again, they are time-stamping this

14    information for their purposes.  The FBI's logging software is

01:25   15    time-stamping that at the point where it is either being

16    generated or something like that.  So the -- there could be very

17    distinct differences, within a couple seconds to a couple

18    minutes, depending on the purposes.

19    Q.   One last series of questions about cell service providers.

01:25   20          In regards to text messages.  When they give a log of

21    the text messages, do they sometimes break long text messages

22    into multiple messages in their call logs because of the length?

23    A.   Generally, so.  The general industry standard is 140

24    characters.

01:25   25    Q.   So I guess what that means is, if a text is over 140

1   characters in the service provider's log of texts, it's going to

2   appear as if it was more than one text message even though it

3   was only one text message.

4   A.   Precisely.  They generally do that for billing purposes.

5   01:26        MR. PTASHKIN:  Thanks so much again for being here

6   today, Mr. Baer.

7        No further questions at this time, Your Honor.

8        THE COURT:  Mr. Albee?

9        MR. ALBEE:  Yes.

10  01:26                    CROSS-EXAMINATION

11  BY MR. ALBEE:

12  Q.   You were speaking a little fast so I didn't catch.  I

13  understand you had a certain position from fall of 2015 until,

14  was it September 2016?

15  01:26 A.   So that position would have been inclusive of 2015, through

16  early 2017, with the -- where I was with the Intelligence and

17  the Risk Analysis Unit with the FBI.

18  Q.   All right.  And in that role, what responsibilities did you

19  have with regard to I guess looking at the collection of text

20  01:26 messages from FBI agents?

21  A.   So with that role there was no component of that.  But when

22  I was with the Enterprise Security Operation Center, or ESOC,

23  from 2017 through actually just a couple weeks ago, my job

24  was -- I was the program manager for the program that oversaw

25  01:27 data collections for the ESOC, which included text messages in

1    this case.

2    Q.   Okay.  And when were you first asked to get involved in this

3    case?

4    A.   Let's see.  This would have been a few months ago. I don't

01:27   5    know precisely when.

6    Q.   And at that time what were you asked to do?

7    A.   Simply discuss the FBI's text message collection

8    infrastructure as owned by the Enterprise Security Operations

9    Center, to give a full understanding of how that operates and

01:28   10   what might cause a text message to appear or not appear.

11   Q.   Were you asked to obtain Agent Adkins' texts?

12   A.   My program was, yes.

13   Q.   Your program was?

14   A.   Yes.  The Enterprise Security Operation Center was requested

01:28   15   to do that.

16   Q.   All right.  And when was that?

17   A.   I don't have the precise date, but that would have been mid

18   2018.

19   Q.   And your understanding is that somebody else was asked to

01:28   20   try to locate Agent Adkins' texts.

21   A.   Precisely.  There's a standard procedure for providing text

22   messages for discovery purposes.

23   Q.   Were you asked -- or I guess I should say was your program

24   asked to obtain texts for other agents relating to this

01:28   25   investigation?

1   A.   I believe so.

2   Q.   Are you able to tell me which agents those were or would you

3   have any documents that would tell us that?

4   A.   Yes.  The original discovery request probably would have

01:29   5   included that.

6   Q.   And do you have that?

7   A.   I do not, no.

8   Q.   And so what is your understanding as to what someone else in

9   your program did in terms of trying to search for Agent Adkins'

01:29   10   text messages?

11   A.   So these text messages are placed in a centralized database

12   where they are searched according to the parameters provided.

13   Most generally it will be a cell phone or a username, in which

14   case the -- and sometimes a date range as well.

01:29   15          So at that point all data matching those criteria are

16   provided to the requester, generally a local counsel for a field

17   office.

18   Q.   And do you know what was searched in this case?  Was it the

19   cell phone or the username, or what was it?

01:30   20   A.   I believe it was the cell phone.

21   Q.   Does it ever occur that these software glitches or problems

22   with the operating system, whatever causes the problem with

23   preservation, does that ever on occasion cause calls to not be

24   preserved under the right call -- right cell phone or username?

01:30   25   A.   So this would only be through the logging itself.  I'm not

1    aware of any circumstances where it would have the information

2    attached to a different user or username.

3    Q.  Would you be able to potentially find more information by

4    also searching for content or phone numbers?

01:30    5    A.  I'm sorry.  I don't quite understand.

6    Q.  So it sounds like you looked for texts associated with a

7    particular cell phone, or somebody in your program did, correct?

8    A.  Uh-huh, yes.

9    Q.  So could you also have searched for in this case Mr. Hamzeh,

01:31    10    Samy, could you have searched for his name, would that have

11    potentially located other texts that hadn't been I guess

12    downloaded in connection with the cell phone?

13    A.  I'm honestly not certain about that.

14    Q.  And you're not aware of any effort to try to search through

01:31    15    other -- looking to find other phone numbers or particular names

16    in this case, or the informants' or the agents' names, those

17    kind of things?

18    A.  I'm not aware of that, but that may have gone through the

19    standard procedures.

01:31    20    Q.  What did you review, Mr. Baer, in preparation for testifying

21    today?

22    A.  The FBI -- the ESOC's procedures for collecting these text

23    messages to ensure that I had a accurate understanding of the

24    process, as well as the -- double-checking the steps that the

01:32    25    ESOC took during this time period, before my departure.

22

1    Q.  Was there a report on that?

2    A.  No.

3    Q.  In what way did you double-check?

4    A.  I mean, so this would have been simply reviewing the emails

01:32   5    and what was provided for the text messages.

6            MR. ALBEE:  Your Honor, I'd move for production of the

7    items that Mr. Baer reviewed in preparation for his testimony.

8            MR. PTASHKIN:  Your Honor, I guess I'm -- so

9    essentially, we're talking about I guess an email request from a

01:33   10    field office to ESOC requesting that this search of the text

11    message retention system be done?  I mean, I guess I'm unclear

12    on what Mr. Albee wants us to produce.

13            THE COURT:  Yeah, it's not clear to me what exactly

14    you're asking for, Mr. Albee.

01:33   15            MR. ALBEE:  I'm sorry, Judge.

16            THE COURT:  It's not clear to me what you're asking

17    for.

18            MR. ALBEE:  So he reviewed at least the ESOC's

19    procedures for collecting or searching for these -- this

01:33   20    information, so we're moving for that.

21            And then the emails I think are relevant to when these

22    searches were undertaken and may contain other information.  But

23    he used them -- he did review them in preparation for his

24    testimony.

01:33   25            THE COURT:  All right.  Well, I will take it under

23

1    consideration.

2    BY MR. ALBEE:

3    Q.  And did you write any report about this matter, Mr. Baer?

4    A.  No.

01:34  5    Q.  And you're aware that there's a policy that requires FBI

6    agents to preserve text messages?

7    A.  Yes.

8    Q.  When did the FBI become aware of the problem preserving

9    text messages?

01:34  10   A.  This would have been in 2016, I believe.

11   Q.  Do you know what month in 2016?

12   A.  Unfortunately, I do not.

13   Q.  And has that problem been fixed?

14   A.  The FBI has been working on that and addressing that issue.

01:34  15   Q.  So it has not been --

16        MR. PTASHKIN:  Your Honor, objection.  Again, I'd

17   respectfully submit the scope of the hearing is fall of 2015 to

18   spring of 2016.  So what's going on in 2018 is irrelevant to the

19   scope of the hearing.

01:34  20        THE COURT:  Sustained.

21   BY MR. ALBEE:

22   Q.  You understand Mr. Adkins to have an Android phone?

23   A.  Yes.

24   Q.  When did the FBI begin using Android phones?

01:35  25   A.  This would have been 2014, I believe.

1    Q.  All right.  You had testified on direct to the effect that

2    Mr. Adkins had had some problems with his phone and the

3    preservation of the text messages?

4    A.  I mean, under the -- yes.  In the fact -- insofar as they

01:35    5    were not text messages that were captured between October 2015

6    and April 2016.

7    Q.  When were individual offices or agents told that there was a

8    problem capturing these text messages?

9    A.  I'm not aware of any specific communication to that.

01:36    10    Q.  Now, there are other ways to preserve text messages besides

11    through this system?

12    A.  I believe so, but I'm not aware of the specifics of that.

13    Q.  I mean, you could simply take a screen capture of your text

14    messages for one, correct?

01:36    15    A.  Unfortunately, the actual preservation of text messages is

16    not something I deal with.

17    Q.  You have a cell phone.  Right?

18    A.  Yes, sir.

19    Q.  And you know you can take a screen capture of your text

01:36    20    messages.

21    A.  Yes.

22    Q.  And so agents in the Milwaukee office presumably could have

23    done the same at the time, correct?

24    A.  Once again, I'm not a aware of any guidance about that.

01:37    25    Q.  They could have written a report where they verbatim

25

1    memorialized what was in the text messages, correct?

2    A.   Again, I'm not familiar with what the process is that would

3    have been involved in this.

4    Q.   Well, I mean, you know that you could look at a text message

01:37    5    and write down what it says and then it would be preserved what

6    information came through on that text, right?

7    A.   I mean, again, my -- yes, it is possible to write something

8    with a pen.

9    Q.   You could -- you're aware that for a period of time the

01:37    10    phone company maintains what text messages have been sent and

11    received, correct?

12    A.   Yes.

13    Q.   You could get those from the phone company too, right?

14    A.   I'm not aware of what precise circumstances are required to

01:37    15    get the text messages from phone companies.

16    Q.   You indicated that a decent percentage of phones were

17    afflicted with this problem?

18    A.   Uh-huh.

19    Q.   Yes?

01:38    20    A.   Yes.

21    Q.   Can you give me a percentage?

22    A.   The precise number is still being identified, but 10 percent

23    or greater.

24    Q.   So there is a significant number of text messages that are

01:38    25    being sent or received by FBI agents that aren't being preserved

26

1    as required by policy.

2              MR. PTASHKIN:  Objection.  It really calls for

3    speculation.  There hasn't been a foundation laid that this

4    witness knows anything about how agents nationwide are

01:38  5    preserving their text messages, outside of this text retention

6    system.

7              THE COURT:  Sustained.

8    BY MR. ALBEE:

9    Q.  If the agents are relying on this text retention system, a

01:38  10    significant amount of text messages aren't being preserved,

11    correct?

12              THE COURT:  At that time.

13              MR. ALBEE:  At that time.

14              THE WITNESS:  I'm not familiar with how they -- how

01:39  15    they would rely on that, on that system, but if the system is

16    not collecting something that text message would not be

17    collected by the system.

18    BY MR. ALBEE:

19    Q.  Are you aware of other ways in which agents at that time

01:39  20    were preserving their text messages?

21    A.  No, I'm not.

22    Q.  Was there some guidance from the agency as to what they

23    should be doing because their text retention system was not

24    working properly?

01:39  25    A.  I am not aware of any of that guidance.

1  Q.  Did the software problems also afflict the security of the

2  telephones?

3          MR. PTASHKIN:  Objection, Your Honor.  I'm not sure of

4  the relevance of the security of FBI's systems in regard to a

01:39  5  hearing on text retention and preservation.

6          MR. ALBEE:  I think it goes to what kind of response

7  the FBI had to these problems and when they were aware of them.

8          THE COURT:  Why is that relevant?

9          MR. ALBEE:  Well, I think in terms of -- I mean,

01:40  10  there's -- as Exhibit H indicates, there was a requirement that

11  these be preserved.  If the FBI is aware of problems and is

12  doing nothing to resolve those problems, that goes to their

13  violation of the policy and their failure to preserve evidence

14  in a criminal case.

01:40  15          THE COURT:  The objection is sustained.

16  BY MR. ALBEE:

17  Q.  All right.  Did you or anyone with your program make an

18  effort to obtain Mr. Adkins' phones?

19  A.  I or my program, I am not aware of any attempts to obtain

01:40  20  his phone.

21  Q.  All right.  And you're aware that information including

22  texts can be obtained from the phone directly, true?

23  A.  Yes.

24  Q.  Cellebrite is one program that's often used to obtain text

01:40  25  messages?

28

1    A.   Yes, Cellebrite is one program used.

2    Q.   And you have no knowledge of anybody trying to do that with

3    Agent Adkins' phone.

4    A.   My complete -- my intersection with this case has been

01:41    5    solely about the FBI's logging system and infrastructure, so I

6    am not aware of anything.

7    Q.   Would there be other methods for trying to obtain the text

8    messages that appear not to have been preserved that weren't

9    utilized in this case?

01:41    10    A.   Again, I don't know what was or what is possible in this

11    case.

12    Q.   Okay.  I mean, let's say that the agency was aware that a

13    text message was of enormous importance, either for a

14    prosecution or for a life-and-death matter, and you weren't

01:41    15    finding the texts or it appeared to have been not preserved for

16    the same reasons as is in Mr. Adkins' case.  What additional

17    steps would the FBI take to try to find that crucial text?

18          MR. PTASHKIN:  Your Honor, objection.  This question

19    strikes me as being asked and answered, and it also calls for --

01:42    20    somewhat calls for speculation on Mr. Baer's part.

21          THE COURT:  Overruled.

22          THE WITNESS:  I'm sorry, sir, can you please repeat

23    that question?

24    BY MR. ALBEE:

01:42    25    Q.   Yeah.  If this text was deemed absolutely crucial by the

29

1    FBI, whether it would prove a case or it was a life-and-death

2    matter and you really needed to find a past text, what other

3    steps could be taken?

4    A.   So from the -- again, this is outside of my wheelhouse, but

01:42  5  contacting the service provider, for one.

6          And, yeah, I mean, unfortunately, the process of

7    actually collecting the text messages outside of the system is

8    not something that I have any real understanding of insofar as

9    the FBI's capabilities or procedures.

01:43  10  Q.   Okay.  And I'm not trying to be critical, you're not the guy

11   that they would go to to see how to try to find that text

12   through a different method.

13   A.   Correct.  Correct.

14   Q.   I presume you and probably everybody else in the FBI is

01:43  15  familiar with the situation with Special Agent Strzok and Lisa

16   Page?

17   A.   A little bit, yes.

18   Q.   And you're aware that in that case there were tens of

19   thousands of missing texts.  That was widely reported, correct?

01:43  20  A.   I have seen the news, yes.

21   Q.   All right.  And after that was reported then a number of

22   texts were actually recovered, right?

23   A.   Um, I believe so, yes.

24   Q.   The Office of the Inspector General was able to obtain many

01:44  25  of the missing texts.

30

1    A.  Uh-huh.

2    Q.  Yes?

3    A.  Yes, I believe that was what happened in this case.

4    Q.  All right.  How were those texts recovered in that case?

01:44   5    A.  My understanding is that they contacted an outside party to

6    collect the information.  But again, I was not specifically

7    involved with the recovery of those text messages.

8    Q.  So your understanding is that there were additional methods

9    that an outside party was able to bring to bear to find the

01:44   10   texts.

11   A.  Again, this would be only through what I've seen through the

12   news.

13   Q.  And in this case no one contacted an outside party to try to

14   locate Agent Adkins' missing texts or the missing texts of the

01:44   15   other agents in this investigation.

16   A.  Once again, that is not anything that I have any insight

17   into.

18   Q.  As far as you know, nobody did make a contact to an outside

19   agency here.

01:45   20   A.  I'm sorry.

21          MR. PTASHKIN:  Objection.  Asked and answered.

22          THE COURT:  Sustained.

23   BY MR. ALBEE:

24   Q.  Were you asked to look for any emails for Agent Adkins or

01:45   25   the other agents in this case?

1    A.  That would have gone through the standard discovery

2    procedure, which the ESOC does not handle the email portion of

3    discovery.

4    Q.  Who does handle the email?

01:45    5    A.  I believe the Office of General Counsel.

6    Q.  Is it your understanding all those emails are preserved or

7    supposed to be preserved just as texts are?

8            MR. PTASHKIN:  Your Honor, objection.  There's been no

9    foundation laid that this is within an IT specialist's area of

01:46    10   expertise.  This sounds like a question for FBI General

11   Counsel's office almost.

12           THE COURT:  He's asking for his knowledge.  Maybe he

13   doesn't have any, but -- overruled.

14           THE WITNESS:  I'm sorry, sir, could you please repeat

01:46    15   that question?

16   BY MR. ALBEE:

17   Q.  Sure.  Is it your understanding that the Office of General

18   Counsel then would preserve text messages -- preserve emails --

19   or attempt to preserve emails just as your former program would

01:46    20   attempt to preserve text messages?

21   A.  I believe that they would try to acquire the communications.

22   But the preservation of that, I don't have any specific

23   knowledge into the ways and means of emails.

24   Q.  Did your program -- or any other program to your

01:46    25   knowledge -- make any effort to examine individual agents'

32

1    phones to try to determine the source of the problem?

2    A.   My program did not.  However, the -- I'm not aware of what

3    other programs in the FBI may have done.

