UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff,*

　　*vs.*　　　　　　　　　　　　　　Case No. 16-CR-21

SAMY M. HAMZEH,

　　　　　　　　*Defendant.*

## CONSOLIDATED OBJECTIONS TO MAGISTRATE JUDGE'S DISCOVERY AND CIPA ORDERS

Samy Hamzeh, by counsel, hereby objects to the Magistrate Judge's Orders on discovery and CIPA. This memorandum first addresses the Magistrate's Discovery Order, R. 219, following the numbering convention used in that order, and then addresses the CIPA orders, R. 220 and R. 221.

### A.　　Discovery Order

### 1. Background.

Hamzeh has no legal objections to this section.

### 2. Text Messages.

The redacted text messages at issue are contained in the sealed exhibit previously submitted as R.211. Hamzeh limits his objections to the redactions in just four specific texts. First, in Exhibit A to R. 211, there is a January 13, 2016, text at 18:34 between CHS2 (Mike) and an agent. The text is redacted to conceal the name of a person associated with a trip to Michigan. This name is important because this text takes place during the

Federal Defender Services
of Wisconsin, Inc.

timeframe in which Mike was not recording his meetings with Hamzeh and was suggesting travel to other states, although from the discovery Hamzeh is unaware of any supposed Michigan trip. There also is a text on January 20, 2016, at 19:19 between agents in Exhibit B mentioning a Michigan trip, suggesting the trip may be significant. The redacted name is a potential witness who may have important information that the defense needs to follow up on, and there is no apparent need to conceal his or her name.

Hamzeh also seeks an unredacted copy of the text in Exhibit A on January 13, 2016, at 18:37 between Mike and the agent. The redacted information may be important for understanding and investigating Mike's activities during this timeframe when meetings and conversations with Hamzeh were not recorded.

The third redacted text is from Exhibit B on November 11, 2015, at 17:11 between agents 1 and 5. This text refer to Mike by a nickname and involves a potentially important event—Hamzeh's alleged desire for a gun. But the defense can't decipher what is happening because of the redaction.

The fourth redacted text is from Exhibit B on January 25 at 13:58 between Agent 1 and Agent 22. This text is about calling CI Mike about a matter that's redacted. This redaction is likely important as this text takes place just hours before Hamzeh's arrest. So while the Magistrate Judge has noted that "[t]he nature of the redacted material is often readily discernable from the context of the message," the four instances cited above do not fall into that category. R.219:4.

Federal Defender Services
of Wisconsin, Inc.

### 3. Emails.

As the Magistrate Judge notes, he previously ordered the government to turn over all emails. R. 150 at 2. That order includes all emails to or from agents, informants, task force officers, or professional support staff relating to the investigation. *Id*. The government has an obligation to seek out any such emails. As the Magistrate notes, the government hasn't indicated that it has done so or that it has provided all emails covered by the Magistrate's order. R. 219:5-6. And to date, the defense has only received 11 pages of emails, which contain a total of 15 emails. For an investigation that spanned four months and involved over 20 agents that seems a bit light. What's more, at the spoliation hearing the lead case agent, stated that he wasn't asked to turn over the emails as part of the investigation. R.205:53 (Q: Were you asked to recover emails in this case? A: I was not, no."). And Agent Zuraw testified that he sent between 10–15 emails, and received between 10–15 emails in the case but only one email including Zuraw has been turned over. *See* R.205:106.

While the Magistrate concludes that he could do nothing more than what he has already done – order that all emails be turned over — this Court can order the government to make all necessary inquiries to ensure that there are no additional emails. Hamzeh requests that order so that there is no issue about unproduced emails at trial.

### 4. Informants.

The credibility of the informants is a critical issue in this case, but the government has not turned over basic impeachment materials. Instead, the government invokes

Federal Defender Services
of Wisconsin, Inc.

CIPA, claims that the information wasn't memorialized, or asserts that information is not exculpatory that plainly would be of value to the defense in cross-examining agents and informants. Further, to the extent that some of this information may not be producible at this stage, it is likely to be *Jencks* material that will have to be produced before trial. Each category of informant information is addressed below. Before addressing each category, it is worth noting that on July 25, 2018, the Magistrate ordered the government to produce the following information relating to the credibility of informants by August 8, 2018:

- all updated *Giglio* material

- any requests by any informant for immigration assistance of any type or any immigration benefits offered or received or contemplated

- all money paid in total for any purpose to the CHS including both expenses and services

- the amount of money paid related strictly to the Hamzeh case (Services + expense broken out separately

- whether any informant has received post-conviction benefits in any case for their cooperation

- the most recent criminal history for the informants

- the results of FBI required public records checks for the informants from commercial databases

- all FBI approvals for the CHS to engage in other illegal activity and include dates of authority and termination of authority

- copies of any admonishments documented to the CHS file evidencing he CHS having violated rules, violated policies, etc.

- any third-party benefit agreements documenting the CHS is working off prosecution issues of another person

4

Federal Defender Services
of Wisconsin, Inc.

