UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED OF AMERICA,

        *Plaintiff,*

    *vs*.                                Case No. 16-CR-21 (PP)

SAMY M. HAMZEH,

        *Defendant.*

## DEFENSE'S FIRST MOTION IN LIMINE:
## ENTRAPMENT

Samy Hamzeh, by counsel, files the defense's first motion in limine in support of presenting the entrapment defense.

### I.    Introduction

In deciding this motion, the governing case is *Mayfield* (an en banc case out of the Seventh Circuit), which emphasizes that entrapment, generally speaking, is a question for the jury, not the court. *United States v. Mayfield,* 771 F.3d 417, 439 (7th Cir. 2014) (*en banc*). Consistent with that principle, to present the entrapment defense Hamzeh only needs to point to "*some evidence in the record that would allow a rational jury to conclude that he was entrapped.*" *Id.* at 440 (emphasis added). While the defense must proffer evidence on both elements of the entrapment defense (predisposition and inducement) to get a jury instruction and shift the burden of proof to the government, this initial burden of production is "not great." *Id.*

1

In evaluating the defense evidence, the "court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it." *Id.* While it's permissible for the trial court to preclude the defendant from asserting an entrapment defense, *Mayfield* expressed concern about courts doing so because of the "increased risk" that it will "invad[e] the province of the jury" by impermissibly balancing the defendant's evidence against the government's or deciding whether the defense is believable. *Id.* at 440-41; *see also Seventh Circuit Federal Crim. Jury Instruction* 6.05 (Committee Comment) (2019 ed.). "[W]here there is at least some evidence [of entrapment] on the record, *it is for the jury…* to weigh conflicting testimony, to draw reasonable inferences from the evidence and to make credibility determinations." *Id.* (emphasis added) (citation omitted).

When it comes to the first element of entrapment—predisposition—the inquiry is whether Hamzeh likely would have committed this crime before his initial contact with the government informants. The Seventh Circuit has recognized that predisposition will rarely be susceptible to resolution before trial because "it's hard to imagine how a particular person could be deemed 'likely' to do something as a matter of law." *Mayfield*, 771 F.3d at 441. The predisposition must exist before the government's attempts to persuade the defendant to commit a crime. *See e.g., Jacobson v. United States,* 503 U.S. 540, 549 (1992). Here, Hamzeh had no criminal history, no gun, and no particular interest in guns—let alone a machine gun—before the informants contacted him. There is no evidence of Hamzeh trying to purchase a machine gun or having the means or the connections to do so. He was, instead, an unremarkable 24-year-old, who worked,

2

devoted himself to his family, occasionally smoked pot, and hung out with his friends. Nothing in Hamzeh's background suggests Hamzeh was likely to or even could buy a machine gun before the informants approached him.

What's more, the strongest evidence that a person is *not* predisposed to commit a crime lies in whether they initially say no. *Mayfield*, 771 F.3d at 435 (noting the "most significant [factor] is whether the defendant was reluctant to commit the offense" (quotation omitted)). Upon meeting Hamzeh, one informant (Mike) immediately seized the opportunity to introduce guns to Hamzeh. The informant began normalizing and encouraging their use and possession by showing Hamzeh his own gun, talking about the Kalashnikov he owned, and taking Hamzeh to the shooting range. During this time (and over a course of months), the informant blurred the lines between legal semi-automatic weapons and illegal automatic weapons by referring to them with the same terms. Yet even after all this pressure and manipulation, when approached by the informants to purchase a machine gun, Hamzeh repeatedly said no—he was only interested in a pistol for protection at work. It was only after a four-month-long campaign of daily meetings and extraordinary pressure (including deceit, psychological pressure, and appeals to friendship) that Hamzeh agreed to purchase one. In sum, nothing suggests that Hamzeh was predisposed to purchase a machine gun before meeting the informants.

That leads to the inducement question—*i.e.*, whether the government did something in addition to the mere solicitation of a crime that could influence a person to commit a crime that the person would not commit if left to his own devices. In various cases, the "something in addition" is present in different ways. It can (as it was in

3

*Mayfield*) include appeals to friendship or loyalty. 771 F.3d at 441. In other cases, it is the agents offering something other than the standard market deal for illegal activity. It can also include repeated attempts at persuasion and fraudulent representations. In other words, inducement covers the full range of behavior that creates the risk that "a person who otherwise would not have committed the crime would do so in response to the government's efforts." *Id.* at 441. And again, to get the instruction, the defense only needs to point to "some evidence" in the record for one of these propositions. *Id.* at 443 ("The defendant is entitled to present the defense at trial if he shows that some evidence supports it.").

Here, the informants engaged in a months-long campaign to persuade Hamzeh to get a machine gun. First, Mike formed an artificial friendship with Hamzeh after taking a job at his workplace; he then introduced and eventually normalized the presence of guns in Hamzeh's life—including taking Hamzeh to the gun range and repeatedly asking Hamzeh if he'd like to get a machine gun. Each time, Hamzeh said no. He wasn't interested; he was simply interested in a handgun.

After months of futility, the informants preyed upon Hamzeh's limited intelligence (he has an IQ of 78) and his sympathies, convincing him that the Masons were aligned with ISIS and Islam's true enemy. They badgered him about making a plan to attack the Masons—this was devised almost four months after Mike entered into Hamzeh's life. As the conversations about attacking the Masons grew, Hamzeh sought counsel with an Imam and then tried to convince his "friends" that violence was wrong and contrary to their religion. Undeterred, the informants made various appeals to

4

change his mind, but Hamzeh stood firm. Yet as a conciliatory matter he was still willing to get a weapon—even if it was just going to be used for target practice. When Hamzeh finally demurred, he expected to get a gun like Mike's—a rifle, not a machine gun. But when he got there, all the agents had were machine guns, and they were selling these weapons at a fraction of their normal price. After carrying the guns to the car, Hamzeh protested that these guns were different from what they'd agreed to buy. Seconds later, he was arrested.

As explained below, most cases have one or maybe two things that the defense can point to in support of presenting the entrapment defense. Yet in four pages, the defense has pointed to a myriad of facts about the informants doing more than offering a standard opportunity to commit the crime. To get Hamzeh to buy the gun, the informants made persistent efforts over a course of months, they made appeals to friendship, they used deceit, they harassed Hamzeh, they used psychological pressure, and they offered a better-than-market-deal—one that could never have happened without the government's machinations. These actions went beyond the government simply offering Hamzeh the opportunity to commit a crime on its standard terms; instead, they stand as the very sort of inducement that will (and here did) allow the government to create and prosecute a crime that never would have happened without its agents' efforts. While the defense only needs to point to some evidence in the record, or "more than a scintilla of evidence," we have far more than that. *Id.* at 440. Thus, Hamzeh is entitled to present the entrapment defense to a jury. What follows is a more robust narrative of those facts and the principles that support the entrapment defense.

5

## II. Background narrative

In August of 2015, Hamzeh was living a rather unremarkable existence. He was 24, lived at home, worked, and supported his family by giving them the money he earned. He had a series of jobs, including working as a waiter, valet and delivery driver. In his spare time, he visited east side coffee shops and occasionally smoked marijuana with friends. He had no criminal convictions and no known interest in automatic firearms. He also wasn't terribly bright. Hamzeh had been in special-education classes for most of his childhood with an IQ tested at 78. He was also a known exaggerator and attention-seeker, who was sometimes described as a "bull shitter."

While Hamzeh spent August 2015, working and supporting his family, his best friend Steve was in a different situation. Unlike Hamzeh, Steve was not a U.S. Citizen. His immigration status was tied to his marriage; and as the marriage deteriorated, Steve was looking for ways to stay in America. On August 17, 2015, Steve called the FBI's main line.[1] We don't yet know what was said, what promises were made, or what hope Steve held out for contacting the FBI, but we do know that he was concerned about his immigration status—at least, that is what he later mentions to the agents.[2]

Over the course of the next four weeks, Steve called the FBI and the agents 12 times. Almost a full month after Steve initially contacted the FBI, on September 16, 2015, the FBI prepared a memorandum of a meeting that Agents Adkins, Zuraw, and Mosback

---

[1] S****_6945_Phone 000154
[2] Agent_Texts_40, and Agent_Texts_16

6

had with Steve.[3]  The memo didn't mention that Steve had already been in contact with the FBI for a month and the government has never disclosed that. In that memo, Steve claimed that Hamzeh was talking about traveling to Egypt for terrorist training, obtaining a commercial driver's license to conduct a terrorist attack in the name of ISIS, and getting a .45 caliber pistol—all of which Hamzeh disputes.[4] Nothing corroborated Steve's suggestion that Hamzeh was a terrorist-in-waiting. In fact, a week later, Steve reported that Hamzeh had "changed his mind about doing stupid things," saying that it was a "bunch of bullshit."[5] And the only criminal activity discussed in Steve's first recorded call with Hamzeh on September 24, 2015, was when Hamzeh asked Steve to get him some pot for a barbecue they were both attending.[6] A week later, Steve noted that one of Hamzeh's flaws is that he "lies all the time."[7]

While Steve reported that Hamzeh changed his mind about doing "stupid things" and said this was all bullshit, the FBI had already arranged for a second, seasoned and paid informant, Mike, to work on the case. The FBI had Mike take a job at the restaurant where Hamzeh and Steve worked, so he could see Hamzeh daily. This was on September 24, 2015.[8] Mike quickly became friends with Hamzeh as he was assigned to do. For unknown reasons, the FBI didn't have Mike record the initial conversations between Mike and Hamzeh; Mike didn't start recording until November 2, 2015.[9] But after having

---

[3] FD-1023_Final_000008
[4] FD-1023_Final_000008
[5] FD-1023_Final_000012
[6] Prelim-Translations_000104-107
[7] FD-1023_Final_000011
[8] FD-1023_Final_000003
[9] Translation_D22_11-02-2015_000001

7

only known Hamzeh for a few days, Mike proclaimed, "Samy Hamzeh has become more serious and more religious in the short time the CHS has associated with him."[10] That same day, Mike (not Hamzeh) began talking about guns.[11] And days later, while Hamzeh and Steve sat in Mike's car, Mike showed them his gun and said they should all go to the shooting range together.[12] It is unclear what gun Mike showed Hamzeh—the report doesn't say.[13] But later recordings discuss Mike having a gun described as a Kalashnikov or machine gun. The two terms were often used interchangeably between the three men to describe Mike's gun. Presumably, it wasn't a machine gun as the FBI would never allow that.

As the weeks wore on and the three hung out more, Mike frequently brought up the topic of firearms. On several occasions, Mike took Hamzeh to the shooting range. Intermixed with their shooting-range plans, the discussions between Mike and Hamzeh in November and early December often centered on Hamzeh buying a handgun. On November 2, he told Mike he wanted a gun for training.[14] On November 11, Hamzeh told Steve he wanted to buy a pistol because he was seeking a new job delivering on the north side and needed protection.[15] That same day, he also asked Mike to get him a pistol for the same reason.[16] The next day (in a recorded conversation) Mike asked Hamzeh why he wants a pistol. When Hamzeh says for work, Mike says he thought it was to kill Jews,

---

[10] FD-1023_Final_000019
[11] FD-1023_Final_0000017 and FD-1023_Final_000009
[12] FD-1023_Final_000009
[13] FD-1023_Fianl, Final-1023_Final_000017
[14] FD-1023_Final_000031
[15] FD-1023_Final_000044
[16] FD-1023_Final_000038

but Hamzeh again says it's for work.[17] As a citizen with no record, Hamzeh was free to possess a handgun.

Later in the same conversation, Hamzeh reiterates he wants a legal pistol for a new job.[18] At the time, Hamzeh was working as a delivery driver for William Ho's, and at least one of his co-workers was robbed while driving on the job. As part of that job, Hamzeh delivered food to the most crime-ridden corners of Milwaukee, so wanting a pistol was reasonable.[19] This wasn't Hamzeh's last mention of getting a handgun for protection. He also mentioned it on November 19 and perhaps in other conversations—since many were not recorded, we can't know for sure.

As the case stretched into December, Mike was pressing Hamzeh to get a machine gun, although Hamzeh's statements remained focused on getting a legal pistol. On December 4, Mike reported that "Hamzeh wants to meet with CHS and possibly have the CHS accompany him to Gander Mountain to purchase a pistol."[20] More than two months after the FBI had planted Mike in the same restaurant where Hamzeh worked and after Mike had first introduced the subject of guns with Hamzeh, the two had a telling conversation. It reveals much about Mike's persistence in driving Hamzeh to talk about overseas travel and getting a gun; the conversation also reveals Mike's frustration with Hamzeh's transience or in the words of the other informant: Hamzeh's bullshit.[21]

---

[17] Translation_DD30_11-12-2015_000007-8
[18] Translation_DD30_11-12-2015_000011
[19] FD-1023_Final_000065
[20] FD-1023_Final_000058
[21] Translation_DD45_PT3_12-07-2015_000012

On December 7, Mike drove Hamzeh to shop at Burlington Coat Factory and to Gander Mountain to look at guns. On the way there, the two discussed recent political events and the presidential election that was still nearly a year away. They raised the specter of bans on Muslims flying or owning firearms.[22] At this point, Mike brought up purchasing a machine gun, although Hamzeh had never expressed a desire to purchase anything more than a handgun for protection:

> Mike: I do not know why you need a handgun
> Samy: I have to have it, man
> Mike: Pardon me?
> Samy: Because it is going to flare up.
> Mike: Handgun, do you mean a gun or what? Like what?
> Samy: A handgun.
> Mike: Or machinegun?
> Samy: Yeah.
> Mike: Pardon me? [Noise] [Background voices] Pardon me?
> Samy: A handgun, man! What do I need a machinegun for?[23]

So it is Mike who first mentions purchasing a machine gun and Hamzeh tells him he's not interested.

As the two wander around Gander Mountain, Mike shows Hamzeh a pistol that costs $1,000 and then a Smith & Wesson revolver but urges Hamzeh to consider something else: "These are rifles. Look at this rifle. [Noise] That is a fucking one."[24] They leave the store without purchasing anything, but Mike continues to steer Hamzeh to machine guns:

> Mike: You got excited about the handgun, right?
> Samy: Oh, yeah.

---

[22] Translation_DD45_PT3_12-07-2015_000011-12
[23] Translation_DD45_PT3_12-07-2015_000012
[24] Translation_DD45_PT3_12-07-2015_000014

> Mike: Which one? Did you see the machine guns?
> Samy: What?
> Mike: Did you see the machine guns?
> Samy: A machine gun is too big for us right now, we do not want it.
> Mike: Yeah?
> Samy: Where are you going to put the machine guns?
> Mike: Yeah [Pause] So we would know, man.
> Samy: A handgun is enough.
> Mike: What?
> Samy: A handgun is enough. I like this handgun with the wheel.[25]

During this conversation, there is a lot of back-and-forth pressure from Mike to talk about "machine guns." Although Mike calls them "machine guns," he's specifically referencing guns the two have just seen in the store, which obviously are legal guns, not machine guns but likely resemble them in appearance. This is one of Mike's many attempts to confuse Hamzeh by blurring the line between legal and illegal guns. During this same conversation, Mike chides Hamzeh for only wanting a handgun. Hamzeh says he doesn't have the money for anything else, but Mike claims he can buy cheap "Kalishnikovs" in Texas. Mike knows that this is likely to appeal to Hamzeh, as money is an issue for him. Mike then taunts Hamzeh by asking whether if attacked, he wants to hunt people "with a small pistol"; Hamzeh reiterates, "I want that for protection only."[26]

As Mike approaches Hamzeh's home to drop him off, he makes one last effort to ensnare Hamzeh by telling him he'll be getting guns with no serial numbers.[27] Hamzeh

---

[25]Translation_DD45_PT3_12-07-2015_000017
[26] Translation_DD45_PT4_12-07-2015_000013
[27] Translation_DD45_PT5_12-07-2015_000002

tells Mike that they will "fuck you" if he buys illegal guns and tells Mike to "leave the matters for now until it gets really serious."[28] (Referring to the political climate).[29]

A week later, on December 14, Mike and Hamzeh meet to go to the shooting range. On the way there, the two talk about Steve's excessive use of hashish, and Hamzeh says he too smokes a few times a week. Hamzeh also wonders why Mike did not bring his Kalashnikov for the range, and Mike informs him that the gun is too strong to use there. Again, this Kalashnikov that Mike owns is obviously not an illegal machine gun. After shooting, Mike diverts Hamzeh's attention to firearms that are on display at the range. Once again, Mike begins promoting the merits of high-powered firearms, saying: one can kill 15 to 20 people with a Kalashnikov and one person with a pistol.[30] Hamzeh responds: five people with a handgun and 50 with a machine gun.[31] Mike then asks Hamzeh about what kind of operation they will carry out.

In response to Mike's badgering about carrying out an operation, on December 14, Hamzeh tells Mike to "leave me alone" and is exasperated about Mike asking him the same question every day.[32] Mike responds it's because Hamzeh has a "different mentality every day."[33] And Hamzeh remains firm that he just wants a pistol, even as Mike prods him to get something more:

---

[28] Translation_DD45_PT5_12-07-2015_000008
[29] *Id.*
[30] Translation_DD51_12-14-2015_000053
[31] Translation_DD51_12-14-2015_000053 - 54
[32] Translation_DD51_12-14-2015_000056
[33] Translation_DD51_12-14-2015_000056

> Mike: Because for each weapon there is something, you don't know. There are million weapons, you tell me "bring me a handgun" I mean, what do you mean by handgun?
> Samy: I want a handgun for me, for the house.
> Mike: Okay
> Samy: Bring me a handgun, for the house, that's all. Not for anything else.
> Mike: So why don't you buy one man?[34]

Just as in the conversation from a week earlier, Mike drives the gun discussion. Yet Hamzeh maintains that he wants a pistol for protection and nothing else. After that conversation, for thirty-five days, Mike stopped recording his meetings with Hamzeh — despite meeting daily.

Although Mike wasn't recording his meetings after December 14, he was still meeting with Hamzeh and reporting back to the FBI. On January 4, Mike told agents that he didn't believe that Hamzeh had acquired a weapon, and Hamzeh had made no further mention of a plan to attack overseas or in the United States.[35] Hamzeh's expressed interest in getting a gun still focused on protecting himself as a delivery driver. Indeed, Mike reported that Hamzeh had recently requested that Mike obtain a weapon for him and a co-worker because the co-worker had been carjacked.[36] In the same report, Mike reported that Hamzeh also said he wanted a weapon because "the war will be soon . . . you'll see."[37] And Mike also stated that Hamzeh "has made no further mention of his plan to attack overseas or within the homeland."[38]

---

[34] Translation_DD51_12-14-2015_000057
[35] FD-1023_Final_000065
[36] FD-1023_Final_000065
[37] FD-1023_Final_000065
[38] FD-1023_Final_000065

Then on January 11 (still with nothing recorded), Mike reported that Hamzeh asked him to go to the Shooter's Shop to look at guns. Mike told the FBI that he believed this was because he had been talking to Hamzeh about the AK-47 he owned.[39] So again, it was Mike driving the gun discussion. Mike also told the agents that Hamzeh hadn't recently spoken about traveling for Jihad.[40] As for Steve, on January 8, he'd reported that "Hamzeh no longer speaks about jihad with CHS, Hamzeh has recently told CHS that Hamzeh intended to travel to Jordan for a vacation."[41]

Thus, by early January, both informants indicated that Hamzeh had abandoned any overseas plans. The investigation showed that Hamzeh worked regularly, was close to his family, and was prone to exaggeration. The investigation also revealed no evidence that Hamzeh was affiliated with or in touch with any radical groups. Further, Hamzeh didn't own a gun, but he had expressed a desire on several occasions to obtain a pistol because he was a delivery driver and feared for his safety. Although Hamzeh had expressed a desire to buy a gun, and could lawfully do so, he had not actually made an effort to buy a handgun other than to reportedly profess his interest to his gun-loving friend Mike. And while Mike had repeatedly asked Hamzeh about a Kalashnikov or machine gun, Hamzeh had repeatedly expressed interest only in buying a handgun. Reduced to a paragraph, that is precisely where things stood on January 11, 2016.

---

[39] FD-1023_Final_000070
[40] FD-1023_Final_000070
[41] FD-1023_Final_000068

Case 2:16-cr-00021-PP-WED   Filed 08/15/19   Page 14 of 40   Document 234

Then, a week later, on January 19, the recordings suddenly began again; and out of the blue, Mike, Steve, and Hamzeh had discussed an attack on the Masonic Center. This was a sudden development. By early January, both Steve and Mike reported that Hamzeh had not been discussing any sort of attack, and the Masons were never mentioned in any recording or report. It's also worth stressing that from January 1 through January 16, the FBI conducted near-constant surveillance on Hamzeh. Then, inexplicably, it stopped on January 17 and 18, only to begin again on January 19, when Mike met with the FBI and claimed that on January 17 and 18 (the only days when Hamzeh was not being watched) that Hamzeh was talking about an attack on the Masonic Center in Milwaukee.

Remarkably, these conversations on January 17 and 18 with Hamzeh *weren't* recorded. Mike reported that Steve, Hamzeh, and a fourth person watched videos about the Masons on YouTube on Mike's and the other person's phone, and they were now planning to attack the Masonic Center.[42] Mike also reported that Hamzeh said he had saved up $7,000 to travel to Texas with Mike to purchase "AK-47s, silencers, and bullet proof vests."[43]

The discovery reveals little about what happened between December 14 to January 19 when Mike stopped recording conversations, but there are indications that he was feeding Hamzeh misinformation about the Masons and that this continued until Hamzeh's arrest. As noted above, Mike reported to the FBI on January 19 that the three

---

[42] FD-1023_Final_000075
[43] FD-1023_Final_000075

15

men had watched videos on the previous days about the Masons on YouTube. And during a conversation on January 21 with Mike and Steve, Hamzeh alluded to a YouTube video that showed the Masons eating hearts and said that the Masons created ISIS to destroy Islam and kill Muslims.[44] That same night, there were also discussions about a video linking the Masons with ISIS fighters.[45] Hamzeh stated his belief that the Masons created ISIS to kill Muslims around the world.[46] And when interviewed by the FBI after his arrest, Hamzeh described watching videos depicting Masons as "people who talked to the devil," who "kidnapped, grabbed some people" and "cut them to pieces," and "eat their heart."[47] Hamzeh's view that the Masons were ISIS started with Mike.

The recordings from January 19 back this up. Hamzeh told Steve and another man that Mike had come to him about two weeks earlier and started talking about the Masonic temple and how the Masons spread negative propaganda about Islam and the Prophet Muhammad.[48] As the conversation continued into the early morning hours of January 20, Hamzeh again described how Mike had approached him a week or two earlier and begun denigrating the Masons.[49] Hamzeh reported that Mike, after baring his soul about his life being in ruins, told Hamzeh that the Freemasons were ISIS, "our enemies," anti-Islam, and always tarnishing the Prophet's image.[50] That same night, Hamzeh

---

[44] Translation_DD84_PT3-4_1-21-2016_000064
[45] Translation_DD84_PT3-4_1-21-2016_000064
[46] Translation_DD84_PT3-4_1-22-2016_000064
[47] Defense Transcripts 000127, 135, 144
[48] Translation_DD73_PT10-11_01-19-2016_000091
[49] Translation_DD73_PT10-11_01-19-2016_000091
[50] Translation_DD73_PT10-11_01-19-2016_000091

complained to Steve that Mike wasn't to be trusted—that "the guy brainwashes you."[51] Hamzeh also told Steve that Mike was the one who came up with the idea of attacking the Masonic Center.[52]

That conversation is critical because it occurred on January 19, 2016 when the three men toured the Masonic Center and discussed plans to attack it. It's also on that day that Hamzeh makes a number of statements about Mike obtaining machine guns and silencers from his associates; about entering the Masonic Center and shooting everyone there; about the attack becoming known all over the world; about the attacks defending Islam; and about how if he gets out after killing 30 people, he will be happy because everyone will know that nobody can play with Muslims.[53] It's also on January 19 that Hamzeh states that the Masons are "playing with the world like a game, and that these are the ones who are against us, these are the ones who making living for us like hell."[54] So something happened in early- to mid-January that caused Hamzeh (who had never before discussed the Masons with the informants) to believe they were affiliated with ISIS and were a danger to Muslims. The weight of the contemporaneous evidence indicates that what happened is that Mike did, in fact, "brainwash" Hamzeh about the Masons.[55] Mike was the one who supplied the idea, fostered it, and provoked these conversations— Mike also had to have proposed the plan. In fact, Special Agent Adkins testified that the

---

[51] Translation_DD74_PT2_01-19-2016_000038
[52] Translation_DD74_PT2_01-19-2016_000054-57
[53] Translation_DD73_PT8_01-19-2016_000025
[54] Translation_DD73_PT8_01-19-2016_000019
[55] Translation_DD74_PT2_01-19-2016_000038

17

plan to have people come up from Texas and provide machine guns was something that Mike came up with on his own.[56]

Hamzeh and the informants had troubling conversations filled with gory detail about finding a Masonic temple to attack, and the three boasted of making a plan for the following week. But the plan kept changing and Hamzeh kept concocting different rouses to back out. For instance, the plan started with an attack in Milwaukee.[57] Then it moved to downtown Texas—that's not a typo, Hamzeh told the informants that Texas has a big downtown.[58] Then the plan moved to Indiana.[59] As the plan jumped about, Hamzeh made up stories that would further postpone the plan.

When the informants started acting like they were taking the plan seriously, and Hamzeh began getting nervous that maybe they were serious, he sought spiritual advice. This was contrary to the instructions of the informants that Hamzeh was not to talk to anyone, as the two had repeatedly tried to isolate him from others. Hamzeh sought the counsel of an Imam, who assured him that this was wrong and he needed to stop the plan. On Sunday, January 24th, after seeing the Imam, Hamzeh went to Steve's hotel room and forcefully announced that he wasn't going through with the plan. Hamzeh proceeded to tell Steve and Mike that he went to the temple and talked to the Imam. The Imam told him that the plan would hurt all Muslims, and it was forbidden. The Imam advised him not to be hostile unless they are hostile to you, and if they wanted to fight,

---

[56] 12/12/18 Tr. at 79-80
[57] FD-1023_Final_000075
[58] Translation _DD84_PT2-01-21-2016_000035
[59] Translation _DD86_PT2-01-21-2016_000021

it should be against ISIS in Syria. Steve responded by claiming ISIS was Masonic and asked why not fight them here. Hamzeh pushed back: "No, as I told you what will happen here. I told you that this act will be forbidden. Because I told [you] what will happen here."[60] When Steve continued to debate with Hamzeh about his decision, Hamzeh responded: "This country let you in, and took a promise from you that nothing happens here unless they transgress against you. So far no one has transgressed against us."[61] Steve said it didn't matter, he was planning on martyrdom, and Hamzeh told him it was Haram, forbidden.[62]

In the face of his two friends trying to undermine his decision, Hamzeh stood firm and continued to fight back. Hamzeh offered to have Steve talk to the Imam to learn for himself, but Steve complained that he hadn't wanted Hamzeh to talk to anyone.[63] Steve continued to try to persuade Hamzeh that the attack was a good idea, but Hamzeh resisted. Steve added that maybe the Imam told you this because he is scared.[64] Hamzeh then explained (at length) the Imam's reasoning and why they could not carry out an attack. In response, Steve insisted he was still ready if Hamzeh wanted to go through with the plan, but Hamzeh maintained that such an attack would be wrong.

The three men then talked about the dangers that awaited Muslims. Hamzeh told them that the Imam had said there could be threats from the new president, including

---

[60] Translation_DD95_PT1_01-24-2016_000005-6
[61] *Id.* at 5.
[62] *Id.*
[63] Translation_DD97_01-24-2016_00008
[64] *Id.* at 12.

that "Muslims will be banned from everything, weapons banned, all IDs will be Muslim, each one carrying an ID, his identification will indicate he's a Muslim in a big stamp, that's what he told me. He said Muslims will be marked throughout America, and there is a possibility that they might put them all in one state."[65] Hamzeh continued: the Imam told him that next year, "There is a possibility that they might attack us, and at that time, we will be ready."[66] But he also emphasized that if "you attack them that is wrong."[67]

Hamzeh then said that they would get the weapons the next day.[68] Hamzeh did not use the word for machine gun (*Rashaan*); instead, he used the generic word for weapon. And Steve and Mike piped up that they too were ready to get them.[69] Hamzeh agreed with getting the weapons, reasoning that Mike's friend, who was providing the guns, might be reluctant to trust them in the future if they backed out.[70] Hamzeh elaborated on the Imam's reasoning, emphasizing that they could not use any violence "what he said is very logical 100%."[71] Steve again said he was ready with the plan if Hamzeh was willing and again Hamzeh said no, referring him to the Imam's logic.[72]

After this, Steve brought up getting the weapons again and Hamzeh said that he had no objection to getting them.[73] Hamzeh responded that they could go practice

---

[65] Translation_DD95_PT1_01-24-2016_000010
[66] Translation_DD95_PT1_01-24-2016_000010
[67] Translation_DD95_PT1_01-24-2016_000010
[68] Translation_DD95_PT1_01-24-2016_000011
[69] Translation_DD97_01-24-2016_000015
[70] Translation_DD97_01-24-2016_000016
[71] Translation_DD97_01-24-2016_000021
[72] Translation_DD97_01-24_2016_000022
[73] Translation_DD97_01-24-2016_000015

shooting, "But to attack, to get this out of your thinking. Take it off your head."[74] A while later, Steve (yet again) indicated that he was "ready for the plan," but he was again rebuffed by Hamzeh.[75] After more discussion, (and still, yet again) Steve brought up going to get the weapons and that the seller wouldn't get them weapons in the future if they didn't follow through. And yet again, the word used was the generic for weapon and not Rashassh for machine gun.[76] They then talked about going target shooting, and Hamzeh said that they *didn't* need a silencer for the guns.[77]

The men then decided to drive to the south side to play pool. They agreed to pick up the guns in the morning and to go see the Imam in the afternoon. On the drive, Steve says: "Honestly it bothered me when you told me that we cancel the operation I want to go; I want to go. Do you understand me? I want to go. I am ready."[78] Hamzeh responded by telling Steve to see the Imam and ask him his questions. After playing pool, Hamzeh asked Mike if there is a place they can practice, and Mike said they can go up north, outdoors in the forest, to practice shooting.[79] After they left the pool hall, Steve took another run at getting Hamzeh to agree to an attack despite Hamzeh's repeated statements that he was not interested. Hamzeh then told them he believes in the Imam, but Steve again says he is ready. Hamzeh responded that they can consult his uncle as well, who also is an Imam.

---

[74] Translation_DD97_01-24-2016_000024
[75] Translation_DD97_01-24-2016_000022
[76] Translation_DD97_01-24-2016_000033
[77] Translation_DD97_01-24-2016_000033
[78] Translation_DD97_01-24-2016_000040
[79] *Id.* at 50.

As Hamzeh resisted their overtures to continue with the plan, his voice began rising. As the following exchange took place, he was clearly frustrated and angry:

> Mike: --I don't know who I should believe, man.
> Samy: --I am afraid [UI]
> Mike: I don't know who I should believe.
> Samy: But it's because you are tense and don't know what you are saying-[OV]
> Mike: You, made me nervous, man.
> Samy: [Screams] There isn't any other way, man. What can I do for you? Go and talk to the sheikh. Why are you talking to me? [OV]
> Steve: I ask for forgiveness from almighty God, I ask forgiveness from almighty God.
> Samy: Why are you talking to me man? I have nothing to do with it. I have nothing to do with it. I can't issue you a decree and later we all go to hell.
> Steve: I ask for forgiveness from almighty God.
> Steve: I ask for forgiveness from almighty God [UI]
> Samy: I ask for God' forgiveness… I can't issue a decree in anything. Don't follow my word. I don't issue a decree in anything.[80]

After taunting Hamzeh about his cursing and putative offense to God, Mike questioned Hamzeh about why he'd accept the word of an Imam who only recently converted.[81] Hamzeh responded that he told him what he needed to know. Hamzeh then called his uncle, a Sheikh in Jordan, and asked for his opinion. His uncle also confirmed that the operation was verboten.[82]

Despite Hamzeh's firm resolution that he would not engage in any violence, Steve pressed on, asking Hamzeh if he was, indeed, confident in the advice he had received. Hamzeh says, "Definitely 100%," and that "I am done; I got it out of my mind."[83]  When

---

[80] Translation_DD95_PT2_01-24-2016_000047-48
[81] Translation_DD95_PT2_01-24-2016_000048
[82] Translation_DD95_PT2_01-24-2016_000050-52
[83] Translation_DD97_01-24-2016_000067

Steve indicated he still wanted to proceed, Hamzeh questioned how he could say this after two Sheikhs told him not to.[84] As Hamzeh got out of the car to go home, he said, "let me out of it, and I'm telling you this thing is not permissible, it is not permissible."[85] That is, Hamzeh wanted nothing to do with the informants and their machinations.

The next morning, Steve and Mike called and texted Hamzeh to meet up.[86] That morning, the three of them met at Steve's hotel room to hang out while waiting for the call from Mike's gun contact. As they prepared to leave, Hamzeh asked if he would be able to license the weapon he was going to buy.[87] Mike told him that he couldn't license them.[88] Although apprehensive, Hamzeh stayed silent. There was, however, another problem: Hamzeh was still short on money. He had $200 but needed to borrow the rest from Steve, so he'd have $300 that the weapons were supposed to cost. This exposed his earlier posturing that he had $7,000 or more to travel to the Middle East as mere bluster.

When he met with Mike's source (the undercover FBI agents) and saw the guns, Hamzeh asked if they had any smaller guns.[89] The agents said that they didn't; this was what they'd brought. One gun had a silencer. Hamzeh inspected the weapons, and asked Mike if it is the "same one you had, that's what you told us about."[90] And Mike assures him "it's like the one I have, but this one is black." To which Hamzeh says: "But, this one

---

[84] Translation_DD97_01-24-2016_000068
[85] Translation_DD97_01-24-2016_000068
[86] Mike's Excel Phone Records, Steve's phone records 1 - 2070
[87] Defense Translations_000026
[88] Defense Translations_000026
[89] Defense Translations_000041
[90] *Id.* at 40

[is]big" and Mike says "it's the same size."[91] And the undercover agent tells him that the silencer doesn't come off and that they wanted $1000 for both weapons.[92] That was more than Hamzeh or Steve had, so the agents brought the price down to $600 and then eventually $570 for both; $300 for Steve's weapon and $270 for Hamzeh's.[93] The Heckler & Koch, MP5SD, 9 x 19mm is valued at roughly $15,000 - $20,000. The Heckler & Koch, MP5/10, 10 mm is valued at approximately $3,000 - $4,0000.

After the money exchanged hands, Hamzeh tried to go to the car and get a bag for the weapons. But the agents told him to just put both guns into the green bag that they'd brought. Hamzeh did. And Steve then had Hamzeh carry the bag (which included the gun that Hamzeh bought and the one that Steve bought) to the car. After the guns were in the trunk, the three got in the car.

Once inside, Hamzeh became upset with Mike. The guns that they bought were not the same as the gun that Mike owned and that he'd been told they were buying.[94] Hamzeh was upset that they were not the same. Here is the exact exchange of Hamzeh's dismay at buying firearms that were different from the ones they came for:

> Samy: I thought it was similar, like yours man [discussing weapons brands]. We are coming came on the basis, of it being the same man.
> Mike: Okay you should not get upset with me, man.
> Samy: But, we agreed as such o [sic] Mike. It is not right that we come and find a different weapon, but okay, it is okay. It is not a problem.
> Mike: Did you really like it?
> Samy: Oh shit.[95]

---

[91] *Id.*

[92] *Id.* at 41

[93] Defense Translations_000048

[94] Defense Translations_000049

[95] *Id.*; *see also* DD104_01-25-2016 at 46.

24

As Mike told him to calm down, the car was surrounded and Hamzeh was arrested and charged with failing to register a weapon: one count for the gun he bought, one count for the gun Steve bought and he carried to the car, and a third count for the silencer that was with the rifle. Again, the rifle that Hamzeh bought cost between $15,000 and $20,000. The one that Steve bought was between $3,000 and $4,000. No one can purchase these weapons without first paying a $200 tax, and according to one long-time law enforcement officer in Milwaukee, he had never seen fully automatic firearms for sale on the street.[96]

III.  **The defense has offered more than enough evidence to support the entrapment defense.**

Given all that background, the question is whether there is *some* evidence that a jury could reasonably believe that Hamzeh was not predisposed to purchase machine guns and whether the agents' and informants' persuasion induced him to do so. *Mayfield,* 771 F.3d at 420. In answering that question, "the court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it." *Id.* The last section supplied the background; what follows explains why that evidence easily crosses the low threshold of *some* evidence and requires that the defense be allowed to present this case to a jury.

A.  **Before being approached by the informants, Hamzeh was not predisposed to purchase an illegal machine gun.**

Predisposition refers to the likelihood that a defendant "would have committed the crime without the government's intervention, or actively wanted to but hadn't yet

---

[96] John Davis Expert Report

found the means." *Id.* at 436. To be predisposed "[t]he defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." *United States v. Hollingsworth,* 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc). In addition, the predisposition must exist before the defendant's exposure to the informants: "[p]redisposition is, by definition, the defendant's state of mind and inclinations before his initial exposure to government agents." *United States v. Kaminski,* 703 F.2d 1004, 1008 (7th Cir. 1983). So "the prosecution must prove beyond a reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by [g]overnment agents." *Jacobson,* 503 U.S. at 549.

In deciding whether a person is predisposed, courts and juries consider: a defendant's criminal history; whether the government initially suggested the criminal activity; whether the defendant engaged in the criminal activity for profit; the nature of the inducement or persuasion that was used; and whether the defendant showed a reluctance to commit the crime that was overcome by persuasion by the agents. *See Seventh Circuit Federal Crim. Jury Instruction* 6.05 (2019 ed.). What follows are the pieces of evidence that the defense can point to in support of Hamzeh's lack of predisposition. At this point, it's worth stressing as the Court in *Mayfield* observed that predisposition can rarely (if ever) be found as a matter of law to preclude the defense from raising entrapment: "it's hard to imagine how a particular person could be deemed 'likely' to do something as a matter of law." *Mayfield,* 771 F.3d at 441.

Before being approached by the agents, there is no evidence that Hamzeh had any interest in acquiring guns, especially an illegal machine gun. There are no internet searches and no reports of him seeking one out. Nothing. Even Steve's initial report on Hamzeh (a full month after he started meeting with the FBI) doesn't mention Hamzeh wanting a machine gun. The only time a machine gun is mentioned is when Hamzeh and Steve bluster about their fantasies of disarming an Israeli soldier and taking his machine gun from him—a boast akin to taking on a Navy Seal.

What's more, throughout September, October, and November, there is no mention of Hamzeh seeking a machine gun. Hamzeh's empty boasts don't make for an actual interest in trying to purchase a machine gun. *See United States v. Joost*, 92 F.3d 7, 13 (1st Cir. 1996) (defendant was "inventing escapades, finding holes in them, suggesting exploratory trips, and inventing excuses"). The only recordings we have of Hamzeh discussing the purchase of a machine gun is him stating he doesn't want one: a hand gun is all he needs. In fact, Mike is the one who suggests (and pushes) the topic of purchasing a machine gun. The first time that any mention of purchasing one comes up is from Mike on November 2, 2015.

There is, to be sure, discussion from Hamzeh about getting a pistol, but there is nothing illegal about him getting a pistol. And even that is all *after* the informants began putting pressure on Hamzeh and directing their conversations towards firearms. Again, he is a citizen and not a felon; and the inquiry is not about whether Hamzeh was interested in guns generally or even general criminal conduct (which he wasn't). It's whether Hamzeh was predisposed to commit this specific crime. *See Mayfield*, 771 F.3d at

27

438 ("[T]he principal element in the defense of entrapment [i]s the defendant's predisposition to *commit the crime—not just any crime*." (emphasis added)); *see also Jacobson*, 503 U.S. at 551 ("Evidence of predisposition to do what once was lawful is not, by itself, sufficient to show predisposition to do what is now illegal"). To that end, Hamzeh's general interest in guns is not evidence that he was predisposed to buy a machine gun, but his general lack of understanding and ability to get a machine gun does bear on his lack of predisposition. After all, his "readiness" to commit the crime is encompassed in whether he has any "demonstrated knowledge or experience with the criminal activity under investigation." *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001). And like the defendant in *Hollingsworth*, Hamzeh had no experience with or ability to navigate the underground world and get a machine gun. 27 F.3d at 1203 ("*No real criminal would do business with such tyros.*" (emphasis added))

That is, there is no evidence that the government can point to that Hamzeh was predisposed to commit this crime. And that point is cemented by the fact that when it comes to the strongest evidence of whether a person is predisposed comes in the form of whether they initially say no, the defense has that in spades. *Mayfield*, 771 F.3d at 435 ("No one factor controls, and *the most significant is whether the defendant was reluctant to commit the offense*." (quotation omitted) (emphasis added)). When Mike brings up getting a machine gun, Hamzeh says no. And the only way that the informants got past Hamzeh's initial and repeated and adamant no! was through a four-month campaign filled with deceit, fraudulent representations, appeals to friendship, a 98% discount on the guns (a better than market deal), and persistent psychological pressure. In other

28

words, while a person can be seen as predisposed to commit a crime if he jumps at the first opportunity, that isn't this case.

### B. Evidence of inducement.

A defendant can only be barred from presenting an entrapment defense as a matter of law "if the evidence shows that the government did nothing more than solicit the crime on standard terms." *Mayfield,* 771 F.3d at 441. The jury instructions provide that "A government agent induces a defendant to commit a crime: (1) if the agents solicit the defendant to commit the crime, and (2) does something in addition that could influence a person to commit a crime that the person would not commit if left to his own devices." *See Seventh Circuit Federal Criminal Jury Instruction* 6.05 (brackets and alterations removed). That additional conduct that could influence a person to commit a crime include: repeated attempts at persuasion; fraudulent representations; promises of reward beyond what is inherent in the usual commission of the crime; threats or coercive tactics and harassment; pleas based on need, sympathy, or friendship; or any other conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the efforts of the agents. *Mayfield,* 771 F.3d at 434 (noting "an illegitimate inducement . . . creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's persuasion").

In most cases, there may be a single "something extra" or illegitimate inducement that supports presenting the entrapment defense. *See, e.g., United States v. McGill,* 754 F.3d 452, 458 (7th Cir. 2014); *United States v. Thomas,* 726 F.2d 1191, 1196 (7th Cir. 1984) ("some degree of Government involvement in coaxing defendant into committing the offense");

*United States v. Theagene,* 565 F.3d 911, 922 (5th Cir. 2009) (agents "persist in encouraging criminality after a defendant rejects overtures"); *United States v. Acosta,* 67 F.3d 334, 338 (1st Cir. 1995) ("a campaign of persistent calls"). While many cases have a single factor or maybe two, here, there are at least seven factors that the defense can point to that establish the informants went beyond merely soliciting the crime on standard terms and instead their calculated campaign turned a "law-abiding person into a criminal." *United States v. Pillado,* 656 F.3d 754, 764 (7th Cir. 2011).

It's worth noting that in cases where the courts have found entrapment as a matter of law, only a handful "plus factors" are usually present. *United States v. Barta,* 776 F.3d 931, 933 (7th Cir. 2015). In *Barta,* the defense (and the Court) pointed to four:

> Undisputed evidence shows that several "plus factors" signaling inducement were present in this case. In the course of its undercover operation the government employed "repeated attempts at persuasion." It employed both "fraudulent representations" and "promises of reward beyond that inherent in the customary execution of the crime." It also employed "pleas based on need, sympathy, or friendship."

776 F.3d at 933. And in *Sherman,* the Supreme Court pointed to two: preying upon a recovering drug addict, and the persistent efforts at persuasion (including appeals to sympathy) to get the defendant to break the law and sell the informant drugs. *Sherman v. United States,* 356 U.S. 369, 373 (1958). Of course, there is no magic number of "something extra" or "plus factors" that entitle a defendant to a finding of entrapment as a matter of law. But the precedent suggests that in a case like this, where the defense can point to seven factors, the real issue is whether there's entrapment as a matter of law, not whether there should be a jury instruction. Like it was in *Sherman,* "[t]he evidence shows that the

30

government play[ed] on the weaknesses of an innocent party and beguile[d] him into committing crimes which he otherwise would not have attempted." *Id.* at 376. Here are seven points that the defense can point to that entitle Hamzeh to present the entrapment defense.

First, the persistence of the informants who were with Hamzeh nearly daily and repeatedly brought up buying a machine gun, even after Hamzeh said he simply wanted a pistol. Mike brings it up in December and Hamzeh says no; Mike brings it up again and again and again. And it's met with both Hamzeh's ire (remember: he told Mike to leave him alone and stop asking the same questions) and apathy (remember: Mike tries to bring up the topic on December 14, and Hamzeh is apathetic). So we have persistent efforts. *Acosta*, 67 F.3d at 338 ( "a campaign of persistent calls ... before [defendant] responded, apparently several weeks later"); *see also United States v. Rodriguez*, 858 F.2d 809, 811, 815 (5th Cir. 1988) (a government agent designed and approached the defendant with a lucrative drug deal, and solicited forcefully with "dogged insistence," making four calls in one day). Here, the efforts were prolonged (over a course of months) and included contact every day with Hamzeh, often multiple times a day. *Barta,* 776 F.3d at 933 ("In the course of its undercover operation the government employed repeated attempts at persuasion.").

Besides repeatedly pushing the topic (despite Hamzeh's refusal), the second "additional factor" that the defense can point to is that the informants engaged in more subtle and sophisticated means of persuasion that began long before December. *Mayfield,* 771 F.3d at 434 ("As we explained in *Pillado*, 'subtle, persistent, or persuasive' conduct by

31

government agents or informants may qualify as an illegitimate inducement."(quoting *Pillado,* 656 F.3d at 765)). Early on, Mike introduces the topic of guns to Hamzeh; he then stokes Hamzeh's interest, taking him to gun stores and the shooting range. He does this on November 2, December 7, December 14, and January 19. Over the course of three months, he subtly normalized guns into Hamzeh's life. Remember: throughout this entire time, Hamzeh never owned a handgun, let alone a machine gun. And in December, when Mike tries to cultivate Hamzeh's interest in a machine gun, Hamzeh doesn't express any interest. His mind is set on a handgun. It's only a month later, when Mike dreams up this plan that the Masons are the enemy of Islam and aligned with ISIS that the topic of purchasing a machine gun suddenly reappears. And Mike's old contact (mentioned in early December) from Texas also reemerges. To be clear, from Hamzeh's last rejection of Mike's overtures on December 14, through January 18, the topic of machine guns was never broached again—at least not in any of the recordings, text messages, or the FBI reports. Thus, like the Court in *Mayfield* noted, we have subtle (and not-so-subtle) forms of persuasion, including harassment and coercion. 771 F.3d at 434 (noting "the government's solicitation of the crime was accompanied by subtle and persistent artifices and devices that created a risk that an otherwise law-abiding person would take the bait").

Beyond those subtle forms of harassment and coercion that would, over time, influence any person, the defense can also point to the way the government preyed on Hamzeh's low IQ and other limitations. That's the third "additional factor" that the defense can point to here. *See United States v. Dennis,* 826 F.3d 683, 692 (3d Cir. 2016)

32

(listing among other evidence, "the expert testimony of his vulnerability to being persuaded due to his low IQ"). It's also why the two-on-one dynamic that Steve and Mike presented to Hamzeh is important for a jury and the Court to understand. *See Mayfield*, 771 F.3d at 434. Hamzeh may have swatted away or dismissed the informant's overtures if he was only meeting with one of the informants, but that became much more difficult when he was isolated and surrounded daily by their lies—including those of his best friend, Steve. So while there are clearly persistent forms of harassment and coercion, there is also preying on Hamzeh's particular psychological vulnerabilities which the Seventh Circuit has found as a basis for presenting the entrapment defense. *McGill*, 754 F.3d at 459 ("And the jury had before it McGill's confession to Elliott of his social anxiety. Elliott alone could have traded on McGill's insecurities to make the number of telephone calls that he did in a brief period of time.").

With preying on Hamzeh's limitations, the informants also traded on their friendship with Hamzeh. Over a course of months, seeing each other *every day*, the informants wove themselves into every fabric of Hamzeh's life. They worked at the same business; they came over to his house, unannounced; and went to the same social functions. They were together every day. And after Hamzeh had repeatedly rejected getting machine guns in December, Mike brought the topic up again by wrapping it up with "the plan" that Mike devised, including getting machine guns for it. It's a matter of common sense that Hamzeh, who knew no one selling guns, let alone machine guns, could not have been the one who suggested the purchase of machine guns from Texas. And Special Agent Adkins acknowledged that it was Mike who came up with this idea

33

on his own.[97] This idea had to originate with Mike—or the agents. And when Hamzeh rejected the plan, and in the face of his "friend's" disappointment, Hamzeh was willing to get the weapons. Thus, like the defendants in *Mayfield* and *Sherman,* we have appeals to friendship as a fourth additional factor that would have induced Hamzeh to commit this crime. *Mayfield,* 771 F.3d at 435 (noting "other conduct" may be "pleas based on . . . friendship"); *Barta,* 776 F.3d at 937 ("Here we have pleas based on need, sympathy, or friendship.").

Beyond the persistent efforts and appeals to friendship and subtle forms of manipulation, Mike used fraudulent representations to induce Hamzeh—that's the fifth "additional factor" that the defense can identify: Mike's lies. He lied to Hamzeh that the Masons were aligned with ISIS and that they eat the hearts of their victims. He fed the paranoia that accompanied then-candidate Trump's rhetoric about Muslims. And he blurred the line between what is legal and illegal conduct using the term "machine gun" to refer to his firearm and firearms at Gander Mountain—all of which would be legal. Those fraudulent representations all feed into the final meeting, when Hamzeh was told they were getting a gun like Mike's, not a machine gun. And after purchasing the gun Hamzeh made that clear: "I thought it was similar like yours man [discussing weapons brands]. We are coming came on the basis, of it being the same man."[98] The government's translation reinforces the point: "I thought they would be like yours man. We came on

---

[97] 12/12/18 Tr. at 79-80.
[98] Defense Translations_000049

the basis that the weapon was like yours. That's what we agreed on."[99] Hamzeh's statement is so much stronger on video. But the point is made: Hamzeh was tricked.

The fraudulent representations don't end with the Masons and blurring the lines between legal and illegal firearms, the informants also offered Hamzeh far beyond the standard market deal for purchasing a machine gun. That is the sixth "additional factor" that the defense can point to and the evidence supports the jury hearing. Mike offers a price for the machine guns far below anything that could be considered "market value" or a standard market deal. *Mayfield,* 771 F.3d at 433 ("[T]he term 'ordinary' in this context ... mean[s] something close to what unfolds when a sting operation mirrors the customary execution of the crime charged." (quotation omitted)). If it weren't for the opportunity presented by the agents, it would have been impossible for Hamzeh to buy a machine gun. First, there was no ability. As John Davis explains: in all his years investigating gun crimes, he never heard of a machine gun being on the streets of Milwaukee. There would have been no opportunity to get one, unless Hamzeh had contacts—and Hamzeh had none. *Hollingsworth,* 27 F.3d at 1203 ("No real criminal would do business with such tyros."). Second, Hamzeh had no money to buy such a weapon. As Georg Labonte's report makes clear: this gun would have cost between 15-20k. The ability to get such a gun could never have happened unless the government offered Hamzeh the gun at a fraction of the price—both of what a machine gun would cost and really any gun that Hamzeh might be interested in getting. After all, when the informants and Hamzeh went

---

[99] DD104_1-25-2016 at 46.

to the gun stores (to window shop) the prices were far above the $260 that this firearm was offered to Hamzeh. It's also worth noting that the cost of the tax associated with the machine gun ($400) would have exceeded the cost of the gun. All of which speaks to the impossibility of the situation that the informants presented to Hamzeh. That is what the courts refer to when they speak of getting a deal beyond the standard reward.

Finally, the seventh "something extra" that the defense can point to isn't neatly captured in the jury instructions. It is, in fact, why the pattern jury instruction has a catch-all: giving the defense the ability to point to specific facts (outside the mentioned categories) that show Hamzeh was induced. *See Seventh Circuit Pattern Instruction* 6.05; *see also Mayfield,* 771 F.3d at 435 ("or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts"). Here, there are two additional aspects of the case that speak to Hamzeh being induced to commit this crime: the bait-and-switch with the gun he expected to get and the one he was sold and then Steve and Mike leaving Hamzeh holding the bag. While colloquial and trite, both fit what happened here and speak to the government's "subtle, persistent, or persuasive conduct" to get Hamzeh to commit this crime. *Id.* at 434.

Here, there is a lack of precision about what type of firearms Hamzeh and Steve were acquiring. That much is clear. Hamzeh thought he was getting one like Mike's. That would be a legal firearm. And when he gets to the rendezvous, surrounded by his friends and already in over his head with people selling him guns for a fraction of their value and half of what was first presented to him, Hamzeh is hesitant. He asks for something

smaller. But then Mike reassures Hamzeh, "it's like the one I have, but this one is black from here." Hamzeh protests that "this one is big." And Mike reassures him: "It's the same size."[100] Eventually, when they don't have anything else and in the face of Mike's persistence, Hamzeh demurs and buys one.

Mike and Steve's four-month push to get him to this point, and the bait-and-switch pays off: Hamzeh buys the gun. It's only minutes later in the safety of Mike's car, away from the undercover agents that Hamzeh starts yelling: this is not the same gun. The bait-and-switch move is deceitful; and coupled with the informant's other efforts, it's what gets Hamzeh past the point of where he'd have been able to say no. Indeed, had Mike presented the "weapons" for what they were, illegal firearms, then Hamzeh would have greeted him with the same admonition he did in early December when Mike tried to get him to buy an illegal gun: "if they caught you with it, they will fuck you."

With that bait-and-switch move, there is also the matter of having Hamzeh get caught holding the bag. Here, Hamzeh did not try to buy two firearms. He gave in and got one. Yet, the undercovers put both in a single bag, and the four FBI actors (the two undercover and Steve and Mike) made it so Hamzeh carried the bag back to the car. The fifty feet that results in another ten years of exposure for a firearm that Hamzeh did not purchase and had no duty to register or pay a tax upon. That trickery, to stack the charges, is what underlies the charges for Steve's gun. Hamzeh was induced to make the purchase, and then tricked into holding the bag.

---

[100] Defense Translations_000042

Thus, the defense can point to seven "additional" or "plus factors" that would (and here did) establish that Hamzeh's decision to buy the firearm and carry Steve's to the car was the product of the agent's creative and manipulative efforts. *Sherman*, 356 U.S. at 372 (noting entrapment occurs "when the criminal conduct was 'the product of the creative activity' of law-enforcement officials"). Indeed, the defense can point to:

o The informants' persistent efforts to get Hamzeh to purchase a machine gun;

o The informants' subtle, persistent, and persuasive conduct aimed at getting Hamzeh to purchase a machine gun

o The informants' preying on Hamzeh's limitations in order to get Hamzeh to purchase a machine gun.

o The informants' making appeals to their friendship with Hamzeh in order for him to purchase a machine gun.

o The informants' making fraudulent representations to get Hamzeh to purchase a machine gun.

o The informants' offering a better-than-market deal for Hamzeh to purchase a machine gun.

o The informants' bait-and-switch move to make sure he gets an illegal machine gun and not the legal one that was promised, coupled with the agents' and informants' efforts to make sure Hamzeh carries the bag (with Steve's gun) to the car.

All of which, is why this is not the type of case where the agents simply caught Hamzeh who was otherwise ready and willing to commit the crime and was waiting for the opportunity; rather, it is the type of case where "the Government plays on the weaknesses

of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted." *Id.* at 376.

## IV. Conclusion.

At this stage, the Court simply has to ask: is there some evidence in the record that the defense has pointed to for a reasonable jury to believe that Hamzeh was entrapped. Here, the defense has gone point by point demonstrating the lack of *any* evidence that Hamzeh was predisposed to commit *this* crime before being approached by the government's agents. This is anything but a case where Hamzeh was "situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so." *Hollingsworth,* 27 F.3d at 1200. And when the agents came along, they didn't simply offer Hamzeh the standard deal, and he jumped at it. Instead, over the course of months Hamzeh said no. He wasn't interested. It was only after months of pressure and the agents rouse of the Masons and Hamzeh's actions to call it off that he was willing to compromise and get a weapon like Mike's. But the weapon wasn't like Mike's, it was different—it was illegal. The subtle and persistent pressure, that trickery, that deceit, coupled with everything else cited above, is what lead to Hamzeh buying the one gun and carrying the bag of the other. Those facts are more than enough to present this to a jury.

39

Dated at Milwaukee, Wisconsin this 15th day of August , 2018

Respectfully submitted,

/s/    *Craig W. Albee*

Craig W. Albee,
Joseph A. Bugni
Federal Defender Services
  Of Wisconsin, Inc.
517 E. Wisconsin Ave – Rm 182
Milwaukee, WI  53202
Tel.: (414) 221-9900
Email:  craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

40