UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                              Case No. 16-CR-21

SAMY HAMZEH,

Defendant.

## THE UNITED STATES' RESPONSE TO THE
## DEFENSE'S FIRST MOTION IN LIMINE: ENTRAPMENT

In 2015, Samy Hamzeh's best friend Steve came forward to the FBI because he was afraid Hamzeh was going to commit a mass killing. The FBI needed to know what Hamzeh was planning in order to stop him. So, it had Steve and later another man, Mike, record Hamzeh talking about Hamzeh's plans. Sure enough, Hamzeh wanted to buy machineguns and silencers. *See, e.g.*, Discovery Disc 73/FBI Disc 72 part 8 (1/19/15)[1] at page 5 lines 33-35 ("HAMZEH: *We want two machineguns*, you now have one, so we want two more, *and we need three silencers*, that's it. Find out how much all together these will cost, then we will march.") (emphasis added); Discovery Disc 84/FBI Disc 86 (1/21/15)

---

[1] Transcripts of Hamzeh's recorded statements are cited herein with reference to their Discovery and FBI disc numbers, the date of the recording, and to the pages and lines at which the quotations can be found. The government has sought to include the actual quotes that support every claim in this Response.

at page 40 lines 13-19 ("STEVE: What are the two weapons that we need? HAMZEH: *Two Machineguns!* STEVE: Single bullet at a time or what it is called, uh? HAMZEH: *No, two machineguns*.") (emphasis added); Discovery Disc 90/FBI Disc 87 (1/23/15) at page 39 (emphasis added) ("HAMZEH: [Lowering voice] Listen, what we need is from those people, *two machineguns, and three silencers* and three magazines.") (emphasis added).

On January 25, 2016, the FBI sent undercover Special Agents to pose as arms dealers, Hamzeh bought machineguns and a silencer from the Special Agents, and he was arrested. Within a few months of learning of the threat, the FBI had thwarted Hamzeh. Hamzeh was charged with the illegal possession of two machineguns and a silencer.

Hamzeh has moved for permission to raise the affirmative defense of entrapment at trial. Defense's First Motion in Limine: Entrapment ("Hamzeh Entrapment Motion") (August 15, 2019) (Dkt. No. 234). As discussed below, no reasonable jury could find that Hamzeh was entrapped. Before he was the subject of an investigation, Hamzeh said he wanted to acquire weapons to "spray" bullets and commit a mass killing. He repeatedly stated he had long held that desire. After the investigation began but before he met the confidential informant who was not his preexisting friend, Hamzeh said he wanted to acquire weapons to "spray" bullets to commit a mass killing. He was then offered the weapons he wanted, and he readily accepted. Hamzeh had some ultimate hesitance regarding committing the attack as he planned on the date planned, but he never wavered on buying the guns – the offense with which he is changed. Hamzeh repeatedly showed through word and deed that he was predisposed to commit the charged and

similar crimes and had been so for a long time. *See* Discovery Disc 22/FBI Disc 24 (11/2/15) at page 55 lines 2 to 20 (emphasis added) ("HAMZEH: Yeah. *It was my intention a long time ago, Mike, by God, a long time ago.*").

He was not induced to buy the weapons and was an enthusiastic purchaser the moment a serious possibility of buying them was presented to him. Even after he was arrested for purchasing the weapons, Hamzeh stated plainly, in a *Mirandized* statement, that he was predisposed to want an automatic weapon with a silencer attached.

> FBI SPECIAL AGENT: "Why the need to buy an automatic weapon? Like, why the need to buy one that you press the trigger and bullets come out until you stop pressing the trigger?
> HAMZEH: I told you, I like weapons. That's all.
> FBI SPECIAL AGENT: Alright.
> HAMZEH: I do like weapons.
> FBI SPECIAL AGENT: Alright.
> HAMZEH: *We tried guns and like guns, that's why we think about automatic weapons.* Just to practice and have fun, that's it.
> Hamzeh January 25, 2016 Post-Arrest Statement MVI_0022 at 1:43 (emphasis

added); s*ee also* Hamzeh January 25, 2016 Post-Arrest Statement MVI_0023 at 16:10 (Hamzeh explaining that Hamzeh purchased the machine gun with the silencer attached because "when I saw this, I liked [the machine gun with the silencer attached] actually, what can I say. . . *the one with the silencer you say, that one was for me, I bought it . . . I liked it, so we got 'em . . .* I actually liked it, what can I say?") (emphasis added).

In light of Hamzeh's extremely unusual recorded statements, and the total absence of government inducement, this is the rare case in which the defendant should not be permitted to raise an entrapment defense. The entrapment defense is frivolous in this rare

case because of the defendant's post arrest-statement, in which he candidly explains his desire to purchase the machine guns and silencer.

I.      *Standard to Raise an Entrapment Defense*

In order to raise an entrapment defense, Hamzeh must first make out a prima facie case of: "'(1) government inducement of the crime, and (2) a lack of predisposition on the part of the defendant to engage in criminal conduct.'" *United States v. Blassingame*, 197 F.3d 271, 280 (7th Cir. 1999) (*quoting Mathews v. United States*, 485 U.S. 58, 63 (1998)); *see also United States v. Santiago-Godinez*, 12 F.3d 722, 728 (7th Cir. 1993); *United States v. Haddad*, 462 F.3d 783 (7th Cir. 2007). The defendant's burden is to establish more than a scintilla of evidence, although the evidence need not be so substantial that if uncontroverted, it supports a finding of entrapment as a matter of law. *Blassingame*, 197 F.3d at 280.

A defendant must proffer evidence on both elements of the entrapment defense. Thus, predisposition does not automatically become a jury issue if a defendant proffers sufficient evidence of government inducement. Indeed, the Seventh Circuit has repeatedly recognized that "[w]here there is sufficient evidence that a defendant was predisposed to commit the crime, the entrapment defense is properly rejected without inquiry into the other factor, government inducement." *United States v. Johnson*, 32 F.3d 308 (7th Cir. 1994); *see also Santiago-Godinez*, 12 F.3d at 728.

Absence of predisposition is the principal element of the Defendant's initial burden of the entrapment defense. *Id*. The predisposition inquiry "focuses upon whether the defendant was an 'unwary innocent' or instead, an 'unwary criminal' who readily

availed himself of the opportunity to commit the crime." *Mathews*, 485 U.S. at 280-81. A predisposed person is one "who takes advantage of an ordinary opportunity to commit criminal acts – not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person . . . ." *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991).

Courts in this Circuit employ a five-factor test to determine predisposition or its absence, examining: (1) the defendant's character or reputation; (2) whether the government initially suggested the criminal activity; (3) whether the defendant engaged in the criminal activity for profit; (4) whether defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and (5) the nature of the inducement or persuasion by the government. *Blassingame*, 197 F.3d at 281. Of these, "the most important factor . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983); *see also United States v. Casanova*, 970 F.2d 371, 375 (7th Cir. 1992). And the Seventh Circuit has held that the "government's persistence in attempting to set up a drug transaction is not alone sufficient to carry the case beyond an ordinary opportunity." *Santiago-Godinez*, 12 F.3d at 729.

There can be no doubt that in the typical case, "entrapment is a question for the jury, not the court." *United States v. Mayfield*, 771 F.3d 417, 439 (7th Cir. 2014). And it is vitally important that the courts "protect the integrity of the judicial process from the corrupting influence of disreputable police conduct" that could entrap an unwary innocent. *Id.* at 426.

Here, though, we have months of recorded statements evincing a durable and sincerely held wish to commit the charged offense. We have the unusual circumstance of confidential informants not inducing but instead often attempting to dissuade the defendant from committing the offense. And we have a *Mirandized* confession in which Hamzeh blithely stated his predisposition to commit the charged offense, even after he was arrested for it. Thus, there need be no weighing of the evidence on each side. Because in light of his statements and actions, it is truly impossible for Hamzeh to present evidence that would support an entrapment finding. And there simply is no evidence of government inducement. This is the rare case in which the defendant should not be permitted to raise an entrapment defense.

## II. *Hamzeh was Not Induced to Commit the Charged Offenses*

At the threshold, Hamzeh was not induced to commit his crimes. As the Seventh Circuit held in *Mayfield*, "where the government's agents merely initiate contact with the defendant, solicit the crime, or furnish an opportunity to commit it on customary terms, the government has not 'induced' the crime within the meaning of the entrapment doctrine and the defense should be unavailable without the need for a more complex inquiry into evidence of predisposition. 771 F.3d at 431-32. "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson v. United States*, 503 U.S. 540, 548 (1992) (internal quotation marks omitted). Inducement is, thus, more likely to be resolved pretrial than predisposition. *Id*. at 441.

### i. *Hamzeh Wanted to Commit a Mass Killing, So He Needed Weapons of War.*

Samy Hamzeh wanted to commit a terrorist attack. He, therefore, wanted the weapons necessary to do so. The weapons were, ineluctably, a lesser-included part of his plans and predisposition. As he said over and over, month after month, he wanted to be able to kill as many people as possible. His plans predated his friend Steve reporting him to the FBI (or there would not have been anything to report) and they predated Hamzeh even meeting Mike. Nonetheless, Hamzeh's primary inducement claim is that Mike talked him into all this. To the extent there are any purported record citations, they are to Mike's statements, not to Steve's. But even via those citations, Hamzeh merely points to examples of Mike playing along with Hamzeh's *preexisting* plan to kill people with weapons – which he necessarily had to do in order to be a remotely effective confidential informant. He thus fails completely to make out the necessary prima facie case of inducement. The plan was Hamzeh's; during his post-arrest interview, while discussing the fact that the Masons and ISIS are, in his mind, related entities, Hamzeh admits that the plan to attack the Masons was his:

> HAMZEH: Like what I told you, I was being a regular person, then I start thinking about this, and reading, watching YouTube, stuff like that. I got the idea about it.
> FBI SPECIAL AGENT: Okay
> HAMZEH: Then I told them about it. I'm the one who told them about it, to be honest with you. I'm the one who told them about it; I'm the one who stopped it.
> FBI SPECIAL AGENT: Right. Good.

Hamzeh January 25, 2016 Post-Arrest Statement MVI__0024 at 10:35

In order for Hamzeh to trust Mike and Steve enough to share his plans with them, Mike and Steve had to play along with those plans. As discussed below, Hamzeh attempted to recruit a fourth man, Mo, and Mo did not play along. So, Hamzeh cut Mo

out. Thus, being agreeable with Hamzeh was an essential element of the confidential informants' role in thwarting the attack. Hamzeh attempts to spin Mike's and Steve's sometimes tacit and sometimes explicit endorsement of his various plans as "normalizing" them. *See, e.g.*, Hamzeh Entrapment Motion at 4. But agreeing to go along with Hamzeh's plans, or agreeing to arrange to acquire the guns he wants so that he does not get real ones, is not inducement. Nor is it close.

Hamzeh also argues that Mike "normalized" automatic weapons by saying he possessed one. Entrapment Motion at 3. But this is not government inducement. No court has ever found that a person was induced into being a drug mule, for example, when a confidential informant merely said "Hello, I am drug mule," thereby "normalizing" it. Threatening to beat him if he did not participate? Inducement. Offering him $1 billion to buy a machinegun and participate in a mass killing? Perhaps. Playing along with Hamzeh's plans and talking about owning a machinegun? Not government inducement.

And from the beginning, these were very definitely Hamzeh's plans. Steve thought so. Mike thought so. And Hamzeh thought so. Even after he was arrested, Hamzeh was plain as day on this point: "HAMZEH: Then I told them about it. I'm the one who told them about it, to be honest with you. I'm the one who told them about it; I'm the one who stopped it." Hamzeh January 25, 2016 Post-Arrest Statement MVI__0024 at 10:35. There is no shred of evidence otherwise. Instead, in a host of statements that Hamzeh did not know were recorded, we have Hamzeh reaffirming over and over his preexisting predisposition to acquire machine guns for a mass killing.  Make no mistake about it: the defendant plotted to murder as many innocent people as possible and sought

to acquire the weapons to commit the attack. Any argument to the contrary is frivolous-there was no inducement.

For example, in November 2015 right after he met Mike, Hamzeh explains how he would like to acquire machineguns in order to kill Jews while they worshipped:

> HAMZEH: We kill two and two. You kill two and I kill two; you take their *machineguns* and go inside, for about from here to that fire extinguisher over there--
> MIKE: Yes.
> HAMZEH: --before you get to the temples and people. You go in, take out the Kalashnikov and go: bang, bang, bang and fuck them all up; all of them.
> MIKE: Well, that is fifty people.
> HAMZEH: You *spray* them all and if you get shot, then you get shot, and if you get caught—of course you are not going to let anyone catch you. Anybody that gets close to you, you shoot him; you fuck him up before you get shot. You know what I am saying! This is the best thing. The best thing for me-- You can kill as many as you want and you fuck them up in their own temple.

Discovery Disc 30/FBI Disc 29 (11/12/15) at Page 26 lines 16-28 (emphasis added).

It is notable that Hamzeh here makes clear that he understands Kalashnikovs and machineguns to be interchangeable terms to describe the automatic weapons he wishes to use to kill people by "spraying" bullets into them.

As described below, Hamzeh eventually cools on committing an overseas attack. At this point the FBI investigation ramps down. Then, Hamzeh openly turns his attention to a domestic attack instead, and the FBI investigation ramps back up again. But in January 2016, in the lead up to the sting, one thing that had not changed is that it is Hamzeh once again recruiting Mike and Steve to *his* plan (and expressing frustration at

their occasional reluctance). In doing so, he is quite obviously eager to go to Texas (where

he was told there were arms dealers who would sell him machineguns and silencers):

> HAMZEH: I want to tell you something men, from now, within two months maximum, if what we are planning did not take place, I will be going to Jordan, and go and stay in Jordan, I can't wait, I am tired, I am with you two more months, I am ready anytime, if you want us to do it tomorrow, I am ready. The task is difficult and it needs planning, but we can't delay it every time, delay, delay.
> STEVE: Okay, since when I knew about the plan? You told me? Yesterday, *you told me you were planning for two months now, right? What did you plan for the two months? What is your plan?*
> HAMZEH: About the man in Texas and all these things
> STEVE: The man in Texas, do you know him, Mo? What is he?
> MIKE: Russian.
> STEVE: Okay, he is going to bring what?
> MIKE: Whatever you people want, *he told me he wants silencers and shit.*
> STEVE: Who wants the…
> HAMZEH: *We want two machineguns, you now have one, so we want two more, and we need three silencers, that's it. Find out how much all together these will cost, then we will march.*
> STEVE: Yeah. Going to Texas and will be as follows: do you want all three of us go together, I am ready. If you want one of us to stay here and observe the situation, what is the best situation.
> HAMZEH: I am saying we go together and return together.

Discovery Disc 73/FBI Disc 72 Part 8 (1/19/16) at page 5 lines 10-41 (emphasis added).

In light of statements like this one, Hamzeh simply cannot possibly prove he did

was induced by the government (and not predisposed) to possess machineguns and

silencers.

Hamzeh repeatedly asserts in his motion that Mike came up with the idea to get

machineguns and silencers and then coerced him into it. That claim is impossible to

square with Hamzeh's statements or with Mike's recorded statements, about Hamzeh in

Hamzeh's presence like "*he* told me he wants silencers and shit." *Id.* (emphasis added). And so it is no surprise that Hamzeh cannot actually cite to Mike inducing him. Because it did not happen.

Hamzeh also argues "Mike chides Hamzeh for only wanting a handgun. Hamzeh says he doesn't have the money for anything else, but Mike claims he can buy cheap 'Kalishnikovs' in Texas. Mike knows that this is likely to appeal to Hamzeh, as money is an issue for him." Hamzeh Entrapment Motion at 11. This passage fully concedes that Hamzeh is predisposed to acquire automatic weapons. If the only thing holding Hamzeh back is putting together the cash for one, or finding cheap after-market conversion parts, then there is no predisposition issue at all. This argument is that Hamzeh would only have slaughtered people with an automatic weapon if it was inexpensive to do spotlights the absurdity of the argument that government inducement is responsible for Hamzeh's crimes. And offering a good deal – more expensive than a semi-automatic to automatic conversion kit but less than a standard automatic weapon – is not inducement. It draws into sharp relief why Hamzeh should not be allowed to present an entrapment defense to the jury.

Hamzeh was saying he wanted to acquire machineguns before he met Mike, he said it to Mike, and, after he was arrested, he said he bought a machinegun with a silencer on it because, well, he "liked it." For Hamzeh's argument to prevail, he must present evidence that "it is Mike who first mentions purchasing a machine gun and Hamzeh tells him he's not interested." Hamzeh Entrapment Motion at 10. But Hamzeh had previously

and repeatedly said he wanted to acquire machine guns to kill people. *See, e.g.*, November 12, 2015 Hamzeh statement above.

And Hamzeh makes clear, not long after meeting Mike, that he is predisposed to acquire an automatic weapon to kill people he does not like. His consistent wish to "spray" bullets into people who are different from him is present throughout.

> HAMZEH: You *spray* five or six at the same time.
> MIKE: With a machinegun, yes.
> HAMZEH: Yeah.
> MIKE: But a handgun …
> HAMZEH: I am telling you, when you shoot … They walk in groups, the Jews
> HAMZEH: Groups, right? You and I, we go and shoot them all and get their weapons and flee, do you understand me?
> MIKE: Perhaps you won't even get caught.
> HAMZEH: Yeah. There is … sometimes there are patrols on jeeps, two at a time..
> MIKE: Um.
> HAMZEH: Do you understand me? You shoot both of them, take their weapons and leave. They carry the best kind of weapons. Jews carry the best Kalashnikovs. So if we shoot two and get two *Kalashnikovs*, it will be it.

Discovery Disc 22/FBI Disc 24 (11/2/15) at page 53 line 34 to page 54 line 12 (emphasis added).

Hamzeh compares this case to one in which a man only participated in an offense to avoid coming to physical harm. That is an insult to the very real, important interest courts have in refusing to allow police misconduct by enforcing entrapment laws and allowing entrapment defenses when they are creditable. *Compare* Mayfield, 771 F.3d at 421 (finding that a man who only committed a crime only upon threat of gang violence if he did not was not otherwise predisposed to commit the crime). Hamzeh's will was not

overcome. Instead, as he admitted in his voluntary post-arrest statement, he got exactly what he wanted.

Hamzeh's inducement argument is not helped by his argument that there is a recording in which he tells a man, Mo, that the plan to kill people was all Mike's idea and was not real. Instead, Hamzeh himself then tells Mike he was just saying all that to put Mo off their scent. Hamzeh had attempted to recruit Mo, Mo had refused to participate, and in doing so Mo heavily criticizes Mike, whom he does not care for. In response, Hamzeh tells Mo that the plan for a mass killing is not serious and is just Mike's bad idea; that he hates Mike as well; and that Mo should put the whole thing out of his mind. The question then is whether that is true, or whether Hamzeh is instead just taking fairly sophisticated action to put Mo off their scent. Hamzeh himself answers it, the next day, to Mike. It was a sham:

> HAMZEH: My dear, we understand—we understand. We went along with what Mo said so that nothing will come out about you.
> STEVE: I said to him "Yeah Mo, that's true; Mike, is garbage" and so on; you know what I mean?
> HAMZEH: So that nothing will come out about you-- so that nothing will come out about you; you know what I mean? We agreed that everything will be turned around against you so that nothing will come out about you. Now they don't know that you bring weapons, they don't know that you know someone who--
> MIKE: No, they don't know anything.
> HAMZEH: -- they know nothing.
> STEVE: No, they don't know a thing.

Discovery Disc 79/FBI Disc 81 (1/20/16) at page 32 lines 30 to 46

*ii. In light of Hamzeh's Interest in Killing People, and the FBI's Interest in Stopping Him, the FBI Offered to Sell Hamzeh the Weapons He Wanted. Hamzeh Readily Accepted.*

Understandably, the FBI wanted to make sure that if Hamzeh tried to acquire automatic weapons, it would be from the FBI, so he could be arrested. The *only way* to accomplish that and prevent a mass killing was to make sure Hamzeh bought the guns from fake arms dealers instead of real ones. And the only way to do that, in turn, was for confidential informants to ask him if he was still planning to acquire weapons.

Contrary to Hamzeh's unsupported (and unsupportable) claims, Mike is consistently careful not to push Hamzeh. Instead, he attempts to tease out where Hamzeh stands. Hamzeh obliges. For example, on December 7, 2015, Hamzeh and Mike have the following exchange:

> HAMZEH: And quit telling everyone.
> MIKE: I am not telling anyone, man, kiss my ass, whom did I tell?
> HAMZEH: What I want now is that you find me a weapon, a good piece--
> MIKE: Yeah?
> HAMZEH: --Something good. If you have one, bring me one from you, you got that? [Background talking] And the war will begin. [Chuckles]
> MIKE: The war begins? Jihad, eh?
> HAMZEH: [Laughs]
> MIKE: Jihad here, seriously? Is Jihad here good?
> HAMZEH: What do you think? You give me your opinion.
> MIKE: [OV] I do not know, I don't.
> HAMZEH: [OV] what do you say about Islam and the Islamic nation?
> MIKE: Yes.
> HAMZEH: Give me your opinion?
> MIKE: If someone tramples on the Quran in front of you, what would you do?
> HAMZEH: [OV] if you shoot them, it is legal. If you shoot him, you go to Paradise, even if you die. If you hear someone cussing the Messenger, or cussing God or the Qur'an, you can shoot him, it is normal, there is nothing against you, [Background voices] because this is how you defend your religion.

Discovery Disc 45/FBI Disc 45 Call 5 (12/7/15) at Page 9 lines 2-35.

Hamzeh provides no citations whatsoever to the "persistent psychological pressure," or "deceit"[2] or "appeals to friendship" or any of his other claimed inducement improprieties. Because they did not occur. The nearest he can come are instances of Mike and Steve playing along with *Hamzeh's* plans. There is absolutely no evidence that Hamzeh's was dragged into anyone else's plans. And as such, he should not be permitted to present an entrapment defense.

Hamzeh argues that he intermittently expressed reluctance to purchase a machine gun or commit a mass killing. But "second thoughts following initial enthusiasm do not establish entrapment." *United States v. Evans*, 924 F.2d 714, 716 (7th Cir. 1991). As the Seventh Circuit held in *Evans* when affirming the denial of a motion to admit an entrapment defense, a defendant's "hesitation alone cannot create a jury question. The [entrapment] defense was properly withheld from the jury." *Id* at 718.

Similarly, Hamzeh casts the fact that Mike and Steve were only intermittently in touch with, and recording, Hamzeh over a period of a few months before the sting as evidence that their persistent inquiries into his plan somehow overcame his will. But a mass killing on the scale Hamzeh had planned necessarily takes time to plan and execute. The timeline in this case does not support Hamzeh's motion. *See United States v. Casanova*, 970 F.2d 371, 374–75 (7th Cir. 1992) *("Casanova expressed some reluctance to sell various

---

[2] The "deceit" here is especially difficult to identify – unless Hamzeh's complaint is that Mike lied when he said he owned an automatic weapon and Hamzeh believed him. How that constitutes inducement is hard to understand. Or that Mike and Steve deceived Hamzeh when they said they would go along with his plan? Or help him acquire machineguns? None of this constitutes government inducement.

firearms to Agent Harding, but offered or agreed to sell other firearms to him" under certain circumstances. "That Agent Harding and Jones contacted Casanova several times during July and August, in person and by telephone, is not determinative.")(citing *United States v. Gunter,* 741 F.2d 151, 154 (7th Cir. 1984) for proposition that "fact that government informant made several telephone calls to arrange a sale of illegal drugs was not extraordinary given that such deals take time to arrange"). This case is extremely remote from cases, like *Jacobsen*, in which the defendant was "bombard[ed]" for years before he acquiesced and purchased child pornography. *Mayfield*, 771 F.3d at 429-30 (describing the facts in *Jacobsen*). Here instead, within a few months, Hamzeh pitched a plan that called for automatic weapons to a confidential informant, the government offered to sell the illegal weapons to him via the confidential informant, he accepted, and Hamzeh bought the illegal weapons.

Further, the subtext that Hamzeh is driving his, Mike's, and Steve's conversations about acquiring weapons and committing a killing is occasionally made explicit. For example, at one point Hamzeh asks Mike how he would actually commit a mass killing in Israel. Mike responds incredulously, "MIKE: You figure it out. It is your planning, how would I know?" Discovery Disc 30/FBI Disc 29 (11/12/15) at page 25 line 14.

And through to January, in the lead up to the sting, the plan is all Hamzeh's:

STEVE: Okay Samy, what do you want? We are three and *what is your plan*. What do you want? What is the plan and who is going to be driving and how do you see it? *What is your plan?*
HAMZEH: What am I thinking?
STEVE: Yes.

HAMZEH: *As I said at the beginning*, if we are three, if Mo is with us, Mo will stay out, one of us will stay at the entrance and lock the door down from inside, he will be at the main entrance from inside, two will take the elevator to upstairs, they will enter the room and riddle everyone in it. The one who is standing downstairs will riddle anyone he finds. We will shoot them, kill them and get out

…

HAMZEH: If someone wants to come in, let him in and finish him off, man.

MIKE: [Laughing]

HAMZEH: There is nothing wrong with that, come on in, you are most welcome, finish him-off at the door.

STEVE: Okay what about his kids and the kids inside?

HAMZEH: Fuck them mother fuckers, try not to kill the kids, let them be, the old ones, these are SOBs, man, they have built the biggest Masonic column next to Ka'ba, this was built lately, recently, recently. You are free to do whatever, as for me, *this is the plan I told you*.

STEVE: Okay.

HAMZEH: This the best way that it is going to work I am telling you.

STEVE: Okay.

HAMZEH: The best way that it is going to work.

Discovery Disc 73/FBI Disc 72 Part 8 (1/19/16) at page 7 line 34 to page 9 line 22 (emphasis added). In the face of statements like this, which are wildly rare in the case law, Hamzeh cannot possibly present evidence that he was entrapped.

Hamzeh formulated and articulated his plans down to the operational details. Hamzeh, Mike, and Steve met people when they toured the Masonic Center in order to better plan the attack. Hamzeh planned out which of those people should be shot by whom in what order. His plans included the elderly woman who volunteered at the reception desk:

HAMZEH: Exactly, if she was alone, it is okay, if there were two of them, eliminate both of them, of course you do not let the blood to show, shoot her from the bottom, two or three shots in her stomach and let her sit on the chair and push her to the front, as if she is sleeping, did you understand?

Then stay downstairs, the other two will take the elevator, to the third floor, go straight to the room, open the door, shoot everyone, move fast even avoiding using the elevator and take the stairs running down.

Discovery Disc 73/FBI Disc 72 Part 8 (1/19/16) at page 13 lines 16 to 22.

In light of statements like this, once again, Hamzeh cannot possibly show he was induced by the government to want illegal weapons. A claim he would only have committed the above mass murder with legal weapons but for the government's inducement is beneath the dignity of this Court and impermissible under the case law. The defendant is an intelligent man who was intent on slaughtering innocent people and acquiring the weapons to carry out the attack.

As for motive, Hamzeh hoped their terrorist attack would inspire other attacks around the United States.

HAMZEH: Sure, all over the world, all the Mujahidin will be talking and they will be proud of us, what is wrong with you, such operations will increase in America, when they hear about it. The people will be scared and the operations will increase, and there will be problems all over, because more than one problem took place already, and this will be the third problem, this will lead to people clashing with each other. This way we will be igniting it. I mean we are marching at the front of the war

Discovery Disc 73/FBI Disc 72 Part 8 (1/19/16) at page 9 line 32 to 40.

In light of all this, Hamzeh wanted weapons. He asked Mike to get them for him. And Mike obliged. That is most assuredly not government inducement. Hamzeh argues that "Mike also had to have proposed the plan. In fact, Special Agent Adkins testified that the plan to have people come up from Texas and provide machine guns was something that Mike came up with on his own." Hamzeh Entrapment Motion at 17. This is dispositively misleading, relying on sleight of hand with regard to what is meant by "the

plan." Hamzeh asked Mike for weapons. Mike said he could get them. That was essential to keeping people safe. Mike also came up with an operational detail on the spur of the moment – *i.e.*, that the arms dealers were from Texas. As Special Agent Adkins testified at a discovery hearing, that was not operationally ideal, because then the FBI had to make sure its eventual undercover Special Agents had a backstory that fit the Texas detail. But Mike adding the word "Texas" does not make this inducement. It most certainly does not mean he overcame the will of an unwary innocent. "The plan" that mattered was Hamzeh's plan to acquire weapons to kill people, not Mike's and the FBI's pretend "plan" to reach out to arms dealers in Texas to thwart Hamzeh. It is irrelevant to entrapment case law that the purchase possibly could have happened in Texas, as opposed to Wisconsin. The only thing that matters is that Hamzeh was determined to buy machine guns and murder as many people as possible with the automatic weapons, wherever sourced.

"Mere solicitation by a government agent is insufficient to establish entrapment." *United States v. Johnson*, 32 F.3d 304, 307–08 (7th Cir. 19940 (citing *United States v. Blackman*, 950 F.2d 420, 424 (7th Cir.1991); *United States v. Perez-Leon*, 757 F.2d 866, 872 (7th Cir.). So, the mere acquiescence to Hamzeh's solicitation most assuredly is not inducement. As such, Hamzeh cannot, as a matter of law, show entrapment.

*iii. Steve and Mike's Discouragement of Hamzeh's Plan to Commit a Crime Makes Clear that Hamzeh Was Not Induced Into Committing the Charged Crimes.*

If anything, Mike and Steve pushed Hamzeh *not* to move forward with the mass killing plan of which the weapons acquisition is a lesser-included part. As early as

November, Mike expressed reticence about Hamzeh's plan. Hamzeh taunts Mike about as much, and then explains that his plan for an overseas attack with automatic weapons will work:

> HAMZEH: If both of us go in with handguns and shoot the four, we will take the *Kalashnikovs* and go in, *spray* as much as you can. A lot of people are inside and they are all Jews.

Discovery Disc 25/FBI Disc 1A15 (11/6/15) at page 17 lines 7 to line 9 (emphasis added)

Earlier, after Steve has become an FBI informant, he attempted not to induce Hamzeh's crime but to prevent it. He expressed his exasperation with Hamzeh's commitment to a mass killing, and he emphasized the suffering it would impose on his family:

> STEVE: I cannot tell you anything, you made up your mind, you are determined and that you will not come back and that's it. I can't tell you a thing. You made up your mind. What was I going to tell you, Samy? By God it's hard.
> HAMZEH: Let me tell you something, Steve, which is better? *To be a martyr* and go straight to Paradise or lead a shitty life like this? Which one is better?
> STEVE: [UI], man. As I told you, your way of thinking is different, man and you know that, man.
> HAMZEH: [UI].
> STEVE: Your family, man, your mother, man. Do you follow me, Samy?
> HAMZEH: Allah will take care of my family. [UI] Whatever happens, happens

Discovery Disc 11/FBI Disc 11 (10/13/15 at page 22 lines 15 to 30 (emphasis added).

Fatally for Hamzeh's entrapment motion, from the beginning, Steve affirmatively did not want Hamzeh to move forward, and he told him as much. Quite the opposite from inducing him, Steve tried to talk him out of all this.

> STEVE: Well why don't you give up the whole idea and stop this thing? If . . . I don't know about you, man!

Discovery Disc 14/FBI Disc 14 (10/15/15) at page 6 line 31 to 32

> STEVE: --look! If it's for your mother, you want to go it but won't for the sake of
> your mother. Cancel it! You cannot postpone!

*Id.* at page 8 line 18 to 19

Again, in the lead up to the sting, far from inducing him, Steve tries once again to

dissuade Hamzeh from purchasing weapons and committing a mass killing. This is not

surprising given Steve was so disturbed by his best friend's plans, that he reported him

to the FBI.

> STEVE: If you are hesitant; I swear to Almighty God.
> HAMZEH: [OV] [UI] I swear by Almighty God that I'm not hesitant.
> STEVE: *Because no one would force you to carry out this mission.*
> HAMZEH: I swear by Almighty God that I'm not hesitant.
> STEVE: *No one would force you to do it.*
> HAMZEH: I swear to Almighty God that I'm not hesitant.

Discovery Disc 92/FBI Disk 88 Part 3 (1/24/16) at page 43 line 5 to 10 (emphasis added).

This is insurmountable evidence that government inducement did not occur.

Relatedly, once Hamzeh attempted to rope in another potential attacker named Mo, Steve

and Mike were adamant the man should not be pressured to participate.

> STEVE: I . . . listen, listen, yesterday Mo dropped me off and I sensed that he is
> hesitant because of his family and that.
> HAMZEH: We all felt the same way. We all felt the same way.
> STEVE: *So listen, you can't force something like this on anyone.* Right or not?
> HAMZEH: I told him, I told him whoever wants out can get out but with a silent
> mouth, a silent mouth. I want Mo to come with us just to be the driver.[3]
> STEVE: *No, don't pressure him just to be the driver. Do you understand me?*
> HAMZEH: If he did not want to, he would have told us that I don't want to

---

[3] Note, once again, this is Hamzeh's plan to commit a mass killing, down to who he wants
to be their driver.

Discovery Disc 73/FBI Disc 72 Part 1-5 (1/19/16) at page 17 line 19 to 31 (emphasis added). *Compare id*. at page 25 line 22 ("HAMZEH: I swear if this thing works out, I swear I'll be the happiest ever in my life.")

Once Hamzeh had made himself clear that he wanted weapons, the government offered them to him in a standard transaction. He readily accepted and purchased them. They were certainly inexpensive, but that discount is categorically different from a case in which a reluctant drug mule is offered a life-transforming amount of money to mule drugs. No one who did not already want a machinegun would buy one, even at a discount. An un-predisposed person might agree to take possession of an illegal machinegun if offered a life-transforming amount of money, and that might constitute entrapment. But Hamzeh simply got a good deal on automatic weapons that he wanted to buy. That is not government inducement. There is no government inducement when a man determined to murder people with automatic weapons is sold the weapons at a discount. No un-predisposed person is induced to purchase machine guns in the back seat of a car in a parking lot, from people he had never met before, just because these random arms dealers offered him a good retail price.

III.     *Hamzeh Was Predisposed to Commit the Charged Offenses.*

   A.  *Hamzeh Wanted to Commit the Charged Offenses or Similar Offenses.*

Beyond the absence of inducement, Hamzeh was so manifestly predisposed to commit the charged crime or a similar crime that he should not be permitted to raise an entrapment defense. *See United States v. Johnson*, 32 F.3d 304, 307–08 (7th Cir. 1994)

("Where there is sufficient evidence that a defendant was predisposed to commit the crime, the entrapment defense is properly rejected without inquiry into the other factor, government inducement.") (citing *Santiago*, 12 F.3d at 728; *United States v. Sanchez*, 984 F.2d 769, 773 (7th Cir. 1993)).

"A defendant is predisposed to commit the charged crime if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." *Mayfield*, 771 F.3d at 438. The description in *Mayfield* is perfectly on target in this case.

Even assuming inducement, which was not present here, "what a defendant *says* after contacted by agents is generally admissible to prove predisposition because, although some post-contact conduct might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to *say* something that evidenced predisposition." 727 F.3d at 209 (emphasis added).

So, what did Hamzeh say after he was arrested for buying two machine guns and a silencer? He stated plainly, in a *Mirandized* statement, that he was predisposed to want an automatic weapon with a silencer attached.

> FBI SPECIAL AGENT: "Why the need to buy an automatic weapon? Like, why the need to buy one that you press the trigger and bullets come out until you stop pressing the trigger?
> HAMZEH: I told you, I like weapons. That's all.
> FBI SPECIAL AGENT: Alright.
> HAMZEH: I do like weapons.
> FBI SPECIAL AGENT: Alright.
> HAMZEH: We tried guns and like guns, that's why we think about automatic weapons. Just to practice and have fun, that's it.

Hamzeh January 25, 2016 Post-Arrest Statement MVI_0022 at 1:43; *see also* Hamzeh January 25, 2016 Post-Arrest Statement MVI_0023 at 16:10 (Hamzeh explaining that Hamzeh purchased the machine gun with the silencer attached because "when I saw this, I liked it actually, what can I say. . . the one with the silencer you say, that one was for me, I bought it . . . I liked it, so we got 'em . . . I actually liked it, what can I say?"). That should be the end of the predisposition analysis.

Hamzeh's foundational claim is that he should be allowed to present an entrapment defense because "the only recordings we have of Hamzeh discussing the purchase of a machine gun is him stating he doesn't want one: a hand gun is all he needs." Hamzeh Entrapment Motion at 27. If that were true, that would support Hamzeh's claim to be allowed to raise an entrapment defense. But this claim wilts under the glare of his statement upon his arrest and the reams of statements Hamzeh made in the preceding months evincing his predisposition to acquire machineguns to commit a mass killing. Even in the final analysis, when he was unsure he should move forward with the killing on the date planned, he was still eager to buy the machineguns.

Unlike in most cases, there is a robust record of Hamzeh's predisposition to acquire a machine gun, both before and after he was arrested. He was, therefore, *per se* not entrapped. *Compare United States v. Cromitie*, 727 F.3d 194, 205 (2d Cir. 2013) (finding that the defendant's initial statements to a confidential informant revealed a pre-existing design to commit terrorist acts against the interests of the United States and were thus sufficient to establish predisposition to commit charged acts of terrorism).

Predisposition analysis is not as narrow as is implied in Hamzeh's motion. The defendant's predisposition need not be to commit precisely the same crime as that charged. Instead, understandably, it need only be to commit the same or a *similar* crime. *United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011) ("to prove predisposition [in an entrapment case] the past conduct need not be identical to the crime charged. Rather, the conduct need only be "similar enough and close enough in time to be relevant to the matter at issue."); *see also United States v. Moschiano*, 695 F.2d 236, 244 (7th Cir. 1982) ("Here, the nature of the activity was *substantially similar* to the indicted offenses") (emphasis added); *United States v. El-Gawli*, 837 F.2d 142, 148 (3d Cir. 1988) ("[if government inducement is shown] the question of predisposition is paramount and the government must prove beyond a reasonable doubt that its inducement merely facilitated the defendant who was ready and willing to commit a *similar* crime") (emphasis added); *Cromitie*, 727 F.3d at 205 (explaining that one way to show predisposition is by reference to prior "*similar* criminal conduct") (emphasis added); *United States v. Mendoza-Prado*, 314 F.3d 1099, 1103 (9th Cir. 2002) ("predisposition [can only be shown when] prior bad acts are *similar* to the charged crime.") (emphasis added).

That makes sense, particularly in the context of weapons charges anchored in a thwarted terrorist attack like those here. Hamzeh could have been charged with, for example, Title 18 United States Code Section 922 charges instead of the present Title 28 charges, among others. The same predisposition evidence would be relevant in either case. He had a generalized interest in committing a terrorist attack with weapons of war. He wished to set off other attacks in the United States by his example. He wanted the

weapons necessary to do so. The weapons were necessarily a lesser-included part of his plans. As he said over and over, month after month, he wanted to be able to kill as many people as possible. It is impossible to disentangle his terroristic intent from the weapons he wanted to acquire. And even if the Court could do so, he fundamentally just wanted the illegal weapons he got. *See* Post-Arrest Statement discussion above.

Thus, Hamzeh's claim that at one point he merely wanted a handgun with a drum magazine (what he calls a "wheel," which would hold a mass-murderous number of bullets), so he was not predisposed to buy machineguns, Hamzeh Entrapment Motion at 10-11, fails. This statement actually shows predisposition; it demonstrates Hamzeh's desire to acquire a gun that can discharge a large number of bullets at a large number of people - this desire is almost identical to the desire to buy a machinegun.

Hamzeh said early and often he wanted to acquire a weapon that would allow him to spray bullets at as many people as possible. That shows he was predisposed to get such a weapon. It was true in October 2015, before Mike was involved:

> HAMZEH: I am telling you, I will get a weapon and hunt as many as I can by the will of God, I mean a number…till I die, I'll keep on doing that till I die. [UI].
> STEVE: Are you going to hunt soldiers or...
> HAMZEH: Of course.
> STEVE: Machine gun?
> HAMZEH: By Almighty God, I'll keep on shooting as much as I can, if I am caught, of course, I am not going to let them catch me. If they try to catch me, I'll keep on shooting at them so they will shoot at me. Do you follow me? Because if I get caught, by almighty God, by almighty God, I would be tortured all my life, the rest of my life.
> STEVE: But why, Samy? You were not like this, what made you do this, and you want to [UI]?
> HAMZEH: Your Lord, your Lord guides whoever He wants.

Discovery Disc 11/FBI Disc 11 (10/13/15) at page 4 line 39 to page 5 line 11.

HAMZEH: If things do not work out, I'll either buy a handgun or find an explosive belt.

STEVE: *Wow*, an explosive belt?

HAMZEH: M-hum.

STEVE: You would wear an explosive belt?

HAMZEH: M-hum.

STEVE: *Wow!*

HAMZEH: By God Almighty.

STEVE: By God, Samy. I don't know, man! Wow! You mean you would wear an explosive belt and attack a bus or, I mean how? ...

HAMZEH: A bus or a restaurant or they have a celebration, where they would park their cars and so on, their gatherings and places. The important thing is not to die in vain.

*Id*. at Page 11 line 12 to line 32.

Even back in October, Hamzeh was discussing acquiring a machine gun so he could spray bullets into people. Steve was not enthusiastic.

HAMZEH: God willing, Oh God.

STEVE: If you cannot go to Gaza, you would get a machine gun and start shooting....

HAMZEH: I will start *spraying* them. Yes I will be a suicide attacker [Laughing].

STEVE: That is difficult, man.

HAMZEH: Yeah. It is difficult, it is difficult. I mean I expect if they try to arrest me and attack me with machine guns, I will fight until I get shot at. I will not let them arrest me, do you understand?

STEVE: Yeah.

*Id*. at page 16 lines 31 to 44 (emphasis added).

In November, Hamzeh begins to push a transition from an overseas attack to a domestic attack. Mike pushes back, but Hamzeh is clear:

MIKE: What I want to know now... listen!

HAMZEH: What?

MIKE: I mean you seriously think jihad here is better than Palestine?

HAMZEH Yeah.

Discovery Disc 45/FBI Disc 45 Call 4 (12/7/15) at page 9 lines 2 to 8.

The fact remained that the attack plan, evolving though it was, was Hamzeh's alone. Hamzeh asserts that "Hamzeh's view that the Masons were ISIS started with Mike." Hamzeh Entrapment Motion at 16. But, crucially for this analysis, there is no evidence of this. Nor any citation that actually supports it. It just follows a series of quotes of statements Hamzeh himself made. Instead, the evidence is uniform: Hamzeh wished to acquire weapons and commit an attack. That was true in November, and it was true in January when we was arrested. In Hamzeh's own accounting, he was predisposed to commit a mass murder long before he met Mike or Steve:

> HAMZEH: Yeah. *It was my intention a long time ago, Mike, by God, a long time ago.*
> MIKE: You have been thinking about it for years.
> HAMZEH: [Whistles] Long time ago.

Discovery Disc 22/FBI Disc 24 (11/2/15) at page 55 lines 4 to 9 (emphasis added).

Hamzeh had a plan, he required weapons, and when Mike offered to help him acquire the weapons necessary to execute his plan, he was happy. That is *per se* predisposition. *See United States v. Blitch*, 773 F.3d 837, 839 (7th Cir. 2014), as amended on denial of reh'g and reh'g en banc (Jan. 27, 2015) ("Carwell's predisposition is aptly demonstrated by his overwhelming enthusiasm for the venture.")[4]

Mike and Steve are agreeable, because that was their role in the effort to stop Hamzeh. But it is Hamzeh who was predisposed to want, and who requested the

---

[4] Hamzeh argues that when he says he wants a Kalashnikov like Mike's, which was "obviously not a machine gun," that somehow shows that Hamzeh was not predisposed to want a machinegun. But Hamzeh *believed* that Mike's gun was a machinegun, and he said that was what he wanted. There is no evidence indicating he was lying.

opportunity to buy, the illegal weapons. Hamzeh argues he ultimately wished to withdraw from committing a terrorist attack on the date planned, but even in the dubious context of a delayed attack, Hamzeh did not express a moment's hesitation to purchase the illegal weapons as planned at the January 25th sting:

> HAMZEH: So you think about this matter and I said what I had to say.
> MIKE: We are in agreement.
> STEVE: We are in agreement.
> HAMZEH: We will go tomorrow and get the weapons, and I am ready tomorrow to go and get the weapons.
> STEVE: And I am ready too.
> HAMZEH: I am ready to go tomorrow and get the weapons

Discovery Disc 97/FBI Disc 106 (1/24/16) at page 15 lines 20 to 26

Even setting aside the fact that he actually went on to negotiate for and buy the weapons necessary to spray bullets into people, it is inherent to the above that he *wanted* the weapons necessary to spray the bullets. And that he knew precisely what he was doing. *See, .e.g.,* Discovery Disc 104/FBI Disc 105 (1/25/16) at page 35 lines 6 to 7 (when describing the impending arms deal on the way to the buy, Hamzeh stated "HAMZEH: You are getting an unlicensed weapon. This is what we are getting. MIKE: Okay.")

Hamzeh argues that he was not predisposed because, after the purchase, "Hamzeh protested that these guns were different from what they'd agreed to buy." Hamzeh Entrapment Motion at 5. But that is a misrepresentation of Hamzeh's quibble with the weapons he purchased – it was not a material fact about the guns he had a problem with (that they were automatic) it was an immaterial fact (their size). Hamzeh repeatedly said he wanted a small automatic weapon because a small one would be easier to sneak into an attack site and thus make it easier for him to kill as many people as possible without

being apprehended. The week of the sting, Hamzeh says to Mike and Steve that he wants

an automatic weapon, and he emphasizes the need to get a weapon that suits his Masonic

Temple attack plan:

> HAMZEH: We want a small one, because it can be hidden.
> …
> HAMZEH: Yeah, and it can be hidden. I mean the most important thing is that it can be hidden.
> MIKE: Yeah.
> HAMZEH: You enter, you can hide it inside.
> …
> HAMZEH: You should secure it and put it on your belt and place your blouse on it. As soon as we enter into the building, put the hats and start. Each one will take his weapon and *spray* those who are in front of him.

Discovery Disc 84/FBI Disc 86 Parts 3&4 (1/21/16) at page 36 lines 1 to page 37 line 5 (emphasis added).

Similarly, during the sting transaction itself, Hamzeh's issue is not that the

weapons are automatic weapons, he *wants* automatic weapons; it is that the weapons may

be too big to sneak into an attack site:

> HAMZEH: This [machine gun is] kind of big; we can't use these.
> MIKE: And it has a silencer.
> HAMZEH: I understand this bro. We don't need that big. I thought you..
> He is talking about the little one.
> UNDERCOVER FBI AGENT: It has the silencer on it, you got a silencer like that, mean you're gonna add it, bu it's small. It is fully automatic, man. You go like, shoot one time…
> HAMZEH: I understand this.
> UNDERCOVER FBI AGENT: Put it down, it can go full auto on you.
> HAMZEH: I understand but we need the little one. That's what we talked about.

Discovery Disc 104/FBI Disc 105 Parts 3&4 (1/25/16) at pages 39 lines 2-11.

Hamzeh believed that Mike's gun was fully automatic, and it was small enough

to suit his homicidal purposes, so he wanted one like that. It was sub-optimal, then, when

the illegal arms dealers only offered to sell him *big* automatic weapons. But that is immaterial to the question of whether Hamzeh was predisposed to buy an automatic weapon. And, of course, he still bought them, and he still said the size of the guns was ultimately "okay, it is okay. It is not a problem." *Id.* at page 46 line 6.

And if the Court has any doubt on this front, Hamzeh's words prove as a matter of law he was predisposed to buy the automatic weapons and silencer he bought. When an FBI Agent asked him why he bought such a powerful weapon, Hamzeh shoots straight: when he saw the machinegun with the silencer, "I bought it . . . I liked it, so we got 'em . . . I actually liked it, what can I say?"" Hamzeh January 25, 2016 Post-Arrest Statement MVI_0023 at 16:10.

The nearest case to this one in the federal case law is *United States v. Cromitie*. 727 F.3d 194 (2d Cir. 2013). *Cromitie* is an extremely thorough, persuasive analysis of how to apply the Supreme Court's entrapment precedent in a confidential-informant-based terrorism sting case. *Cromitie* was an appeal that "primarily present[ed] issues concerning the extent to which a government informant may lawfully urge the commission of crimes" brought "by four defendants convicted of planning and attempting to carry out domestic terrorism offenses involving a plot to launch missiles at an Air National Guard base . . . and bomb two synagogues." 27 F.3d at 199. In *Cromitie*, a man agreed to act as a paid confidential informant as a condition of his guilty plea to committing fraud.[5] Over

---

[5] Neither Mike nor Steve acted as an informant in this case pursuant to a plea agreement.

a period of about one year, the informant met and then recruited to a terrorist plot the appellant, Cromitie.

Cromitie had no imminent plan to commit an attack when the informant met him. Nonetheless, from the beginning, Cromitie said "he wanted "to die like a shahid, a martyr" and "go to paradise," and immediately thereafter said, "I want to do something to America." *Id.* at 200 (citations omitted). "The FBI instructed [the informant] to tell Cromitie that [the informant] was a representative of a terrorist group in Pakistan." He further told Cromitie he could acquire guns and rockets. "[The informant] asked Cromitie if his 'team' [of men he could recruit] had ever 'thought about doing something here [in the United States].' Cromitie responded by saying that his team never considered doing that, but that he had and that he had 'been wanting to do that since I was 7.'" *Id.* (citation omitted).

There was a six-week period during which the informant had no contact with Cromitie, and then the informant offered Cromitie $250,000 to commit the attack. *Id.* at 202. One month later, the informant drove Cromitie, and the men Cromitie recruited to help, to see three fake bombs and "two fake Stinger missiles" the FBI had prepared for the sting. Id. at 203. "[The informant] instructed them how to launch the missiles and how to wire the detonating devices for the bombs." *Id.* Cromitie later placed one of the fake bombs in his trunk, and the FBI arrested him and the men he had recruited. Cromitie argued he had been entrapped. In light of Cromitie's stated predisposition to martyr himself, wage jihad, and "do something to America," the Second Circuit found there was no entrapment as a matter of law.

The Second Circuit explained that because Cromitie was predisposed to commit terrorist activity of some kind, even if indeterminately, from the beginning, that predisposition applied to the plan offered by the FBI informant. The offer of $250,000 might have constituted government inducement, but Cromitie had to be taken at his word regarding his predisposition. As such, he could not raise an entrapment defense. This was true even though "Cromitie's commitment to the terrorism plot was not unwavering," *id*. at 212,

> With respect to a category as varied as terrorist activity, the requisite design in the mind of a defendant may be broader than the design for other narrower forms of criminal activity. In view of the broad range of activities that can constitute terrorism, especially with respect to terrorist activities directed against the interests of the United States, the relevant prior design need be only a rather generalized idea or intent to inflict harm on such interests. A person with such an idea or intent can readily be found to be "ready and willing to commit the offence charged, whenever the opportunity offered."

*Id*. at 207.

The requisite "predisposition is to have a state of mind that inclines them to inflict harm on the United States, be willing to die like a martyr, be receptive to a recruiter's presentation, whether over the course of a week or several months, of the specifics on an operational plan, and welcome an invitation to participate." *Id*. at 207-08. In a fairly poignant summary of the analytical bottom line, when affirming the district court's refusal to allow Cromitie to present an entrapment defense given his stated predisposition: "The Air Force personnel at Stewart Airport and the congregants at two synagogues in the Bronx are fortunate that the person who first approached Cromitie and suggested an operational plan was only a Government agent." *Id*. at 207-08. These words

could not be more applicable to the current case: so too the volunteer receptionist at Milwaukee's Masonic Center.

B. *Hamzeh Was In A Position to Commit the Charged Offense or a Very Similar Offense.*

In the Seventh Circuit, the government must show that a defendant was not merely mentally predisposed to commit a crime but also in a position to potentially actually commit that crime or some similar crime. In *Hollingsworth*, the Seventh Circuit established this doctrine and found entrapment because the defendants, a dentist and a farmer, could not realistically have become "crooked international financiers" without the government making that possible. *Hollingsworth*, 27 F.3d 1196, 1198. They simply could not have been in a position to commit the crime absent the government's action, thus they were not "positionally predisposed" to commit the crime. So, they were entrapped. And if a defendant is charged, for example, with the acquisition of Stinger missiles[6] or nuclear weapons he could never have been in a position to acquire if the government had not sold them to him, he was likely also entrapped.

Hamzeh claims his case is like one in which the government sold him such a nuclear weapon. It is not. First, machineguns are available for street purchase. They are seized in Milwaukee, in Chicago, in Texas, and nationwide all the time. Hamzeh wanted such weapons, and he could have gotten them. Over 3,000 illegal machineguns were

---

[6] In *Cromitie*, the Second Circuit did not adopt the Seventh Circuit's "positional predisposition" requirement. But the remainder of its analysis applies fully in this circuit. While Cromitie may not have been in a position to acquire Stinger missiles on his own, Hamzeh was certainly "positionally predisposed" to acquire automatic weapons or the cheap, widely-available aftermarket parts that convert cheap, ubiquitous semi-automatic weapons into automatic weapons.

seized between 2016 and 2018 in the United States. *See* Bureau of Alcohol Tobacco and Firearms Trace Data (*available at* https://www.atf.gov/resource-center/data-statistics).

Second, and perhaps even more importantly, aftermarket parts that convert semiautomatic guns that a person can buy at any sporting goods store into automatic weapons, like bump stocks and Glock switches, are gallingly inexpensive and accessible. Contrary to Hamzeh's claim in his motion, he could easily have acquired a simple, fully-automatic converter. These parts are *still* available for purchase online (not merely on the dark web, but) on websites like wish.com. For $16, Hamzeh could have converted a cheap semiautomatic handgun into precisely the small automatic weapon he wanted. *See* High Quality Semi Full Auto Switch for Handgun Glock G17 G19 G22 G23 (*available at* https://www.wish.com/product/high-quality-semi-full-auto-switch-for-handgun-glock-g17-g19-g22-g23-5b0f8e805cfaae22ceaa73fa?&hide_login_modal=true).

At the time of the charged offense, Hamzeh could quite literally have bought one on Amazon.com. Thousands and thousands of them have been shipped into the United States, for under $20 each. *See* Scott Glover, CNN, ATF On The Hunt For Thousands Of Illegal Machine Gun Conversion Devices Smuggled Into US (*available at* https://www.cnn.com/2019/05/23/us/atf-agents-hunting-down-illegal-machine-gun-device-invs/index.html). Just because Hamzeh had not yet availed himself of this possibility does not mean he was entrapped under *Hollingsworth*. You cannot buy a nuclear weapon on Amazon.com for $16.

Hamzeh's claim he could never have possessed a gun (illegally) capable of continuous fire is, thus, a complete nonstarter. Tragically, such weapons are ubiquitous

in the United States. Here, instead, the government merely supplied Hamzeh the means to commit the crime he was predisposed to commit. That is all that is required in this Circuit. *See Hollingsworth* at 1202-03 ("We do not wish to be understood as holding that lack of present means to commit a crime is alone enough to establish entrapment if the government supplies the means."). Hamzeh was positionally predisposed to commit the alleged offense.

IV.     *Hamzeh Possessed Both Machineguns and the Silencer*

Hamzeh also argues that although he took possession of the gun Steve paid for after the gun sale, he should not be considered to have possessed it. This argument should not be credited. People can possess guns they do not own, and multiple people can possess weapons at the same time. *See* Seventh Circuit Pattern Jury Instruction 4.13. Steve purchased the relevant gun at Hamzeh's direction, as part of Hamzeh's plan, after Hamzeh negotiated the price. Hamzeh fully exercised dominion and control over both guns and the silencer immediately upon completion of the sale. He carried them in his hands. He possessed them. This is not surprising given the entire plan to attack the Masonic Center was created by Hamzeh. See Hamzeh January 25, 2016 Post-Arrest Statement MVI__0024 at 10:35.

*V. Hamzeh Should Not Be Permitted To Raise an Entrapment Defense.*

No reasonable jury could find either (1) that government inducement occurred, or (2) that Hamzeh was not predisposed. So, to allow Hamzeh to raise an entrapment defense and discuss entrapment or question witnesses regarding entrapment would have no probative value. Yet, the prejudice to the government would be immense. Moreover,

allowing such commentary and questioning would undoubtedly confuse the issues and mislead the jury. Specifically, allowing questioning and commentary on the entrapment defense could result in the jury incorrectly believing that entrapment is an issue or that the government somehow engaged in improper conduct.

As the Supreme Court has concluded,

> The requirement of a threshold showing on the part of those who assert an affirmative defense to a crime is by no means a derogation of the importance of the jury as a judge of credibility. On the contrary, it is a testament to the importance of trial by jury and the need to husband the resources necessary for that process by limiting evidence in a trial to that directed at the elements of the crime or at affirmative defenses. If, as we here hold, an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense.

*United States v. Bailey*, 444 U.S. 394, 416 (1980).

Should this Court choose not to rule on the government's motion in limine prior to trial, the government respectfully requests, pursuant to Federal Rule of Evidence 403, that this Court enter an order barring defense counsel from commenting on entrapment, discussing entrapment, and questioning witnesses in a manner designed to elicit a response that may refer to entrapment until this Court determines that it is going to instruct the jury on entrapment. Alternatively, should this Court allow such questioning and commentary, the government respectfully requests that this Court permit the government to present evidence during its case-in-chief that rebuts Hamzeh's proposed entrapment defense. Such a ruling would be proper since it becomes the government's burden to disprove entrapment beyond a reasonable doubt once entrapment becomes an

issue. *See Blassingame*, 197 F.3d at 280. Moreover, such a ruling would expedite the trial, as the government would not have to wait until its rebuttal case to present its evidence that Hamzeh was not entrapped.

In the final analysis, Hamzeh says over and over and over again: "I was entrapped!" But he does so without evidence, as none is available to him. And just because he "said it thrice" does not make it true. *See Parhat v. Gates*, 532 F.3d 834, 848–49 (D.C. Cir. 2008) (quoting Lewis Carroll, THE HUNTING OF THE SNARK 3 (1876) *See also Larsen v. Suburban Med. Ctr. at Hoffman Estates, Inc.,*, No. 98 C 183, 1998 WL 684204, at *4 (N.D. Ill. Sept. 23, 1998) ("The only support for Larsen's position appears to be the well-known maxim that, "what I tell you three times is true.") (citing Carroll, THE HUNTING OF THE SNARK ("'Just the place for a Snark!' the Bellman cried, as he landed his crew with care; Supporting each man on the top of the tide, by a finger entwined in his hair. 'Just the place for a Snark!' I have said it twice; That alone should encourage the crew. 'Just the place for a Snark!'—I have said it thrice; What I tell you three times is true").

Hamzeh was not induced to possess machineguns and a silencer. And as detailed above, he was heavily predisposed to do so. A predisposed person is one "who takes advantage of an ordinary opportunity to commit criminal acts – not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person . . . ." *Evans*, 924 F.2d at 717. An ordinary person, one not predisposed, would not buy a machinegun with a silencer on it from an illegal arms dealer in a parking lot in Kenosha at any price. And Hamzeh's actions, and his repeated, durable, explicit statements make clear he was predisposed to illegally receive and possess a machine gun. Thus, the

Defendant should not be permitted to burden and confuse the jury with testimony related to a legally infirm entrapment defense.

CONCLUSION

For the reasons stated above, Hamzeh's Motion in Limine to permit him to raise an entrapment defense at trial should be denied.

Dated at Milwaukee, Wisconsin this 4th day of September, 2019.

Respectfully submitted,
MATTHEW D. KRUEGER
United States Attorney

By:     */s/ Benjamin Taibleson*

Benjamin Taibleson
Adam Ptashkin
Assistant United States Attorneys
United States Attorney's Office
Eastern District of Wisconsin
517 East Wisconsin Avenue
      Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
E-Mail: benjamin.taibleson@usdoj.gov