## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

*Plaintiff*,

Case No. 16-cr-21-PP

*vs*.

SAMY M. HAMZEH,

*Defendant*.

## DEFENDANT'S OMNIBUS REPLY
## TO THE GOVERNMENT'S MOTIONS IN LIMINE

Samy Hamzeh, by counsel, files this omnibus reply addressing the government's motions in limine concerning its consolidated motions in limine, the defense's ability to admit certain transcript portions, and the government's arguments concerning the defense experts.

### I.      The government's consolidated motions in limine

The government seeks to preclude the defense from referencing eight different categories of evidence or argument. Hamzeh will not be presenting argument regarding the government's charging decisions or defining reasonable doubt. He also will not be arguing for jury nullification. However, the government's conception of jury nullification is much too broad. Jury nullification does not prohibit the defense from providing background about Mr. Hamzeh and his family, for example. So long as the motion in limine is properly interpreted as preventing argument to the jury to nullify, Hamzeh has no objection to that motion in limine.

Federal Defender Services
of Wisconsin, Inc.

Hamzeh also has no intention of arguing the legal defense of "outrageous government conduct" to the jury or to suggest that any particular actions of the government are so outrageous that the jury should just acquit regardless of the law. That doesn't mean that the defense cannot suggest (or argue) that certain of the government's choices, such as not recording conversations for 35 days, were inappropriate.

The government's request to bar Hamzeh from interjecting race and religion into the proceedings is ironic, given its intent to discuss Hamzeh's alleged hatred of the Jewish people and inflammatory statements about race that have no other relevance. *See, e.g.,* R.284:3. That being said, Hamzeh objects to the government's overly broad request relating to race or religion. Hamzeh's religious identity and how it impacted his conversations and how he is treated or perceives he is treated (as a result of that identity) are integral to this case and the broad prohibition the government seeks goes too far.

That leaves three other categories of evidence to address. With respect to the government's motion seeking to bar inquiry into the agents' subjective motivations for investigating the case (Number 2), even the case law that the government cites as "settled law" for its position does not support the government's broad position. R.276:3 (citing *United States v. Andreas*, 23 F. Supp. 2d 835, 850–51 (N.D. Ill. 1998)). In fact, the *Andreas* case fully supports the defense's traditional right to question the agents' bias and motivations and how it affected the agents' actions and testimony.

The *Andreas* case was (like this) an entrapment case. In the court's opinion, it noted: "Based on the evidence adduced at the hearing, the court finds that the defendants have made an adequate showing that there might have been some ulterior motive by some

2

Federal Defender Services
of Wisconsin, Inc.

government agents which bears on the accuracy of the evidence being used in the prosecution." *Id.* at 850. This included, "government agents [who] allegedly wanted to advance their careers with a major conviction." *Id.* After noting this, the court added this important point: "[m]otive, bias, and prejudice are the oldest reasons to shade testimony and are admissible to challenge a witness' credibility." *Id.* (citing *United States v. Abel,* 469 U.S. 45, 52 (1984)). Thus, *Andreas* actually recognized that the defendant has every right to question the motivations and bias of the agents.

After affirming that the defense can attack the agents' bias or motivations in the same way as any other witness, the *Andreas* court added that "the government's intent to entrap the defendants is irrelevant to prove entrapment." *Id.* Fair enough. While the government uses this quote to suggest it bars inquiry into bias or motive, that's not what it represents. What this quotes means is that the defense can't argue that the agents wanted to entrap Hamzeh; therefore, he was entrapped. Which is the flip-side of the government's inability to argue that the agents didn't want to entrap Hamzeh, therefore he wasn't entrapped. Understood in that way, the government's motion that subjective intentions (either way) aren't fodder for argument is understood and the defense has no objection to an order barring either side from arguing that the agents intention to entrap or not to entrap Hamzeh is determinative of whether he was entrapped.

But that doesn't mean the defense can't use the agents' subjective intentions to argue bias, motive, and prejudice—neither *Andreas* nor any other case bars that. Indeed, the *Andreas* court continued in the very next line cited by the government, that while subjective intent isn't relevant for whether or not the defendant was entrapped, "*this*

3

Federal Defender Services
of Wisconsin, Inc.

*evidence is admissible for the limited purpose of challenging the credibility, reliability and authenticity of the government's tapes.*" *Id.* (emphasis added). That is, the subjective intent of the agents and informants is (like any bias) fertile ground for attacking the integrity of the investigation. Indeed, the *Andreas* court continued with points that are very relevant to this trial and this Court can use as a guidepost:

> The remaining evidence or argument regarding: conversations between government agents; failure to undertake certain investigative steps during the course of the investigation; and the government's knowledge that Whitacre was unreliable, based on references to polygraph evidence and consultations between the investigating agents assigned to the F.B.I.'s Behavioral Science Unit (BSU), is admissible since they are all probative of the credibility of the tapes as previously held in the April 16 order and need not be rehashed. Accordingly, any and all argument or evidence stemming from alleged selective taping and destruction of evidence, *including failure to supervise Whitacre in compliance with FBI internal guidelines*, and the conversations between defendants are admissible for the limited purpose of challenging the credibility, reliability, and authenticity of the tapes.

*Id.* (emphasis added). Understood that way (in its full context) the *Andreas* opinion supports the defense's very arguments in this case: the selective recording and failure to supervise Mike is admissible to challenge the credibility, reliability and authenticity of the investigation. Likewise, we will argue that the informants' motivation for gain tainted and colored their actions and reporting; and we will argue that the resources poured into this case meant that there was pressure to get Hamzeh to commit a crime, such as getting a machine gun. All of which is traditional bias and motive. That is, in fact, the settled law. *See, e.g., Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (noting "we have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination") (citation omitted).

4

Federal Defender Services
of Wisconsin, Inc.

Not only can the agents be cross-examined on their bias, motive, and prejudice, they can be questioned about the quality of their investigation. In *Alvarez v. Ercole*, 763 F.3d 223, 225-26 (2d Cir. 2014), the court held that the state trial court erred in preventing the defense from cross-examining the lead detective about investigations not pursued and leads not followed, recognizing that the investigation that was not done was not subject to a hearsay objection because the issue is not the truthfulness of what is told to police but whether there were leads that weren't followed. *See also Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (citing *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation"); *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (awarding new trial of prisoner convicted in Louisiana state court because withheld Brady evidence "carried within it the potential ... for the ... discrediting ... of the police methods employed in assembling the case")) .

Turning to in limine request number 4 (commenting on discovery matters), the defense does not intend to comment on prior discovery motions or orders before the jury, as in raising that in response to the second motion to compel the government represented there was no surveillance and intercepting of Hamzeh's communications but that wasn't true. But it is routine cross-examination to inquire of witnesses whether they have notes, reports, recordings, photographs, etc. about particular events or investigation or did they fail to document their investigation. That doesn't constitute requesting discovery from witnesses and there should be no prohibition against it. *See Kyles,* 514 U.S. at 446 n.15

5

Federal Defender Services of Wisconsin, Inc.

("When, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and *slovenly work will diminish it*." (emphasis added)).

The next motion in limine category is the government's request to exclude cross-examination regarding bad acts by witnesses that are not probative of truthfulness. This appears to be an effort by the government to have the defense reveal all of its impeachment material before trial. The Court should decline the government's request. Yet the government is correct that under Rule 608(b) the defense can inquire of witnesses about other bad acts of the witness probative of truthfulness. There are many types of conduct that potentially fall within this exception. *See United States v. Mansaw*, 714 F.2d 785, 789 (8th Cir. 1983) (use of false names); *United States v. Manske*, 186 F.3d 770, 776 (7th Cir. 1999) (threatening or intimidating witnesses); *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir. 1996) (theft); *United States v. Zizzo,* 120 F.3d 1338, 1355 (7th Cir. 1997); *United States v. Dawson*, 434 F.3d 956, 957-58 (7th Cir. 2006) (whether witness lied at prior proceeding and whether judge found witness not credible); *United States v. Jones,* 900 F.2d 512, 520-21 (2d Cir. 1990) (false statements on applications); *United States v. Sherlin*, 67 F.3d 1208, 1214-15 (6th Cir. 1995) (false denials of knowledge of arson fires); *Abel*, 469 U.S. at 55-56. So while it may not be admissible, for example, to introduce a witness's commission of arson, it would be admissible to ask about him lying about it.

Beyond that, witnesses may be cross-examined about motive and bias in favor of the government. So, for example, the Supreme Court reversed a murder conviction

6

because defense counsel was not allowed to cross-examine a witness about whether he had had a criminal charge of being drunk on a highway dismissed for speaking to the prosecutor because it was relevant to his potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). Likewise, it was reversible error not to allow questioning of a juvenile witness about his being on probation for burglary because that status provided him with reason to be biased for the state. *Davis v. Alaska*, 415 U.S. 308 (1974). Pending charges, dismissals, failures to charge, failure to report a crime, and reduced charges are all proper inquiries relating to bias and motive of a witness. Sometimes those will relate to crimes of dishonesty and other times not. The issue isn't whether the charges relate to the witness being a liar but whether they reflect the witness's bias. It's also proper to show that a witness has such a tight relationship with the government that he thinks he can act with impunity. Further, the FBI has a policy of regularly vetting its informants. As the court in *Andreas* noted (and was quoted above), the credibility of the agency and the investigation rests, in part on whether they properly supervised, vetted, and held accountable its informants for their criminal conduct. *Andreas*, 23 F. Supp. 2d at 851. Yet another issue that the government's motion in limine would (improperly) bar is whether an informant's criminal conduct reveals that he was lying to the FBI or to child support authorities or others.

In addition, there may be evidence about Mike's interest in guns and the Masons which will not be offered to show he is a bad person or not believable—neither fact even hints at such an inference. Rather, evidence about his interest in guns and the Masons is meant to show that this plan originated with him and he introduced and fed those topics

Federal Defender Services
of Wisconsin, Inc.

to Hamzeh in an effort to induce him into purchasing an unlicensed firearm. As a final matter, the government's motion also suggests an attempt to insulate its witnesses' prior arrests from inquiry. But there is no special rule prohibiting inquiries into prior arrests *if* they go to the witness's bias, motive, or honesty. That should address all of the arguments in the government's consolidated motions in limine.

### II.   The government's motion concerning Hamzeh's statements.

The government has submitted a lengthy memo about the authentication and admissibility of the transcripts. The defense has just two objections on this subject. First, the defense still doesn't have a chain-of-custody for the recordings. The ELSUR envelopes and other chain-of-custody documents are, so far, covered under the Magistrate Judge's CIPA ruling. Second, the defense has always hoped for a complete set of transcripts to avoid any squabbling over words, speakers, or admissibility. To date, however, the government has not signed off on the defense's transcripts. Those were submitted to the government long ago—one, a year ago, and the other nine months ago. Thus, provided that there is a chain of custody established by the ELSUR envelopes or some alternative documents (CIPA provides for that) and the defense's transcripts are equally admissible, the defense has no objection to the transcripts' admissibility—subject, of course, to Rules 402, 403, and 404, as detailed below.

At the end of the government's motion concerning the transcripts, it argues that "the Defendant's and informants out-of-court statements are inadmissible hearsay if offered into evidence by the defense." R.272:15. The government then argues that Hamzeh "is not a party opponent of himself under Federal Rule of Evidence 801(d)(2).

8

Federal Defender Services
of Wisconsin, Inc.

Thus, the defendant cannot offer into evidence any of his own out-of-court statements, including statements taken from recorded conversations between the defendant and CHSs." *Id.* The government is correct that the defense cannot enter the informant's or Hamzeh's statements under that exception, but the defense is not offering the transcript portions as the statements of a party opponent.

This is an entrapment case. And to prevail at trial, the government has to prove, beyond a reasonable doubt, that Hamzeh was predisposed to commit this crime or that he was not induced to do so by the informants. The defense has laid out its theory of how the agents induced Hamzeh to purchase a machine gun and carry the other informant's gun fifty feet to the car. They did it through a calculated campaign of persistent efforts; subtle and persuasive conduct, normalizing firearms in Hamzeh's life, a slow and sure process of grooming him; preying on Hamzeh's limitations; appeals to friendship; fraudulent representations; offering a better-than-market deal on the firearms; and a bait-and-switch move, making sure Hamzeh didn't buy the legal semi-automatic weapon he thought he was buying and instead an illegal machine gun that the agents brought. To that end, the transcripts embody the words and actions the informants used to induce Hamzeh. The transcripts that the defense seeks to introduce are not being offered to establish the truth of what's asserted in them; instead, the transcripts are being offered as verbal acts that establishes what led Hamzeh from being an ordinary law-abiding citizen to buying a machine gun. The statements are thus, as discussed below, not hearsay and can be entered into evidence for effect on the listener, present sense impression, state of mind, the rule of completeness and Hamzeh's constitutional right to present a defense.

9

Federal Defender Services
of Wisconsin, Inc.

### a. The proposed transcript are not hearsay and admissible.

The only way that the transcripts might be categorically barred is if they were hearsay—portions could, of course, be excluded as irrelevant or cumulative or unfairly prejudicial.[1] But the initial fight is on whether the transcripts that the defense seeks to admit are hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). But "an out-of-court statement offered for some other purpose, such as to show that a statement was made, to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred, is not hearsay." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014) (citation omitted). When statements are not offered for "their truth, but for their effect on defendants' state of mind," they aren't hearsay. *Id.*

Put differently, when the words are introduced as a verbal act, a statement whose truth is irrelevant, then the statement is not hearsay. See, *Carter v. Duoma*, 796 F.3d 726, 735 (7th Cir. 2015) (officer's instructions to informant not hearsay where those statements were not factual assertions). Rather, the statement's significance lies in the statement having been made—not in whether the statement is true or not. And the commentary to the Rules makes it clear that "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, [then] the statement is not hearsay." Advisory Committee Note to Fed.R.Evid. 801(c); *see also Schindler v. Seiler,* 474 F.3d 1008, 1010 (7th Cir. 2007) ("Statements that constitute

---

[1] Even then, the constitutional right to present a defense may require the admission of the hearsay. *See, e.g, Chambers v. Mississippi*, 410 U.S. 284 (1973).

Federal Defender Services of Wisconsin, Inc.

verbal acts (e.g., words of contract or slander) are not hearsay because they are not offered for their truth."). Indeed, when the statements are offered to show the effect they induced, they are not hearsay; case law and treatises make that clear distinction: "statements not considered hearsay are typically verbal acts"; indeed, a "statement that D made a statement to X is not subject to attack as hearsay *when its purpose is to establish the state of mind thereby induced in X.*" 2 McCormick On Evid. § 249 (7th ed.) (emphasis added); *United States v. Norwood*, 798 F.2d 1094, 1097 (7th Cir. 1986) (statement by individual to defendant was not hearsay because it was offered to show the probable effect on the defendant's state of mind).

In an entrapment case, it's all about the state of mind that the informants' statements induced. *See United States v. Mayfield,* 771 F.3d 417, 437 (7th Cir. 2014) (en banc). Given the lack of evidence Hamzeh was predisposed to possess a machine gun before being approached by the informants, the whole question is whether the informants' statements and actions induced Hamzeh to purchase the machine gun. And in entrapment cases when the defense has been barred from introducing those types of statements because the government has argued that they are hearsay, the reviewing courts have been quick to offer correction. In one case, the court was clear: "conversations concerning Branham's entrapment defense would not constitute hearsay." *United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996). There, the court echoed the principles sketched above and observed that "if the significance of a statement 'lies solely in the fact that it was made,' rather than in the veracity of the out-of-court declarant's assertion, the statement is not hearsay because it is not offered to prove the truth of the matter

11

Federal Defender Services
of Wisconsin, Inc.

asserted." *Id.* (citations omitted). The court continued: "[h]ere, defense counsel was attempting to offer the parties' conversations as evidence of Branham's state of mind in support of his entrapment defense. *Accordingly, the truth of the conversations would be irrelevant for purposes of the defense, because the conversations' significance would exist solely by the fact that they were made.*" *Id.* (emphasis added) (citations omitted). So too here.

And that's always the case with entrapment defenses: the statement's truth is irrelevant; what matters is that it was said and that it affected the listener. Case law is very clear on that point:

- "Santander's statements were offered as evidence of Cantu's state of mind, bearing directly on his entrapment defense. Thus, the significance of the statements lies solely in the fact that they were made; the truth of the statements is irrelevant for that purpose. The trial court erred in concluding that the proffered statements were hearsay." *United States v. Cantu*, 876 F.2d 1134, 1137 (5th Cir. 1989).

- On the issue of entrapment, wife should have been permitted to testify about defendant's conversation with informant in which he allegedly refused to engage in narcotics transaction, since "[t]he statements made by the husband were not self-serving declarations about a past attitude or state of mind, but were manifestations of his present state of mind, his immediate reaction to the proposal" *United States v. Partyka*, 561 F.2d 118, 125 (8th Cir. 1977);

- And, of course, when "testimony was not offered for the truth of the matter asserted but to show defendant's state of mind as bearing on the entrapment defense, and therefore was not hearsay." *United States v. Lopez* 147 F.3d 1, 6 (1st Cir. 1998).

That is precisely what the defense is seeking to do with the transcripts it seeks to introduce: we want to show how that the statements were made and the effect that they had on Hamzeh—*i.e.*, inducing him to purchase an unregistered firearm—and Hamzeh's response to those statements. Indeed, the verbal act of Hamzeh declining Mike's offer of

Federal Defender Services
of Wisconsin, Inc.

a machine gun by saying "no, I just want a pistol" is just as admissible if he'd put up his hand, shook his head, and walked away.

The bottom line is that the statements which the defense seeks to introduce are not being offered for their truth—not only is the truth of the statements immaterial, many (almost all) of the statements are patently false. *See United States v. Whiteagle*, 759 F.3d 734, 757 (7th Cir. 2014) (noting "statements were not admitted for their truth . . . the *statements were quite obviously false. Consequently, they did not constitute hearsay*" (emphasis added)); *Anderson v. United States*, 417 U.S 211, 219–20 (1974) (testimony admissible non-hearsay where statements were offered simply to show that they were made and further evidence showed those statements were false). The defense is offering the proposed statements as verbal acts, establishing that the statements were made, the effect on Hamzeh, his present state of mind, or the continuity and explanation of Hamzeh's (and the informants') behavior. Each basis is well-established and accepted as grounds for entering the statements into evidence. *See United States v. Conn*, 769 F.2d 420, 422 (7th Cir. 1985) (noting "the conversations between Hake and Judge Devine were not hearsay because they were not offered for the truth of the matters asserted" but as "verbal acts" establishing "background and continuity and explanation of the subsequent taped conversations"); *United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015) (details of conversation between co-defendants admissible to show they did not possess the requisite state of mind in drug distribution case). In other words, the statements are not hearsay, and thus the government is mistaken that they cannot be admitted into evidence.

13

Federal Defender Services
of Wisconsin, Inc.

Of course, the defense cannot put the informants' statements and leave out Hamzeh's in the same conversation. For one, Hamzeh's statements are not offered for their truth. They too are mostly lies or they simply show his then existing state of mind or constitute verbal acts. But mostly Hamzeh's statements are used to show the entirety of the back and forth with the informants' statements. Recently, in *United States v. Fernandez*, the Seventh Circuit was clear that when it comes to introducing a statement, one side of a conversation cannot be divorced from another; rather, a jury is entitled to hear it all: "What Frusti asked of or said to Voecks during interrogation was not offered for its truth, but rather to establish what questions or statements Voecks was responding to and the effect the former had on Voecks as the listener." 914 F.3d 1105, 1111 (7th Cir. 2019). In that case, like Hamzeh's "[t]his was a legitimate non-hearsay purpose aimed at providing the jury with the full context of Voecks' prior statements." *Id*.; *see also United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (informant's side of recorded conversation with defendant admissible to provide context). On that point, the Court in *Fernandez* continued: "Consequently, the hearsay rule did not support the court's decision to preclude the defense from establishing both sides of the interrogations through Voecks himself." 914 F.3d, 1111–12. Thus, there is no basis for the government to argue that Hamzeh cannot introduce the transcripts or that they come in on a piecemeal basis.

In the pretrial report, the defense has marked numerous statements that it could introduce. Many of these statements are tied to giving context to some of the government's statements—statements that the defense has sought to exclude in the third motion in limine. And thus, depending on how the Court rules on the motions in limine

14

Federal Defender Services
of Wisconsin, Inc.

many of the defense's statements would not be offered at trial and a more precise theory of admissibility could be offered for each. But whatever theory the defense would offer would be tied to the principles sketched above.

### b. The government's transcripts, while admissible as statements of a party opponent, are still subject to objection.

In its motion concerning the transcripts, the government has represented that it seeks to introduce 56 different portions of the transcripts. The defense's third motion in limine cites the authority and theory for keeping out or severely limiting the inflammatory and sickening statements about attacks *in Israel,* statements about particular acts of violence, and racially charged and bigoted statements. These statements are not probative of Hamzeh's predisposition. After all, they are all made well over a month after meeting the informants. *Jacobson v. United States,* 503 U.S. 540, 549 (1992) (predisposition is measured "prior to first being approached by Government agents"); *United States v. Pillado,* 656 F.3d 754, 767 (7th Cir. 2011) (noting "prosecutors will bear the burden to prove beyond a reasonable doubt that Lara was predisposed to committing the crime by identifying 'preinvestigation evidence' bearing on this issue"). And the statements are not probative of inducement. They only speak to Hamzeh's prejudices and bigotry and his outrageous propensity to speak when prompted around his "friends." *United States v. Hollingsworth,* 27 F.3d 1196, 1203 (7th Cir. 1994) ("[t]he defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character.") (en banc).

Federal Defender Services
of Wisconsin, Inc.

With such a low to non-existent probative value, many of the statements that the government seeks to introduce have an accompanying and undeniable danger of prejudicing the jury. *United States v. Torres*, 977 F.2d 321, 328 (7th Cir. 1992) ( "[T]he more probative the evidence, the more the court will tolerate some risk of prejudice, while less probative evidence will be received only if the risk of prejudice is more remote."). Indeed, when courts deal with emotionally charged subjects that can sway or inflame a jury, like whether a customer died after receiving the heroin or whether the defendant's gang is made up of a bunch of racists, the courts are quick to exclude the evidence. *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010) ("Evidence of what happened to Cooper's customers after they bought heroin from him had nothing to do with the charges in this case."); *United States v. Bowman*, 302 F.3d 1228, 1239–40 (11th Cir. 2002) ("Since Bowman was not charged with any racially-motivated crimes, his allegiance to a racist organization is not relevant to his guilt or innocence in this case"). And that's because of the evidence's inherent capacity "to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 181 (1997); *see also id.* at 180 (describing unfair prejudice as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"). Put differently, evidence should be excluded when there "is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *United States v. Ham*, 998 F.2d 1247, 1252–53 (4th Cir. 1993). It is hard to imagine two more charged topics in our culture than racism and mass shootings.

16

Federal Defender Services
of Wisconsin, Inc.

What's more, even if they (or some) are deemed relevant, given the sheer volume of statements and their repeated, horrific details, any probative value decreases while the tendency to obscure the issues and appeal to the jury's fear or hatred of Hamzeh increases with each additional statement. Thus, the statements should be (if not excluded) greatly limited. That applies equally to the statements about violence as it does to statements about race and sexual orientation. Those appear in numbers 20, 22–23, 27, 28, 52. Finally, there are certain statements that need context and thus under the Rule of Completeness, additional points should be added. *See United States v. Reese*, 666 F.3d 1007, 1019 (7th Cir. 2012). Those appear in 8, 26, 48, 55–57. The objections are quickly flagged, and the arguments in support are found in the defense's Third Motion In Limine (R.277) and briefly recited above. So only a quick allusion to the point is made in the chart below. The statements that the defense does not object to are noted as are statements where only some are portions objected to.

17

Federal Defender Services
of Wisconsin, Inc.

| | Transcript | The defense's position |
|---|---|---|
| 1 | Disk 11 p. 3–16 | Inflammatory statements about Israel are irrelevant and unfairly prejudicial. |
| 2 | *Id.* p.18 | Inflammatory statements about Israel are irrelevant and unfairly prejudicial. |
| 3 | *Id.* p. 32 | Inflammatory statements about Israel are irrelevant and unfairly prejudicial. |
| 4 | *Id.* p. 39 | This isolated line is about travel to Israel. It is irrelevant and inflammatory. |
| 5 | Disk 14, p.4-8 | Pages 4-5. The first part of the conversation is about Hamzeh's mother and a debt that Hamzeh owes. It is irrelevant.<br><br>Pages 6-7. The second part is about Israel and travel to Palestine. It doesn't show that Hamzeh was predisposed *two months earlier* when he was approached by the informants and it does not bear on inducement. |
| 6 | *Id.* p. 15. | Hamzeh traveling by himself to Gaza has no bearing on the issues. |
| 7 | Disk 22, p.16 | The statement is not relevant. It deals with travel into Palestine and opens the door to questions about Hamzeh's involvement with another individual. The evidence is not relevant. |
| 8 | *Id.* p. 19 | This stand alone statement "I mean if I shoot ten people, it will be enough, I do not want more" is not relevant. It is simply meant to inflame the jury. It should be excluded.<br>If not, the following line where Mike "chuckles," and then says "500 for me" needs to be added for context, showing that this was a bad and offensive joke. |
| 9 | *Id.* at 20 | The statement is irrelevant. It is about Israel. And it is cumulative. |
| 10 | *Id.* at 34 | The statement is irrelevant. It has no bearing on the issues. It is a prayer taken out of context. |
| 11 | *Id.* at 36–37 | The statement is irrelevant. It is about travel to Palestine and has no bearing on the issues. It will only confuse and inflame the jury. |
| 12 | *Id.* at 38 | A statement that there are *many spies in the West Bank* has no bearing on the issues at trial. It is irrelevant. it will only confuse and inflame the jury |
| 13 | *Id.* at 39 | The stand-alone statement is a fabulist boast about Hamzeh blowing himself up. It has no bearing on the trial, it is inflammatory, very cumulative, and confuses the issues. |
| 14 | *Id.* at 40 | This statement has no context. It is again a statement about martyrdom and will simply confuse and inflame the jury. |
| 15 | *Id.* at 42 | The statement is about travel to Palestine and whether to show a Jordanian passport, it has no bearing on this trial. |
| 16 | *Id.* at 43 | It is about travel with an American passport and how much money each claims to have. A boast that the investigation shows is false on Hamzeh's part: he has to borrow money from Steve for the gun. |
| 17 | *Id.* at 52. | The statement is about getting weapons in Palestine. This case is not about getting a weapon to bring to another country. It is irrelevant. |

Federal Defender Services
of Wisconsin, Inc.

| | | |
|---|---|---|
| 18 | *Id.* at 53–55 | The statement is about people Hamzeh may know in Hamas and shooting Jewish people. It is not relevant, it is unbelievably inflammatory, and it is cumulative of other statements. |
| 19 | *Id.* at 78 | The statement is about travel to Palestine; it's inflammatory and irrelevant. |
| 20 | *Id.* at 79 | The statement ("Jews are sons of bitches, man") is like so many inflammatory, bigoted, anti-semitic and irrelevant. It has no bearing on the trial and should be excluded. |
| 21 | *Id.* at 81 | The stand alone statement *what is better than getting martyred in Jerusalem*?" is irrelevant to the issues at trial and it is inflammatory and cumulative. |
| 22 | Disk 25 p. 15–17 | The statement is like so many others, it is about travel to Palestine. It is inflammatory, bigoted, anti-semitic, and irrelevant. It has no bearing on the trial. |
| 23 | Disk 30, p.25–27 | The statement is like the others, it is about travel to Palestine. It is inflammatory, bigoted, anti-semitic, and irrelevant. It has no bearing on the trial. |
| 24 | Disk 30, p.29 | No objection |
| 25 | Disk 34, p27 | The statement is like the others wrapped into travel to Palestine It is irrelevant, it is inflammatory, and it will confuse the issues. |
| 26 | *Id.* at 31 | The statement is not relevant. It is directed at Mike and has no bearing on the issues at trial.<br>If, however, the court allows it then statement's context needs to be added. In the lines above 8-14, Hamzeh is describing his reaction to seeing a veiled (presumably Muslim) woman being beaten. |
| 27 | *Id.* at 35–36. | The statements are inflammatory to not just Jews, but are also directed at Whites and Hispanics. They are inflammatory and have no bearing on the issues at trial. |
| 28 | Disk 37, 11–13 | This is a discussion of events in Palestine and attacks on women, is irrelevant. In particular, the statement, "They should stay home and raise those kids," is irrelevant, is sexist and will just inflame the jury. It should be excluded. |
| 29 | Disk 45 (call 4) Page 5 | The statement is irrelevant. Hamzeh's stated desire to shoot people for staring at him is inflammatory and irrelevant. |
| 30 | *Id.* at 9 | The statement is irrelevant, inflammatory, and confuses the issues. The trial is not about how hard it is to get weapons in Palestine. |
| 31 | Disk 45 (call 5) Page 9 | The statement is irrelevant. It is Mike and Hamzeh debating jihad (and laughing) and Mike asking what Hamzeh's response "if someone tramples on the Quran in front of you?" And Hamzeh's response that you can shoot him. It is not just irrelevant, it is highly inflammatory and cumulative. |
| 32 | Disk 51, 20–22 | The first part of the statement about shooting people should be excluded, for reasons stated.<br>The statement beginning on page 21, line 2, through the end is otherwise admissible. No objection. |

Federal Defender Services
of Wisconsin, Inc.

| 33 | Disk 73 (Part 1–5), page 17 | No objection. |
|---|---|---|
| 34 | *Id.* at 25–28 | For reasons stated about comments about the Masons, it should be curtailed. The statements are in addition not otherwise relevant. The plans of going to Texas and placing the firearms in a tire do not bear on whether Hamzeh was induced. |
| 35 | *Id.* at 31–35 | The inflammatory statements about burning the masonic temple are inflammatory and confuse the issues at trial. The charge is not using Molotov cocktails; it's failing to register a machine gun. The statement is completely irrelevant to the issues at trial. |
| 36 | *Id.* at 76–77 | The statement is bizarre and irrelevant. It is about Hamzeh's dream; it has no bearing on whether he was induced or predisposed. |
| 37 | *Id.* at 81–88 | The statement is irrelevant. It is the tour of the masonic center. It has no bearing on the purchase and failing to register the firearms. While the government is entitled to tell its story, that story has to be relevant to the charged crime and the offense's elements. |
| 38 | Disk 73, part 8, page 5–25. | No objection to page 5-7, line 41.<br>Objection page 7, line 42, through page 14, line 42. This is inflammatory and irrelevant.<br>No objection page 14, line 43 through the end of 15.<br>Objection page 16, what they do with the weapons afterwards and plans about them has no bearing on whether Hamzeh was predisposed or induced.<br>No objection page 21, line 35 through the end of page 23.<br>Objection page 24, line 1, through 25, line 28: discussion about Hamzeh smoking weed and conversation about Masonic meetings is not relevant to the issues at trial. It will simply inflame and confuse the jury. |
| 39 | Disk 79, page 6-10 | Objection 6–8, line 42. It is irrelevant and confusing to the jury.<br>No objection to page 8, lines 43-47.<br>Objection page 9 to the end, it is irrelevant and prejudicial, including the insinuation that Steve or Mike being informants would mean their entire family would be killed in Jordan. There is no basis to present that to the jury. It is untrue, it is inflammatory, and it is in reference to Steve's earlier statements. |
| 40 | Disk 79, page 27-28. | This statement about Mo (a non-informant, bystander) will confuse the issue for the jury. Who "Mo' is and whether Hamzeh could be tricked into thinking that Mike was *not* an informant, has no bearing on the issues of inducement and predisposition. |
| 41 | *Id.* at 32 | Statements about Mo are irrelevant and threatens to confuse the jury about Mo and what Mo says about Mike has no bearing on the issues at trial. |
| 42 | *Id.* at 48 | The statement about Mo has no bearing on the issues at trial. It will confuse the jury. |
| 43 | *Id.* at 78 | No objection: |

Federal Defender Services of Wisconsin, Inc.

| 44 | Disk 84 (part 2) Page 16–17 | If the defense's third motion in limine is granted and statements about the masons are kept out, then this statement is irrelevant. If the government can introduce it, no objection. |
|----|----|----|
| 45 | *Id*. at 35–52 | Objection: 35-38, line 2. It is not relevant and confuses the issues at trial.<br>No objection: page 38, line 3, through page 41, line 28.<br>Objection: 41, line 29 through page 49, line 37. The thoughts about the masons and the conspiracy theory and the horrific details about what could happen inside including with children, will only inflame and confuse the jury. |
| 46 | *Id*. at 45–47 | This will only confuse and inflame the jury. It is irrelevant to the crime charged. |
| 47 | Disk 84 (part 3&4), page 34-37 | No objection |
| 48 | Disk 86 page 18-19 | No objection as it stands. If the Court allows in the other contested statements or a fair amount, then under the doctrine of completeness it should go to page 23, line 31. |
| 49 | *Id*. at 40–41 | The statement is irrelevant. It only seeks to inflame the jury. |
| 50 | Disk 90 p.10-13 | The statement is irrelevant. It only seeks to inflame the jury and isn't germane to the elements of the offense. |
| 51 | Disk 90 (part 2) p29-33 | Objection to the beginning statement that isn't numbered by Hamzeh about "the most important thig is no one remains alive." It's not relevant and will inflame the jury, distracting it from the issues it must resolve.<br>No objection to line beginning with Mike "I mean." To the end of the page.<br>The rest is, for reasons stated, inflammatory and irrelevant. |
| 52 | Disk 92 (part 3), p. 13 | The statement is irrelevant and prejudicial. The statement: "Okay, the second issue: I'm really worried about the blacks when we go to bring them; the blacks that we will be purchasing them from, and you know that Chicago is the dirtiest place, *and the dirtiest blacks are the ones there.*" (emphasis added). It has no place in front of the jury and will only serve to alienate every racial group. |
| 53 | Disk 95, (part 1) p. 12. | The statement is irrelevant and will only serve to confuse the jury. |
| 54 | Disk 97, p. 15 | No objection. |
| 55 | Disk 104 p. 15, line 22. | Under Rule of Completeness there also needs to go back to page 12, line 22, all the way through. |
| 56 | *Id*. at 35 | No objection to the first lines. Objection to Hamzeh's statement that "we will be considered terrorists." It is an inflammatory label and is not germane to the elements and whether he was predisposed or induced. |
| 57 | *Id. at 46* | No objection to the statement, but the whole video should be played. |

Federal Defender Services of Wisconsin, Inc.

### III.    The Government's objections to the defense's expert testimony.

In its consolidated memorandum, the government has moved to exclude or limit the testimony of Professors Bauer and Kimmel and Drs. Sageman and Robbins. The government has made various arguments against each. For ease of reference each expert is broken out. Before addressing the government's specific arguments, it's important to sketch the law that undergirds the admissibility of each's opinion. Under Rule 702 and *Daubert,* this Court must act in a gatekeeping role "to ensure that expert testimony is both relevant and reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). To that end, the Court must determine whether the expert is qualified, whether his methodology is scientifically reliable, and whether the proposed testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702; *see also Daubert v. Merrell Dow Pharmascuticals, Inc.*, 509 U.S. 579, 592 (1993) (explaining that the latitude given to experts under the Rules of Evidence "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"). Those are the Rule's four demands.

When it comes to being qualified, under Rule 702, the question doesn't turn on whether he or she is a specialist in a given and narrow field. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field." (*quoting Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). Rather, the Court looks at "each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Gayton*, 593 F.3d at 617. And the Court focuses on "the principles and methodology, not on the conclusions

Federal Defender Services
of Wisconsin, Inc.

that they generate." *Daubert*, 509 U.S. at 594–95. *Daubert* identifies a number of factors a court might consider, including whether the methods have been tested or subjected to peer review and whether they are generally accepted in the field. *See id*. at 593–94. But the list is not exhaustive. *See id*. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test."). And courts have been quick to note that social science expert opinion appropriately fall under Rule 702—that is, they can be scientifically reliable and helpful for the jury. *United States v. Joseph*, 542 F.3d 13, 22 (2d Cir. 2008) ("Numerous courts have upheld the admission of [social science] expert testimony to explain conduct not normally familiar to most jurors.")

Within that framework, three crucial points can't be lost, which rebut many of the government's objections. First, social science research, "theories and opinions cannot have the exactness of hard science methodologies, and expert testimony need not be based on statistical analysis in order to be probative." *Id.* (quotation omitted). Second, "peer review, publication, potential error rate, etc. . . are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it. In such cases, the place to quibble with [an expert's] academic training is on cross-examination and goes to his testimony's weight not its admissibility." *Id.* (quotation omitted). And third, when it comes to the government's argument about the ultimate issue, Rule 704(b):

> forbids an expert to "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." But as the rule itself states, the expert

23

is permitted to "testify . . . with respect to the mental state or condition" of the defendant.

*United States v. Gladish,* 536 F.3d 646, 650 (7th Cir. 2008). The Seventh Circuit has expressed the Rule 704(b) line that experts may not cross, this way: "The psychologist could not have been permitted to testify that the defendant did not intend to have sex with 'Abagail,' but he could have testified that it was unlikely, given the defendant's psychology, that he would act on his intent. You can sincerely intend to stop smoking, yet a psychologist might conclude that you had such poor impulse control that it was exceedingly unlikely that you would stop. That evidence would not be barred by Rule 704(b)." *Id.* at 650–51. Thus, under Rule 704(b)'s specific terms and its application in case law, the Rule does not restrict all testimony bearing on a defendant's mental state or condition.

Particularly relevant here and to answering the government's objections is the fact that when it comes to entrapment cases, a defendant's IQ or other intellectual limitations are very important to a jury's assessment of inducement. In *United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006), the trial court bared the defendant from introducing expert medical testimony that the defendant's medical condition (brain damage caused by pituitary tumor) rendered him unusually susceptible to "inducement" in the entrapment defense. *Id.* at 654. The court of appeals reversed and held that "medical expert opinion testimony showing that a medical condition renders a person unusually vulnerable to inducement is highly relevant to an entrapment defense." *Id.* at 656. Likewise, in *United States v. Dennis*, 826 F.3d 683, 692 (3d Cir. 2016), the Third Circuit

Federal Defender Services
of Wisconsin, Inc.

listed among other evidence that was bearing on the entrapment defense, "the expert testimony of his vulnerability to being persuaded due to his low IQ." *Id.*

In sum, those three-pages of first principles should guide this Court's analysis. And they inform the problems underlying each of the government's stated objections to each expert.

### 1. Testimony of Professor Brauer

In its objection to Professor Brauer the government argues that he can't testify because "his expert report does not indicate he actually analyzed the facts of this case or spoke with the defendant." R.276:14. It also argues about Professor Brauer (as it does with Dr. Robbins) that the Seventh Circuit has been crystal clear that Hamzeh may not raise a diminished capacity defense. "The defense of diminished capacity only can be used as a defense to a specific intent crime." In support, the government cites *United States v. Moore*, 425 F.3d 1061, 1069 (7th Cir. 2005) and a handful of other cases. R.276:17-18.

When it comes to the government's first objection, there is nothing wrong with Brauer's notice or report. Indeed, the government doesn't claim it fails under Rule 16. As the D.C. Circuit has noted: "While Rule 16 requires the defendant to describe the witness's opinions, the bases and reasons for these opinions, and the witness's qualifications, it does not require the defendant to explain the basis of the proposed opinion's admissibility in his notice, and requiring explanation of legal basis goes far beyond the purpose of the rule." *United States v. Hite*, 769 F.3d 1154, 1168–69 (D.C. Cir. 2014) (quotation omitted). Brauer's testimony about social influence is informed by having read the transcripts in this case and it will be tailored to the contours of Rule 702. And there is

25

Federal Defender Services
of Wisconsin, Inc.

no suggestion that expert testimony in the disciplines of psychology is improper or that testimony about how social pressure affects the average person wouldn't be helpful. *United States v. Mamah*, 332 F.3d 475, 477–78 (7th Cir. 2003) ("We acknowledge that social scientists frequently testify as experts, and their opinions are 'an integral part of many cases.'" (quoting *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir.1996)); *see also Joseph,* 542 F.3d at 22 ("Numerous courts have upheld the admission of expert testimony to explain conduct not normally familiar to most jurors.")

When it comes to the government's objection that the defense (via Brauer) is making a diminished capacity defense, that isn't so. The defense is arguing consistent with *Dennis* and *Sandoval-Mendoza* that Hamzeh's IQ and social functioning is relevant to the jury's assessment of whether Hamzeh was induced. And the cases the government cites don't undermine the defense's ability to make that argument, nor do they actually support the government's position. In *Moore,* (the case cited by the government) the district court barred a diminished-capacity defense but allowed the defendant to testify to his low intelligence: "I've essentially ruled that he can probably testify [to] his mental condition—if he wants to tell us what his IQ is or something like that, he can do it, and if he can tell he's under a disability, I'll allow that, but that's about it." *Moore,* 425 F.3d at 1069. So there is nothing to suggest that testimony about Hamzeh's IQ is irrelevant or inadmissible.

The government's final complaint is that Brauer's opinions are based not on his own research, but on the research of others. There is nothing about Rule 702 that prevents experts from relying on research conducted by others. In fact, that there is research

26

Federal Defender Services
of Wisconsin, Inc.

conducted by others supports that his "testimony is the product of reliable principles and methods." Rule 702(c).

## 2. Testimony of Professor Kimmel

When it comes to Professor Kimmel, the government makes three arguments against him testifying. First, it argues that "the defendant's attorneys cannot offer into evidence or solicit from a witness inadmissible hearsay statements of the defendant or the CHSs (or anyone else)." R. 276:15. Second, it argues that "Professor Kimmel's proposed testimony does not account for the 'obvious alternative explanations,' for the defendant's behavior, in particular that the defendant wanted to join Hamas, and commit a mass terror attack before the FBI began its investigation." *Id*. Third, it goes on to add that "Implicit in Prof. Kimmel's report is the idea that the CHSs recruited and entrapped the defendant to commit an attack and buy machine guns for the attack." And that Professor Kimmel's expertise is "different from the analysis relevant to this trial – i.e., whether the defendant was predisposed to buy machine guns to commit an attack." *Id*.

The government's first argument—that the defense cannot offer into evidence or solicit from a witness inadmissible hearsay statements and thus Kimmel should be excluded—is mistaken for two reasons First, as spelled out above, the statements are not inadmissible. Second, experts can rely on hearsay. *See* Rule 703. So the fact that the government believes that Kimmel's testimony would rely on hearsay is not a basis to exclude *Joseph*, 542 F.3d at 22 ("To the extent that the District Court was concerned that Herriot's testimony would rely on hearsay, *that would not be a valid objection*." (emphasis added)).

27

Its second argument is that Kimmel's testimony does not account "for the obvious alternative explanations" including that he wanted to "join Hamas and commit a mass terror attack." But the mere fact that an opinion doesn't account for "obvious alternative explanations" is not a reason to bar it. This language comes from a non-exhaustive list of factors that courts *can* consider in determining whether an expert's testimony is admissible. Each factor won't fit in each case. The consideration of obvious alternative explanations is more germane to testimony about matters of causation. See *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013) (ruling out expert testimony in a workplace injury case because plaintiff's expert didn't consider that there may have been alternative causes of the plaintiff's injury). But more importantly, the fact that Professor Kimmel considered such an alternative is plainly implicit in his opinion. His opinion does account for the possibility suggested by the government, it just rejects it. And the government can always attack that point on cross-examination.

Concerning its third argument, that Kimmel's expertise is different from what is relevant at trial—"whether the defendant was predisposed to buy machine guns to commit an attack." That actually isn't the question: all the recorded conversations that Kimmel has reviewed occurred *after* the informants approached Hamzeh. So, his testimony does not bear on predisposition. Rather, Kimmel's expertise is relevant to understanding Hamzah's vulnerability to the informants' inducement.

Federal Defender Services of Wisconsin, Inc.

### 3. Testimony of Dr. Robbins.

When it comes to Dr. Robbins, the government argues that he he "will testify regarding Hamzeh's intellectual capacity—that is, "about how people with an IQ at Hamzeh's level function, make decisions (generally), and how they are influenced by others. He will also testify about these limitations and how people generally mask or cloak their limitations Defendant appears to thus be offering a diminished capacity defense via this expert." And like it did with Professor Brauer, proclaims that "the Seventh Circuit has been crystal clear that Hamzeh may not raise a diminished capacity defense." R.276:17. That, however, is not the case. The defense is offering expert testimony that is germane to the jury understanding Hamzeh and why he was particularly vulnerable to the informants' inducement. That evidence is admissible and relevant information for the jury to consider in an entrapment defense.

### 4. The testimony of Dr. Sageman

In response to Dr. Sageman, the government argues "this testimony is completely irrelevant to this trial, and appears to be a jury nullification argument—an irrelevant attempt to convince the jury that it is was morally acceptable for the defendant to discuss and plan the murder of innocent Israeli civilians because of Operation Protective Edge." R.276:19. It continues: "this testimony is an attempt at jury nullification – an attempt to explain that the defendant's desire to murder innocent Jewish civilians is not morally wrong." *Id.*

Before sketching and then addressing the government's other arguments, it's worth pausing for a second. Hamzeh is not charged with anything connected with Israel.

Federal Defender Services
of Wisconsin, Inc.

The government's complaints about the relevance of Dr. Sageman's testimony actually mirror Hamzeh's objections to the government's use of the statements. That's why it's the defense's position that these statements about Israel should be excluded. But if they are admitted, it's imperative that the jury have a basic understanding of the context and background in which they were made. That's what Dr. Sageman's testimony will do.

The government's objections to Dr Sageman are curious for another reason. While the substance of his testimony may differ from Dr. Levitt's, it's being offered for the same reason. So any of the concerns with the Dr. Sageman are equally applicable to Dr. Levitt. Dr. Sageman's testimony will provide the jury the cultural context to evaluate and understand the statements. It would be no different from capturing the speech of many Americans towards the Middle East in the wake of 9/11 or many Americans' speech towards Japan in the wake of Pearl Harbor. Whether Hamzeh or others *should* talk that way is a different question than what the jury needs to evaluate—which is what would prompt such statements. Presenting such testimony is nothing close to jury nullification.

Aside from that argument, the government also posits that Dr. Sageman's "testimony is impermissible under Rule 704 to the extent Dr. Sageman will state the defendant's state of mind as a result of Operation Protective Edge, or testify that the defendant did not actually want to possess machine guns and murder people. Dr. Sageman's analysis of Hamzeh apparently is that he was merely joking or expressing anger at Jews because of Operation Protective Edge. This opinion is impermissible under Rule 704(b)."

Federal Defender Services
of Wisconsin, Inc.

The government cites no authority for its reading of Rule 704(b). Indeed, the Rule's very text provides that "an opinion is not objectionable just because it embraces an ultimate issue." Rule 704(a). And Rule 704(b) itself provides: "in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Rule 704(b). Sageman's testimony does not go to the ultimate issue—it doesn't even hint at what was running through Hamzeh's mind when he purchased the machine gun. Instead, his testimony will give needed context to the statements that the government seeks to introduce about Palestine and Israel. So rather than answering the ultimate issue, Dr. Sageman will explain why Hamzeh would engage in reprehensible hyperbole with no intention or ability to carry out any of his preposterous boasts—why he's a Palestinian Walter Mitty. Additionally, Sageman can testify about how the extreme emotions relating to the Palestinian conflict have made it so that there are countless Palestinians who speak in such extremes but take no action, which touches on the probabilistic inquiry that the jury must consider under *Hollingsworth,* 27 F.3d at 1203.

31

Federal Defender Services
of Wisconsin, Inc.

## IV.    The government's discovery motion

The defense has no obligation under Rule 16 to create reports of potential witnesses. And the defense will comply with all of the demands of *Jencks* and Rule 16. Whatever fear of the defense sandbagging the government should be cured by the compliance with this Court's pretrial order. Everything we plan to use has been turned over. Of course, in the next month, some things will be discovered and much will be subtracted. And as that happens, the defense will keep the government apprised of these changes. Thus, there is no basis for limiting the defense to what it has learned a week before trial and that motion should be denied.

Dated at Milwaukee, Wisconsin this 20th day of September 2019.

Respectfully submitted,

/s/      *Craig W. Albee*
Craig W. Albee, WI Bar No. 1015752
Joseph A. Bugni, WI Bar No. 1062514
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI  53202
Tel. (414) 221-9900
E-mail:  craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

32