UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                           Case No. 16-cr-21-pp

SAMY MOHAMMED HAMZEH,

        Defendant.

---

**ORDER GRANTING THE DEFENDANT'S FIRST MOTION *IN LIMINE*:
ENTRAPMENT (DKT. NO. 234).**

---

On January 25, 2016, the defendant was arrested after purchasing two machineguns from an undercover FBI agent. Dkt. No. 234 at 24. The arrest closed a four-month undercover investigation of the defendant for alleged potential terrorism crimes, including an alleged plot to attack a Masonic Temple. See generally Dkt. No. 255. The defendant was charged with two counts of possession of an unregistered machinegun and one count of an unregistered silencer. Dkt. No. 6; see also 26 U.S.C.A. §5861(d).

In its first motion *in limine*, the defendant seeks leave to present evidence at trial in support of an affirmative defense of entrapment. Dkt. No. 234. The government opposes the request. Dkt. No. 255. The court will grant the defendant's motion.

1

## I.    Factual Background

For reasons that will become clear during the analysis portion of this order, the court takes most of the facts from the defendant's forty-page motion *in limine*, which he describes as a factual proffer.

The defendant is a United States citizen, a Muslim and has no prior criminal history. Dkt. No. 234 at 27. He was born in America but lived in Jordan from infancy until the age of eighteen. Dkt. No. 47 at 7. At the time of the alleged offenses, he was twenty-four years old, lived "at home" (presumably with his parents) and worked at various restaurant jobs in Milwaukee. Dkt. No. 234 at 6. According to the defendant, in August of 2015, the defendant's best friend Steve called the FBI's main line. Id. The defendant claims that Steve was concerned about his immigration status. Id. According to the defendant, Steve continued calling the FBI over the next four weeks. Id.

The defendant asserts that in an FBI memo dated September 16, 2015, three agents describe the first in-person meeting Steve has with the FBI. Id. at 6–7. The defendant says that Steve claimed the defendant "was talking about traveling to Egypt for terrorist training, obtaining a commercial driver's license to conduct a terrorist attack in the name of ISIS, and getting a .45 caliber pistol." Id. at 7. The defendant asserts that a week later (September 24), Steve reported that the defendant had "changed his mind about doing stupid things," and that it was "a bunch of bullshit." Id.; see also Dkt. No. 270 at 6. According to the defendant, Steve thought that the defendant's biggest flaw was that he "lies all the time." Dkt. No. 234 at 7.

The defendant alleges that on September 24, 2015, the FBI directed a "confidential human source," or "CHS," who went by the name "Mike," to take a job at the same restaurant where Steve and the defendant worked; the defendant alleges that Mike spent the next few months with the defendant on almost a daily basis. Id. The defendant reports that on October 2, Mike showed the defendant and Steve a gun in his car. Id. at 8; Dkt. No. 270 at 6. The defendant later was recorded asking Mike about his "Kalashnikov." Dkt. No. 234 at 8. The defendant asserts that Steve, Mike and the defendant use the word "Kalashnikov" interchangeably with the word "machinegun." Id.

On November 2, Mike had his first recorded conversation with the defendant. Id. at 7; Dkt. No. 270 at 6. (Many other recorded conversations followed, and many are in Arabic. See Dkt. No. 234 at 20.) According to the defendant, during the November 2 conversation, the defendant told Mike that he wanted a "gun for training," id.; dkt. no. 234 at 8, and that he'd never been shooting before, dkt. no. 270 at 6. The government asserts that the defendant also said that he wanted to shoot "Jews" and steal their "Kalashnikovs." Dkt. No. 255 at 20, 28.

The defendant next points to a November 11 recorded conversation, in which he told Steve that he wanted a "pistol" because he was beginning a new job delivering on the north side and needed it for protection. Dkt. No. 234 at 8. The defendant says that he asked Mike to get him a pistol for the same reason. Id.; Dkt. No. 270 at 6.

3

On November 12, Mike asked the defendant why he (the defendant) wanted a pistol. Dkt. No. 234 at 8–9; Dkt. No. 270 at 6. The defendant told Mike that it was for work, and specifically for protection when he traveled to high-crime areas of Milwaukee. Id. The government asserts that the defendant also said he wanted to kill soldiers, take their machineguns and kill people in a "temple." Dkt. No. 255 at 9.

The defendant contends that in a recorded conversation from November 19, he again told Mike that he wanted a pistol for protection. Dkt. No. 234 at 9; Dkt. No. 270 at 6. He says that a couple of weeks later, on December 4, Mike reported back to his handlers that the defendant "wants to meet with CHS and possibly have the CHS accompany him to Gander Mountain to purchase a pistol." Dkt. No. 234 at 9; Dkt. No. 270 at 7.

The two traveled to Gander Mountain on December 7. Id. They discussed the impending election and its potential effect on the Muslim-American community. Id. The defendant states that Mike was recording the conversation, which included the following exchange:

> Mike: I do not know why you need a handgun
> Defendant: I have to have it, man
> Mike: Pardon me?
> Defendant: Because it is going to flare up.
> Mike: Handgun, do you mean a gun or what? Like what?
> Defendant: A handgun.
> Mike: Or machinegun?
> Defendant: Yeah.
> Mike: Pardon me? [Noise] [Background voices] Pardon me?
> Defendant: A handgun, man! What do I need a machinegun for?
> ...
> Mike: You got excited about the handgun, right?
> Defendant: Oh, yeah.
> Mike: Which one? Did you see the machine guns?

4

> Defendant: What?
> Mike: Did you see the machine guns?
> Defendant: A machine gun is too big for us right now, we do not want it.
> Mike: Yeah?
> Defendant: Where are you going to put the machine guns?
> Mike: Yeah [Pause] So we would know, man.
> Defendant: A handgun is enough.
> Mike: What?
> Defendant: A handgun is enough. I like this handgun with the wheel.

Dkt. No. 234 at 10–11.

The defendant also reports that Mike told the defendant that they could buy cheap "Kalishnikovs" from a man in Texas. Id. The defendant responded that he wants a pistol "for protection only." Id. The government asserts that the defendant also said in this conversation that it's acceptable to shoot people for "cussing the Messenger, or cussing God or the Qur'an." Dkt. No. 255 at 14.

According to the defendant, when Mike dropped the defendant off after their trip to Gander Mountain, he told the defendant that he'd be getting guns with no serial numbers. Dkt. No. 234 at 11. The defendant refused, telling Mike that "they will 'fuck you'" if Mike buys illegal guns. Id. The defendant also told Mike to "leave matters for now until it gets really serious." Id. at 12.

The defendant reports that a week later, on December 14, Mike took him to the shooting range. Id. at 12; Dkt. No. 270 at 7. In their recorded conversation, the defendant asks Mike why Mike didn't bring his "Kalashnikov" to the range. Dkt. No. 234 at 12. Mike says that his Kalashnikov is too strong to use there. Id. According to the defendant, Mike continued to "badger" the defendant about carrying out an "operation" and about why he wanted Mike to get him a handgun. Id. The defendant told Mike to "leave [him] alone" and says

5

that Mike asks him the same question "every day." <u>Id.</u> Mike responded that he asked because the defendant had a "different mentality every day." <u>Id.</u> The defendant reiterated that he wants a handgun "for the house . . . not for anything else." <u>Id.</u> at 13.

The defendant alleges that after this trip to the shooting range[1], Mike stopped recording conversations, but continued to meet the defendant daily. <u>Id.</u>; Dkt. No. 270 at 7. The defendant says that on January 4, 2016, Mike reported to the FBI that the defendant had asked Mike to obtain a weapon for the defendant and a co-worker because the co-worker had been carjacked. Dkt. No. 234 at 13. Mike also reported that the defendant told him he wanted a weapon because "the war will be soon . . . you'll see." <u>Id.</u> Mike reported that the defendant had made no further comments about "his plan to attack overseas or within the homeland." <u>Id.</u>

The defendant says that on January 8, 2016, Steve told the FBI that "[the defendant] no longer speaks about jihad with CHS, [the defendant] recently has told CHS that [the defendant] intended to travel to Jordan for a vacation." <u>Id.</u> at 14. He says that January 11, Mike reported to the FBI that the defendant had asked him to go to a gun store to look at guns; the defendant says that Mike told the FBI that "he believed this was because he had been talking to [the defendant] about the AK-47 he owned." <u>Id.</u> at 14. The defendant

---

[1] The defendant asserts that Mike took the defendant to the shooting range "[o]n several occasions." Dkt. No. 234 at 8.

6

asserts that Mike also told the agents that the defendant "hadn't recently spoken about traveling for Jihad." Id.

The defendant proffers that between January 1 and January 16, 2016, the FBI "conducted near-constant surveillance" on the defendant; the defendant says this surveillance "inexplicably" stopped on January 17 and 18, but resumed on January 19 "when Mike met with the FBI and claimed that on January 17 and 18 (the only days when [the defendant] was not being watched) the defendant was talking about an attack on the Masonic Center in Milwaukee." Id. at 15. The defendant says that on January 19, Mike reported to the agents that he, Steve, the defendant and another person had watched internet videos about the Masons and were planning an attack; Mike also reported that the defendant claimed to have saved $7,000 to fund a trip to Texas with Mike to buy "Ak-47s, silencers, and bullet-proof vests." Id.

According to the defendant, that same day—January 19, 2016—Mike resumed recording his conversations with the defendant. Id. at 15; Dkt. No. 270 at 7. The defendant says that "out of the blue, Mike, Steve and [the defendant] had discussed an attack on the Masonic Center;" the defendant asserts that this was a "sudden development." Id. The defendant indicates that the defendant told Steve and another man that Mike had come to the defendant about two weeks earlier and started talking about the Masonic Temple, and saying that Masons spread negative propaganda against Islam and the Prophet Muhammad. The defendant said that Mike told him that the Masons were ISIS, were anti-Islam and tarnished the Prophet's image. Id. at 16. The defendant claims that this

7

conversation spanned the evening of January 19 into the wee hours of January 20, and included the defendant's complaint to Steve that Mike "brainwashes you," and telling Steve that attacking the Masonic Center was Mike's idea. Id. at 16-17.

Another significant event occurred on January 19. According to the government, that day the three men toured the Masonic Center in Milwaukee and discussed their plan of attack. Dkt. No. 255 at 1, 10, 16–17. The defendant also states that on January 19, "the three men toured the Masonic Center and discussed plans to attack it." Dkt. No. 234 at 17. The defendant states that

> on that day . . . [the defendant] makes a number of statements about Mike obtaining machine guns and silencers from his associates; about entering the Masonic Center and shooting everyone there; about the attack becoming known all over the world; about the attacks defending Islam; and about how if he gets out after killing 30 people, he will be happy because everyone will know that nobody can play with Muslims. It's also on January 19 that [the defendant] states that the Masons are "playing with the world like a game, and that these are the ones who are against us, these are the ones who making living for us like hell.

Id. The defendant asserts that "something happened in early- to mid-January that caused [the defendant] (who had never before discussed the Masons with the informants) to believe [the Masons] were affiliated with ISIS and were a danger to Muslims." Id. From the defendant's perspective, "[t]he weight of the contemporaneous evidence indicates that what happened is that Mike did, in fact, 'brainwash' [the defendant] about the Masons," and he asserts that "Mike . . . had to have proposed the plan," pointing to testimony from one of the agents that Mike came up with the plan to have people come up from Texas and bring machine guns "on his own." Id.at 17-18. The government argues that

8

the defendant came up with the plan to attack the Center, and points to recorded comments by the defendant that day explaining how he would carry it out. Dkt. No. 255 at 7-11. The government also asserts that the defendant repeatedly asked for Mike to contact his man in Texas (the man Mike mentioned in December) so that they could buy weapons. Id.

The defendant proffers that on January 21, 2016—two days after the tour of the Masonic Center—the defendant "alluded to a YouTube video that showed the Masons eating hearts and said that the Masons created ISIS to destroy Islam and kill Muslims." Dkt. No. 234 at 16. He indicates that that night,

> There also were discussions about a video linking the Masons with ISIS fighters. [The defendant] stated his belief that the Masons created ISIS to kill Muslims around the world.

Id. at 16.

According to the defendant, there were other "troubling" conversations between him, Steve and Mike "filled with gory detail about finding a Masonic temple to attack, and the three boasted of making a plan for the following week." Id. at 18. He asserts, however, that the plan kept shifting, and that he came up with different ruses "to back out." Id. He says that as the details of the plan changed—from, for example, a plan to attack a temple in Milwaukee to one in "downtown Texas" to one in Indiana—he "made up stories that would further postpone the plan." Id. Finally, the defendant says, he sought spiritual advice from a local Imam, against the instructions of Steve and Mike not to talk to anyone. Id. He says that "[o]n Sunday, January 24th, after seeing the Imam,

[the defendant] went to Steve's hotel room and forcefully announced that he wasn't going through with the plan," telling Steve and Mike that the Imam had advised him that the plan would "hurt all Muslims, and it was forbidden." Id. The defendant says that when Steve pushed back, he (the defendant) continued to argue that the plan was forbidden. Id. at 19.

Nonetheless, the defendant says that he indicated that "They would get the weapons the next day." Id. at 20. He says that he did not use the Arabic word for machinegun, but the generic word for weapon. Id. He says that he agreed to get the weapons because "Mike's friend"—presumably the person from Texas—who was providing the guns, might be reluctant to trust them in the future if they backed out." Id. The defendant says that when Steve reiterated that he was ready to go forward with the plans, the defendant said no, based on the Iman's logic. Id. The defendant says that while he agreed to get the weapons, and even agreed to practice shooting, he rebuffed Steve every time Steve brought up "the plan." Id. at 20-21. And he says that he stated that the men didn't need a silencer for the guns (in the context of discussing target shooting). Id. The government asserts that the defendant also told Mike, "[y]ou are getting an unlicensed weapon. This is what we are getting." Dkt. No. 255 at 29.

The defendant says that the three men decided to go play pool, agreeing to pick up the guns the following morning and then to see the Imam in the afternoon. Dkt. No. 234 at 21. The defendant says that on the way to the pool hall, Steve again insisted that he was ready to through with the plan, but the

10

defendant told him to see the Imam. Id. After playing pool, the men talked about places that they could practice shooting. The defendant says that Steve "took another run at getting [the defendant] to agree to an attack despite [the defendant's] repeated statements that he was not interested," and that the defendant continued to suggest consulting Imams (including his uncle). Id. at 21-23. The defendant describes extensive discussions among the men, which he says culminated in him saying, as he got out of the car to go home, "let me out of it, and I'm telling you this thing is not permissible, it is not permissible." Id. at 23.

The defendant indicates that the next morning, January 25, 2016, Steve and Mike texted him, and the three met at Steve's hotel room "to hang out while waiting for the call from Mike's gun contact." Id. The defendant says that as they were getting ready to leave, he asked "if he would be able to license the weapon he was going to buy," but that Mike responded that he couldn't. Id. The defendant asserts that "he had $200 but needed to borrow the rest from Steve, so he'd have $300 that the weapons were supposed to cost;" he asserts that this fact "exposed his earlier posturing that he had $7,000 or more to travel to the Middle East as mere bluster." Id.

The defendant asserts that when he met with Mike's source—in actuality, undercover FBI agents—and saw the guns, he asked whether "they had any smaller guns." Id. The agents said that they didn't. The defendant says he "inspected the weapons," one of which had a silencer on it, and asked Mike if it was "the same one you had, that's what you told us about." Id. Mike responded

that it was like the one he had, but black. Id. The defendant says that when he observed that the gun he was looking at was "big," Mike responded that it was the same size. Id. at 23-24. The defendant says that the undercover agent then said that the silencer did not come off, and that the agents wanted $1,000 for both guns. Id. at 24. He says that because that amount was more than either he or Steve had, the agents reduced the price, first to $600 and then to $570 total, $300 "for Steve's weapon and $270 for [the defendant's.]" Id. The defendant asserts that one of the guns, a Heckler & Koch, MP5SD, 9x19mm, "is valued at roughly $15,000 - $20,000," while the other, a Heckler & Koch, MP5/10, 10mm "is valued at approximately $3,000 - $4,000." Id.

The defendant says that the money changed hands, and then that he tried to go to the car to get a bag for the weapons, but that the agents told him to just put them in a green bag that they'd brought. Id. The defendant did that, and says that "Steve then had [the defendant] carry the bag (which included the gun that [the defendant] bought and the one that Steve bought) to the car." Id. He says that after the guns "were in the trunk," the three men got into the car, and that the defendant "became upset with Mike." Id. He asserts that the guns that they bought "were not the same as the gun that Mike owned and that he'd been told they were buying." Id. He says that he expressed "dismay at buying firearms that were different from the ones they came for." Id. The defendant says that as Mike was telling him to calm down, agents surrounded the car and arrested the defendant. Id. at 25. He asserts that "no one can purchase these weapons without first paying a $200 tax, and according to one

12

long-time law enforcement officer in Milwaukee, [the officer] had never seen fully automatic firearms for sale on the street." Id.

The government asserts that after the defendant was arrested, he made a statement. Dkt. No. 255 at 3. The government says that when the interviewing agent asked the defendant why he needed to buy an automatic weapon, the defendant responded that he liked weapons, that "[w]e tried guns and like guns, that's why we think about automatic weapons. Just to practice and have fun, that's it." Id. The government says that in this same interview, the defendant says that he was the person who told Mike and Steve about "it;" the government says that "it" was the plan to attack the Masonic Center. Id. at 7.

## II.    Law Governing the Entrapment Defense

"Law enforcement officials go too far when they 'implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute.'" Jacobson v. United States, 503 U.S. 540, 553 (1992) (quoting Sorrells v. United States, 287 US. 435, 442 (1932) (emphasis in Jacobson)). "When the government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." Id. at 553-54. A defendant is entitled to present the affirmative defense of entrapment "whenever there is sufficient evidence from which a reasonable jury could find entrapment." Mathews v. United States, 485 U.S. 58, 62 (1988). One of the "most important function[s]" of the defense is to "ensure that people who are not predisposed to commit a crime are not

transformed into criminals by the government." United States v. Pillado, 656 F.3d 754, 765 (7th Cir. 2011) (citing Sorrells, 287 U.S. at 442 and Sherman v. United States, 356 U.S. 369, 372 (1958)).

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Mathews, 485 U.S. at 63 (citing Sherman, 356 U.S. at 376-78; United States v. Russell, 411 U.S. 423, 435-36 (1973); Hampton v. United States, 425 U.S. 484, 489 (1976)). "[I]nducement means government solicitation of the crime plus some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." United States v. Mayfield, 771 F.3d 417, 434–35 (7th Cir. 2014). The defendant must show more than that he was offered an "ordinary opportunity to commit the charged crime." Id. at 433. He must point to "plus factors"—some "conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts." United States v. Barta, 776 F.3d 931, 937 (7th Cir. 2015); Mayfield, 771 F.3d at 434–35. Such conduct includes but is not limited to:

- Repeated attempts at persuasion;
- Fraudulent representations;
- Threats;
- Coercive tactics;
- Harassment;
- Promises of reward beyond that inherent in the customary execution of the crime;
- Pleas based on need, sympathy, or friendship.

14

<u>Mayfield</u>, 771 F.3d at 435.

"Predisposition, 'the principal element in the defense of entrapment,' . . .
focuses on whether the defendant was an 'unwary innocent' or, instead, an
'unwary criminal' who readily availed himself of the opportunity to perpetrate
the crime." <u>Mathews</u>, 485 U.S. at 63 (quoting <u>Russell</u>, 411 U.S. at 433, 436,
and <u>Sherman</u>, 356 U.S. at 372).

The Seventh Circuit has held that "[g]enerally speaking, entrapment is a
question for the jury, not the court." <u>Mayfield</u>, 771 F.3d at 439.[2] "[T]o obtain a
jury instruction and shift the burden of disproving entrapment to the
government, the defendant must proffer evidence on both elements of the
defense." <u>Mayfield</u>, 771 F.3d at 440. The burden of production is "not great;"
the defendant need proffer only "some evidence" in the record "that would allow
a rational jury to conclude he was entrapped." <u>Id.</u> (quoting <u>Pillado</u>, 656 F.3d at
764 and <u>United States v. McGill</u>, 754 F.3d 452, 457 (7th Cir. 2014)). "Put
another way, '[a]lthough more than a scintilla of evidence of entrapment is
needed before instruction in the defense becomes necessary, the defendant
need only point to evidence in the record that would allow a rational jury to

---

[2] The Seventh Circuit decided <u>Mayfield</u> in 2014, and it remains the
comprehensive, definitive discussion of the entrapment defense in this circuit.
For reasons that aren't clear to the court, the government relies on pre-
<u>Mayfield</u> cases—some decided fifteen to twenty years *before* <u>Mayfield</u> clarified
the entrapment standard—and at least one case from another circuit in making
its arguments. <u>See</u> Dkt. No. 355 at 4–5. The government acknowledges
<u>Mayfield</u>, but seems to relegate it to secondary status. The court has, as it
believes it must, used <u>Mayfield</u> as primary authority for deciding this motion.

conclude that he was entrapped.'" Mayfield, 771 F.3d at 440 (quoting McGill, 754 F.3d at 457).

The Mayfield court noted that "entrapment is now regularly litigated . . . before trial," on a motion *in limine*. Id. It observed that litigating the question before trial, however, is risky, presenting the trial court with the temptation "to balance the defendant's evidence against the government's, invading the province of the jury." Mayfield, 771 F.3d at 440 (citing United States v. Plowman, 700 F.3d 1052, 1057 (7th Cir. 2012)); United States v. Santiago-Godinez, 12 F.3d 722, 727-28 (7th Cir. 1993). The Seventh Circuit made plain that "[i]n ruling on a pretrial motion to preclude the entrapment defense, the court must accept the defendant's proffered evidence as true and not weigh the government's evidence against it." Mayfield, 771 F.3d at 440 (citing Plowman, 700 F.3d at 1057); United States v. Blassingame, 197 F.3d 271, 279 (7th Cir. 1999). The court also observed that "[p]redisposition rarely will be susceptible to resolution as a matter of law," because it "refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." Mayfield, 771 F.3d at 441. The court characterized this "probabilistic question" as "quintessentially factual," opining that "it's hard to imagine how a particular person could be deemed 'likely' to do something as a matter of law." Id. In contrast, the court found that the question of inducement "may be more appropriate for pretrial resolution; if the evidence shows that the government

did nothing more than solicit the crime on standard terms, then the entrapment defense will be unavailable as a matter of law." Id.

### III.  Analysis

This court is mindful of the Mayfield court's warning of the risk of deciding, pretrial, whether to preclude the entrapment defense. Because this case has been pending for over three years, because the relationship between the defendant and the informants spanned some four months, because there are numerous recorded conversations that will be presented at trial, and because the court has set aside a limited amount of time for the trial, the court has chosen to take that risk and decide the motion before trial, making every effort to consider only whether the defendant has presented information sufficient to warrant the defense, and to avoid weighing the defendant's proffered evidence against any put forth by the government.

### A.    Inducement

In Mayfield, the Seventh Circuit clarified what a defendant must show to demonstrate support for the inducement element:

> Inducement requires more than government solicitation of the crime; the fact that the government's agents initiated contact with the defendant and offered an ordinary opportunity to commit the charged crime is insufficient to raise an entrapment defense. "[T]he term 'ordinary' in this context . . . mean[s] something close to what unfolds when a sting operation mirrors the customary execution of the crime charged." [United States v. Pillado, 656 F.3d] at 765. Something more is required, either in terms of the character and degree of the government's persistence or persuasion, or the nature of the enticement or reward.

Mayfield, 771 F.3d at 433.

17

In providing this clarification, the Seventh Circuit rejected the Second Circuit's approach of "fold[ing]" "the principle . . . that the government's offer of a run-of-the-mill opportunity to commit the charged crime isn't entrapment" into the analysis of the predisposition element. Id. at 431. The Second Circuit had held that the element of inducement "goes simply to the [g]overnment's initiation of the crime and not to the degree of pressure exerted." Id. (quoting United States v. Riley, 363 F.2d 955, 958 (2d Cir. 1966)). The *Seventh* Circuit concluded that this conflating of inducement and predisposition would "encompass[] almost *any* government solicitation of the crime, which in turn [would] establish[] a very light trigger for the defense and require[] an inquiry into predisposition even in cases in which the government's agents simply furnished the ordinary opportunity to commit the crime without additional efforts at persuasion." Mayfield, 771 F.3d at 431 (citing Riley, 363 F.2d at 958–59). While agreeing that "[w]here the government's agents merely initiate contact with the defendant, solicit the crime, or furnish an opportunity to commit it on customary terms, the government has not 'induced' the crime within the meaning of the entrapment doctrine and the defense should be unavailable without the need for a more complex inquiry into evidence of predisposition," Mayfield, 771 F.3d at 432, the Seventh Circuit enunciated a definition of conduct that would qualify as inducement: "government solicitation of the crime *plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." Id. at 434–35.

18

The "other conduct" may be repeated attempts at persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward beyond that inherent in the customary execution of the crime, please based on need, sympathy, or friendship, or any other conduct by government agents that creates a risk that a person who otherwise would not commit the crime if left alone will do so in response to the government's efforts.

Id. at 435.

The indictment charges the defendant with two counts of possessing an unregistered machinegun, in violation of 26 U.S.C. §5861(d) and one count of possessing an unregistered silencer in violation of the same statute. Dkt. No. 6. To be entitled to present the entrapment defense, the defendant needs to have proffered evidence that not only did the government (or, in this case, its agent Mike) solicit those offenses, but that it engaged in some other conduct that created a risk that the defendant would commit those offenses in response to the government's efforts.

The defendant began by referencing government evidence indicating that as early as September 2015, the defendant talked to Steve about committing terrorist acts and obtaining a pistol. The defendant does not argue that this constituted solicitation. The defendant argues that the solicitation began with Mike. He has proffered evidence that on October 2, 2015, Mike showed Steve and the defendant a gun that Mike owned. While the defendant doesn't assert that this was solicitation, *per se*, he argues that it was the beginning of an acclimation process—Mike working the defendant into a certain mindset. The defendant indicates that the government has evidence that on November 2, 2015—the first time Mike recorded a conversation he had with the defendant—

19

the defendant indicated that he wanted "a gun" for training. Again, this does not appear to have been solicitation—it appears that the defendant brought up the idea of obtaining a gun. Significantly, it does not appear from the government's proffer that the defendant mentioned a *machinegun*, or a *silencer*. The defendant had no criminal history; it would not have been illegal for him to buy or own a gun, if it was the type of gun that was not subject to registration requirements.

The defendant's proffered evidence indicates that between November 2 and December 7, 2015, the defendant talked with Steve and/or Mike a few times about wanting a pistol, and that in several of those conversations, he said that he wanted the pistol for self-protection. These conversations culminated in the trip to the Gander Mountain sporting goods store on December 7, 2015. The defendant proffers that it was during this trip that the subject of buying a machinegun first came up, and that it was Mike who brought it up.

He cites to a portion of the taped conversation from that day, in which Mike appears to be grilling the defendant on why he wants a handgun. The defendant mentions that "it" is going to "flare up," and reiterates that he wants a handgun. Mike then says, "[o]r machinegun?" The defendant responds, "Yeah." But when Mike says, "Pardon me?," the defendant replies, "A handgun, man! What do I need a machinegun for?" Dkt. No. 234 at 10-11. The conversation appears to have continued, with Mike asking the defendant if he'd seen the machineguns (presumably at Gander Mountain), and the defendant

response that machineguns are "too big for us right now, we do not want it." Id. The defendant continues by asking where they would put machineguns, and concludes by saying that a handgun "is enough." Id. Finally, the defendant says that when Mike dropped the defendant off after this trip, he told the defendant that he'd be getting guns with no serial numbers. Id. at 11.

Arguably, Mike's statements about machineguns constituted a solicitation. The defendant says that he went to Gander Mountain with Mike to look for the handgun he wanted for protection, and that *Mike* began to suggest a machinegun instead, or a gun without serial numbers. In its response to the defendant's motion, the government identified other portions of the conversation which it says support the conclusion that the defendant was predisposed to commit a violent crime. But the Seventh Circuit was clear that this court should not weigh that evidence against the defendant's proffer; that is the jury's job. Even so, this one conversation, standing alone, appears to be the kind of run-of-the-mill offer of an opportunity to commit a crime that the Seventh Circuit has said does *not* constitute inducement.

A week later, Mike took the defendant to a shooting range. The defendant proffers that he'd told Mike earlier that he'd never been shooting before. The defendant says that during this trip, Mike "badgered" the defendant about carrying out an "operation" and demanded to know why the defendant wanted a handgun.

After the shooting range trip, Mike stopped recording his conversations with the defendant, but the defendant proffers that they continued to have

21

daily contact. The defendant proffers that just under a month later, on January 4, 2016, Mike reported to his FBI contacts that the defendant had asked Mike to help him obtain a "weapon" for himself and a co-worker, because the co-worker had been carjacked, and because "the war will be soon . . . you'll see." Dkt. No. 234 at 13.

The defendant proffers that it was not until January 19, 2016—the day Steve, Mike and the defendant toured the Masonic Center—that Mike reported the defendant had talked to him in the two days prior about having saved $7,000 for a trip to Texas with Mike to buy "AK-47s, silencers, and bullet-proof vests." Dkt. No. 234 at 15. Assuming this conversation took place—the defendant points out that the alleged conversation was not recorded—the defendant argues that the reference to AK-47s is significant. He proffers that after Mike first showed the defendant a gun back in early October 2015, the defendant had asked Mike about his "Kalashnikov." Id. at 8. Some of the other conversations between the men involved mentions of Kalashnikovs, the Soviet assault rifles also known as AK-47s; the defendant says that during the Gander Mountain trip, Mike told the defendant that they could buy cheap "Kalashnikovs" from a man in Texas, dkt. no. 234 at 11, and that during the December 14, 2015 trip to the shooting range, the defendant asked Mike why Mike hadn't brought his "Kalashnikov," Id. at 12. The defendant points to these

references as evidence of Mike's campaign to acclimate the defendant to the idea of buying, or possessing, machineguns.[3]

The defendant points to this pattern of acclimation, as well as the fact that Steve and Mike continued to interact with him over the next few days and to discuss the notion that the Masons were in league with ISIS, until they met with the agents to purchase the guns. The defendant also points to the facts that he continually rejected the idea of using the guns to carry out the plan to attack the Masons, that Steve lent him some of the money he thought he needed to buy the gun, and that the agents reduced the price of the guns on the spot when he and Steve did not have the amount the agents were asking for. Finally, he points to the fact that the agents sold him the gun at a drastically reduced price. All these facts, the defendant argues, constituted "other conduct," the something more than routine solicitation that the <u>Mayfield</u> court said was necessary to justify an entrapment defense.

Considering the facts as proffered by the defendant, without weighing those facts against the government's, the court agrees that the defendant has submitted evidence upon which a reasonable jury could rely to conclude that the government induced the defendant to buy the machine guns on January

---

[3]The parties appear to agree that Steve, Mike and the defendant used the word "Kalashnikov" interchangeably with the word "machinegun." According to Encyclopedia Britannica, Mikhail Kalashnikov designed a fully-automatic version of his Kalashnikov rifle in 1947 (thus the name "AK-47," for "**a**utomatic **K**alashnikov" designed in 19**47**). https://www.britannica.com/technology/AK-47. Today, Kalashnikov USA™ manufactures semi-automatic Kalashnikovs, such as the KR-9 9mm SBR. https://www.kalashnikov-usa.com/product/kr-9-sbr/.

23

25, 2016. A jury could conclude that on November 2, 2015, Mike planted the idea of purchasing a machinegun in the defendant's mind. A jury could conclude that it was Mike who brought up the idea of Kalashnikovs, Mike who came up with the idea of purchasing them cheaply through a seller in Texas, and Mike who brought up the idea of buying guns without serial numbers. A jury could conclude that Mike was persistent enough, raising the issue of a machinegun (as opposed to the pistol the defendant had stated several times that he wanted) that the defendant expressed frustration with repeated attempts.

On a broader scale, a jury could conclude that it was Mike or Steve or both who came up with the idea of an attack on the Masons, and the suggestion that the Masons were in league with ISIS and posed a threat to Muslims. The defendant proffers that none of the men had talked about this notion in any of the recorded conversations from November and December 2015; the first time the idea surfaced was when Mike reported to the agents in mid-January that the three had been watching YouTube videos and talking about it. There is a month-long gap between the trip to the shooting range and January 19, 2016, during which Mike did not record his conversations with the defendant, and when he resumes recording, the idea of the attack on the Masons seems to appear, as the defendant put it, "out of the blue." Even if a jury believed that in the fall of 2015 the defendant had talked about Jihad and going to the Middle East to commit attacks, it could conclude that it was Mike and Steve who brought up the idea of a domestic attack on the Masons, and

24

who pushed it even when the defendant expressed a desire to back out after speaking with the Imam.

A reasonable jury might also conclude that Mike used his friendship with the defendant to induce him to do something he otherwise would not have done. The defendant proffered evidence that Mike wove himself completely into the defendant's life through work, trips to gun stores, outings at the shooting range and social outings. The evidence indicates that the two saw each other constantly for some four months. Although the defendant has not proffered evidence that Mike appealed to their common struggle as Muslims to convince the defendant to purchase unregistered machineguns, see Mayfield, 771 F.3d at 441 (confidential informant appealed to defendant through their "common struggle as convicted felons trying to make a living"), a jury might conclude that Mike, through his friendship with the defendant, put all the constituent pieces in the defendant's head: the idea of a Kalashnikov or a machinegun instead of a pistol, the ability to buy cheap machineguns, possibly without serial numbers, from a guy in Texas, the killing-power advantage of a machinegun over a pistol, possibly the theory that the Masons somehow created or were in league with ISIS.

A jury could go a step farther and conclude that Mike both introduced the defendant to guns and blurred the lines between legal and illegal weapons. The defendant asserts that he had no history with guns before meeting Mike, and that the recorded conversations show that he did not have a gun and had not been to a shooting range. After he met Mike, however, the defendant

appears to have seen a gun (when Mike, the defendant and Steve saw a gun in Mike's car). Mike appears to have led the defendant to believe that he had a Kalashnikov. The defendant took trips to the shooting range with Mike, possibly learning to fire a gun or firing one for the first time. Mike took the defendant to Gander Mountain. Mike referred to some of the guns at Gander Mountain as "machineguns." And Mike was the person with the connection for buying illegal guns.

A reasonable jury also could conclude that the undercover FBI agents who appeared on January 25, 2016 induced the defendant to purchase the guns, by first offering them at what the defendant asserts was a steeply discounted price, and then dropping the price twice to accommodate the sale.

The parties' briefs show that the defendant and the government frequently view the same events, even the same words, through very different lenses. They have conflicting characterizations for what the defendant and the informants intended or meant at given times. And the government asserts that it has evidence to counter, and discredit, the evidence the defendant has proffered. That may well be, and the court expects that the government will present that evidence at trial. But this court must hew to the clear instructions of the Seventh Circuit and avoid the temptation to usurp the jury's job by weighing the conflicting evidence. The court finds that the defendant has proffered evidence of more than mere solicitation, and that it is sufficient evidence to meet the inducement prong of the entrapment defense.

B.    Predisposition

The Mayfield court explained that a person is "predisposed to commit the charged crime" if he is "presently ready and willing to commit the crime," and "likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." Mayfield, 771 F.3d at 438. A defendant's "inclinations" and "fantasies" do not constitute predisposition; they are "his own and beyond the reach of government . . . ." Jacobson, 503 U.S. at 551–52 (quoting Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67 (1973)). As noted above, Mayfield characterized predisposition as "chiefly probabilistic, not psychological." Mayfield, 771 F.3d at 428. The defendant "must be so situated by reason of previous training or experience or occupation or acquaintances that it is *likely* that if the government had not induced him to commit the crime some criminal would have done so." Id. at 436 (quoting United States v. Hollingsworth, 27 F.3d 1196, 1206 (7th Cir. 1994) (emphasis in the original)).

Predisposition is measured "at the time the government first proposed the crime," not before. Mayfield, 771 F.3d at 438. This does not mean that the defendant's conduct after meeting government agents is irrelevant to the analysis. Id. at 437. Rather, the government's inducement is "significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question." Id. (quoting Hollingsworth, 27 F.3d at 1200).

27

The Seventh Circuit has established a "non-exclusive list of five factors to determine whether the defendant was predisposed to commit the charged crime." Mayfield, 771 F.3d at 435. These factors are:

1. The defendant's character or reputation;
2. Whether the government initially suggested the criminal activity;
3. Whether the defendant engaged in the criminal activity for profit;
4. Whether the defendant evidenced a reluctance to commit the offense that was overcome by government persuasion; and
5. The nature of the inducement or persuasion by the government.

Id. (citations omitted). "No one factor controls, and the 'most significant is whether the defendant was reluctant to commit the offense.'" Id. (quoting Pillado, 656 F.3d at 766).

The parties disagree on whether the law requires the government to show that the defendant was predisposed to commit *a* crime, or whether it must show that he was predisposed to commit the specific crime charged. Dkt. No. 255 at 25. The government argues that "[t]he defendant's predisposition need not be to commit precisely the same crime as that charged," and that "it need only be to commit the same or a similar crime." Id. In support of this argument, the government cites several cases, only two of which were decided by the Seventh Circuit: United States v. Lewis, 641 F.3d 773,783 (7th Cir. 2011) and United States v. Moschiano, 695 F.2d 236, 244 (7th Cir. 1992). The defendant correctly points out, however, that neither of these cases stand for the proposition the government asserts.

The defendant in Lewis presented the affirmative defense of entrapment at his trial on charges of drug conspiracy and using and carrying a gun in relation to a drug offense. Lewis, 641 F.3d at 779. "To rebut Lewis' entrapment

28

defense, the government was allowed to introduce evidence of two prior convictions during its case-in-chief, specifically a 1995 conviction for possession of a firearm by a felon, and a 2000 conviction for theft (pled down from residential burglary)." Id. On appeal, the defendant argued that the district court abused its discretion by allowing the government to present the two prior convictions. Id. at 783. Judge Evans, writing for the court, noted that normally, evidence of a defendant's prior bad acts was not admissible to show his character under Fed. R. Evid. 404(b). Id. He explained, however, that "when a defendant employs an entrapment defense, evidence of prior bad acts is admissible to prove predisposition 'because in such a case the defendant's predisposition to commit the charged crime is legitimately at issue.'" Id. (quoting United States v. Swiatek, 819 F.2d 721, 728 (7th Cir. 1987)).

But the court went on to explain that "[t]o be admissible, however, this evidence [of prior bad acts] must show an act that is similar enough and close enough in time to be relevant to the matter at issue, and its probative value must not be substantially outweighed by the danger of unfair prejudice." Lewis, 641 F.3d at 783. The Seventh Circuit reviewed the information that the trial court had allowed the government to present—the "titles, dates, and dispositions of Lewis' 1995 and 2000 convictions"—and decided that the trial court did not abuse her discretion in allowing that evidence to show "a pattern of behavior of someone who has an intent, first, to use a firearm unlawfully, and, secondly, to enter into a residence and commit theft." Id.

29

The court imagines that, at trial, the government will seek to introduce evidence to rebut the entrapment defense, and that some of that evidence might otherwise be prohibited under Rule 404(b). If so, the court will consider the parties' arguments in that context. But the court cannot conclude that the Lewis court's holding amounts to a holding that all the government needs to do is show that the defendant was predisposed to commit a crime like the one with which he is charged in order to prove predisposition.

Nor does Moschiano support the government's position. Moschiano was charged with conspiracy to distribute and distribution of heroin. Moschiano, 695 F.2d at 238. At trial, he asserted an entrapment defense, admitting that he delivered heroin to an undercover agent but arguing that it was all the informant's idea. Id. at 239. In rebuttal, "the government introduced in its case-in-chief evidence of Moschiano's participation in other narcotics transactions occurring prior to his arrest . . . ." Id. On appeal, the defendant conceded that it was not error for the court to allow the government to present evidence of his *prior* drug dealing to rebut his entrapment defense, but argued that evidence of *subsequent* bad acts was irrelevant. Id. at 243-44. The Seventh Circuit concluded that "subsequent similar acts may, under proper circumstances, be admissible to prove the defendant's predisposition to commit the crime charged," though it noted that subsequent acts were "less probative on this issue than prior similar acts." Id. at 244 (citations omitted). The court stated that "the admissibility of any particular subsequent act will depend on a number of factors, especially the balancing of probity and prejudice mandated

30

by Rule 403," and clarified that it held "only that such evidence is not *always* inadmissible." Id.

Again, the government will have the ability at trial to present evidence to rebut the defendant's entrapment defense, and the court will rule on any disputes as to the admissibility of any such evidence at that time. But Moschino does not stand for the proposition that if the defendant was predisposed to commit a similar crime, the court must preclude him from presenting an entrapment defense.

The government's argument also does not square with the Seventh Circuit's language in Mayfield. The Mayfield court stated that "[e]ntrapment is a defense to criminal liability when the defendant was not predisposed to commit the *charged crime* before the intervention of the government's agents . . . ." Mayfield, 771 F.3d at 420 (emphasis added). It stated that "our circuit has long used a nonexclusive list of five factors to determine whether the defendant was predisposed to commit the *charged crime*." Id. at 435 (emphasis added). It said that "[w]e know from Sherman and Jacobson that predisposition requires more than a mere desire, urge, or inclination to engage in the *charged criminal misconduct*." Id. (emphasis added). Pages later, it asked whether "*any* history of criminal misconduct [is] sufficient to make the defendant 'predisposed,' or must the defendant's prior crimes be similar to the *charged offense*?" Id. at 437 (emphasis on "any" in the original; emphasis on "charged offense" added). And most telling, in answering the previous question, the Mayfield court noted that the Supreme Court "has said that 'the principal element in the defense of

31

entrapment [i]s the defendant's predisposition to commit *the* crime'—not just *any* crime." Id. at 438 (emphasis in original) (quoting United States v. Russell, 411 U.S. at 433).

The court also disagrees with the government that "[t]he nearest case to this one in the federal case law is United States v. Cromitie, 727 F.3d 194 (2d Cir. 2013)." Dkt. No. 255 at 31. First, Cromitie is a Second Circuit decision that pre-dates Mayfield. As the court already has discussed, the Mayfield court explicitly rejected the Second Circuit's approach of conflating the inducement and predisposition prongs of the entrapment defense. The government *may* acknowledge this in footnote 6 of its brief, but the court isn't sure; the government says that the Second Circuit "did not adopt the Seventh Circuit's 'positional predisposition' requirement," but argues that the rest of the Cromitie decision applies. Id. at 34, n.6. This is a bit of an odd argument— given that the Seventh Circuit decided Mayfield after its sister circuit decided Cromitie, it seems more relevant that the Seventh Circuit *rejected* the Cromitie reasoning than that the Second Circuit did not adopt the Seventh Circuit's reasoning.

Second, although the Second Circuit rejected Cromitie's claim that the evidence established entrapment as a matter of law, it did so after a full-fledged trial. Cromitie, 727 F.3d at 204. "The defendants presented their defense of entrapment to the jury through cross-examination and summations," and the Second Circuit noted that "[b]y its verdicts of guilty, the jury rejected the defense." Id. at 209–10. The court stated, "[o]n appeal, the defendants contend

32

that entrapment was established as a matter of law, a claim we understand to mean that on the facts of this case, no reasonable jury could find predisposition beyond a reasonable doubt." Id. at 210. As to Cromitie, the court concluded that although there was inducement, id., the evidence in the record was sufficient to allow the jury to conclude that he had a predisposition to commit the terrorist act with which he was charged, id. at 210–15.

The procedural posture of the two cases makes a difference. The trial court allowed Cromitie to present an entrapment defense. The defense did not prevail with the jury, but the trial court allowed him to present it. The defendant here asks this court to allow him to present such a defense, and at this stage, the court need only determine whether the defendant has submitted sufficient evidence to be granted that request. The government insists that its version of the evidence proves "as a matter of law" that the defendant "was predisposed to buy the automatic weapons and silencer he bought." Dkt. No. 255 at 31. This argument flies in the face of the Mayfield court's observation that "[p]redisposition rarely will be susceptible to resolution as a matter of law," because it "refers to the likelihood that the defendant would have committed the crime without the government's intervention, or actively wanted to but hadn't yet found the means." Mayfield, 771 F.3d at 441. The Mayfield court made that observation in the context of discussion *pretrial* resolution of entrapment motions, observing that it found it hard to imagine "how a particular person could be deemed 'likely' to do something as a matter of law."

33

Id. That is why the Mayfield court concluded that predisposition was a "quintessentially factual" inquiry, appropriately left to a jury. Id.

Third, Cromitie was, to paint with a broad brush, a terrorism case. The defendants were "convicted of planning and attempting to carry out domestic terrorism offenses involving a plot to launch missiles at an Air National Guard base . . . and bomb two synagogues . . . ." Cromitie, 727 F.3d at 199. That matters, given how the Second Circuit reached its decision on what was necessary to prove predisposition. The Cromitie court referenced its 1933 decision in United States v. Becker, 62 F.2d 1007, 1008 (2d Cir. 1933), in which Judge Learned Hand "postulated three circumstances, any one of which would become the accepted means in this Circuit of establishing a defendant's predisposition: 'an existing course of similar criminal conduct; the accused's already formed *design* to commit the crime or similar crimes; his willingness to do so, as evinced by ready complaisance.'" Id. at 205 (quoting Becker, 62 F.2d at 1008) (emphasis in the original). The court then stated, "as far as we have been able to determine, no decision of our Court has encountered a jury's rejection of an entrapment defense where the prosecution's claim of predisposition rests solely on the defendant's already formed 'design,' *i.e.*, without prior criminal conduct or prompt agreement to commit the offense, we consider the meaning of 'design' in some detail." Cromitie, 727 F.3d at 206.

After recounting other Second Circuit cases that had considered this "already-formed design" evidence of predisposition, the Cromitie court said,

> When used as one of the three means of showing predisposition, we
> think "design" must take its meaning from the context of the type of

34

criminal activity comprising the specific offenses a defendant has committed. With respect to a category as varied as terrorist activity, the requisite design in the mind of a defendant may be broader than the design for other narrower forms of criminal activity. In view of the broad range of activities that can constitute terrorism, especially with respect to terrorist activities directed against the interests of the United States, the relevant prior design need be only a rather generalized idea or intent to inflict harm on such interests. A person with such an idea or intent can readily be found to be "ready and willing to commit the offence charged, whenever the opportunity offered."

Id. at 207.

The government quotes this portion of Cromitie, arguing that the same can be said of the defendant's alleged participation in a plan to attack the Masonic Center. Dkt. No. 255 at 3. But this argument ignores two critical facts: the "design" theory of predisposition articulated by Judge Hand and the Second Circuit has not been adopted by the Seventh Circuit, and this defendant has *not* been charged with committing a terrorist offense. *This* defendant has been charged only with possessing two unregistered machine guns and an unregistered silencer. Even if the Seventh Circuit had adopted some corollary to the Second Circuit's "design" theory of predisposition, the question would be whether there was evidence that this defendant had a pre-formed "design" to obtain unregistered machineguns and silencers.

Particularly troubling to the court in this case is the government's argument in response to the defendant's assertion that it is difficult to buy fully automatic machineguns on the street. The court does not know whether it is difficult for someone to buy a machinegun on the street, but that somewhat innocuous assertion by the defendant in support of his argument that he

35

wouldn't have known how to get a machinegun if not for Mike elicited this response from the government:

> [The defendant] claims his case is like one in which the government sold him . . . a nuclear weapon. It is not. First, machineguns are available for street purchase. They are seized in Milwaukee, in Chicago, in Texas, and nationwide all the time. [The defendant] wanted such weapons, and he could have gotten them. Over 3,000 illegal machineguns were seized between 2016 and 2018 in the United States . . . .

> Second, and perhaps even more importantly, aftermarket parts that convert semiautomatic guns that a person can buy at any sporting goods store into automatic weapons, like bump stocks and Glock switches, are gallingly inexpensive and accessible. Contrary to [the defendant's] claim in his motion [that it is difficult to buy a machinegun on the street], he could easily have acquired a simple, fully-automatic converter. These parts are *still* available for purchase online (not merely on the dark web, but) on websites like wish.com. For $16, [the defendant] could have converted a cheap semiautomatic handgun into precisely the small automatic weapon he wanted.

> At the time of the charged offense, [the defendant] could quite literally have bought one on Amazon.com. Thousands and thousands of them have been shipped into the United States, for under $20 each. . . . Just because [the defendant] had not yet available himself of this possibility does not mean he was entrapped . . . . You cannot buy a nuclear weapon on Amazon.com for $16.

Id. at 34-35.

The first argument—that machineguns are not so hard to come by on the street—may be an appropriate argument for the government to raise at trial to rebut the entrapment defense. But the second argument—that someone who expresses a desire to buy a legal handgun is predisposed to purchase an illegal one because the means to convert the legal weapon to an illegal one are available to anyone—stretches the predisposition argument to the breaking point. It seems a bit like arguing that someone who wishes that he had more

36

money is predisposed to counterfeiting because one can buy good paper, ink and printers at any office supply store.

The court concludes that <u>Mayfield</u>, not <u>Cromitie</u>, is the law that governs, and that under <u>Mayfield</u>, the question at this stage is whether the defendant has proffered sufficient evidence to support a reasonable jury's conclusion that he was not predisposed to commit the crimes with which he is charged— possession of unregistered machine guns and an unregistered silence—before the government intervened.

The defendant asserts that there is no evidence that prior to meeting Mike, the defendant was inclined to purchase a machinegun. The defendant's friend Steve didn't mention to the FBI in September 2015 that the defendant wanted a machinegun. The defendant says that there is no evidence that he searched for machineguns online or made any effort to find one. The defendant argues that, at best, the evidence shows that on multiple occasions, he expressed to Mike his interest in getting a pistol—something that he says would have been legal for him to do, given that he was not a prohibited person. Dkt. No. 234 at 8–11. The defendant's desire to purchase a handgun legally is not evidence that he was predisposed to purchase a machinegun illegally. <u>See</u> <u>Jacobson</u>, 503 U.S. at 551–52 (personal inclination for child pornography is not evidence that a defendant would purchase that pornography in the mail).

The defendant argues that whenever Mike brought up machineguns, the defendant not only expressed reluctance to purchase one, but refused. For example, he points to the exchange after the visit to Gander Mountain, when,

37

Case 2:16-cr-00021-PP-WED   Filed 09/24/19   Page 37 of 39   Document 295

in response to Mike's suggestion of a machinegun, the defendant stated, "A handgun, man! What do I need a machinegun for? Dkt. No. 234 at 10. That same conversation, he says, included this exchange:

> Mike: Did you see the machine guns?
> Defendant: What?
> Mike: Did you see the machine guns?
> Defendant: A machine gun is too big for us right now, we do not want it.
> Mike: Yeah?
> Defendant: Where are you going to put the machine guns?
> Mike: Yeah [Pause] So we would know, man.
> Defendant: A handgun is enough.
> Mike: What?
> Defendant: A handgun is enough. I like this handgun with the wheel.

Id. at 11. The defendant points to the fact that when Mike tells the defendant he'll be getting "guns with no serial numbers," the defendant refuses and says that "they will 'fuck you' if [Mike] buys illegal guns." Id. at 11–12.

The defendant asserts that he agreed to purchase a machinegun only after months of nearly daily contact with Mike and only after the informants began to discuss the notion of the Masons being in league with ISIS. Id. at 15, 16–17. He argues that even then, when he saw the guns on January 25, he was "dismayed" that they were not guns like the ones Mike had described, and that he got into an argument with Mike after the purchase. The government disagrees with the defendant's characterizations of these exchanges, but again, it is not for the court to weigh the defendant's interpretation of the evidence against the government's. That is the jury's job. The court must decide only whether the defendant has presented enough evidence to allow a jury to

38

conclude that he was not predisposed to buy machineguns and a silencer, and the court concludes that he has.

## IV.    Procedural Note

By this ruling, the court is allowing the defendant to present evidence of, and to argue, entrapment at trial. The court also will allow the government to present evidence and argument rebutting that defense. The court anticipates that both parties may raise specific objections to certain evidence as the trial unfolds; the court will, as it has indicated, rule on those objections as they arise. The court is *not*, at this early stage, agreeing to give an entrapment instruction to the jury. The court will consider the evidence as it comes in at trial and will decide whether an entrapment instruction is appropriate based on that evidence, after hearing argument from the parties.

## V.    Conclusion

The court **GRANTS** the defendant's first motion *in limine* requesting leave to present an entrapment defense. Dkt. No. 234.

Dated in Milwaukee, Wisconsin this 24th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

39