UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF WISCONSIN

--------------------------------------------------------------

UNITED STATES OF AMERICA,          )
                                    )
                  Plaintiff,      )     Case No. 16-CR-21
                                    )     Milwaukee, Wisconsin
    vs.                         )
                                    )     September 27, 2019
SAMY MOHAMMED HAMZEH,        )     9:30 a.m.
                                    )
                  Defendant.      )
                                    )

--------------------------------------------------------------

**TRANSCRIPT OF FINAL PRETRIAL CONFERENCE**
BEFORE THE HONORABLE PAMELA PEPPER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:    United States Department of
                                     Justice
                                     By: Benjamin P Taibleson & Adam
                                   Ptashkin
                                   Office of the US Attorney
                                   517 E Wisconsin Ave - Rm 530
                                   Milwaukee , WI 53202
                                   Ph: (414)297-1727
                                   Fax: (414)297-1738
                                   benjamin.taibleson@usdoj.gov
For the Defendant
SAMY MOHAMMED HAMZEH:       Federal Defender Services of
(Present)                     Wisconsin
                                   By: Craig Albee & Joseph Bugni
                                   517 E Wisconsin Ave - Rm 182
                                   Milwaukee, WI 53202
                                   Ph: 414-221-9900
                                   Fax: 414-221-9901
                                   Craig_albee @fd.org

U.S. Official Reporter:     SUSAN ARMBRUSTER, RPR, RMR,
Transcript Orders:          Susan_Armbruster@wied.uscourts.gov

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.

1    THE CLERK:  Court calls criminal case 2016-CV-21,

2 United States versus Samy Mohammad Hamzeh.  Please state your

3 appearance starting with the attorneys for the Government.

4    MR. TAIBLESON:  Good morning, Your Honor.  Benjamin

5 Taibleson and Adam Ptashkin for the United States.

6    MR. ALBEE:  Good morning.  Craig Albee and Joseph

7 Bugni appearing with Samy Mohammad Hamzeh.  Also present at

8 counsel table is Shavon Caygill, our paralegal.

9    THE COURT:  Good morning, everyone.  We are here this

10 morning for final pretrial conference.  Although I think

11 everybody remembers, we also have kind of a semi-final pretrial

12 conference on the calendar as well when we get closer to trial.

13    What I'd like to do is work through a number of issues

14 this morning.  I can't guarantee that we'll work through every

15 single one of them and get you definitive answers on everything

16 this morning, but maybe we can, at least, make some progress so

17 that you all can see where some things are headed.

18    So the first thing I want to note that you all have

19 already seen, I think, is that the jury questionnaire went out a

20 few days ago, and I want just to make a record.  As you all will

21 remember, the original jury questionnaire was fairly extensive.

22 And when I determined that the clerk's office was not going to

23 send out 19 pages, they don't have the funds to be able to do

24 that, I sent it back and asked if you all would make some

25 revisions so that we could send out one that actually met the

1  length qualifications for the jury for the clerk's office.  And

2  what came back was pretty much the same number of questions,

3  maybe more questions but in a more compact form.  And I give the

4  defense all sorts of credit for being creative with word or what

5  it was you all did to do that.

6       What I had anticipated was that the process of

7  condensing to three pages or basically six pages, three

8  double-sided pages, is that we reduce the number of questions.

9  I suppose I should have made that clear.  I wanted that for a

10 couple of reasons.

11      Number one, there are some of those questions that I

12 didn't think were appropriate.  Number two, quite frankly, I had

13 some concerns about the potential jury pool getting this

14 document that was a little bit longer than their usually tax

15 return document and having some push back in terms of people

16 just going, I'm going to figure out any way I can not to be a

17 part of this trial even if, perhaps, I might be a decent juror.

18      And so I went through and removed a number of the

19 questions that I didn't think were appropriate and that were not

20 the sorts of questions that I would have allowed to be asked in

21 in-person voir dire.  I also modified a little bit the cover

22 letter partly to make it seem a little bit more friendly and

23 grateful that they would be willing to serve, which I think we

24 all are.  And so what ended up coming out are the questions that

25 I felt comfortable putting in a questionnaire.

1         Now, I want to make clear I know that you all have

2    submitted proposed voir dire to ask on the first day of trial,

3    and I'm not saying that I won't ask some of the questions that

4    you proposed or wouldn't allow some of the questions that you

5    proposed in person.  I think it's appropriate.  I think that

6    happens quite frequently anyway when we have jurors answer and

7    we have follow-up questions because it leads to other questions,

8    and so I'm not saying that I wouldn't necessarily go broader.

9    But what I was trying to do here was to at least get some base

10   information on what seemed to be some of the more critical

11   issues, so that you'd have a starting point.

12        I also rephrased some of the questions in ways that I

13   generally ask them and made some changes to the language.  So

14   all of that is by way of saying that some of the questions that

15   I took out, and we'll come back and talk about this I suppose

16   when we talk about the voir dire questions that I'm going to be

17   asking -- will be asking at trial, but I took out all of the

18   questions that asked jurors what their feelings are about

19   reasonable doubt.

20        I don't normally ask those sorts of questions in jury

21   selection because jurors are instructed that they have to follow

22   the law as I give it to them.  They must presume a defendant

23   innocent, and they must not convict unless they're convinced

24   beyond a reasonable doubt.  And I'm concerned and I said this in

25   other cases and I read other judges are concerned as well that

1    planting in the jury's mind that it's okay to not presume

2    somebody innocent if they don't agree with that, that that's all

3    right.  Or if they don't agree with the fact that proof beyond a

4    reasonable doubt is required by the law, that, you know, that's

5    okay as long as they kind of let us know that.

6         I think those are issues on which we have to be firm,

7    that there's not any option to disagree with those concepts.

8    They are instructions that are given, and they must follow them.

9    That is why I don't ask those sorts of questions because I'm not

10   comfortable giving jurors the impression that they have any

11   choice to conclude anything otherwise.

12        I also took out in this case the question about

13   whether people belong to a Mosque, Synagog or other religious

14   community and whether they have positions of leadership in their

15   religious community.  I think it's certainly appropriate to ask

16   whether anybody's ever been a member of the Masons or any of

17   their affiliated organizations.  That's, clearly, an obvious

18   question that's applicable here, but I'm concerned about

19   intruding into the religious affiliations of jurors and whether

20   or not they've had leadership positions in their religious

21   affiliations.

22        I allowed some of the questions about people's

23   feelings towards Muslims or people of Arab descent, but I think

24   I modified them somewhat.  One of the biggest areas of concern I

25   have, and it's going to come up again as we talk about things

1  this morning, are questions with regard to people's knowledge of

2  and views of conflict between the Arab-Israeli conflict.  And

3  one of the reasons I certainly did not want that in the

4  questionnaire is that number one, as far as I can recall, and I

5  indicated this in a ruling I issued recently, Mr. Hamzeh has

6  simply been charged with possession of two unregistered machine

7  guns and an unregistered silencer.

8       To the extent that there's evidence that he had

9  conversations about other things, we'll be getting into whether

10  or not those conversations are relevant, but the events that I

11  think eventually lead to Mr. Hamzeh's arrest seem far removed

12  from some conversations that he allegedly had early on during

13  the investigation commenting about Arab-Israeli issues.

14       The parties have talked about whether or not there

15  would be a "mini trial" about the Arab-Israeli conflict.  I can

16  assure you there's not going to be, because I'm not going to

17  allow there to be.  This trial cannot turn into that kind of an

18  issue, and so I took out those questions.  We can certainly talk

19  about that issue in other contexts, and we will.  But in terms

20  of the jury questionnaire, I did not want to give potential

21  jurors the idea that this was somehow a case about the

22  Arab-Israeli conflict.

23       So there are other questions that you can see that I

24  removed, and we can talk about whether or not some of those

25  might be appropriate during an in-person voir dire, but I simply

6

1    wanted to make a record of the reason that I took out some of

2    the questions that were in the proposed questionnaire.  And

3    hopefully, we'll start getting those responses back relatively

4    soon, and you all will be able to take the information from that

5    and process it.

6          The second thing is that as you know, I recently

7    issued a ruling on the defense's request to be able to present

8    an entrapment defense, and I have indicated that the defense can

9    present that defense.  I want to make clear I think, I made it

10   clear in the order, but I want to make clear again that number

11   one, that means that the Government of course also has the right

12   to present evidence to try to rebut that defense.  I would

13   anticipate that it will.  But also that at this point in time,

14   I'm not making a ruling on whether or not I will give a jury

15   instruction as to entrapment.  That is something that will

16   depend on how the evidence comes in.

17         I think as I indicated in the order, the defense has

18   certainly put forward the weight of evidence that the *Mayfield*

19   decision says that the defense needs to put forward to be

20   allowed to present the defense.  But the question of whether or

21   not there's enough there to give an entrapment instruction I

22   think depends entirely on how that evidence plays out at trial,

23   and so we'll see what happens with the instructions once we get

24   to that point and some of the evidence has come in.

25         I understand that there is a discovery order that

1    Judge Duffin issued that the defense objected to that has been

2    fully briefed.  It was a Motion to Compel a number of pieces --

3    that the Government turned over a number of pieces of different

4    kinds of information.  I'll tell you all that while you don't

5    have the decision in your hands for the most part, I have

6    completed that decision.  And for the most part, my ruling is

7    that I find nothing clearly erroneous in anything that Judge

8    Duffin decided with regard to that discovery.

9            The one issue that I did have some concern about is

10   that more recently, earlier this month, the defense filed a more

11   precise request with regard to or more precise reasoning, I

12   suppose, and more precise support for its request for the

13   informant files and information in the informant files.  When I

14   say files plural, but really the defense request has to do with

15   the confidential resource known as Mike.  And the defense has in

16   its own investigation come across information that leads it to

17   believe that there may be concerning information in that file

18   with regard to either Mike's involvement in possible criminal

19   activity or Mike's expectation that because of his being an

20   informant, that he had special protection whenever he might get

21   in trouble or have issues with the law, and that's just a broad

22   summary of what the defense's concerns are.

23           I think the information that's in that filing is

24   certainly information that if the defendant has it, and I

25   realize that some of the emphasis in that pleading we're not

1    saying necessarily this is evidence we have or are going to use,

2    we're just putting forth concerns that we have, but that is

3    certainly I think information that would be, at least, subject

4    to discussion at trial about cross examination were Mike to

5    testify.  But the real issue that I think the defense was trying

6    to raise is whether or not the information that it has uncovered

7    leads to concerns that there may be something in the informant

8    file that could be impeaching, and it should be turned over.

9           I guess one of my initial reactions to that is to ask

10   the Government, you know, what -- first of all, I suppose,

11   whether or not the Government has seen that file or has it?

12          MR. TAIBLESON:  Judge, there's nothing in that file

13   supporting any of the defense's suspicions asserted in their

14   filing.

15          THE COURT:  Does that mean you've seen it,

16   Mr. Taibleson?

17          MR. TAIBLESON:  That is, in fact, as part -- Well,

18   it's challenging to --

19          THE COURT:  I understand.  It's an uncomfortable

20   situation.  I thought it would be a straightforward question in

21   terms of have you seen it, but perhaps -- Are you aware,

22   Mr. Taibleson, of whether or not there would be a way and if so

23   how long it would take to present a file to the Court to view in

24   camera?

25          MR. TAIBLESON:  Your Honor, my understanding is that

1    should we do that, which if Your Honor wishes us to do, we'll do

2    it.  We would do it in keeping with the requirements of the

3    Classified Information Procedures Act, which is going to require

4    court information security officer who works for Your Honor to

5    fly here, and we'll do that.  If Your Honor orders us to do it,

6    we will do it.

7         THE COURT:  I appreciate that.  I guess I kind of

8    assumed that generally.

9         MR. TAIBLESON:  Of course not.

10        THE COURT:  Not to be a jerk, but what I was asking

11   from a logistical standpoint if I were to order that, is that

12   something that would take place in a relatively short period of

13   time, or is that something that would take longer to achieve?

14        MR. TAIBLESON:  I think it would be challenging to do

15   it quickly, Your Honor.  And because there is truly no evidence

16   supporting any of the allegations at all as the defense

17   acknowledges, I don't think that Your Honor should order that

18   production.

19        THE COURT:  I appreciate that.  I was trying to get a

20   sense of what the logistics would be if I were to do it.  And

21   when you say it wouldn't happen quickly, are you indicating it

22   might be weeks, that it might be a number of days?  Do you have

23   a sense?

24        MR. PTASHKIN:  Your Honor, I don't think we can give a

25   precise timeline of how long it would take.  But obviously

1    turning over a file of that nature involves coordination with

2    the FBI General Counsel's Office.  It certainly would not be an

3    overnight --

4              THE COURT:  No, I understand that.

5              MR. PTASHKIN:  I don't think we can say right now

6    sitting here whether it would be two weeks or two months.  We'd

7    have to research that after the hearing.

8              THE COURT:  Okay.  Thank you.

9              MR. ALBEE:  Judge, can I make one comment?

10             THE COURT:  Sure, Mr. Albee.

11             MR. ALBEE:  So just to be clear about the informant

12   file.  We're, of course, concerned about what is in it.  It's

13   our understanding, and I think we've cited the sources for our

14   understanding, that informants are supposed to initially be

15   vetted as to their appropriateness and then be reviewed on a

16   yearly basis.

17             THE COURT:  Right.

18             MR. ALBEE:  And of course identifying if they've

19   violated instructions, violated the law, those kind of things.

20   The informant, Mike, has had a number of run-ins with the law,

21   including the one the Court referred to that is, you know,

22   probably the most significant that we're aware of.  And frankly,

23   we think there's *Brady* material if those things are documented.

24   We think it's *Brady* material if they are not documented.  If for

25   some reason the FBI who is going to sponsor this informant is

1    not identifying the wrongdoing or violations of instructions and

2    other things, that's really problematic because the informant

3    file is supposed to presumably be a way of accountability for

4    the informant.  And if they're bypassing that, that says

5    something about their entire investigation and also the agents

6    themselves.

7         And so we'd certainly encourage the Court to review

8    that information in camera.  The other thing I was going to

9    mention is we had previously asked Judge Duffin and I think

10   initially he indicated an openness to this and then it didn't

11   happen, but we had requested an opportunity, as the Government

12   has, when it comes to CIPA information to meet with the Court ex

13   parte to explain why we think various things in the informant

14   file, the payments, expenses, other benefits and other things

15   that might be in there would be important to the defense so that

16   we can give the Court the full view of the defense theory and

17   why the informant, Mike, is not credible.  And so we would again

18   request that opportunity to explain our position ex parte to the

19   Court.

20        THE COURT:  Thank you.  I'll think about that because

21   I was not aware of that.  I guess one question I do have,

22   Mr. Albee, is some of the events that are described in your most

23   recent filing, in fact I think all of the events that are

24   described in your most recent filing, are events that post date

25   what happened with Mr. Hamzeh, post date Mr. Hamzeh's

1    investigation.  And one of the questions that I guess I had and,

2    perhaps, this is something that you would consider addressing if

3    you had this meeting.  But let's say theoretically that law

4    enforcement has an informant and that they conduct an

5    investigation using that informant, and then three years later

6    that informant goes out and commits arson.  How is it impeaching

7    of the informant to know about and to inquire into an event that

8    took place two years after the time that the informant was

9    involved in the investigation?

10          MR. ALBEE:  Well, in general, I guess it's easier if I

11   start with anything that has to do with credibility.  He's still

12   a witness at this trial, and it's whether he has any motive or

13   bias, any reason to curry favor with the Government, any reason

14   to shade the truth, any reason to pile on Mr. Hamzeh, any desire

15   to continue to please the Government so that he may be eligible

16   for future payments from the Government.

17          I mean, at least it was represented to us in November

18   of 2017 that he was continuing to work as an informant, and so

19   he has a continued desire as a Government employee to please the

20   Government and to give testimony consistent with their theory of

21   the case.  Again, if there's misconduct that the Government

22   turns a blind eye to, assists him with, tries to get him out of,

23   then, you know, that also affects his bias and motive in the

24   case as well as the agents and the integrity of the

25   investigation; that they're willing to do that because of their

1   desire to convict Mr. Hamzeh in this case.

2          THE COURT:  Well, like I said, I hope to get this

3   discovery order out to you all shortly and for all categories.

4   Except that particular one, my ruling will be in more detail on

5   the record.  My ruling will be that I don't find any clear

6   errors in any of Judge Duffin's rulings in that regard.

7          Another issue I haven't gotten you a ruling on and,

8   quite frankly, I think probably lends itself better to a ruling

9   orally is the motion that the defense has filed seeking to

10  conduct voir dire -- to have counsel conduct the voir dire at

11  trial instead of me doing it.

12         I certainly understand the logic behind it.  I read

13  some of Judge Bennett's work, and I realize what the rationale

14  is.  I have a handful of concerns.  One of my concerns is that

15  we've got a lot to get through in this case, regardless of some

16  of the rulings on the motions in limine.  Picking a jury,

17  obviously, is critical for Mr. Hamzeh as well as for the

18  Government.  I don't doubt that for a minute.  But picking a

19  jury is critical in almost every single case, if not every

20  single case that we have, and I am concerned about the length of

21  time.

22         Now, I realize the defense has represented that it has

23  research that shows that attorney-conducted voir dire does not

24  extend the amount of time that it takes to select a jury.  To be

25  honest, some of my experiences when I was a defense attorney in

1    state court practice demonstrated to the contrary, but I realize

2    that may depend on the judge and may depend on the case and may

3    depend on the attorneys, so I don't want to paint with too broad

4    a brush.  But I think it will be very important to, number one,

5    conduct the voir dire efficiently.  And number two, conduct it

6    consistently.

7         One of the things that concerns me about the jury

8    questionnaire questions and about the form in which some of the

9    questions have been presented to me for voir dire to the jury

10   itself is that many of the questions are sort of if so, why-type

11   questions, open-ended type questions that invite kind of a

12   discussion.  I've not in many cases allowed questions like that.

13   Because particularly if we end up with some 70 or 80 folks in

14   here in the voir dire and say, you know, everybody raise your

15   hand if you think that, you know, the Packers did really well

16   last night.  And, you know, nobody raises their hand.  Okay, let

17   me pick a different question.  Everybody raise your hand if and

18   57 people raise their hands, and then we go, okay, so why, and

19   we have a discussion.  It is going to be an extended -- This is

20   going to take a while.

21        On the other hand I do understand, and I think it's

22   probably true in some cases that jurors are more reluctant to

23   look at somebody wearing a black dress who they believe would

24   disapprove of them if they gave a particular answer and give

25   that answer than they might to an attorney who even though they

15

1    should think that attorney would disapprove of them too,

2    apparently has a less likelihood of believing that.

3            What I think is appropriate is that I will do the

4    initial questioning.  After I do the initial questioning, I'll

5    follow my usual practice, which is to ask counsel to sidebar and

6    discuss follow-up questions either of specific jurors based on

7    answers they've given or of a category that you think has raised

8    some concern.  And then based on that sidebar, I will allow

9    counsel on both sides to do follow-up questions that we discuss

10   at sidebar.

11           I think that was sort of one of the proposals the

12   defense hinted at was a combination of judge conducted and

13   attorney-conducted voir dire.  I think that allows the initial

14   set of questions to be consistent and to make sure that they're

15   asked in the same way, but it also gives you all an opportunity

16   to follow up albeit in specific categories or with specific

17   questions that we will talk about at sidebar.  Mr. Ptashkin, do

18   you have a question?

19           MR. PTASHKIN:  I guess if the Court will continue

20   talking about the process, I can wait.  I guess a couple

21   questions about the process.  After we have the sidebar, is

22   there going to be a time limit on the questions the parties are

23   going to be able to ask the jury pool?  And I guess our general

24   concern is we've expressed in our briefing is if we don't know

25   the questions the defendant's attorneys are going to ask the

1   jurors in advance, it's concerning to us because we don't want

2   to have to object repeatedly to questions that are asked to the

3   jury pool.  So I guess my -- our question is specifically what's

4   the procedure going to be based on the sidebar discussion?  Is

5   there then going to be a list of questions produced that the

6   parties can ask or is it going to be here is a general category

7   of questions that can be asked to the jury pool, have at it for

8   ten minutes each with whatever questions that fall under that

9   broad category you want to ask?

10          THE COURT:  I have not discussed whether or not there

11  will be a time limit on it because I don't know.  We can get to

12  sidebar and somebody could say, I have two questions for Juror

13  No. 14, and that's it in which case I don't see any reason to

14  put a time limit on anybody.  If we get to sidebar and somebody

15  says, I have the following 87 questions that I would like to ask

16  that we haven't covered, number one, I'm probably going to say

17  no.  And number two, at that point, I guess I would consider a

18  time limit.  What I had attempted to describe a moment ago as

19  the procedure is that I had anticipated that at sidebar, we

20  would discuss if someone wanted to say you know Judge, based on

21  answers we just got, I would like to ask these questions.  And I

22  would either say sure or no, I don't think that's appropriate.

23  So while I understand that doing it that way may mean, for

24  example that you, Mr. Ptashkin says, Judge, I would like to ask

25  is there anyone here who has very strong feelings about machine

1    guns not ever being sold ever.  And then when you got up in

2    front of the jury and actually ask the question and say, do any

3    of you have really strong feelings about the fact that no one

4    should be allowed to sell machine guns?  Okay, you asked a

5    different question technically than what you asked at sidebar,

6    but I think it's generally the same question, so I'm not going

7    to have an eruption over it, and I would like to hope nobody

8    else will have an eruption over it.

9         I think I trust all of you that if we discuss at

10    sidebar what the question generally will be, that you will turn

11    around and that's the question you will generally ask, so I'm

12    not going to sit here right now and say each person gets ten

13    minutes.  I think we need to see what happens.  This will have

14    to be a little bit of a fluid situation, but I don't anticipate

15    people will walk away from the sidebar not knowing what's going

16    to happen next.  Does that answer that question?

17         MR. PTASHKIN:  Yes, Your Honor.

18         THE COURT:  Any question from the defense about that

19    particular issue?

20         MR. ALBEE:  About the sidebar and the follow-up

21    questions?

22         THE COURT:  The procedure generally for voir dire.

23         MR. ALBEE:  No Judge.  The one slight thing, and I

24    don't know, I hope I'm not jumping the gun on this, but we'll

25    get the questionnaire back.  That might lead to some obvious

18

1    questions at that time.  I don't know if the Court was going to

2    get them.  We might get them, there is some opinion expressed by

3    a juror where somebody will say, we have to follow up or you

4    know, I don't know if the Court was addressing that.

5         THE COURT:  No.  Thank you because one of the things I

6    had thought about in this context was you had suggested it

7    earlier at the last hearing, Mr. Albee, that we might want to

8    have this kind of interim hearing that we've got a week ahead of

9    trial or whatever.  I am hoping that you will all have gotten,

10   at least, a good chunk of the jury questionnaires back by that

11   time, and perhaps we can fine tune voir dire at that point.  If

12   we get questions back that everybody goes oh, there's a theme

13   here, and there's something that we need to address, that will

14   be a place that we can build in some of that is what I am

15   hoping, assuming that we get a critical mass of the

16   questionnaires back prior to that hearing.  Anymore questions

17   about that?  The general procedure then is I'll ask the initial

18   questions.  We will confer, and then I will allow you to ask

19   follow ups based on questions we've agreed to at sidebar.

20        Okay.  A couple of easy housekeeping things to take

21   care of.  You all have requested a court reporter.

22   Ms. Armbruster is here today not because we needed necessarily

23   to have a court reporter for the final pretrial, but she is

24   going to be one of our court reporters I think.  I think you are

25   going to try to tag team so nobody's hands fall off, so we will

Case 2:16-cr-00021-PP   Filed 10/09/19   Page 19 of 83   Document 316

1  have a court reporter.  You can rest assured that that's taken

2  care of.

3         You all I appreciate it, came up with a brief recount

4  of what you'd like to tell the jury in terms of what the charges

5  are.  That's in your pretrial report, and I will do that.

6         The pretrial report indicates that you all anticipate

7  the trial will take two weeks, if the defense is allowed to

8  present the entrapment defense.  I ruled on that.  So what I

9  plan to tell the jury in the opening or the preliminary

10  instructions, and we also told them I think in the questionnaire

11  is that it will take, approximately, two weeks, so we'll use

12  that estimate.

13         At the time you filed the pretrial report, you

14  anticipated or you didn't have any stipulations.  I know that

15  you have just recently filed the one, which I have buried here

16  somewhere under all my stacks, is Docket No. 299, and it

17  indicates that there are a number of the recordings that you all

18  have agreed on in terms of authenticity.  I appreciate that.  I

19  will come back to that in a minute in terms of some of the

20  motions in limine.

21         I got the witness list.  I understand that you all

22  have agreed that you're not going to necessarily list the

23  occupation or not advise the jury of the occupation or the city

24  of residence of a witness.  I know the reasons for that.  I

25  think we should all probably just have a head's up though that,

1    obviously, the reason we tell folks who the witnesses are going

2    to be is to figure out if anyone knows them.  So we may have to

3    figure out or be a little thoughtful about flexibility in that

4    way.  If somebody says, well, that name sounds familiar to me,

5    is there something else you can tell me about that person so I

6    can figure out if it is my Joe Smith or somebody else's Joe

7    Smith?  I assume we can figure that out if somebody says I think

8    I know that person.  We will cross that bridge when we get to

9    it.

10          I found the list of potential witnesses daunting, but

11   I assume as is usually the course, you all have listed every

12   possible witness, including people who may not be called.  I did

13   note there is a lot of duplication, that the defense anticipates

14   will call a number of witnesses that are on the Government's

15   witness list, so I presume that that will probably get worked

16   down a little bit.

17          I'll come back to expert witnesses when we're talking

18   about motions in limine.  I know there are some issues there.

19   You all have got your exhibit lists.  The only thing I would ask

20   is that if those change in the next few weeks, which they may as

21   you're fine tuning and prepping, if we could just get even a few

22   days before trial, if we could get a finalized exhibit list for

23   each of you for trial purposes, we're all working with that same

24   document.  And a trial like this where we'll have a number of

25   pieces of evidence coming in, I'm going to be asking you all and

1   my staff to double check and make sure that we're keeping up

2   with every single document that's introduced or items,

3   everything that gets admitted so we can double check against

4   each other and have a record of what came in and what didn't

5   come in.  I think a finalized exhibit list will be really

6   helpful for all of us in that regard.

7        MR. ALBEE:  Judge, I presume on that score, you

8   wouldn't want us to be turning in one every two days.  Maybe we

9   can shoot for turning in the next one the day before the next

10  final pretrial conference.

11       THE COURT:  Actually what I said is as long as I have

12  a final a couple days before trial, that will work for my

13  purposes, I think.  But if you kind of think okay we're settled

14  in or we think we're settled in before that next conference,

15  that's fine.

16       MR. TAIBLESON:  I think we'd like to shoot for that

17  too, Your Honor.

18       THE COURT:  For my purposes if we've got a couple days

19  before trial what we kind of know is most likely the final list,

20  I want us to be able to have something to go off of during

21  trial.

22       I'm not going to discuss jury instructions today.

23  Obviously, this is going to be a trial in which how those

24  instructions unfold is going to matter.  I do know that the

25  defense has raised some questions about my normal kind of

1    preliminary instruction script that I use in other trials.  I've

2    started to take a look at those issues.  I realize that there

3    are some modifications you all are asking for, and I'll be

4    looking at those, and we can talk about those as we get a little

5    bit closer to the second conference.

6         Two alternate jurors, I think, that is more than

7    appropriate, so we'll plan on 14.  I think we've already let the

8    jury coordinator know that they will have 14, and we are looking

9    at a two-week trial.  If we get somewhere around 70 people or so

10   or whatever we end up with, we will have a sizable venire to

11   cover that time period and that number of folks.

12        With regard to motions in limine, one of the first

13   questions I wanted to ask you all is as you know, the Government

14   has presented a list all of the records that it's going to be

15   seeking to utilize, and the defense filed some objections.  Some

16   of them are kind of to categories of conversations.  Some of

17   them are to specific recordings, and some of them are to

18   recordings with modifiers or qualifiers or however you want to

19   put it.

20        So I guess one question that I'd ask just from a

21   broad -- I have not worked my way through all of those yet and

22   will continue to do that.  But from a broad picture standard,

23   one of the questions that I had is whether or not the stip that

24   you all filed today which is to authenticity, I'm assuming that

25   that doesn't necessarily affect people's objections as to

1    admissibility.  But if any of these stips do and there's some of

2    this I don't need to consider, that would be interesting to

3    know.  From the Government's standpoint.

4         MR. TAIBLESON:  My understanding, Your Honor, the

5    defense has not stipulated to the admissibility of our

6    statements via the stipulation nor have we to them.

7         THE COURT:  Is that correct?

8         MR. TAIBLESON:  Unless I'm mistaken.

9         MR. ALBEE:  Unfortunately, that's accurate.

10        THE COURT:  I will not give you a ruling on that

11   today, but I will continue plodding through that.  To that end

12   though, I did want to ask a practical question.  I think all of

13   you know that I strongly encourage people ahead of trial to make

14   an appointment with Ms. Wrobel to come in here on a day when we

15   don't have anything going on and look at all the equipment, try

16   your stuff out on the equipment.  Make sure that it's set up the

17   way that you want it to be and it operates, at least, when

18   you're in here practicing with it.

19        One of the questions that I have for the Government,

20   and I suppose the defense as well, is how do you all intend to

21   present the recorded conversations to the jury?  I don't mean

22   technically, you know, how do you plan to push play.  Are you

23   going to have a note book?  Is it going to have English and

24   Arabic columns?  How is that going to work?

25        MR. PTASHKIN:  Your Honor, basically our procedure,

1    what we intend to do if it's okay with the Court, we're going to

2    play the oral recorded statements, which are in Arabic, to the

3    whole courtroom.  And on the jury screen, they will see

4    synced-up English transcripts for our exhibits.  So and as we

5    discussed in one of our filings, we want to admit the English

6    transcripts, which are translations of the Arabic recordings

7    into evidence.  Because in this case, I think the recordings by

8    themselves are going to be pretty worthless in the jury room

9    given I think it's fair to assume there won't be many Arabic

10   speakers on the jury.  We intend to play the oral recordings

11   with the transcripts of our exhibits synced up, so the jury is

12   reading the English as the Arabic is being played for our

13   exhibits.

14           THE COURT:  And you plan to show the English

15   translations electronically?  But you mentioned, Mr. Ptashkin,

16   usefulness or uselessness in the jury room.  Are you planning to

17   have a paper copy for them in the jury room?

18           MR. PTASHKIN:  We have no problem printing out the

19   English translations of the recordings and providing a binder of

20   our exhibits that are admitted into evidence to the jurors in

21   the jury room.

22           THE COURT:  Mr. Albee, I know that there's some

23   dispute that the defense has with some of the translations.  How

24   is the defense planning to proceed?

25           MR. BUGNI:  Your Honor, we don't have any disputes.

1    We've been able to work out with the Government as far as the

2    exact words, so we have no dispute.  We, in fact -- I hope the

3    Government will correct me if I'm wrong.  We hope to have

4    another stipulation filed next week as to the accuracy of all

5    the transcripts.

6              THE COURT:  Okay.  Can I just ask, Mr. Bugni, one of

7    the experts I know that you all are offering is an expert in

8    Arabic-English translation.  So is the issue more going to be on

9    how the word inferences or context?

10             MR. BUGNI:  It could be.  Sorry, Your Honor.  As it

11   stands, we don't think we'll need him let's say if Mike were to

12   say that's not what I said or that's not what it means.

13             THE COURT:  I see, I see.  Okay, thank you.  That

14   helps tremendously.  Thank you very much.  So everybody is on

15   the same page then in terms of how the audio recordings and the

16   visuals will be presented then?

17             MR. BUGNI:  We have not made a final decision on how

18   we're going to present ours, Your Honor.  Part of it is, we've

19   noticed a lot of transcripts, and those go to the context of

20   what the Government might put in.  If they want Page 8 through

21   10, you have to understand what's being said from Page 2, the

22   reference earlier.

23             If the Court grants the motion in limine, 8 threw 10

24   doesn't need to come in.  We don't need Page 2, either.  We're

25   sort of playing catch up on what's going to happen there.

1          THE COURT:  I see.  Okay, thank you.  Mr. Ptashkin.

2          MR. PTASHKIN:  I guess briefly we agree with

3   Mr. Bugni.  I anticipate there will be a stipulation to the

4   accuracy of the English language transcripts soon.  Of course,

5   that's different than whether they are admissible or not, even

6   though we are agreeing they are authentic and accurate

7   translations.  And I guess this has already been said but just

8   to nail it on the head, we've already provided the defense with

9   the precise clips from the recordings that we're going to use,

10  and those are our exhibits.  We're not going to be offering in

11  the full recordings, all of the recordings into evidence.  We're

12  just going to be offering the clips we want to use as exhibits

13  into evidence.

14          So the stipulation I hope wasn't too confusing.  But

15  just to highlight, US Exhibits 100 through 159, those are the

16  exhibits we're going to offer into evidence.  Those are the

17  clips.  Exhibits 500 through 530 we added to the stipulation.

18  They weren't on our original exhibit list.  Because in talking

19  with Mr. Bugni, we thought it made sense to just authenticate

20  the entire full-length recordings so that whatever clips each

21  party wants to use that are deemed admissible were then

22  authenticated to avoid an authentication.  I thought that might

23  be a little confusing, so I wanted to clarify.

24          THE COURT:  I appreciate that.  So if we get objection

25  at trial to any recording, it should not be on authenticity

27

1    grounds, it should be on some other evidentiary basis?

2              MR. PTASHKIN:  Correct.

3              MR. ALBEE:  Judge, I'm just worried a couple issues

4    might be overlooked.  As Mr. Bugni seemed to indicate, while

5    they've identified certain experts, the rule of completeness, in

6    our view, might require those to come in at the same time.  It's

7    not that we supplement it later.  The jury needs the context

8    immediately to understand it at the time it's presented.  That's

9    one of the evidentiary issues that's going on.

10             Then, it's my understanding as to, you know, we're

11   also providing -- I think have provided a disk today to the

12   Government with excerpts that we intend to put in.  And my

13   understanding is that those are sort of admissible subject to

14   the Court's ruling on them.  In a number of instances, as the

15   Court knows, they've suggested that it's inadmissible hearsay to

16   put in Mr. Hamzeh's statements.

17             My understanding is that if the Court were to rule no,

18   that's admissible as to state of mind or not offered for its

19   truth, whatever it is, that those will go in.  And then as

20   Mr. Bugni indicated, we're still in the process of deciding how

21   we'll present these to -- Once we admit those, some of them we

22   may deal with in cross examination.  Some we may deal with in

23   closing argument.  And others we may try to play as the

24   Government is or maybe in a different form.

25             THE COURT:  So let me ask, that reminds me of another

28

1   question I wanted to ask.  I appreciate that, Mr. Albee.

2   Without getting too much into the weeds about how digitally you

3   all are organizing these clips, one of the things that I think

4   is in all of our best interest to avoid, obviously, is a

5   situation in which an issue comes up and either of you want to

6   play something in cross or in rebuttal.  Or in other words, it's

7   not part of your standard presentation in your direct.  Have you

8   all come up with some mindful way to ensure that if on the fly

9   you need to pull up the conversation from November 29th at

10  10 o'clock that, number two, we're not going to be sitting here

11  with the jurors taking a 45 minute water break while we try to

12  figure out where that is?

13          MR. PTASHKIN:  Your Honor, I think this gets to the

14  broader issue of the admissibility of Mr. Hamzeh's out-of-court

15  statements when presented by the defendant.  Because I mean, our

16  exhibits we think are all extremely relevant and admissible

17  exhibits.

18          THE COURT:  I hope so.

19          MR. PTASHKIN:  As we briefed, we don't think the

20  defendant should be able to put in his out-of-court statements.

21  So it's going to be extremely difficult to create these exhibits

22  if we don't know in advance what the exhibits are going to be

23  that the defendant's going to use.  Because again, we're dealing

24  with Arabic recordings that have been translated.  And to sync

25  them up is a fairly time-consuming process.  Because we need the

1   Arabic translator sitting next to the person that's cutting the

2   Arabic audio and saying, okay, stop here, stop there to create

3   that recording where the exhibit needs to be.  So if we're doing

4   that on the fly where we're deciding what is needed under the

5   rule of completeness on the fly, just being honest, it will be

6   physically impossible to create the clipped recordings on the

7   fly in court.

8           THE COURT:  So one of the concerns that I have,

9   though, is that you all have basically argued, Mr. Ptashkin,

10  that any of Mr. Hamzeh's statement that Mr. Hamzeh may try to

11  put in are hearsay.

12          MR. PTASHKIN:  Yes.

13          THE COURT:  Well, the problem with that is that we

14  have a rule that takes up six pages of the Federal Rules of

15  Evidence that lists all the exceptions to hearsay, and it's

16  almost impossible for me to say as a blanket ruling that

17  anything that Mr. Hamzeh might want to put in is hearsay because

18  he might want to put in some of it to show state of mind.  Some

19  of it may fall under certain exceptions.  One of the motions in

20  limine that I don't think I can rule on today is to say, you're

21  right, all Mr. Hamzeh's statement, if he seeks to put them in,

22  are hearsay because I don't know what he might want to put in

23  any particular statement in for.

24          MR. TAIBLESON:  And Judge, I guess our request is that

25  if it's at all possible for the defense to identify with

1 particularity which statement they seek to admit and then for

2 Your Honor to rule in advance of trial whether they are

3 admissible, that might allow us to deal with these issues ahead

4 of time. But if it's left to the trial as a logistical matter,

5 I think it's going to be a nightmare.

6 So one way we try to do our part in this is by

7 identifying exactly what we seek to use. We're just trying to

8 get out in front of this and make it as humane as possible once

9 it's time to actually do that.

10 THE COURT: I appreciate you all identifying. Despite

11 being flabbergasted by the thickness of it, I appreciate the

12 fact that you all have provided that. And I don't know,

13 Mr. Albee and Mr. Bugni, if you all are planning to present

14 something similar.

15 MR. BUGNI: Three things, Your Honor. One answer to

16 your initial question, I think we'll be able to work that out as

17 far as the presentation and not having problems beforehand given

18 that we've both identified the specific portions that we want.

19 What happened, Your Honor, if I could take 15 seconds, is we

20 originally had a Bates number page system that we could all use.

21 The Government has a very good system where they came up with

22 the line numbers that made objections very precise. That then

23 took away the Bate system. So when we identified everything on

24 our transcripts that we put on the exhibit list, it was all Page

25 8, Page 4, whatever it was.

1    THE COURT:  I had a question about that.  It didn't
2  seem to match up.
3    MR. BUGNI:  That's right.  So what we've spent over
4  the last week was weaving, really me, going through everything
5  again to then match it up perfectly to the transcript pages, and
6  we've turned that over to the Government I think today.  We were
7  working all day yesterday and the day before, so I don't think
8  there will be a problem at all as far as what we're trying to
9  admit and what we need to.
10    To the third point, Your Honor, I think most of this
11  will come in in cross examination or refreshing recollection.
12  It's not so much as your -- The transcript says what it says.
13  The transcript is accurate.  Was this what you said?  Was it a
14  revolver?  Was it a handgun?  Whatever it is.  It's not then we
15  need to play the Arabic form.  We all agree it's accurate.  We
16  all agree that it's authentic.  That's the point we're trying to
17  make.  A lot of the headaches won't come to fruition.  We'll do
18  everything we can to guard against those.
19    THE COURT:  I appreciate that from both of you.  Maybe
20  what is getting exchanged today will move us forward toward
21  everybody feeling a little more comfortable with that when we
22  next get together.  Okay.  Thank you.
23    I wanted to go through a few of the motions in limine
24  if you all will bear with me for just a second.  I've already
25  ruled on the request for attorney-conducted voir dire, which was

1   discussed in Docket Nos. 257, 269 and 280.  You all will know

2   what I am proposing to do now.  Docket Nos. 272, 277 and 271 --

3   291, sorry, had to do with authentication.  It looks like

4   today's stipulation, at least, deals with some of that.

5          The Government moved in Docket No. 272, I believe, to

6   be able to admit Mr. Hamzeh's statements as statements of a

7   party opponent.  I think, for the most part, they do fall into

8   that category, and again I'm going to be going through that

9   chart and looking at specific objections that the defense has,

10  and I'll get back to you on those.

11         Same thing with the Government's request to preclude

12  the defense from introducing Mr. Hamzeh's statement.  As I

13  indicated, that's really going to have to depend on what

14  statements they want to put in and for what purpose.  I will

15  defer ruling on that.

16         The Government's request to preclude the defense from

17  soliciting testimony or introducing transcripts of Mike and

18  Steve's comments, I think again, I can't really rule on that

19  until I know what -- I know that they're not admissions of a

20  party opponent.  I agree with that because those two gentlemen

21  aren't parties.  But in terms of an exception to the hearsay

22  rule, there is no way I can know that until I know what the

23  defense wants to bring the statement in for, and so that one is

24  going to have to be, unfortunately again, something that I see

25  as I see what the purpose is for the admission.

1       MR. TAIBLESON:  Judge, I hate to interrupt you.  Do

2  you mean to say that you will do that at trial, or is that

3  something you are asking the defense to do pretrial so you can

4  rule pretrial?

5       THE COURT:  I guess I don't know if that is part of

6  what you all are going to identify ahead of time.  Mr. Bugni,

7  what part of Steve and Mike's statements you might be looking to

8  admit?

9       MR. BUGNI:  Sorry, Your Honor.  We will bring in their

10 effect on him, like Steve saying hey machine gun, machine gun,

11 machine gun.  We're going to bring those in.  We're seeking to

12 admit those as, you know, what the influence they have upon

13 Sammy.  Were intending to bring those in.  We've identified

14 portions.  We're not asking for a single sentence to be brought

15 in, but two pages, here you go, here is Sammy saying, no, I just

16 want a handgun.  How about a machine gun?

17      THE COURT:  When you say you identified, Mr. Bugni,

18 forgive me from sounding really ignorant, but have you

19 identified them in the pleadings you filed here or have you

20 identified them to the Government, and you're going to be --

21      MR. BUGNI:  They are in the exhibit list, so all the

22 transcripts to the page number.  And today we gave them an

23 updated one with the exact excerpts, and the Court -- Your

24 Honor, once we kind of go back and forth, we'll give you -- If

25 you want the updated one, we can file that today as well.

34

1    THE COURT:  I think that might be helpful.  Again,

2 we're trying to avoid a situation where in the middle of trial

3 you want to bring something in and the Government says, wait,

4 wait, wait.  If I can get a copy of it, that will be great.

5    MR. BUGNI:  I will get it filed, Your Honor.

6    THE COURT:  Thank you very much.  The Government asked

7 for reciprocal discovery deadline for the Rule 16(b) and 16(d)

8 information.  And the defense response was that it knows that

9 it's got to comply with Rule 16.  It has turned everything over

10 it plans to use.  I'm not sure, does the Government have some

11 view there's something that you don't have?

12    MR. TAIBLESON:  No.  Your Honor, our position

13 essentially is that if the defense is -- intends not to produce

14 witness statements in its possession for its witnesses until

15 after the witness has testified, they should tell the parties

16 now.  And we ask the Court to order the defense to turn them

17 over, at least, a little bit earlier so that the jury doesn't

18 need to recess after every defense witness.  This case has been

19 going on for several years, so it seems very likely they will

20 have witness statements in their possession.  And just for

21 purposes of ordering -- an orderly trial, we would like to avoid

22 a situation where statements are not given before trial.

23    MR. ALBEE:  Judge, the issue is what is a witness

24 statement?  And I don't believe we have any witness statements.

25 If we do, we will produce them.  If it's work product if we take

1  notes of a witness' interview, if we don't have the witness

2  adopt those statements or record them in some verbatim fashion,

3  then they don't qualify as witness statements, so they won't be

4  produced because they are work product.

5       THE COURT:  So are you indicating then that whatever

6  memorialized information you may have from a witness is your

7  notes, you all's notes or investigator's notes, and not sort of

8  what we think of as a formal witness statement?

9       MR. ALBEE:  Just to be clear, I'm not trying to evade

10 the Court's question.  They wouldn't be a witness writing down

11 on October 10th, I, you know, approached Mike and blah, blah,

12 blah signed.  We don't have something like that that I'm aware

13 of, and we will certainly produce it if we do.  Otherwise, it

14 will be investigator notes or memos to the attorney or attorney

15 notes.

16      THE COURT:  Which is work product.  You wouldn't be

17 entitled to those.  I think the defense is aware of its on-going

18 obligation if it does have something of that nature.  In other

19 words, a witness who has sat down and signed a statement or

20 someone who is not part of the defense team who has taken a

21 statement from a witness, they have an obligation to turn those

22 over.  And I agree with Mr. Taibleson, I prefer those get turned

23 over before trial, so I'll just remind you of that obligation.

24      MR. ALBEE:  Thank you.

25      THE COURT:  The Government asked to exclude argument

1    or questioning relating to its decision to charge Hamzeh with

2    the machine guns rather than any crime that could be arguably

3    defined as a terrorism crime.  Defense said they will not be

4    making arguments in that respect, so I will grant that motion.

5    That is at Docket Nos. 276 and 291.

6              The Government has asked to exclude evidence and

7    argument from the defense regarding the Government's motives for

8    prosecuting the case, the informant's motivations for

9    investigating, agent's mental state.  The Government argues that

10   this is extraneous or collateral.  I think this is one of those

11   that there are bits and pieces that could fall into other

12   categories or different categories.

13             I think there is sufficient basis for the Government

14   to -- the defense to ask questions about this period when there

15   was not recording going on.  I think the defense has more than

16   enough or more than sufficient basis to question Mike's

17   credibility and to the extent Steve's credibility, and so

18   motivation goes to that.  If people are getting paid and that's

19   a reason for them to, perhaps, say things that they wouldn't

20   otherwise say.  If people are getting other sorts of benefits

21   other than money, and there's a reason for them to say something

22   that they wouldn't otherwise say, that's just purely

23   credibility.

24             I think the defense absolutely has the ability to get

25   into that.  The defense has admitted that it knows that it can't

1    solicit evidence that the Government somehow asked the

2    informants to entrap Mr. Hamzeh.  They've acknowledged that they

3    can't get into that.  But in terms of questioning the

4    credibility of any witness, I think that's appropriate.

5            Now, as to the Government's motivation in prosecuting

6    the case, that may be closer to whether or not they can ask

7    about the Government's solicitation to entrap.  But any witness,

8    I think, is subject to questions on cross examination.

9            Now, obviously, if any of you think that someone's

10   being asked questions that go beyond credibility questions and

11   motivation questions, I will except those objections, and we'll

12   deal with them at trial.

13           MR. TAIBLESON:  Your Honor, may I flag one issue on

14   that?

15           THE COURT:  Sure.

16           MR. TAIBLESON:  One line of questioning and argument

17   that the Government believes is inappropriate is to quote the

18   defense's motion, "the resources poured into the case meant that

19   there was pressure to get Hamzeh to commit a crime, such as

20   getting a machine gun".  As the defense acknowledges, "the

21   Government's intent to entrap the defendant is irrelevant to

22   prove entrapment".

23           So any line of argument indicating that the Government

24   had to entrap Hamzeh because they spent a lot of time and effort

25   to investigate him is under their own correct reading of the law

1  totally impermissible, and so I want to flag that now.

2        If Your Honor feels that Your Honor can't rule now in

3  advance of questions, I understand that, but I think that's

4  enormously important as to the legal issue that can be put to

5  the jury.

6        THE COURT:  And what I would say to that,

7  Mr. Taibleson, is that there's in my mind a thin line and maybe

8  a blurry one between saying you guys put a lot of work into this

9  case, you put a lot of money into that case, it was important

10  for you to, you know, be able to get something out of this case.

11  I think that's a valid line of questioning.  I realize that that

12  can teeter into and so you know if you couldn't prove a crime,

13  you needed to get him to commit one.

14        Now, we're clearly in entrapment territory, and it's

15  inappropriate questioning.  I think the reason I can't say

16  absolutely is because I don't know what the question will be

17  like.  I think if there's a question in terms of you had a lot

18  invested here, it was important to you, you needed this

19  investigation to turn out well, so to speak.  I think that's a

20  valid line of questioning.  And where the line gets crossed is

21  going to depend on how the question is asked.

22        MR. TAIBLESON:  Thank you, Judge.

23        THE COURT:  The Government asked to exclude any

24  argument or line of questioning that would interject issues of

25  race or religion into the trial.  I note the actual heading of

1    the motion in limine refers to arguments or questioning implying

2    that the investigation or the prosecution of the case was

3    racially or religiously motivated.  So in other words, that

4    either the investigating agency chose to investigate the case

5    because of religious or racial biases, or that I suppose an

6    agent of the investigating agency, that being an informant, made

7    a decision in that regard.

8            The defense responded not that they necessarily

9    disagreed, but the objection was overbroad.  There's a

10   difference between saying the FBI decided to investigate

11   Mr. Hamzeh because they were prejudiced against him based on his

12   race or religion and saying, you know, does Mr. Hamzeh's either

13   ethnicity or Mr. Hamzeh's own religious beliefs play into some

14   of what was going on here and some of what you're going to hear?

15   I think that's a valid distinction.

16           I agree that arguments accusing the Government of

17   choosing to bring this case because of racial or religious bias

18   are inappropriate.  I don't necessarily read the defense's

19   remarks to say that they're going to argue that.  But I don't

20   think there's any way to completely separate out.  The jury is

21   going to hear people talking about Islam.  They are going to

22   hear people talking about Muslims.  They are going to hear

23   people talking about Masons, so it's a little bit hard to issue

24   a ruling saying you can't ask any questions about race, neither

25   of you.  You can't ask any questions about religion when

40

1    necessarily there are going to be some of those questions.

2            So to the extent that the motion goes to prohibiting

3    an argument that the investigation was motivated by improper

4    reasons, I agree with that, and I will grant the motion to that

5    extent.

6            The more subtle question in terms of the realities of

7    the religious discussions that the jury will hear, I think

8    that's got to kind of -- has to be a more case by case.

9            The Government asked to preclude counsel, I assume

10   defense counsel, from demanding discovery, commenting on

11   discovery, things of that nature during trial.  I think it's a

12   very common motion.  And so to the extent that the motion says,

13   you know, we don't make discovery arguments in front of the jury

14   and we don't say, you know, I asked you for those, and you

15   didn't turn them over, I agree with that.

16           The defense responded that said, you know, somebody

17   pops up in court and says there were five conversations that

18   took place on Thursday, November 15th.  I remember there were

19   five conversations, and the defense might want to respond by

20   saying, really, are there notes of that?  This is the first I

21   heard, do you have notes of that?  Those are kind of common

22   questions, and I think those are appropriate.

23           If there's a discussion that we need to get into at

24   sidebar if the next question is going to be Judge, he just said

25   he had notes and we've heard nothing about this, that needs to

Case 2:16-cr-00021-PP  Filed 10/09/19  Page 41 of 83  Document 316

1    happen at sidebar, and I would prefer that that goes for

2    everybody.  If there are issues that come up and you all want to

3    discuss the fact that you just heard something you've never

4    heard before and you've gotten no documentation to verify, it

5    should have been turned over in discovery, I ask that whoever

6    discovers they have that problem request a sidebar, and we'll

7    deal with that outside the hearing of the jury.

8         And to that end if I could just make a general

9    comment.  I don't think any of you have had a trial in front of

10   me yet.  You did, Mr. Taibleson, that's right.  You know this.

11   To the extent that any of you have objections based on pretty

12   straightforward one and two word, objection hearsay, lack of

13   foundation, objection, asked and answered, any of these standard

14   objections, feel free to make them, and I will rule on them.  If

15   there's argument that you need to make in connection with an

16   objection even though it's cumbersome, I would ask that we do

17   that at sidebar.  I don't think those discussions ought to be

18   had in front of a jury.

19        So if I perceive that someone says objection, Your

20   Honor, we talked about this before trial, and one of the things

21   that -- I'm going to cut you off, and I'm going to ask that we

22   come over to sidebar.  I know it's cumbersome and particularly

23   sort of fraught issues.  We can make several journeys back and

24   forth, and I apologize to you for that.  But the jury doesn't

25   need to be involved in those discussions.

42

1        So quick typical Federal Rule of Evidence objections I
2    will rule on without having to go to sidebar.  Beyond that, we
3    need to talk.

4        The Government has asked to limit cross examination
5    regarding bad acts to only acts that are probative of
6    truthfulness.  And so they argue that, for example, if the
7    defense has evidence that Mike seems to be getting -- seems to
8    have an awful lot of money, that there doesn't seem to be any
9    explanation for where he's getting that money from and the
10   defense thinks that, perhaps, Mike is involved in drug dealing
11   or some other illegal activity, past arrests, things of that
12   nature, that the defense should not be allowed to cross-examine
13   that.

14       As to prior convictions, the defense has acknowledged
15   that it can't ask about the facts of those prior convictions.
16   But whether or not the witness was truthful about the conviction
17   or about the offense of conviction goes to credibility, and I
18   agree with that.  I think that's correct.  It's a thin line, so
19   obviously I would expect an objection if I thought if someone
20   thinks they were going over that line.

21       But questions as to credibility and fruitfulness, I
22   think, are relevant.  And I also think that the Government --
23   defense is correct.  Sorry, I keep -- the defense is correct
24   that some of those questions may go to bias or motive.  For
25   example, if there is -- If the defense has a good faith reason

1    to believe that Hamzeh was involved in illegal activity and

2    believes and has reason to believe that because of that witness'

3    assistance to the Government, that person is going to be helped

4    out of that situation, and that person has -- and I realize,

5    Mr. Taibleson, we've already talked about this, and you've

6    indicated the CI file has no evidence to that effect.  That's

7    fine.  I'm simply giving an example that if that evidence might

8    tend to indicate that the witness has a motive to be less than

9    truthful or to bloviate or to create evidence, that will be a

10   relevant line of inquiry.

11          It really is going to have to depend on what the

12   good-faith basis is for asking the question and what the

13   specific question is.  So again, this is one that while I'm not

14   trying to blow you all off, it is going to depend a lot on the

15   context of the question and what's put forward as the good-faith

16   basis for asking the question.

17          The Government made a jury nullification motion, which

18   I expected they would do.  And the defense has, as it does in

19   most cases, acknowledges that it cannot and will not attempt to

20   argue jury nullification, so I appreciate that.  I assume that

21   everybody is going to comport with that.

22          However, I think that I agree with the defense that

23   the Government's view of what constitutes nullification is

24   awfully broad.  Much of what the Government has identified in

25   its motion seems to me to be standard background information

1  that a defendant has a right to present in introducing himself

2  to a jury and in letting a jury know who he is.

3         So if the defense has evidence that Mr. Hamzeh

4  financially supported his family and was close to his family and

5  he's got pictures of him socializing with other people, I don't

6  know if that is the kind of evidence they will put that in, but

7  I don't see that as nullification evidence.  That is simply

8  evidence of the defendant letting the jury know who he is.

9         In particular, the Government says that I should not

10  allow Mr. Hamzeh to put in evidence that, "makes him appear like

11  a normal American man devoid of a plan to commit a mass murder".

12  I find that a particularly surprising request.  Mr. Hamzeh is a

13  criminal defendant defending himself against charges that he

14  argues that he didn't commit.  Of course, he's going to present

15  himself as someone who didn't do what the Government alleges

16  that he did, and so I'm a little mystified by what the focus is

17  here.  Maybe I'm missing something, Mr. Taibleson.

18         MR. TAIBLESON:  Your Honor, our position is just that

19  family photos, discussion of him supporting his family that any

20  person could produce who is predisposed or not predisposed to

21  commit the offense or didn't commit the offense is not probative

22  of the elements of the offense or the elements of the entrapment

23  defense.  Because any family photo -- Any person no matter how

24  guilty can produce a familiarly photo.  It's simply not

25  probative.

1        If Your Honor -- We defer to Your Honor's ruling, of

2    course, that Mr. Hamzeh wants to put in sort of background

3    information about himself he may do so I guess to introduce

4    himself, but we don't think that an extended discussion of

5    supporting his family really has anything to do with the jury's

6    charge here, which is to see how the facts apply to the elements

7    of the offense.  That's what we went to express.  Maybe we

8    didn't do a very good job of that.

9        THE COURT:  I'm certainly going to give Mr. Hamzeh

10   some leeway in introducing himself to the jury and telling

11   himself to the jury.  The Government, of course, has the right

12   to argue, hey, the fact that you support your family means you

13   are or are not predisposed to commit a crime.  I leave to you

14   all that argument.  I don't see this as going to jury

15   nullification.  I see this as a defendant simply wanting to

16   present the best side of himself, which I guess would be

17   shocking if he didn't.  There are limits on that, of course.  If

18   we spend a day with every member of Mr. Hamzeh's family coming

19   in and telling about his fifth grade birthday party, I think I'm

20   going to have to put a stop to that.  I assume the defense is

21   not planning something along those lines.  So again, we will

22   play that a little bit by ear.  I'm not going to make a blanket

23   ruling that the defense can't put in information about

24   Mr. Hamzeh's relationships and his everyday life.

25       Under Seventh Circuit law, the Government has asked to

1    preclude the defense from defining reasonable doubt.  The
2    defense did not respond, I assume, because it knows full well it
3    can't do that, so I will, of course, grant that motion.  I was
4    going to say I never had anybody try to do that.  I had one
5    person teeter pretty close one time.  I wouldn't anticipate that
6    in this case.
7              The Government has moved to bar any kind of defense or
8    argument that looks like an outrageous Government conduct
9    affirmative defense, which has not been raised.  And even if it
10   were, the Seventh Circuit has said that's not -- that's not an
11   appropriate defense.  In the days when it was allowed as a
12   defense, it was a jury question -- I mean a court question, not
13   a jury question.  The defense has said it doesn't plan to make
14   any of those arguments now.
15             Again, we get into the subtleties the defense says it
16   may very well ask questions how appropriate is an investigation
17   to have someone who has been recording, recording, recording and
18   then one day suddenly stop recording and not do it for a month.
19   I anticipate there will be questions around that.  I'm not sure
20   that is an outrageous Government conduct defense.  That is what
21   was going on here.  What happened?  You don't know, we don't
22   know.  And then the next thing that happens is X and what
23   inferences can you draw from that?  That's all appropriate, I
24   think, in the context of this case.  I would expect it.
25             There's a motion with regard to one of the experts

1  that the defense wants to bring in.  Markus Brauer.  And Brauer,

2  generally speaking, I think is going to testify to, just

3  glancing over the report, how human beings influence other human

4  beings in certain social settings and how peer pressure, I

5  suppose, influences people's decisions to do certain things.

6  And I guess one question I have, it doesn't seem to me, perhaps

7  I'm incorrect -- Well, no let me take that back.  Is the

8  Government's argument, number one, that Brauer is not qualified

9  as an expert under Daubert 702?

10         MR. PTASHKIN:  Your Honor.  With a lot of these

11  witnesses, we're stressing Rule 704(b), and I think this is

12  another situation where there's a line.  Can under the Ninth

13  Circuit case law and Third Circuit case the defendant's cited,

14  can these witnesses say Mr. Hamzeh's IQ is 78, thus he is

15  susceptible to influence?  Yes.  What the main point we're

16  trying to make is, it really can't go further than that and ask

17  these ultimate questions, which are barred from testifying about

18  it by 704(b), was he entrapped?  Did he have the mens rea to

19  possess the gun?  Was he predisposed?  Was he induced?  I think

20  to some extent, it is a fine line.

21         To some extent, it really isn't.  They can say his IQ

22  is 78, and thus he is susceptible to influence.  To really go

23  any farther and attempt to apply that IQ level to the elements

24  of the offense or the elements of the entrapment offense, we

25  think is impermissible under Rule 704(b).

1    THE COURT:  Thank you for that clarification.  So

2    Mr. Albee, Mr. Bugni, were you planning to present the ultimate

3    issues to these experts or simply to elicit the information

4    about one's cognitive faculties and one's accessibility to

5    manipulation if one's cognitive faculties fall under a certain

6    category?

7    MR. BUGNI:  You put it well.  We're not going to go

8    past the line.

9    THE COURT:  Thank you.  Generally, if the Government

10   is of the view that we're wandering dangerously close to it, I

11   expect objections at that point.  So thank you.  That clears

12   that up for me.

13   Professor Kimmel.  The Government has objected, I

14   assume, a similar objection with regard to how it was that the

15   two informants interacted with Mr. Hamzeh, and how similar that

16   is to how, perhaps, terrorist organizations seek to recruit

17   people.  And again, I think part of the Government's objection

18   is if you're going to have this expert testify, say he wasn't

19   predisposed, that's unacceptable.

20   So tell me, Mr. Ptashkin, you know, are we kind of in

21   the same general category?  You're not necessarily objecting

22   under 702, you're objecting to this witness testifying to the

23   ultimate conclusions that the jury is supposed to draw?

24   MR. PTASHKIN:  That's correct, Your Honor.

25   THE COURT:  Okay.  All right.  Same answer?

49

1          MR. BUGNI:  Same answer.

2          THE COURT:  All right.  Thank you.  And same for

3    Dr. Brauer, is that the case, Mr. Ptashkin?

4          MR. PTASHKIN:  Yes.

5          THE COURT:  With regard to all of these experts,

6    Robbins, Brauer, this whole group of folks, testimony as to

7    someone's cognitive function and how that relates to someone's

8    accessibility, testimony about how certain kinds of pressure

9    impacts people regardless of their cognitive functions and in

10   particular with, perhaps, deficient cognitive functions is

11   appropriate, but it's not appropriate to ask any of these folks

12   so was he predisposed?  Was he not predisposed?  Was he induced?

13   Was he not induced?  Those are questions for the jury.

14         Dr. Sageman falls into a different category in my

15   mind, and I hinted at this earlier when I talked about the

16   questions and the jury questionnaire, and this has come up

17   actually not only from the defense's proposed expert, but from

18   the Government's proposed expert as well.  And sorry, I'm

19   flipping.

20         The Government wants to put in Dr. Matthew Levitt and

21   his testimony, and the defense wants to put in Dr. Mark Sageman

22   and his testimony.  And as I understand it, both of these

23   experts are experts in Middle East relations and particularly

24   Israeli-Palestinian relationships.  I am really concerned about

25   going down this road.  I understand that there were

1    conversations early on in which Mr. Hamzeh allegedly made some

2    statements about going over to the Middle East and getting an

3    Israeli soldier's gun and shooting Jewish people.  I realize

4    that.  I understand that the Government is likely to argue that

5    that is part of its evidence, that Mr. Hamzeh was predisposed to

6    do something bad on a large scale, and that the defense is going

7    to argue that no, it wasn't, it was talk.

8              I think some of that probably comes up through the

9    experts that we've just talked about in terms of how people

10   interact with each other.  But it seems to me that the basis for

11   both of these experts, you all asking for these experts to come

12   in, is both of you are asking to kind of give a tutorial to the

13   jury on relationships between Palestinians and Israelis or

14   between Arabs and Jewish people.  I think that's a huge

15   quagmire, and I think it also assumes a fact that it shouldn't.

16   It assumes that people on the jury are not going to be familiar

17   with the fact that there is a conflict between certain, perhaps,

18   Israelis and Palestinians and, perhaps, even between Arabs and

19   Jews at large, not every Arab and Jewish person of that descent.

20             It assumes that the jurors are not going to be

21   somewhat aware of that.  Are people going to know about 1947 and

22   are people going to know about where the Gaza Strip is and are

23   people going to know about specific events that are listed, for

24   example, in Dr. Levitt's expert witness report?  Probably not.

25   But I guess I got to say, I will be flabbergasted if we get

51

1    anybody on a 14-person juror who isn't aware that there is some

2    historical enmity there and who would be confused if they heard

3    that someone of Arab descent might have had some comments to the

4    negative about some Israeli people.

5            I do not want this to turn into -- I think both sides

6    commented on a mini-trial about the Middle East conflict,

7    particularly when the issue that I think sort of precipitated

8    the final moments of this offense was a different one.

9            The one thing that I do think conceivably could be

10   confusing to a jury, and I'm not quite sure yet entirely how to

11   address this, and I'm not necessarily giving you a ruling right

12   now -- I'm giving you an opportunity to talk about it -- Is any

13   belief or connection -- any belief that one might have that

14   there is some sort of connection between free Masons and Isis?

15   I think persons with some historical background found that,

16   like, sort of goofy given that the free Masons allegedly are

17   descendents of the Knights Templar, so that would seem sort of

18   weird.

19           On the other hand, that to me seems more of something

20   that your average run-of-the-mind juror might go, what, I don't

21   understand what those things have to do with each other or why.

22   One answer to that question might be I saw a video on YouTube

23   that said it in which case you don't need to know the historical

24   backgrounds of the religious underpinning.  I just saw something

25   on the internet that convinced me that this was a thing.  So

1   that's the piece to me that while I don't think we ought to be

2   having a seminar for the lucky jurors on learning the history of

3   the conflict in the Middle East and the history of the conflict

4   in Israel, I do see there may be a kernel of something there

5   that needs explaining.  I will give you each a chance to comment

6   on this.  This is my biggest concern.

7          MR. PTASHKIN:  Your Honor, Dr. Levitt's testimony is

8   integral to our case.  It's extremely relevant and important,

9   and here's why.  He's not testifying about the big-picture fact

10  that there is an Israeli-Palestinian conflict.  He's discussing

11  the specific facts that Mr. Hamzeh discussed in the recorded

12  statements.  I will give a couple examples.  He talks about how

13  the fact that it's much easier to get into the West Bank if you

14  have an American passport as opposed to a Jordanian passport.

15  He talks about the fact that he can join up with Hamas in the

16  Gaza Strip.  But in the West Bank, it would be much more

17  dangerous to engage in terror activities because as Mr. Hamzeh

18  called it, there are spies.  And by that, I believe he's

19  referring to people that are informants for the Israeli military

20  and security services in the West Bank.

21         Mr. Levitt will explain while of course I agree with

22  the Court, the jurors are going to know what the

23  Palestinian-Israeli conflict is in general, are they going to

24  know the differences between the security situation on the

25  ground and the Gaza Strip versus the West Bank?  Are they going

53

1    to know how critical it is to have an American passport if

2    you're trying to go from Jordan into the West Bank is?

3              Mr. Levitt is going to testify about what is Hamas?

4    What is the West Bank?  What is the Gaza Strip?  Respectfully, I

5    don't think the average juror in the jury pool in the Eastern

6    District of Wisconsin has that refined view of the facts.  They

7    know in general that there is this conflict, but they are not

8    going to know what the Gaza Strip is as opposed to the West

9    Bank.  They're not going to know the issues about the passport.

10             So it's not going to be -- His testimony is not going

11   to be broadly explaining why the Israeli side -- why Israel is

12   justified in performing Operation Protective Edge.  It's going

13   to be what is Hamas?  What is Gaza Strip?  It is really going to

14   be just a dry, academic lecture about the places, the security

15   situations on the ground, and that is extremely necessary for

16   the jury to hear because all those things are discussed by

17   Mr. Hamzeh in his statements.

18             So why are those statements relevant to the charged

19   offense?  They're arguing Mr. Hamzeh was entrapped.  Our counter

20   argument is that in October, he was planning on flying to Israel

21   to join Hamas and murder Israeli civilians.  He discusses in the

22   recordings that is a plan that far predated those recordings in

23   October.  Eventually, the plan morphed, and he was going to do a

24   mass-casualty attack at the Masonic Temple and murder civilians

25   two blocks north of here.  It's extremely relevant to his

1    predisposition to buy a machine gun that for months and months

2    and months he wanted to commit a mass-casualty attack, which a

3    machine gun, obviously, makes much easier than a handgun or a

4    knife, and he discusses machine guns in these recordings

5    consistently.  Sometimes he does discuss a handgun, too.

6            THE COURT:  I think you're blurring a lot of issues.

7    I think what I'm hearing you say, Mr. Ptashkin, is that you're

8    anticipating that the defense is going to argue that this was

9    all just a bunch of yapping and posturing on Mr. Hamzeh's

10   behalf.  Forgive me for putting it that way.  And you all are

11   proposing to put forth Levitt's testimony to say actually what

12   he was saying tracks with the realities on the ground.

13           MR. PTASHKIN:  Exactly and tracks a sophisticated plan

14   about how to commit a terror attack in Israel.  I think this is

15   also is extremely important given this defense about his IQ

16   allegedly being 78.  When you look at the sophistication of his

17   statements in the recordings, and Dr. Levitt's testimony shows

18   how that sophistication, how there was intelligent planning

19   here, it rebuts the defense that this is a person with a low IQ

20   who is incapable of plotting anything that requires strategic

21   thought.

22           The recorded statements show strategic thought and an

23   in-depth knowledge of the realities on the ground in Israel.

24   And when he discusses those realities on the ground if there

25   isn't an expert to explain how those statements are correct

1  statements of the reality on the ground, how is the jury going

2  to understand?  I don't think --

3          THE COURT:  I think I understand what you said.  Thank

4  you.  Mr. Albee, Mr. Bugni, you have two things to respond to.

5  One is Levitt and the other is your own proposed expert.

6          MR. BUGNI:  Two things, Your Honor.  I just want to

7  answer your direct question first.  We don't think that you need

8  an expert to explain the Masonic link to Isis.  I just think

9  that's very clear.  They saw it on the YouTube video.  I don't

10 think that needs to be done at all.  I think whatever Dr. Levitt

11 would bring to that, it sort of goes to his boogyman statement

12 that I think is completely inappropriate within his report.

13 Demeaning those in the Middle East, you know, I can't remember

14 the exact quote, but blaming all their woo's upon other people.

15 I think that is completely inappropriate.

16          As far as the Government's real issue or their

17 argument today, we put forth, Your Honor, much of that isn't

18 relevant, all right.  And what the Government's trying to do is

19 trying to backfill what isn't relevant.  And what they don't

20 have as far as predisposition, any text messages, computer

21 communications, anything that shows beyond talk and give the

22 imprimatur of an expert to say no, no, this is really

23 sophisticated.  He talked, but he didn't do anything beyond

24 talk.

25          So that idea doesn't bring it to what an expert needs

1    to do.  An expert doesn't need to opine as to that.

2         MR. ALBEE:  If I could just add one thing.  The claim

3    I think that that is sophisticated knowledge is in some way, I

4    mean, these are, you know, who is in charge of Gaza?  Who can

5    travel where?  To somebody in Menomonee Falls or something like

6    that, maybe that would require a little research, but easily

7    gotten.  But to somebody who grew up in Jordan or Palestine or

8    Israel, it is not sophisticated knowledge in any way.

9         The alternate on any of this stuff like, you know,

10   what is Hamas?  I know there have been some cases where the

11   Government initially proposed Dr. Levitt and a definition was

12   provided.  This is what Hamas is.  There's absolutely no need to

13   get into this because although they call it dry and academic, as

14   Mr. Bugni pointed out, Mr. Levitt, at least in his report,

15   shares some, you know, what I think are pretty controversial

16   views that would then require us also to provide some context as

17   to what is happening there.

18        In terms of the sophisticated plan, almost all the

19   conversations, Judge, are of a level of sophistication along the

20   lines of, you know what we'll do?  We'll grab the guns from the

21   Israeli soldiers, shoot them and take their guns.  It is

22   preposterous.  Those are the best trained soldiers in the world

23   probably.  That's just not going to happen, this Rambo kind of

24   thing.  It's the Palestinian Walter Mitty is what's coming out

25   there.

1          Dr. Levitt's explanation of Hamas and going into the
2     details of, you know, I think the Court was already pointing out
3     and suggesting is, you know, to try to unravel this long
4     historical, you know, issues there.  It's just not a morass we
5     should be wading into.
6          I won't address Dr. Sageman, I guess, until I get some
7     sense into what the Court thinks.  Our desire to put him on on
8     these issues is related to Dr. Levitt's proposed testimony.
9          THE COURT:  Well, I guess that's my question.  I
10    haven't -- I glanced over Levitt's report, which is extensive.
11    And if the Government's thought was to put all of that in, then
12    that's not happening.
13          MR. PTASHKIN:  I apologize.  Just on that question, I
14    told Mr. Levitt -- Dr. Levitt to error on the side of including
15    too much information.  I would estimate his direct exam would
16    take about an hour to an hour-and-a-half.  It's going to be very
17    high level.  What is Hamas?  The basic questions that he
18    summarized at the beginning of the report.  What is Hamas?  What
19    is the Gaza Strip?  What is the West Bank?  Are there Masonic
20    conspiracy theories that exist in the Middle East?  It's going
21    to be very high level just discussing the facts of what these
22    places are that are a 15-hour plane ride away from here, so that
23    the 12 lay people on the jury have a sense of what are these
24    places.
25          We are not going into an excruciating level of detail.

1    I note a lot of the specific facts that the defendant objected

2    to in their motion in limine including -- We're not going to

3    discuss the videos of training children, all those specific

4    things.  It will be very high level to answer those basic

5    questions to put the defendant's own statements in context.

6              MR. ALBEE:  Judge, an hour, hour-and-a-half?

7              THE COURT:  That's what I just thought.

8              MR. ALBEE:  I mean, Mr. Hamzeh wasn't a member of

9    Hamas.  There is no suggestion he ever joined them, took any

10   action on their behalf, anything.  It just doesn't matter.  The

11   Government -- I don't think they should be able to get into any

12   of these conversations, by the way.  But if the Court allows any

13   of the conversations, the jurors don't have to know anything

14   about the Middle East to know that I'm going to grab the guns

15   and shoot people isn't a good thing.  That's really what the

16   Government wants.  I don't think they should be able to get into

17   that, which is a different question.  You don't need to know who

18   Hamas is for the Government to sell that point.

19              As I said, I think that should be excluded on 403

20   grounds because it doesn't have anything to do with his

21   predisposition to obtain machine guns, which is the charge here,

22   and so I think that that leads to its own morass.

23              You know, for Dr. Levitt to testify about all the

24   details of Hamas, I don't think any of this is relevant.

25              THE COURT:  I know.  I have not ruled on your request

1    to exclude any reference to allowing this.

2           MR. ALBEE:  You know, it would be Hamas off the top of

3    my head is probably a poor -- Hamas is a political organization

4    that is in conflict with Israel and has been deemed responsible

5    for a number of attacks against Israel.  I don't know off the

6    top of my head, I'm not sponsoring that definition, but nothing

7    more would ever be needed than that.  An hour-and-a-half?

8           THE COURT:  I'm a little flabbergasted to hear an

9    hour-and-a-half.  That aside, Mr. Albee, let me ask you a

10   hypothetical question.  If I were to rule -- Number one, this is

11   the first hypo.  If I were to rule that the Government cannot

12   call Dr. Levitt, would you all be seeking to call Dr. Sageman?

13          MR. ALBEE:  We would not be calling him.

14          THE COURT:  Number two, second hypo.  If I allow the

15   Government to put in limited testimony from Dr. Levitt, would I

16   be correct in assuming that you all would want to call

17   Dr. Sageman to address that limited testimony depending on what

18   it was?

19          MR. ALBEE:  I would guess that would be the case.

20          THE COURT:  All right.  I want to go back and read

21   these reports in more detail and see what we're looking at.  I

22   can't give you a ruling on this today.

23          MR. ALBEE:  The one thing I will be brief, Judge, on

24   the Masonic part.  Dr. Levitt which -- All that matters here is

25   what Mr. Hamzeh and the informants were thinking.  I mean,

1   there's nothing factual about this.  Going back to the Court's

2   original question.  The New York times isn't reporting any link

3   between the Masons and Isis.  This doesn't really exist.  And so

4   to -- It's going to be a matter of who is responsible for

5   creating this preposterous view that the Masons and Isis is

6   linked, who is selling that to who and how that came about.

7   There is no truth to it, so there's no need for expert testimony

8   on something that is completely fictitious.

9           THE COURT:  Thank you all.  As I said, I will have to

10  get you a ruling on that.  The same is true, the defense has

11  moved to exclude or limit the Government's use of any of

12  Mr. Hamzeh's discussions of any of these topics that we've just

13  been talking about on the recordings, and I'm going to get you a

14  ruling on that.  I know that the Government needs it sooner

15  rather than later, obviously, as does the defense, so you know

16  what you all are or are not putting in.  I promise I will try to

17  get to it quickly.

18          Docket No. 277, defense moved to exclude or limit any

19  evidence that Mr. Hamzeh has gotten any speeding tickets or

20  speeds when he drives or that he has gotten into a fight because

21  he's not on trial for any of that stuff.  The Government says it

22  doesn't have any intention of getting into speeding, and the

23  only reason that it might get into any kind of physical violence

24  that Mr. Hamzeh has gotten into is if the defense comes in and

25  says, he's never been physically violent or never been involved

1  in anything like that.  Am I understanding that correctly?

2          MR. TAIBLESON:  That's right, Judge.

3          THE COURT:  So to that extent, I will grant the

4  motion; although, again if the defense opens the door, I will

5  allow the Government to walk through it.

6          The defense has asked me to preclude the Government

7  from characterizing Mr. Hamzeh as a lone wolf, a terrorist or a

8  mass murderer.  And from the Government's response, the

9  Government says, number one, it doesn't plan to refer to

10 Mr. Hamzeh as a lone wolf.  So okay, that problem is solved.  If

11 it does, I will sustain the objection.

12         The Government says it's going to put on "limited

13 evidence" of Mr. Hamzeh's escalating claims to commit a mass

14 murder.  Again, this goes back to the ruling I have not given

15 you about what I'm going to allow the Government to get into

16 with regard to the conversations that preceded the purchase of

17 the machine guns.

18         I will note, however, that I think the defense is

19 absolutely right that if the Government has any intent to

20 referring to Mr. Hamzeh as a terrorist or as a mass murderer

21 even looking at this entire record, there's no evidence that

22 Mr. Hamzeh committed a terrorist act.  There is no evidence that

23 Mr. Hamzeh murdered a mass or an individual, and it would be, I

24 think, completely inappropriate for the Government to refer to

25 him using any of those terms.

1    If I allow the Government to get into some of the

2    conversations that we've talked about, and the Government can

3    characterize what Mr. Hamzeh allegedly said he was going to do

4    as an attempt to commit a mass murder.  But to refer to him as a

5    mass murderer or terrorist, I think, is completely

6    inappropriate, and I will grant the motion to the extent that

7    that's what it addressed.

8    Defense moves to preclude the Government from

9    characterizing the defense of entrapment as a mere technicality.

10   The Government says it doesn't plan to do that, but it is going

11   to say he wasn't entrapped.  Of course it's going to say he

12   wasn't entrapped, and I will allow that.  But if we -- I assume

13   the Government is aware of this, if we start wondering toward a

14   line of this is not really that big a deal, then we're getting

15   into prohibited territory.

16   Obviously, if the defendant is entrapped and can

17   convince a jury that he or she was, it is a big deal.  So

18   qualifying or characterizing an entrapment defense generally is

19   not an appropriate argument.  Responding to it and rebutting it

20   is.

21   The defense has asked to prevent the Government from

22   arguing that in order to prove the inducement clause of

23   entrapment, the defendant needs to show that the inducement was

24   somehow extraordinary.  The Government responds that *Mayfield*

25   didn't say, don't use the word extraordinary.  It just said,

63

1   extraordinary is more than ordinary. That's a bizarre argument.

2   Inducement does not have to be extraordinary. It has to be -- I

3   don't think it's appropriate, and none of the cases that lead up

4   to *Mayfield* or *Mayfield* itself said that the inducement has to

5   be extraordinary.

6          So, no, the Government can't argue that the inducement

7   has to be extraordinary. You can certainly argue there wasn't

8   inducement. I expect that that will probably happen, but we're

9   not going to fight or quibble over the word extraordinary. I

10  don't think that's what the law calls for, and I'm not going to

11  allow that argument.

12         The same thing with regard to the defense's motion to

13  preclude the Government from speculating about Mr. Hamzeh's

14  positional predisposition, which is this kind of notion of from

15  the Second Circuit cases, including *Cromitie*. I've already

16  ruled on that in the entrapment motion and in particular, I

17  think I made clear in the decision that I issued with regard to

18  entrapment.

19         I realize that the defense has put forward in some of

20  its pleadings that machine guns are not easy to get, that

21  Mr. Hamzeh couldn't have just gone out on the street corner and

22  bought a machine gun, and that's part of the Government's

23  inducement argument. I understand that. I understand the

24  defense wants to respond with, I think you propose an expert to

25  say, sure you can. Sure you can buy a machine gun on the

1    street.  But to the extent that the defense wants to argue that

2    the recordings do indicate that Mr. Hamzeh was trying to get a

3    handgun, that he was trying to get a pistol, and that one can go

4    onto cites on line or, perhaps, he can go into a sporting goods

5    store and purchase parts to convert a handgun into a

6    semi-automatic or fully-automatic weapon, I'm not going to allow

7    any argument to that extent.  I can assume you all picked that

8    up from my written ruling.

9         MR. TAIBLESON:  And it was never our intent to do

10   that.  The point is just the defense intends to say it was

11   difficult for him to do this.  We would like to be able to

12   respond and say that it wasn't.  And to the extent that forms a

13   predispositional analysis, that's as far as it is was going to

14   go.

15        THE COURT:  I want to be real specific about our

16   terms.  It was difficult to do this.  The defense has said, it

17   would be difficult to purchase a machine gun of the type that

18   ended up getting purchased out on the street.  And the

19   Government, as I understand it, is going to present someone to

20   say, no, it's not.  You can buy machine guns on the street.

21   What I'm saying is that can't go further into, you know, if you

22   bought a perfectly legal weapon, there are ways you can convert

23   it.  I think that is stretching the predisposition argument far

24   to far.

25             MR. TAIBLESON:  So I just want to make sure that we're

1  clear.  The variety of the machine gun that any person could buy

2  on line for $20 is exactly the machine gun under the statute

3  that the defendant is charged with violating.  That is a machine

4  gun.  The part on its own is a machine gun.

5      THE COURT:  No, that's the problem, Mr. Taibleson.

6  Now, we're getting into that is not what Mr. Hamzeh is alleged

7  to have purchased.  That is not the item that ended up in his

8  hands on the 19th of January.  And so I understand that

9  technically under the statute, that thing can be defined as a

10  machine gun.  But what we're talking about here, you know it,

11  the defense knows it, I know it.  What we're talking about here

12  is -- is an actual machine gun that's complete in and of itself.

13  And so we're not going to go down a rabbit hole of there are all

14  sorts of other things that are defined as a machine gun under

15  the statute, under Title 26.  And that if you attached them to

16  what is not defined as a machine gun, it then becomes a machine

17  gun.

18      MR. TAIBLESON:  No, no, Judge.  It's not that if you

19  attach them they become a machine gun.  It's just that that part

20  on its own is a violation of the statute the defendant is

21  charged with.  And just in as much to my understanding of

22  *Hollingsworth*, if a person is in a position to violate the

23  statute, that satisfies the -- This is enormously important, the

24  positional predisposition piece of the analysis.  If he does it

25  with a 9 millimeter machine gun, if he's capable of getting a 10

1    millimeter machine gun, he's capable of getting a submachine gun

2    that fires automatically.  All of that is enough to say that

3    he's in a position to do it.  And because the Government would

4    like to argue he was in a position to buy an item that would be

5    a violation of the statute, that that is enough to show he was,

6    at least, in a position to do this.  That's all.  It is a very

7    limited sort of argument about exactly the statute with which he

8    is charged and the term.

9         THE COURT:  Again, I am -- I don't purport to be an

10   expert on a $20 dollar item that you can buy on Amazon.

11        MR. TAIBLESON:  Would Your Honor permit testimony to

12   that effect?

13        THE COURT:  No, that's what I am trying to tell you.

14        MR. TAIBLESON:  I guess --

15        THE COURT:  Look.  What you're telling me right here

16   today, and this is what I tried to say in the order, is that I

17   am in a position to buy a machine gun.  I can go on Amazon, and

18   I can buy that same --

19        MR. TAIBLESON:  That's exactly right.  But you don't

20   want to.  So there are two pieces to this.  One, is we don't

21   intend to say he wanted to do it because it was on Amazon.  We

22   have the statement to say he wanted to do it.  But the defense

23   is going to argue he was not predisposed to commit this crime

24   because even if he wanted to, it's really expensive to violate

25   the statute and buy a machine gun.

1    We're not going to try to say any person with access

2  wanted to.  We're going to say under *Hollingsworth*, we have to

3  satisfy the Seventh Circuit pattern jury instruction.  I think

4  it does a nice job summarizing this.  We want to say he could

5  have.  It was reason to believe that he might not yet have found

6  the means that probabilistically these were available.  So we're

7  not going to say that you or anyone else wanted to just because

8  these are on line.  We'll use other evidence for that.  It is

9  absolutely essential that the Government be able to put in

10  evidence that whether it was a 9 millimeter or 10 millimeter or

11  a box switch or submachine gun, any item that was capable of

12  continuous fire, that he could have gotten one reasonably.  We

13  have to prove that, and that is evidence that we must be able to

14  put in evidence of that to put on our case.

15    THE COURT:  Well, I guess my understanding was, and I

16  will go back and reread the pleadings.  But my understanding was

17  that what the defense had said was that you can't just go out

18  and buy one of these things.  These things, I assumed, meaning

19  what ended up in Mr. Hamzeh's hands on the 19th of January on

20  the street.  If you want to put in evidence, and I thought you

21  had proposed either a retired agent or somebody to say, yeah,

22  you can, they're out on the streets of Milwaukee, you can find

23  somebody to sell you one, I think that directly addresses that,

24  and you're allowed to do that.  I think going beyond that and

25  saying and there are also these other 50 million ways you could

1  have gotten it, quite frankly, I think in some senses, that

2  argument is counterproductive.  Because if it were that easy, I

3  don't know why we spent four months allegedly going through all

4  this.  I think that confuses the issue.  I think it steps

5  outside of the facts of what we had here.

6              MR. TAIBLESON:  Judge, would you permit additional

7  briefing on this issue, limited briefing just to explain?  Maybe

8  I just didn't explain it very well in the briefing, how we are

9  not attempting to show he wanted to do it because there are a

10 whole different set of machine guns he could have purchased.

11 Just that under the probabilistic analysis *Hollingsworth*

12 requires in this circuit, it informs the jury -- We have to tell

13 them the whole set of ways he could have done this and whether

14 they were available to him.  That's all.

15             THE COURT:  If you want to argue that, you can give me

16 something by Wednesday.

17             MR. TAIBLESON:  Thank you, Judge.

18             THE COURT:  I will give the defense an opportunity to

19 respond by Friday.

20             MR. TAIBLESON:  Thank you, Judge.

21             MR. BUGNI:  Your Honor, if I -- Just to avoid a

22 problem, we want to make sure the Government's expert, John

23 Lindamen, they noticed.  We assumed it would be in response to

24 John Davis.  He was talking about this machine gun, which is

25 what we are all operating under the last three years.  Their

1    expert isn't going to go and talk about these convergent parts

2    and everything else.  I didn't take that to be part of it until

3    right now.

4              THE COURT:  That's what I'm telling you.  I'm not

5    comfortable with going that direction.  Mr. Taibleson says that

6    he wants to explain why he ought to be able to.  I am giving you

7    a chance to respond.

8              MR. BUGNI:  Okay.

9              THE COURT:  Docket No. 219, not 219, I'm sorry, Docket

10   No. 277.  The defense moved to preclude the Government from

11   introducing evidence from Mr. Hamzeh's laptop, mobile phone,

12   Play Station, pole cameras.  The Government says it is not going

13   to do that.  I think I can grant that motion.

14             MR. ALBEE:  Judge, they added the words in their case

15   in chief in there.  I think it would have been clear from the

16   order initially that if there's any intent to use anything from

17   the computer, the Play Station or cell phone, that we turn it

18   over.  It wasn't in the case in chief kind of thing.  The whole

19   point of the motion that we made was to avoid having to find an

20   expert or go back through a computer.  We didn't think there was

21   anything there.  But if there was, we wanted to be able to have

22   somebody examine it.  We are asking the Court be --

23             THE COURT:  At all and not in the case in chief.

24             MR. PTASHKIN:  Your Honor, the only comment I would

25   make about that is Exhibit 27 on our list is an exhibit video of

1    the defendant at 9Rounds.  This is something the defence

2    provided us as one of their exhibits.  I believe this is off of

3    the defendant's cell phone so --

4            MR. BUGNI:  We can work that out, Your Honor.  If it

5    is limited to that one video, we'll work it out.

6            MR. PTASHKIN:  If they're going to use it, thus we put

7    it on our exhibit list.  Aside from that, we are not using

8    anything from the cell phone and the Play Station.  I just

9    wanted to mention that one exhibit because we believe that might

10   be from his cell phone.

11           MR. BUGNI:  Fair enough, Your Honor.

12           THE COURT:  Thank you.  This next objection, which is

13   at 277 may go to what Mr. Bugni was talking about earlier, which

14   is the defense has moved to preclude the Government from

15   challenging the defense translations of disks 104 to 106 or

16   Bates 151 and 272 to 465.  Is this the re-numbering?

17           MR. BUGNI:  No.  We had a separate translation done of

18   the last day of the 25th.  I believe we worked that out with the

19   Government.  The stipulation covers the authenticity of it, and

20   we're going to work out the accuracy.  We made the final change.

21   It will be covered by the stips.  You don't need to worry about

22   it.

23           MR. TAIBLESON:  That's right.

24           THE COURT:  Thank you.  I appreciate that.  We've

25   already talked about Docket No. 278 and Dr. Levitt.  I'm going

1     to take a look at that.  And the only other two things that I

2     have on the list are there were some motions to seal 274 and

3     265.  Government's motion to seal I think relates to the

4     protective order and the fact that the Government was asking to

5     seal because there is a protective order in place.  Am I

6     recalling that correctly?  It's your response to what the

7     defense filed earlier this month about --

8               MR. TAIBLESON:  About Mike?

9               THE COURT:  Yes.

10               MR. TAIBLESON:  Yes.  Our position is that needs to be

11     sealed.

12               THE COURT:  And the other one regards something that

13     everybody has been sealing.  I don't think we have an issue with

14     that.  I can deal with those.

15               MR. BUGNI:  What was the other one?

16               THE COURT:  There's a motion to seal Docket No. 279.

17     I think if you take a look at it, you'll understand.

18               MR. BUGNI:  The text messages?  Thank you.

19               THE COURT:  I'll take care of those.  The -- So I owe

20     you some rulings on some of this and some voir dire.  In terms

21     of sort of housekeeping practicalities, and I will give each of

22     you an opportunity to let me know things you'd like to talk

23     about that we haven't hit on this morning.

24               In terms of housekeeping practicalities, what I would

25     like to do and we can talk about this more at our next get

1  together, I am hoping to have you all on the first morning of

2  trial -- Well, let me back up.  As I understand it right now,

3  there may be three trials scheduled for the 21st.  I believe

4  Judge Stadtmueller has two civil cases that are on the calendar

5  right now for the 21st.  I believe Judge Duffin may have one,

6  and then we've got this one.  I don't know whether Judge

7  Stadtmueller's are going to go.  He's senior to me, but those

8  are civil cases and not criminal cases, and I don't know.  I

9  need to try to figure out whether we will be getting a pool

10  first.  I would like to hope so because we need to get started

11  right away on the first morning of trial.  I wanted to give you

12  all a head's up that I need to sort that and figure that out.

13  As soon as I know that for sure, I will let you know.

14        For the moment, let's imagine that we get the pool

15  first.  What I'm hoping is that you all can be here 8:00, 8:15

16  to do any kind of pretrial housekeeping we need to do.  I would

17  like to have butts in seats at 9:00 and start the preliminary

18  instructions and voir dire at 9:00 in the hope that we can move

19  as quickly through jury selection as possible while still giving

20  everybody the freedom to do what they need to do.

21        So the first day we will take breaks as needed.  We

22  will take a lunch break as needed in terms of how we are doing

23  in terms of jury selection.  Once we get the jury selected,

24  however, what I'd like to do, depending on how we're moving, is

25  have a 9:00 to 5:00 or 5:15 trial schedule.  Have you get here a

73

1   few minutes before 9:00 to talk about housekeeping issues, and

2   we actually start at 9:00, give the jurors a break mid-morning

3   to stretch their legs, do what they need to do.  So we can give

4   them an hour lunch.  I prefer to do that because they have to

5   leave the building, and then afternoon break and try to finish

6   around 5:00 ar 5:15.  If it looks like we're dragging under that

7   schedule and we're not making decent time, we can move them back

8   and have them come back at 8:30, and we can shorten the lunch.

9         The concerns I have, and I know not everybody does it

10   this way, but the concerns that I have about really extended

11   trial days, as you know, we get jurors from far reaches.

12   Sometimes we get jurors who get hotels room here for the time

13   they're going to be in trial.  We want them to be able to pay

14   attention.  And so I'd like to avoid putting them through a

15   longer day and then worrying about how they are going to get

16   home to Menomonee Falls or wherever they are coming from to be

17   able ensure they keep their attention here.

18         My normal practice is to allow them to takes notes,

19   and we provide notebooks and pens for them.  They don't get them

20   during opening.  They don't get them during closing.  Those,

21   obviously, are not evidence.  As soon as the closing statements

22   are finished, then we distribute out the notebooks.  Every time

23   they leave the courtroom, we make them leave their notebooks in

24   their chairs, and they are re-distributed to them the next

25   morning when they come back.

1    And I have instructions which I think you all may have

2    seen in the preliminaries, and then I also give them the final

3    instructions, the fact that the notes are not evidence and you

4    have to rely on your recollections, and you can't rely on

5    somebody else's notes if you chose not to take notes.  If anyone

6    has strong objections to allowing note taking, I am happy to

7    hear that.

8         MR. TAIBLESON:  None.

9         MR. ALBEE:  No, Your Honor.

10        THE COURT:  We'll follow that practice, and we'll

11   allow them to take notes during the trial.  I would ask you all

12   to when you're prepping your witnesses, let them know things

13   like the fact that they'll have to come through security to get

14   into the building, so they can build that in for the time for

15   them to get into the courtroom.  We will have two witness rooms

16   back there.  We'll have those open.  And if you all think that's

17   not sufficient, let me know, and we'll see if we can open across

18   the hall as well and get additional space to let witnesses wait.

19   I am happy to do that.  We can find extra space for witnesses to

20   wait.

21        Let them know they'll have to go through security and

22   let them know they will have to leave the building to eat,

23   unless they want to live out of the vending machine like people

24   who work here do in which case they don't have to leave the

25   building, but that time needs to be built in.

1    I am very much hoping, and I know you all will try, to

2  line up as many witnesses as possible each day assuming that you

3  can gauge how long your witness is going to take, so we don't

4  run out of witnesses at the end of the day.  I understand you

5  may be having people coming in from somewhere, and they don't

6  want to come in on Monday if they're not going to testify on

7  Monday.  I get it.  I don't want anybody to incur anymore

8  expense then they have to.  By the same token, given what we

9  have to get through here, it will be important to try to fill

10  each day and not find ourselves at 3:15 with nobody for the next

11  day.  To the extent that you can think of an alternative

12  witness, for example, if you've got three witnesses that you can

13  put on in an afternoon, you know you will only get through one,

14  but if for some reason that one doesn't take as long, as least

15  you have an alternative witness in the wings that you can pull

16  in.  That will be helpful in moving things forward.

17    In terms of -- We talked about the digital evidence,

18  the recordings, but I'm assuming that there will be other forms

19  of evidence.  I haven't gone over the exhibit list in detail.  I

20  am assuming that there will be.  If there are exhibits that you

21  anticipate physically handing to the jury to look at, for

22  example, if you have a binder of photos that you would like for

23  the jury to look at, I'd like you to confer with the other side,

24  make sure the other side has seen that, and that it be organized

25  and identified.  If there are multiple exhibits in such a

1    binder, I think that we need to have a practice of instructing

2    the jury that they can't look at an exhibit until after it has

3    been admitted, and then they can only look at that particular

4    tab, so there should be tabs in the exhibit binders, if that is

5    what you plan to do.  If everything will be on the screen, we

6    don't need to worry about that.  Everybody will see everything

7    at the same time.

8         One of the things I encourage you all to think about.

9    You come in here, get the lay of the land of the courtroom and

10   you figure out the tec.  We have the capacity here.  Ms. Wrobel

11   controls it, that when someone asks to introduce an exhibit, we

12   can show that exhibit just on the screens here so that I see it.

13   And we can also have it so you all see it.  Once I rule that

14   it's admitted, then she can transfer it into the jury box and if

15   necessary to the bigger screen, and then jurors can see it.  So

16   to that end, it's important for you all to say, you know, that

17   you know you want to show me something, and then may I publish.

18   Usually I won't worry too much about those formalities or

19   technicalities.  But the words may I publish and my answer yes

20   is a signal to Ms. Wrobel now she can throw it over into the

21   jury box from here, so that's something to be aware of.

22        Also, please be aware there's sometimes a momentary

23   delay.  You say can we show the witness Exhibit No. 27, it may

24   take a second or two for it to come up on the screen.  Let

25   witnesses know not to panic if it doesn't pop up right away.

1  They should be able to see it.

2          Mr. Taibleson, Mr. Ptashkin, you have to keep that one

3  screen turned toward you.  We had an incident in a trial several

4  weeks ago in which an attorney was questioning from the podium

5  to the witness stand and turned that screen around so that she

6  could see the exhibit she was asking about, which meant that the

7  jury could see it too, and it hadn't been admitted yet.  So if

8  you need to look at an exhibit, we'll need to put a screen up

9  back here or find a way for you to look at it.  It can't be

10  turned toward the jury.

11          Also, be aware in this courtroom it really helps

12  Ms. Armbruster if you are close to the mic or to a mic when you

13  are questioning.  So that if you're seated at counsel table,

14  that always works.  If you are standing up here showing

15  something to a witness if you can stand next to the mic and

16  share the mic with a witness, that's helpful.  Standing out in

17  the middle of the well and asking questions even if you have a

18  strong voice, somehow this room can sometimes swallow that up,

19  so just be aware of those logistics.

20          If you want to use the podium to question witnesses,

21  you can; although, it's weird in this courtroom.  It means you

22  have your back to the jury.  It's a strange staging.  So

23  generally, I think most people elect to use the podium to do

24  their opening or closing, but they question from the table.  I

25  am not telling you you have to do that.  Be aware if you

1   question from the podium, it's kind of a weird set up in here,

2   and we probably need to know that ahead of time so we can get it

3   moved to where you need it to be moved.

4           Mr. Taibleson, Mr. Ptashkin, things we haven't covered

5   yet today that you think we ought to talk about or questions?

6           MR. TAIBLESON:  No Judge.  Thank you.

7           THE COURT:  Mr. Albee, Mr. Bugni.

8           MR. BUGNI:  One second.

9           MR. ALBEE:  Judge, just two things.  We talked about

10  CIPA in connection with issues with Mike.  We also had some

11  pending issues in terms of interception of texts and telephone

12  conversations.

13          THE COURT:  Is that the most recent?

14          MR. ALBEE:  It's most recent as to texts, and it has

15  been pending for awhile on telephone conversations.  It is our

16  review of the discovery we received indicates to us certainly

17  that there were texts and telephone conversations that were

18  intercepted.  We don't have any other explanation.  We've asked

19  for an explanation how else they could have been obtained.  The

20  Government has --

21          THE COURT:  I'm sorry, the only reason I am

22  interrupting you is this is part of the omnibus objection to

23  Judge Duffin's rulings on the Motion to Compel the Discovery

24  Motion, is that right, and you're waiting for my ruling on the

25  objections?

79

1        MR. ALBEE:  On the telephone conversations.  And then

2   one of the supplemental things we recently found out with the

3   texts that were intercepted.

4        THE COURT:  And that is part of the order that I

5   indicated to you I have pretty much drafted and made a

6   determination that there was no clear error, but I will get

7   that.

8        MR. ALBEE:  Yeah.  And if I could just make one point

9   on that.  One of our concerns is that it's not just -- Well,

10  when there's a secret investigation going on, it's a big concern

11  of ours.  And I know the Court understands that and CIPA allows

12  that to some extent, but it doesn't allow for *Brady* material to

13  be concealed.  We don't know by what mechanism those were

14  obtained.  But also the problem if there are an abundance of

15  texts or conversations that were obtained and they don't know

16  anything about Mr. Hamzeh, I presume if they had, we would have

17  received them.  They would be happy to say, here he is doing

18  something stupid or dangerous or whatever.  The fact that, for

19  example, they have all the texts for whatever period of time and

20  conversations for whatever time, he's not talking about anybody

21  in the world about doing bad things.  He's talking about work

22  and hanging out with friends at the coffee shop and the other

23  things he did in his life, that that's *Brady*.  I don't think the

24  Government has ever understood that.  I don't know that we have

25  had a whole arm to really explain that position.  That is the

1    additional point we wanted to make about CIPA.

2        The other issue is as Mr. Bugni indicated we've now I

3    think after getting the lined transcripts with the line numbers

4    on them, we're able to produce the excerpts that we intend to

5    rely on, which are recordings of Mr. Hamzeh's conversations with

6    Mike and Steve.  I think it would be helpful to the Court if we

7    tried to identify a little more precisely why we think those are

8    admissible conversations.  It's a little bit of a tedious

9    process for us.  You know, it is probably more tedious than for

10   the Court.  If we can have until next Friday to submit our

11   explanation for why we think those are admissible over any

12   hearsay objections by the Government.

13       THE COURT:  I think that's fine.  That would be

14   helpful to both me and the Government.  Yes, you can have until

15   Friday to do that.  I will take a look at it.  Thank you for

16   that.

17       MR. BUGNI:  You Honor, if I could just echo one point

18   of Mr. Albee.  I know you already made a decision, and we are

19   getting the CIPA ruling.  There is one other fact.  We don't

20   have all the text messages from the informants to Mr. Hamzeh,

21   and that had been a big issue is that we really want all of

22   those text messages.  And if there was intercept, that's where

23   we would be able to gets those.  Those would be *Brady*, and those

24   would be material.  Thank you.

25       THE COURT:  Anything else we need to cover this

1    morning?

2             MR. TAIBLESON:  No.  Thank you, Judge.

3             THE COURT:  Anything else that I am capable of

4    covering with the mushy thing inside of my head that I'm

5    identifying as a brain?  Thank you everybody.

6        (Whereupon proceeding was concluded.)

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RPR, RMR, Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of my original machine shorthand notes taken in the aforementioned matter to the best of my skill and ability.

Signed and Certified October 9, 2019.

/s/Susan Armbruster

Susan Armbruster

Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov