UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff*,

                                                                                       Case No. 16-cr-21-PP

*vs*.

SAMY M. HAMZEH,

       *Defendant*.

## SIXTH MOTION IN LIMINE: POST ARREST STATEMENTS

Samy Hamzeh, by counsel, files this Sixth Motion in Limine concerning his post-arrest statements that the government has proposed to introduce.

The post-arrest statements that the defense seeks to introduce involve two separate sets of arguments. First, there are a number of statements from Hamzeh's post-arrest interrogations that the defense believes in fairness must come in under the Rule of Completeness, Fed. R. Evid. 106, and the right to present a defense. Attached to this filing and under seal is a copy of the transcript of Hamzeh's two post-arrest statements. For ease of reference, the statements that the government seeks to introduce are highlighted in yellow; the proposed qualifying statements are in blue. The charts below explain *why* each statement the defense seeks to introduce is necessary. Second, there is one other excerpt that the defense moves to exclude because it is irrelevant, inflammatory, and unfairly prejudicial in its innuendo about Islam. That objection is addressed in the second part of the brief.

Federal Defender Services
of Wisconsin, Inc.

As a final note, the defense apologizes for filing this so close to the trial. This should have been filed earlier. Unfortunately, this issue was one that kept being pushed aside as other matters needed attention and briefing. The delay is solely a matter of triage among all of the other matters that have demanded counsel's attention as trial approaches, included in that list is the fact that lead counsel had to make two unanticipated trips to Texas to tend to family issues.

## I. Hamzeh's statements that also need to come in under the Rule of Completeness.

### A. Legal Principles

The Rule of Completeness provides that when one party introduces in evidence a part of a recording or writing, his opponent "'may require the introduction . . . of any other part . . . which ought in fairness to be considered contemporaneously with it.'" *See, e.g., United States v. Paladino,* 401 F.3d 471, 476 (7th Cir. 2005) (citations omitted). The Rule is not limited to obvious cases like the oft-cited example in the Seventh Circuit: it "would be accusing the Biblical David of blasphemy for saying, 'There is no God,' his full statement being, 'The fool hath said in his heart, there is no God.'" *United States v. LeFevour,* 798 F.2d 977, 981 (7th Cir. 1986). Rather, the Rule applies far beyond requiring a party to introduce a full sentence (over a partial one) in the name of completeness. The text of the Rule itself provides for introducing "any other part" of the recorded statement or even "any other writing or recorded statement" that in fairness should be considered at the same time. Fed. R. Evid. 106. Thus, "[u]nder the doctrine of completeness, another writing or tape recording is required to be read [or heard] if it is necessary to (1) explain

the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *United States v. Sweiss*, 814 F.2d 1208, 1211–12 (7th Cir. 1987). Put another way, "[t]o lay a sufficient foundation at trial for a rule of completeness claim, the offeror need only specify the portion of the testimony that is relevant to the issue at trial and that qualifies or explains portions already admitted." *Id.* at 1212.

Additional guidance for how this applies in practice comes from the Advisory Committee Notes, which explain: "The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial." Thus, Rule 106 allows parties to responsively and contemporaneously (during either cross-examination or the next major phase of the trial) introduce additional evidence that would correct a misleading impression caused by the introduction of a truncated version of a statement.

In the leading Supreme Court discussion about the Rule, the Court noted that the common-law rule of completeness underlies Rule 106 and, for a definition of the common-law rule, cited Wigmore's summary: "The opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988) (citing Wigmore, Evidence in Trials at Common Law (1978)). Thus, "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, *the material required for completeness is ipso facto*

3

*relevant and therefore admissible under Rules 401 and 402." Id.* at 172. (emphasis added). Properly understood, the application of Rule 106 extends beyond correcting misleading impressions; rather than being so limited, it is animated by interests of fairness—a much broader principle than mere accuracy of the quoted portion, *i.e.,* plucking a misleading phrase out of a sentence or more. *See Paladino,* 401 F.3d at 476 ("Asked at the deposition about his knowledge of the invested money, he said: 'I learned that this money that's been coming in was investment money, *and I was totally surprised because I assumed this whole time that this was trade money.' The government put a period after 'investment money' and deleted the rest of Paladino's answe*r." (emphasis added)).

Before delving into the particular statements that the defense will seek to enter in response, one final point should be emphasized. The Seventh Circuit has recognized that under Rule 106, otherwise inadmissible evidence is admissible if it is necessary to correct a misleading impression. *See LeFevour,* 798 F.2d at 981. Indeed, the Court noted: "If otherwise inadmissible evidence is necessary to correct a misleading impression, then either it is admissible for this limited purpose by force of Rule 106… or, if it is inadmissible [because of privilege], the misleading evidence must be excluded too." *Id.* Thus, to be clear, courts allow Rule 106 to trump the exclusionary rules of evidence

- "[O]therwise inadmissible evidence may be admissible under Rule 106 to correct a misleading impression or else the misleading evidence must be excluded." *United States v. Reese*, 666 F.3d 1007, 1019 (7th Cir. 2012) (citing *LeFevour,* 798 F.2d at 981).

4

Federal Defender Services
of Wisconsin, Inc.

- "Even if the fact allocution would be subject to a hearsay objection, that does not block its use *when it is needed to provide context for a statement already admitted.*" *United States v. Lopez-Medina*, 596 F.3d 716, 735 (10th Cir. 2010) (emphasis added).
- "[The Rule] may be invoked to facilitate the introduction of otherwise inadmissible evidence." *United States v. Bucci*, 525 F.3d 116, 133 (1st Cir. 2008).

In sum, the question is whether in fairness to Hamzeh the post-arrest statements that the government plans to use need additional information to qualify or explain the portions already admitted. *See Sweiss*, 814 F.2d at 1211–12.

### B. Hamzeh's Post-Arrest Statements

The government has identified excerpts that it intends to present from Hamzeh's two recorded statements. Because the introduction of these statements alone would result in a misleading picture of what Hamzeh was telling the agents, additional portions of the recordings must be introduced. Hamzeh can easily lay a foundation for the admission of these additional statements as they plainly are relevant and they qualify or explain the portions of the statement the government is admitting. *See Sweiss,* 814 F.2d at 1211–12 ("Under the doctrine of completeness, another writing or tape recording is "required to be read [or heard] if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding"); *Reese,* 666 F.3d at 1019. One thing that must be kept in mind in reviewing Hamzeh's statements is that he is not a native English speaker. As with many persons for whom English is a second language, Hamzeh's explanations and descriptions are not models of clarity and his literal language sometimes appears

5

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/14/19   Page 5 of 16   Document 330

contradictory until his statements are looked at as a whole. He also acquiesces to leading questions at times where it's unclear whether he grasps their significance.

The defense's primary concern with the government's excerpts is the potential for the jury to be misled by Hamzeh's statements about who came up with the "idea" or "plan," what that idea or plan was, how that idea or plan developed, what level of responsibility each man had for the plan, how the concern about the Masons developed, what Hamzeh meant about having fun with weapons and why he wanted them, and why Hamzeh sought out the counsel of two Imams and what he did with that advice. The government's excerpts would make it appear that Hamzeh came up with everything on his own and was prepared to move forward with the plan, but the recording as a whole shows that not to be the case. In fairness, all of Hamzeh's explanations about these matters need to be presented.

1. **Audio Statements in Car**

The government intends to introduce excerpts from this statement and the video statement made immediately after at the FBI's headquarters. The transcript of the audio statement is attached as Exhibit A. In the audio statement clips that the government wants to present Hamzeh relates the following:

| Ex | Page | The substance |
|---|---|---|
| 15A | 3 | Advice of rights. |
| 15B | 11 | Hamzeh likes weapons, Mike said that they can go and shoot and have fun and that they "bought unlegally weapons." |
| 15C | 15 | Hamzeh bought the weapon with all the money he had. |
| 15D | 35–36 | Hamzeh exercises and he used to do kickboxing |
| 15E | 22 | Hamzeh carried the weapons to Mike's car. |
| 15F | 25–26 | Hamzeh and Steve are best friends and he has known Mike for several months. |

6

As described below, the government's clips from the video statement delve further into how the plans originated, the roles of each person in getting the weapons and the Mason's plan, Hamzeh's response to the plan, and other matters.

The defense submits that if the government intends to introduce its excerpts from both statements, that the Rule of Completeness requires it to play the audio statements in the car from page 9, line 6, through page 25 of Exhibit A. In these pages, Hamzeh explains that Mike had the connection for the guns, what he understood about the type of guns they were receiving, why they wanted guns and chose to get these guns, that "training" means "practice" to him (this is implied), and what Mike told him about these guns. Ex. A at 9–25. These statements are necessary because the government's clips, from the video questioning particularly, imply the following:

- The guns' only purpose would be offensive and that they were for something else other than having fun. *See* Govt. Ex. 16N, *id.* 16P; Ex. B (60, 64).
- That the idea was all three of theirs. Govt. Ex. 16R; Ex. B at 82.
- That Hamzeh was in control of Steve and Mike. Govt. Ex. 16U; Ex. B at 103-04.
- That Hamzeh wanted an automatic rifle. Ex. 16D.
- And it goes to why Hamzeh tried to buy the weapons through his friend "Mike's" connections instead of a store. Ex.16; Ex. B at 59–60.

The defense's proposed audio clip, spanning page 9, line 6 through page 25, are necessary to not leave the jury with the impression that Hamzeh said he wanted the guns for offensive purposes and took all responsibility for the plan, rather than explaining to the

7

agents from the outset that Mike was behind getting the guns, what guns Hamzeh thought he was getting, and the reasons these guns were obtained. Those points of clarification come from his statements in the beginning of his audio statements.

### 2. Video Statements at FBI Office

When it comes to the video, the government's clips are broken along these general and specific lines. The general lines are that the agents were respectful, read Hamzeh his rights, and let him have water and go to the bathroom as much as he wanted. Those clips encapsulate exhibits 16C (reading rights); 16H (giving Hamzeh water); 16J (same); 16K (bathroom); 16L(cuffs off); 16X(being polite). Then there are the specific points that are being made and that the government will use to argue that Hamzeh wasn't entrapped. They break along these lines, with a description being provided for each. The text is, for the most part, very short and (again) is highlighted in yellow in Exhibit B.

| Ex | Page | |
|---|---|---|
| 16C | 1-2 | Reading Hamzeh his rights |
| 16D | 2-3 | Adkins asking why Hamzeh needed an automatic weapon and Hamzeh responding that he likes weapons. |
| 16E | 5 | Hamzeh repeating that he likes weapons and that he would store it at his house and his mom would not have seen it. |
| 16F | 10-11 | Hamzeh saying that he'd die for America and that four months ago he tried to join the U.S. Army. |
| 16G | 13-14 | Hamzeh saying that he took some classes at MATC—"like math, English—math, English—yeah, that's it." And that he got his online CDL, he just needs to pass the test. |
| 16H | 15-16 | Giving Hamzeh water |
| 16I | 23-24 | Hamzeh discussing going to Palestine in 2008-09 and that he went there twice. Depending on how the Court rules about Israel statements the relevancy of this will be easy to determine. |
| 16J | 33 | Giving Hamzeh water |
| 16K | 34 | Letting Hamzeh go to the bathroom |
| 16L | 41–42 | Taking the cuffs off |

8

| | | |
|---|---|---|
| 16M | 57 | That his country is Palestine but his family has been displaced since 1948. Depending on how the Court rules about Israel statements the relevancy of this will be easy to determine. |
| 16N | 59-60 | This is Adkins's statement about availability of weapons for $300 and Hamzeh discussing how he wanted a gun but couldn't find an affordable one. |
| 16O | 61-62 | Adkins asking about someone contacting the FBI about the Masons and there was some planning to do an act. Depending on whether the masonic stuff is kept out with the motion in limine this is easy to sort out. |
| 16P | 64-65 | Hamzeh is asked about weapons and he says that he was planning on taking them up north. But that he had never gone before. |
| 16Q | 79 | Adkins asked about the masons and Hamzeh tells him that they "pray for the devil and stuff like that. So that's where we thought like in our Koran, this is against Islam." |
| 16R | 82 | Adkins asking whose idea it was (Mike or Steve) and Hamzeh saying "three of us." |
| 16S | 97 | This is the exhibit dealt with below about speculating about the Imam. |
| 16T | 98 | Adkins asking if anybody overseas directed Hamzeh and him saying "nobody told me anything." |
| 16U | 103-104 | Hamzeh saying that Steve and Mike listened to him. "Like I know more than them. So they believe me. They do anything I want to do." |
| 16V | 108-09 | Discussing watching videos on YouTube about how "ISIS have the masonic thing" and how "I'm the one who told them about it and I'm the one who stopped it." |
| 16W | 114 | He had been shooting with Mike and he wanted to shoot bigger and better guns. |
| 16X | 116 | Being polite to Hamzeh. |

Breaking away from the defense's always-present charts, here's how the specific points break down. In order of importance, first with the guns that he was buying.

- He likes weapons and what he planned to do with the weapons he got. Ex. Nos. 16D, 16E, and 16P.
- That he was going to store a gun at his house. Ex. 16E.
- He wanted to shoot bigger and better guns. Ex. 16W.

9

- That the government is concerned that he bought such an offensive weapon and powerful weapon that cost about the same as a handgun because he liked it. Ex. 16 N.

The next most important set of statements concern the potential attack on the Masons and whose idea it was and how it originated.

- That he initially denied considering an attack. Ex.16O.
- That he chose a Masonic center because they worship the devil. Ex. 16Q.
- He started seeing videos and got idea that ISIS was Masonic, and told them about it and then stopped it. Ex. 16V.
- The idea was all three of theirs. Exhibit 16 R.
- If the Imam said ok, he would have done it. Exhibit 16 S.
- When he got these ideas and that nobody told him to do it. Exhibit 16 T.
- Other two guys were following him and they do what he says. Exhibit 16 U.

The other statements that need clarifying relate to details about his life that are marginally relevant.

- He was going to join the army. Ex. 16 F.
- He went to MATC and also got CDL permit. Ex. 16 G.
- He identifies as Palestinian and used American passport to travel to Palestine and stayed for a month with his aunt. Ex. Nos.16 I, 16 M.

All three of those topics are discussed throughout the interview. And the excerpts that the government has chosen to present do not present an accurate picture of what Hamzeh meant in the interview, with his excerpted statement. That is, the thrust of the statement is lost without the context provided by the surrounding statements. *See Sweiss*, 814 F.2d at 1211–12. There is, of course, a hierarchy of statements. The ones that matter most relate to why Hamzeh liked (or wanted) the weapons so much, what he was planning on doing with them, whose idea this was (both getting weapons and the masons), and what the steps were that Hamzeh took in relation to each. The statements

10

that need clarifying are addressed below. The column on the left provides the government exhibit that the statement relates to and these proposed additions are highlighted in blue in Exhibit B.

**Statements about weapons that need to be added.**

| Exit relates to | Pages To add | Reason |
|---|---|---|
| 16D | 3 | This statement puts Hamzeh's statements about why he was getting the gun into context. It's not enough to put in "I told you I like weapons. That's all." And then leave out the paragraph that follows where he talks about why and what he planned to do with them. |
| 16E | 4:19–5:6 | The statement is necessary so that the jury doesn't believe that the weapons were only going to his house but also to Mike. |
| 16D, 16E, 16N | 20:21– 22:6 | This excerpt goes directly to how the idea for the gun developed and Mike's introduction of guns into Hamzeh's life and how it was that they decided to get these weapons, which goes to qualifying and giving context to Hamzeh's statements about what he planned to do with the guns and why he tried to buy *this* particular gun. |
| 16D 16E 16N | 57:17–58:11 | How he got idea to get gun from Mike. It goes to Hamzeh's statements in response to Adkins's statements about the availability of firearms and why he choose these. |
| 16D 16E 16N 16P 16W | 65:3–6 | This goes to why he wanted to get the guns and his plan. It is also the full answer to the question Hamzeh was posed in 16P, concerning going up north and where the idea originated: Mike. |
| 16W | 114:11–17 | The government's excerpt is simply leading (clarifying and damning) questions and the six lines that precede it show why Hamzeh would agree that he was willing to spend his "hard-earned money" on these weapons. |

**Statements about the Masons that need to be added.**

| Ex it relates to | Pages To add | Reason |
|---|---|---|
| 16O<br>16Q<br>16S | 76:19–78: 13;<br>79:2– 79:12 | Without this information about going to see the Imam, the government is putting in only the excerpt where he says they targeted Masons because devil worship, giving a misleading impression that Hamzeh remained on board with attacking Masons and didn't express the compelling reasons he had for backing out; also it's necessary to understand why he took responsibility because it was within broader narrative about how he abandoned the plan after talking to the Imam—he took responsibility for devising and withdrawing. Imam info is also necessary to put Ex. 16S excerpt into context about if Imam said ok because it shows that Hamzeh had grave concerns and reservations about the plan that were unlikely to be overcome. |
| 16R<br>16S<br>16U | 85:7–86: 8 | This gives context to Hamzeh's statements about what he was doing with respect to the Masons, how Hamzeh stopped it, and the conversations with the Imam. |
| 16Q<br>16R<br>16S<br>16U | 88:16 to 90:13 | This is Hamzeh explaining how he went to the Imam for guidance about the Masons and what he told him. Again, this is critical for understanding the context of Hamzeh's actions and that this was not a slight or trivial choice and his thought process. It goes directly to the partial explanation that the government wishes to introduce and qualifies the most inflammatory (and irrelevant) statement in 16S. |
| 16S | 96:20–97:10 | This statement is necessary, so the jury is not misled by statement about if Imam said ok. Again, this statement is objected to below. |
| 16Q<br>16R<br>16S<br>16U | 95, line 18 to 96 line 16 | This goes to the statements about the Masons and the evolution of the idea. It also pertains specifically to the idea that his impetus for being against the Masons lied solely in the Quran and why he choose to talk to the Imam. |
| 16R<br>16U | 82:7–16;<br>82:22–83:8 | Provides context to statement "all three of us" because his narrative explains that the other two influenced him and how he thought they were joking and they said man let's do this; and that he thought he rejected "group" decision. *See* Ex. 16R. This also puts in context to Ex. 16U about him controlling them. The entirety of Hamzeh's explanations reveal he was fooled into believing he actually made decisions. |
| 16T | 98:12–99:1 | This statement provides necessary context for Adkins's question that "nobody told you to do this" and Hamzeh's response that |

12

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/14/19   Page 12 of 16   Document 330

| | | "nobody told me anything." It's clear by the paragraph that followed that he was told by someone, someone who directed him to watch these videos on YouTube. |
|---|---|---|
| 16U | 104:15 to 106:7 | This gives the necessary context to understand what Hamzeh meant by his statement that "they were listening to me" and "I'm always controlling them." The statement in blue shows why he says that and the underlying context to explain what he precisely meant. |

**General Statements that need to be added.**

| Ex it relates to | Pages To add | Reason |
|---|---|---|
| 16G | 13:21-22 | So that jury understands he wasn't actually successful in his studies. |
| 16G | 14–15:3 | So that jury understands he didn't complete CDL |
| 16I | 25:15–25 | So that jury understands he didn't just stay with his aunt which would be misleading impression from page 24 |

In sum, the government has the right to present Hamzeh's inculpatory statements, but it must do so in a manner that fairly presents the context and meaning of the statements. As the excerpts currently stand additional information has to be presented. Thus, either the government must present it in its direct examination or the defense allowed to on cross-examination, when the statement is introduced.

## II.  Hamzeh's statement Ex. 16S should be excluded.

During Hamzeh's post-arrest interview, Agent Adkins asked Hamzeh about the plan and the fact that Hamzeh had convinced his friends not to do it. Hamzeh also recounted a narrative that matches the contemporaneous recordings of conversations with the informants—he went to the Imam, and then he called his uncle, who also is an Imam, who said the same thing. Ex. B at 95–96. After recounting this history, Adkins asked Hamzeh:

13

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/14/19   Page 13 of 16   Document 330

> Q. What do you think would have happened if the Iman would have said that was okay? Would you have –
>
> A. If the Iman said that okay?
>
> Q. If the Iman would have said that was okay.
>
> A I'm going to do it.
>
> Q You would have done it.

That statement should not be admitted. For starters, it's not relevant, it's speculative, and it's unfairly prejudicial. And it's not a fair impression of what Hamzeh meant or said, because in the very next line, he says:

> A. To be honest. To be honest. But Iman said no, and we believed it. Like, we pray five times a day. We do like, we tried to make our life to take us to heaven, like, do good things in the life, this make you go to heaven. That's what we believe.
>
> Q. So you believe so strongly in your religion that if the Iman would have said that's okay, you would have believed him.
>
> A. Because Iman knows more about the religion. The Iman knows more and more and more. Like, he knows about the religion. But if the Iman told me don't do it, of course I'm not going to ask just one Iman, I'm going to ask more than one. I'm going to ask one, two, three just to make sure. Like everybody telling me the same thing. And they all agree this is going to take you to hell.

Ex.B:96. The statement is, like the others noted above, given new life when that is added

Here's the foundation for all three objections, particularly for excluding the statement in its entirety. First, the statement in 16S is not relevant to whether Hamzeh possessed an unregistered machine gun, and it's not relevant to whether he was predisposed or induced. The statement is relevant to nothing that the jury must weigh. Second, it's Hamzeh speculating about something that didn't happen. Third, it's unfairly prejudicial. It is Hamzeh saying that if he would have had the imprimatur of not just his friends (who convinced him that the Masons are ISIS and the enemy of Islam) but also

14

the religious community he respected, he would have killed people. That is too inflammatory for trial.

Additionally, this point can't be lost in all this: it is inherently offensive and prejudicial to introduce a statement about whether an Imam would have sanctioned this. One can't imagine an agent asking a young Catholic, in a similar scenario, if either the priest and the bishop told you to do it, would you have committed murder. The basic working assumption of *all* reasonable people is that the Imams (like *all* other religious leaders) would give the sound advice that *any illegal behavior* is not tolerated. There is no reason to present the jury with such speculation that an Imam would be any different from a priest.

What's more, Hamzeh's actual reaction is not captured in the government's excerpt but reflected in the statement from Hamzeh that immediately follows: "The Iman knows more and more and more. Like, he knows about the religion. But if the Iman told me go and do it,[1] *of course I'm not going to ask just one Iman, I'm going to ask more than one. I'm going to ask one, two, three just to make sure.*" Ex. B at 98 (emphasis added). That obviously is needed to clarify that Hamzeh had no intention of blindly following an Imam's advice to engage in violence in the extraordinarily unlikely event such advice were given.

In sum, the statement has no probative value, it's speculative about an extremely frightening subject and the risk of unfair prejudice is extremely high. Not simply because

---

[1] The transcript erroneously states "don't do it," but in listening to the recording, Hamzeh actually says "go and do it."

15

Federal Defender Services
of Wisconsin, Inc.

it deals with violence but because it's wedded to prejudices and biases that attach to Muslims: a Imam may condone violence where a priest would not. If anything the juror questionnaires should make everyone at trial more sensitive to the hurdles that already attach to Hamzeh having a fair trial.

### III. Conclusion.

This is the last of the substantive motions in limine that the defense plans on filing. But in some ways, it may be the most important. In the excerpts the jury will see and hear Hamzeh; it will be able to judge the way he interacts with Agent Adkins and assess his statements. And the statements that the government plans to present need context— context that is provided by other parts of the interview and that the jury must hear to weigh and understand Hamzeh's statements. Thus, the defense asks that under the Rule of Completeness the additional portions identified above be added. And the defense also moves to exclude Ex.16S as irrelevant and unfairly prejudicial.

Dated at Milwaukee, Wisconsin this 14th day of October 2019.

Respectfully submitted,

/s/     Craig W. Albee
Joseph A. Bugni, WI Bar No. 1062514
Craig W. Albee, WI Bar No. 1015752
FEDERAL DEFENDER SERVICES
  OF WISCONSIN, INC.
517 E. Wisconsin Ave - Rm 182
Milwaukee, WI  53202
Tel. (414) 221-9900
E-mail:  joseph_bugni@fd.org

*Counsel for Defendant*, Samy M. Hamzeh

16

Federal Defender Services
of Wisconsin, Inc.
Case 2:16-cr-00021-PP   Filed 10/14/19   Page 16 of 16   Document 330