UNITED STATES OF AMERICA,

        Plaintiff,

                                 Case No. 16-cr-21-pp

    v.

SAMY M. HAMZEH,

        Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE* REGARDING DEFENDANT'S RECORDED STATEMENTS (DKT. NO 272), GRANTING IN PART AND DENYING IN PART DEFENDANT'S THIRD MOTION *IN LIMINE* TO EXCLUDE OR LIMIT EVIDENCE AND ARGUMENT RELATING TO CONVERSATIONS ABOUT ISRAEL AND MASONS (DKT. NO. 277, MOTION I), GRANTING THAT PORTION OF SECTION X OF GOVERNMENT'S MOTIONS *IN LIMINE* WHICH ASKS THE COURT TO EXCLUDE DR. MARC SAGEMAN AS EXPERT WITNESS (DKT. NO. 276, MOTION X, PP. 18-21) AND GRANTING DEFENDANT'S FOURTH MOTION *IN LIMINE* TO EXCLUDE DR. LEVITT'S TESTIMONY (DKT. NO. 278)**

---

In less than a week, the defendant faces a trial at which a jury will decide whether the government can prove beyond a reasonable doubt that on January 25, 2016, the defendant possessed two unregistered machineguns and one unregistered silencer in violation of 26 U.S.C. §5861(d). One would think that such a trial would be brief and straightforward—the government might present a couple of witnesses to testify that the defendant possessed the items, and a witness to testify about registration requirements and whether the items were registered to the defendant. One might think that such a trial would be the work of two, perhaps three days.

In this case, one would be incorrect in such thoughts. Because of events that occurred in the months leading up to January 25, 2016, the defendant has asked to present the affirmative defense of entrapment, and the court has granted that request. Because of events that occurred in the months leading up to January 25, 2016, the government seeks to present evidence that it believes shows that the defendant wanted to obtain the machineguns and the silencer for the purpose of committing mass murder; the government asserts that this evidence is relevant and is necessary for the government to rebut the entrapment defense. The defendant argues that the court should exclude the evidence because it shows only that the defendant had bad judgment, a desire to impress his friends and a wild imagination, and because admitting the evidence would be more prejudicial than probative.

Determining whether a piece of evidence is "relevant" to the question of whether the defendant committed the charged crimes is more complicated in this case than it might be in others. Some of the events that occurred prior to January 25, 2016 reveal a possible motive for the defendant to have possessed the charged items. Some arguably reveal that it wasn't the defendant, but undercover informants working with the government, who suggested and pushed the idea of obtaining the charged items. If one credits the government's view of the evidence, some show that the defendant was disturbingly interested in committing acts of mass violence; if one credits the defense view, those same facts show that the defendant had a misguided sense of religious and political zeal that caused him to bloviate and talk big about things he had no intent or

ability to do. The evidence resembles the paintings of the Dutch graphic artist M.C. Escher; what you see depends on where you stand.

The parties have filed several pretrial motions asking the court to allow, or to restrict or preclude, evidence. This order resolves those motions, to enable the parties to complete preparations for trial.

A.    Background

The following factual summary comes from the court's review of various pleadings, transcripts of recorded conversations filed by the parties and the court's own decision granting the defendant leave to present an entrapment defense. The court has not cited to pleadings and transcripts, and it cites to its own decision only occasionally.

As the court recounted in its order regarding the entrapment defense, the defendant is an American of Pakistani descent in his late twenties who lived in Jordan from the time he was little until he was eighteen. Dkt. 295 at 2. He is Muslim. Id. He had no criminal history prior to being charged in this case. Dkt. No. 2. The defendant came to law enforcement's attention in August or September of 2015, when a friend of the defendant's contacted the FBI, reporting that the defendant had been talking about going to Egypt for "terrorist training," getting a commercial driver's license to commit a terrorist attack in the name of ISIS[1] and getting a pistol. Id. at 2. Whether the defendant had said these things to his friend—referenced in the evidence as "Steve"—and

_____

[1] The Islamic State of Iraq and Syria, also sometimes known as ISIL (Islamic State of Iraq and the Levant). https://www.rand.org/topics/the-islamic-state-terrorits-organization.html.

whether he meant them even if he did say them, is questionable; even Steve appears subsequently to have told law enforcement that the defendant had changed his mind, and that the defendant was a liar. Id.

Regardless, in late September 2015, the FBI placed an informant, referred to as "Mike" in the evidence, at the restaurant where the defendant and Steve worked. Id at 3. The defendant and Mike saw each other frequently over the next three and a half to four months. Id. In early October 2015, Mike showed the defendant and Steve a gun, and the defendant appears to have believed that Mike owned a "Kalashnikov"—a term often used to refer to an AK-47 automatic assault rifle, although the Kalashnikov company manufactures other weapons, including semi-automatic sporting weapons. Id. See https://kalashnikov-usa.com. The parties don't dispute that the defendant, Mike and Steve used the word "Kalashnikov" interchangeably with the word "machinegun." Id.

Starting November 2, 2015, Mike began recording the conversations he had with the defendant; Steve recorded some of his conversations as well. Id. The recorded conversations include more than one instance of the defendant talking about going to Israel and taking Kalashnikovs from Israeli soldiers and shooting Jews, or "spraying" Jews and trying to kill as many people as possible. Id. The conversations were, at time, detailed. The defendant spoke of how he could get into Israel because he had an American passport, of how the "Al Buraq" wall—also known as the Western Wall, or the Wailing Wall—in Jerusalem would be a good target because of how many people visit the

location, of how killing many people would make the defendant a martyr. He spoke of the difficulty in leaving his mother, and how upset she was over his plans. He spoke of wearing an explosive vest. Conversations in this vein took place between November 2 and December 14, 2015, and at times, it sounded as if the defendant was on the cusp of going overseas—he talked about having gotten a plane ticket and having to leave his mother.

During this same period, however, the defendant talked about his desire to obtain a handgun for self-protection. There are multiple conversations in which he talks about wanting a handgun, and there is more than one conversation in which the defendant rejects Mike's suggestion that he might want a machinegun. Id. at 4-5. On December 7, 2015, the defendant and Mike traveled together to Gander Mountain sporting goods store to look at handguns. Id. at 4.

Finally, during this period the defendant talked about purchasing "Kalashnikovs" from a contact Mike allegedly had in Texas. The men went to a shooting range more than once, and on one such trip on December 14, 2015, the defendant questioned why Mike hadn't brought his Kalashnikov to the shooting range. Id. at 5.

After the December 14, 2015 trip to the shooting range, Mike stopped recording conversations with the defendant; the evidence sheds no light on why. Id. at 6. The men continued to talk, but by January 8, 2016, Mike reported that the defendant was no longer talking about jihad, and he'd mentioned traveling to Jordan only in the context of taking a vacation. Id.

On January 19, 2016, Mike resumed recording conversations with the defendant, after Mike reported to the agents that the defendant had started talking about attacking a Masonic lodge in Milwaukee. Id. at 7. When Mike resumed recording, the defendant was recorded discussing the Masons as enemies of Islam. Id. at 7-8. There was more than talk; on January 19, the defendant, Mike and Steve toured the Masonic Center in downtown Milwaukee, and the conversations that followed that tour involved the defendant discussing with precision how the three man might carry out a shooting attack at that location. Id. at 8-9. No one disputes that the conversations were chilling, with the men—including the defendant—talking about shooting the receptionist first, then moving to the people meeting upstairs, as well as discussing whether to avoid shooting children.

Over the next five or six days, the men continued to talk, but the conversations took various turns. At one point, it appears that the defendant may have suggested conducting an attack on a Masonic temple in Texas, rather than in Milwaukee. In other conversations, he notifies Mike and Steve that he has talked with an Imam, who advised him that it would not be a good idea to attack the Masons because it would make Muslims look bad. By January 24, 2016, the defendant had indicated that he no longer wished to go through with the attack, but that he still wanted weapons for protection. The next day, the defendant and Mike purchased the machineguns and silencer from undercover FBI agents for far below retail price; the defendant was arrested after putting the guns in the car.

B.    <u>Motions</u>

The government filed a motion *in limine* asking the court to deem the recorded in-person conversations authentic, to admit them as evidence and to admit the English language transcripts of the conversations. Dkt. No. 272. The government also asked the court to rule that the *defendant's* attempt to use any of the recorded statements should be deemed hearsay in advance of trial. <u>Id.</u> The government attached to the motion the portions of the conversations it wished to present at trial. Dkt. No. 272-1. The parties have resolved the authenticity issue and the issue of the admissibility of the English translations of any conversations the court allows the parties to present. They have agreed that for each conversation the court admits into evidence, the government will play the Arabic language recordings and will simultaneously display the English-language translations to the jury. What is left is for the court to decide which conversations to admit and which to exclude.

The defendant has asked the court to exclude, or at the least limit, "evidence and arguments related to conversations about Israel and the Masons." Dkt. No. 277, Motion I.

The defendant has asked the court to exclude the testimony of the government's proposed expert, Dr. Matthew Levitt, who would testify about the Arab-Israeli conflict, the relationships among organizations such as Hamas and ISIS and the significance of certain events or locations to the conflict. Dkt. No. 278. In turn, the government has asked the court to exclude the defendant's expert on the same topic, Dr. Marc Sageman. Dkt. No. 276, Motion X.

C.     Conversations about Killing People in the Middle East

The defendant argues that the court should preclude the government from presenting to the jury any of the conversations where the defendant talked about killing people in Israel. It argues that these conversations are not relevant to the question of whether the defendant possessed the three items charged in the complaint, and that the nature of the conversations would be more prejudicial than probative and would inflame the jury. The government responds that the conversations are relevant, because they show that the defendant was interested in obtaining machineguns and that he wanted them so that he could kill a lot of people at once.

The indictment alleges only unlawful possession of unregistered machineguns and a silencer, on a single date, and it charges only the defendant with possessing those items. The indictment does *not* allege that the defendant planned or conspired to commit a terrorist act. There are reasons for this. Federal law prohibits and criminalizes international terrorism, terrorist acts against U.S. nationals that "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum . . . ." 18 U.S.C. §§2331, 2332. Even if the defendant was plotting or planning a terrorist act in Israel, such an act would have violated 18 U.S.C. §2332 only if its target was "a national"—or nationals—"of the United States." 18 U.S.C. §2332(b). The law also prohibits the use, threat, attempt or

conspiracy to use a weapon of mass destruction against United States nationals if a facility of interstate commerce is used in the offense, or the perpetrator travels in interstate commerce to commit the offence or the offense affects interstate commerce. 18 U.S.C. §2232a. But it defines "weapons of mass destruction" by referring to the definition of "destructive device" in 18 U.S.C. §921(a)(4)—"any explosive, incendiary, or poison gas—bomb, grenade, rocket having a propellant charge of more than four ounces, missile having an explosive or incendiary charge of more than one-quarter ounce, mine, or device similar to any of the devices described in the preceding clauses." Machineguns do not meet the definition of "weapons of mass destruction."

Even if there were a criminal statute prohibiting acts of international terrorism against citizens of other countries, the evidence suggests that the government could not have charged the defendant with conspiring to commit such an act. As far as the court can tell, the evidence shows that the defendant talked with *Steve and Mike* about going to Israel and shooting people. Steve and Mike were government informants. "[A]n agreement must exist among *conconspirators*, that is, those who actually intend to carry out the agreed-upon criminal plan. A defendant is not liable for conspiring solely with an undercover government agent or a government informant." United States v. Corson, 579 F.3d 804, 811 (7th Cir. 2009) (citing United States v. Mahkimetas, 991 F.2d 379, 383 (7th Cir. 1993)). The evidence may not even have supported an attempt charge; a defendant is not guilty of "attempt" unless he both intended to commit the crime and "committed an overt act qualifying as a substantial

step toward completion of his goal." <u>United States v. Resendiz-Ponce</u>, 549 U.S. 102, 107 (2007).[2]

While there are valid reasons why the government did not charge the defendant with planning or conspiring to commit an act of terrorism in Israel, the fact that the law currently does not provide criminal penalties for the sorts of actions the defendant was discussing does not require the conclusion that the government ought to be able to use the offense it *could* charge—possession of the two guns and the silencer—as a round-about way to introduce evidence of, and seek conviction of the defendant for, the crimes with which it could not charge him. While the defendant's descriptions of killing people in Israel were arguably racist, violent and disturbing, the court must try to ensure that a jury would not be tempted to convict the defendant for racist, violent and disturbing talk, rather than focusing on whether the government proved the elements of possession of unregistered firearms and a silencer beyond a reasonable doubt.

The government implies that the court should allow it to present the conversations about killing people in Israel because those conversations show why the defendant wanted a machinegun. In other words, the government argues that the conversations show motive. Motive, however, is not an element of a §5261(d) violation. A transferee of an item prohibited under §5261(d) "may . . . be held criminally liable if he takes possession of the weapon before

---

[2] The government asserts that the defendant "purchased a one-way ticket to Jordan in the fall of 2015." Dkt. No. 302 at 7, n.3. Arguably this may have constituted an "overt act" in support of an attempt, but the defendant also had lived in Jordan for much of his life and presumably has family there.

receiving official approval of the registration; this liability attaches regardless of the motives of either party to the transaction. Thus, it is irrelevant what the transferor did or why he did it or *why the transferee wanted the gun*." United States v. Brown, 548 F.2d 204, 209 (7th Cir. 1977) (emphasis added); see also United States v. Khatib, 706 F.2d 213, 216 (7th Cir. 1983) (citing Brown).

The evidence of the talk about going to Israel, taking Kalashnikovs and shooting people also smacks uncomfortably of prohibited "other acts" evidence under Fed. R. Evid. 404(a)(1). Under that rule, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Rule 404(b)(1) prohibits the use of evidence of any "crime, wrong, or other act" to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." There are exceptions for proving motive, opportunity, intent, preparation, plan, knowledge, absence of mistake or lack of accident, and the government might respond that the defendant's talk about Israel showed his motive for obtaining the machineguns and silencer, or his intent to obtain a machinegun, or his plan to do so. But the conversations about Israel do not involve the defendant stating that he is going to obtain a machinegun *here* and take it overseas to commit a crime. He talks of going there and either taking a gun from an Israeli soldier or obtaining a weapon when he is there.

The government also argues that the court should admit the conversations about killing people in Israel because it rebuts the defendant's

defense that he was entrapped by Steve and Mike. The government asserts that the defendant's talk of taking "Kalashnikovs" from Israelis and Israeli soldiers, and his talk of "spraying" people (presumably with bullets) shows that in his earliest conversations with Steve and Mike, he was expressing a desire for a machinegun—in other words, that the defendant was predisposed to the offense of obtaining an unregistered machinegun, and wasn't induced to commit the crime by Steve and Mike.

This argument has more purchase. In United States v. Mayfield, the Seventh Circuit held that a defendant is predisposed to commit "the charged crime if he was ready and willing to do so and likely would have committed it without the government's intervention, or actively wanted to but hadn't yet found the means." Mayfield, 771 F.3d 417, 438 (7th Cir. 2014). A jury might find that the defendant's statements about taking Kalashnikovs from Israelis showed that he was "ready and willing" to obtain a machinegun. The defendant argues that the statements the defendant made to Steve and/or Mike after the investigation began cannot show predisposition, pointing to the Mayfield court's emphasis on the fact that "predisposition is measured *prior* to the government's attempts to persuade the defendant to commit the crime." Id. at 436 (citing United States v. Theodosopoulos, 48 F.3d 1438, 1444 (7th Cir. 1995)). But the Seventh Circuit followed that statement by clarifying that "[w]e are not suggesting that the defendant's conduct after he encountered the government's agents is irrelevant to the determination of predisposition." Id. at 437. The court explained that the defendant's "response to the government's

offer may be important evidence of his predisposition." Id. (citing United States v. Kaminski, 703 F.2d 1004, 1008 (7th Cir. 1983)). In Kaminski, the court discussed the "peculiar nature" of the inducement prong of the entrapment defense, noting that "[i]n many cases . . . there is little direct evidence of the defendant's state of mind prior to interaction with Government agents and we must instead rely upon indirect proof available through examination of the defendant's conduct after contact with the agents." Kaminski, 703 F.2d at 1008. A jury could conclude that the defendant made the statements about taking Kalasnikovs from Israelis on his own, without being induced. It could conclude that by engaging in this talk, rather than refuting it, the defendant showed a willingness—separate and apart from any inducement by Steve or Mike—to obtain a machinegun.

The defendant asserts that even if the statements about going to Israel and obtaining a gun and shooting people bear some relevance to predisposition—and the defendant vehemently maintains that they do not—the probative value of the statements are outweighed by the unfair prejudice to the defendant. Fed. R. Evid. 403 allows the court to exclude evidence despite its relevance "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

To determine whether to exclude relevant evidence because of the risk of unfair prejudice, a court must "weigh whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

United States v. Gorman, 613 F.3d 711, 718 (7th Cir. 2010) (citing Fed. R. Evid. 403). "[T]o warrant exclusion under Rule 403, the 'probative value [of evidence] must be insignificant compared to its inflammatory nature so that the evidence *unfairly* prejudices the defendant." Id. (quoting United States v. Gougis, 432 F.3d 735, 743 (7th Cir. 2005)).

The following is the result of the court's weighing of these factors in relation to the excerpts of the recorded statements which the government asked the court to admit. The court notes that all the statements in all the transcript excerpts were made *after* the defendant met government informant Mike, and after Steve began working with the government. The court is mindful of the defendant's insistence that any statements that he made after inducement are not probative of predisposition. When the court opines below that a particular statement is probative of the defendant's predisposition, it means that the statement is relevant for the jury to consider in determining whether the statement shows predisposition or was the result of inducement.

Disk 11, page 3 line 18 to page 16 line 46:

The portion of the conversation on page 3 appears to have little probative value; the court will exclude it.

Page 4, lines 1-7 have little probative value regarding the defendant's predisposition to obtain a machinegun; the court will exclude those lines.

Page 4, lines 8-30 have some probative value, because they indicate the defendant's intent to obtain a weapon; a machinegun is a weapon. They are not

particularly inflammatory and admitting them would not cause undue prejudice to the defendant. The government may present them.

Page 4, lines 31-38 are not probative; the court will exclude them.

Page 4, lines 39-41 may have some probative value, but that value is insignificant relative to their unquestionably inflammatory nature. The court will exclude them.

Page 4, lines 42-46: Line 42 is probative of predisposition, because it is Steve, not the defendant, who mentions a machinegun. While lines 42-44 are somewhat inflammatory, they are necessary to understand the context in which line 46 occurs. The government may present lines 42-46.

Pages 5-6: the danger of unfair prejudice outweighs any probative value the statements on these pages of the transcript may have. The court will exclude them.

Page 7, lines 1-3: The defendant's statement of his intention to buy a weapon is somewhat probative, as it shows the defendant's intent to obtain a weapon. While the other statements on these lines are prejudicial, they provide context for the statement about the weapon. The government may present them.

Page 7, lines 4-26, pages 8-10: The statements on these pages either are not probative or carry the risk of undue prejudice that would outweigh any probative value. The court will exclude them.

Page 11, lines 1-11: These statements either are not probative of predisposition or carry the risk of substantial prejudice. The court will exclude them.

Page 11, lines 12-13: These lines are probative of predisposition. The defendant has argued that he wanted only a handgun, and here he indicates that he will try to buy a handgun. The reference to an explosive belt is prejudicial, but it is not clear that the risk of unfair prejudice outweighs the probative value of the statement about the handgun. The court will allow the government to present these lines.

Page 11, lines 14-46, page 12: These statements either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

Page 13, lines 1-4: These lines are probative of disposition, as they imply that the defendant wanted to obtain a handgun, not a machinegun. The court will allow the government to present these lines.

Page 13, lines 5-46: These statements either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

Page 14, lines 1-44: These statements either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

Page 14, lines 45-46, page 15, lines 14-17: These lines are probative on the question of whether the defendant had the ability to purchase a

machinegun—so-called "positional predisposition." The defendant talks about how his uncle has offered to give him money to buy a weapon. The lines do not carry the risk of unfair prejudice. The government may present these lines.

Page 15, lines 18-46: These statements either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

Page 16, lines 1-32: These statements either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

Page 16, lines 33-36: Steve's statement is probative of predisposition, given the defendant's argument that it was Steve, not the defendant, who brought up machineguns. The defendant's response is arguably inflammatory and prejudicial to him, but necessary to avoid the impression that Steve brought up the idea of a machinegun and the defendant said nothing. The government may present these lines.

Page 16, lines 37-46: These lines either are not probative of predisposition or carry a risk of unfair prejudice that would outweigh any probative value. The court will exclude them.

<u>Disk 11, page 18 line 5 to page 26 line 41:</u>

This entire excerpt is a discussion of the defendant's views on Israel and his plans to go to Israel and fight with Hamas against Jews. None of it is probative of the defendant's predisposition to obtain a machinegun, and all of it

carries the risk of unfair prejudice that would outweigh any probative value. The court will exclude it.

Disk 11, page 32 line 43 to page 33 line 18:

This entire excerpt is a discussion of the defendant's views on Israel and his plans to go to Israel and fight with Hamas against Jews. None of it is probative of the defendant's predisposition to obtain a machinegun, and all of it carries the risk of unfair prejudice that would outweigh any probative value. The court will exclude it.

Disk 11, page 39 line 10 to page 39 line 12:

These lines discuss how the defendant's martyrdom will motivate people. They are not probative of the defendant's predisposition to obtain a machinegun and it carries the risk of undue prejudice that would outweigh any probative value. The court will exclude them.

Disk 14, page 4 line 17 to page 8 line 25:

This entire excerpt is a discussion of how the defendant's mother became ill and went to the hospital, discouraging him from any plans to martyr himself at that time, as well as further discussion about traveling to Israel/Palestine to join the fight there. It is not probative of the defendant's predisposition to obtain a machinegun and it carries the risk of undue prejudice that would outweigh any probative value. The court will exclude it.

Disk 14, page 15 line 15 to page 15 line 17:

These lines are somewhat probative, as the last line discusses the fact that if the defendant cannot get to Gaza, he will buy a weapon "or something

and that's it." They are not unfairly prejudicial. The government may present these lines.

Disk 22, page 16 line 6 to page 16 line 43:

This excerpt concerns plans to travel to Palestine and the logistics of that travel. It is not probative of the defendant's predisposition to obtain a machinegun and it carries the risk of undue prejudice that would outweigh any probative value. The court will exclude it.

Disk 22, page 19 line 16:

This single line is inflammatory, carries a high risk of undue prejudice and is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Disk 22, page 20 line 5 to page 20 line 24:

This excerpt relates to the defendant's purported plans to shoot people in Israel. It is inflammatory, carries a high risk of undue prejudice and is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Disk 22, page 34 line 30 to page 34 line 35:

This excerpt contains statements by the defendant about his prayer for martyrdom. It is inflammatory, carries a high risk of undue prejudice and is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Disk 22, page 36 line 4 to page 37 line 26:

This excerpt is a discussion of the postponement of the defendant's alleged plans to go to Israel/Palestine and the logistics of getting there when the defendant does go. It is not probative of the defendant's predisposition to obtain a machinegun, and it carries the risk of undue prejudice. The court will exclude it.

Disk 22, page 38 line 12 to page 38 line 16:

This excerpt relates to fighting in the West Bank and the presence of spies there. It is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Disk 22, page 39 line 18 to page 39 line 20:

In this excerpt, the defendant says that if Hamas tells him to blow himself up, he will do so. It is not probative of the defendant's predisposition to obtain a machinegun and is highly inflammatory and prejudicial. The court will exclude it.

Disk 22, page 40 line 13 to page 40 line 21:

This excerpt again discusses the plaintiff's view that if one kills more people, one is less afraid. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

Disk 22, page 42 line 7 to page 42 line 30:

In this excerpt, the plaintiff discusses martyrdom, and the logistics of getting into Palestine (using an American, rather than a Jordanian, passport).

It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

Disk 22, page 43 line 8 to page 43 line 42:

Page 43, lines 8-14: The lines relate to the type of passport needed to get into an unnamed place—presumably Palestine or Israel. They are not probative of the defendant's predisposition to obtain a machinegun. The court will exclude them.

Page 43, lines 15-40: The statements in these lines are probative of positional predisposition—whether the defendant had the means to obtain a machinegun. He and Mike discuss the amounts of money they have or expect to have by travel time. The statements carry some risk of prejudice, but not enough to outweigh their probative value. The government may present these lines.

Page 43, line 42: Mike tells the defendant not to mention anything to anyone. This isn't probative of the defendant's predisposition, and the court will exclude it.

Disk 22, page 52 line 40 to page 52 line 46:

In this excerpt, the defendant opines that Palestine is a difficult country in which to obtain weapons. Mike responds by mentioning a Kalashnikov. The defendant responds that if you don't join a resistance group, the most you will get is a pistol. While there is mention of both a Kalashnikov (by Mike, supporting the defendant's argument that he was not the one who brought up firearms) and the ability to obtain weapons, this excerpt isn't particularly

probative of the defendant's predisposition to obtain a machinegun or weapon. It appears to be nothing more than an opinion. The court will exclude it.

Disk 22, page 53 line 4 to page 55 line 20:

Page 53, lines 1-33: These lines contain a discussion of resistance groups and Hamas and how to get into Hamas. They are not probative of the defendant's predisposition to obtain a machinegun. The court will exclude them.

Page 53, lines 34-45, page 54, lines 1-14: In this exchange, the defendant mentions "spraying" several people at once, and Mike responds by bringing up a machinegun; the defendant confirms Mike's statement. The defendant talks about shooting people and getting their weapons and shooting two people and taking their Kalashnikovs. The statements have some probative value as to the defendant's desire to obtain and use a machinegun, but also support the defendant's argument that it is Mike who brings up machineguns, not the defendant. The references to killing several people are prejudicial, but the prejudice does not outweigh the probative value. The government may present these statements.

Page 54, lines 15-46, page 55: These statements are not probative of the defendant's predisposition to obtain a machinegun and are unduly prejudicial. The court will exclude them.

<u>Disk 22, page 78 line 15 to page 78 line 32:</u>

This excerpt is a discussion of going to Palestine to wage jihad. It is not dispositive of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

<u>Disk 22, page 79 line 1 to page 79 line 24:</u>

This excerpt contains a discussion of how to avoid detection while in Israel/Palestine. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

<u>Disk 22, page 81 line 30 to page 81 line 36:</u>

In this excerpt, the defendant and Mike discuss the desirability of being martyred in Jerusalem. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

<u>Disk 25, page 15 line 1 to page 17 line 27:</u>

Page 15, lines 1-11: The defendant and Mike discuss going to "shoot"—presumably going to the shooting range, because they talk about "training." The defendant appears to be the person who brings up the idea of going shooting. This exchange is probative of the defendant's predisposition to obtain a weapon (albeit not necessarily a machinegun). The government may present these lines.

Page 15, lines 13-46, page 16: This portion of the excerpt contains more discussion about the logistics of getting into Jerusalem (at least, it appears that they are discussing entry into Jerusalem, because they discuss the Western Wall and the nearby gates). It is not probative of the defendant's predisposition

to obtain a machinegun and is unduly prejudicial. The court will exclude these lines.

Page 17, lines 1-9: In this portion of the excerpt, the defendant and Mike discuss going in with handguns and taking Kalashnikovs from the guards, then spraying the people inside, all of whom are Jews. This exchange is inflammatory and prejudicial, but it also is probative of the defendant's intent to obtain a machinegun, and he is the one who raises the issue of Kalashnikovs. The court will allow the government to present these lines.

Page 17, lines 10-27: In this portion of the excerpt, the defendant and Mike discuss the people who pray at the wall, and the defendant's belief that they want to tear something down. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

Disk 30, page 25 line 5 to page 27 line 13:

Page 25: This highly inflammatory and prejudicial conversation about killing large numbers of Jewish people is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Page 26, lines 1-8: This is a continuation of the conversation on the previous page. The court will exclude these lines for the same reason.

Page 26, lines 9-21: This portion of the excerpt is another conversation about the defendant and Mike taking handguns and killing people, then taking their machineguns or Kalashnikovs. It is prejudicial, but also probative of the

defendant's predisposition to obtain a machinegun. The government may present these lines.

Page 26, lines 22-31, page 27: This is a continuation of the discussion about how many people the two will shoot and whether they will get on the news or go to Paradise as a result. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

Disk 30, page 29 line 1 to page 30 line 22:

The defendant does not object to the court's admission of this excerpt. The government may present it.

Disk 34, page 27 line 12 to page 27 line 34:

This excerpt involves further discussion of going to Palestine. It is not probative of the defendant's predisposition to obtain a machinegun. The court will exclude it.

Disk 34, page 31 line 16 to page 31 line 18:

It is not clear what the defendant meant by this statement. It appears that the government seeks its admission only because the defendant talks about being an American and shooting. It is not probative of the defendant's predisposition to obtain a machinegun—it isn't clear that it's probative of anything. The court will exclude it.

Disk 34, page 35 line 27 to page 36 line 21:

This excerpt appears to be a rant against people of various races, including "whites," "Jews" and a "Mexican." It is not probative of the

defendant's predisposition to obtain a machinegun and is unduly prejudicial and inflammatory. The court will exclude it.

Disk 37, page 11 line 13 to page 13 line 6:

This excerpt is a discussion of the defendant's and Mike's opinions about whether women should try to attack soldiers, and what happens to them when they do. It is not probative of the defendant's predisposition to obtain a machinegun and is inflammatory and unduly prejudicial. The court will exclude it.

Disk 45, page 5 line 36 to page 6 line 45:

The topic of this discussion is unclear, at least without further context. In the first six lines or so (page 5, lines 36 to 41), the defendant and Mike talk about going shooting, and they could be talking about going to the shooting range to practice. The rest of the conversation, however, is about shooting people and not caring about it, and the reasons for shooting people. Overall, the conversation does not appear to be probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial and inflammatory. The court will exclude it.

Disk 45, call #4, page 9 line 2 to page 9 line 14:

This is a discussion of whether it is better to conduct jihad in the United States than in Palestine. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude it.

<u>Disk 45, call #5, page 9 line 1 to page 9 line 35:</u>

Lines 1-11: In this portion of the excerpt, the defendant instructs Mike to stop telling people, and to find him a good weapon. This portion is probative of the defendant's predisposition to obtain a machinegun through Mike. The government may present these lines.

Lines 12-35: The remainder of the excerpt is about jihad, what to do if someone shows disrespect for Islam and how to defend the faith. It is not probative of the defendant's predisposition to obtain a machinegun and is unduly prejudicial. The court will exclude these lines.

<u>Disk 51, page 20 line 23 to page 22 line 26:</u>

Page 20, lines 23-26, page 21, lines 1-2: This conversation occurred during a trip to the shooting range on December 14, 2015. It is not clear whether these lines refer to shooting people or objects. Because of the lack of clarity, the court will exclude these lines.

Page 21, lines 3-26, page 22, lines 1-26: The defendant does not object to the court admitting this portion of the excerpt, and it appears relevant to the offense, as the defendant and Mike are discussing shooting at the shooting range and there is mention of Mike's Kalashnikov. The government may present this portion.

In making the above rulings, the court has excluded several conversations that involve the politics of the Israeli-Palestinian conflict, the geography of the region and the logistics of travel in the region. The defendant asked the court to preclude the government from calling as an expert witness

Dr. Matthew Levitt. Dkt. No. 278. In its response to that motion, the government argued that it needed Dr. Levitt's testimony to "provide the jury with expert background knowledge it needs to understand the defendant's own statements about Hamas, Israel, ISIS and the Masons." Dkt. No. 284 at 1. The government argued, for example, that the defendant made statements about joining Hamas (the militant Islamic Palestinian nationalist group that seeks to establish an independent Islamic state in disputed territories of Israel/Palestine), and argues that Dr. Levitt's testimony is necessary to explain what Hamas is and the importance (in the government's view) of the defendant's desire to join it. Id. at 1-2. It argues that Dr. Levitt's testimony will help the jury understand the defendant's statements about the ease (or lack of ease) of getting into Israel or Palestinian territories with certain passports and to understanding why a person might want to join Hamas but have an antipathy toward ISIS. Id. at 2.

After the final pretrial conference, the government submitted another brief (without seeking the court's permission to do so), asserting that the jury would need an expert to answer the following questions:

1.    What is Hamas?
2.    What are the Gaza Strip and West Bank?
3.    Why do the different security stations in the Gaza Strip and West Bank have different appeals to someone that wants to commit a mass killing there?
4.    How is it possible a person would sympathize with one designated foreign terrorist organization in the Middle East (Hamas), but oppose the values of another designated terrorist organization in the Middle East (ISIS)?

5.    Do Masonic conspiracy theories exist in the Middle East (the United States anticipates asking Dr. Levitt this one question on this topic)?[3]

Dkt. No. 302 at 4.

The defendant sought leave to respond to this brief, dkt. no. 305, and the court granted that leave, dkt. no. 306. In his response, the defendant argued that Dr. Levitt's testimony was irrelevant and unnecessary, and that the government could accomplish its purpose "with a stipulation or the Court taking judicial notice of the definition of certain terms." Dkt. No. 314 at 11-13.

The court's exclusion of most of the statements that referenced terms or issues the government claims needed illuminating (the Western, or "Al Buraq," Wall, Hamas, the West Bank) renders any expert testimony on these terms, or on Israeli-Palestinian geography, unnecessary. The court expressed concern at the final pretrial conference that allowing such testimony would create the possibility of a mini-trial on the Israeli-Palestinian conflict. It didn't see the need for that risk at the final pretrial conference and sees less need now. The court will grant the defendant's motion to exclude Dr. Levitt as an expert witness on the topics of the geography of Israel, Jordan and the Palestinian territories; the Israeli-Palestinian conflict and the political/religious issues in the region. It also will grant the government's motion to exclude the defendant's expert on the same topic, Dr. Marc Sageman.

---

[3] The last two issues are more relevant to the conversations about Masons, which the court addresses in a separate section below.

The parties are free to discuss a stipulation to the definition of any terms in statements the court has allowed (Gaza, for example), or to ask the court to take judicial notice of certain geographical facts. But the court will not allow expert testimony on an issue that is peripheral to the question of whether the defendant was predisposed to obtain a machinegun—the issue of the defendant's alleged plans to travel to the Middle East to participate in the conflict there in the fall of 2015.

D.    Conversations about Masons

Just as the indictment did not charge the defendant with conspiracy to commit an act of international terrorism, it did not charge him with conspiring or attempting to commit an act of domestic terrorism at the Masonic Center. Again, there is a reason for this. While the statute defines domestic terrorism, 18 U.S.C. §2331(5), it does not impose criminal penalties for domestic terrorism, 18 U.S.C. §2332. See *All Things Considered*, Federal Prosecutors Are Treating El Paso Shooting as Incident of 'Domestic Terrorism' (NPR radio broadcast Aug. 5, 2019 (accessible at https://www.npr.org/2019/08/05/748387322/federal-prosecutors-are-treating-el-paso-shooting-as-incident-of-domestic-terrorism). Even if it did, the defendant could not have "conspired" with Steve and Mike to commit such an act, because they were government agents.

The defendant argues that the January 18-25 conversations involving Masons contain "fabulist and disgusting (but abandoned) talk," that they occurred months after the defendant was approached by the informants and so

aren't relevant to predisposition, and that they aren't relevant to inducement. Dkt. No. 277 at 11. The defendant asserts that anything he may have said about the Masons doesn't show that it is more or less likely that Steve and Mike induced him to buy machineguns. Id. at 12. He reminds the court that even after making the statements about the Masons, the defendant "disavow[ed] any violence toward them," saying the day before the purchase that he wouldn't go through with the alleged planned shooting at the Masonic Center. Id. The defendant admits that his statements about Masons would be relevant if "the night before he had not convinced Mike and Steve to abandon the plan" to commit the Masonic Center shooting. Id. at 13. But he argues that the fact that he abandoned the plan makes any statements he made about it irrelevant, and he argues that allowing the government to introduce the statements "threatens to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." Id. The defendant concludes that "whatever marginal relevance the government could propose is substantially outweighed by the risk of having [the defendant] convicted for his lack of character and nothing more." Id. He asked the court to "either exclude or greatly limit much of the violent statements that the government intends to introduce into evidence." Id.

If the government seeks to admit the January 2016 conversations about Masons and the Masonic Center to prove motive, the court already has concluded that they are not admissible for that purpose. Motive is not an

element of the charged offenses and is not relevant to whether the defendant committed the charged offenses.

If the government seeks to admit the January 2016 conversations about Masons and the Masonic Center to prove that the defendant was a violent, vengeful person bent on committing acts of incomprehensible violence, the statements are not admissible for that purpose. That is the kind of character evidence Rule 404(a) prohibits.

If the government seeks to admit the discussion of the plan to shoot people at the Masonic Center as evidence of the defendant's intent to obtain machineguns, his preparation to do so or his plan to do so, the government would be required to give the defendant notice of that fact under Rule 404(b). As far as the court is aware, the government has not done so.

The court is less convinced than the defendant that some of the conversations about Masons and the plan to shoot people at the Masonic Center couldn't be relevant to predisposition. The defendant's view is that as of January 18-25, 2016—the dates of the conversations about Masonic conspiracy theories and committing a shooting in a Masonic center or temple— the defendant had been talking with Steve and Mike for around four months, during which he had been subject to consistent pressure, indoctrination and inducement. Under this view, nothing the defendant said in the week before the purchase was said pre-inducement, and therefore none of the conversations are relevant as to whether he was predisposed to obtain a machinegun before the informants started inducing him to do so.

But that view begs the question that is up to the jury to answer: did Steve and Mike induce the defendant to purchase the charged items, and if so, *when* did they induce him? The defendant believes that the inducement started in August or September of 2015, with Steve mentioning machineguns during conversations about the defendant going to Israel, and when Mike showed the defendant a gun and began talking about guns and shooting with the defendant. If the jury agrees that Steve and Mike engaged in a prolonged indoctrination program, easing the defendant into a culture of guns and working him toward agreeing to buy a machinegun, then the defendant's statements in January 2016 aren't relevant to predisposition because by that time the defendant already had been subject to extensive inducement.

But the jury could conclude that what passed between the defendant and the informants in the fall and winter of 2015 was just three guys talking trash (albeit bigoted, violent trash). A jury could note that something seems to have happened in mid-January 2016, when Mike went from informing the agents that the defendant was no longer talking jihad and planned to visit Jordan only for a vacation to talking about going to Texas and shooting in the desert. A jury could reasonably wonder whether the inducement began sometime after Mike resumed recording, and if so, could consider whether any of the statements in the days leading up to the purchase reflected on predisposition. The question of whether the statements about Masons and the shooting are relevant to predisposition depend on whether the jury concludes that the informants induced the defendant and if so, when they conclude that inducement began.

For better or for worse, there is also the fact that before Mike stopped recording in mid-December 2015, the Masons never came up. All the talk about committing violent acts was related to Israel and Palestine, and the defendant traveling there. In mid-December 2015, Mike stopped recording his conversations with the defendant. The defense doesn't know why, although it suspects that Mike may have stopped recording to hide the fact that he was putting ever more increasing pressure on the defendant, or perhaps to hide the fact that agents were encouraging him to put increasing pressure on the defendant. The court does not know why Mike stopped recording and has seen no evidence to support the defendant's speculative theories. But the evidence does show that when Mike resumed recording on January 19, 2016, the topic of conversation had changed from Israel to the Masons.

If the court were to grant the defendant's request that it exclude all conversations that mentioned the Masons, it would leave a gaping and misleading hole in the chronology of events. The defendant has asked to present an entrapment defense, which requires evidence of the history of the relationship between the informants and the defendant. Part of the history of that relationship is that Mike stopped recording, and that he resumed at a time when the focus of the defendant's interest and energy had shifted dramatically. Mike also resumed recording only days after telling the agents that the defendant had stopped talking about jihad and going to the Middle East to join the conflict there. The existence of the Masons and the fact that the defendant appears to have become aware of conspiracy theories about them appear to be

the reason for the resumption of recording and the resumption of discussions about going to Texas and obtaining weapons. The defendant himself has suggested that it was the informants who planted the idea of the Masons as enemies of Islam in the defendant's head. Whether that is true or not, scrubbing all discussions of the Masons and prohibiting argument about the Masons would present the jury with false facts.

Perhaps realizing this, the defendant suggests that the court should "curtail" the statements and argument regarding the Masons. The court assumes that this is the defendant's way of saying that the court should conduct the Rule 403 balancing. What follows is the result of that balancing.

Disk 73, page 17 line 1 to page 21 line 3:

The defendant does not object to the admission of this excerpt, which is a discussion that took place on January 19, 2016 between the defendant and Mike. It relates to going to Texas, and to going shooting, as well as to a third person the men refer to as "Mo." The discussion appears to relate to the previously-discussed plan to purchase guns from Mike's "source" or "connection" in Texas. The government may present this excerpt.

Disk 73, page 25 line 22 to page 28 line 39:

Pages 25-26 and page 27 lines 1-5: The court will exclude these statements. They are probative of the defendant's intent to obtain weapons, but the danger of unfair prejudice exceeds the probative value.

Page 27, lines 6-40, page 28: This part of the conversation relates to going to Texas and obtaining guns and how to conceal them on the trip back.

The defendant argues that this conversation doesn't bear on whether the defendant was induced. As the court has indicated, that depends on the jury's view of whether he was induced and when. If the jury finds that the defendant wasn't induced, this portion of the conversation is relevant to the defendant's intent to obtain guns. Arguably, it is also relevant to the defendant's argument that he thought he was getting handguns, not machineguns—the defendant talks about putting the guns "inside" the spare tire for the return trip. The government may present this portion of the excerpt.

Disk 73, page 31 line 3 to page 35 line 6:

Pages 31-33: This portion of the excerpt is a discussion of using Molotov cocktails to burn the Center after the shooting. It is not probative of the defendant's intent to obtain the *means* to commit the shooting. It is highly inflammatory (in the emotional sense) and carries a high risk of undue prejudice. The court will exclude this portion of the excerpt.

Page 34, lines 1-35: In this conversation, the defendant talks about having silencers and about the weapons not being licensed. This statement is relevant to the defendant's intent to obtain a silencer and unregistered weapons. The statements at lines 23-25 are highly prejudicial; the defendant speaks of each man grabbing a group, shooting them and then walking out. In light of the probative value of the statements that surround it, however, the court will allow the government to present this portion of the excerpt.

Page 34, lines 36-40; page 35: The court will exclude this portion of the excerpt, which talks about cameras in the temple and wearing masks. It is not probative of the defendant's intent to obtain a machinegun.

Disk 73, page 76 line 2 to page 77 line 4:

The court will exclude this excerpt. The defendant appears to be relating a dream that he had about the alleged planned shooting. The defendant asserts that it is "bizarre." That isn't a reason to exclude evidence. The fact that the statement isn't relevant to the defendant's intent to obtain machineguns is a reason to exclude the excerpt.

Disk 73, page 81 line 18 to 88 line 7:

This excerpt records the defendant and Mike finding a parking place at the Masonic Center in Milwaukee, and the three men receiving information about Freemasonry by a Freemason who introduces himself as "Pete." The conversation is not relevant to the defendant's intent to obtain a machinegun. The court will exclude this excerpt.

Disk 73, Part 8, page 5 line 8 to page 25 line 28:

Pages 5-6, page 7 lines 1-41: The defendant does not object to the government presenting this discussion about getting machineguns and silencers from the man in Texas, as well as a discussion of the attack on the Masonic Center. The government may present this excerpt.

Page 7 line 42, pages 8-13, page 14 lines 1-42: The defendant objects to this portion of the excerpt. It is a detailed discussion of how the planned shooting will take place, from who will participate, who will stand where,

whether to avoid children and elderly people, whether the shooting will bring the men notoriety with groups like Hamas. The statements are not probative of the defendant's intent to obtain a machinegun or silencers and are unquestionably unduly prejudicial. They raise the risk that the jury will convict the defendant for his cold, calculating and chilling words, and not because he possessed the charged items. The court will exclude this portion of the excerpt.

Page 14, lines 42-45; page 15: The defendant does not object to the government presenting this discussion of purchasing machineguns and silencers from the person in Texas. The government may present this portion of the excerpt.

Page 16: The defendant objects to this discussion of what the men will do with the weapons after the shooting. The court agrees that this portion of the conversation is not relevant to the defendant's intent to obtain a machinegun. The court will exclude this portion of the excerpt.

Pages 17-20, page 21, lines 1-33: **The defendant did not state whether he objected to any of this portion of the excerpt**. Without ruling, the court notes that some of it relates to going to Texas to get the guns (page 17, lines 1-33), which the court believes are relevant; some to plans about the shooting (page 17, lines 34-44; page 18, lines 1-2), which the court believes are not relevant and are inflammatory; some to strange information (or misinformation) about Masons and Mo and someone's sister and going on a trip to Jordan (page 18, lines 3-45; pages 19-20; page 21, lines 1-33), which do not appear to be relevant.

Page 21, line 35; pages 22 and 23: The defendant does not object to the presentation of this discussion about buying guns from the man in Texas, the trip to Texas and the cost of the guns. The government may present this portion of the excerpt.

Pages 24-25: The defendant objects to this portion of the conversation. The men are talking about the defendant quitting his use of marijuana. The defendant also talks about changing the date of the shooting, and how many people will be there. This portion is not relevant to the defendant's intent to obtain a machinegun and carries a high risk of undue prejudice. The court will exclude it.

Disk 79, page 6 line 30 to page 10 line 2:

Pages 6 and 7; page 8, lines 1-42: The defendant objects to the presentation of this discussion of Mo and the men's views of Mo. The court agrees that this portion of the excerpt is not relevant to the defendant's intent to obtain a machinegun. It isn't necessarily unduly prejudicial; it simply doesn't seem to relate to the charges. The court will exclude this portion of the excerpt.

Page 8, lines 42-47: This brief excerpt is the defendant talking about getting the guns. The government may present this excerpt.

Page 9, lines 1-45; page 10: This excerpt appears to be a continuation of the conversation about Mo. It is irrelevant. The court will exclude it.

<u>Disk 79, page 27 line 22 to page 28 line 14:</u>

This excerpt is a discussion of Mo and what is in Mo's heart. It is irrelevant and confusing, and the court will exclude it.

<u>Disk 79, page 32 line 20 to page 32 line 46:</u>

This excerpt is more discussion of Mo and what Mo has said about Mike. It is irrelevant and the court will exclude it.

<u>Disk 79, page 48 line 37 to page 49 line 31:</u>

This excerpt is yet more discussion about the men's opinion of Mo and what Steve told Mo about talking about Mike. It is irrelevant and the court will exclude it.

<u>Disk 79, page 78 line 32 to page 80 line 42:</u>

The defendant has no objection to the government presenting this excerpt. The conversation took place on January 20, 2016—the day after the visit to the Masonic Center. The defendant, Steve and Mike appear to begin by talking about an "eye," which the defendant insists is a Masonic symbol but Mike says is "the eye of jealousy." The men then root around to find a dollar bill, then discuss the image of George Washington on the bill. The conversation then shifts to talk of whether any of the men will get out of the "temple" and whether they will be martyred. Because the defendant does not object, the government may play this excerpt but the court has difficulty seeing the relevance of this conversation to the charged conduct.

<u>Disk 84, page 16 line 40 to page 17 line 37:</u>

In this excerpt from January 21, 2016, the three men discuss Masonic symbolism, the defendant asserts that Masons kidnap people to offer them to the devil, they discuss a video that either the defendant or Mike showed Steve the night before, the assertion by the defendant that ISIS is Masonic and that the Masons destroyed the world. The defendant says that if the court grants its motion *in limine* to exclude or curtail statements about the Masons, it should exclude this statement as irrelevant, but "if the government can introduce it, no objection." Dkt. No. 291 at 21. The court isn't sure what the defendant means by that objection.

The first part of the conversation—page 16, lines 40-46 and page 17 lines 1-19—is irrelevant, in the court's view, and the court will exclude it.

Page 17, lines 21-37 may explain why the defendant's attention shifted to the Masons. The jury will be aware that the defendant and the informants had discussed an attack on the Masonic Center. These statements provide context and are not unduly prejudicial. The government may present page 17, lines 21 through 37.

<u>Disk 84, page 35 line 38 to page 52 line 12:</u>

Pages 35-37; page 38, lines 1-2: The defendant objects that this portion of the excerpt is not relevant and is confusing. It appears in this conversation that the defendant is proposing to change the location of the planned shooting from Milwaukee to Texas, due to his fear that the plan has leaked. The court agrees that the conversation is not relevant to the defendant's intent to obtain

a machinegun, although it notes that the defendant himself has argued that this change in plan was evidence of the defendant trying to find a way to back out of the plan to attack the Milwaukee Masonic Center. But the court will exclude this portion of the excerpt as irrelevant.

Page 38, lines 5-46; pages 39-40; page 41, lines 1-28: The defendant does not object to this portion of the conversation, and it is relevant to the defendant's intent to obtain machineguns. The government may present this portion of the excerpt.

Page 41, lines 29-46; pages 42-48; page 49, lines 1-36: The defendant objects to this portion (and an additional line) because it is a detailed description of how the mass shooting at a Masonic location (possibly in Texas) will be carried out. The court agrees that the risk of unfair prejudice far outweighs any probative value this portion of the excerpt may have, and the court will exclude it.

Page 49, lines 37-46: This is a discussion of the silencers. It is relevant, the defendant does not object, and the government may present it.

Pages 50-52: **The defendant did not indicate whether he objects to this portion of the excerpt**. On these pages the conversation returns to a detailed discussion of how the shooting will be carried out, and telling people to take their kids out, and whether there will be kids present. This portion of the excerpt is irrelevant and carries a very high risk of undue prejudice. The court will exclude it.

<u>Disk 84, page 45 line 27 to page 47 line 20:</u> The defendant objects that these statements are unduly prejudicial and irrelevant. The court agrees, but notes that it is confusing that this conversation purportedly appears on Disk 84, Part 2, pages 45-47, and that the previous excerpt purported to be on that same disk at pages *38 through 52*. It appears there may be some numbering confusion. Regardless, the court will exclude this conversation, in which Steve says that he told the defendant to postpone due to Mo and some other person named 'Umar, and the men talk about a shooting in Texas and how it will go down.

<u>Disk 84, Parts 3&4, page 34 line 40 to page 37 line 5:</u>

The defendant does not object to this excerpt. The majority of the conversation relates to the cost of the guns and the kind of guns the men plan to buy and how they'll carry them. The court will allow the government to present this excerpt.

<u>Disk 86, page 18 line 9 to page 19, line 26:</u>

This is a discussion of the cost of the guns. The defendant says, "No objection as it stands. If the Court allows in the other contested statements or a fair amount, then under the doctrine of completeness it should go to page 23, line 31." Dkt. No. 291 at 21. The court doesn't know what to make of this assertion; the defendant does not appear to have provided the court with the additional excerpt it believes is necessary for completeness. The court will allow the government to present this excerpt, **and if the defendant provides the court with the remaining statements it believes are necessary, the court**

**will consider whether to require the government to include those statements.**

Disk 86, page 40 line 31 to page 41 line 4:

The defendant objects that these comments about finding a temple close to a highway, then shooting everyone inside, are irrelevant and inflammatory. The court agrees, and will exclude this excerpt.

Disk 90, page 10 (portion) to page 13 (portion):

This conversation took place on January 23, 2016 and appears to be a discussion of a possible attack on a Masonic location in Indiana on the coming Friday. While there is a relevant reference to having Mike arrange to get the guns before the following Thursday, the court agrees with the defendant that the high risk of undue prejudice carried by the entire exchange outweighs the probative value of that one sentence. The court will exclude this excerpt.

Disk 90, Part 2, page 29 (entire) to page 33 (portion):

The defendant objects to the first nine segments, from the defendant's statement beginning "Exactly" through the defendant's statement "Nice." The defendant argues that this section is highly inflammatory and not relevant to the defendant's intent to obtain a machinegun. The court agrees—this is another discussion of what to do with any children who may be in the building and a discussion of whether the location is near a highway. The court will exclude this portion.

The defendant has no objection to the rest of page 29 (starting with Mike's statement, "I mean, when you were talking . . . ."). This portion of the excerpt is relevant, and the government may present it.

The defendant objects to the remainder of the excerpt—pages 30-33. The court will exclude this portion of the excerpt; it contains more detailed discussions of how the shooting will be carried out, and the risk of undue prejudice outweighs any possible probative value.

Disk 90, Part 2, page 35 (portion) to page 39 (portion):

**The defendant did not indicate whether he objected to this excerpt**.

Again, without ruling, the court notes that page 35 and page 36 from the first line to the paragraph where the defendant says, "And the situation is under control . . ." do not appear to the relevant.

Page 36 starting with Mike saying, "Did everyone has his money ready" through page 38, the paragraph where the defendant starts with "I mean, you are not asking for a big amount . . ." appears to be relevant, because the men are talking about how they are going to come up with the money and the exact items they'll buy with the money. The remainder of the excerpt appears either irrelevant or carries a high risk of prejudice relative to any probative value.

Disk 92, Part 3, page 13 line 13 to page 13 line 15:

The defendant objects to this excerpt and the court agrees. Any slight probative value this statement may have is outweighed by the inflammatory nature of the racist comment. The court will exclude it.

<u>Disk 95, Part 1, page 12 line 20 to page 13 line 9:</u>

The defendant objects on relevance grounds. This appears to be another conversation about Mo, and how he came to the defendant and reported that he had heard about the plan to shoot at a Masonic temple. The statement is irrelevant to the defendant's intent to obtain a machinegun. The court will exclude it.

**The defendant next states that he has no objection to the court admitting Disk 97, p. 15. The government did not provide the court with a Disk 97, p. 15.**

<u>Disk 99, page 15 line 2 to page 16, line 19:</u>

In this excerpt from a January 24, 2016 conversation, the defendant appears to be reporting that he learned from an Imam that attacking the Masons would be wrong, but that he still wanted to buy the guns and was ready to get them the next day. The court suspects that the defense meant to indicate that it did not object to the admission of this excerpt. It is relevant, and the government may present it.

<u>Disk 104, page 15 line 22 to page 16 line 25:</u>

The defendant does not appear to object to this excerpt, and it is relevant. The defendant says, however, that as to page 15, "[u]nder Rule of Completeness there also needs to go back to page 12, line 22, all the way through." Dkt. No. 291 at 21. Page 15 contains only one line: the defendant says, "The fear is regarding the issue that the weapon is not licensed."

The defendant provided in his proposed transcript excerpts of what the court assumes is the portion of the conversation he believes should be added. Dkt. No. 324 at 72-75 (defense exhibit 3150). The court agrees that this portion of the conversation is relevant to explain why the defendant is concerned about the fact that the gun would be unlicensed. The government does not appear to object to the added portion; it did not list this among the transcripts to which it either objected or felt that modifications were necessary.

The court will allow the government to present this excerpt, as long as it starts at page 12, line 22.

Disk 104, page 35 line 6 to page 35 line 11:

The first four lines of this conversation are relevant, with the defendant, Mike and Steve discussing the unlicensed guns. The defendant objects to the last two lines, where the defendant states that if they are caught, they will be considered terrorists. The court agrees that the last two lines should be excluded (starting with the defendant saying "Because if we are caught in this . . ."). The government may present the first four lines of the conversation.

Disk 104, page 46 line 2 to page 46 line 6:

The government's last proposed excerpt is from January 25, 2016. Dkt. 285-1 at 187. It consists of a five-line exchange between the defendant and Mike about the guns, in which the defendant asserts that he thought "they would be like yours, *man*." The defendant indicated that he had no objection to the statement, but "the whole video should be played." Dkt. No. 291 at 21.

The defendant has asked the court to allow him to present a transcript which he has marked defense exhibit 3153. Dkt. No. 311-5 at 1. A review of this transcript reveals that it is the recording of the defendant's, Mike's and Steve's meeting with the undercover agents on January 25, 2016—the meeting where the men bought the guns. Given that this is the very event that gives rise to the charges, the conversation is relevant.

The government does not appear to dispute that, because in its response to the defendant's t proposed excerpts, the government says that "[t]he parties will be able to play the full undercover sale." Dkt. No. 315 at 4. Strangely, however, the government *objects* to the *defendant* seeking to admit the very five lines at the end of the meeting that the government itself proposed to admit. In its objection, the government asserts that the defendant is seeking to admit these five lines for the truth of the matter asserted, that they do not fall under any hearsay exception and that they're not legally relevant because they're a complaint about the physical size of the guns, which the defendant discusses during the earlier parts of the conversation. Id. The court will require the government to play the entire conversation that appears in defendant's exhibit 3153.

In making these rulings, the court has excluded some statements regarding the Masons and the reason the defendant may have focused on them. The court concludes that the jury does not need Dr. Levitt's testimony about whether Masonic conspiracy theories exist in the Middle East (the court didn't understand the relevance of that information before ruling on this

motion) or testimony about how someone might sympathize with Hamas but not ISIS. The discussion of the video the defendant and Steve saw that caused the defendant to conclude that ISIS was Masonic could raise questions, but the parties could stipulate to, or the court could take notice of, the fact that "Da'ish" is another acronym for ISIS. Dr. Levitt's testimony is not necessary on this point. The court will grant the defendant's motion to preclude Dr. Levitt from testifying.

E.    Evidence and Argument About the Plans to Commit a Shooting at the Milwaukee Masonic Center

The parties' arguments focused on admission of the government's proposed transcript excerpts, and the court has addressed them in that fashion. The transcripts are not the only evidence the government wishes to present, however. The government has provided an extensive witness list which includes Mike, Steve and the undercover agents. These witnesses will testify about their interactions with the defendant. The jury will hear that the three men discussed a plan for conducting a shooting at the Masonic Center, and that discussions about purchasing guns took place as part of the discussions of those plans. In excluding some of the recorded conversations about those plans, it is not the court's intent to bar witnesses from testifying about the chronology of events that unfolded leading up to January 25, 2016. The court has tried to exclude those portions of the conversations that are so irrelevant or inflammatory that the jury would be hard-pressed to heed this court's instructions to focus only on the charged offenses. The court realizes that knowing the defendant was involved in conversations about a planned shooting

at the Masonic Center could make it hard for the jurors to focus on the charged offenses. But the plans are a fact and are part of the series of events that the defendant says resulted in his entrapment, and the government says led to his purchase of illegal items. In making these rulings, the court has tried to balance the government's right to present its case and to try to rebut the entrapment defense with the need to protect the defendant from being convicted for uncharted conduct. The need to continue that attempt at balancing will continue through the trial.

F.      Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the government's consolidated motions *in limine* regarding the defendant's recorded statements. Dkt. No. 272.

The court **GRANTS IN PART AND DENIES IN PART** the defendant's motion *in limine* to exclude or limit evidence and argument related to conversations about Israel and the Masons. Dkt. No. 277, Motion I.

The court **GRANTS** that portion of Section X of the government's motions *in limine* which asks the court to exclude Dr. Marc Sageman's testimony. Dkt. No. 276, Motion X, pp.18-21.

The court **GRANTS** the defendant's fourth motion *in limine* to exclude Dr.

Levitt's testimony. Dkt. No. 278.

Dated in Milwaukee, Wisconsin this 16th day of October, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**