UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        *Plaintiff*,

    *vs*.

SAMY M. HAMZEH,

        *Defendant*.

Case No. 16cr21

## DEFENSE SENTENCING MEMO

# TABLE OF CONTENTS

I.    Introduction and overview of the defense's sentencing memorandum. .................. 1

II.   Hamzeh's background and characteristics reveal a different person from what
      the government has portrayed him to be. .................................................................... 5

   A.   As a teenager, Hamzeh comes to Milwaukee alone and knowing no one. ............. 5

   B.   Hamzeh becomes extremely close to Steve, who deceives him. .............................. 8

   C.   The government has a professional, paid informant of dubious character take
        a job with Hamzeh, befriend him, and introduce him to guns. ............................ 12

   D.   After the investigation stalls and appears to have been a colossal waste, the
        government doesn't record the investigation's most critical conversations. ........ 16

   E.   Hamzeh angrily denounces his friends' plan, refuses to participate, and
        seeks out an imam's assistance to discourage his friends from taking action. ...... 18

   F.   Hamzeh's behavior has to be interpreted through the social dynamic lens of
        social and psychological pressure. ............................................................................ 23

   G.   Hamzeh's conduct since his release demonstrates that additional time not only is
        unnecessary but would undermine the goals of sentencing. ................................. 26

III.  A sentence of time-served is sufficient to achieve the purposes of sentencing. .... 28

IV.   Conclusion ....................................................................................................................... 32

**TABLE OF ATTACHMENTS**

| **Description** | **Exhibit** |
|---|---|
| Family and Friends Letters | A |
| Redacted Dr. Kimmel Report | B |
| Dr. Brauer Report | C |
| Dr. Robbins Report | D |
| Surveillance of Samy Hamzeh | E |
| Gowin Affidavit | F |
| Meeting with A.M. | G |

# I.    Introduction and overview of the defense's sentencing memorandum.

Through multiple hearings, hundreds of pages of pleadings, and PSR objections, this Court knows that the parties view the facts of this case very differently. The government claims that its undercover operation may have stopped a dangerous man from committing serious, even deadly, crimes. The defense's view is that the government didn't solve a crime, it created one.

Before meeting Mike, Hamzeh was an unsophisticated young man with no record and no association with any political group (let alone a terrorist group). Even after the informants and agents expended enormous time and resources, Hamzeh adamantly refused to engage in any violence and angrily denounced the informants' plans to do so as "haram." Yet as a conciliatory measure, he still agreed to purchase guns that the government provided at a fraction of their true cost. He knows he shouldn't have done it, and he deeply regrets his decision. But what he did in the face of all that pressure was commit a non-violent gun crime—a non-violent gun crime that cannot be divorced from the pressure that was exerted on him to possess the guns.

To a limited degree, the defense will delve into the disputed facts (some that were never discussed before) to explain why there is no basis to conclude that Hamzeh ever intended to engage in violence. But most of that discussion is contained in the defense's PSR objections. Despite the presentation here and in the PSR objections, resolving the guideline issues and the disputed facts may be largely unnecessary. That's because the plea agreement effectively cabins the range of additional incarceration to between time-served and two additional years. Given Hamzeh's pretrial detention, he has already

served the equivalent of three years in prison. Under the government's recommendation, accounting for good time and halfway house, Hamzeh would serve about fifteen additional months. Disrupting Hamzeh's successful life and returning him to custody for that (or any) period would not only serve no legitimate purpose, it would also be counterproductive. Indeed, given that Hamzeh has demonstrated he poses no danger to the public, the Court could even decide not to resolve the disputed guidelines issues, recognizing that no additional custody is necessary. *See United States v. Brantley*, 282 F. Supp. 3d 1069, 1071 (E.D. Wis. 2017) ("The Seventh Circuit has held that, when the district court is faced with a difficult guideline issue, it can decline to definitively resolve the dispute if it will not affect the final sentence under § 3553(a).").

To that end, Hamzeh has been free for nearly four years (forty-six months) and has been completely compliant with his bail conditions. He has been employed full-time—working the same job for over three years. Most importantly and perhaps most tellingly, since his release he has married his wife Amy and they've had two children together. We don't have to guess at whether he is a danger to the community, rehabilitated, or whether more confinement is necessary to deter him from misconduct. He has shown as conclusively as possible that he's not a danger, that he doesn't need rehabilitation, and that more confinement is unnecessary.

Buttressing that point, it's worth considering that one of two things has happened since Hamzeh's release. Either the government, truly believing that Hamzeh posed a danger to the community (after all, it suggested repeatedly he was intent on committing mass murder), has kept him under constant surveillance and observed nothing amiss, or

it has not kept close tabs on him, tacitly admitting he is not the danger it portrayed him to be. Those are the two options. Despite the government's continued access to the massive level of resources that it used during the investigation to keep Hamzeh under constant surveillance, the government has not raised one claim about misconduct since his release. In fact, Hamzeh's compliance and success prompted his supervising probation officer to regularly petition to reduce his conditions. Whatever legitimacy there was in the government's initial concerns about Hamzeh (and there appears to be none), its actions over the past forty-six months establish that he currently poses no risk of harm. Again, either the government has had Hamzeh under surveillance and knows he's a model citizen or he's not been under surveillance because the government knows he's not a threat to anyone.

That point resonates in why a time-served sentence achieves the purposes of sentencing. Additional incarceration doesn't keep society safe; rather, it would simply interfere with the life Hamzeh has successfully built. And because he has shown himself worthy of remaining with his wife, children, and family, and keeping his job, time-served is the appropriate sentence. It takes into account not just the time Hamzeh has already served (within the harsh confines of a county jail), but also the severe restrictions he was initially released under, which were the equivalent of custody. It takes into account the Supreme Court's recognition that supervision itself is a significant form of punishment. And it takes into account that Hamzeh was, at the very least, pressured and manipulated to a serious degree before agreeing to receive a gun.

In three pages, that's the thrust of the defense's argument for a time-served sentence: Hamzeh is not the person the government portrayed him to be; he's not a threat to the community; and the § 3553(a) factors fully align with a time-served sentence. To that end, this memo addresses Hamzeh's upbringing and background before highlighting salient facts about the investigation and Hamzeh's arrest that the Court may not be aware of. It addresses how Hamzeh has devoted himself to building a family and a successful life. And finally, it addresses the appropriateness of a time-served sentence. Attached to this memo are letters from family members, including a beautifully written letter from his wife. In addition, our mitigation specialist, Luli Buxton, has produced a sentencing video for the Court to see a different side of Hamzeh than what can be captured on paper—it is only twenty minutes and it speaks directly to the person Samy Hamzeh is today. It is worth watching the video before reading the rest of this memorandum.

## II. Hamzeh's background and characteristics reveal a different person from what the government has portrayed him to be.

In the myriad motions filed, the defense has made many allusions to Hamzeh's background and the genesis of the investigation. This memorandum naturally builds on those prior pleadings, without repeating everything, and it stresses certain points that were not made in those pleadings but would have been developed at trial—particularly concerning Hamzeh's relationships with Steve and Mike. So while smaller points made below hint at earlier arguments, they all fit within the fuller, narrative picture: Hamzeh was never the person the government portrayed him to be and he certainly is not now.

### A. As a teenager, Hamzeh comes to Milwaukee alone and knowing no one.

As laid out in the PSR, Hamzeh was born in New Jersey, but when he was two his family moved to Jordan. They lived in a neighborhood where many Palestinian families settled. His family was (and is) tight knit and supportive. Hamzeh reports that he enjoyed school as a child and being with friends, but that he needed extra tutoring and his grades weren't particularly good. Yet he graduated from high school and even went on to get a certificate in Airport Management in Jordan. His father had a successful small business that Hamzeh worked at in high school. Unfortunately, his father was in a car accident and hospitalized for months. After that, and as Hamzeh approached his late teens, it became difficult for the family to make ends meet and stay in Jordan.

As a boy, Hamzeh dreamed of moving to the United States. When he was teenager, he flew to Chicago, planning to live with a friend whose family would help provide him with a place to stay and help him get on his feet with a job. But when he got to Chicago,

he struggled. As happens too often, those who promised to help Hamzeh exploited him. His friend's father demanded excessive rent, and Hamzeh soon ran out of money. He spoke little English and had a very hard time finding work. And his friend's family had no interest in letting him stay rent-free when he ran out of money or in providing any other assistance to ease his transition.

A mere teenager, alone in a foreign country whose language he didn't speak, and broke, Hamzeh was scared and desperate. A neighbor from Jordan called Tom, a fellow Palestinian from Jordan who lived in Milwaukee, and ran an auto-glass shop. Looking to help a fellow Palestinian, in a magnanimous gesture, Tom jumped to Hamzeh's aid. He not only drove to Chicago to rescue Hamzeh from the situation, he let Hamzeh live with his family and began training him to install auto-glass. Hamzeh enjoyed the work and he did that for several months.[1]

But as with most teenagers, Hamzeh grew restless with a single job and found others working at a gas station and then delivering food.[2] As a testament to his character, Hamzeh has never been without a job—whether it was installing glass or delivering food or parking cars. During this time, one of the longer-term jobs he held was working for a restaurant on Brady Street.[3] There, he worked as a busboy before being promoted to server.

---

[1] PSR ¶ 98.

[2] *Id* ¶¶ 95–97.

[3] *Id.* ¶ 95.

Shortly after Hamzeh's arrest, the defense met with one of the restaurant's owners who gave his impressions of Hamzeh—the owner described their relationship as employer/employee, not friends.[4] He reported that he did not believe that the allegations were within Hamzeh's character, that Hamzeh was not particularly religious and didn't talk politics. The owner, in fact, didn't think Hamzeh had a "bad bone in his body." He thought Hamzeh was, however, of limited intelligence and education, describing him as a bit of a "dimwit." He gave as an example the time it took to train Hamzeh in the point of sale system. He also characterized Hamzeh as a yes-person who went above and beyond to be liked and accepted. Although Hamzeh was not a solid server, he was personable and people loved him. Unfortunately, Hamzeh was fired when he served alcohol to a minor as part of a police sting.

Being a people pleaser and naïve made Hamzeh susceptible to being preyed upon by others. Soon after coming to Milwaukee, he opened a bank account with the help of a "friend" who also put his own name on the account. As one might suspect, Hamzeh's "friend" eventually took out a line of credit on the account, which Hamzeh didn't discover for several years until it caused him difficulty with his credit. By then it was too late.

After a couple years on his own, Hamzeh moved in with his parents. They moved to Milwaukee in 2013. While this setup naturally provided him with some stability and support, his parents also received support from him. Hamzeh's paycheck went to his

---

[4] *See Ex.* G.

father and was used to help pay the family's bills—this included supporting not just his parents but also his younger sister. His father, in turn, would give Hamzeh a modest allowance.

And so in the summer of 2015, Hamzeh turned twenty three. He had been in the United States for roughly four years. He had a solid work history, sometimes carrying multiple jobs at the same time. He was someone who liked smoking marijuana and hanging out with his friends and he was someone who wanted to be accepted by his friends. He was also someone who was gullible, an attention-seeker, and susceptible to being manipulated. Before addressing in a little more depth what happened during this time and what the Court may not know from the prior litigation, it's worth pausing to introduce a little more of the backstory of Steve and Mike and aspects of their involvement in the case.

**B. Hamzeh becomes extremely close to Steve, who deceives him.**

As one would expect with a teenager moving to a new country by himself, Hamzeh's adjustment in Milwaukee was a struggle. At times, he was homesick and lonely and desperate to make connections. During that time, he grew close to Steve. They worked together, lived together for a time, and spent lots of time together hanging out. Hamzeh depended on Steve and trusted him like a brother—he was Hamzeh's best friend. Unfortunately, when Steve found himself in difficult circumstances, it made Hamzeh ripe for exploitation.

The parties have extensively litigated the issue of Steve's motivation in all this. At times, the government has insisted that Steve's motivation was purely altruistic and he

acted in the interest of keeping society safe. Of course, as the case proceeded, more and more evidence accumulated showing that was not the case. There were the early text messages from agents to Steve that the FBI was "trying to help with your immigration stuff."[5] And two weeks later, a text telling Steve to bring his passport and immigration documents to his office.[6] The government's initial position about Steve's motivations was quickly undermined as more discovery was produced.

One aspect of Steve's motivation that the Court is unaware of arose while the interlocutory appeal was pending. As the Court knows, the government appealed the day before trial well *after* the *Brady* material should have been turned over—by court order it was supposed to be produced ninety days before trial. So the defense was surprised to get (in the middle of briefing) a disclosure concerning Steve and his relatives. The defense learned for the first time that one of Steve's uncles, who also lived in Wisconsin, had been investigated for criminal-export violations. The uncle had first been contacted by federal agents in 2014 and received a target letter about one week after Steve first talked to the FBI. The defense also learned for the first time that the FBI had met with Steve's two uncles a month after Hamzeh's arrest and after Steve's second mental health hospitalization and told them that it was possible that Steve could receive a visa even after returning to Jordan and that an S-VISA was possible. After this meeting in February 2016, Steve's uncle's response was to send the agents his target letter and business cards— with the likely hope that they'd take care of his federal problems. The investigation into

---

[5] Trial Ex. 1107 at 4.

[6] *Id* at 5.

the uncle was later dropped (in 2017) and no charges were brought. But none of this was disclosed to the defense before the last trial date.

Given Hamzeh's guilty plea, those facts were never presented in the various filings made before this Court. Yet, they harken to (and reinforce) the Court's concluding lines in its omnibus discovery order. "No one can question that defense counsel have made extraordinary, heroic efforts on the defendant's behalf. Perhaps there is more information out there—this case involves a complicated set of facts that evolved over an extended period. But without some evidence that the government is ignoring specific court orders and long-established law, there is nothing the court can do to help the defendant unearth that information, and the court will not assume that the government deliberately is withholding it or refusing to look for it. Judge Duffin's conclusion to the contrary was not clear error."[7]

Taken together, the evidence that would have been presented at trial was not that Steve was a concerned citizen, but a friend who sacrificed Hamzeh when the situation he and his family faced was dire. Indeed, the defense knows:

- Steve called the FBI in August, immediately after calling a psychic hotline.

- Steve's life was falling apart. He was getting divorced, and his immigration status was tied to his wife.

- His uncle had been notified of a looming federal investigation into his export business.

- Steve reported about not just Hamzeh but another person who worked at the restaurant.

---

[7] R.318:36–37.

- After Hamzeh's arrest, the FBI told Steve's family that immigration benefits, including an S-Visa were possible.

All of those data points lend to a strong inference, that Steve exploited Hamzeh—his gullible friend—to benefit himself and perhaps his family.

But the most telling aspect (to the defense) was not just Steve's self-interest, it was Steve's reaction to Hamzeh's arrest—another point that was not previously brought before this Court in a comprehensive manner. After Hamzeh's arrest, Steve fell apart. Texts from the day of the arrest between agents described the "wheels coming off" with Steve and things were "getting ugly really fast."[8] Steve would not accept the money the agents offered him. In fact, Agent Zuraw texted he was "working on getting him to accept money," and in response another agent said that Steve then "needs to leave town."[9] Steve didn't leave town. Instead, he refused everything the FBI had offered him. He got into an altercation in a barbershop and then had a full breakdown and was committed to the Milwaukee County Mental Health Complex for a week. While there could be various reasons for such a breakdown and Steve refusing the money the government offered for his work, the most logical reason is that he knew he'd betrayed an innocent friend. There is, after all, historical precedent for refusing the silver paid for betraying an innocent friend and then losing one's mind.[10]

---

[8] Trial Ex. 1109 at 17.
[9] *Id.*
[10] Matthew 27: 3-5

**C. The government has a professional, paid informant of dubious character take a job with Hamzeh, befriend him, and introduce him to guns.**

In addition to uncovering issues surrounding Steve's credibility, the defense investigation revealed that Mike is a slippery character. If the Court recalls:

- Mike several times requested more money from the FBI for his services as an informant and threatened to drop out if it wasn't forthcoming.

- After Hamzeh's arrest Mike requested immigration benefits for his family.

- The defense uncovered photos of Mike with large stacks of money—despite pleading poverty in his child-support filings.

- That when he was arrested for pistol-whipping an off-duty female officer, Mike promptly called FBI Agent Gaskill from jail looking for help.

- That all charges in the pistol-whipping case ultimately were dismissed

All of that went to his veracity. But there was (and is) a deeper problem with how Mike influenced Hamzeh's decision to possess the unregistered machine gun.

Mike had (and has) a very untrustworthy reputation in his community and with his past associates. Adept at manipulating people, many people felt burned by their contacts with him.[11] Mike was not just someone who used people, he was someone who profited from using them. While it's unnecessary to present all the character evidence the defense would have produced at trial, there is one piece of evidence that provides a particularly revealing window into Mike's character. His ex-girlfriend provided the defense with two books that Mike bought when he lived with her and left behind when he moved out.[12] The covers and back covers are depicted below.

---

[11] Trial Ex. 1105.
[12] *See* Ex. F. (affidavit of Bill Gowin).



# THE ART OF MANIPULATION

## HOW TO GET ANYBODY TO DO WHAT YOU WANT

OMAR JOHNSON



# THE ART OF DECEPTION

## HOW TO MASTER AND USE SUBTERFUGE ON ANYONE

MADISON TAYLOR

We have all used forms of manipulation in our lifetime. For example, a child manipulating a parent by crying incessantly when that parent balks at the idea of buying them the latest toy, crying to the point where that parent just eventually wears down and gives in or altering our appearance with the intention of getting a specific reaction or getting others to perceive us in a certain way. We all have engaged in the art of manipulation. Manipulating others is a great way to get what you want. It can be used in a positive sense or in negative one and that choice rests solely on the individual who is engaging in the manipulation.

There are many techniques that are use to manipulate others and In his book entitled "The Art of Manipulation" author and serial entrepreneur Omar Johnson examines the secrets of how to use manipulation to get anybody to do what you want. You will also learn how to determine if someone is trying to manipulate you.

The art of deception is an essential art to know to get through life. No, deception is not nice. You should not regularly engage in it. But deception is also a part of human nature that is very important. Deception can get you through a lot of situations and save from a lot of ego bruising. It can even preserve your relationships in some situations.

Deception can also be bad. It can hurt you and those around you. It can limit your quality of life as you get deeper and deeper over your head. Knowing how to stop and prevent lying is just as important of an art as knowing how to lie well.

Well, this book is your guide to the art of deception. This book will teach you how to use the art of deception to your advantage. It will show you how to lie convincingly. It will also show you the reverse side of deception: catching people who lie to you and preventing them from lying again. By the end of this book, you will be a master of deception and subterfuge and you will be the best liar and lie detector around.

Read this book to learn all about lying to yourself and others, detecting when people lie, and preventing future lying from your loved ones. You will be a different person and a better communicator by the end of this guide. Transform your life with the essential art of deception today.

ISBN 9781492760528


9 781492 760528

Consistent with deception and manipulation, Mike instigated and then groomed Hamzeh's interest in guns. Recall: despite all the investigation into this case, there is not a single email, text, google search, or interview with a person other than Steve who talked about Hamzeh having an interest in guns before he met Mike. Yet within a week or so of meeting Hamzeh, Mike showed him the Kalashnikov that he personally owned that was stored in his trunk.[13] While Hamzeh had never been to the shooting range, when Mike took him there for the first time, the clerk at the range knew Mike—for good measure, Mike even paid.[14] And throughout the months that followed, it was Mike's suggestions and Mike's provocations that got Hamzeh to go to the gun stores. Mike cultivated and then exploited that interest.

The Court knows about the times when Hamzeh was pressed (on December 7 and 14) to get a gun and refused. The Court also knows that Hamzeh's interest was in a pistol. But what wasn't central to the defense's prior filings was Mike's manipulation and deception to get Hamzeh to possess the charged guns. Hamzeh thought he was buying a gun like Mike's and he was duped. That was never more evident than when they returned to the car after purchasing the guns and Hamzeh explodes: "I thought it was similar like yours, man. We came on the basis, of it being the same man" . . . "But, we agreed as such o [Mike]. It is not right that we come and find a different weapon . . . ." Mike had manipulated and deceived Hamzeh into getting that illegal gun. While it may

---

[13] Trial Ex. 1109.
[14] Ex. 3047 at 3; Ex. 3051 at 57; Ex. 3050 at 44.

not rise to a complete legal defense, the manipulation and deception leveled against Hamzeh does bear on the amount (and form) of pressure it took for Hamzeh to violate the law.

Mike's cunning was also reflected in how the conversation focused on the Masons. In the PSR and throughout the case, the government has claimed that Hamzeh came up with the idea to target Masons, but the evidence shows that the idea developed with Mike. There is no indication that Hamzeh knew anything about the Masons before January 2016, while there is abundant evidence that Mike was infatuated with them. Recall: he went so far as to become a member. The defense attached his initiation photo to the PSR objections.

In contrast to Mike's documented interest in the Masons, the government searched Hamzeh's electronics, including his phone, laptop, and play station, and obtained every record it could for him, but found no evidence of him searching for information about the Masons, guns, Hamas, terrorism, or anything else damning. It would be a striking coincidence for Hamzeh to have chosen (at random) a group to attack that Mike just happened to also be infatuated with. Beyond the matter of common sense, there's the contemporaneous evidence supporting Mike's manipulation and deception. Recall: Hamzeh, not knowing his conversations were being recorded, made statements about how Mike had showed him videos of the Masons and introduced the idea of an attack. Those videos were the source for the misinformation fed to Hamzeh about the Masons, including that they were ISIS and ate human hearts. In a word, it's hard to overstate the amount of deception and manipulation that Mike plied against Hamzeh.

**D. After the investigation stalls and appears to have been a colossal waste, the government doesn't record the investigation's most critical conversations.**

There is a fair amount of back-and-forth in the parties' presentence report filings—most of it centering on the degree of Mike's and Steve's involvement and the pressure they exerted on Hamzeh. The defense has argued that Hamzeh's possession was the product of their relentless badgering and the government claims Hamzeh had a long-held desire to get the machine guns. Unfortunately, the Court is deprived of the best evidence of what happened because the government didn't record for those thirty-five crucial days. Thirty-five days elapsed between Hamzeh shutting the door on Mike's overtures to get a machine gun, and the first recorded conversation about the Masons. Those thirty-five days are key. And we don't have them. We don't have them despite the government policies and procedures and its own behavior in this case documenting the need to record. Recall Agent Zuraw's text: "[w]e need to get stuff like last night recorded every time," because the "bosses got a bit upset that last night wasn't recorded and said they want everything recorded from now on."[15] Despite the fact that recording the conversations is the best (and essential) practice, and despite daily meetings between Hamzeh and the informants, we have nothing during those thirty-five days—nothing.

The government in its response to Hamzeh's PSR objections makes the claim that it didn't record because it was "extremely labor intensive to record conversations between [Hamzeh] and the CHSs." To put it mildly, this claim rings hollow. Consider that between January 2 and January 16, while the FBI made no recordings of those

---

[15] Trial Ex. 1107 at 5.

conversations because it was so labor intensive to have the informants press RECORD, the FBI conducted surveillance on Hamzeh almost *every day*. Over that two week period, when there were no recordings made because it was "too labor intensive," Hamzeh was subjected to 22 different shifts of surveillance.[16] Each surveillance shift involved six to eight agents working together for eight hours doing nothing but watching Hamzeh's every movement. Put differently, the government's explanation for refusing to have the informants record because it was too labor intensive sounds like malarkey. The more logical explanation is that the lack of recordings hid what was really going on.

It's hard to imagine the level of disappointment that Mike and the agents faced, after three months of hard work with still nothing to show for it. Undoubtedly, conditions were ripe for the agents and informants to be influenced by the "sunk cost fallacy."[17] It's in that thirty-five day void when the government knew to record and didn't that the government wants to conjure up Hamzeh devising a plot against the Masons. Yet, what seems more likely: that Hamzeh, who knew nothing of the Masons and is described as a dim-wit, somehow learned of and developed a hatred towards the Masons and once it was in full bloom, the informants just then started to record. Or, that Mike, the seasoned informant, familiar with the Masons, and a student of the art of deception and the art of manipulation used that thirty-five day void to press this idea and conjure up this plot?

---

[16] Ex. 1728.
[17] See Jesse J. Norris, *Why the FBI and the Courts are Wrong About Entrapment and Terrorism*, 84 MISS. L. J. 1257, 1303 (2015).

The defense submits that the evidence supports Hamzeh's candid assessment of Mike's influence, when days *before his arrest,* he exclaimed: "he brainwashes you."

### E. Hamzeh angrily denounces his friends' plan, refuses to participate, and seeks out an imam's assistance to discourage his friends from taking action.

The Court has read (often) about Hamzeh's visit to the imam. After the discussions about the Masons grew uncomfortably real, Hamzeh realized he was in over his head and began looking for a way out. His first tact was to continue to change the plan so it could never move forward, changing the location from Milwaukee, to Texas, to Indiana, to up north. He then told Mike and Steve he was unavailable because he had to travel to Washington D.C. Then, finally, he did what people do when in distress—he went to see a spiritual advisor, an imam, so he could get help in convincing his friends how wrong their ideas were.

Recall that Hamzeh went to Steve's hotel room to forcefully announce he wasn't going through with the plan and that he didn't want them claiming he was backing out because he was scared: "I'm going to speak a few words, if you want to listen to me, listen to me. If you don't, that's your decision and wait until I'm done before you start talking. The word hesitant, the word being afraid or scared, I don't want to hear it."[18] Hamzeh then proceeded to tell Steve and Mike that he went to the temple and talked to the imam and that the plan was forbidden. The imam advised him not to be hostile unless they are hostile to you and if they wanted to fight it should be against ISIS in Syria.

---

[18] The quotes and citations are all contained in R.47:33–41.

Steve responded to this by claiming ISIS was Masonic and asked why not fight them here. Hamzeh then pushed back: "Because I told [you] what will happen here. I told you this operation will be considered Haram [religiously forbidden]. He told me this plan will be forbidden because people will not trust and they will kill and slaughter Muslims and all this will be because of what you did and will be your fault." When Steve continued to debate Hamzeh about his decision, Hamzeh responded:

> This country let you in, and have taken a pledge from you that nothing happens here unless they become hostile to you, and no one has become hostile or enemy [to] you, in this country.

Steve said he was planning on martyrdom, and Hamzeh told him it was haram.

Hamzeh then offered to have Steve talk to the imam, but Steve complained that he hadn't wanted Hamzeh to talk to anyone—a clear effort at isolating him. Then, as Hamzeh had predicted, Steve needled Hamzeh for being "hesitant." But Hamzeh explained what the imam had told him, and urged Steve "to listen to someone who understands religion." Hamzeh said they should still get the weapons as a precaution for what might happen under a new president, but reiterated that it was haram to conduct any attack.

Steve continued to try to persuade Hamzeh that the attack was a good idea, and Hamzeh resisted. Steve added that maybe the imam "told you this because he is fearful" they would die. Hamzeh then explained (at length) the imam's reasoning and why they could not carry out an attack. In response, Steve insisted he was still ready if Hamzeh wanted to go through with the plan, but Hamzeh maintained that such an attack would be wrong.

The three men then talked about the dangers that awaited Muslims. Hamzeh told them that the imam had said there could be threats from the new president, including that "Muslims will be banned from everything, weapons banned, all IDs will be Muslim, each one carrying an ID, his identification will indicate he's a Muslim in a big stamp, that's what he told me. He said Muslims will be marked throughout America, and there is a possibility that they might put them all in one state." Hamzeh continued: the imam emphasized that if "you attack them that is wrong."

Steve then said that they would get the weapons the next day and Mike said he too was ready to get them. Hamzeh agreed with getting the weapons, reasoning that Mike's friend, who was providing the guns, might be reluctant to trust them in the future if they backed out. But in the same breath, Hamzeh elaborated on the imam's reasoning, emphasizing that "what he said is very logical 100%." After this, Steve brought up getting the weapons again and Hamzeh said that he had no objection to getting them, and they can go practice shooting, "but to attack, to get this out of your thinking. Take it off your head." Recall that Mike had spent months developing target shooting as the men's shared hobby.

The three men then decided to drive to the south side to play pool. They agreed to pick up the guns in the morning and to go see the imam in the afternoon. On the drive, Mike said that he became "sad" when Hamzeh cancelled the operation and three times he said that he wanted to go. Hamzeh responded by telling Mike to see the imam and ask him his questions. After playing pool, Hamzeh asked Mike if there is a place they can practice shooting, and Mike said they can go up north, outdoors in the forest, to practice

shooting. After they left the pool hall Steve took yet another run at getting Hamzeh to agree to an attack:

Steve: Each of you should provide his own opinion, I think we should do Jihad, I should go carry out the operation on Friday. I am seeking Martyrdom; I am seeking Martyrdom.

Hamzeh: We must figure out what is right, or what is it that we can do right.

Steve: We have been planning this for a year, and after all the discussions we did, each one of us has to be ready and not hesitate.

Hamzeh: Not the issue of hesitation, you don't know if this is Haram or Halal. What are we going to do, you don't know? Someone must guide us, give you the proper wise word.

Hamzeh then told them he believes in the imam, but Steve again says he is ready. And Hamzeh responded that if they don't believe this imam, they can consult his uncle in Jordan, who also is an imam.

As Hamzeh resisted their overtures to continue with the plan, his voice began rising. As the following exchange took place, he was clearly frustrated and angry:

Mike: Too many conflicting information, coming from so many Sheikhs. Don't know whom to believe.

Hamzeh: I take the trusted words, my uncle. Don't be nervous.

Mike: I got nervous for nothing.

Hamzeh: There is nothing else. What do you want me to do, God Damn your religion [Hamzeh screaming] go talk to the Sheikh.

Mike: I ask for forgiveness from the mighty Allah [referring to Hamzeh's curse].

Hamzeh: Why are you talking like this (UI) I can't have you do this, then we all go to hell.

| Mike: | I ask for forgiveness from the mighty Allah. You curse the religion like this Samy? |
|---|---|

After taunting Hamzeh, Mike questioned him about why he'd accept the word of an imam who only recently converted from Christianity. Hamzeh responded that he told him what he needed to know. Hamzeh then called his uncle, in Jordan, and asked for his opinion. His uncle, of course, confirmed that the operation was verboten.

Still Mike persisted, while Hamzeh resisted. Mike asked Hamzeh if he was, indeed, confident in the advice he had received. And Hamzeh says, "of course," and that "it's over." When Steve indicated he still wanted to proceed, Hamzeh questioned how he could say this after two imams told him not to. As Hamzeh got out of the car to go home, he said, "get me out of this, and do as you please." That is, when push came to shove: Hamzeh wouldn't be part of the informants' plans.

It's important to reflect on what Hamzeh did. First, he stood up to his friends and was adamant that he wouldn't engage in violence. He would talk about it and bloviate on it—all day—but he wasn't serious. Then, when it looked like his friends were serious, he tried to stall and then sought help. Finally, he confronted his friends; he stood up to their pressure and their mockery and he wouldn't budge. He wanted no part in their plans—nothing to do with violence. That is not a small thing. And it's something that not only reflects well on Hamzeh's character, it's also reflected in the person he is today: someone who is not violent and doesn't need prison to be deterred from violence.

**F. Hamzeh's behavior has to be interpreted through the social dynamic lens of social and psychological pressure.**

The last part of the defense's case that was never fully fleshed out for the Court was the expert testimony that we intended to produce. There were six experts slated to testify. And the government did not oppose our notices, so the reports were never given a hard look by the Court. There are two aspects of that testimony that are germane to sentencing: first, why Hamzeh's speech, though troubling, is consistent with the way that men in their twenties often speak, when there is no outside (grounding) influence to govern their speech. And second, the effect that Steve's and Mike's friendship had on Hamzeh's willingness to get the guns as a conciliatory gesture. Both of these reports support Dr. Robbins's initial and continued impression of Hamzeh and his speech.

The first expert report (or piece of evidence) that wasn't fleshed out at trial concerned the way Hamzeh spoke with his friends. What he said was vile and disturbing. It was just disgusting speech. And there is no escaping how jarring it is. Yet, to those who have studied the speech and behavior patterns of young men and the way they communicate with one another, the way Hamzeh (and his friends) spoke is what happens when there is an unfiltered echo chamber of like-minded speakers who are trying to impress one another. Dr. Kimmel's report makes that abundantly clear, and it is attached to this brief. It is short and insightful.

Dr. Kimmel, a leader in this field and the author of several books on male behavior and speech, makes a few pertinent observations about Hamzeh and his interaction with the informants and the way that social pressure can be exerted on a person and the way

it was exerted on Hamzeh: "The dynamics of bonding in all-male friendship groups create a uniformity of thought and a constant provocation to take greater and greater risks. It is, therefore, quite surprising and ultimately revealing that Hamzeh eventually resists the peer pressure and risks social exclusion by deciding he does not want to participate in a terrorist act in the United States."[19]

Dr. Kimmel then notes that Hamzeh broke the norms that usually create uniform male thought by breaking with Mike's leadership and bucking Mike's place in the group's hierarchy. Referring to Hamzeh, Dr. Kimmel explains:

- He breaks the unanimity and consensus within the group, risking exclusion.

- He reports to a different authority; in fact, he consults two imams who advise against it, which provides Hamzeh with an alternative justification that he needs to resist.

- He withstands homophobic taunts of being a faggot and chicken because he does not want to go through with it.

- He insists that he only wants to acquire a weapon for self-defense, and wants to acquire only a handgun.

- He admits to being afraid, thus breaking the masculine norm of never showing weakness nor fear. "I could have gone a long time ago. I am afraid to go and get arrested. That's what I'm afraid of; I don't want to be arrested."

Dr. Kimmel then observes: "At that stage, in my opinion, his association with the weapons was only because they all asked him to do it, and by then he had already extricated himself from the plan. His motivation was about going along with the group, [he] wanted to please the others, wanting to prove he wasn't weak."[20] Finally, Dr. Kimmel

---

[19] Ex. 1516.
[20] Id.

concludes: "As I read these transcripts, it is my opinion that they represent the dynamics of male bonding through boastful banter, preening and posturing in a comradely hierarchy, and not the strategic planning by a terrorist cell."[21]

The second aspect of the experts' reports revolves around the fact that the effect of those efforts to dissuade Steve and Mike from violence reverberated in his decision to get the gun. It was a conciliatory gesture. As Dr. Brauer's report makes clear: "There are also certain factors that magnify the reciprocity impulse, among these is friendship and for some their culture will make them more susceptible to feelings of loyalty and reciprocity. For instance, the longer the reciprocal relationship has existed, the more we feel compelled to reciprocate."[22] Dr. Brauer continues, reflecting on how Hamzeh's middle-eastern norms would have been affected by the principles of reciprocity: "Culture also affects reciprocity. The US is an independent culture that values individual achievements and self-reliance. Other countries, like Middle-Eastern and Asian countries, have a more interdependent culture that values group harmony and fitting in. Being loyal to friends and reciprocating favors are very important in such cultures."[23]

That's an important factor that the Court must consider. Hamzeh's relationships with Mike and Steve—particularly his best friend Steve—were so strong that having disappointed them in this way (or any way), Hamzeh's natural reaction was to be agreeable for the lesser thing: getting the gun—a gun he couldn't afford and a gun he

---

[21] Id.
[22] Ex. 1504:4.
[23] *Id*. at 5.

really didn't want. And that reaction (that reciprocity) is hardwired into us. Dr. Brauer's report is clear that experiment after experiment shows it.[24] Hamzeh refused to go along with *Mike's and Steve's* plan and when his friends are disappointed, Hamzeh is then willing to buy the guns that *Mike and Steve* want him to buy. Again, time after time in November and December Hamzeh refused to get a machine gun—he only wanted a pistol. It was only after the cumulative effect of that social influence that he bought one.

There is a lot there to unpack, and it would have been better presented at trial through live testimony. But those are the facts that the Court has before it, and they are facts that frame Hamzeh's behavior. And all of that bears on why Hamzeh's crime was the product of the government's efforts and manipulation and not indicative of who he is as a person.

### G. Hamzeh's conduct since his release almost four years ago demonstrates that additional time not only is unnecessary but would undermine the goals of sentencing.

When Hamzeh was arrested, he was twenty-three-years old. He had a solid work history and many pro-social aspects, but he was undeniably immature. Not just with his language but also his tastes: smoking marijuana and hanging out at coffee shops. After his arrest, he spent thirty months in jail. He turned 24 in jail. He turned 25 in jail. And he was released four days before he turned 26. All of that time, he prayed and he reflected on what the rest of his life held. He met frequently with the defense team, cried often, and hoped for a day when he'd be able to be with his family. There is no way to

---

[24] *Id.*

adequately catalog what that much time in county jail was like for Hamzeh. But it's undeniable that over those long years that Hamzeh matured.

When he was released, he was placed on the most stringent conditions. Total lock down. Slowly, he earned the probation office's trust and slowly the Court loosened those conditions. He was allowed to work and to exercise and to attend services. He faithfully did everything that was demanded of him. Over the past forty-six months, he has not had a single slip up. Again, the government's either been monitoring him and knows it; or its decision not to monitor him establishes that they know he's not a danger. Whatever the motivation and whatever the level of surveillance, he's done *everything* that shows he's law-abiding and trustworthy. He has the stability of marriage and children. And he has a stable job at Godfather Electronics. He has been working there for about three years. And he is a model employee. Indeed, the Court can see from the description on the video—Hamzeh is a truly valued and valuable employee.

On top of the marriage, the children, and the job, Hamzeh also has had the benefit of natural maturation. When he was arrested, he was twenty-three years old. He had little ambition beyond getting high and making sure he worked enough to provide for his family. He didn't have any true stability or long-term goals. Put differently, he didn't have anything greater than himself and the immediate pressure to provide for his parents—instead, his life revolved around hanging out with his friends—which isn't terribly unusual for someone that age. But that's not the Samy Hamzeh that's appearing before the Court for sentencing. The Court has before it a much different man from the one that handled the gun in January 2016. In two months, he turns thirty. He has a stable

job and a mortgage. He has a wife and kids, all of whom rely upon him. In a word, the Court has before it a much better person from the one that possessed the machine gun; it has before it a responsible father and husband. It has a person who for forty-six months has demonstrated that he is an upright and model citizen.

### III. A sentence of time-served is sufficient to achieve the purposes of sentencing.

The points raised above all show why a time-served sentence is sufficient to achieve the purposes of sentencing. Before specifically addressing the § 3553(a) factors it's worth again stressing one central point: the difference between the parties' recommendations is not that great. Given the time Hamzeh has already served, and accounting for good time and halfway house, we are talking about at most fifteen more months of incarceration. And so, the question becomes whether anything above time-served is necessary to achieve the goals of sentencing.

When it comes to deterrence, further incarceration isn't necessary to deter Hamzeh. His law-abiding and productive lifestyle since being released on bail nearly four years ago is the strongest demonstration that he's been deterred that anyone could make. There's also a strong argument that Hamzeh never needed any incarceration to deter him from violating the law in the first place. But regardless, Hamzeh has already been incarcerated for thirty-months. He has known the pain of time lost, and the lesson that crime doesn't pay was drilled into him between his arrest in January 2016 and his release. And deterrence doesn't just come from time in prison, it comes from having something more valuable, something you'd refuse to sacrifice and lose. And for Hamzeh, the issue

isn't how does the Court deter a twenty-three-year-old stoner, the issue is whether an almost thirty-year-old dad with kids and a wife and a mortgage needs prison to be deterred from criminal conduct. He doesn't.

When it comes to protecting the public, further incarceration doesn't provide any additional protection. In fact, given the degree to which Hamzeh has adjusted since his release, the public's interests and safety aren't advanced by disrupting his life. Beyond that, it's again worth noting that the daylight between the parties' recommendations is fifteen months of incarceration. Whatever argument could have been made about the danger Hamzeh posed has been quelled over the past forty-six months. To that end, Hamzeh's scrupulous compliance with all bail conditions supports the defense view that none of this would have happened had the government not directed enormous resources against Hamzeh. His perfect compliance is precisely what one would expect from a blowhard with no criminal history or past acts of violence—in the words of the defense's original bond motion: a Palestinian Walter Mitty. It also supports that the only intervention ever needed was to confront Hamzeh with his statements and tell him to knock it off. In other words, Hamzeh is not a threat to the public, so he does not need to be incarcerated to protect the public.

That leaves the issue of just punishment. The crime here was a non-violent gun offense that would not have come to fruition without the government's involvement. But the Court also looks at the offender and not just the offense. In doing so, the Court has to examine three things: first, what lead Hamzeh to this crime; second, what type of person he was when he committed this crime; and third, what type of person is the Court

sentencing today. That is, it's not just relevant who Hamzeh was in 2016 but *who* he is today.

Concerning the offense, Hamzeh possessed a machine gun. It was a gun he shouldn't have possessed. And appropriately calculated, his guidelines should be 18–24 months. The defense will not rehash the arguments made in support of that. They are all in the letter we sent to USPO Graham on and in the formal PSR objections. This is a gun case, with someone who has no record. And under ordinary circumstances, a sentence even in that range would be unusual. But these are far from ordinary circumstances. In August of 2015, Hamzeh was not interested in getting a machine gun. He wasn't interested in September, or October, or November of that year. Even in December, after months of manipulation, with Mike pressing the issue, Hamzeh had no interest. It's only after the full weight of the informants' manipulation and deception had been laid against him that he agreed to appease his friends and get the gun. Those types of circumstances would normally call for a very short sentence, but the Court doesn't have to decide the appropriate sentence in the first instance. Rather, the Court just has to ask whether those circumstances and that crime call for any *more* incarceration. Here, the defense submits it doesn't. The defense also respectfully submits that sweeping Hamzeh back into custody after such a lengthy period in the community demonstrating that he is not a risk to the public would itself be unjust and harsh.

That leaves the final aspect of just punishment: Samy Hamzeh's character, both as it was in 2016 and as it is today. There is a line in the post-arrest interview between Hamzeh and Special Agent Adkins that's worth reflecting on. Adkins told Hamzeh that

everyone makes mistakes, but what's important is what we do about those mistakes as that "says what kind of person we are." Here, that point is telling. Hamzeh first reacted to his mistakes that got him in over his head by stalling and then going to his imam and then angrily denouncing his friends' plans and refusing to be involved with their plans for violence. That's one aspect of the kind of person Samy Hamzeh is—his absolute refusal to engage in any violence. And when arrested, he was cooperative and respectful with agents.

But then, there's the second aspect: how he's changed since his arrest. Over the past six years, he has done everything possible to build a productive, law-abiding life with his family. He is married. He has kids. He has a house. He has a steady job. He has all the markings of a model citizen. In deciding whether more time is necessary to serve as just punishment, the Court has to ask: whether Hamzeh's non-violent gun offense, from six years ago, needs any more incarceration to be imposed on the husband and father described above—the one that is captured so poignantly in the sentencing video. The defense submits there's not. Samy Hamzeh does not need to be returned to prison.

While the defense strongly believes that more custody is inappropriate absent a compelling need that isn't present, if the Court believes otherwise, Hamzeh requests that custody be imposed under house arrest as a condition of supervised release. The same amount of custody could be imposed and Hamzeh would be available to work, provide for his family, and care for his kids. Another reason for crafting the sentence in this fashion is the concern that Hamzeh, based on the sensational nature of the initial allegations, would be sent to a higher security prison where his safety would be in

danger. There's no reason to subject him to that possible risk. Again, Hamzeh does not believe even house arrest is appropriate, but asks the Court to consider that alternative if it's inclined to order additional custody.

## IV. Conclusion

In a case like this, there's a very real and abiding fear that the defense has failed to give the Court all it needs to see what the defense so clearly knows—to see what's so patent and so real—to see that Samy Hamzeh is not the person and never was the person the government made him out to be. He's just not. It took time to develop this case and to present those facts. But they are there and have been before this Court for a long time. But as much as those facts were found in the discovery (and what's not contained in the discovery), the best evidence that Samy Hamzeh is not and was not the person he was painted to be is captured in the sentencing video. Hamzeh's life does not bear the markings of someone who was bent on mass murder; it bears the markings of an immature and insecure young man, who was the victim of his own big mouth and his own cunning friends. And when he matured, he became a responsible and productive adult, the kind of person his background gives every indication he'd be. That person doesn't need to be sent to prison, as a great deal of punishment has already been imposed—by three years of harsh county jail time, house arrest, nearly four years of supervision, publicity, shame, restrictions on his movement, and intense anxiety over his future. It's time to allow him to finally stay with his family and move on from this case. And so, with hesitation and fear that we haven't said enough to convince the Court of that, the defense respectfully submits that a time-served sentence is appropriate.

Dated at Milwaukee, Wisconsin this 18th day of May, 2022.

Respectfully submitted,

/s/      *Craig W. Albee*
Craig W. Albee, WI Bar #1015752
Joseph A. Bugni WI Bar # 1062514
Federal Defender Services
  of Wisconsin, Inc.
411 E. Wisconsin Ave.
Milwaukee, WI  53202
Tel. (414) 221-9900
E-mail:  craig_albee@fd.org

*Counsel for Defendant*, Samy M. Hamzeh