UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

                                                  Case No. 16-cr-21

v.

SAMY HAMZEH,

        Defendant.

## SENTENCING MEMORANDUM

In January 2016, Samy Hamzeh was recorded telling Confidential Human Sources that if they were caught with machineguns, they would get a lenient sentence if they pretended they just "liked" guns—and had not bought the machineguns to commit the mass murder Hamzeh had planned. Hamzeh instructed the Confidential Human Sources that, "Whatever happens" (*i.e.*, if they are caught), they should lie and claim they just "like" weapons and had not acquired them in connection with a mass murder (*i.e.*, in order to "do something" with the guns):

    HAMZEH: Because if we bring a silencer, this will only increase, increase doubts about us.

    Steve: Right...

    HAMZEH: Do you follow me?

    Mike: Um.

Steve: Right.

Hamzeh: As to the weapon. I liked it. I liked to obtain. I mean, whatever happens, I like the weapons and I liked to obtain a weapon.

Steve: Right.

Hamzeh: I got it smuggled, I would be imprisoned for six months rather than being imprisoned because of a silencer for I intended to do something.

Those were Hamzeh's own words about the lies he would tell to get a shorter sentence. And sure enough, those are precisely the lies he told the FBI after he was arrested:

FBI Agent: Why – why the need to buy an automatic weapon? Like, the need to buy one that you press the trigger and bullets come out until you stop pressing the trigger?

Hamzeh: I told you, I like weapons. That's all.

FBI Agent: You like weapons? Okay. All right.

Hamzeh: I like weapons. Like, we tried gun. We did gun. That's why we did the automatic weapon, just to practice and have fun. That's it.

And those are precisely the false claims he made in his PSR objections and will likely make to the Court at sentencing. That he just liked guns, and his illegal acquisition of this machinegun was not connected to any other crime.

That claim is, was, and always has been false.

It is a premeditated false statement that Hamzeh told the CHSs he would make in order to get a shorter sentence. He said this is what he would do, and it is exactly what he is doing.

**Facts**

On January 25, 2016, Samy Hamzeh met two men he thought were illegal arms dealers, in a parking lot. These were two men he had never met before. And Hamzeh gave these strangers every dollar he had on him.

As part of the purchase, Hamzeh also inspected the weapons. He looked at a machinegun with a silencer on it and said, "I like this one actually, I need the silencer." And Hamzeh negotiated for a fully automatic machinegun and a silencer for himself, and a fully automatic machinegun for his friend. From two strangers—two purported illegal arms dealers in a rural Wisconsin parking lot—Hamzeh bought a weapon that, with one pull of the trigger, would spray bullets. Then, the deal done, he picked all those weapons up, and he walked away.

Hamzeh knew what he needed. Because he knew what he intended to do.

What Hamzeh did not know, though, was that despite his best efforts, the FBI was on to him. Even though he would often make his friends turn off their phones and take the batteries out, before talking about his plans to acquire weapons and commit a mass shooting, the FBI was on to him.

Even though he had pretended to try to join the Army and to lead a normal American life—which he said he did "for distraction," for cover, so no one would catch on—the FBI did catch on. Because one of his friends ("Steve") did a truly heroic thing,

3

and came forward to the FBI after Hamzeh started talking about all the horrible things he wanted to do to other people.

In response to Steve's whistleblowing, the FBI told him to go back, ask questions, and find out what Hamzeh was planning. Because the FBI knew that if they did not determine what Hamzeh was planning, they could not stop him from killing people.

And the FBI sent in another cooperator, "Mike," to do the same things. Like Steve, Mike was told to ask questions and play along, to find out what Hamzeh was planning. And these two cooperators did not even know they were both cooperators until a few days before Hamzeh was arrested. They were not working together. They were both just meeting with Hamzeh, reporting back on what he was saying, and often recording the things Hamzeh said.

And from the outset, Hamzeh said he wanted to get machineguns and commit an attack abroad. He also wanted a handgun. But in the first half of the investigation, in the fall of 2015, the cooperators were told, for obvious reasons, to discourage him from getting a weapon of any kind.

But along the way, Hamzeh's focus shifted to committing a mass murder in the United States. So the FBI told Mike that if Hamzeh was dead set on acquiring weapons in order to commit a mass murder, Mike should offer to help him. The FBI determined that in light of Hamzeh's repeated and express wish to commit a mass murder, he could not be allowed to get machineguns on his own.

Mike told Hamzeh that Mike knew arms dealers who could get him automatic weapons if Hamzeh wanted them. And Hamzeh responded "swear"—"swear to God

4

that is true." When Mike says he can get Hamzeh what Hamzeh wants, Hamzeh's enthusiasm was obvious from his words and his laughter. He said, "that's it. It just got flared up."

In December, Hamzeh took his plans underground for a month. The same day he made Mike swear to God that Mike could get him machineguns, Hamzeh also said, "what would I need a machinegun for?" And he stopped talking about the mass murder. So the informants report that back to FBI, and the FBI eases their investigation back. It takes a lot of resources to record Hamzeh's every word with the CHSs, so they dial back the recordings. And things were peaceful.

That peace did not last. By mid-January, Hamzeh's been on YouTube and convinced himself that the Masons are devil-worshippers, such that he has to get machineguns and kill them to protect his community. He called Mike and Steve back to him, he showed them the videos that he had been watching, and he told Mike to follow through and get him those machineguns.

Then Hamzeh went to the Masonic Center, in Milwaukee. A community center that was in an old building a few blocks north of the federal courthouse, and they toured it. They walked around. And people were nice to them. And Hamzeh asked when the meetings were, so he knew when the most people would be trapped inside. And then, in gruesome detail, Hamzeh told the cooperators, the men he did not know were recording him, that they needed to get machineguns and silencers and then go into that building so that they could slaughter people. The older woman at reception, the retiree who walked them around—Hamzeh needed machineguns to spray bullets into them.

5

So, Hamzeh had Mike set up a weapons deal with illegal arms dealers a few days later. And then, when that deal was done, Hamzeh walked off with two machineguns and a silencer. He had taken substantial steps toward the attempted mass murder he had been discussing for months.

Hamzeh wanted machineguns because he needed them in connection with the mass murder. On January 19th, he said:

> HAMZEH: We want two machineguns, you now have one, so we want two more, and we need three silencers, that's it. Find out how much all together these will cost, then we will march.
> ***
> HAMZEH: My dear-- my dear; I swear that if the three of us were to carry machineguns we would finish them off in 10 minutes, so why don't you just be quiet.

And the next day, when Steve presses Hamzeh on this:

> Steve: What are the two weapons that we need?
> HAMZEH: Two Machineguns!
> Steve: Single bullet at a time or what it is called, uh?
> HAMZEH: No, two machineguns [UI].

On January 23rd, he is again crystal clear about why he wants the guns: to murder people.

> HAMZEH: Yeah. So, on our way out – on our way out – don't leave before us, leave after us. You will get us out; you will watch our backs; in case there is someone behind us or something, shoot him. If the coast is clear, leave after us immediately. We will return our weapons here and everything is fine. The moment we exit the back door, take off the skull cap and put it in your pocket and leave. That's it; nothing will happen to us; with the silencers nothing will be heard. The operation will take place inside. *But I want to*

*ensure that everybody dies*, meaning, if anyone lives, he will talk with the police – right away.

Hamzeh wanted the guns to commit a murder. He knew exactly what he was doing. And he had come up with contingency plan lies if he was caught.

On November 12, 2015, before he was arrested, Hamzeh said he had applied to join the U.S. military to cover up his true intentions:

> HAMZEH: The American military. I swear by God. I went and applied for the American military . . . . The officer and I had a chat, and everything was fine. He asked me why and such, and I told him I like to . . . I like to serve in the American military against all the terrorists that are against it. Are you getting me? . . . This is all for distraction.

Then, sure enough, during his post-arrest interview, he said:

> HAMZEH: And I'm telling you if I could – like if you guys want me, I could die for this country. I went to the Army and applied. I applied to the Army. . . . And you can check the Army. And I went there and I talked to them.

And similarly, as quoted in full above, before Hamzeh and the CHSs went ahead and bought the machineguns, Hamzeh gave the CHSs the advice he thought would get them a light sentence if they got caught: just say you "like" guns and would never actually shoot people ("do something") with them. But, of course, that ostensible intention would go without saying for most people, as most people are not actually planning to commit a mass murder. Hamzeh said it – told those CHSs to say it – precisely because it was a lie and needed to be said.

In short: Hamzeh planned a mass murder; acquired the weapons to be used in that murder; and discussed the lies he would tell if he was held to account.

7

Luckily, those lies were recorded, and the Court can rely on those same contemporaneous, candid recordings as it assesses Hamzeh's current, self-serving, contrary representations.

## **Sentencing**

In light of the above, the PSR is correct to find that "there appears to be sufficient reason to believe that the defendant possessed the firearms with the intent that they would be used or possessed in connection with another offense; specifically, assault with intent to commit murder. Pursuant to USSG §2X1.1(a), the base offense level is the base offense level from the guideline for the substantive offense. Therefore, the base offense level is 33 under USSG §2A2.1(a)(1)." PSR ¶46. The PSR is also correct to recommend that "based on statements made by Mr. Hamzeh, it appears the firearms he purchased had the potential of facilitating another felony offense. Therefore, the four-level enhancement is recommended." *Id*. at ¶45.

Hamzeh held the two machineguns and silencers. He had the ability and intention to control them. Hamzeh repeatedly stated that he would not even contest his actual possession of the weapons—both to this court and on appeal. As the Seventh Circuit Court of Appeals described Hamzeh's representation to that court: "As Hamzeh points out, physical possession is not disputed since he will concede that fact at trial." *United States v. Hamzeh*, 986 F.3d 1048, 1054 (7th Cir. 2021) (referring to Hamzeh's repeated affirmations to the Court of Appeals that: "the defendant concedes he possessed the firearm . . .", Hamzeh Appellant Brief at 28; "the defense didn't dispute [that Hamzeh]

possessed" the firearms, *id.* at 28; and "here, Hamzeh's possession is not disputed," *id.* at 29). Because he possessed all three weapons, the PSR is also correct in its finding that "this offense involved two firearms and a silencer, all of which meet the definition of a firearm under 26 U.S.C. §5845(a). Therefore, a two-level increase is appropriate." *Id.* at ¶44.

Hamzeh stated repeatedly in recorded conversations with FBI sources that he wished to murder as many people as possible at the Masonic Center. He then took multiple substantial steps toward committing those murders. Hamzeh toured the Masonic Center in January 2016. Hamzeh then set out whom to murder in what order in the Masonic Center, in graphic, homicidal detail. *See, e.g.*, January 21, 2016 Recording (Hamzeh: "When we first walk in the [Masonic Center] door . . . we will put [masks] on….[and] shoot all those who are closest to us…we will shoot all the people in front of us . if us gets wounded, we will keeping on shooting until we all die . . . Now, for example, I and [Mike] will go to the big meeting room [in the Masonic Center]; we would already have shot the ones downstairs and those at the meeting. We will get inside – we will get inside where they are and before we shoot them we will tell them, 'Take your kids out or they will be killed with you.'" Mike: "If they don't get [the kids] out?" Hamzeh: "If you don't get your kids out, then that is it, there is no other choice – no other choice.").

Hamzeh then drove to a parking lot in rural Wisconsin and purchased an illegal machinegun and silencer from men he believed were illegal arms dealers. Acquiring those weapons was a substantial step toward the mass murder Hamzeh intended to commit. *See Hill v. United States*, 877 F.3d 717, 718 (7th Cir. 2017) (analyzing whether

9

attempted murder under Illinois law qualifies as a violent felony and noting that "one could be convicted of attempted murder for planning [an] assassination . . . and buying a rifle to be used in that endeavor"); *see also United States v. Scognamiglio*, 424 F. App'x 809, 811 (11th Cir. 2011) (affirming district court's application of attempted murder cross-reference at defendant's federal sentencing for unlawful firearms possession, finding that since defendant "ordered a silencer," gave an undercover informant a barrel to be threaded for a silencer, and "traveled to a meeting where he was to pick up the silencer," he had completed the requisite "substantial step"); *Saner v. Nooth*, No. CIV. 07-1196-CL, 2008 WL 5046175, at *9 (D. Or. Nov. 21, 2008) ("petitioner made threats and statements about killing [others], obtained weapons and went searching for them . . . . there is law that indicates this combination of facts constitutes a 'substantial step' for purposes of an attempted murder charge").

And the weapons he acquired were illegal machineguns particularly suited to the crime he intended to commit: a mass murder.

This evidence is all of a piece. A gun nut who just wants to buy a cool-looking gun does not start his foray into gun ownership by buying illegal machineguns and silencers in a parking lot. Surely his foot in the door would be a pistol, a shotgun, a rifle. Those can be bought legally for a few hundred dollars. So it would be easy enough to guess what Hamzeh really wanted the weapons for. But we need not guess. Because Hamzeh told us.

Over and over: he told us wanted machineguns in connection with a mass murder.

And he told us exactly what lies he would tell if he got caught, in order to try get himself a more lenient sentence.

The United States has agreed to recommend a sentence of 60 months of imprisonment and does so here. Hamzeh has committed no new crimes on pretrial release. He has worked, and he has a family. That success is reflected in the government's recommendation.

Every sentencing is a tragedy, particularly in cases in which the defendant has a family. But Hamzeh can no longer claim he was entrapped. And the extraordinarily aggravated nature and circumstances of Hamzeh's offense, the risk he posed to the public, and the need for adequate deterrence demand he serve a term of imprisonment well beyond the time he has already served.

That additional imprisonment will undoubtedly be painful for Hamzeh and his family. But because he bought an illegal machinegun and silencer from men he thought were illegal arms dealers in order to murder members of other people's families, such a term of imprisonment is the absolute minimum necessary to achieve the purposes of sentencing.

The consequences, direct and collateral, of Hamzeh's crimes are deeply sad. But responsibility for them is his and his alone. And without the FBI's diligence and Steve's bravery, those consequences would have been far worse—and they would have been borne by many more innocent people.

Dated at Milwaukee, Wisconsin, this 18th Day of May, 2022.

        Respectfully submitted,

        RICHARD FROHLING
        United States Attorney

By: *s/ Benjamin Taibleson*

        Benjamin Taibleson
        Kevin Knight
        Assistant United States Attorneys
        Eastern District of Wisconsin
        517 East Wisconsin Avenue, Room 530
        Milwaukee, WI 53202
        Telephone: (414) 297-1700
        Fax: (414) 297-1738
        benjamin.taibleson@usdoj.gov