4    Q.   Had you heard of those efforts being undertaken to try to

01:47    5    solve the issue here?

6    A.   Again, I'm not familiar with what would have been done

7    specifically.

8    Q.   Setting aside whether the actual text message is preserved,

9    is there a log that's maintained or available showing how many

01:47    10   text messages that agent sent or received?

11   A.   Again, the specific logging that I would be aware of -- I'm

12   aware of would be the software that in this case failed to

13   collect those text messages.  So, again, the specific logging

14   for this wouldn't have shown whether a text message was sent or

01:48    15   received.

16   Q.   Your office wouldn't have available to it if the -- if there

17   was the software glitch -- a list of the texting that occurred

18   from, in this instance, Agent Adkins.

19   A.   Again, if it's -- the software is failing it's not providing

01:48    20   that information.

21   Q.   And do you know whether texts are maintained for task force

22   agents who aren't employees of the FBI?

23   A.   It would depend on if they are provided an FBI-issued cell

24   phone.

01:49    25            And I should clarify that that would be through my

33

1   former program, whether they're preserved in that manner.

2   Q.  You were asked a few questions about differences in

3   timestamps.

4   A.  Uh-huh.

01:49  5   Q.  Could you explain to me what you're talking about?

6   A.  Essentially, that depending on what piece of software is

7   generating the timestamp, those can have a -- they can show

8   different times.

9           So essentially, if you have different pieces of

01:49  10  software they may be using slightly different clocks or slightly

11  different begin and end points to actually generate those

12  timestamps.  So you can end up having discrepancies between two

13  different pieces of -- two different datasets when describing

14  the same thing.

01:49  15  Q.  And you have no reason to question the records maintained by

16  these different telephone companies, Verizon, AT&T, Sprint?

17  A.  I mean, again, the -- I'm not aware of the specific criteria

18  that they use for generating the timestamp, but I do not have

19  any reason to question the accuracy of that timestamp.

01:50  20  Q.  And if there are these discrepancies, you said -- you gave

21  the example of a couple seconds to a couple minutes.

22  A.  Generally so, yes.

23  Q.  And with a phone call, you might have an instance where if

24  somebody put down the time of the phone call its beginning and

01:50  25  someone else put down its end, you would definitely have a

1  discrepancy there, correct?

2  A.  Yes.  I mean --

3  Q.  That would be -- there would be either no discrepancy or

4  less significant discrepancy when it came to text messages.

01:50   5  A.  Potentially so.  I mean, again, it depends on what the

6  specific criteria are involved with generating that timestamp.

7            MR. ALBEE:  That's all.

8            THE COURT:  Before you ask follow-up, Mr. Ptashkin,

9  let me ask Agent Baer a couple questions.

01:51   10                    EXAMINATION

11  BY THE COURT:

12  Q.  This logging software that you indicated had to be installed

13  properly and there was a procedure that if it wasn't installed

14  properly it could create problems, have you personally ever

01:52   15  installed the logging software?

16  A.  No, I have not.

17  Q.  Do you know the steps that are involved in installing the

18  logging software?

19  A.  At a high level I'm aware of the steps, yes.

01:52   20  Q.  What do you know at the level that you're familiar with?

21  A.  I've gone through the process.  Essentially the ITS -- the

22  information technology specialist involved would take the phone,

23  install the security software, logging software, and then begin

24  linking that phone to different FBI databases and ability to,

01:52   25  say, connect to email.

1    Q.  Okay.  And if -- where is the potential for that person to

2    do it incorrectly?

3    A.  Well, so the security software itself restricts how other

4    pieces of software can request information from the cell phone.

01:53  5         So if the logging software is installed in an improper

6    sequence with the security software, the security software can

7    actually create blocks in the logging software's ability to

8    access information on that phone.

9    Q.  So what problems does that create?

01:53  10   A.  So what that can create is either a complete failure to

11   collect information, or over time as the -- that can also create

12   a buildup effect as different pieces of that software become

13   disconnected from their normal function.

14   Q.  Okay.

01:53  15         THE COURT:  Mr. Ptashkin?

16         MR. PTASHKIN:  Thank you, Your Honor.

17                   REDIRECT EXAMINATION

18   BY MR. PTASHKIN:

19   Q.  Just a few quick questions.

01:53  20        So ESOC was not able to recover -- there was a

21   retention gap and thus ESOC was not able to recover some of

22   Special Agent Adkins' text messages from the text retention

23   system.

24   A.  Correct.

01:54  25   Q.  So if the text messages were not able to be recovered

1  because they were never stored in the system, that means any

2  hypothetical search that is -- could have happened by say the

3  defendants' name or something, it can't find messages that were

4  never stored in the system to begin with.

01:54  5  A.  That is actually very correct in that if the text messages

6  were not being collected and sent by the phones, then that

7  information would not have made it into the system.

8  Q.  Is there anything ESOC could have done to find these -- the

9  messages that were not retained by the software for Special

01:54  10  Agent Adkins that hasn't been done?

11  A.  I mean, again, the software -- the software collects what it

12  collects.  And at the point where it is collected and stored,

13  you know, at that point we have a high confidence that what has

14  been collected and stored is accurate from that collection.  But

01:55  15  if there were gaps for any phone sending that information, that

16  simply would not have made its way into the system.

17  Q.  Is Cellebrite one of the standard tools for doing a forensic

18  exam on a cell phone?

19  A.  Yes.  Cellebrite is considered to be kind of the standard in

01:55  20  many cases.

21  Q.  Do you know if service providers sometimes timestamp things

22  using different time zones?

23  A.  I know that they can.  But, again, the specifics of what

24  dataset is actually being requested is actually something that I

01:55  25  don't know in that case.

Q.  Okay.  And so -- one last question.  What's your level of

certainty that between October 2015—April 2016 Special Agent

Adkins was not able to disable the text retention software on

his phone?

01:56   A.  Very confident.

MR. PTASHKIN:  Thanks so much again for being here

today.  No further questions, Your Honor.

THE COURT:  Mr. Albee, anything else?

RECROSS-EXAMINATION

01:56   BY MR. ALBEE:

Q.  Mr. Baer, you were just asked whether there was anything

else ESOC could have done, right?  Do you remember that

question?

A.  Well, yes.  Anything else that my program could have done,

01:56   yes.

Q.  But as you indicated in the Strzok case, somebody else was

contacted to take a look at the records in those cases, right?

In that case?

A.  That would have been a matter of the FBI, IB, DOJ, OIG in

01:56   that instance.

Q.  And as a result of that referral, additional texts were

obtained, correct?

A.  That's my understanding, yes.

Q.  Presumably there could have been a referral in this case as

01:56   well to have somebody with more insight to look for the texts.

38

1  A.  I'm not aware of what precisely would have been required in

2  that case.

3  Q.  If phone records are stamped or are -- I guess if the

4  records relate to one particular time zone, it's not too

01:57  5  difficult to convert them to another time zone that's relevant?

6  Correct?

7  A.  (No response.)

8  Q.  I mean, if you have a Greenwich Mean Time record, you can

9  figure out how many hours to deduct to have it be Eastern Time,

01:57  10  Central Time, Mountain Time or Pacific Time.

11  A.  Yes.  I mean, dealing with time zones is something that

12  could be done, yes.

13  Q.  And I apologize if I've asked this, but Mr. Bugni thinks I

14  did not.  Did you determine whether the glitch affected the

01:57  15  other agents' phones who have missing texts?

16  A.  In this case the precise reasons for anything are something

17  that we don't understand.  Or I should say we understand sort of

18  the spectrum of what could occur on FBI cell phones in general,

19  but whether a specific phone is exhibiting a logging gap is not

01:58  20  something that is readily apparent because it appears the exact

21  same as if a phone is turned off as a logging gap.

22  Q.  And I take it that if there was a software glitch that

23  affected the phone and was preventing texts from being

24  preserved, that that would either apply to all texts at the time

01:59  25  or none of the texts during the relevant time?

39

1    A.    That is actually not the case in the sense that as I

2    described earlier it can be an intermittent problem.  So you can

3    actually have very short-term gaps, for example, in an area of

4    poor cell reception.  Or, you know, a variety of other issues

01:59    5    can cause a very short-term or very long-term gap.

6    Q.    I take it though there'd be no reason why if I texted you 10

7    times and I texted Mr. Ptashkin 10 times, that only my texts to

8    you would be preserved and not the ones to Mr. Ptashkin.

9    A.    Again, without knowing the specifics of what was going on

02:00    10    with the logging at that time, I couldn't say.  But there are

11    conceivably reasons why that would happen, again, depending on

12    geographic location of different people, the status of their

13    logging software, et cetera.

14    Q.    Well, if I'm the one sending the texts, it would -- the --

02:00    15    it would relate to my phone, correct?  The records would relate

16    to my phone.

17    A.    Yes.

18    Q.    And so if I sent Mr. Ptashkin a text right now and you a

19    text right now --

02:00    20         MR. PTASHKIN:  Your Honor, objection because the

21    question is asking for speculation about something that's

22    physically impossible.  A phone can't send texts to two people

23    simultaneously.  And the agent -- Mr. Baer's already testified

24    this is intermittent so it could affect one text message and

02:00    25    then not affect the text message that was sent directly after

40

1    it.

2            THE COURT:  Overruled.

3    BY MR. ALBEE:

4    Q.  So maybe I don't mean exactly simultaneously.  But, you

02:01  5    know, if I sent you one right now, immediately after sending it

6    to Mr. Ptashkin, immediately after that sent you one,

7    immediately after that sent to Mr. Ptashkin.  There would be no

8    good reason why the ones to you would be preserved and the ones

9    to Mr. Ptashkin would not.  And they all happened within a

02:01  10   10-second period of time and I'm at this location the whole

11   time.

12   A.  Yeah, I mean, unfortunately, without knowing the specifics I

13   couldn't answer that definitively.

14            MR. ALBEE:  That's all.  Thank you.

02:01  15           THE WITNESS:  Thank you.

16            THE COURT:  Is that it?

17            MR. PTASHKIN:  I guess one other question.

18                    FURTHER REDIRECT EXAMINATION

19   BY MR. PTASHKIN:

02:01  20   Q.  Mr. Albee asked you questions about these text message

21   recovery that are -- I guess newspapers have reported are

22   related to the current events and a couple specific agents,

23   right?

24   A.  Uh-huh.

02:01  25   Q.  You indicated earlier your entire knowledge of that recovery

1    process is based on newspaper reports, right?

2    A.  So my program is at the periphery; however, the DOJ Office

3    of Inspector General was the component that performed the text

4    message recovery efforts in this case.  In that case I should

02:02    5    say.

6    Q.  And so you weren't involved in that.

7    A.  I did not work on collecting or finding those text messages.

8            MR. PTASHKIN:  No further questions.  Thank you.

9                    FURTHER RECROSS-EXAMINATION

02:02    10    BY MR. ALBEE:

11    Q.  Well, and for that matter you didn't personally collect the

12    text messages or try to collect the text messages in this case,

13    correct?

14    A.  Correct.  I was not involved in that either.

02:02    15    Q.  In each case you're relying on -- to give your statement

16    you're relying on information you heard from someone else.

17    A.  Yes.

18            MR. ALBEE:  Thank you.

19            THE COURT:  All right.  Thank you.

02:02    20            THE WITNESS:  Yes, sir.

21            THE COURT:  You can step down.

22            (Witness excused at 2:02 p.m.)

23            THE COURT:  Mr. Ptashkin?

24            MR. PTASHKIN:  Your Honor, the United States now calls

02:02    25    Special Agent Neil Lee.

42

1          THE CLERK:  Please raise your right hand.

2           NEIL LEE, GOVERNMENT WITNESS, DULY SWORN

3          THE CLERK:  Please state your full name and spell it

4     for the record.

5          THE WITNESS:  Neil Lee, N-e-i-l, L-e-e.

6          THE COURT:  You may be seated.

7          THE WITNESS:  Thank you.

8                      DIRECT EXAMINATION

9     BY MR. PTASHKIN:

10    Q.  Thank you for being here today, Mr. Lee.  Where do you

11    currently work?

12    A.  I work for the FBI in Milwaukee.

13    Q.  What's your position with the FBI?

14    A.  I'm a special agent and I'm a CART forensic examiner.  CART

15    stands for Computer Analysis Response Team.

16    Q.  Broadly speaking, what's your -- what are your job

17    responsibilities as a CART examiner?

18    A.  I review digital evidence, mainly computers, cell phones,

19    tablets.  Things of that nature.

20    Q.  What's the length of time you've worked at the FBI?

21    A.  Just over 11 years.

22    Q.  What types of crimes have you examined in those --

23    decade-plus?

24    A.  I've worked gangs and drugs, cyber matters, and now CART.

25    Q.  Broadly speaking, what types of cyber matters have you

43

1    investigated?

2    A.   Computer intrusion, internet fraud.

3    Q.   To a layman like me, what is a forensic exam of a cell

4    phone?

02:04    5    A.   So we take a cell phone and we extract the data from the

6    cell phone in a forensically sound manner.

7    Q.   And is a physical examination kind of a synonym for forensic

8    exam?

9    A.   It's one type, yes.

02:05    10    Q.   Ballpark, not precise, what's the number of phones or

11    computers you have performed a forensic exam on over the course

12    of your decade-plus, approximately?

13    A.   Approximately hundreds.  Maybe thousands.

14    Q.   Directing your attention to the summer of 2018, did you

02:05    15    receive a request to do a forensic examination on a FBI-issued

16    cell phone that previously belonged to Special Agent Jonathan

17    Adkins?

18    A.   Yes, I did.

19    Q.   How did you receive the phone?

02:05    20    A.   I received it via FedEx from our headquarters office.

21    Q.   Headquarters in DC?

22    A.   Yes, Washington, DC.

23    Q.   Did you attempt to recover text messages off of Special

24    Agent Adkins' government-issued phone?

02:05    25    A.   Yes, I did.

44

1    Q.   What type of exam did you perform on the phone?

2    A.   I attempted a physical extraction on the phone.

3    Q.   Were you able to recover -- what were you able to recover

4    from the physical extraction?

02:06    5    A.   I was not able to recover anything from the physical

6    extraction.

7    Q.   And that includes you weren't able to recover any text

8    messages.

9    A.   Yes, that's correct.

02:06    10   Q.   What type of physical extraction tool did you use to do

11   this?

12   A.   In this particular case it was Cellebrite UFED.

13   Q.   Is that one of the standard tools the FBI uses to perform

14   physical extractions?

02:06    15   A.   Yes.

16   Q.   And is that a tool you regularly used over the course of

17   your career?

18   A.   Yes.

19   Q.   What is a factory reset?

02:06    20   A.   It's a setting on your phone that once you enable it it

21   resets the phone to the state that it was once it left the

22   original manufacturing location.

23   Q.   And so when a factory reset occurs does that essentially

24   take all the data that had been put on the phone and erase it?

02:07    25   A.   It makes it unrecoverable because it's getting it ready for

1    the next user.

2    Q.   What if any other procedure technologies could you have used

3    to attempt to recover text messages from Special Agent Adkins'

4    phone?

02:07  5    A.   As far as in this situation I've tried every tool or

6    technique that I'm aware of that could recover text messages on

7    the phone.

8    Q.   When an FBI special agent gets a new phone -- I mean a new

9    model of the same phone or a new phone for any reason, what

02:07  10   typically happens to the old cell phone?

11   A.   It's common for the phone that's being turned in to be

12   factory reset for security reasons.

13        MR. PTASHKIN:   Thank you so much for being here,

14   Special Agent Lee.

02:08  15        No further questions at this time, Your Honor.

16        THE COURT:   Mr. Albee?

17                      CROSS-EXAMINATION

18   BY MR. ALBEE:

19   Q.   Good afternoon.

02:08  20   A.   Good afternoon.

21   Q.   When is it that you were asked to conduct this forensic

22   examination of Agent Adkins' cell phone?

23   A.   I believe it was in the May-June timeframe of this past

24   year, 2018.

02:08  25   Q.   And you said you received it -- it was delivered to you from

1  DC, the DC office.

2  A.  Yes, that's correct.

3  Q.  And I take it it was in DC because Mr. Adkins had stopped

4  using that phone at some time in the past.

02:08  5  A.  I couldn't say.  I don't know what -- where it was before

6  that.

7  Q.  All right.  I mean, when it was in DC before it came to you,

8  Agent Adkins wasn't using it at that time, correct?

9  A.  Correct.

02:09  10  Q.  And do you know when he stopped using that phone?

11  A.  I don't.

12  Q.  I presume that like with all government agencies there's a

13  lot of recordkeeping when people -- when FBI personnel get new

14  equipment like a cell phone?  Are records kept of that?

02:09  15  A.  Is your question are there records when an agent gets a new

16  phone or turns in --

17  Q.  Correct.  I'll start with when an agent gets a new phone.

18  Is there a record created of that?

19  A.  I don't know for sure.  I couldn't say positively.

02:09  20  Q.  Do you have an FBI-issued cell phone?

21  A.  Yes, I do.

22  Q.  And there are requirements for you to maintain good care of

23  that cell phone?

24  A.  Yes.

02:10  25  Q.  I mean, and at some point you're expected to turn that phone

47

1   in, correct?

2   A.  Yes.

3   Q.  And they'll maintain an inventory of when you received the

4   phone and when you turned it in, right?

02:10   5   A.  Yes.

6   Q.  And that would be true for Agent Adkins presumably -- Adkins

7   as well, too.

8   A.  I would believe so, yes.

9   Q.  And so can you tell me when he turned in that phone that you

02:10   10   received and examined?

11   A.  I don't know.

12   Q.  Is that information you're able to obtain?

13   A.  That's not information that I would have.

14   Q.  All right.  And it was your understanding that the phone you

02:10   15   examined had been subject to a factory reset?

16   A.  Yes.

17   Q.  And is that something you were -- that you're able to

18   determine through Cellebrite and looking at the phone?

19   A.  Yes.

02:11   20   Q.  Had you also been told that?

21   A.  I discussed it with our folks who handle our cell phones.

22   Q.  And they told you it had been subject to a factory reset?

23   A.  Yes.

24   Q.  Now, you're aware that it's FBI policy to preserve all text

02:11   25   messages with witnesses?

48

1    A.  Yes.

2    Q.  And this is supposed to happen automatically?

3    A.  That I don't know.

4    Q.  One way in which you could preserve text messages is by

02:11  5    doing screenshots?

6    A.  That's a possibility, yes.

7    Q.  Do you know whether the phone company keeps records for a

8    time of the content of text messages?

9    A.  That I don't know.

02:11  10   Q.  An agent also could write down or memorialize in some other

11   fashion exactly what text messages he's received from a

12   particular witness, correct?

13   A.  Yes.

14   Q.  Are there other ways in which text messages could be

02:12  15   preserved?

16   A.  I'm sure there are.  Yep.

17   Q.  Were you asked to examine the cell phone for Agent Fraser?

18   A.  No, I was not.

19   Q.  Were you asked to examine the phone of Agent Zuraw?

02:12  20   A.  Yes.

21   Q.  And are you the one that produced the Cellebrite report in

22   this case?

23   A.  I would have to -- which Cellebrite report are you referring

24   to?

02:13  25   Q.  Let me show you what's been marked as Exhibit C.  And I'll

49

1    invite your attention to the back of the exhibit to the area

2    labeled, "Extraction Report."  Just take a glance at that.

3                (Witness peruses documents.)

4    A.  This report doesn't look familiar to me.

02:14    5    BY MR. ALBEE:

6    Q.  Okay.  And can you tell me why it doesn't look familiar to

7    you?  Or what looks different from the Cellebrite report that

8    you might have prepared in this case?

9    A.  So this does look like a Cellebrite report.  I don't believe

02:14    10    this was a report I did though.

11    Q.  And why not?

12    A.  Because it doesn't look familiar to me.

13    Q.  What would be different on the report that you prepared as

14    you recall it?

02:14    15    A.  Usually on reports that I generate there is usually a cover

16    page where there is a spot for the examiner name, and I don't

17    see that here.

18                MR. ALBEE:  Your Honor, if I could just have a moment

19    to talk to counsel.

02:15    20                THE COURT:  Go ahead.

21                (Counsel confer.)

22    BY MR. ALBEE:

23    Q.  You did prepare a Cellebrite report of your examination of

24    Agent Zuraw's phone?

02:15    25    A.  So, to answer your question, I don't believe I generated

1   this report and I don't believe I examined -- this was a result

2   of my examination.

3   Q.  I'm sorry, I don't understand what you're saying.

4   A.  So you asked me earlier if I examined Agent Zuraw's phone?

5   Q.  Yeah.

6   A.  I believe not only did I examine Agent Zuraw's phone, but I

7   also believe one of my colleagues examined and I believe this

8   was the report from that examination.

9   Q.  Okay.  And who is the colleague who examined the phone?

10  A.  I believe it was Special Agent Matthew Peterson, who is no

11  longer with the FBI.

12  Q.  All right.  And then you did your own Cellebrite

13  examination.

14  A.  I did not.  I was asked to review the extraction that he had

15  conducted, Special Agent Peterson had conducted, and make

16  available all the text messages to make sure that everything was

17  indeed provided.

18  Q.  Well, just so I'm clear, is there another report that you

19  put together or not?

20  A.  There was another report I generated I wanna say a couple

21  days ago, but I'm not sure if it was related to this matter, for

22  Agent Zuraw's phone.

23  Q.  Were there any other phones you were asked to examine in

24  connection with this case for any other agents?

25  A.  No.

1    Q.   All right.  I think the agents would be Fraser, Buono

2    Simmons -- and what's the other?  Mosback.

3    A.   No.

4    Q.   And when was it that you reviewed Special Agent Peterson's

5    work on the Zuraw phone?

6    A.   This past week.

7    Q.   Were you able to tell when the factory reset had occurred?

8    A.   For --

9    Q.   For Agent Adkins' phone?

10   A.   I was not, no.

11   Q.   And why wouldn't you be able to make that determination?

12   A.   There aren't any artifacts for me to make that

13   determination.

14   Q.   On the Cellebrite report that was prepared with respect to

02:19   15   Agent Zuraw's phone, is it your understanding that these texts

16   were still on the phone?  That is, were these deleted texts or

17   not deleted or not --

18   A.   I couldn't say based off of this report alone.

19   Q.   Do you recall from your review of the information from

02:19   20   Agent Peterson?

21   A.   Based on my review I would -- it did not -- I do not recall

22   them being deleted.  I believe they were still active.

23   Q.   This Cellebrite report shows a couple hundred texts relating

24   to CHS-1.  There was also a CHS-2 in this case.  Would there be

02:20   25   any reason why Cellebrite would capture only the texts from

52

1    CHS-1 and not CHS-2?

2    A.   Without knowing more of the facts I would be speculating.

3    Q.   And as far as you know, is Agent Zuraw's phone still

4    available to determine whether there are texts to CHS-2?

02:20   5    A.   I believe so.

6    Q.   Were you asked to look whether there were any texts between

7    agents themselves?

8    A.   I don't believe I was.

9    Q.   I assume that the FBI could get phone records for its agents

02:21   10   from the telephone company as with any other phone?

11   A.   I would believe so.  I'm not 100 percent certain.  I would

12   think so.

13   Q.   And are you aware of any effort to do that in this case, to

14   determine how many text messages were made from the agents?

02:21   15   A.   I don't know for sure.

16   Q.   Are emails from FBI agents or to FBI agents preserved?

17   A.   I believe so, yes.

18   Q.   Were you asked to recover emails in this case?

19   A.   I was not, no.

02:21   20   Q.   Do you know, is that phone for Agent Zuraw, is that

21   FBI-issued?

22   A.   I don't believe it is.

23   Q.   Just one last question, I think.  How long do agents usually

24   have their phones, or is there a usually?

02:22   25   A.   It varies depending on the technology of the phone.  There's

53

1    no set time period.

2    Q.  It's not like you get a replacement every year or every two

3    years, something like that?

4    A.  I believe it's worked out to be about every couple years,

02:22    5    but I don't believe it's set that way.  I think it's depending

6    on the technology that comes out and the needs of the bureau as

7    far as what's been researched for security purposes.

8    Q.  And I guess I do have one more question.  The Cellebrite

9    analysis you did earlier this week relating to Agent Zuraw's

02:23    10    phone, I take it you still have that information available if it

11    does relate to this case so that it could be produced?

12    A.  Yes.

13                MR. ALBEE:  Thank you.

14                MR. PTASHKIN:  No further questions, Your Honor.

02:23    15                THE COURT:  Mr. Albee, you're done as well?

16                MR. ALBEE:  Yes.

17                THE COURT:  All right.  Thank you, sir.  You can step

18    down.

19                THE WITNESS:  Thank you, sir.

02:23    20                (Witness excused at 2:23 p.m.)

21                THE COURT:  The government can call its next witness.

22                MR. PTASHKIN:  Intelligence for one minute,

23    Your Honor.

24                THE COURT:  No problem.

02:23    25                (Brief pause.)

1     MR. PTASHKIN:  Your Honor, at this time that concludes

2  the government's witnesses for this hearing.

3           THE COURT:  All right.  Mr. Albee?

4           MR. ALBEE:  We'd like to call Agent Adkins.

02:24   5           THE COURT:  Okay.

6        JONATHAN ADKINS, GOVERNMENT WITNESS, DULY SWORN

7           THE CLERK:  Please state your full name and spell it

8  for the record.

9           THE WITNESS:  Jonathan Todd Adkins, J-o-n-a-t-h-a-n,

02:25  10  T-o-d-d, A-d-k-i-n-s.

11           THE COURT:  Have a seat.

12           THE WITNESS:  Thank you.

13                       DIRECT EXAMINATION

14  BY MR. ALBEE:

02:25  15  Q.  Good afternoon.

16  A.  Good afternoon.

17  Q.  Mr. Adkins, what do you do for a living?

18  A.  I'm an FBI agent.

19  Q.  And you're in the Milwaukee office?

02:25  20  A.  I am.

21  Q.  How long have you been in the Milwaukee office?

22  A.  Since 2012.

23  Q.  And you're involved in the investigation of Samy Hamzeh?

24  A.  That's correct.

02:25  25  Q.  Were you considered the lead case agent?

55

1    A.   Yes.

2    Q.   That is, the other agents in the case reported to you or

3    took your directions in this case?

4    A.   I'd like to think of myself as the co-case agent.  There

02:25  5    were two of us that were lead agents.

6    Q.   And who was the other co-case agent?

7    A.   Joe Zuraw.

8    Q.   And he's not an FBI agent; is that right?

9    A.   That's correct.

02:26  10   Q.   Who does he work for?

11   A.   He works for Customs and Border Protection.

12   Q.   All right.  And so in this case you also -- as co-case agent

13   you reviewed the work of others in the case?

14   A.   I did.

02:26  15   Q.   You reviewed their reports?

16   A.   I did.

17   Q.   Did you have occasion to review their text messages?

18   A.   I did not.

19   Q.   Have you reviewed their text messages at any time?

02:26  20   A.   No.

21   Q.   And did you give instructions to the agents about this

22   investigation?

23   A.   What do you mean by "instructions"?

24   Q.   During -- I presume that during the course of the

02:26  25   investigation you gave them instructions as to what you wanted

56

1   them to do, what you didn't want them to do, what they could not

2   do.

3   A.  That's correct.

4   Q.  Did you give them instructions about text messages?

5   A.  No.

6   Q.  Did you give the informants in this case instructions about

7   text messages?

8   A.  Yes.

9   Q.  And what were the instructions you gave the informants in

10  this case?

11  A.  That we were not to do any substantive case conversations

12  via texts; that it was all to be in person.

13  Q.  And did you convey those instructions to the fellow agents

14  who were working on the case?

15  A.  That's correct.

16  Q.  And you say you haven't reviewed the texts so you don't know

17  whether those instructions were violated or not.

18  A.  That's correct.

19  Q.  You're aware that text messages between witnesses or

20  prospective witnesses and agents are required to be preserved?

21  A.  That's correct.

22  Q.  You had -- have you seen the list of text messages that you

23  had with -- we'll call him CHS-2, we'll call him Mike -- have

24  you seen the list prepared by the defense of the number of text

25  messages you had with Mike?

1  A.   I have reviewed that list.

2  Q.   Does that number of text messages during that period of time

3  seem consistent with what you remember at the time?

4  A.   Yeah, I would say so.  I've reviewed them and it's

02:28  5  consistent with how I operate when I operate with an informant.

6  Q.   Okay.  It's not as though you felt like I never texted with

7  him or I texted with him many more times than that.  This seems

8  relatively consistent with the record?

9  A.   It is.

02:28  10  Q.   All right.  And you're aware that a number of your text

11  messages were not preserved despite the policy requiring

12  preservation.

13  A.   I am aware of that.

14  Q.   And when did you learn that your texts were not preserved?

02:29  15  A.   Sometime after we received the results back.  I was the one

16  that actually initially requested all the text messages.  And

17  when we got the request back, found that there was a gap in the

18  text messages and realized that all of mine weren't there.

19  Q.   Do you remember when you made that request?

02:29  20  A.   I don't.

21  Q.   Can you give me the approximate year?  Was it in 2018, or do

22  you think at the outset of this case?

23  A.   I know that it was within several days to weeks of the

24  defense's request to obtain those messages.  So whenever that

02:29  25  date was.

58

1    Q.   Okay.  It was sometime after the defense made the request

2    though.

3    A.   That's correct.

4    Q.   And did you request just your texts or the texts of other

02:29    5    agents as well?

6    A.   I think I met the requirement at the time which was to

7    request text messages between agents -- any agents that had any

8    contact with the informants was the request at the time, if I

9    remember correctly.  Whatever the original request was from the

02:30    10    defense, I fulfilled that obligation.

11    Q.   Now, I'm going to show you what's previously been admitted

12    as Exhibit H.  If you could just read that to yourself for a

13    moment.

14              (Witness peruses document.)

02:30    15    BY MR. ALBEE:

16    Q.   And is that policy that's outlined in that December 11

17    letter that is Exhibit H, is that policy consistent with your

18    understanding?

19    A.   It is.

02:31    20    Q.   And where does that requirement of the United States

21    Department of Justice that e-communications be preserved, where

22    does that originate from?

23    A.   Where does the policy originate from?

24    Q.   Yeah.  I mean, you said this is consistent with your

02:31    25    understanding of the policy.  The letter itself doesn't identify

59

1   a particular source for that policy.  I'm wondering if you could

2   tell me, is that from a DOJ memo?  An AG manual?

3   A.  I'm not sure of the originating policy.  I just know when

4   we're issued a device, a computer or phone, we're told there's

02:31   5   no expectation of privacy; that these communications are going

6   to be maintained at an enterprise level.  So I made the

7   assumption that my text messages are maintained at an enterprise

8   level.  So it didn't even cross my mind to preserve my own

9   individual text messages.

02:32   10   Q.  Have you done that in the past?

11   A.  I have not.

12   Q.  How long have you been an FBI agent?

13   A.  16 years.

14   Q.  So were texts -- I don't know, were texts around 16 years

02:32   15   ago?  I think so.  But when -- during your entire history have

16   texts been automatically preserved?

17   A.  Yes, that's correct.  I've actually never had to give my

18   text messages.  I've had to give my written notes, but never

19   text messages before.  So it never occurred to me to safeguard

02:32   20   my own text messages.

21   Q.  So at no time did you take any screenshots of your text

22   messages?

23   A.  I did not.

24   Q.  All right.  And did you ever memorialize them in any rough

02:32   25   notes?

1  A.  Not in any form or fashion.

2  Q.  And I take it that you didn't give any direction to your

3  fellow agents to preserve their texts because you believed that

4  that was happening automatically for them as well.

02:33  5  A.  That's correct.  That subject never came up.

6  Q.  Now, are you -- you indicated earlier that you weren't aware

7  of the content of your fellow agents' texts.  Let me just ask

8  about a couple particular texts to see if it refreshes your

9  recollection.

02:33  10          Are you aware of Agent Zuraw texting CHS-1, Steve --

11          MR. TAIBLESON:  Objection.  We'd like to see the

12  exhibit, please.  And if he doesn't have that in front of him,

13  of course, he can't know what agents are all sent.

14          THE COURT:  Well, let's wait till the question is out.

02:34  15          MR. TAIBLESON:  I'm sorry, Judge.

16  BY MR. ALBEE:

17  Q.  Information about the possibility of immigration benefits?

18  A.  I know that the agents were texting the informants.  They

19  were both kind of younger, kind of of the generation that

02:34  20  preferred to text to communicate.

21          But the guidance was to always make it very logistical

22  in nature, where to meet, when to meet.  We did have specific

23  conversations saying don't do anything substantive over text

24  message.  I believe we had to take training that also states

02:34  25  that.

1   Q.  All right.  So if there -- if -- would you agree that a

2   discussion about immigration benefits would be something

3   substantive?

4   A.  Yes.

02:34   5   Q.  And so, if that's -- if there are text messages on that

6   subject, that would be contrary to instructions you gave in this

7   case.

8   A.  If it was promising something and not just a -- I'd have to

9   see it to be able to definitively say whether it was or was not.

02:35   10  If you had one in particular I'd be happy to review it.

11  Q.  And were the informants in this case told to record every

12  contact they had with Mr. Hamzeh?

13  A.  When feasible, absolutely.  We wanted to try to have every

14  conversation recorded that was possible.

02:35   15  Q.  And were the informants told that?

16  A.  They were.

17  Q.  Were the informants told to delete the messages from the

18  agents?

19  A.  I did not give any instructions to delete messages to any

02:35   20  agent or any informant.

21  Q.  Would that be appropriate to tell the informant to delete

22  messages?

23  A.  The only instance I could think of where that would be

24  appropriate is if we were texting them an instruction to meet

02:36   25  before or after we would -- it wouldn't be uncommon to say

62

1  delete this message so that the target of the investigation

2  doesn't see the text message and look at it and say why are you

3  meeting somebody right after this or before this.

4        So just for operational security reasons, but not --

02:36  5  which is precisely why we didn't want to have any substantive

6  information sent via text message, so you couldn't delete

7  anything substantive.

8  Q.  Would it be substantive in your view if a CHS asked about

9  getting additional financial benefits for his work?

02:36  10  A.  Again, I'd prefer to see the text if -- to make a comment on

11  that.  I would have to see it in context.

12  Q.  Now, about the text message records that we have, appear to

13  show you texting on a number of occasions with CHS-2 or Mike.

14  Did you also text with CHS-1, Steve?

02:37  15  A.  I don't recall texting CHS-1.  I was not the primary handler

16  of CHS-1.  So it would have been uncommon for me or out of the

17  ordinary for me to do that.  To answer your question, I don't

18  recollect ever texting CHS-1.

19  Q.  Did you ever call or text Steve's wife?

02:37  20  A.  No.

21  Q.  If there is a call or a text to that phone number it's

22  likely that was for the purpose of contacting Steve?

23  A.  I don't recollect ever talking to a wife or a girlfriend.

24  Q.  Were you ever asked to determine how many texts that you had

02:38  25  either sent or received from the informants in this case?

1  A.  Can you ask that again?

2  Q.  Yeah.  Were you ever asked to determine how many texts you

3  had sent or received with the informants in this case?

4  A.  No.

02:38  5  Q.  You weren't asked to take a look at the toll records, for

6  example?  For your phone?

7  A.  No.

8  Q.  Have you seen the toll records for your phone?  Let me ask

9  it a different way.  Did the government, to your knowledge, ever

02:38  10  obtain those toll records for your phone?

11  A.  I don't know if they obtained my call records.  I know that

12  my text records, of course, were obtained.

13  Q.  Did the government obtain those text records or is it your

14  understanding that those are the ones that came from the

02:38  15  defense?

16  A.  No, we obtained them and provided them to you.  So I saw the

17  text messages.

18  Q.  We're talking past each other.

19  A.  Okay.

02:39  20  Q.  The actual text messages that were recovered, those were

21  what were provided to us.

22  A.  Okay.

23  Q.  And that you obtained, correct?

24  A.  That's correct.

02:39  25  Q.  And I was just asking about the toll records themselves like

1    you would get from the telephone company that show from your

2    phone everybody you called or texted.  Do you know whether the

3    government ever obtained --

4    A.  I do not know.  I did not request my toll records.

02:39    5    Q.  When did you first become aware that texts were not being

6    automatically preserved?

7    A.  When we got the results back and they said text messages

8    were missing.  We went back and thought it was just an oversight

9    or some sort of a clerical input error that we need to go back

02:39    10    and there's a gap, we need to get them.

11    And then when we went back the second time and were

12    told you're not -- they're not there, we don't have them, that's

13    when I first learned of it.

14    Q.  At the time of the investigation of Mr. Hamzeh before his

02:40    15    arrest you had an Android phone?

16    A.  That's correct.

17    Q.  And how long did you keep that phone that you were using at

18    that time?

19    A.  I don't know.

02:40    20    Q.  Do you sign some kind of receipt or get some kind of receipt

21    when you turn in a phone?

22    A.  We do.

23    Q.  And so there would be a record of when you turned in that

24    phone?

02:40    25    A.  I would think so.

1    Q.  And I take it you're always required to turn in a phone to

2    get a new phone.

3    A.  We are.

4    Q.  Would you have done any investigative work using your

02:40    5    personal cell phone in this case?

6    A.  I don't have a personal cell phone.

7    Q.  In July of this year you were asked to write a report?

8    Write a report in this case in July 2018?

9    A.  (No response.)

02:41    10    Q.  Let's me ask it this way.  Do you recall preparing a

11    one-page report in approximately July of 2018, in this case?

12    A.  If it's an email you're referring to where I sent to the

13    supervisor regarding my interaction with the informant?  If

14    that's what you're speaking about, yes.

02:41    15    Q.  It is.

16    A.  Okay.

17    Q.  My apologies.  I didn't realize it began with an email.

18          Let me show you Exhibit G, Agent Adkins.  Have you

19    seen this actual report before?

02:41    20    A.  I have not seen this report.

21    Q.  Okay.  Take a moment to read it to yourself.  My question's

22    going to be:  Does this appear to be the email that you sent?

23          (Witness peruses document.)

24    A.  Yeah, this is almost a word-for-word transcription of the

02:42    25    email that I sent to the acting supervisor.

66

BY MR. ALBEE:

Q.  Okay.  And this was in response for a request for specific information about the text messages?

A.  That's correct.

Q.  Now, in this email you indicate that you -- every time you met with the CHS you would tell them to ask open-ended questions such as who, what, when, where, and why?

A.  That's correct.

Q.  Had you previously been asked by the U.S. Attorney's Office to give them -- or to identify for them all instructions that you had given to the informants in this case?

A.  I believe that was part of the discovery process, any paperwork documenting instructions to informants.

Q.  Okay.  And this information hadn't been provided at that time, correct?

A.  Not in this form.

Q.  Well, are you aware of any other report in which you indicated that you told the informants each time to ask open-ended questions such as who, what, when, where, and why?

A.  No.  At no other time did I do that.  That I'm aware of.

Q.  Did Mike, always follow those instructions?

A.  No, he did not.  There were on a couple of occasions where -- actually, one time I had to admonish him.  He had sent me some memes, some like politically -- they were political memes, and he had sent them to me on my texts and I had to

1    instruct him to not send me -- we're not friends, we're -- it's

2    a professional relationship and this texting back and forth

3    needs to be strictly logistical in nature and not have any -- it

4    needs to be strictly professional in nature.

02:44   5    Q.  On how many occasions did he send you memes?

6    A.  He probably sent me three or four.

7    Q.  And when was that?

8    A.  It must be during the time we don't have text messages,

9    otherwise I would be able to provide them to you.  So it must

02:44   10   have been during that.  I'm assuming it's during the gap of time

11   where we don't have text messages or we would have been able to

12   provide them.

13   Q.  Can you recall specifically the content of any of these

14   memes?

02:45   15   A.  They were political figures, like -- involving like the

16   current speaker of the house or the current president.  They

17   were political memes.  They were not professional.  And so I

18   instructed the source to no longer send those to me and he

19   complied.

02:45   20   Q.  Did you text him to not do that?

21   A.  No, I did it in person.

22   Q.  But you didn't write any report about that until this email.

23   A.  Correct.

24   Q.  Did you give him other instructions about texting?

02:45   25   A.  Just every time we would meet it was always:  "Don't send

1  anything substantive in a text.  We'll talk about it and then

2  we'll memorialize it in a report where it belongs."

3  Q.  And why is it that you didn't want substantive matters

4  included in texts?

02:46   5  A.  Because they can be taken out of context.  They can be

6  matters that are misunderstood.  There's a number of reasons.

7          In addition to in my training we're told to not do

8  substantive communications via text message because that's just

9  not how we do business in the bureau.

02:46  10  Q.  Now, in terms of the instruction that you gave him every

11  time about only asking open-ended questions such as who, what,

12  when, where, and why, were you aware of him violating those

13  instructions?

14  A.  No.  No.  They both did a pretty good job about that.  The

02:46  15  situation changed so -- the case situation changed so

16  drastically so many different times that we were always trying

17  to figure out what is going to happen next.

18          So it was very pertinent to ask the questions who,

19  what, when, where, and why so we knew what the next change in

02:47  20  plan was going to be.

21  Q.  Are you aware of any violations of those instructions?

22  A.  I can't think of any off the top of my head.

23  Q.  You did advise the CHS Mike that he should text you while

24  meeting Mr. Hamzeh if he needed something?

02:47  25  A.  Uh-huh.

69

1    Q.   Yes?

2    A.   Yes.

3    Q.   Now, you recall that between December 14th and January 19th,

4    there were no recordings of any meetings between Mike and

02:47   5    Mr. Hamzeh?

6            MR. TAIBLESON:   Objection.   Beyond the scope of this

7    hearing.

8            MR. ALBEE:   Ask about texts during that time.

9            THE COURT:   I'll give a little leeway.   Overruled.

02:48   10            THE WITNESS:   I'd have to look at a report to know the

11    exact dates.   If you say that's true then I would have to -- I

12    don't know that to be true, I'd have to look at the --

13    BY MR. ALBEE:

14    Q.   Sure.

02:48   15    A.   -- the recordings.

16    Q.   Do you recall a lengthy multi-week period, though, where

17    there were no recordings --

18    A.   I do.

19    Q.   Yet you were aware that Mike during that time was continuing

02:48   20    to meet regularly with Mr. Hamzeh.

21    A.   I was aware of that.

22    Q.   And wasn't the instruction that he was to record those

23    meetings?

24            MR. TAIBLESON:   Objection.   Beyond the scope of this

02:48   25    hearing.   He said he didn't give substantive instructions by

1   texts, so I don't see how that question can be getting at

2   something that is relevant to this hearing.

3              THE COURT:  Mr. Albee?

4              MR. ALBEE:  Next question will get into whether there

02:48   5   are texts, to tie this up and address the absence of recordings.

6              THE COURT:  Well, he's already testified that the

7   instruction was to record those meetings.  So I'll sustain that

8   objection.

9              Ask your next question.

02:49   10  BY MR. ALBEE:

11  Q.   So were you concerned then about this absence of recording

12  during that period of time?

13             MR. TAIBLESON:  Objection.  Same reason.

14             THE COURT:  Sustained.

02:49   15  BY MR. ALBEE:

16  Q.   Did you try to address the absence of recordings with Mike

17  through any texting?

18  A.   No.

19  Q.   Would he text you when he was meeting with Mr. Hamzeh?

02:49   20  A.   They worked together so he was seeing them near daily.  And

21  just because we didn't have a recording didn't mean that we

22  weren't getting valuable information on what is going on.  It

23  just wasn't recorded.  It was in a report, a report that the CHS

24  would come back and we'd debrief with them and then we would

02:50   25  make a report.

1    So there were many reports where there wasn't a

2    recording.  We didn't have a recording every time they met.

3    That wasn't feasible.  Especially since they were working

4    together and the other informant was his best friend, so they

02:50    5    were together quite a bit.

6    Q.  So would -- what was the nature of the texts that Mike was

7    sending you during this period of time, let's say, early January

8    up to January 19th?

9    A.  I'd have to see them.  I can't imagine there would have been

02:50   10    much.  It would have been very logistical in nature like when

11    are we going to meet next.

12    I mean, we would still meet with the informants

13    regularly, even if we didn't have a recorded meeting between

14    Mr. Hamzeh and the informants.  So we would -- we still were

02:50   15    meeting with them.  But I guess, I'm sorry, maybe I don't

16    understand your question.

17    Q.  Well, if there weren't recordings then you're relying just

18    on what Mike tells you, correct?

19    A.  Correct.  Not just Mike but also Steve.

02:51   20    Q.  Special Agent Adkins, let me give you Exhibit A.  I'll

21    invite your attention to -- it's the last three or four pages.

22    Do you recognize those as the -- actually that's not

23    what I want you to look at.  I apologize.

24    Do you recognize those as the texts that were

02:51   25    produced, correct?

72

1    A.  I do.

2    Q.  And those came after October -- after sometime in October

3    there were no more texts that were available.

4    A.  That's correct.

02:52    5    Q.  All right.  Let me invite your attention to page 2 of

6    Exhibit A.

7            MR. ALBEE:  And, Judge, later on we're going to call

8    Ms. Caygill to discuss how she compiled these numbers, but I did

9    want to just ask Agent Adkins about the texts in January.

02:52    10            MR. TAIBLESON:  I just want to be clear, which Bates

11    stamp page are we looking at?

12            MR. ALBEE:  It's page 2 of Exhibit A, or just

13    summarizes the texts from January.

14    BY MR. ALBEE:

02:52    15    Q.  And so these texts from beginning on January 4th through

16    January 18th, as you indicated there's not a lot of them.  Do

17    you recall what was being texted during that time during that

18    time?

19    A.  I don't.

02:53    20    Q.  Did you make an effort to recreate any of the texts from

21    January, by looking at when the texts were sent or received and

22    looking at what else was going on?

23    A.  And try to fill in the gaps on what is missing?

24    Q.  Yes.

02:53    25    A.  I did not.

1    Q.  Did you do that for any other month?

2    A.  I did not.

3    Q.  And do you recall whether you texted him about the failure

4    to record any of the conversations?

02:53   5    A.  I don't recall.

6    Q.  Who made the determination whether you would record?

7    A.  It depended a little bit on what was going on; how much

8    notice we had; when it was happening; where it was happening.

9         If we could have -- if both CHSs were at the same

02:53   10   event we were a little less concerned about recording because we

11   had two independent sources reporting about the same event.  And

12   so we felt pretty comfortable that we could get exactly what

13   happened.

14        Neither one knew the other was an informant until very

02:54   15   late in this investigation.  So if they were both at the same

16   event, that played part of the factor.  There was a multitude of

17   reasons.  But we did -- whenever there was something big, we

18   felt like there was a discussion, a plot occurring or a change

19   in plan, we made every effort to get that recorded.

02:54   20   Q.  During this January period, do you recall one way or another

21   whether Mike would have texted you about the Masons?

22   A.  I don't remember whether he sent me a text or a call.  He

23   certainly did contact me and let us know that there was a change

24   in direction, but I don't recall whether it was a text or a

02:55   25   phone call.

1  Q.  Would there have been a text in either direction between you

2  and Mike regarding machine guns?  And I'm talking about the pre

3  January 19th period.

4  A.  I don't recall getting a text from him regarding guns or --

02:55  5  again, every time I met with him in person I gave him the same

6  instructions.  And it was -- it's the same instructions I've

7  been giving to informants my whole career.  It's:  I want you to

8  do -- to ask the questions of who, what, when, where, and why.

9  We're tasking you to meet with this -- the subject of

02:55  10  this investigations, so I'm tasking you to do this, I want you

11  to ask who, what, when, where, and why.

12  And I've been doing that my whole career.  And I've

13  been giving the same instructions to let's not send any

14  substantive information via text message; let's talk in person

02:56  15  so we can figure out what happened and then we'll get it on a

16  report.

17  And that's been based on my training and based on not

18  just my Quantico training and additional training I've received,

19  but also the training I got from my training agent when I first

02:56  20  came into the bureau.  So I've been doing that that way my

21  entire career.  So I would have not done that differently in

22  this case.

23  Q.  Who came up with the idea of obtaining machine guns from

24  a --

02:56  25  MR. TAIBLESON:  Objection.  Beyond the scope.

1    BY MR. ALBEE:

2    Q.  -- undercover agent in Texas?

3          THE COURT:  Hold on.  Wait till he finishes the

4    question before you object.

02:56    5          So let me -- Mr. Albee, what's your response?

6          MR. ALBEE:  And I will follow up with whether that was

7    supplied through a text by Mike.

8          THE COURT:  Why don't you jump to that question.

9    BY MR. ALBEE:

02:57   10    Q.  The idea of obtaining machine guns from a source in Texas,

11    was that raised by Mike in a text?

12    A.  I don't recall a text message indicating such.

13    Q.  Is that possible?

14    A.  I don't think so because that certainly wouldn't have been

02:57   15    any instruction we gave.  We early on said -- early on we

16    recognized that Mr. Hamzeh changed his plans numerous times, and

17    we were always playing catchup to what his change of plan was.

18    We always felt like we were just a tiny step behind because he

19    was constantly changing his plans.  So it was very, very common

02:57   20    and just a normal course for us to say what is his new plan; we

21    have to find out what his new plan is, so ask who, what, when,

22    where, and why.

23          He changed it so many times we didn't need to give him

24    any ideas.  He had enough plan ideas on his own that we were

02:58   25    just trying to figure out what they were.

1    Q.  Well, Mr. Hamzeh wouldn't have been able to come up with, on

2    his own, that there would be a source of guns in Texas, right?

3              MR. TAIBLESON:  Objection.  Beyond the scope.

4              THE COURT:  Sustained.

02:58   5    BY MR. ALBEE:

6    Q.  Well, so, might you have texted Mike that he could tell

7    Hamzeh that guns would be available from Texas?

8    A.  I'm not sure.  I didn't instruct him to tell him that we had

9    a guy in Texas that could get him guns.  I certainly didn't do

02:58  10    anything like that via text message.

11              I think later on in the investigation when -- early in

12    the investigation we were trying to determine did Mr. Hamzeh

13    have a gun.  Once we felt pretty comfortable that he didn't have

14    a gun and made it clear that he wanted the informants to help

02:59  15    him obtain a gun, that's when the idea of if that's what he's

16    trying to do there might be a way to like find out what he's

17    trying to do and we might be able to set up an undercover and

18    create a sting in such case.

19              But we did not create the idea of getting a gun;

02:59  20    Mr. Hamzeh created that idea.  We were just trying to react to

21    it.

22    Q.  Well, were there any texts about the gun being a machine

23    gun?

24    A.  I don't recall.  There was not a text that I recall

02:59  25    involving a machine gun.

77

1    Q.  And, I mean, logistically if Mike was proposing that he'd

2    bring machine guns from Texas, he had to back up that

3    suggestion, right?

4    A.  Right.

03:00  5           MR. TAIBLESON:  Objection.  Beyond the scope.

6           THE COURT:  Yeah.  I mean, we're here talking,

7    Mr. Albee, about the preservation of evidence or failure to

8    preserve evidence.  So let's focus on that when we ask these

9    questions.

03:00  10          MR. ALBEE:  And, Judge, I understand what the Court's

11   saying, but I kinda need that as a foundation then to say

12   whether then that suggestion -- that information could have been

13   obtained through text messages.

14          THE COURT:  I'm just not sure how helpful it is to

03:00  15   talk about what could have happened as opposed to what did

16   happen.

17          MR. ALBEE:  But that's where the prejudice is of the

18   not having the text messages.

19          THE COURT:  Well, you can ask him then if that -- but

03:00  20   focus on it in the context of -- I don't think you need to ask

21   the -- I mean, focus on what was communicated.

22          What you're trying to establish is, what I understand

23   at least, is what could have been contained in these missing

24   text messages.  Correct?

03:01  25          MR. ALBEE:  Yes.

1        THE COURT:  That's what you're trying to determine.

2   So let's phrase the questions in that respect.

3   BY MR. ALBEE:

4   Q.  And do you recall whether Mike would have texted agents to

03:01  5   see whether he could tell Mr. Hamzeh that there would be a

6   source for machine guns?

7   A.  I don't recall that.  A reason why that would be a problem

8   is if -- the reason we didn't want the informant to deliver or

9   sell anything or say anything that we didn't specifically

03:01  10   direct, is because then we would have to cash that check.  So if

11   he said I know three females in Texas that speak Serbian that

12   can get you a machine gun, we'd have to figure out how to make

13   that happen.

14        And I didn't want to -- that's not feasible.  So we

03:02  15   didn't ever -- we never instructed them to say or do anything

16   that we couldn't back up.

17   Q.  But at some point he did make the representation that he

18   could have people from Texas bring machine guns.

19        MR. TAIBLESON:  Objection.  Beyond the scope.

03:02  20        THE COURT:  Overruled.

21   BY MR. ALBEE:

22   Q.  But at some point Mike did make the representation that he

23   could have people come up from Texas and provide you machine

24   guns, correct?

03:02  25   A.  He did mention that, that he had spoken to Mr. Hamzeh about

79

1    a cousin or something from Texas.  Yes, that's correct.

2    Q.  And you know from the recordings that he told Mr. Hamzeh

3    that.

4    A.  That's correct.

03:02  5    Q.  And so he had your -- was there any texts granting him that

6    permission to make that representation?

7    A.  No.

8    Q.  He came up with that on his own.

9    A.  He came up with that on his own.  And he was admonished for

03:02  10   that.

11   Q.  Is there any report regarding that admonishment?

12   A.  No.  It was a verbal admonishment.

13   Q.  Are there other admonishments that aren't reduced to a

14   report?

03:03  15   A.  Not that I recollect.

16   Q.  And do you recall whether Mike texted you regarding

17   Mr. Hamzeh's rejection of the plan?

18   A.  I know, again, he contacted me.  I don't recall if it was in

19   a text or a phone call that he decided to change his plan.  That

03:04  20   happened numerous times throughout this investigation.  So,

21   again, I'm sorry, I don't recall if that was a text or a phone

22   call.

23   Q.  But he'd let you know at some point that Mr. Hamzeh was no

24   longer interested in a plot against the Masonic Lodge?

03:04  25   A.  That's correct.

1          MR. TAIBLESON:  Objection.  Beyond the scope.

2          THE COURT:  Overruled.

3     BY MR. ALBEE:

4     Q.  Did you have emails with the informants?

03:04  5     A.  The informant was provided an email address early on.  He

6     had taken a video at the shooting range, and we were trying to's

7     get that -- he was trying to get that to us.  But I was not able

8     to retrieve it.  So there were no actual -- there was no actual

9     email correspondence that occurred.  He attempted to send an

03:05  10    email to me and I wasn't able to retrieve it, and there was no

11    follow-up and no other further emails.

12    Q.  Are you aware of him emailing other agents, either of the

13    informants emailing other agents?

14    A.  I'm not aware of that.  I don't believe that occurred, but

03:05  15    I'm not aware of anything.

16    Q.  Now, did the agents text among themselves during the course

17    of this investigation?

18    A.  Yes.

19    Q.  And have those texts been obtained?

03:05  20    A.  The texts between agents?

21    Q.  Yes.

22    A.  Not that I'm aware of.

23    Q.  Were you asked to obtain those texts?

24    A.  I don't believe so.

03:05  25    Q.  Were you asked to determine from phone records or from my

1    other source what texts occurred?

2    A.  I was not.

3    Q.  Do you know whether through Cellebrite of Agent Zuraw's

4    phone whether there was an attempt to obtain texts between the

03:06    5    agents?

6    A.  I don't.

7    Q.  You're not aware --

8    A.  I'm not aware of it.

9    Q.  I take it, for example, that during surveillance procedures

03:06    10    there's probably a lot of texting going on between agents?

11    A.  I'm not sure.  I know they primarily do their work via

12    radio.  We have an interagency radio system that we use, but I'm

13    not sure if they're texting as well.

14    Q.  How often did you personally text with other agents about

03:06    15    this investigations?

16    A.  I couldn't tell you a frequency.  Again, though, I can tell

17    you that it would have been very logistical in nature like

18    "we're going to have a meeting to discuss the new change of

19    plan" or "can you help me meet with Mike on a certain date and

03:06    20    time."  They were not substantive in nature.

21    Q.  Were these texts have been on a daily, near daily basis?

22    A.  The logistical texts?

23    Q.  Any texts at all.

24    A.  They would have been as needed.  As required.  I mean, as

03:07    25    you pointed out earlier, there were times in this investigation

1   where there was kind of a lull in the action where we were

2   waiting for what was going to happen next.  So during that

3   period we were working on other matters so there wouldn't have

4   been any texts regarding this case.  Or any other

03:07   5   communications.

6   Q.   And were there emails between agents -- I mean between

7   yourself and other agents about this investigation?

8   A.   Yes.

9   Q.   And have those emails all been collected and turned over?

03:07   10   A.   I don't know.

11   Q.   You weren't asked to turn over your emails regarding this

12   investigation?

13   A.   I don't believe so.

14   Q.   And did you also email prosecutors regularly about

03:07   15   information obtained in the case?

16   A.   On a fairly frequent basis any time something changed we'd

17   keep the prosecutor updated either by phone or by email.

18   Q.   In the text messages from Mike, did he express any -- this

19   may not be the perfect word -- animosity towards Mr. Hamzeh?

03:08   20   A.   No.

21   Q.   Were you aware of an instance when Mike -- were you aware of

22   an instance when Mike texted Agent Momocilvic seeking more money

23   in the case?

24   A.   I have a vague recollection of that.  I'd have to see the

03:09   25   text messages.  I have a vague recollection of that.  I was the

1   primary handler on Mike, so the majority of anything related to

2   Mike or any logistics related to Mike was my responsibility.

3   Q.  Then would he have texted you about financial matters?

4   A.  Again, we spoke primarily in person.  And that was my

03:09  5   instructions to him.  So he did at times ask for more money and

6   there was a reason for that.  And when possible, after clearing

7   it with my supervisors and the prosecuting attorney, we would

8   get him more money.  He bore a significant personal expense on

9   this case, so we were trying to get him compensated so that he

03:09  10  could afford to live.

11  Q.  And were any of those money requests by texts that you

12  recall?

13  A.  Not that I recall.

14  Q.  In an effort to obtain the text messages in this case did

03:10  15  you talk to either of the CHSs about getting the text

16  information from their phones?

17  A.  I did not.

18  Q.  Did they have -- did they only use their own phones or did

19  they use FBI phones at some point?

03:10  20  A.  They used their own phones.  And they did -- CHS no. 2

21  replaced his phone pretty regularly.  He was in the cell phone

22  business.  He had a business whereby he dealt with the buying

23  and selling of cell phones, so whenever a new phone came out it

24  was not uncommon for him to get a new phone.  So he pretty

03:11  25  regularly got a new phone.

84

1   Q.  Did any agent that you're aware of use his personal phone in

2   connection with this investigation?

3   A.  Not that I'm aware of.

4   Q.  And was there ever any new training regarding the handling

03:11   5   of texts after the Peter Strzok matter?

6   A.  I don't recall if there was any training.  There certainly

7   was talk about renewed -- it brought that subject to light that,

8   you know, all of our communications are monitored; that there is

9   no expectation of privacy; you know, to not do anything via text

03:11   10  message that you wouldn't want to see the light of day.

11          So we were all -- it was certainly a good reminder.  I

12  don't recall if there were any additional training requirements

13  because of that.

14  Q.  So both -- the phone records reflect that both informants

03:12   15  frequently called two numbers that I believe had an address

16  associated with the FBI.  Do you know the number 888-221-9575?

17          MR. TAIBLESON:  Your Honor --

18          THE WITNESS:  I do.

19          MR. TAIBLESON:  -- is this a question about text

03:12   20  messages or about phone calls to a phone number?

21          THE COURT:  We're not there yet, but let's hear the

22  answer.

23  BY MR. ALBEE:

24  Q.  Do you know that phone number?

03:12   25  A.  I am aware of that phone number.

85

1   Q.  And is that an FBI number?

2   A.  It is.

3   Q.  Is that a landline or a cell phone?

4   A.  It's a landline.

03:12   5   Q.  And are you able to reach agents at that number?

6   A.  You are not.

7   Q.  And what's that number for?

8   A.  That number is --

9       MR. TAIBLESON:  Your Honor.  Maybe he can ask if that

03:12   10  number is about text messages.  On the off chance it's not,

11  maybe that would stay within the scope of this hearing without

12  asking him to reveal all their FBI operational information.

13      THE COURT:  Overruled.

14      THE WITNESS:  So that is a system by which the

03:13   15  informants don't have to be wearing a wire to record the

16  conversation between the target and the informant.  It allows us

17  the flexibility of having conversations recorded without having

18  to actually have equipment on the informant to record the

19  conversation.  I'm being vague only because --

03:13   20      THE COURT:  That's okay.

21      THE WITNESS:  Thanks, Your Honor.

22      THE COURT:  That's as specific as I'm going to let it

23  go.

24      MR. ALBEE:  Okay.

03:13   25  BY MR. ALBEE:

1    Q.  Okay.  And is the 414-221-9716 number an FBI number?

2    A.  That's correct.

3    Q.  Is that a landline?

4    A.  It's the same process.

03:14    5            MR. ALBEE:  Thank you, Special Agent.

6                 That's all I have.

7                 THE WITNESS:  Thank you.

8                 THE COURT:  Any questions, Mr. Taibleson?

9                 MR. TAIBLESON:  Just one.

03:14    10                      CROSS-EXAMINATION

11   BY MR. TAIBLESON:

12   Q.  Agent Adkins, did you ever delete text messages to hide them

13   from the defense?

14   A.  No, I did not.

03:15    15           MR. TAIBLESON:  Thank you.

16               THE COURT:  All right, Agent Adkins, you can step

17   down.  Thank you.

18               THE WITNESS:  Thank you, Your Honor.

19               (Witness excused at 3:15 p.m.)

03:15    20           THE COURT:  Mr. Albee, does anybody need five minutes?

21               MR. ALBEE:  Yeah, I was just going to ask for five

22   minutes, please.

23               THE COURT:  All right.  We'll give the court reporter

24   five to seven minutes, then we'll come back.

03:15    25               And you have how many more witnesses, Mr. Albee?

1      MR. ALBEE:  Perhaps three.

2      THE COURT:  Okay.

3      (Recess taken at 3:15 p.m., until 3:26 p.m.)

4      THE COURT:  So let me ask you, Mr. Albee, how much

03:26  5  more do you think you have time-wise?

6      MR. ALBEE:  We have Agent Zuraw and Agent Fraser which

7  I think will be significantly shorter.  Little bit shorter.

8  Maybe not significantly.  Shorter than Agent Adkins.  The other

9  witness we have is Ms. Caygill who is going to lay the

03:27  10  foundation for the summaries we have --

11      THE COURT:  She's from your office.

12      MR. ALBEE:  Yes.  The exhibits that we filed with the

13  Court with our reply memo yesterday, she prepared those doing

14  what she could to identify from the phone numbers we received

03:27  15  from the government how many text messages were for each.

16      The government, as I understand it, didn't feel it had

17  enough time to check her work, so I guess we need to present her

18  to do that

19      THE COURT:  Your expectation is -- are you thinking

03:27  20  you'll be done this afternoon?

21      MR. BUGNI:  I assume so, Your Honor.  I think Zuraw

22  will take awhile, but Fraser shouldn't take too long.  And I

23  don't know what kind of questions the government has, but it

24  probably won't take more than 10 minutes to lay the foundation

03:27  25  with Ms. Caygill.

1          THE COURT:  Are both the agents local?

2          MR. BUGNI:  Yes.

3          THE COURT:  That was my principal concern, if we

4    weren't going to get done today.  Yes.

03:28  5          MR. PTASHKIN:  Your Honor, several housekeeping

6    matters.  Permission to have a side bar with the defense

7    attorneys.

8          THE COURT:  Fine.

9          (Discussion at side bar off the record.)

03:29  10          MR. BUGNI:  Your Honor, the defense would call Task

11   Force Officer Agent Joe Zuraw.

12          THE COURT:  Please come forward, Agent Zuraw.

13          JOSEPH ZURAW, DEFENSE WITNESS, DULY SWORN

14          THE CLERK:  Please state your full name and spell it

03:29  15   for the record.

16          THE WITNESS:  Joseph Zuraw.  Last name is spelled

17   Z-u-r-a-w.

18          THE COURT:  Please be seated, Agent Zuraw.  Thank you.

19                    DIRECT EXAMINATION

03:30  20   BY MR. BUGNI:

21   Q.  Agent Zuraw, for whom are you employed?

22   A.  I'm employed by U.S. Customs and Border Protection.

23   Q.  How long have you worked for them?

24   A.  About 13 years, sir.

03:30  25   Q.  And do you currently work with the FBI?

89

1    A.  Correct.

2    Q.  And what is your role there?

3    A.  I'm a task force officer assigned to the FBI on the joint

4    terrorism task force.

03:30   5    Q.  And among your duties was the Hamzeh investigation?

6    A.  Yes.

7    Q.  And what was your role in that investigation?

8    A.  My role was as a case agent, or a co-case agent I should

9    say, assisting case agents and helping with CHS coordination.

03:30   10   Q.  And were you the co-lead agent in this case?

11   A.  I don't know what co-lead --

12   Q.  Were you in charge of the investigation?

13   A.  No.  I was only -- I only served in a co-case role, which

14   would be an assistant to a primary case agent.

03:31   15   Q.  Who was the primary case agent?

16   A.  Jonathan Adkins.

17   Q.  Okay.  And among your duties of coordinating with the CHSs,

18   how did you communicate with them?

19   A.  Through phone call, through text message, in person.

03:31   20   Q.  Any emails?

21   A.  No.

22   Q.  I'd like to ask you about the text messages.  Did you use an

23   FBI phone to communicate with the CHSs?

24   A.  No, I did not.

03:31   25   Q.  What phone did you use?

1    A.   I used the CBP-issued phone.

2    Q.   And what does the CBP issue?

3    A.   Customs and Border Protection, my employer.  I'm issued a

4    government phone from them.

03:31  5  Q.   Okay.  And did you also use your personal phone?

6    A.   No.

7    Q.   Okay.  Do you have a personal cell phone?

8    A.   I do.

9    Q.   And did you text with the informants on that phone?

03:31  10  A.   On my government-issued phone, yes.

11   Q.   That was it.  And what's the phone number for that

12   government-issued phone?

13   A.   414-232-1814.

14   Q.   And among the text messages that you would send with the

03:32  15  agent or with the informants, what were some of the texts that

16   you would send to them?

17   A.   To who?

18   Q.   To the informants.

19   A.   To the informants?  It was almost exclusively logistical.

03:32  20  It was meet at this place at this time.

21   Q.   And what else?

22   A.   Nothing of an operational nature.  Just purely logistical

23   planning, go to this place, meet at this place.

24   Q.   And did you speak to them about some of their benefits in

03:32  25  this case?

1    A.  Through text message, yes.

2    Q.  And what were those benefits?

3    A.  I was working on what's called deferred action for one of

4    the CHSs.

03:32  5    Q.  And what is deferred action?

6    A.  Deferred action allows for a foreign national who is either

7    overstayed or is otherwise removable from the United States, to

8    be allowed to remain in place while assisting.

9    Q.  And what was your involvement in that?

03:33  10   A.  My involvement was to collect immigration-related

11   information from the source, from the CHS, and forward that to

12   the FBI who would prepare that written request for deferred

13   action.

14   Q.  And do you know if that written request was made?

03:33  15   A.  Yes, it was.

16   Q.  Do you know when it was made?

17   A.  I don't remember off the top of my head, no.

18   Q.  Do you have a guess?

19   A.  It would have been -- my best guess would be late -- late

03:33  20   2015.

21   Q.  And was the coordination for some of these immigration

22   benefits, was that done through text message?

23   A.  No.  That would have just been me communicating with the

24   source saying I need a copy of your passport or I need to see

03:33  25   your passport specifically.  I remember that text message --

1    Q.  Okay.

2    A.  -- asking for the documentation.  And then forwarding to the

3    FBI.

4    Q.  Did you coordinate this, the gathering of documents, through

03:34    5    email?

6    A.  (No response.)

7    Q.  How did he get these documents to you?

8    A.  How did who get the documents to me?  The CHS?

9    Q.  Steve.

03:34    10    A.  Steve.  In person.  When we met he had his passport.  I

11    reviewed it, I took a picture of it, and forwarded the

12    information onto the FBI.

13    Q.  And was there coordination over text message about payment

14    for his services?  Steve I'm talking about.

03:34    15    A.  There was.  Yes.  Yes, there was.

16    Q.  And what was the nature of that?

17    A.  The nature of that was a text message from me to him saying

18    that I would have an agent in contact with him, and try to get

19    him money for a hotel.

03:34    20    Q.  How often did you try to secure payment for Steve?

21    A.  I believe maybe twice at best that I remember, that I was

22    involved with.

23    Q.  And when you were coordinating that did you text with Steve?

24    A.  About what we just discussed, yes, that I was going to try

03:35    25    to have another agent contact him to work out how he would get

1    paid or where and when.

2    Q.   And do you know who that other agent was?

3    A.   Special Agent Mike Buono.

4    Q.   Okay.  And do you know if he coordinated with Steve through

03:35   5    text message?

6    A.   Yes.

7    Q.   Okay.  And was there coordination through text message to

8    get payment after the case was over?

9    A.   No.

03:35   10   Q.   Was there coordination through text message for immigration

11   benefits after the case was over?

12   A.   Not that I recall, no.

13   Q.   After Mr. Hamzeh's arrest what text messages did you share

14   with Steve?

03:35   15   A.   I believe it was just how are you doing.  More logistical

16   things.  Where are you.  How's everything going.  That kind of

17   thing.

18   Q.   And how often did you have those kinds of conversations with

19   him?

03:36   20   A.   Every couple days.

21   Q.   Okay.  And did he text you about any mental health concerns

22   through the text messages?

23   A.   Did who?

24   Q.   Steve.

03:36   25   A.   Steve text me about --

1    Q.  His mental health concerns.

2    A.  No.

3    Q.  Did you express your concern for his mental health through

4    text message?

03:36   5    A.  Not that I recall, no.

6    Q.  And, Agent Zuraw, when did you give up your phone to have a

7    Cellebrite extraction done?

8    A.  Roughly a year ago.

9    Q.  So roughly -- so December-November of 2017?

03:36   10   A.  Yes.  I don't have the exact date.  But in talking with

11   another agent who knows of that being done, he said it was just

12   about a year ago.

13   Q.  And who was the other agent that you spoke with?

14   A.  Special Agent Neil Lee.

03:37   15   Q.  And did Special Agent Neil Lee, did he conduct the

16   extraction?

17   A.  No, he did not.

18   Q.  Do you remember who it was that conducted the extraction?

19   A.  Matthew Peterson.  He's a retired FBI agent.

03:37   20   Q.  And do you remember asking them -- telling them specifically

21   what they were supposed to extract from the phone?

22   A.  I remember asking for specific phone numbers that I knew at

23   the time that we had maintained.

24   Q.  Okay.  And did you ask for any text message between yourself

03:37   25   and CHS-2, Mike?

95

1    A.   I don't believe so.

2    Q.   And do you still have the same phone that you had while you

3    were texting with Steve and Mike?

4    A.   I have the physical device, but it's not on DHS network any

03:37  5    longer.  I have a new phone that was issued to me.  And in that

6    process, expecting that there would be some questions about the

7    content or those text messages, I asked my agency, please let me

8    keep this phone in my possession.  That way it's available if we

9    need it down the road.  Instead of any alternatives to that.

03:38  10   Q.   Okay.  And as part of this Cellebrite extraction that was

11   done a year ago, did it take an entire download of all the

12   phone's contents?

13   A.   I don't know for sure.  I wasn't there with them while they

14   did it.

03:38  15   Q.   Okay.  But were you able to look at the Cellebrite report?

16   A.   Yes.

17   Q.   And did you see Mike's number appear in the Cellebrite

18   report?

19   A.   I don't recall seeing it in there.

03:38  20   Q.   Did it surprise you that his number wasn't in the Cellebrite

21   report?

22   A.   I didn't give it any thought.  I was more looking for the

23   other CHS's phone number when that was requested.

24   Q.   Because were you primarily handling Steve?

03:38  25   A.   Correct.

96

1    Q.   Okay.  But you did text with Mike.

2    A.   I'm sure I did.  I don't remember a date or a time or

3    anything like that, but I'm sure over the course of the

4    investigation I did.

03:39  5    Q.   And since you had your phone downloaded in November, have

6    any steps been taken with your phone to locate your text

7    messages with Mike?

8    A.   I reviewed information today to double-check to see if there

9    was anything there, and there was not anything associated with a

03:39  10   phone number that we had for him at that time.

11   Q.   And what did you review today?

12   A.   The original dump of that phone, the Cellebrite.

13   Q.   I believe, is Exhibit C up there?

14   A.   I was just looking at this.  You said C?  Charlie?

03:39  15   Q.   Yeah.  Yes.

16   A.   Yes.

17   Q.   Okay.  And could you go to the second page of Exhibit C.

18   A.   I'm sorry, could I just interrupt?  Is it two pages for that

19   one?

03:40  20   Q.   No, it should be a composite exhibit, fairly thick with the

21   Cellebrite report.

22   A.   Okay.  I have a thick one that doesn't have anything on it

23   that I can see.

24            MR. BUGNI:  If I can approach, Your Honor.

03:40  25            THE COURT:  You may.

1          THE WITNESS:  Yes, I believe that's it.

2     BY MR. BUGNI:

3     Q.  You have everything?

4     A.  It's got my name on it.

03:40    5     Q.  That's it.  And can you go to the second page of that

6     document.

7     A.  Which one?

8     Q.  Of the one marked "C."

9     A.  Okay.  There's only two pages on that one.

03:40   10     Q.  Yup.

11     A.  Okay.

12     Q.  And that phone number, the 1814 number, do you know whose

13     number that is?

14     A.  Yes, that's my phone number.

03:40   15     Q.  And who is number is the 0064?

16     A.  I believe that's going to be CHS-2.

17     Q.  So you have no reason to doubt that this is accurate that

18     you texted with CHS-2 at these times.

19     A.  No.  As I said before, I'm sure over the course of the

03:41   20     investigation we had.  I just don't remember specifically doing

21     that.

22     Q.  Okay.  And these text messages all took place in November.

23     What was happening in the investigation in November?

24     A.  I don't remember off the top of my head specifically what

03:41   25     was going on then.

1    Q.  Okay.  Did you text about hopefully the money that Mike

2    would be getting for this?

3    A.  What money that Mike would be getting?

4    Q.  The payment for his work as a undercover.  Or as a

03:41  5    confidential human source.

6    A.  Okay.  I didn't coordinate any payments with him or discuss

7    that.

8    Q.  Who coordinated the payment with him?

9    A.  That would have been Jonathan Adkins.

03:41  10   Q.  So when he was texting you would he be texting you about

11   what Mr. Hamzeh had said at that time?

12   A.  No, we didn't normally -- as a course of operations we

13   wouldn't do that.  I wouldn't ask him what was said via text

14   message necessarily.

03:42  15           Again, like I said, the text messages that went back

16   and forth were primarily logistical.  Anything beyond that, any

17   operational information or anything beyond logistics would have

18   been done in person.

19   Q.  Would you consider giving instructions to Steve to be

03:42  20   logistical in nature?

21   A.  No.

22   Q.  And yet you texted him to make sure he records everything,

23   correct?

24   A.  Correct.

03:42  25   Q.  So not everything that you texted was logistical in nature.

99

1  A.  I would say that it is because that wasn't necessarily an

2  operational tasking from us.

3  Q.  So just for the benefit so we're not talking past each

4  other, what is the separation that you have?  You have

03:42  5  operational and logistical?

6  A.  Those are my own terms that I'm using here.  I would just

7  say logistical is meet at this place at this time.

8  Q.  Okay.

9  A.  And it's not anything more specific than that.  Or of an

03:43  10  operational nature which is ask about this or bring this up.

11  Those kinds of things.

12  Q.  And admonishing Steve to make sure he records, that's more

13  operational or logistical?

14  A.  I don't know that that would -- I don't think that would

03:43  15  necessarily be an admonishment.  That would just be me saying,

16  hey, from now on we need to have everything recorded.

17  Q.  And what other instructions did you give to Steve through

18  text message?

19  A.  Meet at certain locations.

03:43  20  Q.  Did you ever tell him to ask certain questions a certain

21  way?

22  A.  Not through text message, no.  That's something that would

23  have been done in person.

24  Q.  Did you tell him to bring up the Masons to Hamzeh?

03:43  25  A.  No.

100

1   Q.  Did Steve -- did you text Steve to bring up machine guns?

2   A.  I don't remember texting Steve to ask him to bring up

3   machine guns, no.  That doesn't sound like what we would have

4   been doing through text message.

03:44   5   Q.  How would that have been communicated to him?

6           MR. TAIBLESON:  Objection.  He didn't say it had been,

7   he just said he didn't do it by text.

8           THE COURT:  Sustained.

9   BY MR. BUGNI:

03:44   10   Q.  Would you have texted Mike to go to a gun range with

11   Mr. Hamzeh?

12   A.  No.

13   Q.  Would you have texted him to show him movies of the Masons?

14   A.  No.

03:44   15   Q.  And if that happened, would that have been communicated --

16   how would that have been communicated to Mike?

17   A.  If I would have told him that?

18           MR. TAIBLESON:  Objection, calls for speculation.

19           THE COURT:  Hold on.  Sustained.

03:44   20   BY MR. BUGNI:

21   Q.  How were matters of the investigation communicated to the

22   CHSs.

23   A.  I don't know -- in terms of what?

24   Q.  Of the operational nature.  Where things were going with the

03:44   25   investigation and where to guide Mr. Hamzeh.

101

1    MR. TAIBLESON:  Objection.  He didn't say they ever

2  told the CHSs to guide Mr. Hamzeh in any direction.

3        THE COURT:  Well, rephrase the question.

4  BY MR. BUGNI:

03:45  5  Q.  Instructions were given in this case, correct?

6  A.  Yes.

7  Q.  What instructions were given to the CHSs?

8  A.  Ask a certain question, let the target respond, don't add

9  anything to it.  It has to be their own words.

03:45  10  Q.  And were there any other instructions given?

11        MR. TAIBLESON:  Your Honor, does he mean by text

12  message?

13        MR. BUGNI:  Well, I'm trying to lay the foundation to

14  see --

03:45  15        Your Honor, if I can respond.  We know that directions

16  were given about what -- when to record and that it had to be

17  recorded.  What I'm trying to find out is whether instructions

18  were given and whether or not those were contained within the

19  missing instruction -- within the missing text messages.

03:45  20        THE COURT:  Well, let's focus -- I mean, I don't want

21  to get too deep into a dispute today in the context of the

22  spoliation hearing about, you know, whether the government has

23  fully and completely expressed all of the instructions that were

24  given to the CSs.

03:46  25        So let's focus on information that is, you know,

102

1    possibly missing because of the missing text messages.

2    BY MR. BUGNI:

3    Q.   So other than instructing through text message that Steve

4    record everything, were any other instructions given through

03:46    5    text message?

6    A.   No.  We give -- like I said, we give the logistical

7    instructions, which I would consider that to be logistical.

8    Q.   Okay.

9    A.   It's not -- not more than that.

03:46    10   Q.   Did Steve ever text you about what was happening between him

11   and Mr. Hamzeh?

12   A.   Not that I remember, no.

13   Q.   Were there text messages -- there was a fair amount of

14   surveillance done in this case, correct?

03:47    15   A.   Yes, as I understand it.

16   Q.   And were you part of that surveillance?

17   A.   No.

18   Q.   Did you help coordinate that surveillance?

19   A.   I did not.

03:47    20   Q.   Did you help coordinate with other agents at any time?

21   A.   About what?

22   Q.   About this investigation.

23   A.   Yes, the other source handlers.

24   Q.   And did you text with those other source handlers?

03:47    25   A.   Yes.

1    Q.   And when they did a Cellebrite extraction of your phone, did

2    they also grab the texts between the other agents?

3    A.   I don't know.  I don't remember seeing that.  Again, when I

4    look through the report that was made available to me it was

03:47   5    pretty specific what he was looking for and that's -- it wasn't

6    that.

7    Q.   Okay.  And is the report that was made available to you the

8    same report that's in front of you, the Cellebrite extraction?

9    A.   I don't know.

03:48   10   Q.   Can you page through it?

11           (Witness peruses document.)

12   A.   Sorry, I didn't see there was a whole report in back of it.

13           (Witness peruses document.)

14   A.   It appears to be.

03:49   15   BY MR. BUGNI:

16   Q.   So there was only for one phone number that the extraction

17   took place.

18   A.   Of this report?

19   Q.   Yes.

03:49   20   A.   Yes.

21   Q.   And so the one report that you saw was for that one single

22   phone number.

23   A.   For my government phone, yes.

24   Q.   Yes.  Was one done for your personal phone?

03:49   25   A.   No.

104

1    Q.  Okay.  Did you ever text any agents on your personal phone?

2    A.  No.

3    Q.  Did you ever text any other agents on their personal phones?

4    A.  No.

03:49    5    Q.  If you can go to page 17 of that report, line 84.  It's

6    Bates 17, but seems to be page 5 of the actual report.  Line 84.

7    Do you see it?

8    A.  Yup.  I do.

9    Q.  Can you read that to yourself?

03:50    10         (Witness peruses document.)

11    BY MR. BUGNI:

12    Q.  So this -- the bosses being upset the night before with the

13    failure to record.

14    A.  Uh-huh.

03:50    15    Q.  That's the context of the text message, correct?

16    A.  Yes.

17    Q.  Did the bosses text you that it was supposed to be recorded?

18    A.  No.

19    Q.  Was it emailed?

03:50    20    A.  No.

21    Q.  How was this conveyed to you?

22    A.  This was the supervisor over our squad telling me in his

23    office.

24    Q.  And who was the supervisor?

03:50    25    A.  Phil Hale.

105

1    Q.  And how many emails would you say were sent in the course of

2    this investigation?

3    A.  I have no idea.

4    Q.  More than a hundred?

03:51  5    A.  I don't know.  I don't know where to start to try to guess

6    on that.  I don't know who was all involved or what people were

7    involved with it necessarily outside of Milwaukee that would

8    have --

9    Q.  No, just from you.

03:51  10   A.  Maybe 10.  15.

11   Q.  Okay.  How many emails did you receive about this case?

12   A.  Probably about the same.

13   Q.  Okay.  And when you first -- you first started meeting with

14   Steve in August of 2015.

03:51  15   A.  I believe that's correct.

16   Q.  And did you have him use his personal phone to contact you?

17   A.  Yes.

18   Q.  Would he ever contact you with his wife's phone?

19   A.  Not that I ever knew of.

03:51  20   Q.  And were there any other phone numbers that he texted you

21   with?

22   A.  Not that I remember, no.

23   Q.  And if he had texted you from another number it wouldn't

24   have shown up on the Cellebrite report.

03:52  25   A.  No, this was for his number specifically, I believe.

106

1  Q.  And before Mr. Hamzeh became a target in this investigation,

2  how often would Steve text you?

3  A.  Before the defendant -- can you say that again?  I'm sorry.

4  Q.  So when was your first contact with Steve?

03:52  5  A.  When was my first contact?  I believe roughly August.

6  Q.  Okay.  And the first contact or first report about

7  Mr. Hamzeh takes place on September 16th.

8  A.  Correct.

9  Q.  Okay.

03:52  10  A.  I think.

11  Q.  So what I'm asking is, within that five-week period were

12  text messages sent to Steve from you?

13  A.  It's possible, but I don't remember specifically texting him

14  in-between there.

03:52  15  Q.  Okay.

16  A.  He came into the office and we talked.  And we exchanged

17  phone numbers and made -- kinda kept contact that way, through a

18  phone call.

19  Q.  How many phone calls do you believe you talked to him with?

03:53  20  A.  I don't know.

21  Q.  Okay.  And when he first introduced Mr. Hamzeh as a subject,

22  was it through text message?

23  A.  No.

24  Q.  How did he approach that?

03:53  25  A.  In person.

107

1    Q.  And did you have an email address for Mr. -- Steve?

2    A.  I don't remember.

3    Q.  And as far as the preservation of these texts, you mentioned

4    earlier that you kept your DHS phone, correct?

03:53    5    A.  Correct.

6    Q.  So a Cellebrite analysis could be done today to retrieve the

7    missing text messages.

8    A.  It's possible.

9    Q.  Okay.  Has the government approached you since the November

03:53    10    download that they did to try and retrieve those text messages?

11    A.  No, I brought the phone back to them.

12    Q.  And those text messages or potential text messages between

13    Steve in August, what were they concerned about as far as

14    Hamzeh?  When was Hamzeh first brought up?

03:54    15    A.  I don't remember a specific date, but that was the reason

16    for his initial contact to us.

17    Q.  And where was that recorded?

18    A.  I'm not positive.  Perhaps the case file.

19    Q.  And do you remember -- so he walked in and told you about

03:54    20    Samy Hamzeh?

21    A.  That's correct.

22    Q.  In August.

23    A.  Approximately.

24    Q.  And the first report about Hamzeh is not generated until mid

03:54    25    September?

108

1    A.  I don't know when the first report was generated.

2    Q.  If I told you it was -- go ahead.

3    A.  What report are you -- what report do you mean specifically?

4    Is there a report?

03:54   5    Q.  There is a report of September 16th written by you.

6    A.  Okay.

7    Q.  It's CHS-1.  But were there other reports written by you

8    about your contacts with Mr. Hamzeh -- or, sorry, with Steve in

9    August?

03:55   10   A.  Not that I remember.  That's why I'm asking what the nature

11   of that report was.  If that was a CHS report, if that was

12   something else, I don't know.

13   Q.  What other reports could there be?

14   A.  A report of an interview.

03:55   15   Q.  And do you believe that a report of an interview was made

16   between you and Steve?

17   A.  I don't remember.

18   Q.  And would the text messages at times would be used as almost

19   your rough notes, correct?

03:55   20   A.  No.

21   Q.  Did you ever use the text messages to produce a report?

22   A.  The text messages, no.

23           MR. BUGNI:  If I can just have a second, Your Honor.

24           THE COURT:  Yes.

03:55   25           (Brief pause.)

109

1    BY MR. BUGNI:

2    Q.  Do you recognize this report?

3    A.  Yes.

4    Q.  Who wrote this report?

03:56   5    A.  I did.

6    Q.  And in this report, how often would you write reports in

7    this case?

8    A.  Just about every time we met.

9    Q.  Every time you met with whom?

03:56   10   A.  With the CHS.

11   Q.  So every time you met with the CHS you produced a report.

12   A.  Yes.

13   Q.  As well as with phone contact too?

14   A.  If the two were -- if it was discussing the same thing or if

03:57   15   it was the same information being passed, then, no, not

16   necessarily.  It wouldn't always be one for one and that would

17   be the difference, I guess.

18   Q.  Okay.  But what became the -- the decisionmaker between

19   whether or not you wrote a report about a phone call?

03:57   20   A.  I'm sorry?

21   Q.  When you said that you would write a report about every

22   contact you had with him, but sometimes if it was about the same

23   subject matter you didn't.

24   A.  Correct.  If I was -- if I received a text that I can't meet

03:57   25   today, and I made a follow-up phone call and said what's going

110

1    on, is everything okay, is there anything I need to know about,

2    I wouldn't document the text message and then the phone call in

3    individuals reports.  That's what I mean when I say it's not one

4    for one.

5    Q.  Got it.

6    A.  He texted me, he called me, I called him.

7    Q.  I understand now.  And so any time there was a phone call

8    there would be a report written.

9    A.  No, not always.

03:58    10    Q.  Okay.  When would there not be a report written?  Other than

11    if it was duplicative of the text message.

12    A.  If there was a contact where he would say merry Christmas or

13    something not related to the case.

14    Q.  And did you have daily contact about the case?

03:58    15    A.  No.

16    Q.  How often would you have contact about the case?

17    A.  Every few days.  There was nothing set up where we contact

18    each other every 72 hours or anything like that, for example.

19    It was just as information is coming or going.

03:58    20    Q.  But you would often meet on Tuesdays, correct?

21            MR. TAIBLESON:  Objection.  Beyond the scope of the

22    hearing.

23            MR. ALBEE:  It's in the text messages.

24            MR. TAIBLESON:  I don't understand how this is

03:58    25    relevant to spoliation.

111

1    THE COURT:  Sustained.

2  BY MR. BUGNI:

3  Q.  Returning back to the report that's been marked Exhibit L.

4  In the middle of that report it lists the type of contact,

5  correct?

6  A.  Yes.

7  Q.  And underneath that it says "SMS."

8  A.  Yes.

9  Q.  So, in fact, you would have wrote a report based upon text

10  messages.

11  A.  What I said earlier was "not always," no.

12  Q.  Not always, but there are times when text messages would

13  provide a basis to write a report.

14  A.  Potentially, yes.

15  Q.  And the text message itself would become your rough notes

16  about what you're about to base the report upon.

17  A.  No.

18  Q.  What would be your rough notes at that point to write this

19  report?

20  A.  If I took rough notes it would be the rough notes.  If it

21  was a text message and I had a question about it, likely as this

22  one would have been, I would have just made a phone call instead

23  of texting back and forth.

24  Q.  And would you fill in your rough notes with your text

25  messages?

112

1    A.  I don't know what you mean.

2    Q.  So if there's a gap in the rough notes that you had taken,

3    would you refer to your text message to see what was missing?

4    A.  No.

03:59    5    Q.  To clarify something?

6    A.  No.

7            MR. BUGNI:  If I could have one more second,

8    Your Honor.

9            THE COURT:  Yes.

04:00    10           (Brief pause.)

11           MR. BUGNI:  No further questions, Your Honor.

12           THE COURT:  Mr. Taibleson?

13                        CROSS-EXAMINATION

14   BY MR. TAIBLESON:

04:00    15   Q.  Did you ever delete anything to hide it from the defense?

16   A.  No.

17           MR. TAIBLESON:  Thank you.

18           THE COURT:  Thank you, Agent.  You may step down.

19           (Witness excused at 4:00 p.m.)

04:00    20           THE COURT:  Another witness from the defense?

21           MR. BUGNI:  Yes, Your Honor.  The defense would call

22   Agent Eric Fraser.

23           THE COURT:  Raise your right hand.

24           ERIC FRASER, DEFENSE WITNESS, DULY SWORN

04:01    25           THE CLERK:  Please state your full name and spell it

113

1    for the record.

2              THE WITNESS:  My name is Eric Parker Fraser.  E-r-i-c,

3    P-a-r-k-e-r, F-r-a-s-e-r.

4              THE COURT:  You may be seated.  Thank you, Agent.

5                        DIRECT EXAMINATION

6    BY MR. BUGNI:

7    Q.  Agent Fraser, with whom are you employed?

8    A.  I'm currently employed with the FBI.

9    Q.  How long have you been employed there?

10   A.  Just over 10 years.

11   Q.  And what you are your duties there?

12   A.  I'm currently a special agent assigned to the criminal

13   enterprise squad.

14   Q.  And in 2015 and 2016, were you involved in the Samy Hamzeh

15   case?

16   A.  I was.

17   Q.  And what was your role in that case?

18   A.  I was another agent on the squad working with the

19   investigation over those couple months.

20   Q.  And who was the lead agent in that case?

21   A.  That would be Jonathan Adkins.

22   Q.  And would he -- he was the person in charge for coordinating

23   everything?

24   A.  He was the primary case agent for the case, correct.

25   Q.  And part of him being the primary case agent and

1  coordinating everything is to communicate with other agents,

2  correct?

3  A.  Yes.

4  Q.  And sometimes that was done through email?

5  A.  Yes.

6  Q.  And sometimes that would be done through text message.

7  A.  Yes.

8  Q.  And were these text messages -- let me ask you this.  Do you

9  have a government phone?

10  A.  Yes.

11  Q.  And that's issued by the FBI?

12  A.  Correct.

13  Q.  And what kind of phone is that?

14  A.  Currently we have the Samsung S7.

15  Q.  And when was that issued to you?

16  A.  That was probably the summer of 2016.

17  Q.  So after this case.  And what kind of phone did you have

18  during Mr. Hamzeh's case?

19  A.  Pretty sure it was a Samsung S5, the previous model.

20  Q.  And did you also have a personal cell phone?

21  A.  Yes, I did.

22  Q.  And would you text with agents on that phone?

23  A.  No.

24  Q.  So all the text messages that you sent in this case were

25  through your work phone.

115

1    A.    Correct.

2    Q.    And when you texted with other agents about this

3    investigation, how often would that happen?

4    A.    Very seldom.

04:03    5    Q.    Give me an example.

6    A.    Maybe just a couple times a week.

7    Q.    And would it be with the people who were coordinating

8    surveillance?

9    A.    It would be with other individuals on the squad, just

04:03    10    determine their availability like for calendar purposes to see

11    who is available tomorrow or the next day or what our schedule

12    looked like for the week.

13    Q.    And there were a lot of developments in this case, it's been

14    described as rapidly changing.  Would the developments in the

04:03    15    case be shared over email or text?

16    A.    Typically not through email or text through our work phones,

17    no.

18    Q.    How would they be shared?

19    A.    In the office in the environment that we all worked or

04:03    20    shared in.  We were showing up for work every day and we talked

21    among ourselves with the direction from our supervisor and

22    Jonathan who was leading the case.

23    Q.    And sometimes would these developments be shared through

24    email?  I'm not saying exclusively or every time, but would you

04:04    25    get emails and updates about this case?

116

A.   Not like developments for the case or anything through

email, no.

Q.   Okay.  What type of information would be shared over email?

A.   Just like I said, our calendars, our schedules, trying to

04:04   coordinate if we're available for either surveillance or some

sort of operational activity outside of the office.

Q.   And as the surveillance was taking place would exhibits be

written back and forth or text messages sent about what was

happening?

04:04   A.   Not about what was happening, but about like logistically

where we would need to maybe be or to set up or to try and move

our movements.  Nothing with relating to the case.

Q.   No, but I mean what was happening as to where Mr. Hamzeh is

at a certain time or who he's meeting?

04:04   A.   That would be like through our phone calls.

Q.   Okay.

A.   We would call each other or we would actually have our

radios that we would communicate with.

Q.   At times would agents text that information?

04:04   A.   I would assume they did.  I never did.

Q.   And when did you find out about the lack of preservation of

some text messages affecting FBI phones?

A.   I imagine it would have been sometime in late '16 or even

'17.  I don't recall the exact date.

04:05   Q.   How did they let you know?

117

1   A.   Just through general conversation in the office, through

2   other case agents such as Jonathan Adkins or others.  Just kind

3   of word of mouth.

4   Q.   I don't mean about this specific case, but about the lack of

04:05   5   preservation of text messages in the FBI generally.

6   A.   Oh, I gotcha.  I'm sure there was just an email I think sent

7   out to everybody a couple years ago just so everybody was at

8   least knowledgeable about whatever guidance.

9   Q.   And do you remember when that email would have taken place?

04:05   10   A.   It would have been a couple years ago, but I don't recall

11   exact timeframe.

12   Q.   2016.

13   A.   Either '16, or '17 maybe, yes.

14   Q.   And did that email give any direction to the agents of what

04:05   15   to do with their phones to make sure that text messages were

16   preserved?

17   A.   If there was relevant or substantive information regarding

18   that phone or that device as far as like the text messages or

19   exhibits then yes, they provided guidance as to what to do to

04:06   20   preserve those.

21   Q.   And do you remember what the guidance was?

22   A.   I have actually never done it because I don't use the phone

23   for emails or texts to have any substantive information on it.

24   So I've never done it myself, but if I needed to I would look up

04:06   25   the guidance or policy and follow that.

118

1   Q.  And so was it given to each individual agent to decide

2   whether or not they thought those text messages or emails were

3   substantive, or was that something that every email or every

4   text message is presumed substantive?

04:06   5   A.  It's not necessarily presumed substantive.  I think a lot of

6   it is informal just kind of work dialog or just kind of other

7   things that might be sent out amongst the office or whatever.

8   But then if there is something substantive that the agent that

9   receives it deems that that's credible that needs to go to the

04:06   10  case, then they would preserve it in the matter that they would

11  follow in the guidance and do that.

12  Q.  At no point in this case did Agent Adkins approach you and

13  tell you to make sure you preserve your text messages about this

14  case.

04:06   15  A.  Mr. Adkins did not, no.

16  Q.  Did anybody approach you?

17  A.  No.

18  Q.  Did anybody attempt to do a Cellebrite extraction on your

19  phone?

04:07   20  A.  On my phone?  Not that I recall or not that I was aware of.

21  Q.  Has anybody in the FBI or the government's office approached

22  you with your toll records and asked you how many text messages

23  you sent to Steve and Mike?

24  A.  No.

04:07   25  Q.  Did they ever ask you to recreate those?

1    A.  No.

2    Q.  Did they ever ask you to recreate the text messages between

3    the agents?

4    A.  No.

04:07  5    Q.  I believe I asked this but if I didn't:  And nobody's ever

6    approached you to look through your cell phone to try and

7    extract that.

8    A.  No.

9    Q.  And do you remember, were there any meetings in this

04:07  10   specific case about the lack of preservation of the texts and

11   what could be done to recreate them?

12   A.  Not that I recall, no.

13   Q.  Any emails sent out?

14   A.  No.

04:07  15   Q.  When did you first learn that your text messages with

16   confidential human sources were missing?

17   A.  Probably like a year, year and a half ago.  Sometime during

18   the course of this investigation once it was closed and we were

19   working through discovery and everything here in court.

04:08  20   Q.  And how did you learn that?

21   A.  I'm not sure if it was exactly from the United States

22   Attorney's Office or internally like our management or something

23   knew about it and would pass it on to all of us agents that were

24   currently involved in that case at that time.

04:08  25   Q.  And did you make any efforts to talk to the CHSs to see what

1    they thought you remember having texted them?

2    A.   I did not have any sort of contact with any of them since

3    that case was concluded.

4    Q.   In this case -- sorry, if I can have one second.

04:08    5              MR. BUGNI:  May I approach, Your Honor?

6              THE COURT:  You may.

7              (Document tendered to the witness.)

8    BY MR. BUGNI:

9    Q.   Agent Fraser, the 414-265-6414 number, is that your phone

04:09    10   number?

11   A.   Correct.

12   Q.   And did you text with Steve in this case?  We were calling

13   him Steve, CHS-1.

14   A.   CHS-1, I'm pretty sure I did, yes.

04:09    15   Q.   And you texted with him -- if you could go to page 2 of this

16   report.  We've already established you're the 6414 number and

17   his would be the 6945 number.

18   A.   Yes.

19   Q.   These text messages took place right as Mr. Hamzeh was

04:09    20   backing out of the Masonic plot.

21             MR. TAIBLESON:  Objection.

22             MR. PTASHKIN:  Objection, obviously.

23             THE COURT:  Sustained.

24   BY MR. BUGNI:

04:10    25   Q.   Do you know what was taking place on the 23rd or 24th of

121

1    this investigation?

2           MR. PTASHKIN:  Objection, Your Honor.  Irrelevant to

3    the spoliation hearing.  It seems like he's asking him to

4    recounts facts of the investigation.  The substance of the

04:10    5    investigation.  This has nothing to do with the preservation of

6    whether he deleted text messages in bad faith or not.

7           MR. BUGNI:  It goes to whether or not what was on the

8    text messages.

9           THE COURT:  Overruled.

04:10    10   BY MR. BUGNI:

11   Q.  So the 23rd and 24th in this case, what was going on in the

12   investigation?

13   A.  I think it was coming to a conclusion.  Or it was -- I knew

14   it was ending sometime in late January.

04:10    15   Q.  How do you know it was ending in late January?

16   A.  I just recall that being a significant timeframe during, you

17   know, our squad work and kinda just knowing that that was a big

18   case that we, you know, were concluding in late January.  So

19   three years almost now.

04:10    20   Q.  And as part of the sort of culmination of this case, there

21   had been a plot to -- alleged plot to attack the Masonic Center,

22   correct?

23   A.  Yes.

24   Q.  And at some point Mr. Hamzeh backed out of that plot.

04:11    25          MR. PTASHKIN:  Objection.

122

1      MR. TAIBLESON:  Objection.

2      MR. BUGNI:  Your Honor, we want to get to the

3  substance of what was texted between him and Steve.

4      MR. TAIBLESON:  Defense counsel could ask whether

04:11   5  Mr. Fraser is aware of any  text messages about a withdrawal

6  from the Masonic Center.

7      THE COURT:  Let's phrase without generally talking

8  about the investigation.  This isn't a deposition.  We're

9  focused on what could be on these texts.  So let's ask the

04:11  10  question in that fashion.

11  BY MR. BUGNI:

12  Q.  You are aware that Mr. Hamzeh backed out of the plot and

13  that could have been communicated through a text message to the

14  agents.

04:11  15      MR. TAIBLESON:  Leading.  Calls for speculation.

16  Doesn't just ask him whether he knows if that happened.

17      THE COURT:  Overruled.  Go ahead.

18  BY MR. BUGNI:

19  Q.  You can answer the question.

04:11  20  A.  I know on the 23rd and 24th I was needing to meet with him

21  in person.  So I was coordinating a lot of texts to try and

22  figure out where he was so I could talk to him about, you know,

23  what Jonathan Adkins or the nature of the case, where it was

24  going and what information he had and what he knew.

04:12  25  Q.  And did he communicate what he knew through text message?

123

1   A.  Not through text.

2   Q.  Did he communicate what was happening at that moment with

3   Mr. Hamzeh through text message?

4   A.  Not through text.

04:12   5   Q.  Did he communicate where he saw the investigation going

6   through texts?

7   A.  No.

8   Q.  Did you coordinate -- after meeting with Mr. Steve, did you

9   communicate with any of the agents through texts?

04:12   10   A.  At this particular date or time?

11   Q.  Yes.

12   A.  I talked to them over the phone when I was done meeting with

13   Steve, and I would tell them that we concluded and I would see

14   them back at the office the next day or --

04:12   15   Q.  And did you communicate any information about the

16   investigation to the other agents through text?

17   A.  Nothing through text.

18   Q.  What about email?

19   A.  Nope.

04:12   20   Q.  Okay.

21           MR. BUGNI:  No further questions, Your Honor.

22           THE COURT:  Government?

23                   CROSS-EXAMINATION

24   BY MR. TAIBLESON:

04:13   25   Q.  Agent Fraser, did you ever delete anything to hide it from

124

1   the defense?

2   A.  No.

3           MR. TAIBLESON:  Thank you.

4           THE COURT:  All right.  Thank you, Agent Fraser.  You

5   can step down.

6           (Witness excused at 4:13 p.m.)

7           THE COURT:  Mr. Bugni?

8           MR. BUGNI:  Your Honor, we'd call Shavon Caygill to

9   the stand.

10          SHAVON CAYGILL, DEFENSE WITNESS, DULY SWORN

11          THE CLERK:  Please state your full name and spell both

12  the first and last name.

13          THE WITNESS:  Shavon Caygill, S-h-a-v-o-n, last name

14  C-a-y-g-i-l-l.

15                          DIRECT EXAMINATION

16  BY MR. BUGNI:

17  Q.  Ms. Caygill, for whom are you employed?

18  A.  The Federal Defender Services.

19  Q.  And how long have you worked there?

20  A.  It will be almost a year.

21  Q.  As part of your duties in this case in our office, have you

22  been working on the Hamzeh case?

23  A.  I have.

24  Q.  And among those duties has it been to look through and sort

25  the phone records in this case?

125

1    A.  Yes.

2    Q.  Were subpoenas issued in this case for the phone records?

3    A.  They were.

4    Q.  All right.  We've already agreed that Exhibit K is a

04:14   5    stipulation of the phone numbers.  Was a subpoena issued for the

6    toll and text messages for the 6945 number?

7    A.  It was.

8    Q.  And who did that number belong to?

9    A.  CHS-1.

04:14  10    Q.  And to the 0064 number?

11    A.  CHS-2.

12    Q.  And as part of -- did you get certified copies of all those

13    records?

14    A.  Yes.

04:14  15    Q.  And approximately how big were those phone records?

16    A.  In Excel sheets, over 10,000 lines; paper, a couple thousand

17    pages.

18    Q.  And for Steve about the same?

19    A.  Yes, for both.

04:15  20    Q.  And were those records return certified?

21    A.  Yes.

22    Q.  And were they shared with the government?

23    A.  They were.

24    Q.  And as part of your duties in this case did you make

04:15  25    summaries for how many messages were shared between the CHS

126

1    numbers and other numbers?

2    A.   I did.

3    Q.   And who provided the other numbers to you?

4    A.   The government.

04:15    5    Q.   And based upon that did you -- how did you create your

6    summaries?

7    A.   I was able to extract text messages from the main report and

8    pull them out and make a summary of just the text messages.

9    Q.   So you were able to isolate the SMS messages.

04:15    10    A.   Yes.

11    Q.   And were you able to isolate them for each phone number?

12    A.   He was.

13    Q.   For Agents Fraser, Adkins, Zuraw and Buono?

14    A.   Yup.

04:16    15    Q.   And did you prepare the summaries A, B, C and D in this

16    case?

17    A.   I did.

18    Q.   And are those accurate?

19    A.   Yes.

04:16    20    Q.   How did you determine how many texts had been sent between

21    the agents and the CHSs?

22    A.   I isolated it by phone number and counted -- I mean in Excel

23    sheets it gives you a number.

24    Q.   And then how did you determine the number that were missing?

04:16    25    A.   The government had provided text messages and I manually

1    counted them.  Besides Officer Zuraw's was a Cellebrite

2    extraction and it gave me the number, but other than that I

3    manually counted all the text messages.

4    Q.  And did you go through the same process with Exhibits A

04:16   5    through E?

6    A.  Yes.

7            MR. BUGNI:  Your Honor, we move in Exhibits A through

8    E.

9            THE COURT:  Do I have all of those?  I mean right now

04:16   10   I have A, --

11           MR. BUGNI:  Sorry.  We submitted them yesterday,

12   Your Honor, but we'll hand up copies that should be here.

13           THE COURT:  Okay.  I would like copies if you've got

14   them.  So any objection to A through E did you say?

04:17   15           MR. BUGNI:  Yes, Your Honor.

16           THE COURT:  Any objection?

17           MR. PTASHKIN:  Your Honor, the issue the government's

18   having is we think there are some inaccuracies in the summaries.

19   And some of them relate to this issue of the text messages that

04:17   20   are over the 140 characters being broken down.  So I guess the

21   short answer is we object on the grounds that they aren't a

22   hundred percent accurate.

23           THE COURT:  Well, there's no evidence of that so I'm

24   going to accept them.  And if you want to subsequently present

04:17   25   evidence of some inaccuracy I suppose you could do so.

128

1    MR. PTASHKIN:  Of course, Your Honor.  Thank you.

2    THE COURT:  So A through E will be received.

3    (Exhibits A through E received in evidence.)

4    MR. BUGNI:  We have no further questions, Your Honor.

04:17    5    THE COURT:  Any questions for this witness?

6    MR. PTASHKIN:  No questions for this witness,

7  Your Honor, for the United States.

8    THE COURT:  All right, you may step down, Ms. Caygill.

9  Thank you.

04:18    10    (Witness excused at 4:18 p.m.)

11    THE COURT:  Any more witnesses from the defense?

12    MR. ALBEE:  No, Your Honor.

13    THE COURT:  So let me ask.  I've got this exhibit

14  witness list.  Who gave this to me?

04:18    15    MR. BUGNI:  Your Honor, sorry, we didn't move into

16  admission the stipulation of Exhibit K.

17    MR. ALBEE:  Can we hand that up?

18    THE COURT:  Okay.  I also have -- we've also

19  referenced today -- so K -- no objection to K, correct?

04:18    20    MR. PTASHKIN:  No objection, Your Honor.

21    THE COURT:  And we also today talked about G, H, L.

22  And I was given a copy of N.  Have those been offered?  I can

23  answer that.  Nobody's offered those.  Are they being offered?

24    MR. ALBEE:  No, Judge.  I thought at the outset -- and

04:19    25  if I didn't I apologize -- that H and N were agreed upon and

129

1    we've agreed to admit those.  So H and N.

2            We were not moving G.

3            And -- so the ones that we would hope are admitted at

4    this point are A through E, H, K, and N.

5            MR. PTASHKIN:  And no objection to that, Your Honor.

6    The United States would also move to have Exhibit G admitted

7    into evidence.

8            MR. ALBEE:  We don't object.

9            THE COURT:  All right.  So H -- or G, H, K, and N will

10   be admitted.  And I need copies of B, E, and I guess I just got

11   K.

12           (Exhibits G, H, K and N received in evidence.)

13           MR. ALBEE:  Judge, in fairness to the government,

14   actually we should probably admit Exhibit I, the -- Agent

15   Mosback.  E relates to his missing texts, but there are two

16   missing texts and the government provided those yesterday

17   evening.  So we probably should supply Exhibit I.  And I don't

18   believe there are any more missing from Agent Mosback.

19           MR. PTASHKIN:  That's correct, Your Honor.

20           THE COURT:  So "I" also will be received.

21           (Exhibit I received in evidence.)

22           THE COURT:  Okay.  And you're giving me a copy of "I."

23           So just to summarize from the exhibits.  We have

24   received A, B, C, D -- I guess I still don't have E.

25           MR. BUGNI:  Coming up, Your Honor.

130

1          THE COURT:  E.  G, H, I, K, and N.  Okay.

2          All right.  So that's the exhibits.

3          MR. ALBEE:  And, Judge, I think our agreement is all

4     of those should be under seal except G and H.

04:21   5          THE COURT:  All right.  Well, I will -- as previously

6     indicated, I will accept -- I'll receive those under seal for

7     the time being, subject to a later determination as to whether

8     they should properly remain under seal.

9          MR. ALBEE:  Actually, given a meeting I had yesterday,

04:22  10     I don't know if we should call these restricted.  They can be

11     available to the parties.  I guess there's a technical

12     difference there.  So if they're restricted the parties at least

13     can access them as opposed to sealed.

14          THE COURT:  What's the government's position on that?

04:22  15          MR. PTASHKIN:  I guess that's okay, Your Honor.  I

16     mean, we already have the exhibits.  But, I mean, no objection

17     to them being not restricted to the parties.

18          THE COURT:  They will be restricted which means the

19     parties have access to them, the public does not for the time

04:22  20     being at least.

21          So I guess the next question to you, Mr. Albee, is:

22     What do you propose as the next step?

23          MR. ALBEE:  Judge --

24          THE COURT:  There's no motion pending.  There was a

04:23  25     motion for a spoliation hearing.  So we've had that.

                                                                    131

1          MR. ALBEE:  Judge, we'd like to get the transcript and

2     then file with the Court a pleading addressing two things:

3     Whether there's any basis for any kind of spoliation sanction --

4     and I don't know that there will be or there won't be.

04:23    5          The bigger concern at this point is it's been

6     identified there are still things that aren't -- haven't been

7     produced in discovery.  And that would probably -- our primary

8     focus is getting those things produced.  And then I guess if

9     they still aren't produced, then we'd ask for a sanction.

04:23   10     But --

11          THE COURT:  Well, I think that as to documents that

12     the defense believes have not yet been produced that have been

13     requested, you know, communicate with each other about that, see

14     if you can, you know, if there's some agreement about what

04:24   15     exists and what's been ordered produced but hasn't been.  And if

16     there is still something out there that the defense takes the

17     position exists and the government has it and it hasn't been

18     produced and they're refusing to produce it, then I guess file a

19     motion.

04:24   20          MR. ALBEE:  That's fine.  Thank you, Judge.

21          THE COURT:  And so wait till you get a transcript

22     from -- of this hearing.  And if the defense believes there's a

23     basis for anything based on the testimony that's been received,

24     should we set a date for the filing of a motion for that?

04:25   25          MR. ALBEE:  Yes, Judge.  If we could -- two weeks for

                                                                    132

1    the transcript.  Two weeks for the transcript and two weeks to

2    file.

3              THE COURT:  All right.  So roughly a month out,

4    recognizing we've got holidays in there.  Friday, January 18th

04:25    5    for the filing of any such motions?

6              MR. ALBEE:  Yes, that would be great.

7              THE COURT:  And then for response for a week?

8              MR. TAIBLESON:  Week is fine, Your Honor.  Thank you.

9              THE COURT:  So January 25th.  And a week for reply,

04:25    10   February 1st?

11             MR. TAIBLESON:  Yes, Your Honor.

12             MR. BUGNI:  Actually, Your Honor, Mr. Albee and I both

13   have trials in separate districts, but -- so if we could have

14   one more week.  So maybe February 8th would be --

04:25    15             THE COURT:  Any objection from the government?

16             MR. TAIBLESON:  No.

17             THE COURT:  All right.  February 8th for reply.

18             Mr. Ptashkin, looks like you want to say something?

19             MR. PTASHKIN:  I apologize.  I guess I'm just -- I

04:26    20   think the defense requested an extra week for their initial

21   response?  Or was that for the reply?

22             MR. BUGNI:  For the reply.

23             MR. PTASHKIN:  For the reply.  The February 8th date.

24   I apologize.

04:26    25             THE COURT:  No problem.  Is there anything else?

133

1          MR. BUGNI:  No, Your Honor.

2          THE COURT:  From the defense?

3          MR. ALBEE:  No, Judge.

4          THE COURT:  All right.  Then we're concluded.  Thanks,

5     everybody.

6          MR. TAIBLESON:  Thanks, Judge.

7          (Proceedings concluded at 4:26 p.m.)

8                              *    *    *

04:26 (beside line 5)

134

C E R T I F I C A T E

       I, JOHN T. SCHINDHELM, RMR, CRR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified December 19, 2018.

/s/John T. Schindhelm

John T. Schindhelm

           John T. Schindhelm, RPR, RMR, CRR
           United States Official Reporter
           517 E Wisconsin Ave., Rm 236,
           Milwaukee, WI 53202
           Website: WWW.JOHNSCHINDHELM.COM



```
1                        I N D E X

2    WITNESS   EXAMINATION                               PAGE

3    JOSHUA BAER, GOVERNMENT WITNESS

4         DIRECT EXAMINATION BY MR. PTASHKIN..............     7

5         CROSS-EXAMINATION BY MR. ALBEE..................    19

6         EXAMINATION BY THE COURT........................    35

7         REDIRECT EXAMINATION BY MR. PTASHKIN............    36

8         RECROSS-EXAMINATION BY MR. ALBEE................    38

9         FURTHER REDIRECT EXAMINATION BY MR. PTASHKIN.....   41

10        FURTHER RECROSS-EXAMINATION BY MR. ALBEE.........   42

11   NEIL LEE, GOVERNMENT WITNESS

12        DIRECT EXAMINATION BY MR. PTASHKIN..............    43

13        CROSS-EXAMINATION BY MR. ALBEE..................    46

14   JONATHAN ADKINS, GOVERNMENT WITNESS

15        DIRECT EXAMINATION BY MR. ALBEE.................    55

16        CROSS-EXAMINATION BY MR. TAIBLESON..............    87

17   JOSEPH ZURAW, DEFENSE WITNESS

18        DIRECT EXAMINATION BY MR. BUGNI.................    89

19        CROSS-EXAMINATION BY MR. TAIBLESON..............   113

20   ERIC FRASER, DEFENSE WITNESS

21        DIRECT EXAMINATION BY MR. BUGNI.................   114

22        CROSS-EXAMINATION BY MR. TAIBLESON..............   124

23   SHAVON CAYGILL, DEFENSE WITNESS

24        DIRECT EXAMINATION BY MR. BUGNI.................   125

25
```

136

```
                                    * * * * *

                            E X H I B I T S

     NUMBER              DESCRIPTION                OFFERED ADMITTED

A    Texts between Muntasser and Jonathan ............129      129
     Adkins-RESTRICTED

B    Texts between Shhab and Michael .................129      129
     Buono-RESTRICTED

C    Texts between Muntasser and Joseph ..............129      129
     Zuraw-RESTRICTED

D    Texts between Shhab and Eric Fraser-RESTRICTED...129      129

E    Texts between Shhab and Ronald ..................129      129
     Mosback-RESTRICTED

G    7/30/2018 FBI Report.............................130      130

H    12/11/2018:  Letter from the government to ......130      130
     defense counsel

I    Agent Texts-RESTRICTED ..........................130      130

K    Index of Phone Numbers-RESTRICTED................130      130

N    Agent Texts-RESTRICTED...........................130      130
```