- any prosecution deferral or declination or benefit promised to the CHS in exchange for the CHS's cooperation

- the results of the required CHS 'testing' by the case agents if the CHS failed the testing. In any case, confirm the CHS was tested via policy (believed to be the sub "V" file)

- if the CHS had recording equipment routinely assigned to him for extended periods of time, which is routine with CHS's in the FBI

- if that recording equipment was in the possession while the CHS was having unrecorded conversations with Hamzeh.

R. 150. Yet none of that information has been turned over.

### 4.1 Benefits received by informants

The first category of informant information concerns benefits requested, hoped for, or received. As noted above, in the Magistrate's July 25 order, he ordered the government to produce information involving benefits, including immigration benefits, post-conviction benefits in any case for cooperation, all money paid to the informants for cooperation, and third-party benefits. *Id.* The July 25 order also required the government to "turn over all underlying documentation regarding the payments given to informants as part of their work in this case." R. 150 at 4; *see also* R. 107. But the government later claimed CIPA protection and has declined to produce this material to the defense. The Magistrate Judge has now endorsed the government's invocation of CIPA, saying only that "that order resolves these requests." R.219:8.

For reasons explained more fully in part B of this memo (objections to the Court's CIPA order) the defense does not understand how the government can be allowed to conceal the specific payments and other benefits received by the informants in this case

Federal Defender Services
of Wisconsin, Inc.

given the critical importance of the informants' credibility, especially when the Magistrate already deemed them producible. Indeed, "[p]ayments to a government witness are no small thing." *United States v. Sedaghaty,* 728 F.3d 885, 901 (9th Cir. 2013) (reversing the defendant's conviction under *Brady* where the government failed to disclose an offer of payment of $7500 to the witness and other payments that had been made to her husband for his cooperation). In *Sedaghaty,* the court found that despite the witness's claim that she didn't recall an FBI agent's offer of payment, "her relatively modest position and unpaid medical bills would have supported an inference that the FBI payments [to her husband], together with the offer of possible future payment were a substantial influence on [the witness's] testimony." *Id.*

Like the unpaid medical bills in *Sedaghaty,* during CI Mike's cooperation in this case, he raised concerns with the lead FBI agent over whether he could continue to work for them because he owed $7000 to the Department of Revenue. Indeed, in this case (just as in any) the benefits given, offered, or hoped for are critical to the "jury's estimate of the truthfulness and reliability" of the informants and "it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Napue v. Illinois,* 360 U.S. 264, 269 (1959).

The Magistrate Judge also noted that the government has indicated that the informants received no immigration benefits and suggests that that representation moots that issue. But the issue isn't limited to whether benefits in fact were received, but extends to whether benefits were requested, expected, or hoped for. And the text messages make

Federal Defender Services
of Wisconsin, Inc.

it clear that Steve asked for help with his immigration status and the agents were willing to help. Agent Zuraw wrote on October 16:

> Thank you again for you help last night. I am trying to help with your immigration stuff. No guarantees that it will change anything, but I think it's worth a try. I do need to see your passport sometime soon. I will need a copy of it.

That "help" is not a small matter; the type of help that has to be disclosed to the defense includes: relocation assistance and stays of deportation or other immigration status as the government itself recognizes. *See* United States Department of Justice, *Guidance for Prosecutors Regarding Criminal Discovery* (January 4, 2010), Step I.B.7 (DOJ Guidance Memo).[1] That help also would include requests for assistance with other prosecutions, including state prosecutions, and with tax issues. Thus, the Magistrate Judge has erred in failing to order that this be produced or for the government to reconcile the evidence of benefits that are offered to the CI's with the *Brady* information that has been produced to the defense.

### 4.2 Instructions and admonishments to informants.

The Magistrate's July 25 order required the government to notify the defense of "admonishments documented to the CHS file." R. 150 at 3. Hamzeh doesn't believe there is any dispute as to the exculpatory nature of admonishments to the informants or the informants' violations of the agents' instructions. Hamzeh's discovery motion sought notice of all admonishments, all instructions given to the informants, and violations of

---

[1]  https://www.justice.gov/archives/dag/memorandum-department-prosecutors.

Federal Defender Services
of Wisconsin, Inc.

policies and instructions by the informants, whether they were memorialized or not. R.214. But the Magistrate determined that the government has no obligation to produce information under either Rule 16 or *Brady* if is not memorialized. R.219:9–10.

This Court should require the production of this information because the Magistrate has committed a legal error by concluding that the government has no obligation to produce information that has not been reduced to writing. The law on this point is clear: "the government cannot avoid its *Brady* obligations by choosing not to memorialize favorable information in writing." Cary, Singer, Latcovich, FEDERAL CRIMINAL DISCOVERY, at 30 (ABA 2011); *see also United States v. Rodriguez*, 496 F.3d 221, 225–29 (2d Cir. 2007) (holding that the government's failure to make a written record of a witness's inconsistent statement does not exempt the government from turning over the information). The DOJ's own policy provides that "with few exceptions" "the format of the information does not determine whether it is discoverable," and that "material exculpatory information that the prosecutor receives during a conversation with an agent or a witness is no less discoverable than if that same information were contained in an email." DOJ Guidance Memo, Step I.B.5.

And the Supreme Court has been clear on this point: a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case." *E.g., Kyles v. Whitley*, 514 U.S. 419, 437 (1995). That means that prosecutors have a duty to learn from agents what exculpatory information is known to them, which would include information that has not been memorialized. DOJ Guidance Memo, Step 1.B.6.

Federal Defender Services
of Wisconsin, Inc.

("Prosecutors should have candid conversations with the federal agents with whom they work regarding any potential *Giglio* issues . . ."). So the Magistrate Judge is incorrect when he holds that "[i]f a document does not exist, there is no obligation to disclose. Thus, if an agent provided oral instructions or admonitions to a confidential informant, the government has no obligation to now record those instructions or admonitions so that they may now be disclosed to Hamzeh." R.219:10 (citations omitted).

In addition, these instructions and admonishments are not a mere trifle but something that the defense has been seeking for a long time from the government. The government initially responded that the agents gave just four instructions to the informants. R. 93:3. The government has never supplemented this list, although through testimony and the government's responses to other issues raised by the defense, the defense has uncovered eight other instructions that were given to the informants. *See* R. 209:6-8. Over time the defense has learned that the following additional instructions were given to the informants: (1) CHSs "are always instructed to delete text messages with special agents for their protection and to maintain the covert relationship with the FBI." R. 199: 4, R. 135: 5; (2) Agent Zuraw instructed CHS1 that he needed to record all conversations with Hamzeh even if it required pushing off a meeting with Hamzeh for a day or two, R. 135: 4; (3) Adkins told CHS2 every time he met with him to be inquisitive and not to lead Hamzeh into any plan or ideology, R. 177: 4; (4) Adkins told CHS2 every time to ask open-ended questions, such as who, what, when, where, and why, R. 177: 4; and (5) Adkins instructed CHS2 to stop texting Adkins any memes and that text messages

9

Federal Defender Services
of Wisconsin, Inc.

had to be professional and work related, R. 177: 4. The spoliation hearing revealed three other instructions: (6) the informants were told to record every contact they had with Hamzeh, if feasible, Tr. 62; (7) the informants were not to conduct any substantive case conversations by text, Tr. at 57, 68-69; and (8) Adkins admonished Mike for supplying the plan of action to get machine guns from Texas, Tr. at 79-80.

Hamzeh should be entitled to rely on any representations the government makes to the defense about the instructions and admonishments it has given the informants. So if the government says that there are just four instructions, when in fact there were twelve, the government has a duty to correct that information so that the defense is not mislead. And that is true whether those additional instructions were in writing or not.

### 4.3 Informant file materials

When it comes to the informants' files, the Magistrate Judge held that "to the extent these requests are not resolved under CIPA, they are denied." R.219:12. The Magistrate also endorsed the government's view that "the initial suitability report and any annual or other reviews of the informants do not contain exculpatory material. *Brady* and its progeny do not entitle a defendant to more." *Id.* And it held that Hamzeh has not "made the requisite prima facie showing of materiality to be entitled to this information under Rule 16." *Id.*

The problem with the Magistrate's rationale is that the informant files and suitability reports include the informants' motives for cooperation as well as all the information the FBI obtained in vetting the informants. The files also should contain

Federal Defender Services
of Wisconsin, Inc.

annual reviews and any issues the agents had with the informants. "The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources,"[2] provides that before using a person as an informant, FBI agents must subject the CHS to the validation process and assess their suitability, including by:

1. determining their true identity; determining their criminal history and whether they are the subject of any investigation or charges; determining their motivation for providing information, including whether they are seeking consideration; determining what promises and what benefits were made to them; and gathering any other information that is required to be documented in the Confidential Human Source's file pursuant to these Guidelines and FBI policies, including but not limited to, the instructions provided to the Confidential Human Source.

2. With respect to payments to informants, the Guidelines provide that after receiving a payment, the informant shall be required to sign or initial, and date, a receipt and that the agent must advise the informant that the payment is taxable.

3. Advising them that they cannot engage in any unauthorized illegal activity.

4. Having the informant acknowledge his receipt and understanding of instructions.

5. The CHS's file also must be reviewed at least annually.

*See* Guidelines at 13–17.

Accordingly, the information contained in those files extends from whether the informants disliked Hamzeh to the protocols that were in place to control the informants. *See, e.g., United States v. Sipe*, 388 F.3d 471, 492 (5th Cir. 2004) (holding that government's failure to reveal that a government witness told the government that he "disliked" the

---

[2] https://www.ignet.gov/sites/default/files/files/ag-guidelines-use-of-fbi-chs.pdf

Federal Defender Services
of Wisconsin, Inc.

defendant, as well as the benefits granted to numerous other witnesses, violated *Brady* and was reversible error).

These types of documents are exculpatory because they are admissible in whole or part, could "lead to admissible evidence" or would "be an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002). And negative information about the FBI's perception of an informant's character or false statements by an informant during the vetting process must be produced under *Brady. See United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463-64 (9th Cir. 1992) (reversible error not to disclose government memo written to government agent "highly critical" of key government informant); *see also United States v. Phillips*, 854 F.2d 273, 1278 (7th Cir. 1988) (court examined entire contents of FBI informant file *in camera* to determine if government summary was accurate and complete).

The files will reveal the informants' biases toward Hamzeh, their motivations for cooperation, and they will reveal the FBI's assessment of the informants' character and truthfulness. And it is not enough that the U.S. Attorney's Office has stated there is nothing exculpatory in there. If the informants stated mercenary motivations or motivations out of resentment to Hamzeh or general concern for the wellbeing of society all of that is exculpatory and must be produced. In addition, if the FBI agents failed to conduct the required vetting, or failed to document it, that undermines the credibility of the agents who are accountable for the informants.

Federal Defender Services
of Wisconsin, Inc.

### 5. Recordings

Given the Magistrate's order that the government produce all recorded telephone calls, and the government's representation that there are no other calls, Hamzeh agrees there is nothing more for the Court to do.

### 6. Documents Regarding Recordings.

No objections to this section.

### 7. Surveillance.

Hamzeh addresses the issue of surveillance in his CIPA objection.

### 8. Notice of Intent to Use Evidence

No objections to this section.

### 9. CIPA Information

Hamzeh objects to the denial of his CIPA motion for the reasons stated below in his objections to the Magistrate's CIPA orders.

## B. CIPA Orders

### 1. Background

Approximately two-and-a-half-years ago, in October 2016, the Government filed a motion for a CIPA hearing along with a memorandum of law. R. 17. Subsequently, the Government filed three sealed ex parte motions under CIPA. *See* R. 21, R. 169, R. 184. On September 26, 2018, the defense filed a memorandum explaining why the Government should not be able to conceal from the defense helpful discovery, including impeachment material about the informants and information about wiretaps the government carried

Federal Defender Services
of Wisconsin, Inc.

out against Hamzeh. R. 185. Although Hamzeh requested oral argument on CIPA, and the Magistrate initially indicated he would accommodate that request, no hearing was held. *See* R. 175; R. 209:9. Then on March 25, 2019, the Magistrate issued two orders granting the government's requests to withhold discovery under CIPA. R. 220, R. 221. Before addressing the particular objections and why this Court must conduct a de novo review of the Magistrate Judge's order (namely, he did not make any findings, let alone those the statute demands), it's important to give the Court a brief framework on CIPA and what it demands.

### 2. CIPA Standards

At the outset, it's important to recognize that CIPA does not expand or restrict the government's obligation to produce discovery under Rule 16, *Brady*, or *Jencks*. *E.g., United States v. Yunis*, 867 F.2d 617, 621 (D.C. Cir. 1989); *Sedaghaty*, 728 F.3d at 903. Rather, CIPA "contemplates an application of the general law of discovery in criminal cases to the classified information area with limitations imposed based on the sensitive nature of the classified information." *Yunis*, 867 F.2d at 621. It's "fundamental purpose" is to protect and restrict the "discovery of classified information in a way that does not impair the defendant's right to a fair trial." *United States v. O'Hara,* 301 F.3d 563, 568 (7th Cir. 2002).

The courts have applied a four-part test to resolve CIPA discovery motions:

> (1) When considering a motion to withhold classified, information from discovery, a district court must first determine whether, pursuant to the Federal Rules of Criminal Procedure, statute, or the common law, the information at issue is discoverable at all.

(2) If the material at issue is discoverable, the court must next determine whether the government has made a formal claim of the state secrets privilege lodged by the head of the department which has actual control over the matter, after actual persona-consideration by that officer.

(3) Once a court concludes that the material is discoverable and that the state secrets privilege applies, then the court must determine whether the evidence is relevant and helpful to the defense of an accused.

(4) If the information meets the relevant and helpful test CIPA § 4 empowers courts to determine the terms of discovery, if any.

*United States v. Turner,* 2014 WL 3905873, * 2 (N.D. Ill. July 29, 2014) (quoting *Sedaghaty,* 723 F.3d at 904)).

When the government submits evidence to the Court under CIPA, the Court's first task is to determine whether the information is discoverable without regard to its classified nature. That includes information discoverable under Rule 16, the *Jenks* Act, and *Brady. See Turner,* at *3. Of course, Rule 16 requires the production of inculpatory as well as exculpatory evidence that might assist in the preparation of the defense. *Id.* at *3; *United States v. Baker,* 453 F.3d 419, 424 (7th Cir. 2006). If the information is discoverable, then the Court must determine whether the government has asserted a colorable national security interest. *United States v. Mejia*, 448 F.3d 436, 455 (D.C. Cir. 2006). A government invocation of privilege based on the classified nature of the material must be "lodged by the head of the department which has control over the matter, after actual personal consideration by that officer." *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953); *United States v. Stewart*, 590 F.3d 93, 131-32 (2d Cir. 2009); *Sedaghaty,* 728 F.3d at 904.

Federal Defender Services
of Wisconsin, Inc.

If the national security claim is not "colorable," the information should be produced. If the Court finds that it is colorable, then the Court must determine whether the classified material is "relevant and helpful to the defense." *Yunis,* 867 F.2d at 622. This "relevant and helpful" standard is akin to the *Roviaro* standard for disclosing confidential informants.[3] But it is lower than the materiality standard under *Brady,* as "information can be helpful without being 'favorable' in the *Brady* sense." *Mejia,* 448 F.3d at 456–57. Of course, inculpatory evidence also may be helpful to the defense because it is "just as likely to assist 'in the preparation of the defendant's defense as exculpatory evidence and the preparation of the defense requires knowledge of its pitfalls as well as its strengths." *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998). *See also United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012) (noting "the 'favorable' materiality standard of *Brady* is much more difficult to satisfy than the 'relevant and helpful' standard of *Yunis*").

If there is a colorable national security interest and the evidence is relevant and helpful to the defense, then the Court must balance these competing concerns based on the particular circumstances of the case. *United States v. Smith*, 780 F.2d 1102, 1107 (4th Cir. 1985). This requires the court to balance the usefulness of the classified information to the defense against the government's "interest in protecting sensitive sources and methods of gathering information." *Id.* at 1108. In resolving these competing concerns, the Court has the option of fully disclosing the helpful information to the defense,

---

[3] In *Roviaro*, the Supreme Court recognized the informer's privilege, but held that it gives way "[w]here disclosure of the informer's identity, or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro v. United States,* 353 U.S. 53, 60-61 (1957).

Federal Defender Services
of Wisconsin, Inc.

providing a summary of the information contained in the classified documents, or substituting a statement admitting relevant facts that the classified information would tend to prove. 18 U.S.C. App. 3, § 4. The court may authorize a statement or summary as a substitute for classified material "if it finds that the statement or summary will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information." 18 U.S.C. app. 3 § 6(c)(1). This requirement arises out of the Constitution's guarantee that all criminal defendants must have a meaningful opportunity to present a complete defense. *Sedaghaty,* 728 F.3d at 904–05. The fundamental purpose of a CIPA substitution is to place the defendant as nearly as possible in the same position as if the classified information were available to him. *Id.* at 905. An inadequate substitution may undermine a defendant's ability to present a complete defense and constitute reversible error. *Id.* at 907.

And it's here with no findings and no substitution where the Magistrate Judge provides absolutely nothing to the defense to work with. We have six categories of discoverable information (including potential wiretaps that will help recreate the informants' conversations with Hamzeh) and the defense is told without any findings that it can get nothing. And there is no middle ground of substitution. All of this has been done ex parte and with the defense in the dark. "[A] system that permits ex parte hearings and requires the court to pass on the legitimacy of claims related to classified information places a heavy burden on the court." *Sedaghaty,* 728 F.3d at 891. And not just the Court suffers with ex parte hearings, defense counsel, who best know the client's interests, "are

Federal Defender Services
of Wisconsin, Inc.

placed at a serious disadvantage in challenging classified proceedings in a vacuum." *Id.* That requires the court to undertake its review of classified information with "special scrutiny," *Sedaghaty,* 728 F.3d at 891, to "'place [itself] in the shoes of defense counsel . . . and act with a view to the [defendant's] interests,'" and to "'err on the side of protecting the interests of the defendant.'" *Turner*, at *3 (quotation omitted).

### 3. Magistrate Judge's Orders

The Magistrate issued two orders granting the government's requests not to disclose discovery and *Brady* material under CIPA. In each order, the Magistrate's reason for granting the government's motion was that the classified information "implicates the Government's national security and classified information privilege because the information is properly classified, and its disclosure could cause serious damage to the national security of the United States." The Magistrate did not, however, make any findings in the Order regarding what information was at issue, whether it was discoverable, whether the government adequately established it was classified, or whether the information was favorable to the defense. He also didn't determine whether any substitute statements or summary were appropriate or necessary. *Compare United States v. Turner,* 2014 WL 3905873, * 3 (N.D. Ill. July 29, 2014) (applying the CIPA factors and explaining whether the factors were applied and satisfied).

Hamzeh requests *de novo* review of the Magistrate's CIPA decision and the opportunity to appear before the Court *ex parte* to explain to the Court why the information would be favorable to the defense and to answer any questions from the

Federal Defender Services
of Wisconsin, Inc.

Court. *See id.* at * 3 (court granted the defendant leave to file an *ex parte* submission explaining what information would be helpful to the defense in an effort to alleviate the disadvantage CIPA places on defendants). What's more, *de novo* review is required because the Magistrate's decision does not identify the proper legal standard for withholding discovery from the defense, there's no indication that the Magistrate applied the proper legal standard, and the Magistrate did not make the necessary findings under CIPA. In fact, from the order itself, one can't tell whether the Magistrate exercised any discretion at all.

Particularly troublesome is that the Magistrate previously had determined that information about the informants' benefits must be produced, *see* R.205, but the CIPA Orders don't recognize that this information is favorable and explain why it won't be produced, at least in some form. Regardless whether the information could "cause serious damage to national security," which seems questionable given the absence of any alleged ties between Hamzeh and any foreign or terrorist organization, the national security privilege must accommodate the defendant's right to a fair trial. The CIPA orders are contrary to law and constitute an abuse of discretion.

### 4. Discovery at issue under CIPA

Hamzeh doesn't know what material the government submitted to the Court under CIPA, but what follows are some educated guesses, including categories of information that the Magistrate initially ordered produced that the government did not

Federal Defender Services
of Wisconsin, Inc.

produce, relying on CIPA.[4]  Because the Magistrate previously ordered some of this evidence produced, there should be no issue concerning whether the evidence is discoverable in the first instance.  The questions then are whether the material implicates national security, whether it is relevant and helpful to the defense, whether it should be turned over, and in what form.

From Magistrate Judge Duffin's July 25 Order, there are six categories of information.

1.  The Magistrate ordered production of "any requests by any informant for immigration assistance of any type or any immigration benefits offered or received or contemplated." R.150:2. Although the government previously indicated that no immigration benefits were conferred, in a letter to defense counsel on August 10, 2018, the government indicated that it would be relying on CIPA.

2.  The Magistrate ordered the government to identify "all money paid in total for any purpose to the CHS including both expenses and services." *Id*. The government has indicated it will rely on CIPA.

3.  The Magistrate ordered that the government provide "the amount of money paid related strictly to the Hamzeh case (services plus expenses broken out separately)." *Id*. The government has indicated that it will rely on CIPA.

4.  The Magistrate ordered the government to provide "copies of the front portion of every ELSUR envelope (commonly referred to as the 1D envelope or FD-504 envelope for all digital recordings. Include copies of an ECs documenting justification for late submission." *Id*. at 3. The government indicated it would rely on CIPA.

5.  The Magistrate ordered the government to provide the "Sentinel index/listing of all electronic recordings from the 'ELSUR' (1D) section of the file." *Id*. at 4. The government indicated it would rely on CIPA.

---

[4]  As courts have noted, the defendant "'is forced to argue for the relevance of material without actually knowing what the classified record contains,'" even while the defense is "'in the best position to know whether information would be helpful to the[] defense.'" *United States v. Turner*,  2014 WL 3905873, * 3 (N.D. Ill. July 29, 2014) (citations omitted).

Federal Defender Services
of Wisconsin, Inc.

6. The Magistrate ordered the government to produce all "FD-302's regarding obtaining custody of the recording devices from the CHS or undercover agents, the downloading and chain-of-custody for the digital recording devices and the production of the original CDs form those recording devices for every recorded conversation." *Id*. Again, the government indicated it would rely on CIPA.

In addition to the above material that the Court ordered produced, Hamzeh requested the following material in his superseding discovery motion. R. 214. Hamzeh believes that the government relied on CIPA regarding some of the following five categories of information:

1. All documentation relating to the calls that are on discs 118, which he believes were intercepted by the government.

2. The file for each informant, to include, the initial suitability report, the informant's reported motivations for cooperating, identification of all benefits, including travel to and from the United States, the documentation underlying those benefits, annual reviews of the informants and identification of any violations or deviations from guidelines, instructions, or policies by any informant or agent.

3. All instructions given to the informants.

4. All chain-of-custody documents, ELSUR envelopes, information concerning when informants had recording devices checked out to them, what types of recording devices were used, and what instructions were given as to when to record Hamzeh;

5. All information and documentation relating to intercepted communications, GPS, stingray, pole cameras, or other undisclosed surveillance or interception techniques.

Each category of information is discoverable and for the first six (from Judge Duffin's order) they had all previously been ordered produced, so the question is whether this information would be helpful to the defense.

Federal Defender Services
of Wisconsin, Inc.

**5.** **The discovery is helpful to the defense.**

For the Court to understand what discovery would be helpful to the defense, it might be helpful to provide a brief summary of the case from the defense's perspective. For four months, beginning in September 2015, two confidential informants talked or met with Samy Hamzeh on nearly a daily basis in an effort to obtain evidence against him. One of these informants had been best friends with Hamzeh. The second, a paid informant, took a job where Hamzeh worked for the sole purpose of pretending to be his friend. Although Hamzeh had made inflammatory remarks and empty boasts about traveling to Israel and conducting an attack, he never took any actions in furtherance of those statements. To the contrary, he routinely came up with excuses as to why he couldn't travel or take part in any plan. Many of his boasts about his supposed plans were plainly falsehoods, as were some of his excuses.

Despite the mounting evidence in November and December of 2015 that Hamzeh was nothing more than an attention seeker, the informants continued to have near-daily contact with him and to sporadically report to the FBI. By early January 2016, however, the informants reported that Hamzeh seemed disinterested in conducting an attack; and after more than three months' investment of time and money the investigation seemed at a standstill. One of the informants, CI Mike, stopped recording his conversations with Hamzeh. This happened on December 14. And Mike did not start recording the conversations again until January 19—a 35-day period of silence. Although the FBI wasn't (for unknown reasons) recording conversations between CI Mike and Hamzeh during

Federal Defender Services
of Wisconsin, Inc.

this period, FBI agents continued to conduct surveillance of Hamzeh. In total, surveillance was conducted on at least 64 occasions during the course of the investigation. Each surveillance typically involved 6-8 agents working together for an eight-hour shift watching Hamzeh.

Then after 35 days of no recordings between CI Mike and Hamzeh, on January 19, 2106, CI Mike reported to the FBI that Hamzeh and the informants had a plan to attack a Masonic center in Milwaukee. There are no recordings of the discussions leading to this supposed plot, but in the recordings during the days that followed Hamzeh disclosed to others that CI Mike came up with the plan and showed him videos of Masons engaged in atrocities and that the Masons were (of all things) actually ISIS.

Ultimately Hamzeh adamantly refused to go along with the plan to attack the Masonic Center, screaming at his comrades that it was wrong, resisting their overtures to become a martyr, and insisting that they could not go through with the plan because it was wrong. He pleaded with them to desist and consulted two imams in an effort to dissuade them. Yet, Hamzeh, perhaps to save face, agreed to go with the informants to obtain two machine guns and a silencer that one of the informants had arranged to be purchased for a few hundred dollars, despite a street value of many thousands of dollars. When FBI agents handed Hamzeh a bag with the two guns and the attached silencer, he was then arrested.

Hamzeh's defense to the charge of possessing unregistered NFA firearms is that he was entrapped. The discovery includes no evidence that Hamzeh had ever before been

Federal Defender Services
of Wisconsin, Inc.

involved with or pursued illegal firearms (or for that matter legal firearms) and he had no criminal record. The subject of guns was first broached by CI Mike shortly after the FBI had him get a job at Hamzeh's work place. Within two weeks of starting the job, CI Mike brought his gun to the parking lot of the workplace to show to Hamzeh. After that, he suggested that they go to a shooting range to spark Hamzeh's interest in a new hobby. When Hamzeh first met CI Mike, he apparently had little or no experience with firearms and certainly had not owned one. The government (and presumably the informant) knew that possession of a pistol (or even a semiautomatic weapon) by Hamzeh would not be illegal. Accordingly, CI Mike began lobbying heavily for Hamzeh to get a machine gun. But Hamzeh resisted—telling CI Mike that he only was interested in a pistol for self- defense and did not need a machine gun.

One thing that is especially troubling about this case and will be central to the defense argument at trial is that numerous contacts between the informants and Mr. Hamzeh were apparently not recorded. What makes that absence of recordings particularly concerning is that the FBI was continuing to have the informants contact Hamzeh during this time period, the agents were meeting with the informants themselves, and the FBI was conducting surveillance on Hamzeh. And it is during this time period that the supposed plot to attack the Masons develops and Hamzeh relents to

Federal Defender Services
of Wisconsin, Inc.

the informants' pressure to obtain a machine gun. Thus, it is critical for Hamzeh's defense to know what the government and the informants were up to during this period of time.[5]

The eleven categories of discovery that have been submitted under CIPA falls roughly into four broad areas: (1) informant benefits and other information relevant to credibility; (2) instructions to informants; (3) information regarding the recording of conversations; and (4) surveillance. Hamzeh will briefly explain why this evidence is helpful to the defense.

### i.    Informant Benefits/Credibility

Hamzeh has explained why the credibility of the informants is a big deal in this case—many conversations at critical junctures were unrecorded so the jury will have to assess the truthfulness of the informants' accounts about who suggested activities, when that happened, and what words were used by whom. Indisputably, the benefits that were discussed, promised, or hoped for by the informants is critical to their credibility and the Magistrate, by his earlier orders, already found them to be helpful to the defense.

Everyone knows the FBI compensates informants and the defense (as well as the public) has a strong interest in knowing exactly how the informants received, expect to receive, or will receive compensation. The Magistrate previously determined that the

---

[5]  The possibility that exculpatory evidence is being withheld or ignored is not merely fanciful. *See, e.g.,* Denny Walsh & Sam Stanton, *Convicted 'eco-terrorist' freed amid claims FBI hid evidence,* Sacramento Bee, Jan. 8, 2015 (describing how thousands of pages of evidence had been withheld from defense counsel, including information relevant to the relationship between the defendant and the informant); Carrie Johnson, *Report: Prosecutors Hid Evidence in Ted Stevens Case*, NPR.org, March 15, 2012, available at www.npr.org/2012/03/15/148687717/report-prosectors-hid-evidence-in-ted-stevens-case; *United States v. Olsen*, 737 F.3d 625 (9th Cir. 2013).

Federal Defender Services
of Wisconsin, Inc.

underlying documentation relating to benefits must be turned over so that Hamzeh can assess what compensation was a reward versus an expense reimbursement. Hamzeh seeks the original documents because they may be admissible evidence and will serve as "an effective tool in disciplining witnesses during cross-examination by refreshment of recollection or otherwise." *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002).

Hamzeh also has requested the informants' FBI files. FBI policy requires an initial suitability report for each informant, including their criminal history and motivations for cooperating. The policy provides that informants must be reviewed annually and violations of instructions are to be documented. The motivations of the informants are especially important to the defense as Hamzeh is confident that they were not acting out of the goodness of their hearts as the government might seek to portray it at trial. After all Mike took a delivery job at a restaurant for months just to befriend Hamzeh. His motivations and compensation for doing so are critical to the defense, as are Steve's motivations.

### ii.    Instructions to Informants

Hamzeh has not received clear information about what instructions were given to its informants. First, the government reported to this Court that four instructions were given by the agents. But then some of the agents' texts were produced and there was one emphasizing to Steve the necessity of recording every conversation with Hamzeh. Then on July 30, 2018, Special Agent Adkins wrote a report detailing still other instructions he gave to the informants. The spoliation hearing revealed more instructions. *See* R. 209 at

Federal Defender Services
of Wisconsin, Inc.

6-8. According to the government, these additional instructions hadn't been produced because they hadn't previously been memorialized.

The instructions given to the informants are critical to gauge the credibility of the agents and the informants, which is why it's FBI policy to document instructions in the file. *See Suarez*, 2010 WL 4226524, *5 (stating that "whether an informant abided by the agent's instructions [is] fertile grounds for cross-examination"). The instructions provide a basis to assess whether agents and informants are following FBI protocol, to determine whether there is supervision and accountability, and to assess whether rules may have been bypassed to entrap Hamzeh. The dangers of using informants are well known and the failure to properly instruct them or to enforce policies increases the risk of rogue informants. *See United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463-64 (9th Cir. 1992) (reversible error not to disclose government memo written to government agent "highly critical" of key government informant). As with the other credibility information, there is little national security interest at play here. In many ways this is a run-of-the-mill sting operation as it involves no foreign governments, no terrorist organization, and no sophisticated target. It involves informants acting in their own interest and the jury must have all available information relevant to credibility to be able to determine whether to believe the informants as in any other informant case.

### iii. Information Concerning Recording Devices

The Court ordered production of the ELSUR envelopes, the Sentinel Index of all electronic recording devices from the CHS's, and the downloading and chain-of-custody

Federal Defender Services
of Wisconsin, Inc.

for the devices and recordings for every recorded conversation. The government has indicated it is proceeding under CIPA, although it's hard to imagine why chain-of-custody information for materials already produced would be classified. The original envelopes should be produced so that the defense can assess whether there are gaps in the chain, delays in placing recordings in evidence, problems with storage, or opportunity for alteration.

There is an even greater reason for ordering this information. The discovery in this case has been a mess, with different disk numbering between what the FBI has used for transcripts and what the defense has been given in the discovery. The only way that the defense can know for certain who is recording on each disk is with the ELSUR envelopes.

### iv. Surveillance

Hamzeh has evidence that the government intercepted his phone calls, but doesn't know the extent of it. As outlined in the Third Motion to Compel, R. 174 at 1-4, Disk 118 appears to contain intercepted phone calls—unlike *all* the other recordings these contain calls that Hamzeh made to a third person. But when Hamzeh makes a call, his phone is heard ringing before the informant picks up – meaning that the informant wasn't recording the call because he couldn't record until after he answered. The only logical explanation is that Hamzeh's line was tapped. But the government has never told Hamzeh that and has declined to confirm or deny that. The defense has received no documentation relating to wiretaps. This wiretap presumably extends beyond the 14 calls on Disk 118 and may be crucial in telling the defense what happened during the 35 days

Federal Defender Services
of Wisconsin, Inc.

Mike stopped recording communications. That information should be produced as the government's failure to uncover incriminating information through any wiretaps is exculpatory. Furthermore, Hamzeh has a right to his own statements, and he should have the opportunity to challenge the lawfulness of any such activity. Indeed, the calls on Disk 118 can be used against him at trial. Finally, the content of the calls that Hamzeh made with the informants and third parties doesn't implicate national security.

The same applies to other surveillance techniques, like GPS or stingray. If the government tracked Hamzeh's conversations or movements in any way and uncovered no criminal activity, connections to guns or terrorists, or other inculpatory information, it supports his claim that he was not predisposed. Repeatedly the government has contended that information like texts or surveillance reports would not aid the defense, but after their production the defense finds them extremely helpful and will be a centerpiece of the entrapment defense. The information should be turned over to avoid an issue later and to allow Hamzeh to challenge the lawfulness of these searches. *E.g.*, *United States v. Pelullo*, 105 F.3d 117. 122-23 (3d Cir. 1997) (finding a *Brady* violation where rough notes and surveillance tapes would have undermined informant's claim that he met with defendant at particular location).

Federal Defender Services
of Wisconsin, Inc.

**Conclusion**

For the above reasons, Hamzeh requests production of the information submitted under CIPA. He also requests a hearing to further elaborate on his need for this material.

Dated at Milwaukee, Wisconsin this 10th of April 2019.

Respectfully submitted,

/s/    *Craig W. Albee*
Craig W. Albee, WI Bar # 1015752
Joseph A. Bugni, WI Bar #1062514
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI  53202
Tel. (414) 221-9900
E-mail:  craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh